# D
# PART III

1992 WL 470239                                                                          Page 1

1992 WL 470239 (D.Del.), 25 U.S.P.Q.2d 1870

(Cite as: 1992 WL 470239 (D.Del.))

▷

United States District Court, D. Delaware.
DENTSPLY INTERNATIONAL, INC. and
Dentsply Research and Development Corp.,
Plaintiffs,
v.
KERR MANUFACTURING COMPANY,
Defendant.
Civ. A. No. 89-167-JJF.

July 8, 1992.

Henry N. Herndon, of Morris James Hitchens &
Williams, Wilmington, DE, Albert W. Preston, Jr.,
and Dianne B. Elderkin, of Woodcock Washburn
Kurtz Mackiewicz & Norris, Philadelphia, Edward
J. Hanson, Jr., of Denstply Intern., Inc., York, PA,
for plaintiffs.

Robert W. Whetzel, of Richards Layton & Finger,
Wilmington, DE, Sidney David, and Charles P.
Kennedy, of Lerner David Littenberg Krumholz &
Mentlik, Westfield, N.J., for defendant.

MEMORANDUM OPINION

FARNAN, District Judge.

*1 This patent infringement action is before the
Court on post-trial motions following a two week
jury trial, a verdict for the Plaintiff, and the Court's
Final Order of Judgment of October 10, 1991. The
Plaintiffs' motions at issue include a Motion for
Injunctive Relief Under 35 U.S.C. § 283, a Motion
for an Accounting, and a Motion for a New Trial
Limited to the Issue of a Lump Sum Reasonable
Royalty. [FN1] Defendant's motions at issue
include a Motion for Judgment Notwithstanding the
Verdict ("JNOV") and Motion for a New Trial.

FACTUAL BACKGROUND

This is a patent, trademark and trade-dress action
brought by Plaintiffs Dentsply International Inc. and
Dentsply Research and Development Corporation

("Dentsply") against Kerr Manufacturing Company
("Kerr"). Dentsply alleged that Kerr infringed U.S.
Patents No. 4,384,853 ("the '853 patent"), which
described a dental syringe in the shape of a gun;
No. 4,391,590 ("the '590 patent"), which described
plastic tips that fit onto the tip of the dental syringe;
and No. 4,330,280 ("the '280 patent"), which
described the combination of the syringe and tips.
Dentsply also alleged that Kerr had infringed
several of its trademarks and its trade-dress.

At trial the parties focused on two issues. First,
whether the undercut groove element of claim 1 of
'280 and '853 patents also required a snap-fit
portion. Specifically, Kerr argued that the '280 and
'853 patents required that the undercut groove
create a snap-fitting mechanism for the annular
collar of a cartridge that would be inserted into the
syringe. Kerr contended that its syringe did not
contain an undercut groove and therefore could not
have the allegedly required snap-fit mechanism.
Dentsply contended that the patents provided for a
snap-acting mechanism within the side walls of the
syringe which worked to keep the entire cartridge,
and not just the annular collar, in place. Dentsply
argued that the undercut groove was designed only
to prevent axial movement of the annular collar and
not to provide a snap fit for the entire cartridge.
The second issue at trial was whether the prior art
on the '590 patent would have rendered both
versions of the Kerr tip invalid because of
obviousness. Specifically, Kerr argued that the
'590 patent was rendered obvious by the teachings
of the Dragan '399 and '954 patents. Dentsply,
argued that the '590 patent was not obvious in light
of the relevant prior art which did not include the
Dragan '399 and '954 patents.

The jury returned a verdict finding that Kerr
infringed the '853, '590 and '280 patents under the
doctrine of equivalents. Further, the jury found
that Kerr's infringement of the patents was willful.
Finally, the jury awarded Dentsply damages in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1992 WL 470239 (D.Del.), 25 U.S.P.Q.2d 1870

**(Cite as: 1992 WL 470239 (D.Del.))**

amount of a 12% reasonable royalty.

DISCUSSION
A. KERR'S MOTION FOR JNOV

1. *Standard*

The relevant inquiry upon a motion for JNOV is whether, in the court's judgment, the jury's verdict was supported by substantial evidence. *Schering Corp. v. Precision-Cosmet Co., Inc.,* 614 F.Supp. 1368, 1371 (D.Del.1985), *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1571 (Fed.Cir.1986) *citing Shatterproof Glass Corp. v. Libbey-Owens Fork Co.,* 758 F.2d 613, 619 (Fed.Cir.) *cert dismissed* 474 U.S. 976 (1985). "Substantial evidence" has been defined as relevant evidence from the record which, when reviewed as a whole, would reasonably support the jury's finding under review. *Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893 (Fed.Cir.) *cert denied* 469 U.S. 857 (1984). "Substantial evidence" does not refer to the amount of evidence presented to the court but rather to the substance or nature of the evidence and whether that evidence would reasonably support the jury's verdict. *Id.* If the Court finds that substantial evidence reasonably supports the jury's verdict, the motion for JNOV should be denied. Courts are not free to weigh evidence, pass on the credibility of witnesses or substitute the court's judgment of the facts for that of the jury. *Aloe Coal Co. v Clark Equipment Co.,* 816 F.2d 110, 113 (3d Cir.) *cert. denied,* 108 S.Ct. 156 (1987).

**\*2** JNOV is an extraordinary remedy, and should only be granted if allowing the verdict to stand would result in manifest injustice. *Consumers Power Co. v. Curtiss-Wright Corp.,* 780 F.2d 1093 (3rd Cir.1986). The specific grounds for JNOV must have been raised in a motion for directed verdict. *Bonjorno v. Kaiser Aluminum & Chemical Corp.,* 752 F.2d 802 (3rd Cir.1985) *cert denied* 477 U.S. 908 (1986). An objection to a jury instruction, for example, may not be raised for the first time on a motion for JNOV. *Shatterproof Glass Corp.,* 758 F.2d at 619 n. 1.

2. *Discussion*

a. Interpretation of the Claims of the '280 and '853 Patents as to Alleged Requirement That the Undercut Groove Element Include a Snap Fit

Kerr alleges that the language of Claim 1 of both the '280 and '853 patents, the description in the specification, the prosecution history during reexamination and even the testimony of the inventor Mr. Welsh, all support only one interpretation: the undercut groove limitation in all claims at issue requires that the sidewalls of the compartment, which includes the undercut groove, create a snap-fit for the collar of the cartridge. Kerr contends that the jury's finding of infringement under the doctrine of equivalents cannot be supported if the claims are construed to require an undercut grove which creates a snap-fit for the collar because there is no substantial evidence that Kerr's syringes have the equivalent of such an undercut groove.

Dentsply argues, and the Court agrees, that there was substantial evidence to support the jury's interpretation of the claims at issue as not requiring the undercut groove element to include a snap fit. At trial Dentsply admitted into evidence the language of claim 1 which clearly sets forth the function of the undercut groove as being ".... to receive the annular collar on said cartridge to prevent relative axial movement between said cartridge and compartment ..." Pl.Ex. 4, 7, and 8. In addition, at trial Dentsply presented evidence showing that the file history of the claim language had been amended to clarify that the snap-fit mechanism was forward of the groove and not part of the groove. Pl.Ex. 12, p. 442; Pl. Ex 461.

The Court also finds that there was substantial evidence to support the jury's finding that under their interpretation of the claims, Kerr's syringe infringed under the doctrine of equivalents. Mr. Welsh, Dentsply's expert, testified that each of the claim elements of Claim 1 of both the '280 and '853 patents were present in Kerr's products. Tr. at 391, 393. Dentsply presented substantial evidence showing the substantially similar function, way, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1992 WL 470239 (D.Del.), 25 U.S.P.Q.2d 1870

**(Cite as: 1992 WL 470239 (D.Del.))**

result of the component of both versions of Kerr's product that corresponds to the undercut groove found in Claim 1 of both the '280 and '853 patents. Tr. at 389-391; 404-406; 410; 480; 512; 516-518; 522; 526-27; 1043; 1165; 1074-75. Thus the Court finds there was substantial evidence for the jury to find that both versions of the Kerr's product infringed the '853 and '280 patent under the doctrine of equivalents.

b. Scope of the '590 Patent

*3 Kerr alleges that if a wider range of prior art had been used, as it alleges was required, the jury would have found that the '590 patent was obvious. Dentsply argues that the asserted range of prior art was correct and that there was substantial evidence for the jury to find that the '590 patent was valid in view of that prior art.

Kerr argues that when applying the doctrine of equivalents, the so-called "hypothetical claim" should be used. The "hypothetical claim" allows a wider range of prior art to be examined because the scope of the specific claim at issue is expanded so that it could generically cover the product at issue. *See Wilson Sporting Goods v. David Geoffrey & Associates,* 904 F.2d 677, 683 (Fed.Cir.), *cert. denied,* 111A S.Ct 537 (1990). Kerr contends that here the hypothetical claim would have been covered by the prior art taught by the Dragan '399 and '954 patents. Thus, Kerr concludes that the jury's finding of infringement must be vacated because the evidence presented at trial could have led to a finding that the prior art covered the claims at issue.

Dentsply argues, and the Court agrees, that Kerr has misconstrued the standard for JNOV. The Court may only disturb the jury's finding where it concludes that there was no substantial evidence to support their findings. If there was substantial evidence to support either of two conclusions or findings, the Court cannot overturn the jury's choice because such a choice is based on credibility which is a matter resting with the jury.

Here, while there may have been evidence that would support Kerr's theory, Dentsply presented

substantial evidence to support its contention that the claims in issue were not covered by the prior art and that Kerr's products infringed the claims. Specifically, Dentsply presented evidence regarding the following prior art: Dragan '399 patent (Tr. at 762-78); ESPE patent in the name of Purrmann, U.S. No. 3,907,106 (Tr. 779-786); Dragan '954 patent (Tr. at 786-788); S.S. White Capsule (Tr. at 811-12); the 3M capsule and Newby '439 patent (Tr. 812-13); color coding of bulk syringes (Tr. at 823); and the Ivoclar tip (Tr. at 833-34). Dentsply's expert, Mr. Wylie, testified that he had taken into consideration the asserted prior art in forming his expert opinion in which he found infringement of the '590 patent under the doctrine of equivalents. Tr. 1087-1091; 1136-1137. The Court finds that the jury's finding of infringement under the doctrine of equivalents was supported by substantial evidence and thus will not be overturned.

c. Willful Infringement

Kerr asserts that reasonable persons could not have made a finding of willful infringement in this case. Kerr argues that the undisputed evidence at trial was that Kerr had: (1) obtained opinions from qualified patent attorneys; (2) made efforts to design around the patents; and (3) had reasonably relied on its' experts' opinions. Kerr contends that this evidence clearly refutes the jury's finding of willful infringement. Kerr argues that the case law requires the Court to find that the jury incorrectly weighed the credibility of the evidence and then to overturn the jury's finding.

*4 Dentsply argues that Kerr did not move for a directed verdict on this issue at trial and is thus precluded from asserting this objection in post-trial motions. Further, Dentsply contends that it submitted substantial evidence to support the jury's finding of willfulness. Specifically, Dentsply presented evidence concerning the copying of Dentsply's patented products. Pl.Ex. 85, 86, 93, 431; Tr. at 64-69, 210. Dentsply also presented evidence of Kerr's insistence of indemnification by Centrix for infringement. Pl.Ex. 87, 92, and 113. Further, Dentsply's cross-examination of the three patent attorneys who's opinions had been submitted by Kerr may have created some questions as to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1992 WL 470239 (D.Del.), 25 U.S.P.Q.2d 1870

**(Cite as: 1992 WL 470239 (D.Del.))**

credibility of those opinions.

The Court finds that Kerr has misconstrued the JNOV standard by arguing that the Court should overturn a jury's finding that rests upon determinations of credibility. Further, the Court finds that Dentsply presented substantial evidence as cited above from which the jury could have determined that Kerr willfully infringed Dentsply's patents.

B. KERR'S MOTION FOR NEW TRIAL

*Standard*

Motions for new trial are entirely within the district court's discretion. *Gutzan v. Altair Airlines, Inc.,* 766 F.2d 135 (3rd Cir.1985). District courts will generally grant such a motion only if some grievous error occurred during trial which rendered the trial unfair. In addition, some prejudice to the moving party should be shown. *Orthokinetics,* 806 F.2d at 1581-82. Even in the case of grievous error, however, courts are not inclined to grant such motions where the moving party made no effort to bring the alleged error to the Court's attention at the time it occurred. *Shushereba v. R.B. Industries, Inc.,* 104 F.R.D. 524 (W.D.Pa.1985).

Kerr argues that a new trial is warranted on the issue of willful infringement because the jury's findings are against the clear weight of the evidence. Dentsply argues that Kerr is merely re-arguing the facts and that a new trial is not warranted.

As stated above, a court will not grant a motion for a new trial unless there was grievous error which seriously prejudiced the moving party. Here, Kerr has not demonstrated that there was any error nor that Kerr was in any way prejudiced by any alleged error. Thus, the Court concludes that a new trial is not warranted.

C. DENTSPLY'S MOTIONS

1. *Dentsply's Motion for Injunctive Relief*

Dentsply has moved that this Court provide it with injunctive relief under 35 U.S.C. § 283 by enjoining the manufacture, use or sale of tip and/or syringe devices by or on behalf of Kerr which have been found to infringe the ' 280, '853, and '590 patents in suit. Kerr has not opposed Dentsply's Motion.

Section 283 of the Patent Act provides that the Court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283 (1952). One of the most important rights protected by the patent system is the patent owner's right to exclude others from using his or her "idea" without authorization during the seventeen year patent term. A finding of infringement, then, generally entitles the owner to remedies which include the right to prevent the infringer from further use of his property without the proper compensation, i.e., an injunction. *Richardson v. Suzuki Motor Co.,* 868 F.2d 1226, 1247 (Fed.Cir.1989), *cert. den.,* 493 U.S. 853 (1989).

*5 The Court finds that liability has been established against Kerr and thus Dentsply is entitled to injunctive relief. Kerr, its officers, agents, employees and licensee, will be permanently enjoined from continuing to manufacture or have manufactured for, use or sell the Kerr UnidoseTM tip (first version) or syringes which have been found to infringe Claims 1 and 2 of the '590 patent, Claims 1,2,3,4,6,7,9,10,11 and 12 of the '280 and Claims 1, 3, and 4 of the '853 patent.

2. *Motion for an Accounting*

Dentsply contends that now that the jury has awarded it damages in the form of a reasonable royalty on Kerr's devices, the Court should institute an accounting to determine the damages through June 1, 1990. Dentsply contends that under the entire market value rule, the royalty base should include unpatented parts designed for and sold with the patented parts. They also argue that the accounting should cover tips that were manufactured under contract for the Defendant, but

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1992 WL 470239 (D.Del.), 25 U.S.P.Q.2d 1870

**(Cite as: 1992 WL 470239 (D.Del.))**

which were not accounted for as being sold under 35 U.S.C. § 284. Kerr has not opposed Dentsply's Motion.

The Court finds that Dentsply is entitled to an accounting and that such an accounting should include: unpatented parts designed for and sold with the patented parts and tips that were manufactured under contact for the Defendant but which had not been accounted for as being sold under 35 U.S.C. § 284.

3. *Motion for New Trial on Establishment of Lump Sum Reasonable Royalty*

Dentsply contends that the Court's exclusion of its proffered evidence to establish a lump sum reasonable royalty was prejudicial. Specifically, Dentsply contends that it was prejudiced by the Court's ruling that Dentsply was not hurt because it already had presented evidence in support of two other damages theories. Dentsply argues that there is no limitation on the number of legal theories a plaintiff-patentee may advance and thus precluding Dentsply from presenting evidence on the establishment of a lump sum reasonable royalty was error.

Kerr argues that Dentsply was given many opportunities to submit evidence in support of its theories of damages for lost profits and for a reasonable royalty. Kerr contends that Dentsply's paid-up license theory was totally improper as a matter of law and thus the Court correctly ruled such evidence inadmissible. Further, Kerr contends that Mr. Behrmann, Dentsply's expert witness on the paid-up license theory, was not designated in the pretrial order and that Defendant had not been able to depose him on this expert opinion.

As stated earlier, a court will not grant a motion for a new trial unless there was grievous error which seriously prejudiced the moving party. Here, the Court finds that it was not grievous error to exclude Dentsply's further evidence on damages. As Kerr correctly points out, Dentsply had ample opportunity to present evidence on lost profits and a

reasonable royalty. Further, the Court finds that Dentsply was not prejudiced because the jury returned a verdict for Dentsply with a generous damage award consisting of a 12% reasonable royalty. Thus the Court will deny Dentsply's request for a new trial on the issue of establishing a lump sum reasonable royalty.

CONCLUSION

**\*6** For the reasons discussed, the Court will deny Defendant Kerr's Motions for JNOV and New Trial as well as Plaintiff Dentsply's Motion for a New Trial on the Issue of Establishing a Lump Sum Reasonable Royalty. The Court will grant Dentsply's Motion for Injunctive Relief and Motion for an Accounting. The parties shall submit a stipulated Proposed Order no later than Monday, July 20, 1992.

> FN1. Plaintiff also filed a Motion for Attorneys' Fees, and a Motion for Increased Damages, Specifically for Treble Damages, Under 35 U.S. § 284, but the parties have agreed to defer briefing and resolution of those motions until all post-trial and appeal issues have been resolved.

1992 WL 470239 (D.Del.), 25 U.S.P.Q.2d 1870

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2003 U.S. DIST. LEXIS 1445

**HARRY GAUS, Plaintiff,–against–CONAIR CORPORATION, Defendant.**

**94 Civ. 5693 (FM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 1445*

**January 31, 2003, Decided**
**February 3, 2003, Filed**

**DISPOSITION:** [*1] Defendant's motions pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure for judgment as a matter of law and a new trial was denied. Plaintiff's cross-motions for enhanced damages, prejudgment interest, and an injunction was granted to the extent indicated, but his motion for attorney's fees was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff inventor sued defendant hair dryer manufacturer for patent infringement. The jury found in favor of the inventor and awarded compensatory damages. The manufacturer moved for judgment as a matter of law (JMOL) or, in the alternative, for a new trial. The inventor cross-moved for enhanced damages, prejudgment interest, attorney's fees, and injunctive relief.

**OVERVIEW:** The manufacturer was not entitled to JMOL on the inventor's doctrine of equivalents claim because expert testimony on three claim limitations provided sufficient evidence to support the jury's finding. The damage award was justified given that the manufacturer was unable to document the number of infringing hair dryers it had sold, an expert had estimated the number sold, the royalty amount was reasonable and supported by expert evidence, and the evidence supported a finding that the manufacturer knew that it was infringing the patent. The manufacturer was not entitled to JMOL with respect to its claims of patent invalidity as it had not shown that the inventor failed to disclose the best mode, the inventor's patent was anticipated by another patent, or that the patented device was obvious. The manufacturer was not entitled to a new trial because it had not shown any reason for the court to change its rulings regarding the interpretation of a claim limitation and the patent did not contain ambiguous disclaimers or exclusions. The inventor was entitled to enhanced damages, a permanent injunction, and prejudgment interest, but was denied attorney's fees.

**OUTCOME:** The manufacturer's motions for JMOL and a new trial were denied. The inventor's cross-motions for enhanced damages, prejudgment interest, and an injunction were granted, but not for the full amount requested. The inventor's motion for attorney's fees was denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Judgment as Matter of Law*
[HN1] Under Fed. R. Civ. P. 50(b), a party may renew after trial a judgment as a matter of law motion made pursuant to Fed. R. Civ. P. 50(a) before the case was submitted to the jury. In turn, Rule 50(a) requires that such a motion specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

*Civil Procedure > Trials > Judgment as Matter of Law*
[HN2] Trial and appellate courts apply the same standard in reviewing a post–trial judgment as a matter of law motion. Pursuant to that standard, a movant seeking to set aside a jury verdict faces a high bar. As the United States Court of Appeals for the Second Circuit cautions, in deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence. Thus, judgment as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

*Civil Procedure > Trials > Judgment as Matter of Law*
[HN3] A party is generally precluded from filing a post–trial judgment as a matter of law motion on a ground not asserted prior to verdict.

*Civil Procedure > Trials > Judgment as Matter of Law*
[HN4] Denial of a motion for judgment as a matter of

2003 U.S. Dist. LEXIS 1445, *1

law is not always appropriate simply because the grounds set forth in a post–trial motion are more expansive than those advanced during the trial. The United States Court of Appeals for the Second Circuit rejects an attempt to construe Fed. R. Civ. P. 50 narrowly where both sides were well aware of an issue both before and during the trial.

***Civil Procedure > Trials > Judgment as Matter of Law***
[HN5] The United States Court of Appeals for the Second Circuit holds that a defendant who fails to raise the issue of damages in its judgment as a matter of law motion during trial cannot later complain about the jury's findings regarding that issue. Additionally, the Second Circuit rejects a claim that post–trial review of a jury's damages award cannot be waived during a trial because the sufficiency of the evidence underlying the jury's award cannot realistically be evaluated until the verdict is rendered. As the court observes, at the point that the defendant makes its Fed. R Civ. P. 50 motion at trial it is aware of the proof submitted on the issue of damages and therefore can question its sufficiency.

***Civil Procedure > Trials > Judgment as Matter of Law***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > General Overview***
[HN6] A court may consider any issue raised in a judgment as a matter of law motion if necessary to prevent manifest injustice.

***Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > Equivalence***
***Patent Law > Inequitable Conduct > General Overview***
***Patent Law > Claims & Specifications > Claim Language > Elements & Limitations***
[HN7] The doctrine of equivalents requires an element–by–element comparison of the claims of the patented invention to the accused device. Essentially, the finder of fact is asked to consider whether every limitation of the disputed claim has a substantially equivalent element in the accused product. The patent holder must establish that, with respect to each disputed element, the accused product performs substantially the same function, in substantially the same way, to give substantially the same result.

***Patent Law > Ownership > Conveyances > Licenses***
***Patent Law > Ownership > Conveyances > Royalties***
***Patent Law > Remedies > Damages > Measures***
[HN8] The factors a jury should consider in determining the royalty that would have resulted from an arms length negotiation between a patent holder and an infringer include: (1) the royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty; (2) the rates paid by the licensee

for the use of other patents comparable to the patent in suit; (3) the nature and scope of the license, as exclusive or non–exclusive, or as restricted or non–restricted in terms of territory or with respect to whom the manufactured product may be sold; (4) the licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly; (5) the commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter; (6) the effect of selling the patented specialty in promoting sales of other products of the licensee, that existing value of the invention to the licensor as a generator of sales of his non–patented items, and the extent of such derivative or convoyed sales; and (7) the duration of the patent and the term of the license.

***Patent Law > Ownership > Conveyances > Licenses***
***Patent Law > Ownership > Patents as Property***
***Copyright Law > Civil Infringement Actions > Remedies > Damages > Infringer Profits***
[HN9] The factors a jury should consider in determining the royalty that would have resulted from an arms length negotiation between a patent holder and an infringer include: (1) the established profitability of the product made under the patent; its commercial success; and its current popularity; (2) the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results; (3) the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention; (4) the extent to which the infringer has made use of the invention, and any evidence probative of the value of that use; (5) the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions; (6) the portion of the realizable profit that should be credited to the invention as distinguished from non–patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer; (7) the opinion testimony of qualified experts; and (8) the amount that a licensor and a licensee would have agreed upon (at the time the infringement began) if both had reasonably and voluntarily tried to reach an agreement.

***Evidence > Witnesses > Expert Testimony***
[HN10] Pursuant to Fed. R. Evid. 703, experts may base their opinion testimony on facts and data made known to them before trial, which need not be admissible so long as the information is of the type normally relied on by experts in the relevant field.

2003 U.S. Dist. LEXIS 1445, *1

*Evidence > Witnesses > Expert Testimony*
[HN11] Pursuant to Fed. R. Evid. 705, experts may generally also render their opinions without first testifying to the underlying facts or data.

*Evidence > Witnesses > Expert Testimony*
[HN12] If a litigant wishes to attack the assumptions and data underlying an expert's opinion, the appropriate time to do so is during cross-examination.

*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Remedies > Damages > General Overview*
[HN13] To prove willful infringement, and therefore possibly secure punitive damages, a patent holder has to establish by clear and convincing evidence, in view of the totality of the circumstances, that the infringer acted in disregard of the patent and lacked a reasonable basis for believing it had a right to do what it did. The extent to which the infringer disregarded the property rights of the patentee, the deliberateness of the tortious acts, or other manifestations of unethical or injurious commercial conduct are among the factors that the jury may properly consider in resolving this question.

*Civil Procedure > Trials > Judgment as Matter of Law*
[HN14] Under the stringent standard applicable to a Fed. R. Civ. P. 50 motion, a trial court may not weigh the credibility of witnesses or the evidence. Accordingly, judgment as a matter of law should be granted only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
[HN15] Once the United States Patent and Trademark Office issues a patent, the patent is presumed to be valid. This presumption can be rebutted only by clear and convincing evidence.

*Patent Law > Date of Invention & Priority > General Overview*
*Patent Law > Claims & Specifications > Best Mode > General Overview*
[HN16] Under 35 U.S.C.S. § 135, an inventor's patent specification must disclose the best mode contemplated by the inventor of carrying out his invention. Determining whether an inventor complied with this best mode requirement involves a two-step factual inquiry. The first step is to determine whether the inventor had a best mode for practicing his invention at the time he applied for the

patent. This inquiry into the inventor's thoughts is a wholly subjective one. If the inventor in fact had a best mode for practicing the invention, the second step is to make an objective determination whether the best mode was disclosed with sufficient clarity to permit those skilled in the art to practice it.

*Patent Law > Anticipation & Novelty > Elements*
[HN17] If each and every element of a claimed invention is present in a single piece of prior art, the patent is invalid as anticipated.

*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
[HN18] Even if every element cannot be found in prior art, a patent is invalid if the invention would have been obvious to one skilled in the relevant art.

*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
*Patent Law > Nonobviousness > Elements & Tests > Claimed Invention as a Whole*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > General Overview*
[HN19] See 35 U.S.C.S. § 103(a).

*Civil Procedure > Relief From Judgment > Motions for New Trial*
[HN20] When a judgment has yet to be entered, a party's Fed. R. Civ. P. 59(e) motion must be treated as a motion for reargument of the court's prior rulings pursuant to U.S. Dist. Ct., S.D.N.Y., R. 6.3.

*Civil Procedure > Relief From Judgment > Motions for New Trial*
[HN21] Under Fed. R. Civ. P. 59(a)(1), a new trial may be granted in an action tried before a jury for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States. The Rule imposes a lower threshold for the grant of a new trial than Fed. R. Civ. P. 50 does for the grant of judgment as a matter of law because the trial judge may reassess the trial evidence and need not view it in the light most favorable to the nonmovant. Accordingly, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict. Although the trial court has considerable discretion in ruling on a Rule 59(a)(1) motion for a new trial, it ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.

*Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview*

*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Appeals*
[HN22] A patentee who has specifically identified, criticized, and disclaimed a particular structure, cannot invoke the doctrine of equivalents to embrace a structure that was specifically excluded from the claims. As the United States Court of Appeals for the Federal Circuit explains, where such an explicit disclaimer is present, the patentee cannot be allowed to recapture the excluded subject matter under the doctrine of equivalents without undermining the notice function of the patent.

*Patent Law > Remedies > Collateral Assessments > Increased Damages*
*Patent Law > Remedies > Damages > General Overview*
[HN23] Upon a finding of willful infringement, *35 U.S.C.S. § 284* authorizes a court to increase the damages up to three times the amount found or assessed. Whether and to what extent damages should be enhanced is a matter entrusted to the sound discretion of the trial court. A finding of willful infringement does not mandate that damages be enhanced, much less mandate treble damages. By the same token, the finding of willfulness warrants some explanation by the trial court if it declines to enhance damages.

*Patent Law > Remedies > Collateral Assessments > Increased Damages*
*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Appeals*
*Patent Law > Remedies > Damages > General Overview*
[HN24] The United States Court of Appeals for the Federal Circuit sets forth the factors that a court should consider in determining the extent, if any, by which a patent owner's damages should be enhanced. Those factors are: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) any remedial action by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct.

*Patent Law > Remedies > Collateral Assessments > Increased Damages*
*Patent Law > Remedies > Damages > General Overview*
[HN25] The United States Court of Appeals for the Federal Circuit recognizes that a finding of non-literal infringement can change the picture as to willfulness. While it is not a rule of law that infringement that is not literal can never be sufficiently culpable to warrant en-

hanced damages, avoidance of literal patent infringement is a fact to be considered' in determining whether there has been willful infringement.

*Patent Law > Remedies > Collateral Assessments > Increased Damages*
*Patent Law > Remedies > Damages > General Overview*
[HN26] The United States Court of Appeals for the Federal Circuit counsels that any other factor tending to show good faith should be taken into account and given appropriate weight in determining whether an enhancement of damages is appropriate in a patent infringement action. One factor given substantial weight in this analysis is whether the infringer, after having notice, obtained an opinion of counsel.

*Patent Law > Remedies > Collateral Assessments > Increased Damages*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Remedies > Damages > General Overview*
[HN27] To establish good faith in obtaining an opinion of counsel, and thereby avoiding enhanced damages in a patent infringement case, an opinion of counsel need not be legally correct. Indeed, the question arises only where counsel was wrong. Consequently, the inquiry should focus on whether the opinion was thorough enough, as combined with other factors, to instill a belief in the infringer that a court might reasonably hold the patent is invalid, not infringed, or unenforceable. Although written opinions from outside counsel naturally are preferred, it is permissible in some circumstances for a party to rely on an oral opinion or one written by an in-house counsel.

*Patent Law > Remedies > Collateral Assessments > Increased Damages*
*Patent Law > Remedies > Damages > General Overview*
[HN28] A patent owner who successfully establishes a willful infringement of his patent should ordinarily be awarded some amount of punitive damages to deter such misconduct.

*Patent Law > Remedies > Collateral Assessments > Increased Damages*
*Patent Law > Remedies > Damages > General Overview*
[HN29] A review of the case law indicates that in situations involving less than overwhelming evidence of misconduct by an infringer, courts have enhanced damages for patent infringement using multipliers considerably lower than trebling.

*Patent Law > Remedies > Collateral Assessments > Attorney Fees*
[HN30] Under *35 U.S.C.S. § 285,* a court in exceptional cases may award reasonable attorney fees to the prevailing party. Such an award often follows a finding of willful

2003 U.S. Dist. LEXIS 1445, *1

infringement; however, an award of attorney fees is not automatic, even for the exceptional case. The trial judge is in the best position to weigh considerations such as the closeness of the case, tactics of counsel, the conduct of the parties and any other factors that may contribute to a fairer allocation of the burdens of litigation as between winner and loser. Where there has been a finding of willfulness, however, it would be an abuse of discretion for the trial court not to discuss its reasons for declining to award attorney's fees.

***Patent Law > Remedies > Equitable Relief > Injunctions***
[HN31] It is customary to award injunctive relief when there has been a finding of patent infringement. This is so because the heart of the patentee's legal monopoly is the right to prevent others from utilizing his discovery.

***Patent Law > Remedies > Collateral Assessments > Prejudgment Interest***
***Patent Law > Remedies > Damages > General Overview***
[HN32] Under *35 U.S.C.S. § 284*, the court is authorized to award prejudgment interest to make a patent owner whole.

***Patent Law > Remedies > Collateral Assessments > Prejudgment Interest***
***Patent Law > Remedies > Damages > General Overview***
[HN33] Since the purpose of prejudgment interest is compensatory, prejudgment interest should ordinarily be awarded to a patent owner that prevails in an infringement suit. Nevertheless, it may be appropriate to limit prejudgment interest, or perhaps deny it altogether when the patent owner has been responsible for undue delay in prosecuting the lawsuit.

***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview***
***Patent Law > Remedies > Collateral Assessments > Prejudgment Interest***
***Patent Law > Remedies > Damages > General Overview***
[HN34] In the context of a patent infringement action, determining the rate of prejudgment interest and whether it should be compounded are matters entrusted to the discretion of the trial court.

**COUNSEL:** Arthur Beeman, Esq., Susan L. Williams, Esq., Robert H. Eichenberger, Esq., Frost Brown Todd LLC, Louisville, Kentucky, for Plaintiff.

Alan M. Anderson, Esq., Fulbright & Jaworski L.L.P., Minneapolis, Minnesota, for Plaintiff.

John F. Triggs, Esq., Greenberg Traurig, LLP, New York, New York, for Defendant.

**JUDGES:** FRANK MAAS, United States Magistrate

Judge.

**OPINIONBY:** FRANK MAAS

**OPINION:**

### OPINION AND ORDER

**FRANK MAAS,** United States Magistrate Judge.

I. Introduction

This patent infringement suit was brought by Dr. Harry Gaus ("Gaus"), a German inventor, against the Conair Corporation ("Conair"). Following a two–week trial in early January 2002, and several hours of deliberations, the jury returned a verdict in favor of Gaus in the amount of $28.5 million.

Conair has now moved for judgment as a matter of law ("JMOL") under Rule 50(b), or, in the alternative, a new trial [*2] under *Rule 59, of the Federal Rules of Civil Procedure*. Gaus has cross-moved for enhanced damages, prejudgment interest, attorney's fees, and injunctive relief. As set forth below, Gaus's motions are granted in part and denied in part, and Conair's motions are denied. Additionally, the Clerk of the Court is directed to enter a judgment against Conair consistent with this Opinion and Order and close this case.

II. Background

This action arises out of Conair's sale of hair dryers containing a nonresettable device intended to stop the flow of electricity if the dryers become immersed in water. In his complaint, Gaus contends that the accused Conair hair dryers infringed his U.S. Patent No. 4,589,047 (the "'047 Patent" or "Gaus Patent"), entitled "Protective Mechanism In Electrically Operated Devices."

Prior to trial, the Court denied, on various grounds, three motions by Conair seeking summary judgment. See *Gaus v. Conair Corp., 2002 U.S. Dist. LEXIS 104, 2002 WL 15647* (S.D.N.Y. Jan. 4, 2002)(Maas, Mag. J.)("Conair III"); *Gaus v. Conair Corp., 1999 U.S. Dist. LEXIS 16031, 1999 WL 945519* (S.D.N.Y. Oct. 18, 1999)(Duffy, J.)("Conair II"); and *Gaus v. Conair Corp., 1998 U.S. Dist. LEXIS 2339, 1998 WL 92430* (S.D.N.Y. March 3, 1998)(Duffy, J.)("Conair I"). [*3] Familiarity with the facts and these prior decisions is assumed.

III. Discussion

A. Rule 50(b) Motion

1. Applicable Law

[HN1] Rule 50(b) provides that a party may renew

2003 U.S. Dist. LEXIS 1445, *3

after trial a JMOL motion made pursuant to Rule 50(a) before the case was submitted to the jury. *Fed. R. Civ. P. 50(b)*. In turn, Rule 50(a) requires that such a motion "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." *Fed. R. Civ. P. 50(a)*(emphasis added).

[HN2] Trial and appellate courts apply the same standard in reviewing a post-trial JMOL motion. *DiSanto v. McGraw-Hill, Inc./Platt's Div., 220 F.3d 61, 64 (2d Cir. 2000)*. Pursuant to that standard, a movant seeking to set aside a jury verdict faces "a high bar." *Lavin McEleney v. Marist College, 239 F.3d 476, 479 (2d Cir. 2001)*. As the Second Circuit has cautioned:

> In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence. Thus, judgment [*4] as a matter of law should not be granted unless
>
>> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
>>
>> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*DiSanto, 220 F.3d at 64* (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998)*).

2. Compliance with the Rule

Before turning to the merits of Conair's motion, the Court must consider whether Conair has complied with the specificity requirement of Rule 50(a). During the trial, Conair made its JMOL motion at the close of Gaus's direct case and properly renewed it at the close of the evidence and after the jury returned its verdict. As part of these applications, Conair's counsel identified, in summary fashion, five alleged grounds for relief: (a) Gaus's failure to disclose the "best mode" for practicing his invention; (b) Gaus's failure to comply with the "all elements rule;" (c) Gaus's failure to specify the location [*5] of the device, which Conair contends is an essential element of his in-

vention, (d) "defenses in connection with specification estoppel;" and (e) anticipation and obviousness. (Tr. 830–32, 1456–58, 1614).

In its post-trial JMOL motion papers, in addition to these grounds, Conair seeks to overturn the jury's special verdicts relating to damages, wilfulness, and the doctrine of equivalents. (Conair JMOL Mem. at 1–2). Gaus contends that Conair has waived the right to rely on these grounds as bases for its JMOL motion because they were not specifically identified at trial. (Gaus JMOL Mem. at 3–4).

"The purposes of the specificity requirement 'are twofold: (1) to assure that the trial court has an adequate basis for its decision; and (2) to afford the adverse party the opportunity to correct any possible infirmities in the proof submitted.'" *Gordon v. County of Rockland, 110 F.3d 886, 887–88 n.2 (2d Cir. 1997)*(quoting 5A Moore's Federal Practice P 50.04); see also *Lambert v. Genesee Hosp., 10 F.3d 46, 54 (2d Cir. 1993)*("the specificity requirement is obligatory and ensures that the other party is made aware of the deficiencies in proof that may have [*6] been overlooked"). Thus, [HN3] a party is generally precluded from filing a post-trial JMOL motion on a ground not asserted prior to verdict. See *Doctor's Assocs., Inc. v. Weible, 92 F.3d 108, 112 (2d Cir. 1996)*.

However, [HN4] denial of a motion for JMOL is not always appropriate simply because the grounds set forth in a post-trial motion are more expansive than those advanced during the trial. For example, in Gordon, an additional issue was raised by the district judge, rather than the defendant, during the Rule 50(a) colloquy. *Gordon, 110 F.3d at 887–88 n.2*. The Second Circuit nevertheless rejected an attempt to construe Rule 50 narrowly because both sides "were well aware" of the issue both before and during the trial. Id.

Similarly, in this case, Gaus can scarcely claim to have been blindsided by Conair's post-trial arguments with respect to the doctrine of equivalents. Indeed, Conair's liability under the doctrine of equivalents has been the central issue in this case since Judge Duffy determined in Conair I that Gaus's patent was not literally infringed. Also, although Conair did not specifically cite the doctrine of equivalents during the [*7] trial as the basis for its Rule 50 motion, it did challenge the adequacy of the proof under the related "all elements rule." Accordingly, because Gaus must have been fully aware of Conair's intent to rely on the doctrine of equivalents as a basis for its JMOL motion, I decline to find that this ground for JMOL has been waived.

Turning to damages and wilfulness, Gaus is correct that Conair failed to preserve its objection with respect to

these issues. In *Cruz v. Local Union No. 3 IBEW, 34 F.3d 1148, 1155 (2d Cir. 1994),* [HN5] the Second Circuit held that a defendant who fails to raise the issue of damages in its JMOL motion during trial cannot later complain about the jury's findings regarding that issue. Additionally, the court rejected the defendant's claim that post-trial review of a jury's damages award cannot be waived during a trial because the sufficiency of the evidence underlying the jury's award cannot realistically be evaluated until the verdict is rendered. As the court observed, at the point that the defendant made its Rule 50 motion at trial it "was aware of the proof submitted on the issue of damages" and therefore could have questioned its sufficiency. [*8] Id.

At trial, Conair's initial Rule 50 motion was made immediately after Gaus's economics expert testified about the extent of Gaus's monetary damages. By that time, as in *Cruz,* Conair was fully aware of Gaus's proof with respect to the issue of damages and could have challenged its sufficiency in the JMOL motions it made during trial. Gaus also had devoted much of his direct case to proving wilfulness on the part of Conair. Nevertheless, despite that focus, Conair failed to voice any complaints about the adequacy of Gaus's proof of wilfulness in its Rule 50 motions at trial. See *Nestier Corp. v. Menasha Corp.-Lewisystems Div., 739 F.2d 1576, 1580 (Fed. Cir. 1984)*(declining to review the jury's findings with respect to wilfulness in light of the appellant's failure to list it as a ground for relief at the close of all the evidence).

Accordingly, on this record, the Court could treat the sufficiency of Gaus's evidence with respect to wilfulness and damages as issues which were waived by Conair's failure to raise them prior to the jury's verdict. I am mindful, however, that the jury's damages award — even in the absence of any enhancement for wilfulness — [*9] is exceptionally large. See Jerry Markon, Conair Faces Hair-Raising Damage Award, The Wall Street Journal, Mar. 19, 2002, at B1 (noting that the Gaus verdict, if trebled, "would be one of the largest damage awards in recent years in [the patent field]"). Accordingly, I have chosen to address each of the issues raised in Conair's post-trial briefing concerning its Rule 50 motion. See *Baskin v. Hawley, 807 F.2d 1120, 1134 (2d Cir. 1986)*(court [HN6] may consider any issue raised in a JMOL motion if necessary to "prevent manifest injustice"). Gaus can claim no prejudice as a consequence of this review because, as shown below, the evidence at trial with respect to the contested issues of damages and wilfulness was more than sufficient to support the jury's verdict.

3. Doctrine of Equivalents

In *Conair I,* Judge Duffy granted Conair partial summary judgment with respect to Claim 12 of the Gaus Patent, finding that the "housing" limitation of that claim was not literally infringed. Nevertheless, Judge Duffy permitted the case to move forward under the doctrine of equivalents based upon his finding that "Gaus has met his required burden and shown through his expert [*10] that material issues of fact exist as to not only the structure of Conair's device but also to its function." *Conair I, 1998 U.S. Dist. LEXIS 2339, 1998 WL 92430,* at *4. Although the same expert testified on Gaus's behalf at trial, Conair continues to maintain that the evidence before the jury did not permit a reasonable juror to find liability under the doctrine of equivalents.

[HN7] The doctrine of equivalents requires an element–by–element comparison of the claims of the patented invention to the accused device. See *Kahn v. Gen. Motors Corp., 135 F.3d 1472, 1478 (Fed. Cir. 1998).* Essentially, the finder of fact is asked to consider whether every limitation of the disputed claim has a substantially equivalent element in the accused product. Id. The patent holder must establish that, with respect to each disputed element, the accused product performs "substantially the same function, in substantially the same way, to give substantially the same result." *Conair I, 1998 U.S. Dist. LEXIS 2339, 1998 WL 92430,* at *3 (quoting *Hormone Research Found., Inc. v. Genentech, Inc., 904 F.2d 1558, 1564 (Fed. Cir. 1990)).* Accord *Overhead Door Corp. v. Chamberlain Group, Inc., 194 F.3d 1261, 1270 (Fed. Cir. 1999).* [*11]

At trial, Dr. LeRoy Silva, a retired professor of electrical engineering, testified on behalf of Gaus that each of the three disputed limitations of Claim 12 of the '047 Patent was present, either literally or under the doctrine of equivalents, in the accused Conair hair dryers. First, with respect to the housing limitation of Claim 12, Dr. Silva testified that the housing in the Conair device, which is unitary with the power cord, served substantially the same function, in substantially the same way, with substantially the same result as the housing encasing the electric components and switching arrangement in the patented invention. (Tr. 609–11). Dr. Silva further testified that the R–3 resistor in the accused device would be considered a "fusible member" by one skilled in the relevant art and the substantial equivalent of the "fusible electrically conductive member" described in Claim 12 of the Gaus Patent. (Id. at 597–602). As he explained, the introduction of water into both the patented invention and the Conair hair dryers would generate a current that caused the fusible member to explode. (Id. at 597–98). This, in turn, would allow contacts which were normally closed [*12] to open in both the claimed invention and the accused device. (Id. at 598–99). Finally, Dr. Silva testified that Conair's accused devices contain the substantial equivalent of a "pair of spaced-apart electrically-exposed

2003 U.S. Dist. LEXIS 1445, *12

conductive probe networks" because Claim 12 imposes no requirement that the pair of networks be independent of the voltage-carrying circuitry. (Id. at 602–03).

Dr. Silva's testimony, if accepted by the jury, was sufficient to sustain the jury's verdict, but it was not the only evidence in the record supporting a claim of infringement by equivalents. Dr. Arden Sher, Conair's own expert and former employee, admitted at trial that the sense wire in Conair's accused device would not function in the intended manner unless it was paired up with (i.e., connected to) the hot phase line. (Id. at 1196). This gave greater credence to Gaus's contention that the Conair device contained the substantial equivalent of the "pair of spaced apart electrically exposed probe networks" limitation found in Claim 12. During his testimony, Dr. Sher also conceded that if the word "pair" in the "pair of probe networks" limitation were construed to mean two corresponding parts used [*13] together, as in a "pair of pants," his opinion that this element was not found in the accused device would be undermined. (Id. at 1195–96). This construction, of course, is precisely what Judge Duffy concluded the term "pair" meant when he was asked to construe it in Conair I. See *Conair I, 1998 U.S. Dist. LEXIS 2339, 1998 WL 92430,* at *3. Richard Shoemaker, a former Conair engineer subpoenaed by Gaus, also conceded at trial that the hot phase line in the accused Conair hair dryers would be "electrically" the same as a second sense wire if the hot phase line were extended and water then entered the device at that point. (Id. at 420–21).

In sum, the testimony of Dr. Silva, supplemented by this additional testimony, plainly permitted a reasonable juror to find in Gaus's favor with respect to the issue of infringement by equivalents.

4. Damages

At trial, Gaus's economics expert, Geoffrey Osborne, testified, on the basis of his review of extensive Conair records, that Conair sold 77 million infringing hair dryers over a period of approximately nine years. (Id. at 747). Dr. Osborne also testified that a royalty of 37 to 44 cents per unit would have been appropriate for the lawful [*14] use of Gaus's invention in those hair dryers. (Id.). In its verdict, the jury awarded Gaus $28,500,000, a sum which it apparently calculated by multiplying 77 million hair dryers by a royalty of 37 cents per unit. (Id. at 1611). Conair contends that both of these figures are grossly inflated. n1 (Conair JMOL Mem. at 5–13).

n1 In his post-trial submissions, Gaus challenges Conair's assumption that the jury necessarily adopted his expert's figures in arriving at its verdict. (Gaus JMOL Mem. at 5). The jury could, of course, have applied a higher royalty rate to

a smaller number of units to arrive at its award. However, the sale of 77 million infringing units at a royalty rate of 37 cents per unit would result in damages of $28,490,000, a sum which is within $10,000 of the jury's actual award. For that reason, I have adopted Conair's assumptions concerning the basis of the jury's verdict for purposes of the analysis set forth below. Gaus is, of course, entitled to prevail if there is any factual theory supported by the evidence which would have permitted the jury to award him the amount that it did.

[*15]

a. Number of Units

Dr. Osborne testified that he and his staff reviewed some 42,000 Conair documents in an effort to determine the number of infringing devices sold by Conair. (Tr. 740). Working with the model numbers of the hair dryers identified by Conair as incorporating a nonresettable IDCI, n2 Dr. Osborne at first concluded that Conair had sold a total of 49 million infringing hair dryers. (Id. at 781). Subsequently, through the report of Conair's own damages expert, Dr. Osborne learned that certain model numbers which used the nonresettable IDCI technology had not been included on Conair's original list of its potentially infringing hair dryers. (Id. at 782, 824–25). After incorporating the records regarding these additional models into his calculations, Dr. Osborne concluded that Conair had sold 77 million infringing devices. (Id. at 782–83).

n2 IDCI refers to an "Immersion Detector Current Interrupter." It is a "device intended to be used with electric appliances and designed to interrupt circuit to the load when an appliance is unintentionally immersed in water." Mark C. Ode, The Differences Between GFCI, IDCI, and GFPE, Electrical Contractor Magazine (Feb. 2001); available at http://www.ul.comregulators/ode/0201.pdf.

[*16]

Conair contends that the dramatic increase in Dr. Osborne's estimate of the number of infringing devices sold is the result of inappropriate double counting. (Conair JMOL Mem. at 6–7). At trial, through the testimony of John Mayorek, one of its senior vice–presidents, Conair sought to show that it had at times inventoried under a single model number hair dryers that incorporated more than one type of circuit interruption device. (Tr. 1227–29). As Mayorek explained, as a result of this error, certain of the hair dryers identified on Conair's lists contained a non-infringing competing technology known as an ALCI. n3 Conair further contended that all of its hair dryers con-

taining nonresettable IDCIs were manufactured in Costa Rica. Accordingly, in its view, Dr. Osborne should have incorporated into his calculations only the considerably smaller number of hair dryers manufactured there. (Id. at 1229-32). Mayorek testified that Conair had manufactured approximately 46 million IDCI plugs in Costa Rica during the relevant time period. (Id. at 1232). Since each infringing device necessarily used an IDCI plug, Mayorek testified — and Conair urged the jury to find — that a maximum [*17] of 46 million infringing hair dryers were manufactured. (Id.).

> n3 ALCI refers to an "Appliance Leakage Current Interrupter." "It is a device intended to be used in conjunction with an electrical appliance and is designed to interrupt the circuit when a ground fault current exceeds 6 milliamps." See Ode, supra.

Conair actually made several attempts over time to quantify its sales of hair dryers that employed nonresettable IDCIs. (See Docket No. 76 (Discovery Order dated July 7, 2000)). Eventually, however, Conair concluded that it could not use its own hair dryer inventory records to determine the correct number of units. (Tr. 828-29). Indeed, Richard Margulies, Conair's vice-president and general counsel, conceded in both a pretrial affidavit and at trial that Conair believed that it was impossible to determine the number of potentially infringing hair dryers "with a reasonable degree of ... accuracy without doing the type of cross-checking apparently done by [Gaus]." (Id. at 1278).

On [*18] this record, a reasonable juror could have concluded that the correct number of infringing devices was 46 million, or 77 million, or possibly some number in between. Although the jury was not asked to specify the number of infringing units in its verdict, it appears to have credited Dr. Osborne's revised calculations. (See n.1, supra). This is scarcely surprising since (i) Margulies conceded that Conair could not derive the correct number from its own inventory records without replicating Dr. Osborne's work (Tr. 1278); (ii) Conair did not dispute this aspect of Dr. Osborne's damages calculation during its summation (id. at 1518-46); and (iii) the jury was instructed (without objection) that it had to resolve any doubts as to the extent of Gaus's damages against Conair. (Id. at 1511). This aspect of Conair's Rule 50 motion consequently is meritless. n4

> n4 Conair's papers suggest that Gaus caused the Court to rule erroneously against the admission of a Conair summary exhibit setting forth the number of IDCI plugs manufactured in Costa Rica. (Conair JMOL Mem. at 7-8). In fact, the Court simply re-

quested that the foundation for the admission of the exhibit be supplemented. (Tr. 1232). Thereafter, Conair introduced testimony concerning the number of such plugs without making a further attempt to introduce the summary. (Id. at 1232-38).

[*19]

### b. Reasonable Royalty

Conair and Gaus agree that the factors that the jury had to consider in determining the royalty that would have resulted from an arms length negotiation between Gaus and Conair at the outset of Conair's allegedly infringing activities are set forth in Judge Tenney's decision in *Georgia-Pacific Corp. v. U.S., 318 F. Supp. 1116 (S.D.N.Y. 1970).* n5

> n5 [HN8] These factors are: (1) the royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty; (2) the rates paid by the licensee for the use of other patents comparable to the patent in suit; (3) the nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold; (4) the licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly; (5) the commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter; (6) the effect of selling the patented specialty in promoting sales of other products of the licensee, that existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales; (7) the duration of the patent and the term of the license; [HN9] (8) the established profitability of the product made under the patent; its commercial success; and its current popularity; (9) the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results; (10) the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention; (11) the extent to which the infringer has made use of the invention, and any evidence probative of the value of that use; (12) the portion of the profit or of the selling price that may be customary in the particular business or

in comparable businesses to allow for the use of the invention or analogous inventions; (13) the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer; (14) the opinion testimony of qualified experts; (15) the amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement. *Georgia-Pacific, 318 F. Supp. at 1120.*

[*20]

During his direct examination, Dr. Osborne discussed each of those factors, highlighting three reasons why Gaus would have been in a strong negotiating position in 1991. First, Underwriters Laboratories ("UL") had set a January 1, 1991 deadline for the introduction of technology to protect users of hair dryers from electrical shock. (Tr. 496, 509, 772-73, 1242). Second, although ALCI technology was also available, through the sale of hair dryers containing an IDCI, Conair was able to realize profits per unit ranging from approximately $4.19 to $5.00, some 74 cents higher than its profit per unit on the sale of ALCI hair dryers. (Id. at 774-75, 777). Third, Conair's own documents indicated that Conair had considered paying a royalty in the range of 45 to 50 cents per unit to two other patentees in 1991 in exchange for a license to use their ALCI technologies. (Id. at 778).

Although Dr. Osborne considered these factors to be of primary importance, he addressed each of the Georgia-Pacific factors during his testimony, ultimately concluding that a hypothetical negotiation between Conair and Gaus in 1991 would have led to a nonexclusive license to use the invention disclosed [*21] in the '047 Patent in exchange for a royalty in the range of 37 to 44 cents per unit. (Id. at 780).

Conair contends that the analysis underlying this royalty estimate is plagued by faulty or unsupported assumptions. For example, Conair complains that Dr. Osborne failed to explain how he determined the profits that Conair allegedly had realized as a result of its sale of hair dryers incorporating the nonresettable IDCI. (Conair JMOL Mem. at 9). Conair also objects that Dr. Osborne failed to provide any evidentiary foundation for his hearsay testimony concerning the 45 to 50 cent royalty that Conair allegedly had considered paying for a license to use ALCI technology. (Id. at 10).

Arguments such as these ignore the substantial leeway that expert witnesses are accorded under the Federal Rules of Evidence. [HN10] Pursuant to Rule 703, experts may base their opinion testimony on facts and data made known to them before trial, which need not be admissible so long as the information is of the type normally relied on by experts in the relevant field. *Fed. R. Evid. 703.* [HN11] Pursuant to Rule 705, experts may generally also render their opinions "without first testifying to the underlying facts [*22] or data." *Fed. R. Evid. 705.* [HN12] If a litigant wishes to attack the assumptions and data underlying an expert's opinion, the appropriate time to do so is during cross-examination. See, e.g., *Herrick Co., Inc. v. Vetta Sports, Inc., 1998 U.S. Dist. LEXIS 14544, 1998 WL 637468,* at *3 (S.D.N.Y. Sept. 17, 1998)(Patterson, J.)(Rules 703 and 705 "place the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross examination")(quoting *Smith v. Ford Motor Co., 626 F.2d 784, 793 (10th Cir. 1980)).* Here, Conair's counsel did that during his cross-examination of Dr. Osborne regarding his royalty estimate. (See Tr. 785-99). The fact that the jury evidently sided with Dr. Osborne, rather than Conair's own expert, is not a basis to set aside the jury's verdict.

Conair also suggests that a royalty of 37 cents per unit is clearly excessive because it is three times greater than the rate set forth in what Conair considers the only relevant comparables: the license agreement between Leviton and Conair regarding the nonresettable IDCI that gives rise to the claims in this suit; and a nonexclusive [*23] license agreement between Gaus and Krups, a German appliance manufacturer. (Conair JMOL Mem. at 9-11). During his testimony, however, Dr. Osborne explained why he had accorded these licenses only minimal weight. With respect to Krups, Dr. Osborne explained that, by the time the nonexclusive license was entered into, the German government had decided that only the wiring of homes needed to contain circuit interruption protective devices. (Tr. 753-54). Krups consequently had a diminished need for Gaus's patented technology. n6 Similarly, when the Leviton/ Conair agreement was being negotiated, Leviton was not in a position to offer Conair any patented technology. (Id. at 756). Here, by comparison, Conair faced a deadline to provide circuit interruption technology in its hair dryers and the solution that Gaus suggested was protected by a United States patent. As Dr. Osborne indicated, these factors both suggest that a reasonable royalty for Gaus's patent-protected technology in 1991 would have been higher than Conair's suggested "comparables."

n6 At an earlier stage, Gaus granted Krups an exclusive license at a royalty rate of 24 cents per unit. (Tr. 752). As Dr. Osborne testified, at the time that this license was negotiated, Gaus had not yet

2003 U.S. Dist. LEXIS 1445, *23

patented his invention and it was unclear whether the German government would require that hair dryers contain safety protection devices. (Id. at 753–54).

[*24]

Accordingly, there is no basis for Conair's contention that the evidence supporting Gaus's royalty rate was insufficient to permit a reasonable juror to find in its favor.

5. Wilfulness

[HN13] To prove willful infringement, and therefore possibly secure punitive damages, Gaus had to establish "by clear and convincing evidence[,] in view of the totality of the circumstances, that [Conair] acted in disregard of the ['047] Patent and lacked a reasonable basis for believing it had a right to do what it did." Amsted Inds. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 181 (Fed. Cir. 1994)(citing Am. Med. Sys., Inc. v. Med. Eng. Corp., 6 F.3d 1523, 1530 (Fed. Cir. 1993)). "The extent to which the infringer disregarded the property rights of the patentee, the deliberateness of the tortious acts, or other manifestations of unethical or injurious commercial conduct" are among the factors that the jury may properly consider in resolving this question. Hoechst Celanese Corp. v. BP Chemicals Ltd., 78 F.3d 1575, 1583 (Fed. Cir. 1996)(internal citations omitted).

The evidence at trial showed that Conair invited Gaus to Stamford, Connecticut, [*25] where its offices were located, shortly after the manufacturing of the accused hair dryers commenced. (Tr. 187, 192–94). During the course of this visit, Conair officials spoke with Gaus about the possibility of securing a license for his patented IDCI technology. (Id. at 194–95). As part of these discussions, Lauren Frazier, the director of research and development at Conair, at one point conceded to Gaus that "we may infringe your patent by a device that we have." (Id. at 201). Six days later, Lee Rizutto, Jr., the vice president for new products at Conair (and the son of Conair's owner), informed Gaus's business partner, Manfred Grove, that Conair was interested in entering into an exclusive arrangement to use Gaus's patented technology. (Id. at 208).

Following the Connecticut meeting, Gaus inspected five samples of the Conair IDCI supplied to him by Frazier, concluding that they did, in fact, infringe the '047 Patent. (Id. at 210–211). Over the next five months, Gaus and Grove notified Conair on several occasions that they believed Conair was infringing the patent. (Id. at 212, 442–48). In response to these communications, a meeting eventually was scheduled [*26] so that Gaus and Grove could discuss their claim of infringement with representatives of Leviton Manufacturing Company, the

entity that had supplied Conair with its IDCI technology pursuant to a license agreement requiring Leviton to hold Conair harmless in the event of patent infringement claims by third parties such as Gaus. (Id. at 448–50, 492–96). Paul Sutton, an attorney representing Leviton, made the arrangements for that meeting, but thereafter failed to appear when it was held. (Id. at 449, 451–52). When Grove inquired in or around November 1991 about Sutton's failure to attend the meeting, Sutton told Grove, "good luck suing us." (Id. at 452).

As Gaus's counsel effectively argued in summation, this evidence would permit a finder of fact to infer that Conair knew it was infringing the Gaus Patent but decided to manufacture the accused hair dryers so that it could meet consumer demand while still complying with the new UL requirements. (Id. at 1547, 1553–54). To be sure, other evidence in the record would support the contrary inference that Conair may, in fact, have been proceeding in good faith. Thus, there was no showing at trial that Conair or Leviton had [*27] purposely copied the Gaus Patent. Moreover, the notion that Conair must have acted wilfully is somewhat further attendated by Judge Duffy's finding that this is not a case of literal infringement. See Conair I, 1998 U.S. Dist. LEXIS 2339, 1998 WL 92430, at *3–*4. Finally, although Gaus contends that it is plainly insufficient, Conair obtained an opinion letter from Paul Sutton, Leviton's counsel, indicating that the accused hair dryers did not infringe the '047 Patent. (See Tr. 938–40; Conair Ex. F2 (Letter from Paul J. Sutton, Esq., to James N. Pearse of Leviton, dated Dec. 2, 1991 ("Sutton Opinion Letter")); Gaus JMOL Mem. at 16–17).

[HN14] Under the stringent standard applicable to a Rule 50 motion, a trial court may not "weigh the credibility of witnesses or the evidence." Phillips v. Bowen, 278 F.3d 103, 108 (2d Cir. 2002). Accordingly, JMOL should be granted "only where there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture or ... [there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [*28] him.'" Id. (quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992)). Here, as noted above, the jury could reasonably have found for either side with respect to the issue of wilfulness. Indeed, if the jury believed, as Gaus urged, that the Sutton opinion letter was a sham, it could easily have concluded that Conair and Leviton knowingly acted together to infringe the '047 Patent. There consequently is no basis for the Court to overturn the jury's finding of wilfulness.

6. Invalidity

Conair's final basis for seeking JMOL is that the '047

Patent allegedly is invalid because it (a) fails to disclose the best mode, (b) was anticipated by U.S. Patent No. 4,103,319, issued to Robert N. Crain and others (the "Crain Patent"), and (c) was obvious in light of the prior art. (Conair JMOL Mem. at 34–37). As Conair acknowledges, [HN15] once the Patent and Trademark Office issues a patent, the patent is presumed to be valid. See *Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997)*. This presumption can be rebutted only by clear and convincing evidence. *Nupla Corp. v. IXL Mfg. Co., Inc., 114 F.3d 191, 192 (Fed. Cir. 1997)* [*29] (citing *Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1375 (Fed. Cir. 1986))*.

a. Best Mode

[HN16] Title *35, United States Code, Section 135* requires that an inventor's patent specification disclose "the best mode contemplated by the inventor of carrying out his invention." Determining whether an inventor complied with this "best mode requirement" involves a two-step factual inquiry. *U.S. Gypsum Co. v. National Gypsum Co., 74 F.3d 1209, 1212 (Fed. Cir. 1996)*. The first step is to determine whether the inventor had a best mode for practicing his invention at the time he applied for the patent. Id. (citing *Chemcast Corp. v. Arco Indus. Corp., 913 F.2d 923, 927–28 (Fed. Cir. 1990))*. This inquiry into the inventor's thoughts is a wholly subjective one. Id. (citing *Chemcast, 913 F.2d at 928)*. If the inventor in fact had a best mode for practicing the invention, the second step is to make an objective determination whether the best mode was disclosed with sufficient clarity to permit those skilled in the art to practice it. Id.

Conair argues that Dr. Gaus failed to disclose [*30] the best mode by failing to disclose the material that he preferred for the fusible wire in his invention. (Conair JMOL Mem. at 35–36). The only material mentioned in the specification of the '047 Patent is "phosphur [sic] bronze," which is described as a "particularly suitable material for such wires." (Gaus Ex. 106 ('047 Patent) at 4183, col. 6, 11, 32–33). When Gaus was shown an entry in his laboratory notebook that appeared to address the fusing response time of two other materials, Nivaflex, a tungsten alloy, and Isaohm, a copper nickel alloy, he conceded that these were his "favorites." (Tr. 272, 279). On the basis of the notebook entry and that testimony, Conair contends that by disclosing phosphor bronze, but not the other metals, Gaus failed to disclose the best mode. (Conair JMOL Mem. at 35–36).

This argument has several flaws. First, as Gaus explained at trial, his statement concerning the use of phosphor bronze was made in connection with Figure 3 of the '047 Patent, which related to a protective device for small appliances, such as an electric shaver. (Id. at 165). Thus,

the mention of phospur bronze was made in connection with an embodiment of the invention which [*31] was not within the scope of Claim 12 of the Gaus Patent. Gaus never testified that phosphor bronze was his best mode for any embodiment of Claim 12.

Additionally, Gaus testified that the purpose of his invention was to shut off an appliance, in conformity with the UL standard, within 25 milliseconds after water had entered. (Id. at 385). Through the calculations in his notebook concerning Nivaflax and Isaohm, Gaus discovered that the difference in the fusing times between different metals actually had only a negligible effect on the total time required for the device to shut off the flow of current. (Id. at 387). The speed with which those metals fused consequently was not a critical factor in selecting a material for the resistor. Rather, as Gaus explained, to determine what material was appropriate a user would have to consider such other factors as availability and cost. (Id.). Even if Gaus's testimony could be read to suggest that Nivaflax and Isaohm were two suitable materials for the fusible member described in Claim 12, Conair has not shown by clear and convincing evidence that he considered them the "best mode" at the time that he applied to the '047 Patent. [*32]

b. Anticipation

[HN17] If each and every element of a claimed invention is present in a single piece of prior art, the patent is invalid as "anticipated." *Rockwell Int'l Corp. v. U.S., 147 F.3d 1358, 1363 (Fed. Cir. 1998)*. Conair contends that the '047 Patent was anticipated by the Crain Patent. (Conair JMOL Mem. at 37). On cross examination, however, Conair's own expert, Dr. Sher, conceded that the electrical contacts in the Crain Patent, unlike those disclosed in the Gaus Patent, were not normally closed, and that the fusible element was not associated with keeping them closed. (Tr. 1206–07). Gaus's expert, Dr. Silva, also testified concerning the differences between the inventions described in the Crain and Gaus Patents. (Id. at 619–625). In light of this testimony, Conair plainly cannot show by clear and convincing evidence that the Gaus Patent was anticipated by the Crain Patent.

c. Obviousness

[HN18] Even if every element cannot be found in prior art, a patent is invalid if the invention would have been "obvious" to one skilled in the relevant art. *Rockwell, 147 F.3d at 1364*. As Title 35, Section 103(a), of the United States Code states: [*33]

[HN19]

a patent may not be obtained ... if the differences between the subject matter sought to

be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made.

At trial, Conair's expert. Dr. Sher, opined that the '047 Patent was obvious to one skilled in the art. (Tr. 1161). More specifically, he testified that all of the important features of the '047 Patent could be found in two previous patents, the Gilardoni Patent (U.S. Patent No. 4,270,158) and the Gould Patent (U.S. Patent No. 3,629,766). (Id. at 1166–67). According to Dr. Sher, a person skilled in the art would know that the device embodied in the '047 Patent could be created by combining attributes of these two inventions. (Id. at 1167–68).

Dr. Sher's testimony was contested by Gaus's expert, Dr. Silva, who testified extensively about the numerous differences between Claim 12 of the '047 Patent and the Gilardoni and Gould Patents. (Id. at 631–40). He also testified that if the Gilardoni and Gould references were combined, the resulting device would be different than the invention described in Claim 12 of the '047 Patent and, perhaps [*34] more importantly, that it would not work. (Id. at 640–41).

In light of this testimony, Conair cannot show that it is entitled to JMOL with respect to its obviousness defense.

B. Rule 59 Motion

The Defendants also have moved, in the alternative, for a new trial pursuant to *Rule 59 of the Federal Rules of Civil Procedure*. There are two branches to this motion. First, pursuant to Rule 59(e), Conair contends that the Court committed legal error requiring the entry of an amended judgment. [HN20] In this case, however, a judgment has yet to be entered. Accordingly, as Gaus correctly suggests, Conair's Rule 59(e) motion must be treated as a motion for reargument of certain of this Court's prior rulings pursuant to Local Civil Rule 6.3. (Gaus JMOL Mem. at 18 (quoting *Cohen v. Koenig, 932 F. Supp. 505, 506 (S.D.N.Y. 1996)*)).

The second branch of Conair's Rule 59 motion asks this Court to grant Conair a new trial in the exercise of its discretion. Insofar as pertinent, [HN21] Rule 59(a)(1) provides that such a new trial may be granted in an action tried before a jury "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the [*35] United States." *Fed. R. Civ. P. 59(a)(1)*. The Rule imposes a lower threshold for the grant of a new trial than Rule 50 does for the grant of JMOL because the trial judge may reassess the trial evidence and need not view it in the light most favorable to the nonmovant. *United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998)*. Accordingly, "a motion for a new trial

may be granted even if there is substantial evidence to support the jury's verdict." *Caruolo v. John Crane, Inc., 226 F.3d 46, 54 (2d Cir. 2000)*(quoting id.) Although the trial court has considerable discretion in ruling on a Rule 59(a)(1) motion for a new trial, *Metromedia Co. v. Fugazy, 983 F.2d 350, 363 (2d Cir. 1992); Caruolo, 226 F.3d at 54*, it "ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Hygh v. Jacobs, 961 F.2d 359, 365 (2d Cir. 1992)*(quoting *Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 370 (2d Cir. 1988)*)(emphasis added).

1. Pair of Probe Networks

Several of Conair's Rule 59 [*36] arguments assume that Judge Duffy's construction in Conair I of the "pair of probe networks" limitation of Claim 12 of the '047 Patent is mistaken. Having never previously advanced precisely this formulation, Conair now contends in its post-trial brief that the limitation must be construed as "a pair of probe networks that is separate and operates independently from any voltage carrying part of the apparatus and which will effect a current shut off (upon entry of water) before water touches any voltage carrying part of the apparatus." (Conair JMOL Mem. at 21). Conair argues that its device uses only a single probe and, consequently, cannot infringe this limitation of the Gaus Patent either literally or under the doctrine of equivalents. (Id. at 21–22). Conair further maintains that a finding of infringement under the doctrine of equivalents would run afoul of the "all elements rule" because, under its suggested claim construction, a finding that the Conair devices infringed would vitiate the limitation of Claim 12 that the "gate input" is "excited only upon a low impedance between said probe networks of said pair." (Id. at 25).

As set forth at some length in Conair [*37] III, the time for debate about the proper construction of Claim 12 expired several years ago. See *Conair III, 2002 U.S. Dist. LEXIS 104, 2002 WL 15647*, at *4–*5. As indicated in that decision, Judge Duffy construed the claims of the Gaus Patent in Conair I, and those rulings constitute the law of this case. Id. Conair has not shown that Judge Duffy's claim construction, which this Court incorporated into its jury instructions, constitutes clear legal error. Accordingly, the arguments advanced by Conair on the basis of its latest proposed construction of Claim 12 of the Gaus Patent must be rejected. n7

n7 Conair's low impedance argument also contravenes its earlier admission that the only limitations of Claim 12 not satisfied by the elements of the accused hair dryers were the "pair," "housing," and "fusible member" limitations. (See, e.g., Tr.

79–83).

Conair also argues that the portion of the jury charge that defined the "pair of probe networks" limitation of Claim 12 contravened the teaching of *Markman v. Westview Instruments, Inc., 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996),* [*38] because "it placed an issue of claim construction before the jury as an alternative, thus effectively allowing the jury to decide which claim construction should apply." (Conair JMOL Mem. at 26). Tracking Judge Duffy's construction of the Gaus Patent in Conair I, the relevant instruction stated: "The term 'pair of spaced-apart electrically exposed conductive probe networks' may mean two corresponding things designed for use together. It may also mean a single thing made up of two corresponding parts that are used together, as in a pair of pants." (Tr. 1496). Contrary to Conair's contention, this charge does not improperly allow the jury to engage in claim construction. Rather, the jury simply was advised, as a matter of law, that the term "pair," as used in Claim 12, may have one of two meanings, both of which are covered by the Gaus Patent.

Conair next asserts that *Festo Corp. v. Shoketsu Kogyo Kabushiki Co., Ltd., 234 F.3d 558 (Fed. Cir. 2000),* precludes an equivalents argument with respect to the "pair of probe networks" limitation of Claim 12 because Gaus's original claim was amended in ways that narrowed the scope of his patent. (See Conair JMOL Mem. [*39] at 23–24). After the post-trial briefs in this case were submitted, the Supreme Court vacated the Federal Circuit's decision in Festo. See *Festo Corp. v. Shoketsu Kinzoku Kogoyo Kabushiki Co., Ltd., 535 U.S. 722, 122 S. Ct. 1831, 152 L. Ed. 2d 944 (2002).* In any event, I previously had rejected the same argument in Conair III. See *Conair III, 2002 U.S. Dist. LEXIS 104, 2002 WL 15647,* at *7. I further held that Gaus was entitled to argue that the pair of probe networks limitation was literally infringed by Conair's device. Id. Conair has not shown any reason for the Court to depart from these prior rulings.

2. Alleged Disclaimers

Relying on *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337 (Fed. Cir. 2001),* Conair argues that the specification of the Gaus Patent bars Gaus from arguing that the accused hair dryers infringe his patent. (Conair JMOL Mem. at 26–29). SciMed involved a patent for a balloon dilation catheter used in coronary angioplasty procedures. *SciMed Life Sys., Inc., 242 F.3d at 1339.* The parties agreed that there were only two possible arrangements for such devices: the dual lumen configuration [*40] and the coaxial lumen configuration. n8 Id. In its specification, the patentee "referred to prior art catheters, identified them as using the dual lumen configuration and criticized them as suffering from the disadvantages of having 'larger than necessary shaft sizes' and being 'stiffer in their distal regions than would be desired.'" *Id. at 1345.* Additionally, the patent stated that the coaxial lumen configuration was used in "all embodiments of the present invention." Id. Despite this language, the patentee later argued that the defendant's device, which utilized a dual lumen configuration, was the equivalent of its claimed invention. Id. The Federal Circuit rejected this argument, reasoning that [HN22] a patentee who has "specifically identified, criticized and disclaimed [a particular structure], ... cannot ... invoke the doctrine of equivalents to 'embrace a structure that was specifically excluded from the claims.'" Id. (quoting *Dolly, Inc. v. Spalding & Evenflo Cos., 16 F.3d 394, 400 (Fed. Cir. 1994)).* As the court explained, "where such an explicit disclaimer is present ... the patentee cannot be allowed to recapture the excluded [*41] subject matter under the doctrine of equivalents without undermining the notice function of the patent." *242 F.3d at 1347.*

n8 In the dual lumen configuration, the two lumens, or passageways, are positioned side-by-side within the catheter. In the coaxial lumen configuration, one lumen runs inside another lumen. *SciMed Life Sys., Inc., 242 F.3d at 1339.*

Conair argues that the specification of the '047 Patent similarly makes disclaimers which cannot be recaptured through the doctrine of equivalents. First, Conair argues that Gaus's critique of a "'first group' of prior art proposals" excludes devices, such as the accused Conair hair dryers, in which the protective mechanism is "located externally to the housing of the apparatus, *e.g.,* in the plug." (Conair JMOL Mem. at 28)(emphases in original). The relevant text of the '047 Patent specification reads as follows:

According to a first group of prior art proposals, the interruption occurs over external leakage current protection switches [*42] (located outside the apparatus and in the house wiring) ... Thus, in Ger. OS No. 26 31 785, a whirlpool bath device is described in which a measuring probe is mounted in the apparatus housing, which probe responds when moisture penetrates into the housing and (said probe) brings about deenergization of a switching relay which is disposed outside the housing of the apparatus, e.g., in a wall plug, which relay connects the house wiring to the apparatus in a double pole switching arrangement. This known type of protective device requires special cables ..., special wall plugs, costly electronic control

of the switching relay, and special measures to prevent re-energization of the relay and supply of line voltage before the precipitating hazard lit, "irregularity" has been removed.

According to a second group of prior art proposals, in response to the drawbacks of the external configuration, the protective device is completely integrated into the electrically powered apparatus.

(Gaus Ex. 106, at 4181, col. 1, ll. 34–56). The "Summary of the Invention" section of the '047 Patent, in turn, notes that the "object of the invention is to devise a protective device of the type of [*43] the abovementioned second group of prior art proposals ...." (Id. at 4181, col. 2, ll. 55–57)(emphasis added).

The specification language cited by Conair does not contain the sort of unambiguous disclaimer or exclusion that the Federal Circuit relied on in SciMed. At trial, consistent with the language of the specification, Gaus testified that the first group of prior art proposals discussed in the '047 Patent specification involved the use of circuit interruption technology within the house wiring to stop the flow of current. (Tr. 156–57, 240–41). This interpretation of the specification language is entirely plausible. Although the specification noted that this "first group" also requires "special wall plugs," that term is not restricted to the multi-bladed object that fits into a wall socket. Rather, the term may also refer to the receptacle in the wall that receives the plug. See, e.g., The Oxford English Dictionary (2d ed. 1989)(defining "plug" as a "device designed to be inserted into a suitable socket to establish an electrical connection," but "also (chiefly *colloq* or as a *wall plug*), a socket fixed to or in a wall for receiving such a plug"), see [*44] also Webster's New International Dictionary (3d ed. 1993)(defining "wall plug" as "an electric receptacle having its face flush with or recessed in a wall"). Accordingly, Conair cannot establish that Gaus is seeking to embrace under the doctrine of equivalents a structure that he previously criticized and disclaimed.

Conair also asserts that its device cannot infringe Claim 12 of the '047 Patent because a user of the accused device experiences a brief electrical shock, a method that the patent specification allegedly expressly criticizes. (Conair JMOL Mem. at 19–22). In the '047 Patent specification, Gaus described one particular prior art proposal which protected the user by triggering the protective system of the house wiring. (Gaus Ex. 106, at 4181, col. 1, l. 68–col. 2, ll. 2). The specification notes that this type of device "violates international guidelines which prohibit intentional short circuiting of the house wiring" for protective purposes. (Id., col. 2, ll. 3–6). The specification

further observes with respect to such prior art that

the disconnection occurs simultaneously with the accident; i.e., the limitation of the electric shock use will depend on the [*45] time parameter of the house wiring system, and in any event a shock will not be completely prevented, since a direct connection (i.e., contact) between the water and the power supply circuit is a precondition for the production of the envisioned short circuit.

(Id., ll. 13–20).

In keeping with this criticism, the "Summary of Invention" section of the '047 Patent states that Gaus's claimed invention

disconnects the voltage of the house wiring on all poles, in the apparatus itself, in reliable fashion and in a very short time, when a conductive fluid such as water penetrates into the apparatus housing, and said device accomplishes this disconnection before the user can be connected to voltage-carrying exposed parts via fluid which has entered the housing.

(Id. at 4182, col. 3, ll. 35–42)(emphasis added).

Conair argues that any device that exposes the user to household current as part of its circuit interruption technology works in a decidedly different manner than the Gaus invention and consequently cannot infringe the Gaus Patent under the doctrine of equivalents. (Conair JMOL Mem. at 22–23). However, the Gaus Patent also states that the "electric [*46] double conductor of the probe should be configured in such a way that the trigger switch circuit will respond before the penetrating water reaches any other parts of the electrical apparatus ...." (Id. at 4183, col. 6, l. 66–col. 7, l. 2)(emphasis added). Through the use of this precatory language, the Gaus Patent makes clear that the goal of isolating the user of an appliance from all electric shock is not an essential part of Gaus's invention.

Finally, Conair maintains that the "fusible wire" limitation of the '047 Patent cannot be infringed either literally or under the doctrine of equivalents by the resistor in the accused Conair device. (Conair JMOL Mem. at 29). Conair predicates this claim on a statement distinguishing the Gaus invention from the prior art because the fusible wire in his invention does not conduct any current. (See Sutton Opinion Letter at 5-7). There is no requirement in the Gaus Patent, however, that the "fusible member"

not carry current. Rather, as Judge Duffy construed the term, a "fusible electrically conductive member" could, in context,

> refer[] to any resistance member that undergoes a physical destruction upon the application of [*47] a certain amount of current which breaks open the circuit. It can include, among many forms, a resistance member that melts rapidly, that stretches, that fractures, or that explodes, so long as it provides a loss of mechanical bias which is associated with the normally closed electrical continuity. All that is required is that the "fusible electrically conductive member" provide a break or discontinuity in the electrical circuit.

(Tr. 1497). The resistor in the Conair device meets this definition.

### C. Enhancement of Damages

[HN23] Upon a finding of willful infringement, 35 U.S.C. § 284 authorizes a court to "increase the damages up to three times the amount found or assessed." Whether and to what extent damages should be enhanced is a matter entrusted to the sound discretion of the trial court. *Nat'l Presto Inds., Inc. v. West Bend Co., 76 F.3d 1185, 1193 (Fed. Cir. 1996).* A "finding of willful infringement ... does not mandate that damages be enhanced, much less mandate treble damages." *Read Corp. v. Portec, Inc., 970 F.2d 816, 826 (Fed. Cir. 1992)*(citing *Modine Mfg. Co. v. Allen Group, Inc., 917 F.2d 538, 543 (Fed. Cir. 1990)).* [*48] By the same token, the finding of willfulness warrants some explanation by the trial court if it declines to enhance damages. *Tate Access Floors, Inc. v. Maxcess Techs., Inc., 222 F.3d 958, 972 (Fed. Cir. 2000).*

In Portec, [HN24] the Federal Circuit set forth the factors that a court should consider in determining the extent, if any, by which a patent owner's damages should be enhanced. Those factors are:

> (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) any remedial action by the infringer; (8) the infringer's motivation for harm; and (9)

whether the infringer attempted to conceal its misconduct.

*Portec, 970 F.2d at 827.*

Most of the relevant facts and circumstances were previously discussed in connection with Conair's motion for [*49] JMOL on the issue of wilfulness and need not be rehashed here. After reviewing the factors set forth above, I find that this is not a case in which the trebling of compensatory damages is warranted.

First, this is not a case involving intentional copying. Gaus has never maintained that either Conair or Leviton used the information publicly disclosed in the '047 Patent to copy his product and pirate his technology. (See Gaus Damages Reply Mem. at 1). In fact, Conair produced evidence at trial indicating that its protective device was independently developed. (Tr. 905–09). Having developed that product, Conair made no attempt to conceal its potentially infringing activities. Indeed, it was a Conair employee who first notified Gaus that Conair's accused device might infringe his patent. (Id. at 201–02).

This also is not a case of literal infringement. [HN25] The Federal Circuit has recognized that a finding of non-literal infringement can "change the picture" as to wilfulness. "While 'it is not a rule of law that infringement that is not literal can never be sufficiently culpable to warrant enhanced damages[,] ... avoidance of literal infringement is a fact to be considered' in determining [*50] whether there has been willful infringement." *WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1354–55 (Fed. Cir. 1999)* (quoting *Hoechst Celanese Corp. v. BP Chemicals Ltd., 78 F.3d 1575, 1583 (Fed. Cir. 1996)).*

Additionally, once summary judgment was granted with respect to Gaus's claim of literal infringement, the jury had to consider Conair's liability under the doctrine of equivalents, which was a close question. In particular, it was by no means certain that the jury would find that the "pair of probe networks" limitation was satisfied by the accused device. This is another factor weighing against the trebling of damages. See *Laitram Corp. v. NEC Corp., 115 F.3d 947, 955 (Fed. Cir. 1997)*(affirming trial court's decision not to enhance damages because the issues of infringement and wilfulness were close).

I also cannot say that Conair acted in such bad faith that the trebling of damages is justified. [HN26] The Federal Circuit has counseled that "any other factor[] tending to show good faith [] should be taken into account and given appropriate weight" in determining whether an enhancement of damages is appropriate. *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc., 127 F.3d 1462, 1465 (Fed. Cir. 1997).* [*51] One factor given substantial weight in

2003 U.S. Dist. LEXIS 1445, *51

this analysis is whether the infringer, after having notice, obtained an opinion of counsel. *Ortho Pharm. Corp. v. Smith, 959 F.2d 936, 944 (Fed. Cir. 1992).*

[HN27] To establish good faith, an opinion of counsel need not be legally correct. Id. "Indeed, the question arises only where counsel was wrong." Id. Consequently, the inquiry should focus on whether the opinion was "thorough enough, as combined with other factors, to instill a belief in the infringer that a court might reasonably hold the patent is invalid, not infringed, or unenforceable." Id. Although written opinions from outside counsel naturally are preferred, it is permissible in some circumstances for a party to rely on an oral opinion or one written by an in-house counsel. See *Radio Steel & Mfg. Co. v. MTD Products, Inc., 788 F.2d 1554, 1559 (Fed. Cir. 1986)*(oral opinion sufficient to form basis of defendant's good-faith belief); *Western Electric Co., Inc. v. Stewart-Wagner Corp., 631 F.2d 333, 337 (4th Cir. 1980)*(reliance on opinion of in-house counsel was reasonable).

At trial, Conair adduced evidence of several consultations [*52] with counsel. After receiving Gaus's first letter indicating his belief that Conair's IDCI device infringed the '047 Patent, Richard Margulies, Conair's in-house counsel, sent Leviton's outside patent counsel, Paul Sutton, a letter which asked him to look into the matter and reminded him that the damages could be "immeasurable" if Gaus's accusations proved true. (Tr. 933–34, 945; Gaus Ex. 65). There is no dispute that Sutton, who has served as Leviton's patent counsel for the last thirty years, has considerable experience in the field of patent law. Following that letter, Messrs. Margulies and Sutton had several conversations about the '047 Patent, during which Mr. Sutton consistently opined that the Conair/ Leviton IDCI device did not infringe. (Id. at 933–34, 936, 963).

In December 1991, Mr. Sutton supplemented his oral advice with a formal opinion letter in which he concluded that the accused Conair device did not infringe the '047 Patent. (Id. at 939–40; Sutton Opinion Letter). Mr. Margulies testified that this written opinion, following on the heels of his discussions with Mr. Sutton, gave him a "comfort level" that the device licensed to Conair by Leviton did not infringe [*53] the '047 Patent. (Id. at 942).

Dr. Gaus has criticized the quality of the legal advice upon which Conair. relied, attacking both the thoroughness of the Sutton opinion letter and the fact that it was written by a person closely affiliated with Leviton. (Gaus Damages Mem. at 6–7). Although the jury evidently did not believe that Conair had satisfied its affirmative duty of good faith by securing Mr. Sutton's opinion, it is apparent that he did devote a fair amount of time and energy to an invalidity analysis. The fact that Conair sought the

opinion of Leviton's counsel and also spoke with its own outside patent counsel Haynes Johnson, (Tr. 942–43), certainly makes Conair less culpable than it would be if it had simply ignored Gaus's complaints.

Conair also received assurances from Leviton, the licensor of the accused technology, which had a contractual obligation to indemnify Conair for any damages that it sustained in a patent infringement suit. (Id. at 492–93). Leviton's willingness to stand behind its product is another factor tending to suggest Conair's good faith. See *Malsbary Mfg. Co. v. Ald, Inc., 310 F. Supp. 1112, 1120 (N.D. Ill. 1970)*(declining to [*54] grant extraordinary damages on claim of willful infringement where defendant "received assurances of non-infringement and a contractual indemnity from its supplier after learning of the patent"). While Gaus attacks Leviton as an interested party by virtue of its indemnity agreement, it is clear that Leviton had as great an incentive as Conair to ensure that it had no liability for infringing the Gaus Patent.

Finally, while Conair's litigation conduct was admittedly aggressive, I cannot say that it was so far beyond the pale as to be indicative of bad faith.

Although the jury found willful infringement, and I have sustained the reasonableness of that determination on the basis of the trial record, this is not a case that warrants treble damages. On the other hand, [HN28] a patent owner who successfully establishes a willful infringement of his patent should ordinarily be awarded some amount of punitive damages to deter such misconduct. See *SRI Int'l, Inc., 127 F.3d at 1468*(primary purpose of enhancing damages when willful infringement or bad faith are found is to punish and deter).

[HN29] A review of the case law indicates that in situations involving less than overwhelming [*55] evidence of misconduct by an infringer, courts have enhanced damages using multipliers considerably lower than trebling. See, e.g., *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc., 265 F.3d 1294, 1310–11 (Fed. Cir. 2001)*(affirming district court's thirty percent enhancement); *Virginia Panel Corp. v. MAC Panel Co., 133 F.3d 860, 866–67 (Fed. Cir. 1997)*(affirming ten percent enhancement where defendant conducted a "marginally sufficient investigation of the asserted patents"); *Datascope Corp. v. SMEC, Inc., 1990 U.S. Dist. LEXIS 1376, 1990 WL 10345*, at *3 (D.N.J. Jan. 25, 1990)(finding a fifty-percent enhancement of damages appropriate where SMEC's infringement was willful, but not blatant); *Crucible, Inc. v. Stora Kopparbergs Bergslags AB, 701 F. Supp 1157, 1164 (W.D. Pa. 1988)* (awarding double, rather than treble, damages "because the court still considers the question [of wilfulness] to be a close one"). Adopting that approach, and after careful consideration

of all of the Portec factors, I have determined that Gaus is entitled to a thirty percent enhancement in the amount of $8.55 million.

### D. Attorney's Fees

[HN30] Under *35 U.S.C. § 285*, [*56] a court "in exceptional cases may award reasonable attorney fees to the prevailing party." Such an award often follows a finding of willful infringement; however, an award of attorney fees is not automatic, even for the exceptional case. *Nat'l Presto Inds., Inc., 76 F.3d at 1197* (citing *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc., 781 F.2d 198, 201 (Fed. Cir. 1986)).* "The trial judge is in the best position to weigh considerations such as the closeness of the case, tactics of counsel, the conduct of the parties and any other factors that may contribute to a fairer allocation of the burdens of litigation as between winner and loser." J.P. Stevens Co. v. Lex Tex Ltd., 822 (F.2d 1047, 1051 (Fed. Cir. 1987). Where there has been a finding of wilfulness, however, it would be an abuse of discretion for the trial court not to discuss its reasons for declining to award attorney's fees. *Modine Mfg. Co., 917 F.2d at 543* (citing *S.C. Johnson & Son, 781 F.2d at 201).*

Gaus cites four reasons why attorney's fees should be awarded. The first three reasons focus on the extent of Conair's allegedly "egregious willful infringement; [*57] " the last is that "Conair pursued a course of litigation conduct designed to exhaust Dr. Gaus'[s] resources." (Gaus Damages Mem. at 23–24). Although Conair's pretrial strategy included the filing of three summary judgment motions, it was by no means a certainty that the jury would ultimately side with Gaus as to the questions of either infringement or wilfulness. Consequently, while Conair certainly has zealously defended this case, I do not believe that it has litigated in bad faith. Having reviewed each of the factors establishing that damages should not be trebled. I have determined, for essentially the same reasons, that Gaus's application for attorney's fees should be denied.

### E. Permanent Injunction

Gaus also seeks an injunction permanently enjoining Conair from utilizing its infringing device. [HN31] It is customary to award injunctive relief when there has been a finding of patent infringement. *W.L. Gore & Assocs., Inc. v. Garlock, Inc., 842 F.2d 1275, 1281 (Fed. Cir. 1988).* As Judge Chin explained in *Pfizer, Inc. v. Perrigo Co., 988 F. Supp. 686, 695 (S.D.N.Y. 1997),* "this is so because 'the heart of [the patentee's] legal monopoly is the [*58] right to ... prevent others from utilizing his discovery'" (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 135, 89 S. Ct. 1562, 1583, 23 L. Ed. 2d 129 (1969)).* In this case, this motion is unopposed.

Consequently, Conair and its officers, agents, servants, employees, and attorneys, and those persons who are in active concert or participation with them and who receive actual notice of this Opinion and Order, or the ensuing judgment, are hereby enjoined from making, using, offering to sell, selling, or importing into the United States all products having the nonresettable IDCI device licensed to Conair by Leviton that was the subject of this lawsuit.

### F. Prejudgment Interest

The final issue raised by the parties' post-trial briefing relates to prejudgment interest. [HN32] Section 284 of Title 35 of the United States Code authorizes the award of prejudgment interest to make a patent owner whole. *General Motors Corp. v. Devex Corp., 461 U.S. 648, 655–56, 103 S. Ct. 2058, 2062–63, 76 L. Ed. 211 (1983).* Conair does not dispute the Court's authority to award prejudgment interest in the event that its efforts to set aside the jury's verdict [*59] are unavailing. The parties disagree, however, as to (1) whether prejudgment interest should be reduced or denied because of Gaus's allegedly excessive delay, and (2) the interest rate to be applied.

[HN33] Since the purpose of prejudgment interest is compensatory, prejudgment interest should "ordinarily be awarded" to a patent owner that prevails in an infringement suit. *Id., U.S. at 655, 103 S. Ct. at 2062.* Nevertheless, "it may be appropriate to limit prejudgment interest, or perhaps deny it altogether when the patent owner has been responsible for undue delay in prosecuting the lawsuit." *Id., 461 U.S. at 657, 103 S. Ct. at 2063.*

Conair points to two periods of pretrial delay which it seeks to attribute solely to Gaus. First, Conair alleges that Gaus failed to commence this action for a period of three years after Mr. Sutton made his "good luck suing us" remark to Grove in or around November 1991. (Conair Damages Mem. at 3; Tr. 452). Gaus counters that the delay was reasonable because he was attempting to reach an amicable resolution of his claim during this period. (Gaus Damages Reply Mem. at 3). He notes that, as early as October 21, 1993, his counsel [*60] was engaged in a dialogue with Mr. Sutton about a possible settlement. (See Eichenberger Decl. at Exs. 12–22). Such delays generally are not considered unreasonable. See *A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1033 (Fed. Cir. 1992).* Nonetheless, the commencement of settlement discussions does not explain Gaus's failure to act for the entire period between Grove's conversation with Mr. Sutton and the date that this suit was filed. This delay allowed Gaus's damages to escalate while Conair continued to sell the infringing devices. See *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336, 1362 (Fed. Cir. 2001).* Accordingly, Gaus should receive interest for the period of time reasonably necessary to

2003 U.S. Dist. LEXIS 1445, *60

institute an infringement suit after the position of Conair and Leviton was made clear by Mr. Sutton, but not for the time from that date until settlement discussions commenced. In this case, I find that Gaus reasonably could have instituted his suit by May 31, 1992. The period from June 1, 1992 through October 21, 1993 will therefore be excluded from the calculation of prejudgment interest.

Conair also [*61] alleges that Gaus did not pursue any additional discovery between March 1, 1996 and September 1, 1999, after his first attorneys withdrew from the case and while Conair's summary judgment was pending. (Conair Damages Mem. at 3). For his part, Gaus contends that he was ready for trial by August 1996, but then was stymied by a series of summary judgment motions which prevented this suit from proceeding to trial. (Gaus Damages Reply Mem. at 4). While Gaus's claim that he was ready to try this case by mid–1996 is dubious, Conair itself was clearly in no hurry to proceed with discovery during this period. See *Gaus v. Conair Corp., 1999 WL 714086,* at *1 (S.D.N.Y. Sept. 14, 1999)(Maas, M.J.). Accordingly, I decline to exclude this second period from the prejudgment interest calculation.

[HN34] Determining the rate of prejudgment interest and whether it should be compounded are matters entrusted to the discretion of the trial court. *Laitram Corp., 115 F.3d at 955.* In the exercise of that discretion, I find that the 52–week Treasury Bill rate, compounded annually, adequately compensates Gaus for his loss of royalty income. See *Accuscan, Inc. v. Xerox Corp., 2000 U.S.*

*Dist. LEXIS 2822, 2000 WL 280005,* at *2 (S.D.N.Y. 2000)(Baer, J.) [*62] (collecting cases in which courts have used this rate); see also *Laitram, 115 F.3d at 955* (upholding award of prejudgment interest at Treasury Bill rate where patent owner failed to show that he borrowed money at a higher rate).

Finally, because the intent of prejudgment interest is to make Gaus whole, not to punish Conair, Gaus is entitled to interest only on the $28.5 million compensatory portion of his damages. See *Underwater Devices, Inc. v. Morrison–Knudsen Co., 717 F.2d 1380, 1389 (1983); Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1066 (Fed. Cir. 1983).*

IV. Conclusion

Conair's motions pursuant to *Rules 50(b) and 59 of the Federal Rules of Civil Procedure* for judgment as a matter of law and a new trial are denied. Gaus's crossmotions for enhanced damages, prejudgment interest, and an injunction are granted to the extent indicated herein, but his motion for attorney's fees is denied. The Clerk of the Court is directed to enter judgment against Conair consistent with this Opinion and Order and close this case.

SO ORDERED.

Dated: January 31, 2003

FRANK MAAS

United States [*63] Magistrate Judge