# D PART V

LEXSEE 2002 U.S. DIST LEXIS 26812

**MEDICAL INSTRUMENTATION AND DIAGNOSTICS CORPORATION, Plaintiff, v. ELEKTA AB, et al., Defendants.**

NO. CV-97-2271-RHW

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA

*2002 U.S. Dist. LEXIS 26812*

September 4, 2002, Decided
September 6, 2002, Filed

**SUBSEQUENT HISTORY:** Reversed by *Med. Instrumentation & Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 2003 U.S. App. LEXIS 19541 (Fed. Cir., 2003)*

**PRIOR HISTORY:** *Med. Instrumentation & Diagnostics Corp. v. Elekta AB, 2001 U.S. Dist. LEXIS 25454 (S.D. Cal., Nov. 5, 2001)*

**DISPOSITION:** Midco's Motion for Enhanced Damages was granted. Midco's Motion for Attorney Fees was granted. Midco's Motion for Prejudgment Interest was granted. Midco's Motion for Permanent Injunction was granted. Elekta's Cross-Motion for Attorney Fees was denied. Elekta's Motion for Judgment with respect to Damages was denied. Elekta's Motion Regarding Liability was denied. Midco's Motion to Strike was granted. Remaining Motions in Limine were denied as moot. Elekta's Motion to Preclude Unpled Tort Claim was denied as moot. Midco's Motion for JMOL at Close of Evidence was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The jury found that defendant competitor's products infringed certain patent claims owned by plaintiff company. The competitor moved for judgment as a matter of law (JMOL), arguing that the company did not present sufficient evidence at trial to support the jury verdict. The company sought enhanced damages, attorney fees, prejudgment interest, and a permanent injunction. The competitor brought a number of cross-motions.

**OVERVIEW:** In the present action, the competitor relied almost exclusively on cross-examination and JMOL defenses. The competitor did not present any expert testimony on infringement or the operation of the accused products, nor did the competitor put on a damages expert. The jury was left to believe or disbelieve the testimony of the company's experts. Because each element was necessary for an infringement finding, one task for the corporation in the response memorandum was to identify points in the record where each element was discussed, which the corporation did. These identifications, along with the court's recollection of the testimony at trial, satisfied the court that the corporation had met its burden of an element-by-element comparison proof of infringement. However, the injunction was limited to the products found to infringe and products not colorably different from those products. The court awarded prejudgment interest as if the corporation had received a nine percent royalty on all relevant sales of infringing products. Having found that the evidence supported a finding by clear and convincing evidence that the infringement was willful, damages were enhanced.

**OUTCOME:** The company's motions for attorney fees, prejudgment interest, a permanent injunction and for enhanced damages were granted. The competitor's substantive motions were denied.

**LexisNexis(R) Headnotes**

*Patent Law > Remedies > Damages > General Overview*
[HN1] The amount of patent damages is a question of fact for the jury. The method for calculation of damages, including whether the entire market value rule is to be applied, is a question of fact.

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN2] See *35 U.S.C.S. § 283*.

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN3] Generally, after patent infringement has been determined, a court will issue a permanent injunction prohibiting infringement unless a sound reason for its denial is shown. The injunction is not automatic and should only

be issued if, and to the extent, equity so requires. The grant or denial of the injunction is reviewed under the abuse of discretion standard. In determining whether to grant a permanent injunction, the court considers (1) whether a plaintiff will be irreparably injured if the injunction is not issued, (2) whether a plaintiff has an adequate remedy at law for monetary damages, (3) who would be more harmed by the issuance or denial of the injunction, and (4) whether granting the injunction would serve any public interest.

*Civil Procedure > Injunctions > Preliminary & Temporary Injunctions*
[HN4] Where parties disagree about the specific language identifying the products covered by the injunction, *Fed. R. Civ. P. 65(d)* details the proper scope of an injunction: Every order granting an injunction shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained.

*Patent Law > Remedies > Equitable Relief > Injunctions*
*Patent Law > Claims & Specifications > Description Requirement > General Overview*
[HN5] The unreasonableness of a decree incorporating a vague or broad prohibition against "infringement" of a "patent" is alleviated because of the universal rule that contempt proceedings, civil or criminal, are available only with respect to devices previously admitted or adjudged to infringe, and two other devices which are no more than colorably different there from and which clearly are infringements of the patent. An enjoined party is entitled to design around the claims of a patent without the threat of contempt proceedings with respect to every modified device.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
*Patent Law > Remedies > Damages > General Overview*
[HN6] Even if a new product may infringe a patent, as long as it is more than colorably different the infringement should not amount to a contempt nor should it be tested in contempt proceedings.

*Patent Law > Remedies > Damages > Reasonable Royalties*
*Patent Law > Remedies > Collateral Assessments > Prejudgment Interest*
[HN7] Prejudgment interest should ordinarily be awarded where necessary to afford a patentee full compensation for infringement. Prejudgment interest is ordinarily necessary to ensure that the patent holder is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement.

*Patent Law > Remedies > Collateral Assessments >*

*General Overview*
[HN8] To calculate the proper amount of prejudgment interest, a court must determine the following: (1) the principal amount for which interest is awarded, (2) the interest rate, (3) the method used to accrue interest (compound or simple), and (4) the date upon which interest begins accruing.

*Civil Procedure > Costs & Attorney Fees > Judgment Interest*
[HN9] In *28 U.S.C.S. § 1961*, Congress has mandated that courts calculate postjudgment interest at the Treasury bill rate, compounded annually. The United States Court of Appeals for the Ninth Circuit has applied this rule to prejudgment interest in some cases: The measure of interest rates prescribed for post-judgment interest in *28 U.S.C.S. § 1961*(a) is also appropriate for fixing the rate for pre-judgment interest in cases such as this, where pre-judgment interest may be awarded, unless the trial judge finds, on substantial evidence, that the equities of the particular case require a different rate.

*Civil Procedure > Costs & Attorney Fees > Judgment Interest*
[HN10] While a state statutory rate is, of course, not controlling in the context of a suit based on a federal claim, federal courts have used the statutory rate in the state in which they sit to calculate an award of prejudgment interest. However, the statutory rate is problematic because it does not account for market fluctuations, which probably would have been accounted for in a hypothetical agreement.

*Patent Law > Ownership > Conveyances > Royalties*
*Patent Law > Remedies > Damages > Reasonable Royalties*
*Civil Procedure > Costs & Attorney Fees > Judgment Interest*
[HN11] Courts have broad discretion in deciding whether to award simple or compound interest. Again, the goal is to put the patent holder into the position in which he would have been had the infringement not occurred (i.e., had the parties entered into a reasonable royalty agreement). For postjudgment interest, *28 U.S.C.S. § 1961* requires annual compounding.

*Patent Law > Remedies > Collateral Assessments > Increased Damages*
[HN12] See *35 U.S.C.S. § 284*.

*Patent Law > Remedies > Collateral Assessments > Increased Damages*
[HN13] Enhanced damages are punitive, not compensatory. The decision to increase damages requires two steps: (1) finding clear and convincing evidence that the infringement was willful (or that other circumstances

justify an enhanced award), and (2) determining from the totality of the circumstances that damages should be increased. In making the second determination, a court should assess the following factors: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, after being put on notice of the patent, took reasonable steps to investigate the scope of the patent and formed a good-faith belief that it was invalid or not infringed; (3) the infringer's behavior during the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) the remedial action by the infringer; (8) the infringer's motivation for the harm; and (9) the infringer's attempts to conceal its infringement.

*Patent Law > Remedies > Collateral Assessments > Attorney Fees*

[HN14] The award of attorney fees under *35 U.S.C.S. § 285* is compensatory, rather than punitive. A court follows two steps in determining whether to award attorney fees: (1) determining whether the case is "exceptional," and (2) deciding to exercise discretion in awarding attorney fees. Conduct sufficient to make a case "exceptional" may include willful infringement, inequitable conduct, litigation misconduct, and vexatious litigation tactics.

*Patent Law > Remedies > Collateral Assessments > Increased Damages*
*Patent Law > Remedies > Collateral Assessments > Attorney Fees*
*Patent Law > Remedies > Damages > General Overview*

[HN15] While a finding of willful patent infringement does not mandate that damages be increased or that attorney's fees be awarded, after an express finding of willful infringement, a trial court should provide reasons for not increasing a damages award or for not finding a case exceptional for the purpose of awarding attorney's fees.

*Patent Law > Remedies > Equitable Relief > General Overview*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Filing Requirements > General Overview*

[HN16] There is no precise rule or formula for making attorney fee determinations in a patent infringement cases when a plaintiff has achieved only partial or limited success. A court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. A court necessarily has discretion in making this equitable judgment. A request for attorneys fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee. Where settlement is not possible, the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.

**COUNSEL:** [*1] For MEDICAL INSTRUMENTATION AND DIAGNOSTICS CORPORATION, plaintiff: Paul E Adams, Peacock Myers and Adams, San Diego, CA. Stephen A Slusher, Peacock Myers and Adams, Albuquerque, NM.

For ELEKTA AB, ELEKTA INATRUMENTS AB, ELEKTA ONCOLOGY SYSTEMS, defendants: Patrick J Sullivan, Law offices of Patrick J Sullivan, Oceanside, CA. Richard J Grabowski, Mazzarella Dunwoody and Caldarelli, San Diego, CA.

For ELEKTA INATRUMENTS AB, counter-claimant: Patrick J Sullivan, Law offices of Patrick J Sullivan, Oceanside, CA. Richard J Grabowski, Mazzarella Dunwoody and Caldarelli, San Diego, CA.

For ELEKTA ONCOLOGY SYSTEMS, counter-claimant: Richard J Grabowski, Mazzarella Dunwoody and Caldarelli, San Diego, CA.

For MEDICAL INSTRUMENTATION AND DIAGNOSTICS CORPORATION, counter-defendant: Paul E Adams, Peacock Myers and Adams, San Diego, CA. Stephen A Slusher, Peacock Myers and Adams, Albuquerque, NM.

**JUDGES:** ROBERT H. WHALEY, United States District Judge.

**OPINIONBY:** ROBERT H. WHALEY

**OPINION:**

### ORDER RE: POST-TRIAL MOTIONS

On May 31, 2002, the Court heard oral argument on the following motions: Motion for Enhanced Damages (Ct. Rec. 491), Motion for Attorney Fees (Ct. Rec. 493), Motion for [*2] Prejudgment Interest (Ct. Rec. 497), Motion for Permanent Injunction (Ct. Rec. 500), Cross Motion for Attorney Fees (Ct. Rec. 505), Motion for Judgment with respect to Damages (Ct. Rec. 507-1 and 507-2), Motion Re: Liability (Ct. Rec. 507-3 and 507-4), and Motion to Strike (Ct. Rec. 526). Paul Adams and Andrea Mays appeared on behalf of Plaintiff Medical Instrumentation and Diagnostics Corporation (Midco). Patrick Sullivan and Theresa Gillis appeared on behalf of Defendants Elekta. In this Order, the Court also resolves the following outstanding motions: Motion in Limine (Ct. Rec. 402), Motion in Limine (Ct. Rec. 405), Motion to Preclude Unpled Tort Claim (Ct. Rec. 478), and Plaintiff's

Motion for JMOL at Close of Evidence (Ct. Rec. 481). The Court has also considered the parties' additional briefing on the issue of attorney fees (Ct. Rec. 531, 532, 534).

At the outset, the Court notes that this trial was unusual in a number of ways. In this patent infringement action, Elekta relied almost exclusively on cross-examination and JMOL defenses. Midco experts testified exhaustively about the claims of the patents and the operation of the accused products, giving persuasive argument that [*3] the accused products infringed the patents. Midco's damages expert testified in great depth about how to calculate damages. Elekta did not present any expert testimony on infringement or the operation of the accused products, nor did Elekta put on a damages expert. The jury was left to believe or disbelieve the testimony of plaintiff's experts.

**Infringement**

At trial, the jury found that Elekta's GammaPlan, SurgiPlan, and ScopePlan infringe claim 9 of the *'846 patent*, and claims 1, 3, 14, and 15 of the *'684 patent*. In this JMOL motion, Elekta argues that Midco did not present sufficient evidence at trial to support the jury verdict. Elekta's argument only addresses claim 9 of the '846 patent, assuming that the claims of the '684 patent do not require separate analysis for purposes of this motion.

First, a review of the claims at issue. Claim 9 of the '846 patent lists seven elements of the machine, and it is these seven elements that must be present in the accused products to support a jury finding of infringement.

(1) Acquiring

The first task is to bring all of the pictures to the same physical location. Instead of each camera holding the picture, all pictures are sent to [*4] one computer.

(2) Converting

Once all of the pictures arrive at the same computer, the next task is to convert them to a common format. Computers can save files in many different formats, and programs exist that can change the data from one format to another.

(3) Storage

Once all the images are collected and converted, the computer stores them. Centralized storage not only makes recall more efficient, it frees up the MRI, CT, X-ray, or other machines to be used on other patients.

(4) Displaying

The doctor can look at the images individually, look at a collection of the images side-by-side, or look at a composite image created by overlaying two or more individual images.

(5) Manipulating

Overlaying two or more individual images is not particularly helpful unless the images have the same size and orientation. In this step, the user can hold one image fixed while changing the size and orientation of another. The goal is to line up the images to make one composite image.

(6) Comparing

Using computer software, the doctor can change the characteristics of images using standard imaging techniques such as filtering, smoothing, sharpening, pseudo-coloring, or edge detection.

(7) Calculating [*5] (Stereotactic Coordinates)

The patent claims a "means for determining stereotactic coordinates." The Court's construction elaborates, construing the claim to cover "computer software used to determine fiducials [reference points] on scanned images displayed on the computer monitor to correlate points on the displayed image with stereotactic coordinates." (Ct. Rec. 326, p. 5.)

Element-by-Element Comparison

Elekta's memorandum in support of this motion makes blanket accusations that the jury did not have sufficient evidence of *any* of the above listed elements. At the hearing, Elekta stressed that under *Alpex Computer Corp. v. Nintendo Co., 102 F.3d 1214 (Fed. Cir. 1996)*, Midco's burden for each element was to (1) define the function, way, and result claimed in the patent n1, (2) define the function, way, and result of the accused products, and (3) include specific testimony linking the contents of (1) and (2).

> n1 Elekta actually argued that Midco must define the function, way, and result for each element of the *claimed product*. This language is incorrect, as Midco patented a means, not merely a product.

[*6]

At trial, the testimony of Midco's expert was far from conclusory (the primary problem with the testimony in *Alpex*). Instead, Midco's expert engaged in an exhaustive process, discussing each element individually and producing evidence as to why the accused devices infringe that element. Because each element is necessary for an infringement finding, one task for Midco in the response memorandum was to identify points in the record where each element was discussed. This Midco did. These identifications, along with the Court's recollection of the testimony at trial, satisfies the Court that Midco has met its burden of an element-by-element comparison proof of

infringement.

### Sequence

Elekta argues that the seven elements described above must be performed in a rigid sequence, and that the jury finding of infringement is unsupported because Midco did not provide evidence that the accused products followed the sequence. The patent claim contains no specific requirement of following a rigid sequence. Neither party addressed sequence issues in Markman briefing, and neither party requested a jury instruction on a required sequence. Instead, Elekta argues that the rigid sequence is [*7] plainly required by the language of the patent. The Court agrees that the claim details an ordered process of "acquiring-converting-storing-displaying-manipulating-comparing-calculating." However, there is no reason in the jury instructions or the patents themselves that each step occur only once. For example, an accused product could not avoid infringement merely because it stored an image that had been manipulated: as long as images that have been acquired and converted are stored, the third element is satisfied.

When the accused products acquire images, those images are stored in the original scanner formats. Therefore, the images are not converted to a common format before being stored on the hard disk. The Parties agree that the images are later converted to a common format (such conversion is a necessary prerequisite to fusion), but disagree as to whether any "storing" as defined in the patent occurs after the conversion. Midco cites trial testimony that the accused products store images not only on the hard drive, but also in RAM, in the video display memory, and in other places at different times during image processing. Response 10-11. Here, the jury could reasonably find [*8] that the accused products infringe if they followed an ordered process beginning "acquiring-storing-converting-storing-displaying." That is, the fact that the images are stored before they are converted does not demand a finding of noninfringement, as long as the images are also stored after they are converted (a finding supported by the evidence before the jury).

Elekta argues that because Midco put on evidence that "fusion" in the accused products fulfills the conversion element, the accused products could not possibly fulfill the later steps of displaying or manipulating two independent images (because fused images are no longer independent). After listening to expert testimony from both sides, one sees that Elekta uses "fusion" to describe a multiple-step operation, an operation described one step at a time by the Midco patents. The jury could reasonably conclude that Elekta's "fusion" function fulfills multiple elements of the Midco patents.

### Identifying Specific Software

The Court construed elements 2, 4, 5, and 8 of the patent as covering various computer software known to one skilled in the art. n2 Elekta argues that in order to find infringement, Midco had the burden [*9] of specifically identifying software within the skill of the art (presumably by naming specific programs or introducing specific programs into evidence) and then comparing that software to the software in the accused products.

> n2 The language differs slightly for each element, but the differences can be ignored for purposes of this motion. For example, element 2 refers to "software routines . . . known to those of skill in the art;" element 4 refers to "routines known in the prior art;" element 5 refers to software "either commercially available or within the skill of practitioner in the field;" element 8 refers to software "apparent to one skilled in the art."

The Court disagrees. First, specific programs may not exist. Note that Midco's burden to identify software "known to one skilled in the art" is a lesser burden than identifying software "existing in the art." Second, after Midco's expert testified that the software was known to one skilled in the art, Elekta had the opportunity to cross-examine and could [*10] have asked for more details, such as a request for specific programs. Third, Elekta put on no expert testimony that the accused products did not infringe the patents (e.g., no Elekta expert testified that the software in the accused products was beyond the skill of the art). Thus, the jury had ample uncontroverted evidence that the software in the accused products fulfills the elements of the patents as construed by the Court.

### One Image, Not Two (and the related Umemura defense)

During patent prosecution, Midco distinguished its patents from the prior art Umemura reference. After extensive briefing and oral argument on file wrapper estoppel and limitations on the doctrine of equivalents, the parties agreed on the following instructions:

> You may not find that elements 4 and 5 of claim 9 of the '846 patent or element 5 of claim 1 of the '684 patent cover products which involve complementary, dependent images, which by weighting and addition, form a single composite image on a single monitor.

Instruction 20 (I) (N).

> . . . with respect to elements 4 and 5 of

claim 9 of the '846 patent and element 5 of claim 1 of the '684 patent, you may only find infringement [*11] if the element is literally present in the accused products.

Instruction 26.

Elekta argues that the "overlay" of two or more images described in element 4 only covers two processes: (1) flicker frame display, where two separate images rapidly alternate on the display, and (2) overlay display, the computer equivalent to cellophane overlays (which Elekta maintains never involves combination of the image data). Although the patent expressly covers these two processes, it does not indicate that these are the only processes covered. Midco's expert testified that the computer equivalent to cellophane overlays could be accomplished in a variety of ways, most, if not all of which, involve combining image data. The jury appears to have reasonably followed the suggestion of Midco's expert.

Elekta's argument is that, in both of these descriptions, the viewer is looking at two images, and seeks to distinguish the accused products by noting that the "fusion" process results in one image, not two. The Court disagrees with Elekta's limited interpretation of "overlay" and, at very least, notes that given Midco's expert testimony, it was well within the discretion of the jury to find that [*12] "overlay" includes processes in which data from two independent images are combined to create a single composite image.

Note that this definition of "overlay" is not foreclosed by Instruction 20 (1) (N), which deals with "complementary, dependent" images. Moreover, the Court finds that Instruction 20(1) (N) was particularly important, as Elekta never argued that the accused products involve "complementary, dependent" images. At trial, there was much ado about the admission of the Umemura reference (the basis for Instruction 20 (1) (N)). Given Instruction 20 (1) (N) (the language comes directly from the file history of the Umemura reference), Elekta could avoid infringement by showing that its product involves "complementary, dependent images, which by weighting and addition, form a single composite image on a single monitor." However, Elekta never pursued this "we are Umemura" defense at trial. At trial, Elekta sought to introduce the Umemura reference, but the Court sustained Midco's objection on relevancy grounds because no one had yet testified that the accused products involved the process described in Umemura (specifically, no one testified that the accused products involved [*13] "complementary, dependent images"). Instead of introducing testimony describing the accused products and their similarity to Umemura (which would have assured introduction of the Umemura reference into evidence as a separate document n3), Elekta did not further pursue the "we are Umemura" defense. This trial strategy precludes Elekta's current argument that *as a matter of law* Instruction 20(1) (N) mandates a finding of noninfringement.

n3 At oral argument on these motions, counsel for Midco cited Trial Transcript 4021, noting that the Umemura reference was in evidence as an attachment to another exhibit.

Specificity of Hardware (the Ethernet board and framegrabber)

The Court's construction of element 1 contains seven lines of technical information regarding ethernet boards and ethernet communications networks. The Court's construction of element 4 contains eight lines of technical information regarding a framegrabber. Elekta argues that Midco's proof at trial failed to meet the high degree of specificity [*14] incorporated in these constructions.

With respect to the Ethernet board, Midco's expert did not use the specific phrase "through the system's Ethernet board" when discussing the accused products, but his testimony contains sufficient evidence of use of an ethernet board. *See* Response at 7. The Court finds that it was reasonable for the jury to infer that these references refer to the same Ethernet board described in the construction of element 1.

Similarly, with respect to the framegrabber, the Court finds that Midco's expert testimony was sufficient to establish the existence of element 4 in the accused products.

Element 6

Element 6 claims a "means for comparing said manipulated independent image to at least one other of said selected independent images." As construed by the Court, the element covers "software used to contrast characteristics of at least two selected images using the imaging techniques of filtering, smoothing, sharpening, pseudocoloring, or edge detection." In response to Elekta's allegation that Midco presented no evidence that the accused products perform the function described in element 6, Midco has identified trial testimony excerpts stating that [*15] the accused products use the techniques of pseudocoloring, filtering, and edge detection. Response 21-22. The Court finds these excerpts more than adequate to support the jury verdict.

**Damages**

Actual Revenues or Projected Revenues?

In discovery, Midco requested financial statements

summarizing revenue from each of the accused products, beginning in December 1991. Elekta provided the statements before the close of discovery. However, due to the death of Judge Schwartz and other unforeseen delays, Midco did not receive the actual revenue figures for 2000 and 2001. In December 2001, Midco requested *Rule 26(e)* updates of the revenue figures, but Elekta did not provide these updates. n4

> n4 At oral argument, the parties referred to a decision of the Magistrate in this case, ruling that Elekta had no obligation to disclose the supplementary financial figures. The Court presumes that parties refer to Midco's Fourth Motion in Limine (Ct. Rec. 412), which the Court referred to the Magistrate. The Court does not address the breadth of the Magistrate's summary ruling, nor will the Court even assume that Midco's Fourth Motion in Limine specifically addressed this issue. For purposes of the motion before the Court, the critical issue is not what Elekta was or was not obligated to disclose but, rather, the consequences of Elekta's decision not to disclose updated financial figures. In other words, even if Elekta had no obligation to disclose the updated financial figures, Elekta may suffer from its choice to withhold the updated financial figures.

[*16]

Elekta takes the position that in patent trials, the jury verdict only covers damages through the close of discovery (requiring the Court to undertake a post-trial accounting to determine damages from the close of discovery to the date of the verdict). The Court is unaware of any case law forbidding the jury from determining damages through the date of trial, nor does the Court believe that *Fed. R. Civ. P. 62* mandates a post-trial accounting as the only way to determine damages for this period. Here, the jury had sufficient evidence to determine damages through the date of trial, and reasonably relied upon the best available evidence.

Having no actual sales figures, Midco's expert, Carl Degen, was charged with the task of testifying with respect to damages. Extrapolating from known sales figures, Degen projected revenues for 2000, 2001, and the relevant portion of 2002. Elekta objected to the introduction of Degen's "manufactured" figures, and the Court overruled the objection because Degen's productions were the best available evidence, especially given the reason for the inadequacy of proof and resolving any doubt against the infringer. [*17]

Later at trial, an Elekta witness testified about actual Elekta revenues from the Gamma Knife: "if you're looking at 2000, 2001, and 2002, you will see right now [revenue] is actually declining. We hope we can turn that around because we're going from 25 to 26 million to 23 and now for the two first-quarter 11...." It is unclear what document the witness was referring to. Without pointing to any document introduced at trial, Elekta argues that this oral testimony was definitive that Elekta's actual revenues were 25 million in 2000, 23 million in 2001, and 11 million in 2002. n5

> n5 Elekta later attacked the accuracy of even these figures, seeking to introduce the Declaration of Rod Farmer as the determinative actual revenue figures. Elekta has cited no rule as to why these untimely actual revenues figures should be admissible in this posttrial setting, and the Court finds no authority for the admission of new evidence at this late stage.

The jury awarded $15 million in damages for the Gamma Knife, apparently [*18] taking 9 percent of the projected revenues of $166,258,322, the procedure advocated by Midco. Had the jury used 9 percent of the alleged actual revenues (a figure not available to the jury at trial), they would have found Gamma Knife damages closer to $9,000,000.

Elekta primarily relies on three n6 cases for the proposition that actual sales evidence is to be preferred over projections. In *Oiness v. Walgreen Co., 88 F.3d 1025, 1029-30 (Fed. Cir. 1996)*, both plaintiff and defendant put in estimates of actual sales, and the court found that plaintiff's estimates were absolutely speculative. In *Hughes Tool Co. v. Dresser Indus., Inc., 816 F.2d 1549, 1558 (Fed. Cir. 1987)*, the Federal Circuit rejected the district court's royalty determination based on projected profits, noting that the actual numbers were available in discovery. *Shockley v. Arcan, Inc., 248 F.3d 1349, 1363 (Fed. Cir. 2001)* is inapplicable, as there the court rejected a projected determination of future (post judgment) lost profits. The case before the Court is distinguishable because (1) actual sales figures (specifically, the requested *Rule 26 (e)* updates) were not [*19] disclosed and could have been; (2) given the difficult task, Plaintiff's expert relied on sound economic theory (projecting growth based on previous growth); (3) Elekta's only testimony regarding actual revenues does not cite to any document disclosed in discovery, and appears to be estimates (all figures are rounded to the nearest million dollars); and (4) after introducing this vague testimony regarding actual damages, Elekta did not move to strike the earlier admitted Midco projections. Given this situation, the Court finds that the jury could reasonably decide to rely on the Midco projections as the

best available evidence of sales of the infringing products. Given Elekta's litigation tactics, Midco's expert testimony appears the only reasonable way to estimate damages.

> n6 The Court will not consider Elekta's citation to *Nilssen v. Motorola, Inc., 1998 U.S. Dist. LEXIS 12882, 1998 WL 513090 (N.D. Ill. Aug. 14, 1998)*, an unpublished opinion from a District Court in North Dakota.

Rule of Thumb

At trial, Midco's expert, [*20] Carl Degen, testified at length on the "rule of thumb" approach, where a reasonable royalty is calculated by taking one-third to one-quarter of the anticipated profits on a patented product as a royalty. For the products at issue, Mr. Degen analyzed historical profits on similar products, concluding that a 9 percent royalty would be appropriate. Elekta did not put on a damages expert, did not offer any expert testimony that some approach other than the "rule of thumb" should be used, and did not offer any expert testimony that the "rule of thumb" should be applied differently (reaching some amount other than 9 percent). Instead, Elekta argues that *as a matter of law*, the "rule of thumb" was incorrectly applied. Mr. Degen was not testifying on his views of patent law but, rather, was testifying, based on his expert *experience* in hundreds of patent cases, that a 9 percent royalty would be appropriate in this matter. Given that this was the only available evidence regarding methodology for calculation of damages, the jury was well within its discretion to rely on this reasonable expert testimony.

Entire Market Value Instruction

At trial, the Court gave the following instruction [*21] n7 (reproduced in relevant part):

> Entire Market Value Rule
>
> Normally, in applying these factors, you should only consider the portion of the revenue that is due to the patented invention (as compared to the portion of the revenue due to other factors, such as unpatented elements for unpatented manufacturing processes, or features or improvements developed by Elekta). However, if you find (1) that the patented product is "functionally integrated" with the non-patented product, and (2) that the patented product "drives the market" for the sale of the non-patented product, you may choose to apply the entire market value rule. If you choose to apply the entire market value rule, you should consider the entire revenue, and not just the portion of the revenue that is due to the patented invention.
>
> The patented product is "functionally integrated" with the patented product if the components together are analogous to components of a single assembly or are parts of a complete machine, or they constitute a functional unit.
>
> The patented product "drives the market" for sales of the patented product if the patent-related feature is the basis for customer demand.

> n7 The Federal Circuit Model Instructions do not include an entire market value rule instruction.

[*22]

[HN1] The amount of patent damages is a question of fact for the jury, and was properly submitted for their consideration. *Bic Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1217-18 (Fed. Cir. 1993)*. The method for calculation of damages, including whether the entire market value rule is to be applied, is a question of fact. *See Tec Air, Inc. v. Denso Mfg. Mich., Inc., 192 F.3d 1353, 1362 (Fed. Cir. 1999)* (finding that application of entire market value rule is a question of fact). The Court finds that there was a sufficient factual basis to submit the entire market value rule instruction to the jury. Specifically, the jury considered Elekta's advertising touting the benefits of the patented technologies in the Gamma Plan, along with the fact that the Gamma Knife and the Gamma Plan are usually sold together and used together as one functioning unit.

Elekta also argues that the instruction should have included a requirement that the Entire Market Value Rule cannot be applied unless Midco can show that it sells the unpatented products. While this requirement is certainly necessary to apply the Entire Market Value Rule to a lost profits award [*23] (as evidenced by numerous cases cited by Elekta), this requirement is not necessary to apply the Entire Market Value Rule to a reasonable royalty award. In fact, the rationale behind reasonable royalty damages is to afford the patent holder some compensation when lost profits cannot be claimed or proved (*e.g.*, when the patent holder does not sell the patented product). *See Fromson v. Western Litho Plate & Supply Co., 853 F.2d 1568, 1574 (Fed. Cir. 1988)*.

Prejudicial evidence

Elekta argues that Midco prejudiced the jury by (1)

making accusations that Elekta committed various discovery violations, (2) noting that Midco had problems with Elekta subsidiary PTI, and (3) introducing testimony on the breach of contract claims that were later withdrawn. In the briefing, Elekta cites to only one portion of the trial transcript (the segment regarding PTI) where Elekta objected. The Court overruled the objection to "see what the question is," and promptly sustained the relevance objection after the question was asked. Transcript 1/29/02, p. 1093. The Court finds that Elekta has failed to identify any prejudicial evidence that reached the jury.

**Injunction**

There [*24] are two issues before the Court with respect to issuance of a permanent injunction: (1) should an injunction be entered? (2) what are the proper terms of the injunction?

Should an Injunction be Entered?

[HN2] Following a finding of infringement, a court "may grant injunctions in accordance with the principles of equity to prevent a violation of any rights secured by the patent, upon such terms as the court deems reasonable." *35 U.S.C. § 283.* [HN3] Generally, after infringement has been determined, a court will issue a permanent injunction prohibiting infringement unless a sound reason for its denial is shown. *See Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1272 (Fed. Cir. 1999).* The injunction is not automatic and should only be issued if, and to the extent, equity so requires. *Id.* The grant or denial of the injunction is reviewed under the abuse of discretion standard. *Id.* In determining whether to grant a permanent injunction, the Court considers (1) whether Midco will be irreparably injured if the injunction is not issued, (2) whether Midco has an adequate remedy at law for monetary damages, (3) who would be more harmed by the [*25] issuance or denial of the injunction, and (4) whether granting the injunction would serve any public interest. *See Smith Int'l, Inc. v. Hughes Tool Co., 718 F.2d 1573 (Fed. Cir. 1983).*

What are the Proper Terms of the Injunction?

[HN4] The parties disagree about the specific language identifying the products covered by the injunction. *Fed. R. Civ. P. 65 (d)* details the proper scope of an injunction: "Every order granting an injunction . . . shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." In *KSM Fastening Sys., Inc. v. H.A. Jones Co., 776 F.2d 1522 (Fed. Cir. 1985)* the Federal Circuit reversed the District Court's contempt finding, noting that the injunction at issue was unreasonable because it enjoined not only specific products, but also their equivalents (a term of art in patent law).

[HN5] The unreasonableness of a decree incorporating a vague or broad prohibition against "infringement" of a "patent" is alleviated because of the universal rule . . . that contempt proceedings, civil or criminal, [*26] are available only with respect to devices previously admitted or adjudged to infringe, and two other devices which are no more than colorably different there from and which clearly are infringements of the patent. . . . An enjoined party is entitled to design around the claims of a patent without the threat of contempt proceedings with respect to every modified device . . .

*Id. at 1526.*

As the court specifically notes in *KSM,* [HN6] "Even if the new product may infringe the patent, as long as it is more than colorably different the infringement should not amount to a contempt nor should it be tested in contempt proceedings." *Id., at 1528.* The Court adopts the "colorably different" language (recommended by Elekta) for the injunction. Thus, the injunction is limited to the products found to infringe and products not colorably different from those products.

The parties also disagree about what effect, if any, the injunction should have on Elekta products currently being used by hospitals (specifically, the 50 GammaPlan systems sold since April 1996 and the 16 GammaPlan Version 4.0 upgrades). *Rule 65(d)* provides that any injunction "is binding [*27] only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them." The hospitals are customers, good-faith purchasers, who bought a product that turned out to infringe a patent. The hospitals are not parties to the action or entities "in active concert" with Elekta and, thus, the Court has no jurisdiction to enjoin their activities. Even if the Court did have jurisdiction to enjoin the activities of hospitals, the Court would find that enjoining the acts of hospitals in this matter is not in the public interest.

**Prejudgment Interest**

In *General Motors Corp. v. Devex Corp., 461 U.S. 648, 76 L. Ed. 2d 211, 103 S. Ct. 2058 (1983),* the Supreme Court held that [HN7] prejudgment interest should ordinarily be awarded where necessary to afford a patentee full compensation for infringement. The Court noted that prejudgment interest is ordinarily necessary to ensure that the patent holder is placed in as good a position as he would have been had the infringer entered into a reason-

able royalty agreement.

[HN8] To calculate the proper amount of prejudgment interest, the Court must determine [*28] the following: (1) the principal amount for which interest is awarded, (2) the interest rate, (3) the method used to accrue interest (compound or simple), and (4) the date upon which interest begins accruing.

Principal

The principal amount for which interest is awarded is the amount of compensatory damages (here, the damages based on reasonable royalty, and not enhanced damages or attorneys' fees).

Interest rate

The Court may choose the prime rate (the rate banks charge for short-term unsecured loans to creditworthy customers), the Treasury bill rate (the virtually risk-free rate one gets when loaning money to the government), the state statutory rate (*Article 15, § 1 of the California Constitution* provides for 7 percent), or any alternative rate supported by the evidence.

[HN9] In *28 USC § 1961*, Congress has mandated that courts calculate postjudgment interest at the Treasury bill rate, compounded annually. The Ninth Circuit has applied this rule to prejudgment interest in some cases:

> We conclude that the measure of interest rates prescribed for post-judgment interest in *28 U.S.C. § 1961 (a)* is also appropriate for fixing [*29] the rate for pre-judgment interest in cases such as this, where pre-judgment interest may be awarded, unless the trial judge finds, on substantial evidence, that the equities of the particular case require a different rate.

*Western Pacific Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1289 (9th Cir. 1984). Although *Western Pacific* was a maritime case, its analysis has been applied to numerous other actions, including 1983 due process claims, SEC actions, 1983 labor claims, and a Warsaw Convention case. Although the Court has found no rule requiring the *Western Pacific* analysis when dealing with patent cases, the Court, here, finds that the Treasury bill rate is most appropriate in this matter.

The Court chooses not to apply the state statutory rate. [HN10] While the state statutory rate is, of course, not controlling in the context of a suit based on a federal claim, federal courts have used the statutory rate in the state in which they sit to calculate an award of prejudgment interest. *See Brooktree Corp. v. Advanced Micro Devices, Inc., 757 F. Supp. 1101, 1103 (S.D. Cal 1990)*. However, the statutory rate is problematic because it [*30] does not account for market fluctuations, which probably would have been accounted for in a hypothetical agreement.

Simple, Compounded Annually, or Compounded Quarterly?

[HN11] Courts have broad discretion in deciding whether to award simple or compound interest. Again, the goal is to put the patent holder into the position in which he would have been had the infringement not occurred (*i.e.*, had the parties entered into a reasonable royalty agreement). For postjudgment interest, *28 U.S.C. § 1961* requires annual compounding. Midco requests quarterly compounding, noting that in the vast majority of patent licenses, royalties are paid quarterly. Elekta correctly notes that all of the figures presented at trial were yearly figures. Although many patent cases can be cited for both simple or compound interest, here, annual compounding best approximates what the parties would have done had they entered into a reasonable royalty agreement.

Summary

The Court awards prejudgment interest at the Treasury bill rate, compounded annually, as if Midco had received a 9 percent royalty on all the relevant sales of infringing products. For simplicity, the Court will assume [*31] that each year Elekta would have paid a 9 percent royalty for the entire year's sales on July 1. For GammaKnife sales for 2000, 2001, and 2002, assume that revenues are as listed in Exhibit 813. n8

> n8 As discussed above, the jury verdict for GammaKnife sales for these years is based on projected (not actual) revenues. Therefore, the Court will calculate the interest based on the projected sales, which were the best available evidence of revenues.

**Enhanced Damages**

*35 U.S.C. § 284* [HN12] provides that a Court "may increase the damages up to three times the amount found or assessed." [HN13] Enhanced damages are punitive, not compensatory. *Beatrice Foods Co. v. New England Printing & Lithographing Co., 923 F.2d 1576, 1579 (Fed. Cir. 1991)*. The Court's decision to increase damages requires two steps: (1) finding clear and convincing evidence that the infringement was willful (or that other circumstances justify an enhanced award), and (2) determining from the totality of the circumstances [*32] that damages should be increased. *State Indus., Inc. v. Mor-*

*Flo Indus., Inc.,* 948 F.2d 1573, 1576 (Fed. Cir. 1991). In making the second determination, the Court should assess the following factors:

(1) whether the infringer deliberately copied the ideas or design of another;

(2) whether the infringer, after being put on notice of the patent, took reasonable steps to investigate the scope of the patent and formed a good-faith belief that it was invalid or not infringed;

(3) the infringer's behavior during the litigation;

(4) the infringer's size and financial condition;

(5) the closeness of the case;

(6) the duration of the infringer's misconduct;

(7) the remedial action by the infringer;

(8) the infringer's motivation for the harm; and

(9) the infringer's attempts to conceal its infringement. *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 827-28 (Fed. Cir. 1992).

With respect to the first determination, the jury found that there was clear and convincing evidence that the infringement was willful. The Court finds that the record contains sufficient evidence to support the jury determination, and will not second-guess this decision in determining [*33] whether to increase damages. Specifically, the jury may have relied on the following: Elekta's video touting the benefits of the new Version 4.0 (one benefit is virtually identical to Midco's patented idea), Elekta's cavalier attitude toward the Midco patents (Elekta did not consult an attorney initially, and appeared absolutely unconcerned about the patent claims), and Elekta's previous business relationship with Midco (the two companies had discussed a joint venture, but Elekta decided to proceed alone — with technology that the jury found belonged to Midco).

With respect to the second determination, the Court considers each of the *Read* factors.

(1) Whether the Infringer Deliberately Copied the Ideas or Design of Another

Again, Elekta's previous business relationship with Midco suggests that Elekta deliberately copied the ideas of another. Elekta's product was not just suspiciously similar but, rather, almost exactly the same as the Midco invention—a fact highlighted by the fact that Elekta did not put on any expert to testify about the differences between Elekta's products and the claims of the patent. The Court finds that this factor weighs in favor of enhanced damages. [*34]

(2) Whether the Infringer, After Being Put on Notice of the Patent, Took Reasonable Steps to Investigate the Scope of the Patent and Formed a Good-faith Belief That it was Invalid or not Infringed

At trial, Dr. Dan Leksell testified that he did not seek advice of counsel regarding the Midco patents because he was "so certain" of his noninfringement analysis that he did not need to take the matter to a patent attorney. Dr. Leksell is not trained as a patent attorney and did not compare the claims of the patent with the accused structures. Dr. Leksell's "analysis" was so insignificant as to leave no paper trail: Elekta presented no notes, memoranda, or other evidence whatsoever that Elekta took *any* steps to determine whether its products infringed the Midco patents. The total lack of any paper trail of the alleged noninfringement analysis further demonstrates that this was a serious breach of Elekta's duty of due care. The Court finds that this factor weighs in favor of enhanced damages.

(3) The Infringer's Behavior During the Litigation

In the Declaration of Paul Adams in Support of Motion for Attorneys Fees, Midco presents 17 specific areas in which it feels it was [*35] the victim of litigation misconduct and/or bad faith litigation. As this case has lasted over 5 years and been before at least three judges, this Court did not have the opportunity to witness all of the accusations listed. While the conduct of Elekta's counsel in this case was hard-nosed, the Court does not find that it rises to the level of litigation misconduct.

The most serious allegation is that of racial prejudice. Specifically, the Court sustained Midco's *Batson* challenge during jury selection. Dr. Hardy, the inventor of Midco's machines and founder of Midco, is a black man and was present during jury selection and every day of the trial. In sustaining Midco's *Batson* challenge, the Court necessarily found that, by a preponderance of the evidence, Elekta's proffered explanation for the strike was a pretext for race (and that Elekta had engaged in purposeful discrimination on the basis of race). Given the weight of the accusation of racial discrimination, the Court does not make such decisions lightly. However, given the importance of the right against racial discrimination, the Court does not reserve such decisions for obvious or blatant violations. Trial courts must [*36] make these critical decisions on the spot. Likewise, Elekta had to satisfy its burden of production (providing a neutral explanation for the challenge) on the spot. In this context, the Court finds that this factor is neutral on the issue of enhanced damages.

(4) The Infringer's Size and Financial Condition

Midco argues that this factor weighs in favor of a

large punitive award, because the Elekta network has annual revenues of over $200 million and a combined market capitalization of over $100 million. Elekta does not dispute these numbers, but responds that they suffered substantial losses or meager profits for the 1996-2002 time period. However, this information is unhelpful because Elekta has not indicated the source of low profits (high equipment costs or production expenses may be more relevant than R&D or investment decisions that have not panned out). Elekta also responds that shareholder equity (assets minus outstanding liabilities) is less than $86 million. Elekta has not suggested any inability to pay the judgment, or noted any specific detrimental effects that would result from paying the judgment. Here, the Court finds that the annual revenues and market capitalization [*37] weigh in favor of enhanced damages.

(5) The Closeness of the Case

Elekta produced no expert to argue that its machines did not infringe the Midco patents but, instead, relied exclusively on its lawyers' ability to pick apart testimony of Midco experts. The Court is left with sufficient evidence of infringement, and no evidence of noninfringement. Likewise, Elekta produced no expert on the appropriate amount of damages, again relying on its lawyers' ability to pick apart testimony of Midco experts. The Court is left with sufficient evidence of damages under one theory, and little evidence of damages under another theory. Elekta's entire case centered around arguing that Midco failed to provide sufficient evidence to support their claims. Once Midco's claims survived JMOL and were submitted to the jury, the case was not close. The Court finds that this factor weighs in favor of enhanced damages.

(6) The Duration of the Infringer's Misconduct

Elekta began infringing the Midco patents by at least April 1996, when Elekta introduced Version 4.0 of the GammaPlan system. Elekta argues that the delay in determining infringement was due to delays in litigation caused by Midco. The [*38] Court finds that many delays in this litigation were also due to Elekta or the Court (specifically, the death of Judge Schwartz). Regardless of the source of the delay, the fact remains that Elekta continued to sell the infringing products during a 6-year time period while litigation was pending. The Court finds that this factor weighs in favor of enhanced damages.

(7) The Remedial Action by the Infringer

Elekta did not take any remedial action until the jury returned a verdict. After the verdict, Elekta immediately ceased shipping and selling all products containing fusion. However, because Elekta did not voluntarily stop making the infringing product during the pendency of the lawsuit, this factor weighs in favor of enhanced damages.

(8) The Infringer's Motivation for the Harm

There is no sufficient evidence in this matter regarding the motivation for the harm. Elekta's motivation in infringement seemed purely financial. The Court finds that this factor does not significantly weigh in favor of enhanced damages.

(9) The Infringer's Attempts to Conceal its Infringement

Midco argues that Elekta's litigation tactics indicate an intent to conceal its infringement. The [*39] Court finds no evidence of affirmative attempts to conceal infringement, and that this factor does not significantly weigh in favor of enhanced damages.

Having found that the evidence supports a finding by clear and convincing evidence that the infringement was willful, and having considered each of the *Read* factors, the Court finds that damages in this matter should be enhanced.

The jury's damage award, while well-supported by the evidence, was at the high end of the jury's options in choosing a reasonable award. Given the existing compensatory award from the jury, as well as the Court's granting of Midco's attorney fees in this case, the Court finds that the punitive purposes of the enhanced damages statute will be adequately served by a 25 percent enhancement.

**Attorney fees**

*35 U.S.C. § 285* provides that "the court in exceptional cases may award reasonable attorney fees to the prevailing party." [HN14] The award of attorney fees under this section is compensatory, rather than punitive. *Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc., 607 F.2d 885 (10th Cir. 1979)*. The Court follows two steps in determining whether to [*40] award attorney fees: (1) determining whether the case is "exceptional," and (2) deciding to exercise discretion in awarding attorney fees. Conduct sufficient to make a case "exceptional" may include willful infringement, inequitable conduct, litigation misconduct, and vexatious litigation tactics. *Hoffmann La Roche, Inc. v. Invamed Inc. 213 F.3d 1359, 1365 (Fed. Cir. 2000)*.

As discussed above, the jury's finding of willful infringement is well-supported by the evidence. Midco additionally cites numerous alleged instances of litigation misconduct by Elekta. The Court need not evaluate the truthfulness of each allegation, as the willful infringement here is sufficient to find the case "exceptional" for *§ 285* purposes.

The Federal Circuit recently noted that [HN15] "while a finding of willful infringement does not mandate that

Case 1:97-cv-00550-SLR    Document 1418-7    Filed 05/24/2005    Page 14 of 15

Page 13
2002 U.S. Dist. LEXIS 26812, *40

damages be increased or that attorney's fees be awarded, after an express finding of willful infringement, a trial court should provide reasons for not increasing a damages award or for not finding a case exceptional for the purpose of awarding attorney's fees." *Tate Access Floors, Inc. v. Maxcess Techs., 222 F.3d 958 (Fed. Cir. 2000).* [*41]

Here, Midco was only successful on a portion of its claims. In *Hensley v. Eckerhart, 461 U.S. 424, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983)*, the Supreme Court gives guidance as to how to determine the proper amount of attorney fees in cases when plaintiff has achieved only partial or limited success. Since an award of the entire claimed hours (here $3 million) would be excessive in this case, the Court must consider how much of a deduction is proper.

> [HN16] There is no precise rule or formula for making these determinations. The District Court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The Court necessarily has discretion in making this equitable judgment. . . .
>
> A request for attorneys fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee. Where settlement is not possible, the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.

*Id. at 436-37.*

The Court finds that the claims are not so intertwined as to make [*42] individualized accounting impractical, and awards Midco attorney fees for all the claims on which Midco prevailed. The parties' original briefing on the issue of attorney fees, however, focused almost entirely on whether or not to award attorney fees, rather than the proper amount of attorneys' fees. Thus, the Court requested that the parties' submit additional fees information listing attorney fees for only those claims on which Midco succeeded. (Ct. Rec. 530.)

Having considered the supplemental information provided by the parties, the Court finds that Midco is entitled to an award of $1,564,133.01 for attorneys' fees. This award represents 59 percent of Midco's total attorney fee expenditures in the case. Midco submitted to the Court a detailed and meticulous accounting of the hours its attorneys spent on the prevailing claims, which substantiated this total. The Court finds Midco's request based on this information to be accurate and reasonable. The Court finds Midco's cost request to be reasonable as well.

Elekta objects to Midco's fee request because it did not have an opportunity to review Midco's attorney time records submitted to the Court for *in camera* review. It was [*43] never the Court's intention, however, to make detailed attorney time records describing the services performed by Midco's attorneys available for perusal by the Defendant. This information is privileged, and Midco's submission to the Court was sufficient to allow the Court to determine the accuracy of its accounting. *See In re Grand Jury Witness, 695 F.2d 359, 362 (9th Cir. 1982)* (noting that time records that reveal nature of attorney services provided are privileged and should be submitted *in camera* for court's inspection).

Midco is not able to recover expert fees under *35 U.S.C. § 285*. The Court does not find that Elekta's conduct was egregious enough to warrant an award of expert fees under the Court's inherent power. Midco may, however, submit to the Court within 14 days of the date of this order a request for witness fees under *28 U.S.C. § 1821*. Any such request must be fully documented.

Elekta has filed a Cross-Motion for Attorney Fees and Costs (Ct. Rec. 505), alleging misconduct and vexatious litigation by Midco. Specifically, Elekta maintains that Midco filed frivolous claims, maintained those frivolous [*44] claims, and falsely accused Elekta's counsel of manufacturing documents. Having presided over numerous hearings and the trial in this matter, the Court was never informed of and did not observe litigation conduct by Midco that was so offensive as to warrant an award of attorney fees to Elekta.

**IT IS HEREBY ORDERED**

1. Midco's Motion for Enhanced Damages (Ct. Rec. 491) is **GRANTED**. The Court exercises its discretion to enhance the damages by 25 percent.

2. Midco's Motion for Attorney Fees (Ct. Rec. 493) is **GRANTED**. Midco is awarded $1,564,133.01 for attorneys' fees and $139,029 for costs, totaling $1,703,162.01. The Court will allow Midco 14 days from the date of this order to submit a request for witness fees under *28 U.S.C. § 1821*.

3. Midco's Motion for Prejudgment Interest (Ct. Rec. 497) is **GRANTED**.

4. Midco's Motion for Permanent Injunction (Ct. Rec. 500) is **GRANTED**. It is further ordered that Defendants, their officers, agents, servants, employees, attorneys, or any of them, and all persons acting in concert or participation with them, or with any of the foregoing, be and hereby are permanently enjoined from making, using, [*45] of-

fering to sell or selling in the United States or importing into the United States the infringing products or products not colorably different from the infringing products.

5. Elekta's Cross-Motion for Attorney Fees (Ct. Rec. 505) is **DENIED**.

6. Elekta's Motion for Judgment with respect to Damages (Ct. Rec. 507-1 and 507-2) is **DENIED**.

7. Elekta's Motion Re: Liability (Ct. Rec. 507-3 and 507-4) is **DENIED**.

8. Midco's Motion to Strike (Ct. Rec. 526) is **GRANTED**. The Court strikes Paragraphs 2 and 3 of the Rod Farmer declaration, as well as the attachments thereto.

9. The remaining Motions in Limine (Ct. Rec. 402 and 405), on which the Court reserved ruling prior to trial and resolved at trial, are now **DENIED AS MOOT**.

10. Elekta's Motion to Preclude Unpled Tort Claim (Ct. Rec. 478) is **DENIED AS MOOT**.

11. Midco's Motion for JMOL at Close of Evidence (Ct. Rec. 481) is **DENIED**.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this order, provide copies to counsel, and **CLOSE** the file.

**DATED** this 4th day of September 2002.

ROBERT H. WHALEY

United States District Judge

JUDGMENT IN A CIVIL CASE

DECISION [*46] BY COURT. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

9/6/02

Date