# D PART VI

Not Reported in F.Supp.                                                      Page 1

1992 WL 125559 (N.D.Ill.)

**(Cite as: 1992 WL 125559 (N.D.Ill.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
NATIONAL PRESTO INDUSTRIES, INC.
Plaintiff,
v.
BLACK & DECKER INC., Defendant,
and
Better Mousetraps, Inc., Third-Party Defendant.
**No. 89 C 8978.**

May 27, 1992.

*MEMORANDUM OPINION AND ORDER*

WILL, District Judge.

*1 Following a jury trial on National Presto's claim
that Black & Decker's Handy Slice 'n Shred
infringed a Presto patent, and BMI's counterclaim
that Presto's SaladShooter infringed their patent,
judgment was entered in favor of National Presto.
In answers to interrogatories the jury found: 1) that
Black & Decker infringed Presto's admittedly valid
patent; 2) that Black & Decker's patent was invalid
because of the prior invention of Presto, without
abandonment, suppression, or concealment; 3) that
there were no acceptable, non-infringing substitutes
for the SaladShooter; 4) that Presto would have
made 161,881 additional sales were it not for Black
& Decker's infringement; and 5) that Presto suffered
lost profits of $2,350,512.12.

The defendants have made five post-trial motions
attacking the jury verdicts. Specifically, they have
moved (1) for judgment notwithstanding the verdict
on Black & Decker's infringement of Presto's
patent, (2) for j.n.o.v. or a new trial on the existence
of acceptable non-infringing substitutes, (3) for
remittitur or a new trial on damages, and (4) for
j.n.o.v. and for a new trial on whether Presto
"abandoned, suppressed or concealed," its prior
invention. The parties have also filed memoranda
debating the proper rate for calculating the
pre-judgment interest. For the reasons explained
below all of Black & Decker and BMI's motions for
j.n.o.v. or a new trial are denied.

*1) Black & Decker's motion for j.n.o.v. or a new
trial on the question of infringement of Presto's
patent.*

The jury's finding of infringement was supported
by the evidence, and was not wrong as a matter of
law. Mr. Anderl's admissions, which Black &
Decker places great weight on, must be taken in the
context of his particular level of expertise and his
lack of familiarity with the patent, as explained in
his testimony at trial, and in light of all of the other
evidence presented on this point by both parties'
experts.

Black & Decker argues that since claim
interpretation is a question of law, j.n.o.v. is
appropriate in this case. While claim interpretation
is a question of law, *Fromson v. Advance Offset
Plate, Inc.,* 720 F.2d 1565, 1569 (Fed.Cir.1983),
*Intervet America v. Kee-Vet Laboratories,* 887 F.2d
1050, 1053 (Fed.Cir.1989), there may be disputed
facts that are relevant to the question of claim
interpretation, see *Johnston v. IVAC Corp.,* 885
F.2d 1574, 1579-80 (Fed.Cir.1989) and *Moeller v.
Ionetics, Inc.* 794 F.2d 653, 657 (Fed.Cir.1986). In
this case there were factual disputes about the
content of the prior art. There was also a need to
hear expert testimony, so that the claims could be
interpreted as one skilled in the art would read
them. *Smithkline Diagnostics v. Helena
Laboratories,* 859 F.2d 878 (Fed.Cir.1988).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1992 WL 125559 (N.D.Ill.)

**(Cite as: 1992 WL 125559 (N.D.Ill.))**

More important, the relevant claims in Presto's patent include means-plus-function language, which, as Black & Decker has argued, are interpreted as specified in 35 U.S.C. § 112, ¶ 6 to include the structure disclosed in the specification and equivalents thereto. The question of equivalence, which was therefore central to the question of infringement in this case, is a question of fact. See *Symbol Technologies, Inc. v. Opticon, Inc.,* 935 F.2d 1569, 1575 (Fed.Cir.1991) ("The scope of literally infringing 'equivalents' under § 112 ¶ 6 is a factual determination."), *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 862 (Fed.Cir.1985). Specifically, the question of equivalence in function, way, and result which Black & Decker places great weight on is a question of fact. *Sun Studs, Inc. v. ATA Equipment Leasing, Inc.,* 872 F.2d 978, 986 (Fed.Cir.1989).

**\*2** Black & Decker also argues that Presto was required to put forward more explicit and more specific testimony on function, way, and result for interpreting the range of equivalents in the 'means' clause, citing *Malta v. Schulemerich Carillons, Inc.,* 952 F.2d 1320 (Fed.Cir.1991). The testimony of both Professor Philpott (Tr. at 248-9) and Mr. Hedrington (Tr. at 355) specifically addressed those points. At any rate, any suggestion that the evidence was not sufficient on this point is immaterial in light of independent claim 14, one of the three independent claims alleged to be infringed, which does not include the "means of support" language, but instead refers to a "support member." Since a patent is infringed if a single claim is infringed, *Intervet,* 887 F.2d at 1055, the jury's verdict is supportable based on this claim alone, even if the testimony was not specific enough on the equivalence of function, way, and result.

Black & Decker also argues that the application of the doctrine of equivalents is the exception, not the rule, and that it should not be applied in this case. However, the question of equivalents is essential to interpreting the means-plus-function clauses that were at issue in this case, as Black & Decker has previously argued.

Black & Decker's remaining arguments on the

propriety of certain jury instructions that were given or refused are also meritless. The example of the Stewart-Warner case was not objected to at the time the instructions were given, although Black & Decker's counsel were specifically asked if they had any objections to the instructions as given. Any possible error in the comment was therefore waived. The refusal to give certain instructions proposed by Black & Decker was also proper, as explained at length in the jury instruction conference. The alleged errors in the jury instructions also do not warrant a new trial. Finally, the jury's verdict was not against the manifest weight of the evidence.

2) *Black & Decker's motion for j.n.o.v. or a new trial on the question of acceptable non-infringing substitutes and the number of lost sales.*

Black & Decker has asked for judgment n.o.v., as well as a new trial. Even if it were the case that no reasonable jury could reach this verdict, there is no way to say that as a matter of law a particular unit was an acceptable substitute, or a particular number of units was the correct finding on lost sales. Therefore, Black & Decker would, at most, be entitled to a new trial, and we therefore consider the new trial standard, rather than the j.n.o.v. standard.

Black & Decker argues that the jury was biased against them, and point to some of the arguments made in Presto's opening statement regarding BMI's arrangements with Black & Decker, and the general contempt with which Presto's counsel, Mr. Hunter treated Black & Decker throughout the trial. The only ground Black & Decker has to show that the jury was influenced by this behavior is the contention that the verdict was one no reasonable jury could reach, so this argument does not necessitate separate consideration--it turns on whether the verdict was supportable, the question discussed later.

**\*3** Black & Decker once again argues that Presto should not have been allowed to make a *Mor-Flo* market share argument because such a theory was not disclosed in discovery. We have already rejected this argument once, and find it no more worthy at this time. Black & Decker had no reason

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to assume that if Presto was unable to prove that "all" Black & Decker sales would have gone to Presto, that it would not argue for a large percentage based on market analysis. It was Black & Decker's job to ask questions about this possibility, and their counsel never did.

Black & Decker also cites as error warranting a new trial the exclusion of their market survey. Although there were clear indications that it probably would not be admitted, Black & Decker never actually moved for its admission; instead they tried to ask their witness questions about it, and those questions were foreclosed since the survey was not in evidence and had not been disclosed to Presto in advance. At any rate, the survey, apparently completed in January 1992, was not disclosed to Presto prior to trial and would properly have been excluded. This does not support the grant of a new trial.

The strongest argument that Black & Decker makes is that the verdict was against the manifest weight of the evidence. Even here, some of their argument is misplaced--they continually argue about the market share analysis, and talk about the 3% reduction in the number of units sold as a reduction based on market share. Market share does not come into this verdict at all. If there are no acceptable substitutes, then the jury is not supposed to look at market share, they award Presto all of Black & Decker's sales, less any purchases that would not have been made at all because the Presto product was not available in every store or because of brand loyalty, et cetera. These reductions are not based on a *Mor-Flo* market share analysis. Thus, since the jury found that there were no acceptable substitutes, the fact that there was not good evidence about exactly what the market was, how it should be defined, how big it was, and what Presto's share was, is irrelevant.

The pertinent question is whether it was against the manifest weight of the evidence for the jury to find that there were no acceptable, non-infringing substitutes. The court observed the good performance of the West Bend unit and some others at hand held slicing/shredding. There were still differences in relevant characteristics, however. Some of the units, such as the West Bend, were larger than the SaladShooter. There was also the issue of ease of cleaning which Ms. Cohen referred to repeatedly in her testimony. While Black & Decker put forward some demonstrative evidence to show that a few other units functioned as well as the SaladShooter when it came to directing the sliced or shredded food, there was no evidence to contradict Ms. Cohen's testimony on the ease of cleaning the Presto unit.

Perhaps Black & Decker could have put forward evidence to show that the West Bend and other units are as easy to clean as the SaladShooter. Or they may not be. They did put in evidence that the West Bend unit was dishwasher safe. Given the uncontradicted statements by Ms. Cohen about the crevices that one needed to dig food out of with toothpicks, and other cleaning problems, however, the jury's finding was not clearly against the manifest weight of the evidence.

*4 Black & Decker argued to the jury that many units were acceptable substitutes which obviously were not. Most of them could not be hand held or could not direct the sliced or shredded food. There was evidence about how various models worked, what they could do, and what their features were. Given the evidence that was presented, the jury finding of no acceptable substitutes was not contrary to the manifest weight of the evidence.

Black & Decker then argues that the jury was confused and did perform a market share analysis in arriving at the number of lost sales (161,881), despite their finding of no acceptable substitutes. This argument assumes that the number of Black & Decker sales during the relevant period was 166,888, and that any deduction was from that number. That number, 166,888, was the final number argued by Black & Decker, and it was the number used as a basis for the testimony of Mr. Duggan, the Black & Decker expert. Earlier in the case, however, various other figures had been discussed, and the jury could have begun its calculations using one of those figures, and not the 166,888 as Black & Decker assumes.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1992 WL 125559 (N.D.Ill.)

**(Cite as: 1992 WL 125559 (N.D.Ill.))**

Assuming that the jury did begin its calculations with 166,888 as a starting point, the reduction in lost sales was 5007. As mentioned above, the jury could certainly have reduced the number by some to account for brand loyalty, unavailability of the Presto SaladShooter, etc., but 5007 is an odd number that happens to be 3% of 166,888. (.03 x 166,888 = 5606.6, which rounds off to 5007) And 3% is the number that Presto's counsel suggested in his closing argument was the share of the market that Rival had, based on the evidence of 50,000 units sold to Wal-Mart. Mr. Hunter in his closing stressed that this showed the Rival unit was unavailable (and unacceptable) to consumers, and was therefore not an acceptable substitute, he did not suggest that the jury find a 97% market share for Presto.

Black & Decker argues that the jury felt it necessary to reduce the lost Presto sales by 3% to account for sales that would have gone to Rival instead, making this verdict inconsistent with their answer to the first interrogatory about acceptable substitutes. If this were true, it would indicate that the jury was confused about what they were doing, and would support the grant of a new trial. However, this argument involves a great deal of speculation about what the jury was doing. It could be just a coincidence that their reduction was 3%. Given their supportable finding of no acceptable substitutes, the jury had a lot of leeway in deciding exactly how many of the Black & Decker sales would have gone to Presto. Black & Decker was fortunate to get any reduction at all, since the burden was on them to prove a reduction from 166,888 once the jury had decided that there were no acceptable substitutes. See *Kaufman Co. Inc. v. Lantech, Inc.*, 926 F.2d 1136, 1141 (Fed.Cir.1991).

Black & Decker also objects to Presto's "flashlight" comment. The transcript shows that no objection was made at the time; therefore this objection is waived.

3) *Black & Decker's motion to reduce the damage award or for a new trial on damages.*

**\*5** In this motion Black & Decker once again

argues that the jury was biased against them, but without any evidence other than that they find the damage award outrageous and otherwise inexplicable. There is no evidence of actual prejudice and the jury's verdict simply shows they believed one set of facts, not another. As discussed below, there was ample evidence to support the jury's verdict.

The disputed damage question was whether advertising costs for the SaladShooter were fixed or incremental. There is no dispute that the established test for lost profits excludes fixed costs, which presumably do not vary with increased production, and only subtracts variable costs from profits. See, e.g., *Paper Converting v. Magna-Graphics*, 745 F.2d 11, 22 (Fed.Cir.1984). There was some evidence that advertising costs were incremental: Ms. Cohen testified that the SaladShooter was driven by advertising; without advertising it did not sell. There was ample testimony that there was a correlation between the amount of advertising and the sales of SaladShooter. In fact, in the second year when Presto's ad budget was lower, their sales were too (both declined 18-19%). Ms. Cohen admitted on cross-examination that when there was a direct correlation between a cost and the number of sales, she would describe that as a variable cost.

However, the evidence that advertising varied with sales does not necessarily make it an incremental as opposed to a fixed cost. The issue in determining lost profits is whether Presto would have spent more on advertising in order to make an additional 161,881 sales, in the same way that it would have spent additional funds on obtaining and shipping the units. There was evidence that the advertising budget was set in advance for each year, and that Presto would not have spent any more money on advertising in the particular years regardless of extra sales. Supporting Ms. Cohen's claim was the evidence that Presto already had reached 90% saturation, with viewers having 15 or more chances to see the ads, so there would have been little added impact from increasing their advertising. (Tr. 1647) If the jury believed that the ad budget was set in advance for the entire year, and Presto would not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Case 1:97-cv-00550-SLR    Document 1418-8    Filed 05/24/2005    Page 6 of 30    Page 5
1992 WL 125559 (N.D.Ill.)

(Cite as: 1992 WL 125559 (N.D.Ill.))

have changed it no matter what, then advertising is a fixed cost. The jury didn't have to find that advertising was a fixed cost, but there was evidence to support such a finding.

It may seem more reasonable and equitable to allocate the cost of advertising over all of the sales, including the 161,881 lost sales, especially since advertising was such a large part of Presto's costs. However, that is not the rule of damages in patent cases: only incremental costs are subtracted; there is no allocation of fixed costs.

Black & Decker further argues that the lost sales cannot be treated as if they came after the rest of the sales, as the "N+1" sale, since they were spread throughout the 27 month period. The rule in patent cases is to treat all lost sales as N+1 sales. See *Paper Converting*, supra. Furthermore, it doesn't really matter: either Presto would have made the Black & Decker sales earlier, covered its costs earlier, and the units it sold later would have generated excess profits, or it would have used its own sales to cover the costs and all of Black & Decker's sales would have been excess profits, with no further advertising costs. Either way, there was sufficient evidence to support the jury finding that advertising was a fixed cost.

*4) Abandoned, suppressed, or concealed.*

*6 BMI has filed separate motions for j.n.o.v. and for a new trial on the issue of abandoned, suppressed, or concealed. The motion for a new trial is based entirely on prejudice, improper argument, exclusion of evidence, etc., and not that the verdict was against the manifest weight of the evidence. On this issue, as on several others, the court might well have weighed the evidence differently and reached different conclusions than the jury did. But the jury's conclusions are not clearly contrary to the manifest weight of the evidence. BMI's argument of error in various evidentiary rulings is without merit. The rulings, as explained in the pre-trial conference and during the trial were proper. While Presto's counsel made some clearly improper arguments, overall I do not find prejudice. Some objections were waived by

BMI, but as to all the court took steps to prevent any prejudice, including vigorously chastising Presto's counsel, Mr. Hunter, in the jury's presence. As discussed below, there was evidence to support the jury's finding on this issue; it was not clearly contrary to the manifest weight of the evidence. There is no evidence that the verdict was the result of prejudice.

BMI has two basic arguments for j.n.o.v. 1) Because Presto intended to keep the invention secret, and did keep it secret past the time when BMI came up with its invention, then Presto "abandoned, suppressed, or concealed" as a matter of law; and 2) The 18 month delay was unreasonably long because Presto was merely commercializing the invention, and had all the basics down with Prototype 2.

BMI argues for j.n.o.v. on this issue because there is no dispute about the facts such as dates of reduction to practice, dates of filing, dates of public disclosure, and most importantly, Presto's stated policy of keeping the invention secret until it was ready for sale. BMI argues that Presto has admitted intentionally concealing the invention for 18 months, and since it was during that time that BMI developed its invention, then Presto has abandoned, suppressed, or concealed as a matter of law, and BMI's patent is valid. BMI argues that where there is direct evidence of intent to conceal, there is no need for a long delay to support the inference. *Paulik v. Rizkalla*, 760 F.2d 1270, 1273 (Fed.Cir.1985); *Lutzker v. Plet*, 843 F.2d 1364, 1368 (Fed.Cir.1988) (" 'Lutzker's actions ... constitute more than an inference of suppression or concealment' because of his deliberate policy not to disclose his invention to the public until he is ready to go into commercial production. Such a policy is evidence of an intent to suppress or conceal the invention under 35 U.S.C. § 102(g)."); *Palmer v. Dudzik*, 481 F.2d 1377, 1380-81 (C.C.P.A.1973).

BMI argues that the entire issue can be resolved with the evidence of Presto's policy showing the necessary intent to conceal under § 102(g). However, the court in *Lutzker* spoke of the inventor's policy as being *evidence* of intent to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1992 WL 125559 (N.D.Ill.)

**(Cite as: 1992 WL 125559 (N.D.Ill.))**

conceal under § 102(g), and it also considered other factors such as the length of delay and, most important in this case, what the inventor was doing during the delay. As the jury was instructed, and as the *Lutzker* court also noted, an inventor may keep the invention secret while working to perfect the invention, without falling under the § 102(g) realm of "abandoned, suppressed, or concealed."

*7 Presto presented evidence and argued that the secrecy was acceptable because everybody, including Black & Decker, does it. BMI suggests that this argument misled the jury, and that "everybody does it" is not a defense under § 102(g). The jury was instructed that patent applications are secret until granted, so that Presto would not have risked disclosure had it filed a patent application. BMI had the opportunity to present evidence and argue that "everybody else" also files patent applications to protect their priority. BMI could have presented evidence and argued this point more forcefully. Nonetheless the instructions made the point and gave the jury the relevant information that Presto would not have been at risk of either premature disclosure or loss of priority if it had filed a patent application.

The question still remains whether the delay was caused by the sort of concealment forbidden by § 102(g), a delay for mere commercialization or other reasons, or whether the delay was necessary to perfect the invention. On that question there was evidence on both sides, and quite enough to support the jury finding in favor of Presto.

The determination of whether Presto's activities were improvements on the invention or merely efforts to commercialize the product is a question for the trier of fact. BMI tries to make this a question of law by arguing that Presto had stipulated to a reduction to practice, and that therefore it had a functioning invention. BMI suggests that Presto's argument that the improvements it worked on were necessary to make the invention function is inconsistent with the stipulation. However, a reduction to practice of an invention does not mean that there can not be improvements to the invention that are not mere

commercialization efforts. Under BMI's theory, a delay between reduction to practice and disclosure could *never* be justified as time necessary to perfect an invention, and rights would always be lost under § 102(g). This is completely contrary to established law recognizing allowable delay for perfecting an invention after it has been reduced to practice. See *Lutzker,* 843 F.2d at 1367, and cases cited therein.

BMI next argues that several changes that Presto placed great emphasis on did not even make it into the patent claims it filed. As stated in *Lutzker,* "When, however, the delay is caused by working on refinements and improvements which are not reflected in the final patent application, the delay will not be excused." *Lutzker,* 843 F.2d at 1367. However, BMI's argument fails because it stipulated not only that Presto made improvements, but also that some improvements were described in the patent and incorporated in the SaladShooter.

It cannot be said that, as a matter of law, Presto's activities can only be viewed as commercialization, and not perfecting of the invention. BMI has also urged reconsideration of the ruling on the burden of proof: the jury was instructed that Presto had the burden of proving, by a preponderance of the evidence, that it had not abandoned, suppressed, or concealed the invention. BMI argues that the burden should have been clear and convincing rather than preponderance. This issue was fully briefed and considered in the course of the trial, and BMI makes no argument that would support changing that ruling.

*5) Parties' memoranda on pre-judgment interest.*

*8 Both parties agree that Presto is entitled to pre-judgment interest, the only dispute is about the rate. The choice of rate is within the court's discretion. We find that Presto will be fully compensated by being given the interest rate it could have earned if it had had the money to invest, the interest rate that is statutorily established for post-judgment interest: the Treasury Bill rate.

An order consistent with the foregoing rulings will

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1992 WL 125559 (N.D.Ill.)

**(Cite as: 1992 WL 125559 (N.D.Ill.))**

be entered.

1992 WL 125559 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

- 1:89CV08978  (Docket)

  (Dec. 05, 1989)

  •

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 1997 U.S. DIST LEXIS 18460

**PHILLIPS PETROLEUM COMPANY, Plaintiff, vs. REXENE CORPORATION, Defendant.**

**Civil Action No. 90–208–LON**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1997 U.S. Dist. LEXIS 18460*

**September 4, 1997, Decided**

**SUBSEQUENT HISTORY:** [*1] Supplemental Opinion of September 9, 1997, Reported at: *1997 U.S. Dist. LEXIS 18459.*

**DISPOSITION:** Phillips is entitled to permanent injunction preventing Rexene from infringing the '851 patent and money damages in the amount of $5,743,373, plus prejudgment interest at the U.S. Treasury Bill rate, compounded quarterly, for Rexene's infringement from April 24, 1990 to June 30, 1994.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff grantor brought an action against defendant grantee for willful infringement of a patent. The grantee filed a counterclaim for a declaratory judgment that it was not an infringer and that the case was "exceptional" within the meaning of *35 U.S.C.S. § 285.* The appellate court held that the grantor provided the grantee with adequate notice of default prior to terminating the license and remanded the case for further proceedings.

**OVERVIEW:** The grantee obtained a license to make, use, or sell the product, crystalline polypropylene, covered by the grantor's patent. The grantor contended that it was justified in terminating the license based on the grantee's failure to make payments due and its failure to submit royalty reports. The grantee claimed that it was not in default at the time that the grantor terminated the license. The court found that the grantor properly and effectively terminated the license agreement and that the grantee infringed the patent by its continued production thereafter of crystalline polypropylene. It granted a permanent injunction preventing the grantee from further acts of infringement and awarded the grantor damages at an established, reasonable royalty rate of one cent per pound (escalated) applied to a quantity of production established by the grantee's expert. The grantor was not entitled to an enhanced damage award under *35 U.S.C.S. § 284* because it did not establish by clear and convincing evidence that the grantee willfully infringed the patent. The grantee had a reasonable, good faith belief that the grantor was willing to reinstate the license prior to being notified otherwise.

**OUTCOME:** The court ordered and adjudged that the grantee infringed on the grantor's patent and materially breached their license agreement. The grantor effectively terminated the license and was entitled to a permanent injunction preventing further acts of infringement, monetary damages, and prejudgment interest to be calculated at the Treasury Bill rate. The grantor was not entitled to enhanced damages or attorney's fees.

**LexisNexis(R) Headnotes**

*Patent Law > Infringement Actions > Infringing Acts > Sale*
*Patent Law > Infringement Actions > Infringing Acts > Make*
*Patent Law > Infringement Actions > Infringing Acts > Use*
[HN1] Patent infringement occurs when a person without authority makes, uses, or sells any patented invention, within the United States during the term of the patent. *35 U.S.C.S. § 271*(a). The interpretation of a license agreement is a question of law governed by state contract law. A court, in interpreting a contract, must attempt to ascertain the intent of the parties to the extent that they evidenced what they intended by what they wrote. A court should not fashion a new contract for the parties under the guise of contract construction. Rather, where the terms of a contract are clear and unambiguous, a court must give effect to the intent of the parties from the language of the contract, interpreting the words and phrases according to their plain meaning.

*Contracts Law > Contract Interpretation > Interpretation Generally*
*Contracts Law > Contract Interpretation > Parol Evidence Rule*

1997 U.S. Dist. LEXIS 18460, *1

*Contracts Law > Performance > Discharges & Terminations*

[HN2] When the parties to a contract have agreed to a termination clause, it must be enforced as written. Where the contract is clear on its face, a court may not rely on extrinsic evidence to alter the agreement's unambiguous language.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN3] New York law implies a covenant of good faith and fair dealing in to every contract. The implied covenant of good faith and fair dealing obligates each party to a contract to refrain from doing any intentional or purposeful act which prevents the other party from carrying out its part of the agreement.

*Patent Law > Remedies > Equitable Relief > Injunctions*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
*Patent Law > Infringement Actions > Infringing Acts > General Overview*

[HN4] A United States District Court is authorized to grant injunctive relief to preclude future infringement pursuant to *35 U.S.C.S. § 283.* Although the grant or denial of injunctive relief is discretionary, courts usually grant injunctive relief upon a finding of infringement. An injunction should issue once infringement has been established, unless a sufficient reason exists for denying it.

*Patent Law > Remedies > Damages > Patentholder Losses*
*Patent Law > Remedies > Damages > Reasonable Royalties*
*Patent Law > Remedies > Damages > Measures*

[HN5] In determining the appropriate amount of damages for a patent infringement, a court is bound by *35 U.S.C.S. § 284.* The appropriate measure of compensatory damages may be determined by one of three methods: (1) lost profits; (2) an established royalty; or (3) a reasonable royalty. A determination of lost profits or an established royalty are methods of assessing the actual damages suffered by the patentee. A reasonable royalty, on the other hand, is a measure of recovery intended to provide a just recovery to persons who for evidentiary or other reasons cannot prove lost profits or an established royalty.

*Patent Law > Remedies > Damages > Reasonable Royalties*

[HN6] See *35 U.S.C.S. § 284.*

*Patent Law > Ownership > Conveyances > Licenses*
*Patent Law > Remedies > Damages > Reasonable Royalties*
*Patent Law > Remedies > Damages > Measures*

[HN7] *35 U.S.C.S. § 284* commands that damages for patent infringement should be no less than a reasonable royalty. A reasonable royalty may be based upon an established royalty, if there is one, or if not upon a hypothetical royalty resulting from arm's length negotiations between a willing licensor a willing licensee. If an established royalty is shown to exist, such a royalty is generally deemed the best measure of damages for infringement. For a patentee's negotiated royalties to constitute an "established" royalty they must meet five criteria: (1) They must be paid or secured before the infringement began; (2) they must be paid by a sufficient number of persons to indicate the reasonableness of the rate; (3) they must be uniform in amount; (4) they must not have been paid under threat of suit or in settlement of litigation; and (5) they must be for comparable rights or activity under the patent.

*Patent Law > Remedies > Damages > Reasonable Royalties*
*Patent Law > Remedies > Damages > Measures*
*Patent Law > Ownership > Conveyances > General Overview*

[HN8] A patent owner may recover as a measure of damages the royalty rate established by prior actual licenses for acts comparable to those engaged in by the infringer without authority. An established royalty rate is a uniform one freely negotiated and paid by a sufficient number of licensees. Rates agreed to under threat of suit or in settlement of litigation are not conclusive. While existence of an established royalty usually sets the minimum recovery by a patent owner for infringement, it does not necessarily set the maximum recovery. Such an established royalty does not preclude the patent owner from recovering a greater sum under a reasonable royalty theory where the established rate was unfairly depressed because the patent had not yet gained recognition or because of widespread infringing activity.

*Patent Law > Remedies > Damages > General Overview*

[HN9] Where an established royalty exists, it will usually be the best measure of what is a reasonable royalty. Nonetheless, a reasonable royalty may be greater than an established royalty. However, the patentee must come forward with evidence that an established royalty rate makes the award inadequate.

*Patent Law > Ownership > Conveyances > Royalties*
*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Remedies > Damages > General Overview*

[HN10] A single, licensing agreement, without more, is insufficient proof of an established royalty.

*Patent Law > Remedies > Collateral Assessments > Increased Damages*
*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Remedies > Collateral Assessments >*

1997 U.S. Dist. LEXIS 18460, *1

*Attorney Fees*

[HN11] Under *35 U.S.C.S. § 284,* a court may increase a damage award up to three times the amount found or assessed. In exercising its discretion under § 284, a court should apply a two–step analysis. First, the court should determine whether an infringer is guilty of conduct that would justify an award of increased damages. Second, the court should determine whether, and to what extent, to increase damages. A finding that an infringer acted willfully or in bad faith may entitle the aggrieved party to increased damages under *35 U.S.C.S. § 284.* A party seeking to establish willful infringement must prove the bad faith of the infringer by clear and convincing evidence. The test for willful infringement is whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Infringement Actions > Infringing Acts > General Overview*

[HN12] There is an affirmative duty to use due care in avoiding infringement of another's patent rights. This duty usually includes seeking and obtaining competent legal advice before engaging in activity that may result in infringement There is, however, no "absolute requirement" for a would–be defendant to obtain its own opinion letter in order to avoid a finding of willful infringement. Instead, a court must look to the totality of the circumstances in determining whether an infringer discharged the duty of due care and in evaluating the question of willfulness.

*Patent Law > Infringement Actions > General Overview*
*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*

[HN13] There does not exist a universal rule that to avoid willfulness one must cease manufacture of a product immediately upon receipt of a patentee's charge of infringement, or upon the filing of lawsuit.

*Patent Law > Remedies > Damages > Reasonable Royalties*
*Patent Law > Remedies > Damages > Time Limitations*
*Patent Law > Remedies > Collateral Assessments > Prejudgment Interest*

[HN14] Prejudgment interest should be awarded in most patent cases because prejudgment interest is necessary to fully compensate the patent owner. An award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he or she would have been in had the infringer entered into a reasonable royalty agreement. An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his or her damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of infringement and the date of the judgment. The purpose of awarding prejudgment interest is to compensate the patent owner for the time value of money and a court must determine which rate of interest will best accomplish that purpose.

*Patent Law > Remedies > Collateral Assessments > Prejudgment Interest*

[HN15] District courts have great discretion in determining the interest rate for awards of prejudgment interest. This broad discretion permits a district court to select an interest rate ranging from the 30–day Treasury bill rate to the prime rate and even beyond. A patentee need not demonstrate that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate.

COUNSEL: For Phillips Petroleum Company, plaintiff: Harry J. Roper, William P. Oberhardt, Sarah L. Taylor, Roper & Quigg, Chicago, Illinois. Lyell H. Carver, Bartlesville, Oklahoma. Richard K. Herrmann, Stradley, Ronan, Stevens & Young, LLP, Wilmington, Delaware.

For Rexene Corporation, defendant: David A. Anderson, Potter, Anderson & Carroon, Wilmington, Delaware. Stanton T. Lawrence, III, Paul J. Zegger, Pennie & Edmonds, New York, New York.

JUDGES: Joseph J. Longobardi, Senior District Judge.

OPINIONBY: Joseph J. Longobardi

OPINION:

   MEMORANDUM OPINION

September 4, 1997
Wilmington, Delaware

LONGOBARDI, Senior District Judge

I. Nature and Stage of the Proceedings

   Phillips Petroleum Company ("Phillips") brought this action against Rexene Corporation n1 for willful infringement of United States Patent *4,376,851* (the " *'851* patent"). Rexene defends and counterclaims for a declaratory [*2] judgment that Rexene is not an infringer and that this case is "exceptional" within the meaning of *35 U.S.C. § 285.*

   n1 Rexene's corporate predecessors in interest

1997 U.S. Dist. LEXIS 18460, *2

include El Paso Products Company and Rexene Products Company. For ease of reference, the Court will refer to these entities collectively as "Rexene."

Although the present action is nominally one for patent infringement, Rexene does not dispute that it made, used, or sold the invention of the *'851* patent, crystalline polypropylene, within the United States during the term of the patent. Rexene also does not challenge the validity or enforceability of the *'851* patent. Those issues were previously resolved in *Phillips Petroleum Co. v. United States Steel Corp., 673 F. Supp. 1278 (D. Del. 1987),* aff'd *865 F.2d 1247 (Fed. Cir. 1989).* In 1983, pursuant to a written agreement (the "License Agreement"), Phillips granted Rexene a license to make, use, or sell the product covered by the *'851* patent. Both parties agree that the overriding issue is [*3] whether Phillips effectively terminated Rexene's license under the *'851* patent on April 23, 1990.

A five day bench trial was held in this Court from October 19, 1994 through October 25, 1994. In an Opinion dated March 27, 1996, the Court of Appeals for the Federal Circuit held that Phillips provided Rexene with adequate notice of default prior to terminating the license, as required by the termination provision contained in Article 10.2 of the License Agreement, and remanded this case for further proceedings. This Memorandum Opinion represents the Court's findings of facts and conclusions of law with respect to all issues necessary to resolve this dispute.

The Court has jurisdiction over the subject matter of the claims and counterclaims in this action pursuant to *28 U.S.C. § 1338(a)* and *§ 2201.* Venue is proper in this district under *28 U.S.C. § 1400(b).*

## II. Summary of Issues

The parties raised three main issues at trial: (1) did Phillips provide Rexene with adequate notice of default prior to terminating the license, as required by the termination provision contained in Article 10.2 of the License Agreement; (2) was Rexene in breach of the License Agreement at [*4] the time of Phillips's termination of its license, and, if so, did this breach permit Phillips to terminate Rexene's license; and (3) if Phillips properly terminated the License Agreement, what damages must Rexene pay as a result of its continued manufacture of the licensed product after its license was terminated.

The first two issues pertain to Phillips's ability to properly terminate Rexene's license. As indicated previously, the first issue has been resolved in Phillips's favor. With respect to the second issue, Rexene raises four arguments

in support of its contention that, notwithstanding the conclusion that Phillips provided adequate notice of default, Phillips purported termination was improper and/or ineffective: (1) Rexene was not in default as of April 23, 1990; (2) if Rexene was in default as of April 23, 1990, the default was not material; (3) if Rexene was materially in default as of April 23, 1990, Phillips had waived its right to terminate the agreement because of any such material default; (4) Phillips's termination of the License Agreement was performed in bad faith, and the Court should therefore invoke its equitable powers to prevent the termination of the License [*5] Agreement.

## III. Facts

### A. Background of the License Agreement

In 1974, Phillips and Montedison (an Italian company) entered into a settlement agreement in an interference proceeding. [Joint Trial Exhibit ("JTX") 1324]. The agreement required Phillips to offer a license to any Montedison licensee/immunity holder under any patent later issued to Phillips covering crystalline polypropylene.

The *'851* patent issued on March 15, 1983 covered crystalline polypropylene. [JTX 1001]. Pursuant to the 1974 Montedison agreement, Phillips offered Rexene a license at 0.175 cents per pound. The evidence at trial clearly establishes that this was a very favorable rate. Phillips presented Rexene with a draft license, and with the exception of certain changes not relevant to this dispute, the License Agreement executed on June 13, 1983 was identical to the draft license agreement prepared by Phillips. [Compare JTX 1005 with JTX 1018].

### B. Key Provisions of the License Agreement

Article 4 of the License Agreement initially required Rexene to submit royalty payments and reports to Phillips within thirty days following the close of each calendar quarter. [JTX 1018]. On [*6] November 15, 1983, the License Agreement was amended to change the due date to forty-five days after each calendar quarter. [JTX 1035]. Article 4 further provided, in section 4.4, that in the event that any payment was not timely made, the payment shall accrue interest at a specified rate beginning the first day following the end of the calendar quarter to which the payment relates. [JTX 1018]. Section 4.4 required that Rexene pay the interest that accrued on any late payment at the time it ultimately made that payment. Id.

The License Agreement contains a provision addressing waivers and modifications in Article 6:

It is understood that this Agreement contains the entire agreement between the parties re-

lating to PATENT RIGHTS. Neither party shall be bound by any agreement, covenants or warranties made by its agents or employees, or any other person, unless such agreements, covenants and warranties shall be reduced to writing and signed by it. The failure of either of the parties at any time or times to require performance of the other of any provisions hereof shall in no manner affect the right of the first-mentioned party thereafter to enforce the same. The waiver [*7] by either of the parties of any breach of any provision hereof shall never be construed to be a waiver of any succeeding breach of such provision or a waiver of the provision itself.

Id.

Article 9 required Phillips to use the following address to send Rexene "reports and notices" under the License Agreement:

El Paso Products Company
P.O. Box 665
Paramus, N.J. 07652
Attention: Mr. Fred S. Valles
Assistant General Counsel and Assistant Secretary

Id.

Article 10 of the License Agreement, specifically section 10.2, sets forth the procedures governing termination of the license by Phillips:

In the event of the default or failure by [Rexene] to make payment herein provided when due or to comply with any of the terms, covenants, or provisions of this Agreement, [Rexene] shall have sixty (60) days after the giving of written notice by PHILLIPS of such default within which to correct such default. If such default is not corrected within the said sixty (60) day period, PHILLIPS shall have the right, at its option, to cancel and terminate this entire Agreement.

Id.

### C. The Parties History under the License Agreement

Apart from [*8] a few exceptions, the parties have stipulated to the due dates for Rexene's royalty payments and reports and to the dates on which Phillips received them for the years 1983 to 1989. [Pretrial Order, Docket

Item ("D.I.") 133, Appendix F]. This stipulation indicates that Rexene frequently did not submit the royalty payments and reports in a timely fashion.

Initially, Jerry Mann was the Rexene employee responsible for the accounting due under the License Agreement and for submitting royalty payments and reports to Phillips in 1984, Richard M. Voke joined Rexene and assumed these responsibilities. At certain times over the years, Mr. Voke had an accounting staff who reported to him and handled these responsibilities.

Fred Valles, the Rexene employee to whom Phillips was required to send "reports and notices" under Article 9 of the License Agreement, retired sometime in 1988, and Rexene never designated another specific individual in the legal department to oversee compliance with the License Agreement.

In the first fifteen months after the License Agreement was executed, Phillips sent three letters to Rexene regarding various disputes over the interpretation and scope of the License [*9] Agreement. [JTX 1038, JTX 1047, JTX 1052]. These letters all threatened Rexene with a "formal notice of default" if certain actions were not taken by Rexene.

The record does not indicate who in Phillips' accounting department, if anyone, was initially responsible for monitoring Rexene's timely compliance with the License Agreement. In September 1989, in response to an internal audit report noting this problem, Phillips hired Lynda Keesling to fill the newly created position of Licensing Contract Administrator.

At the same time, Rexene's compliance with the License Agreement was reaching an all-time low. Mr. Voke testified that his staff was let go, his responsibilities were increased, and, as a result, compliance with the License Agreement was not a priority. It appears that Mr. Voke did not have a tickler system to remind him of payment and report due dates, and he did not even note the dates on his calendar. Consequently, when Ms. Keesling reviewed Rexene's compliance with the License Agreement in November 1989, she discovered that Rexene had failed to submit royalty payments and reports for both the second and third quarters of 1989.

Mike Pregler, Ms. Keesling's supervisor, [*10] had given her a form letter to use to correspond with licensees. [Tr. at 254; see, e.g., JTX 1092]. Information was conveyed to the licensees by placing "x" marks next to certain pre-printed items. The form letter also had a blank space where an additional explanation could be provided. The form letter could be used to provide notice of facts that would constitute a default under a license agreement, such as a failure to make a required payment or to submit a roy-

alty report. The latter could also be used to provide notice of facts that would not constitute a default, such as an overpayment by a licensee.

Using the form letter, Ms. Keesling prepared two letters to Rexene indicating that Rexene had failed to submit royalty payments and reports for the second and third quarters of 1989, respectively. [JTX 1092 and 1093.] After the letters were reviewed and signed by Mr. Pregler, she mailed the letters by registered mail, return receipt requested, to the Paramus address as specified by the License Agreement. [Tr. at 230-33.] By November 1989, however, Rexene no longer had an office in Paramus, and Mr. Valles had retired. The letters were returned by the post office with a stamp [*11] indicating that Rexene's forwarding order had expired. [JTX 1092 and 1093].

Ms. Keesling mailed the letters again, addressing them this time to Rexene's corporate headquarters in Dallas, Texas. [JTX 1094 and 1099]. These letters were not addressed to a specific individual or department. The second quarter letter is dated November 29, 1989, and the return receipt indicates that it was received by the Rexene mailroom on December 4, 1989. [JTX 1094]. The third quarter letter is dated November 30, 1989, and the return receipt indicates that it was received by the Rexene mailroom on December 1, 1989. [JTX 1099].

In mid-December, Phillips received a $477,847.16 wire transfer from Rexene which indicated that it was meant to cover the royalties owed for the second and third quarters of 1989. Keesling took this payment as an indication that her letters had reached an appropriate person at Rexene and the payment had been made as a result. [Tr. at 237]. She was right. Mr. Voke testified that he received the November 30, 1989 third quarter letter on December 4, 1989, [Tr. at 695], n2 and that this letter led to the wire transfer. [Tr. at 669-70]. Although the letter specifically [*12] requested that Rexene advise Phillips of any changes in contact name or address, Mr. Voke did not do so. [Tr. at 712]. The parties dispute whether or not Rexene also submitted the second and third quarter royalty reports at this time.

> n2 A copy of this letter is contained in Mr. Voke's "black book", which he testified contained all of his papers relating to the Phillips license. [JTX 1244 at L002331]. Mr. Voke does not remember seeing the second quarter letter, and there is no copy of that letter in his black book.

In February 1990, Ms. Keesling once again determined that Rexene was not in compliance with the License Agreement. Using the form letter, she sent a letter dated February 15, 1990, to this effect to Rexene. [JTX 1112].

In the February 15 letter, Keesling indicated that Phillips had not received a royalty payment for the fourth quarter of 1989 and had not received royalty reports for the second through fourth quarters of 1989. Id.

When Ms. Keesling sent the February 15 letter, she used [*13] the address she had used with the November 29 and 30 letters. The February 15 letter was received by the Rexene mailroom, but the parties dispute whether the February 15 letter ever reached anyone outside the mail room. Mr. Voke testified that he never saw the February 15 letter. Robert Sutphen, Rexene's in-house counsel, saw a form letter, but his testimony was unclear regarding whether it was the November 30 or the February 15 letter. In any event, Rexene never responded to the February 15 letter.

In March 1990, Phillips's licensing department requested that Allen Richmond, General Patent Counsel for Phillips, prepare a letter terminating the License Agreement. After comparing the February 15 letter with the requirements of the License Agreement, and reviewing the letters of November 14, 17, 29, and 30, Mr. Richmond concluded that the February 15 letter satisfied the notice requirement of section 10.2. [Tr. at 44-46, 120-21]. Mr. Richmond did not perform any case law research, and he did not review any prior correspondence with Rexene regarding the license other than the November letters [Tr. at 111-12, 121].

The termination letter was sent to Rexene on April 23, 1990. [JTX [*14] 1115]. The parties do not dispute that the format of the termination letter itself was adequate, assuming that Rexene was truly in default and that adequate notice had been provided.

## IV. Discussion-Infringement

[HN1] Patent infringement occurs when a person "without authority makes, uses, or sells any patented invention, within the United States during the term of the patent." *35 U.S.C. § 271*(a). The existence of a valid license agreement between Phillips and Rexene, however, would preclude Rexene's liability for infringement of the '851 patent. *De Forest Radio Tel. Co. v. United States, 273 U.S. 236, 242, 71 L. Ed. 625, 47 S. Ct. 366 (1927); Mine Safety Appliances Co. v. United States, 176 Ct. Cl. 777, 364 F.2d 385, 388 (Ct. Cl. 1966); see also Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993).* The undisputed evidence in this case establishes that Rexene continued to manufacture the product covered by the '851 patent after Phillips's purported termination of its license on April 23, 1990. Given the previous determination that Phillips provided Rexene with adequate notice of default prior to its termination of the license, the critical issue [*15] is whether Rexene's conduct prior to

the date of termination constituted a material breach of the License Agreement, thereby giving Phillips the right to terminate Rexene's license.

### A. Phillips Right to Terminate the License Agreement

The interpretation of a license agreement is a question of law governed by state contract law. *Phillips v. Rexene, 1996 U.S. App. LEXIS 6298,* No. 95-1451, slip op. at 4 (Fed. Cir. Mar. 27, 1996). The License Agreement provides, and the parties do not dispute, that New York law shall govern the construction of the agreement. [JTX 1018]. Under New York law, a court, in interpreting a contract, must attempt to ascertain the intent of the parties "'to the extent that they evidenced what they intended by what they wrote.'" *Laba v. Carey, 29 N.Y.2d 302, 277 N.E.2d 641, 644, 327 N.Y.S.2d 613 (N.Y. 1971)* (quoting *Raleigh Assoc. v. Henry, 302 N.Y. 467, 99 N.E.2d 289, 291 (N.Y. 1951)); see Slatt v. Slatt, 64 N.Y.2d 966, 477 N.E.2d 1099, 1100, 488 N.Y.S.2d 645 (N.Y. 1985).* The New York courts have repeatedly stressed that a court should not fashion a new contract for the parties under the guise of contract construction. *Slatt, 477 N.E.2d at 1100; Laba, 277* [*16] *N.E.2d at 644.* Rather, where the terms of a contract are clear and unambiguous, a court must give effect to the intent of the parties from the language of the contract, interpreting the words and phrases according to their plain meaning. *Slatt, 477 N.E.2d at 1100; Laba, 277 N.E.2d at 644.*

### 1. Default

Phillips contends that it was justified in terminating the License Agreement pursuant to section 10.2 based on two defaults by Rexene under the agreement: (1) Rexene failed to make the payment due and owing for the fourth quarter of 1989; and (2) Rexene failed to submit the royalty reports for the second, third, and fourth quarters of 1989. Rexene asserts that Phillips did not have a right to terminate its license, because it was not in default on April 23, 1990. Rexene premises this argument on its assertion that its prior royalty payments exceeded the amount due under the License Agreement, and that these overpayments covered, or substantially covered, the royalties due for the fourth quarter of 1989. Specifically, Rexene contends that it made a duplicate payment for the first quarter of 1989, and that it overpaid the royalties due on its production of "impact" [*17] or "block" copolymer ("impact polypropylene") for the third and fourth quarters of 1987 and for all four quarters of 1988. Phillips admits that Rexene made a duplicate payment for the first quarter of 1989. [Pretrial Order, D.I. 133, Appendix F, P 28]. Phillips, however, disputes Rexene's assertion that it overpaid the royalties due on its impact polypropylene

production in 1987 and 1988.

The parties each retained an accounting expert who testified regarding the amount due and owing from Rexene under the License Agreement on April 23, 1990. The parties entered into a stipulation prior to trial pertaining to many of the facts relevant to the experts' calculations, including the amounts and dates of Rexene's prior royalty payments. [Pretrial Order, D.I. 133, Appendix F]. Both experts agreed that the payment due on Rexene's production of polypropylene for the fourth quarter 1989 was $172,480.77. [Tr. 394-95, 823; JTX 1234, Ex. E; 1237, Ex. B]. Both experts also agreed that Rexene previously overpaid the amount due under the License Agreement, primarily as a result of Rexene's duplicate payment for the first quarter of 1989.

The parties' experts each made two calculations concerning [*18] Rexene's outstanding balance on April 23, 1990, one of which included the interest that accrued on Rexene's previous late royalty payments. Richard Troxel, Phillips's expert, determined that Rexene owed Phillips $22,334.24, not including interest, and $113,284.11, if interest was included, as of April 23, 1990. [Tr. 406–09; JTX 1234, Ex B]. Keith Ugone, Rexene's expert, concluded that Rexene had overpaid Phillips by $15,708, excluding the interest that had accrued on Rexene's previous late payments, on April 23, 1990. [JTX 1237, Ex. C; Tr. 824–25]. Upon including interest in his calculation, Mr. Ugone determined that Rexene owed Phillips $8,808.39 on April 23, 1990. [JTX 1237, Ex. E; Tr. 830–31].

The experts' methodologies differed in two major respects which account for the differences in their conclusions. First, Mr. Troxel's calculations date back to the inception of the License Agreement in 1983, whereas Mr. Ugone's commenced his analysis with the third quarter of 1987. [Tr. 832]. Second, Mr. Ugone included the alleged overpayments on Rexene's production of impact polypropylene for 1987 and 1988, whereas Mr. Troxel's calculations did not include this alleged overpayment. [*19] Id.

The Court first concludes pursuant to *Slatt v. Slatt, 64 N.Y.2d 966, 477 N.E.2d 1099, 488 N.Y.S.2d 645,* (N.Y. 1985), that in determining Rexene's outstanding balance as of April 23, 1990, the calculations should date back to the inception of the License Agreement in 1983 and should include the interest that accrued on Rexene's previous late payments. In Slatt, the parties entered into a separation agreement in which the husband agreed to pay to the wife fixed monthly and yearly payments, plus an additional sum representing a cost of living increase on each payment. Id. at 1099–1100. Both lower courts concluded that the husband was obligated to pay back amounts due as a result of his failure to pay a cost of living increase

on his prior payments, despite the fact that he made no cost of living increase payments for 11 years. Id. at 1100. The New York Court of Appeals affirmed, concluding that effect must be given to the unambiguous language of the contract notwithstanding the husband's failure to make a cost of living payment for 11 years: "There is no need here to examine the conduct of the parties over the intervening years to ascertain their intent in respect [*20] to the application of the cost of living increase. Such an inquiry might be appropriate in the instance of an ambiguity or where the contract is of 'doubtful meaning or where there is claimed "waiver", none of which is present in this case." Id. The court also cited to other provisions of the contract, which required that modifications be in writing and provided that the mere failure to assert a right would not constitute a waiver. Id.

Similarly, the License Agreement in the present case unambiguously requires Rexene to pay interest on any payment not made when due. Additionally, like the contract at issue in Slatt, the License Agreement requires modifications to be in writing and provides that the failure by a party to assert a right under the agreement does not affect that party's ability to later enforce that right or constitute a waiver thereof. Accordingly, pursuant to Slatt, the Court finds that Phillips did not waive its right to collect the interest that accrued on Rexene's repeated late payments, which date back as far as Rexane's first payment under the License Agreement in 1983. This accrued interest must therefore be included in calculating Rexene's outstanding [*21] balance under the License Agreement as of the date of termination.

The Court also concludes, based on an accord entered into between the parties in settlement of prior litigation, that Rexene is estopped from contending that it overpaid the royalties due on its production of impact polypropylene in 1987 and 1988. Rexene makes impact polypropylene using a two-step process in which propylene is first polymerized in a homopolymer reactor and than ethylene is added to the product in a copolymer reactor. [Tr. 766]. The ethylene reacts with the propylene to make a rubbery-type polymer, of which five percent by weight rubber components are added in the copolymer reactor. Id. In prior litigation [hereinafter the "joint polypropylene litigation"], the parties disputed whether the License Agreement required Rexene to pay royalties on its manufacture of impact polypropylene. [Tr. 295-96]. The parties entered into to an accord settling the joint polypropylene litigation which resolved this issue. [JTX 1101; Tr. 296, 304]. In this accord, Phillips and Rexene agreed that the License Agreement required Rexene to pay royalties on 85% of its production of impact polypropylene. [JTX 1101]. [*22]

Rexene contends that it paid royalties on 100% of its production of impact polypropylene in the third and fourth quarters of 1987 and in all four quarters of 1988. [Tr. 639-644]. Prior to 1987, Rexene did not pay any royalties on its production of impact polypropylene. [JTX 1067; Tr. 636-39]. In 1987, during the course of the joint polypropylene litigation, Rexene made a one-time lump sum payment to Phillips which represented a royalty payment for 85% of its production of impact polypropylene from the inception of the License Agreement in 1983 through the first quarter of 1987. [JTX 1067, 1069; Tr. 636-39]. The parties agree that this payment was not intended to resolve the joint polypropylene litigation or to represent an agreement as to the amount of royalty due on Rexene's production of impact polypropylene. [JTX 1067, 1069]. Rexene reserved its right to recover this payment and Phillips reserved its right to obtain a royalty on the remaining 15% of impact polypropylene not subject to the lump-sum payment, depending on the outcome of the joint polypropylene litigation.

Richard Voke, the Rexene employee responsible for submitting the royalty reports and making the royalty [*23] payments to Phillips after 1984, testified that it was his understanding that the 85% figure was a one time catch-up payment to Phillips, and that thereafter Rexene would be paying royalties on 100% of its production of impact polypropylene for each quarter. [Tr. 639-40]. Voke further testified that Rexene did in fact pay royalties on 100% of its production of impact polypropylene for the third and fourth quarters of 1987 and for all four quarters in 1988, basing his testimony on the royalty reports for each of those quarters. [Tr. 640-44].

Phillips counters that Rexene is estopped from contending that it paid royalties on 100% of its production of impact polypropylene as a result of the accord entered into between Phillips and Rexene which settled the joint polypropylene litigation. Phillips relies on the following language in the accord:

It is agreed that [Rexene] will continue to pay Phillips the royalties called for by your license agreement under the '851 patent due to [its] manufacture, use or sale, or importation, of impact grade polypropylene. It is Phillips understanding that [Rexene] and its predecessor(s) have paid, and that [Rexene] will continue [*24] to pay, royalties on the portion of such products which is made by polymerizing propylene alone, or propylene in combination with up to an including five percent by weight or less of another monomer, which portion the parties under-

stand represents approximately 85% of such products. [Rexene's representative's] signature at the conclusion of this letter warrants that Phillips' understanding is correct.

[JTX 1101] (emphasis added). Rexene contends that this language was not intended to convey that it had previously paid royalties on only 85% of its impact polypropylene products. Rather, Rexene asserts that the accord is ambiguous on the issue of whether it had previously paid royalties on 85% or on 100%, and that the agreement should be construed to mean that it had been paying royalties "on at least 85%" of its impact polypropylene production.

The Court finds Rexene's contention to be without merit. First, the Court finds the accord to be unambiguous with respect to Rexene's past payments on its production of impact polypropylene. Although unartfully drafted, the accord states plainly that Rexene made its past royalty payments on 85% of its impact polypropylene products. [*25] Reduced to its essentials, the accord states that Rexene and its predecessors "have paid . . . royalties on the portion of [impact grade polypropylene] products . . . which portion the parties understand represents approximately 85% of such products." Significantly, the accord does not state that Rexene paid royalties on "at least 85%," or use any other qualifying language in specifying the amount of Rexene's prior payments. The Court therefore rejects Rexene's assertion that it did not warrant in the accord that its pre-1990 royalty payments were made on 85% its impact polypropylene products.

Moreover, even if the Court were to conclude that the accord was ambiguous with respect to this issue, the Court finds based on the testimony at trial that the accord was intended by the parties, inter alia, to indicate that Rexene had not previously overpaid the royalties due on its production of impact polypropylene. Lyell E. Carver, Phillips's Senior Patent Counsel, testified at trial that prior to settling the joint polypropylene litigation, there had been some uncertainty between Phillips and Rexene with respect to the portion of impact polypropylene on which Rexene was paying royalties. [*26] [Tr. 306]. Mr. Carver further testified that one of the purposes of the accord was to lay to rest this uncertainty by confirming that Rexene had in the past been paying royalties on 85% of its production and would continue to pay royalties on this same percentage in the future. [Tr. 303-04, 305-06]. Mr. Carver also indicated that although the accord was primarily drafted by Phillips's representatives, several changes were added by Rexene's attorneys including the clause containing the 85% language. [Tr. 301-04]. n3

n3 According to Mr. Carver, Rexene's attorney

added the following language to the relevant passage of the accord, which is set forth above: 'which portion the parties understand represents approximately 85% of such products." [Tr. 304]. Rexene has not produced any evidence to dispute this testimony.

The testimony of Rexene's witnesses is insufficient to counter Mr. Carver's assertion that the accord was intended to resolve the dispute between the parties concerning the percentage of Rexene's [*27] impact polypropylene production included in its previous royalty payments. Keith Ugone, Rexene's accounting expert, testified that his interpretation of the relevant passage in the accord was that Rexene was warranting that its previous payments included royalties for "at least 85%" of its impact polypropylene products. [Tr. 841-42]. Mr. Ugone, however, was not involved in the drafting of the accord, and his interpretation of this passage was based solely on his reading of the accord in preparation for this litigation. [Tr. 841-43]. Mr. Ugone's testimony is accordingly not probative of the parties' intent at the time the accord was drafted, and the Court therefore discounts his testimony on this issue. Rexene's only other witness who provided testimony pertaining to this issue was Michael Steindler, Rexene's signatory to the accord. Mr. Steindler's testimony regarding the parties' intent in drafting this passage is limited to his assertion that he did not see anything in the paragraph in the accord containing the 85% figure that refers to Rexene's payments or lack of payments with respect to the remaining 15% of its impact polypropylene products. [Tr. 472-73]. Mr. Steindler did [*28] not testify as to whether the joint polypropylene litigation involved a dispute between the parties' regarding the percentage of impact polypropylene included in Rexene's prior royalty payments. Nor did Mr. Steindler counter Mr. Carver's assertion that the parties' intended the accord reached in settlement of that litigation to resolve the uncertainty concerning the amount of the prior payments.

Based on the foregoing, the Court concludes that Rexene warranted in the accord settling the joint polypropylene litigation in 1990 that it did not overpay the royalties due on its pre-1990 impact polypropylene products. It follows from this conclusion that Rexene is estopped in this litigation from contending that it overpaid the royalties due on its production of impact polypropylene in the third and fourth quarters of 1987 and in all four quarters of 1988. See Stevens v. State Farm Fire and Casualty Co., 929 S.W.2d 665, 672 (Tex. Ct. App. 1996) ("Estoppel by contract is a form of quasi-estoppel based on the proposition that a party to a contract will not be permitted to take a position inconsistent with its provisions, to the prejudice of another"); Cavicchi v. Mohawk

*Mfg. Co.,* [*29] *34 F. Supp. 852, 854 (S.D.N.Y. 1940); Federal Heating Co. v. City of Buffalo, 182 A.D. 128, 170 N.Y.S. 515, 521 (N.Y. App. Div. 1918);* 31 C.J.S. § 55.

The Court thus concludes that Mr. Troxel's calculations, which date back to 1983 and do not include Rexene's alleged overpayments in 1987 and 1988, are correct. Accordingly, on April 23, 1990, the date on which Phillips terminated the License Agreement, Rexene was in default in the amount of $113,284.11.

Phillips also argued that Rexene was in default on April 23, 1990, because Rexene failed to submit the royalty reports for the second through fourth quarters of 1989. The parties do not dispute that Rexene failed to submit the royalty report for the fourth quarter of 1989 to Phillips prior to Phillips's termination of the License Agreement. [Pretrial order, D.I. 133, Appendix F P 57]. The parties dispute, however, whether Rexene submitted the second and third quarter royalty reports.

Lynda Keesling, Phillips's Licensing Contract Administrator, testified that in November 1989, she sent two notices to Rexene's corporate headquarters in Dallas, Texas, alerting Rexene that Phillips had not received the royalty payments and reports [*30] for the second and third quarters in 1989. [Tr. 230-37; JTX 1094, 1099]. Ms. Keesling further testified that in mid-December 1989, Phillips received the royalty payments for the second and third quarters of 1989, but did not receive the corresponding royalty reports for those quarters. [Tr. 237-39]. Ms. Keesling sent another notice to Rexene's corporate headquarters in February 1989. [Tr. 239]. In this notice, Ms. Keesling requested the royalty reports for the second and third quarters of 1989, as well as the royalty payment and report for the fourth quarter of 1989. [Tr. 239-40; JTX 1112]. Ms. Keesling testified that Rexene did not respond to this notice, and, as a result, Phillips terminated the License Agreement, [Tr. 243-44].

Mr. Voke testified that in early December 1989, he received the notice sent by Ms. Keesling indicating that Phillips had not received the royalty payment and report for the third quarter of 1989. [Tr. 613]. Upon reviewing Rexene's records, Mr. Voke noticed that Rexene had not prepared and submitted the royalty reports and payments for the second and third quarters of 1989. [Tr. 613-14]. Mr. Voke testified that shortly thereafter, he, with the [*31] assistance of Mary Hayes, prepared the royalty reports for the second and third quarters of 1989. [Tr. 614]. After the royalty reports were prepared, Mr. Voke made a payment to Phillips by wire transfer on approximately December 18, 1989. [Tr. 617-18]. Mr. Voke testified that he sent the royalty reports for the second and third quarters of 1989 to Phillips on that same date. [Tr. 617].

On cross-examination, however, Mr. Voke indicated that the original version of the second and third quarter royalty reports remained in his "black book," the book in which he kept a history of the correspondence pertaining to the License Agreement. [Tr. 605-06, 706-08]. Mr. Voke testified that it was his usual practice to send Phillips an original copy of the royalty reports and retain a duplicate copy in his black book. [Tr. 673]. Mr. Voke's explanation for the original version of the second and third quarter royalty reports remaining in his black book was that the reports were messy, and that he would not have submitted documents in that condition to Phillips. [Tr. 707].

Based on the testimony at trial, the Court finds that Rexene failed to submit the royalty reports for the second and [*32] third quarters of 1989 prior to April 23, 1990. The trial testimony reveals that Ms. Keesling was a conscientious individual who effectively monitored the royalty reports and payments that related to the License Agreement. The evidence establishes that Ms. Keesling drafted a letter within one day after the expiration of the time period in which Rexene's royalty payments and reports were due for each of the quarters following her appointment to the position of Licensing Contract Administrator in September 1989. Conversely, the evidence established that Mr. Voke repeatedly failed to submit the reports and payments due under the License Agreement within the required time frame, and, on at least one occasion, neglected to mail a royalty report for over a month-and-a-half after submitting the corresponding payment. [Tr. 681-82]. The testimony also establishes that Mr. Voke made other mistakes in attempting to fulfill Rexene's obligations under the License Agreement, including incorrectly submitting a duplicate payment for the first quarter of 1989. [Tr. 617]. Given this evidence coupled with the revelation that the original copy of the royalty reports remain in Mr. Voke's black book, [*33] the Court concludes that Rexene failed to submit the royalty reports for the second and third quarters of 1989 prior to Phillips's termination of the License Agreement.

## 2. Materiality

Rexene next argues that even if it was in default on the date Phillips terminated the License Agreement, the default was not material, and Phillips therefore did not have the right to terminate its license. Phillips terminated the License Agreement pursuant to the termination clause contained in section 10.2. Upon providing the requisite notice, the License Agreement authorizes Phillips to terminate the entire agreement "in the event of the default or failure by [Rexene] to make payment herein when due or to comply with any of the terms, covenants or provisions of this Agreement," provided such default is not cured within a sixty day period. [JTX 1018].

The New York courts have repeatedly adhered to the principle that [HN2] when the parties to a contract have agreed to a termination clause, it must be enforced as written. *A.S. Rampell, Inc. v. Hyster Co., 3 N.Y.2d 369, 144 N.E.2d 371, 379, 165 N.Y.S.2d 475 (N.Y. 1957)* ("Where as here the parties have agreed to a termination clause, [*34] the clause has been enforced as written"); *Cycleway, Inc. v. Kawasaki Motors Corp., 77 Misc. 2d 829, 354 N.Y.S.2d 812, 816 (N.Y. Sup. Ct. 1974);* see *In re Gordon Car & Truck Rental, Inc., 59 B.R. 956, 959 (Bankr. N.D.N.Y. 1985)* ("New York case law consistently states the maxim that 'where the parties have agreed to a termination clause, it must be enforced as written'") (citations omitted).

The termination clause in the License Agreement unambiguously permits a party to terminate the agreement upon the failure of the other party to comply with any term or provision in the agreement. The Court has already concluded that Rexene failed to comply with several provisions of the License Agreement when it did not pay its outstanding balance of $113,284.11 or submit the royalty reports for the second, third, and fourth quarters of 1989. Interpreting the termination clause as written, the Court concludes that any one of the defaults standing alone gave Phillips the right to terminate the entire agreement. n4 Accordingly, the Court rejects Rexene's assertion that it did not commit a material default under the License Agreement. Phillips therefore properly terminated Rexene's license [*35] on April 23, 1990 under section 10.2 of the License Agreement and is entitled to damages for Rexene's continued manufacture of the product covered by the *'851* patent unless Rexene can raise a successful defense that would prevent Phillips from exercising its right to terminate.

n4 Thus, Rexene's failure to submit the royalty report for the fourth quarter of 1989 prior to April 23, 1990, a fact which Rexene does not dispute, gave rise to Phillips's right to terminate the License Agreement.

**3. Rexene's Other Defenses**

Rexene first asserts that Phillips's waived its right to claim that Rexene was in default based on it past practice of accepting late payments without objecting to Rexene's performance. Rexene's argument ignores the unambiguous language on the non-waiver provision of the license contained in Article 6, which provides:

The failure of either of the parties at any time or times to re-

quire performance of the other of any provisions hereof shall in no manner affect the right [*36] of the first-mentioned party thereafter to enforce the same. The waiver by either of the parties of any breach of any provision hereof shall never be construed to be a waiver of any succeeding breach of such provision or a waiver of the provision itself.

[JTX 1018]. Rexene's position that Phillips waived its right to claim that Rexene was in default under the License Agreement based on Phillips's past willingness to excuse Rexene's defaults is therefore contrary to the unambiguous language of the non-waiver provision. Where the contract is clear on its face, a court may not rely on extrinsic evidence to alter the agreement's unambiguous language. See *Phillips Petroleum Co. v. Rexene Corp., 1996 U.S. App. LEXIS 6298,* No. 95–1451, slip op. at 4 (Fed. Cir. Mar. 27, 1996). Accordingly, this Court concludes that Phillips did not waive its right to claim that Rexene breached the License Agreement as a result of its past acceptance of late payments and reports.

In its final defense, Rexene asserts that Phillips breached its implied duty of good faith when it terminated the License Agreement. Rexene contends that as a result of this breach, the Court should invoke its equitable powers to prevent the [*37] termination of the License Agreement.

[HN3] New York law implies a covenant of good faith and fair dealing in to every contract. *Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 230 (2d Cir. 1991); Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co., 30 N.Y.2d 34, 281 N.E.2d 142, 144, 330 N.Y.S.2d 329 (N.Y. 1972).* The implied covenant of good faith and fair dealing obligates each party to a contract to refrain from doing any intentional or purposeful act which prevents the other party from carrying out its part of the agreement. *Carvel,* 930 F.2d at 230.

Rexene first contends that Phillips acted in bad faith in terminating the License Agreement because Phillips repeatedly accepted late payments in the past, and did not notify Rexene of its intent to change this practice before terminating the agreement. Rexene's assertion that this action constitutes a breach of the implied covenant of good faith and fair dealing is meritless. In terminating Rexene's licenses Phillips did not in any way deliberately hamper Rexene's ability to perform its part of the agreement. In fact, Rexene's power to prevent Phillips from

1997 U.S. Dist. LEXIS 18460, *37

terminating the agreement was entirely within [*38] its own control. The agreement called for Rexene to timely submit the royalty payments and royalty reports at the end of each quarter. It was Rexene's failure to fulfill these requirements that led to the termination of its license.

Rexene also asserts that Phillips acted in bad faith by purposefully addressing the February 15, 1990 notice in such a manner that it would go undetected by Rexene's accountants and lawyers. On the basis of the record at trial, the Court rejects Rexene's assertion that Phillips deliberately attempted to prevent Rexene from discovering the notice of default. First, Phillips addressed the February 15 letter in the same manner as the two previous notices it sent to Rexene to which Phillips received positive response. Ms. Keesling testified that she sent two notices to Rexene in November 1989, indicating that Rexene failed to submit its royalty payments and reports for the second and third quarters of 1989. [Tr. 235–37; JTX 1094, 1099]. Rexene received both notices, and, shortly thereafter, submitted a payment to Phillips. [Tr. 235–37]. Ms. Keesling correctly assumed that the notices had reached an appropriate person at Rexene and that payment had been [*39] made as a result. [Tr. 237, 669–70].

Additionally, any fault for the February 15 notice not being addressed to the correct person must lie with Rexene. The License Agreement identified Fred Valles as Rexene's contact person and provided an address in Paramus, New Jersey as Rexene's contact address. The testimony at trial established that Mr. Valles previously retired and that the Paramus address no longer existed. [Tr. 233–34, 607]. Rexene never informed Phillips of these changes. The record reflects that both of the November 1989 notices sent by Ms. Keesling requested that Rexene advise Phillips of any change in contact person or change in address. [JTX 1094, 1099]. Despite this request, Mr. Voke did not provide Phillips with the name of the new contact person or any change in address. [Tr. 712].

The Court therefore finds that Phillips did not purposefully address the February 15, 1990 notice in such a manner that it would go undetected by Rexene's accountants and lawyers. Accordingly, the Court rejects Rexene's assertion that Phillips breached its implied duty and good faith and fair dealing in terminating the License Agreement.

#### 4. Conclusion

Based on [*40] the foregoing, the Court concludes that Phillips properly and effectively terminated Rexene's license under section 10.2 of the License Agreement. It necessarily follows from this conclusion that Rexene infringed the . 851 patent by its continued production of crystalline polypropylene after Phillips's termination of

its license. Accordingly, Phillips is entitled to relief for Rexene's infringement of the '851 patent.

### V. Damages

#### A. Injunctive Relief

Phillips seeks a permanent injunction enjoining Rexene from infringing the '851 patent. [HN4] This Court is authorized to grant injunctive relief to preclude future infringement pursuant to 35 U.S.C. § 283. Although the grant or denial of injunctive relief is discretionary, courts usually grant injunctive relief upon a finding of infringement. W.L. Gore & Assoc., Inc. v. Garlock, Inc., 842 F.2d 1275, 1281 (Fed. Cir. 1988); KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc., 776 F.2d 1522, 1524 (Fed. Cir. 1985). The Federal Circuit has indicated that an injunction should issue once infringement has been established, unless a sufficient reason exists for denying it. W.L. Gore, 842 F.2d at 1281.

Rexene asserts that [*41] Phillips's policy of granting licenses under the '851 patent is incompatible with its request for an injunction. Rexene has not cited and this Court cannot locate a single case holding that a patentee's practice of licensing its invention is a sufficient reason for denying an injunction upon a finding or infringement. Patent ownership conveys the right to exclude others from making the patented invention. See, e.g., Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1548 (Fed. Cir. 1983). A patentee's practice of licensing its invention for a price to some is not incongruent with its right to exclude others who are unwilling to pay that price. Accordingly, this Court will grant Phillips the injunctive relief its seeks, a permanent injunction preventing Rexene from infringing the '851 patent.

#### B. Money Damages

[HN5] In determining the appropriate amount of damages, the Court is bound by 35 U.S.C. § 284 which provides: "[HN6] Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the [*42] court." 35 U.S.C. § 284. Phillips, as the claimant, bears the burden of proof on the issue of damages. See, e.g., BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1217 (Fed. Cir. 1993); Fromson v. Western Litho Plate and Supply Co., 853 F.2d 1568, 1574 (Fed. Cir. 1988); Mobil Oil Corp. v. Amoco Chemicals Corp., 915 F. Supp. 1333, 1340 (D. Del. 1994).

The appropriate measure of compensatory damages may be determined by one of three methods: (1) lost profits; (2) an established royalty; or (3) a reasonable roy-

1997 U.S. Dist. LEXIS 18460, *42

alty. *Mobil Oil, 915 F. Supp. at 1340;* 7 Donald S. Chisum, *Chisum on Patents § 20.03* at 20–77 (1997). A determination of lost profits or an established royalty are methods of assessing the actual damages suffered by the patentee. *Trell v. Marlee Elec. Corp., 912 F.2d 1443, 1445 (Fed. Cir. 1990); Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320, 1328 (Fed. Cir. 1987)* ("It is reasonable to assume that [an established] royalty is a fair measure of the actual damage to a patentee who has authorized others to practice the patented invention.") (emphasis added). A reasonable royalty, on the other hand, is a measure [*43] of recovery "intended to provide a just recovery to persons who for evidentiary or other reasons cannot prove lost profits or an established royalty." *Hayhurst v. Rosen, 1992 U.S. Dist. LEXIS 7312, 1992 WL 123178,* at *13 (E.D.N.Y. 1992); 7 *Chisum, Patents § 20.03*[3] at 20–159.

Rexene argues that Phillips had an established royalty which should be used to determine the damages in this case. First, Rexene asserts that Phillips is entitled only to a royalty of 0.175 cents per pound of crystalline polypropylene, because it is a Montedison licensee/immunity holder. Alternatively, Rexene asserts that if the Court does not find the 0.175 cent per pound rate adequate to compensate Phillips, the best measure of a reasonable royalty is Phillips's one cent per pound (escalated) n5 established royalty rate for non–Montedison licensee/immunity holders.

> n5 The expression "escalated" refers to the fact that Phillips adjusts this rate for inflation based on the Producer's Price Index of 1983. [Tr. 66, 332]. A rate of one cent per pound (escalated) is equivalent to a rate of one cent per pound in 1983 dollars. [Tr. 67].

[*44]

Phillips counters that there is not an established royalty in this case. Rather, Phillips contends that the Court must conduct a hypothetical negotiation between the parties at the time the infringement began to determine what would constitute a reasonable royalty in this case. Phillips asserts that the product of this hypothetical negotiation would be a royalty rate of two cents per pound (escalated).

### 1. Phillips's Licensing of the '851 Patent

From the issuance of the '851 patent in 1983 through the date of the trial in this case, Phillips maintained a policy of freely licensing the patent to anyone wishing to manufacture crystalline polypropylene. [Tr. 150]. The record also establishes that Phillips offered licenses under this patent at a reduced rate of 0.175 cents per

pound to all Montedison licensee/immunity holders. [Tr. 36, 329]. Pursuant to the 1974 settlement agreement between Phillips and Montedison, Phillips made the reduced rate available for a period of six months after the patent issued. Id. Before this offer expired, Phillips granted licenses at the 0.175 cents per pound rate to approximately thirteen Montedison license/immunity holders, including [*45] Rexene. n6

> n6 The Montedison licensee/immunity holders to whom Phillips's licensed the '851 patent at the rate of 0.175 cents per pound include: Shell Oil Co., [JTX 1008], Atlantic Richfield Co., [JTX 1011], Dow Chemical Co., [JTX 1012], Exxon Corp., [JTX 1015], Eastman Kodak Co., [JTX 1016], Soltex Polymer Corp., [JTX 1017], Rexene, [JTX 1018], Mitsubishi Petrochemical, [JTX 1022], Northern Petrochemical, [JTX 1023], United States Steel Corp., [JTX 1024], Hercules, Inc., [JTX 1026], Imperial Chemical Indus. PLC, [JTX 1027], and Montedison, [JTX 1030].

In 1983, Phillips used a royalty rate for non–Montedison licensee/immunity holders of one cent per pound (escalated). [Tr. 65–66]. The one cent per pound (escalated) rate also applied to Montedison licensee/immunity holders after the expiration of the six month period following the issuance of the '851 patent. [Tr. 329].

Phillips entered into four license agreements at the one cent per pound (escalated) rate. On December 31, 1987, [*46] Phillips entered into a license with Huntsman Polypropylene Corporation at the one cent per pound (escalated) rate. [Tr. 68–69; JTX 1071]. On June 29, 1989, Phillips and Epsilon Products Company entered into a license agreement at this same rate. [Tr. 70; JTX 1088]. A third license agreement at this rate was entered with Genesis Polymers on September 11, 1989. [Tr. 69; JTX 1090]. Phillips's fourth and final license agreement at the one cent per pound (escalated) rate was consummated with Lyondell on February 14, 1990. [Tr. 75; JTX 1109].

Additionally, there is undisputed testimony that subsequent to Phillips's termination of the License Agreement, Phillips offered Rexene a license under the '851 patent at a rate of one cent per pound. Mr. Steindler testified that during a telephone call in early May of 1990, Allen Richmond, Phillips's General Patent Counsel, informed him that Phillips would not reinstate the License Agreement, but that it would be willing to grant Rexene a new license at one cent per pound, the rate that other licensees were being charged. [Tr. 478]. Following this conversation, Mr. Steindler wrote a memorandum to Andy

Smith, Rexene's CEO, indicating that [*47] the current market rate was one cent per pound. [JTX 1132]. Mr. Richmond testified that he remembers very little about this conversation. [Tr. 113–14]. Significantly, Mr. Richmond did not state that he did not offer Rexene a license under the '851 patent at the rate of one cent per pound during this conversation. Id. Based on this evidence, the court concludes that during this telephone conversation in early May of 1990, Phillips offered Rexene a license under the '851 patent at the rate of one cent per pound (escalated).

At some point in time after the completion of the joint polypropylene litigation in January 1989, Phillips increased its royalty rate under the '851 patent to two cents per pound (escalated). [Tr. 66]. Mr. Richmond testified that as a result of the Court of Appeals for the Federal Circuit's affirmance of this Court's determination in the joint polypropylene litigation that the '851 patent was valid, Phillips began to study the implementation of a higher royalty rate. [Tr. 66]. The parties dispute when this increase occurred. Phillips asserts that the increase occurred in approximately August or September of 1989, prior to the termination of Rexene's license. [*48] Rexene contends that the increase occurred at least six months after the termination.

The record reflects that Phillips offered or consummated only two licenses at the rate of two cents per pound (escalated). In December 1990, Phillips offered a license under the '851 patent at the two cents per pound (escalated) rate to Dutch State Mines. [Tr. 76; JTX 1152, 1153]. This license agreement was never consummated. [Tr. 77]. Phillips also entered into a license agreement with Formosa Plastics at the rate of approximately two cents per pound (escalated) on March 31, 1994. [Tr. 77; JTX 1213]. n7

n7 Rexene asserts that the rate of the Formosa license agreement was actually less than two cents per pound. Because this dispute is not material given the Court's resolution of the damages issue, the Court does not resolve the dispute between the parties as to the rate of the Formosa license.

2. Established Royalty

Keeping in mind that [HN7] section 284 commands that damages should be no less than a reasonable [*49] royalty, the Court notes that the Federal Circuit has held that a reasonable royalty "may be based upon an established royalty, if there is one, or if not upon a hypothetical royalty resulting from arm's length negotiations between a willing licensor and a willing licensee." *Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078 (Fed. Cir. 1983)*; see also *Rude v. Westcott, 130 U.S. 152, 165, 32 L. Ed. 888, 9 S. Ct. 463 (1889)* ("It is undoubtedly true that where there has been such a number of sales by a patentee of licenses to make, use and sell his patents, as to establish a regular price for a license, that price may be taken as the measure of damages against infringers"). If an established royalty is shown to exist, such a royalty is generally deemed the best measure of damages for infringement. *Hanson, 718 F.2d at 1078* ("'Where an established royalty rate for the patented inventions is shown to exist, the rate will usually be adopted as the best measure of reasonable and entire compensation.'") (quoting *Tektronix, Inc. v. United States, 213 Ct. Cl. 257, 552 F.2d 343, 347 (Ct. Cl. 1977)*); see also *Clark v. Wooster, 119 U.S. 322, 326, 30 L. Ed. 392, 7 S. [*50] Ct. 217 (1886)* ("It is a general rule in patent causes that established license fees are the best measure of damages that can be used."); *Trell, 912 F.2d at 1445–46* (Federal Circuit expressed preference for established royalty; where none exists, then courts must use hypothetical negotiation analysis); *Nickson Indus., Inc. v. Rol Mfg. Co. Ltd., 847 F.2d 795, 798 (Fed. Cir. 1988)* ("Where an established royalty exists, it will usually be the best measure of what is a 'reasonable' royalty").

For a patentee's negotiated royalties to constitute an "established" royalty they must meet five criteria: (1) they must be paid or secured before the infringement began; (2) they must be paid by a sufficient number of persons to indicate the reasonableness of the rate; (3) they must be uniform in amount; (4) they must not have been paid under threat of suit or in settlement of litigation; and (5) they must be for comparable rights or activity under the patent. *Mobil Oil, 915 F. Supp. at 1342; Studiengesellschaft Kohle m.b. H. v. Dart Indus., Inc., 666 F. Supp. 674, 680 n.6 (D. Del. 1987)*, aff'd *862 F.2d 1564 (Fed. Cir. 1988)*; see also *Trell, 912 F.2d at 1446– 47 (Fed. Cir. [*51] 1990)* (to be "established", royalty must be paid by sufficient number of persons to indicate general acquiescence in its reasonableness and must be for "commensurate" use of patent); 7 *Chisum, Patents § 20.03[2][b]*. Because of these stringent criteria, few courts have actually found an established royalty. See, e.g., *Julien v. Gomez & Andre Tractor Repairs, Inc., 512 F. Supp. 955 (M.D. La. 1981)*.

Almost all courts recognize that an established royalty may be too low to be "reasonable" under certain circumstances. See, e.g., 7 *Chisum, Patents § 20.03[2][d]*; see also *Mobil Oil, 915 F. Supp. at 1342–43*. For example, courts have stated that established rates which are artificially depressed because the patent had not yet gained public recognition or acceptance or due to widespread infringement or to avoid challenges to the patent, may

not constitute a reasonable royalty. See *Nickson, 847 F.2d at 798; Trio Process Corp. v. L. Goldstein's Sons, Inc., 612 F.2d 1353, 1359 (3d Cir. 1980); 7 Chisum, Patents § 20.03[2][d].*

A noted treatise on patent law summarizes the law pertaining to the "established royalty" rule as follows:

> [HN8] A patent owner [*52] may recover as a measure of damages the royalty rate established by prior actual licenses for acts comparable to those engaged in by the infringer without authority. An established royalty rate is a uniform one freely negotiated and paid by a sufficient number of licensees. Rates agreed to under threat of suit or in settlement of litigation are not conclusive.
>
> While existence of an established royalty usually sets the minimum recovery by a patent owner for infringement, it does not necessarily set the maximum recovery. Such an established royalty does not preclude the patent owner from recovering a greater sum under a reasonable royalty theory where the established rate was unfairly depressed because the patent had not yet gained recognition or because of widespread infringing activity.

*7 Chisum, Patents § 20.03*[2] at 20–145 (emphasis in original). Another noted authority on patent law has agreed that "[HN9] where an established royalty exists, it will usually be the best measure of what is a reasonable royalty. Nonetheless, a reasonable royalty may be greater than an established royalty. . . . But the patentee must come forward with evidence that an established royalty [*53] rate makes the award inadequate." Robert L. Harmon, Patents and the Federal Circuit, § 12.2(c) at 423 (2d ed. 1991) (footnote omitted).

### a. Established Rate of 0.175 cents per pound

Rexene first contends that, because it is a Montedison licensee/immunity holder, Phillips is only entitled to an established royalty of 0.175 cents per pound of crystalline polypropylene. The Court concludes that the rate of 0.175 cents per pound does not constitute an established royalty. The evidence at trial establishes that this rate was a very favorable rate available only for a short period of time in 1983 pursuant to a settlement agreement. The evidence in this case is undisputed that this rate was not available and was far below the market value for licenses under the '851 patent at the time Rexene's infringing conduct began in April 1990. Accordingly, the rate of 0.175 cents per pound does not constitute either an established or a reasonable royalty at the time of infringement.

### b. Established Rate of one cent per pound

Rexene next asserts that Phillips's post-1983 licenses demonstrate that Phillips had an established royalty rate of one cent per pound (escalated) [*54] at the time of infringement. Although the Court finds this to be a close case, the Court finds that Phillips had an established rate of one cent per pound (escalated) and that this rate constitutes a reasonable royalty at the time of Rexene's infringement.

Under the first of the five criteria, the patentee's royalties must be paid or secured before the infringement began. As set forth above, Phillips initiated the one cent per pound (escalated) rate in 1983. Phillips consummated four license agreements at this rate prior to April of 1990. Thus, it is clear that the one cent per pound (escalated) rate was paid before Rexene's infringement began.

The second criterion requires that the patentee's prior negotiated royalties must be paid by a sufficient number of persons to indicate the reasonableness of the rate. It is beyond dispute that [HN10] a single, licensing agreement, without more, is insufficient proof of an established royalty. See, e.g., *Trell, 912 F.2d at 1446.* Beyond this well-established tenet, however, there is a paucity of caselaw addressing how many prior licenses are necessary to demonstrate the existence of established royalty. See *Mobil, 915 F. Supp. at 1343* (eleven [*55] prior licenses at same rate is sufficient); *Philip Morris, Inc. v. Brown & Williamson Tobacco Corp., 641 F. Supp. 1438, 1491* (M.D. Ga.) (three prior licenses at same rate constitutes an established royalty), modified on other grounds, *645 F. Supp. 174 (M.D. Ga. 1986); Wayne-Gossard Corp. v. Moretz Hosiery Mills, Inc., 447 F. Supp. 12, 15 (W.D.N.C. 1976)* (four licenses agreed to under the same terms constitutes an established royalty), aff'd *573 F.2d 191 (4th Cir. 1978).* But see *Medtronic, Inc. v. Telectronics, Inc., 686 F. Supp. 838, 845 (D. Colo. 1987)* (three prior licenses where two resulted from settlements of litigation are not sufficient to demonstrate establish royalty); *Medtronic, Inc. v. Catalyst Research Corp., 547 F. Supp. 401, 415 (D. Minn. 1982)* (two existing licenses do not constitute an established royalty).

The Court concludes that Phillips's four prior licenses at the one cent per pound (escalated) rate are a sufficient number of prior licenses to satisfy the second criterion. The record reflects that Phillips negotiated the four licenses during the three year period immediately preceding the commencement of Rexene's infringing activity. In [*56] fact, the last of the four license agreements, between Phillips and Lyondell, was consummated on February 7, 1990, only two months before the relevant date. These

four licenses evince that the market, rate of one cent per pound (escalated) remained static during the period immediately preceding Phillips's termination of Rexene's license on April 23, 1990, and that this rate was a reasonable rate. Additionally, the cases addressing this issue set forth above, although sparse in number, have generally concluded that three or more prior licenses negotiated under the same circumstances and not pursuant to a settlement agreement can be sufficient to constitute an established rate. Accordingly, this Court concludes that the rate of one cent per pound (escalated) was paid by a sufficient number of entities to indicate the reasonableness of the rate.

The Court also finds that each of the final three criterion are clearly satisfied in this case. It is undisputed that all of the Phillips's post-1983 license agreements that were negotiated prior to Rexene's infringement charged the uniform rate of one cent per pound (escalated). It is likewise undisputed that none of these licenses were negotiated [*57] under threat of suit or in settlement of negotiation. Finally, the license agreements each granted the licensee the right to manufacture crystalline polypropylene. Thus, each of the prior licenses conveyed rights under the patent equivalent to those at issue in this case.

Accordingly, the five criteria for finding an established royalty are satisfied, and the Court concludes that Phillips had an established royalty with respect to the manufacture of crystalline polypropylene under the '851 patent. The Court's analysis, however, is not complete upon finding the existence of an established rate. Because section 284 prohibits the Court from awarding damages less than a reasonable royalty, the Court must also determine whether the established royalty is a "reasonable royalty." 35 U.S.C. § 284. As previously stated, almost all courts recognize that an established royalty may be too low to be "reasonable" under certain circumstances. See, e.g., 7 Chisum, Patents § 20.03[2][d]. For example, courts have noted that established rates which are artificially depressed because the patent had not yet gained public recognition or acceptance or due to widespread infringement or to avoid [*58] challenges to the patent, may not constitute a reasonable royalty. See id.; Nickson, 847 F.2d at 798; Trio Process, 612 F.2d at 1359.

Phillips asserts that the established royalty rate of one cent per pound (escalated) was artificially depressed because it did not take into account the culmination of the joint polypropylene litigation which resulted in a determination that the '851 patent was valid. The joint polypropylene litigation terminated in January 1989. According to Phillips, it decided that the value of the '851 patent had increased significantly as a licensing property because the patent had now been fully adjudicated. Phillips as-

serts that in August or September of 1989 it increased the royalty rate under the '851 patent to two cents per pound (escalated). [Tr. 66]. Phillips cites to two internal memoranda dated November 1, 1990 and February 25, 1991, respectively, as evidence of the timing of this increase. [JTX 1149, 1157].

Phillips contends that this increase applied to all licenses offered under the '851 patent after its adoption, with two exceptions. First, Phillips asserts that the increase did not apply to its license agreement with Genesis Polymers, [*59] which was consummated on September 11, 1989, because the negotiation process leading up to this agreement began prior to the change in policy. [Tr. 70]. Second, Phillips states that it offered the one cent per pound (escalated) rate to Lyondell in December 1989, even though the negotiations with Lyondell began after the change in policy, because, at that time, Lyondell was not in the business of manufacturing polypropylene, but was considering the purchase of one of Rexene's plants. [Tr. 73-74]. Phillips asserts that it offered Lyondell a reduced rate of one cent per pound (escalated) as an incentive to induce it to purchase the plant from Rexene, which was operating the plant under the License Agreement at the rate of 0.175 cents per pound. Id.

Phillips's assertion that it increased its royalty rate to two cents per pound (escalated) in approximately August or September of 1989 is untenable given the record in this case. Phillips's contention about the timing of the rate increase is belied by its own documents. In a letter to a prospective licensee dated December 19, 1989, at least three months after the alleged rate increase, John D. Olivier, Phillips's Licensing Manager, [*60] confirmed that the present rate for licenses under the '851 patent was one cent per pound (escalated). [JTX 1103]. The letter further indicates that although Phillips considered increasing the royalty rate as a result of the termination of the joint polypropylene litigation, Phillips decided to maintain the one cent per pound (escalated) rate until at least March 31, 1990. Id.

In December 1990, Phillips made its first offer under the increased rate to Dutch State Mines. [JTX 1153]. Before making the offer to Dutch State Mines at the increased rate, Mr. Olivier, sought approval from John VanBuskirk. [JTX 1152]. Mr. VanBuskirk was the Phillips's employee with the final responsibility for setting the royalty rates during the relevant time frame. [Tr. 86-87]. Mr. Olivier explained during his deposition that he previously initiated a dialogue with the company about increasing the rate, and the purpose of his memo to Mr. VanBuskirk was to get Mr. VanBuskirk's concurrence on the use of a new rate. [JTX 1310, Olivier Dep. Tr. 72-75]. Mr. VanBuskirk responded that he approved the use

of the two cents rate. [JTX 1152].

Phillips does not have single contemporaneous document [*61] indicating that it raised its royalty rate to two cents per pound (escalated) in August or September of 1989. Phillips relies on two internal memoranda dated November 1, 1990 and February 25, 1991, respectively, which outline the history of the royalty rates under the '851 patent and indicate that Phillips raised its rate in 1989 after the termination of the joint polypropylene litigation. The Court, however, finds these documents to be unpersuasive given the fact that they were prepared during the course of this litigation and are inconsistent with the other evidence in this case. The internal memoranda relied on by Phillips are refuted by the December 19, 1989 letter stating that Phillips decided to maintain the one cent per pound (escalated) rate until at least March of 1990, and the correspondence between Mr. Olivier and Mr. VanBuskirk in December of 1990, in which Mr. Olivier seeks authorization to increase the rate to two cents per pound (escalated).

The Court also finds the testimony of Mr. Richmond on this subject to be unpersuasive. Although Mr. Richmond testified that Phillips increased the rate in 1989, he admitted that it was not his responsibility to change the royalty [*62] rates. [Tr. 66, 86-87, 147-51]. Mr. Richmond testified that Mr. Olivier and Mr. VanBuskirk had the responsibility for determining the royalty rates, with the final responsibility residing with Mr. VanBuskirk. [Tr. 86-87, 147-51]. Not being entrusted with this decision, Mr. Richmond indicated that he had no reason to disagree with statements of Mr. Olivier in Phillips's documents to the contrary. [Tr. 149-50]. Phillips has therefore failed to produce sufficient evidence to rebut the statements in its own documents that the royalty rate was not increased to two cents per pound (escalated) in 1989, but rather was changed in December of 1990, when Mr. VanBuskirk approved Mr. Olivier's decision to increase the rate.

Moreover, the most compelling evidence that Phillips did not increase its royalty rate until after April 23, 1990, and that Phillips's established rate is a reasonable royalty, is the undisputed testimony that Phillips offered a license to Rexene in early May of 1990 at the rate of one cent per pound (escalated). See supra Part V.B.1. Mr. Steindler testified that, after informing him that Phillips would not reinstate the License Agreement, Mr. Richmond offered Rexene [*63] a new license at the current market rate of one cent per pound. [Tr. 477-78]. This testimony supported by Phillips's own documents conclusively establishes that the rate of one cent per pound (escalated) constitutes a reasonable royalty as of the date Rexene's infringement commenced. See *Biodynamic Tech., Inc. v.*

*Chattanooga Corp., 658 F. Supp. 266, 269-70 (S.D. Fla. 1987)* (finding in a trade secrets misappropriation case that the amount offered in a proposed license constitutes an established royalty).

Accordingly, the Court concludes that Phillips's established rate of one cent per pound (escalated) is a reasonable royalty. The Court therefore will calculate the award for infringement of Phillips's patent using this rate. n8

n8 Because the Court concludes that Phillips had an established royalty of one cent per pound (escalated) and that this rate constitutes a reasonable royalty, it will not perform a hypothetical negotiation analysis.

### 3. Damages Calculations

Since the commencement [*64] of this action, Rexene has been paying royalties to Phillips's at the 0.175 cents per pound rate specified in the License Agreement. From April 24, 1990 through June 30, 1994, a period encompassing the second quarter of 1990 through the second quarter of 1994, Rexene paid Phillips $1,030,002 in royalties. Rexene also submitted the royalty reports for each of these quarters to Phillips, which indicate the amount of its polypropylene production during this time period. On the basis of these reports, the parties are, for the most part, in agreement as to the poundage of polypropylene to be used in the calculation of a royalty for damages purposes given a finding of infringement.

The sole disagreement as to the amount of polypropylene to be used in this calculation concerns Rexene's series 17 and series 18 products. [Tr. 800-03]. Phillips asserts that Rexene series 17 and series 18 products are impact polypropylene products, and, as such, Rexene must pay royalties on 85% of its production of these products pursuant to the accord settling the joint polypropylene litigation. Rexene asserts that its series 17 and 18 products consist of impact polypropylene blended with additional materials [*65] that are not subject to royalties. Accounting for these additional materials, Rexene asserts that 81% and 77% of its series 17 and 18 products, respectively, are subject to royalties.

The Court finds that the evidence in this case establishes that Rexene's payment must include royalties on only 81% and 77% of its series 17 and 18 products, respectively. Lavon Anderson, Rexene's President and Chief Operating Officer, testified that it makes impact polypropylene, its series 14 product, by adding approxi-

mately five percent rubber components in a copolymer reactor to propylene. [Tr. 766]. The series 17 and 18 products are made by adding an EP rubber to the series 14 product. [Tr. 766–67]. The net affect of assessing royalties on 81% and 77% of Rexene's series 17 and 18 products, respectively, is to assess the impact polypropylene portion of these products at 85%. [Tr. 802]. In fact, Rexene's royalty reports for the second quarter of 1990 through the second quarter of 1994, indicate that it had previously paid royalties on 81% and 77% of its series 17 and 18 products, respectively, without objection from Phillips. [JTX 1144].

Phillips has produced no evidence to counter Mr. Anderson's [*66] assertions as to the content of the series 17 and 18 products. The December 1989 accord settling the joint polypropylene litigation provides that Rexene will pay royalties on 85% its products which are made by combining propylene with up to including five percent by weight of another monomer. [JTX 1101]. The accord is silent on the issue of the royalties required on products consisting of propylene in combination with other materials which make up greater than five percent by weight of such products. Id. The Court therefore finds that only 81% and 77% of Rexene's series 17 and 18 products, respectively, must be included in computing the quantity of Rexene's products that are subject to a royalty payment.

Accordingly, the Court finds that Mr. Ugone, Rexene's expert, correctly computed the amount of Rexene's crystalline polypropylene production from April 1990 through June 30, 1994, as 588,572,301 pounds [JTX 1237, Exhibit F]. Applying a one cent per pound (escalated) royalty rate to this quantity, the royalties due during this period amount to $6,773,375. [JTX 1237, Exhibit F; Tr. 797–98]. Subtracting Rexene's actual payments of $1,030,002 from this number, the Court [*67] finds that Rexene owes Phillips $5,743,373 as a result of its infringement of the *851* patent from April 24, 1990 to June 30, 1994. n9

n9 The Court recognizes that Rexene owes Phillips damages for its post–June 1994 infringement of the *851* patent. Phillips may apply to the Court for an assessment of these additional damages.

**C. Enhanced Damages–Willful Infringement**

Phillips contends that Rexene willfully infringed the *851* patent, warranting enhanced damages and attorneys fees. [HN11] Under *35 U.S.C. § 284,* a court may increase a damages award up to three times the amount found or assessed. In exercising its discretion under this section, the court should apply a two-step analysis. First, the court should determine whether an infringer is guilty

of conduct that would justify an award of increased damages. Second, the court should determine whether, and to what extent, to increase damages. *Jurgens v. CBK, Ltd., 80 F.3d 1566, 1570 (Fed. Cir. 1996).*

It is clear that a finding that an infringer acted [*68] willfully or in bad faith may entitle the aggrieved party to increased damages under *35 U.S.C. § 284. Jurgens, 80 F.3d at 1570; Yarway Corp. v. Eur–Control USA, Inc., 775 F.2d 268, 277 (Fed. Cir. 1985); E.I. DuPont De Nemours & Co. v. Monsanto Co., 903 F. Supp. 680, 740 (D. Del. 1995),* aff'd *92 F.3d 1208 (Fed. Cir. 1996).* A party seeking to establish willful infringement must prove the bad faith of the infringer by clear and convincing evidence. *Monsanto, 903 F. Supp. at 740.* The test for willful infringement is "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." *Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1555 (Fed. Cir. 1996).*

The Federal Circuit has held that [HN12] there is an "affirmative duty to use due care in avoiding infringement of another's patent rights." *Jurgens, 80 F.3d at 1570.* This duty usually includes "seeking and obtaining competent legal advice before engaging in activity that may result in infringement." *Stryker Corp. v. Intermedics Orthopedics, Inc., 96 F.3d 1409, 1414 (Fed. Cir. 1996)* (quoting Electro Med. Sys. [*69] *S.A. v. Cooper Life Sciences, 34 F.3d 1048, 1056 (Fed. Cir. 1994)).* There is, however, no "absolute requirement" for a would–be defendant to obtain its own opinion letter in order to avoid a finding of willful infringement. *Hall, 93 F.3d at 1555.* Instead, a court must look to the totality of the circumstances in determining whether an infringer discharged the duty of due care and in evaluating the question of willfulness. *Rolls–Royce Ltd. v. GTE Valeron Corp., 800 F.2d 1101, 1109–10 (Fed. Cir. 1986); Monsanto, 903 F.2d at 740–42.*

The testimony at trial established that upon receiving Phillips's April 23, 1990 letter, Mr. Steindler gave the letter to Rob Sutphen to look into the matter. [Tr. 475]. On April 24, 1990, Mr. Sutphen and Mr. Voke telephoned Phillips and spoke with John Olivier and Ms. Keesling. [Tr. 557; JTX 1126]. During this conversation, Mr. Sutphen and Mr. Voke informed Phillips that Rexene had previously submitted a duplicate payment for the first quarter of 1989 and that this overpayment would cover the royalty due for the fourth quarter of 1989. [Tr. 246–47, 559; JTX 1126]. The Rexene employees also informed Phillips that they had previously submitted [*70] the royalty reports for the second and third quarters of 1989, but would resubmit them, and that Rexene was preparing the royalty report for the fourth quarter of 1989 and soon thereafter would submit this report. [Tr. 246–47, 623–26;

JTX 1126]. Later that day, Rexene sent the royalty re-
ports for the second, third, and fourth quarters to Phillips,
and wire transferred $11,475.45 to Phillips, the amount
Rexene believed was due for the fourth quarter of 1989
taking into account its previous overpayment. [Tr. 623-
27].

After submitting the royalty reports and effecting the
wire transfer, Mr. Sutphen and Mr. Voke called Lyell
Carver, Phillips Senior Patent Counsel. [Tr. 309-10; 559-
60; JTX 1121]. Mr. Sutphen informed Mr. Carver that
they had submitted the royalty reports in question and
the fourth quarter royalty payment and requested that Mr.
Carver send a letter reinstating Rexene's license. [Tr. 560;
JTX 1121]. Mr. Carver's notes of that conversation suggest
that Phillips would get back to Rexene regarding the status
of the License Agreement. [JTX 1121]. Mr. Sutphen tes-
tified that after these conversations, he had a very strong
impression that Rexene had satisfied Phillips [*71] com-
plaints and that an agreement had been worked out to
reinstate the license. [Tr. 560-61]. Mr. Sutphen informed
Mr. Steindler after these conversations of his favorable
impressions concerning the status of Rexene's license. Id.

In early May of 1990, Allen Richmond, Phillips
General Patent Counsel, telephoned Mr. Steindler and in-
formed him that Rexene's license would not be reinstated
and that Phillips had filed a lawsuit for patent infringe-
ment. [Tr. 477-78; JTX 1131]. On May 7, 1990, Rexene
received a copy of Phillips's complaint and a copy of the
February 15, 1990 letter, Phillips's purported notice of de-
fault. [Tr. 479-80]. Upon receiving these documents, Mr.
Steindler conducted an investigation into the factual and
legal basis of Phillips's claim. [Tr. 480-81]. Specifically,
Mr. Steindler discussed the facts surrounding the termina-
tion with Mr. Voke on May 7. [Tr. 480-81; JTX 1125]. Mr.
Steindler also requested legal advice from Mr. Sutphen
and Rexene's outside counsel, Pennie & Edmonds. [Tr.
481, 483].

Mr. Sutphen researched the issue of the adequacy of
Phillips February 15 letter as a notice of default. [Tr. 562,
565-570]. Mr. Sutphen delivered an oral opinion [*72] to
Mr. Steindler on May 15 or 16 that the February 15 letter
was not adequate as a notice of default. [Tr. 569-70]. Mr.
Steindler, who also researched this issue, agreed with Mr.
Sutphen's conclusion. [Tr. 484]. On May 17, 1990, Mr.
Steindler delivered a written opinion to Rexene's manage-
ment, which provides:

> From a legal viewpoint, the February Letter,
> which was in the nature of a polite reminder,
> does not constitute a notice of default un-
> der the License Agreement. We have located
> several cases (including one in Texas and one

in New York whose law governs the License
Agreement) to the effect that letters similar
to the February Letter do not constitute a
notice of default which would permit con-
tract cancellation after the expiration of a
specified cure period. (Although these cases
are all in Landlord–Tenant situations, they
hopefully would apply to any type contract.)
Further, the February Letter, if it was in fact
received by Rexene, was not directed to any-
body's attention as required by the License
Agreement.

[JTX 1131].

Phillips raises several arguments in support of its as-
sertion that Rexene willfully infringed the *851* patent.
First, Phillips asserts that [*73]  Rexene's manufacture of
crystalline polypropylene continued without interruption
after receiving the April 23 notice of termination. Phillips
points to the fact that Rexene did not obtain a legal opin-
ion until several weeks after receiving the April 23 letter
and after Phillips filed suit in this case. Phillips therefore
asserts that Rexene failed to discharge its duty to obtain
competent advice of counsel prior to initiating any pos-
sible infringing activity. Phillips also contends that the
legal opinions on which Rexene relies are insufficient to
shield it from a finding of willfulness. Phillips asserts that
Mr. Steindler's May 17 memorandum contained only a
superficial analysis and consisted merely of conclusory
statements and that oral opinions are extremely disfa-
vored.

Based upon a review of the totality of the circum-
stances, the Court finds that Phillips has not satisfied its
burden of establishing by clear and convincing evidence
that Rexene willfully infringed the *851* patent. The Court
finds first that Rexene had a reasonable, good faith belief
that Phillips was willing to reinstate its license prior to
Mr. Richmond's phone call to Mr. Steindler in early May.
Rexene filed [*74] the royalty reports and submitted what
it believed was its outstanding balance under the License
Agreement within one day of its receipt of Phillips's no-
tice of termination. Mr. Sutphen testified that he came
away from the telephone conversations on April 24, with
a very favorable impression that Phillips intended to rein-
state the license. This testimony was not contradicted by
the testimony of the Phillips's representatives who were
parties to those conversations or their notes of those con-
versations. Significantly, neither Ms. Keesling's nor Mr.
Carver's notes of the April 24 conversations indicate that
Phillips remained intent on terminating Rexene's license.
[JTX 1121, 1126]. In fact, Mr. Carver's notes indicate that
he told Mr. Sutphen that he would get back to him next
week regarding whether Phillips was willing to reinstate

1997 U.S. Dist. LEXIS 18460, *74

the license. [JTX 1121].

Moreover, upon learning in early May that Phillips would not reinstate the License Agreement and had filed suit for patent infringement, Rexene immediately began to conduct an investigation into the legal and factual basis of Phillips's claim. Within two weeks, Rexene completed its examination, which included consultation with [*75] outside counsel, legal research performed by Mr. Sutphen and Mr. Steindler, and factual interviews conducted by Mr. Steindler. See *Braun, Inc. v. Dynamics Corp. of America, 975 F.2d 815, 822 (Fed. Cir. 1992)* ("On-going consultation with a patent lawyer is highly probative evidence of good faith"). Based on their research, Mr. Steindler and Mr. Sutphen each independently reached the conclusion that Rexene was not guilty of infringement because Phillips's notice of default was inadequate. The investigation culminated in Mr. Steindler's written opinion to management, indicating that Phillips failed to effectively terminate the License Agreement.

Because Rexene diligently conducted a prompt investigation immediately following the date on which it learned that Phillips was accusing it of infringement, Rexene's continued manufacture of crystalline polypropylene during the course of this investigation does not constitute willful infringement. The Federal Circuit has opined that [HN13] there does not exist a "universal rule that to avoid willfulness one must cease manufacture of a product immediately . . . upon receipt of a patentee's charge of infringement, or upon the filing of suit." *Gustafson,* [*76] *Inc. v. Intersystems Indus. Products, Inc., 897 F.2d 508, 511 (Fed. Cir 1990);* see 7 *Chisum, Patents, § 20.03*[4][b][v][F], at 20-349 to 50 ("The infringement time commencement rule is not applied rigidly") (citing *Polysius Corp. v. Fuller Co., 709 F. Supp. 560, 577 (E.D. Pa. 1989))*. Given the expeditious nature of its investigation, the Court finds that Rexene acted reasonably and in good faith in continuing to manufacture crystalline polypropylene during the two week duration of the investigation. The Court therefore rejects Phillips's assertion that Rexene's continued production of crystalline polypropylene between the time it received Phillips's letter of termination on April 23 letter and Mr. Steindler delivered his written opinion to management on May 17 warrants a finding of willful infringement.

The Court also finds that the oral opinions of Mr. Steindler and Mr. Sutphen and Mr. Steindler's May 17 written opinion are sufficient to discharge Rexene's affirmative duty to use due care not to infringe another's patent. Regarding the notice of default issue, both the Federal Circuit and this Court agreed that at the time this case was decided, prior federal [*77] court decisions presented two irreconcilable views as to what constitutes

an adequate notice of default under New York contract law. *Phillips Petroleum Corp. v. Rexene Corp., 1996 U.S. App. LEXIS 6298,* No. 95-1451, slip op. at 6 (Fed. Cir. Mar. 27, 1996). One view, adopted in *NL Indus., Inc. v. PaineWebber Inc., 720 F. Supp. 293 (S.D.N.Y. 1989)* and *PacifiCorp Capital, Inc. v. Tano, Inc., 877 F. Supp. 180 (S.D.N.Y. 1995)*, requires a heightened notice of default. The second view, adopted in *Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228 (2d Cir. 1991)*, does not. Phillips February 15 letter would constitute an adequate notice of default only if the latter view were adopted in this case. Significantly, Carvel, which articulated the latter position and was ultimately adopted by this Court and the Federal Circuit in concluding that Phillips's February 15 letter constituted an adequate notice of default, was decided after Rexene's attorneys issued their opinions that Phillips did not effectively terminate the License Agreement. Mr. Steindler's and Mr. Sutphen's opinions in May of 1990, based on the NL Indus. case, were clearly reasonable given the status of the law at the time [*78] they performed their research. Rexene continued to rely in its post-trial brief on the same defense originally set forth in these opinions. See *Read Corp. v. Portec, Inc., 970 F.2d 816, 829 (Fed. Cir. 1992)* (stating that the continued assertion at trial of defenses set forth in the original opinions of counsel supports good faith).

Moreover, although courts generally disfavor oral opinions and written opinions which do not provide a detailed analysis, the opinions of Rexene's attorneys are sufficient to preclude a finding of willfulness in this case for the following reasons: (1) Rexene's defense, based on an issue of contract law, was far less complicated and required less research than the issues generally involved in a determination of patent infringement or invalidity; (2) Rexene's attorneys were under pressure to complete their investigation in a short period of time given Rexene's decision to continue to manufacture crystalline polypropylene during the course of the investigation; (3) Mr. Steindler prepared his May 17 written opinion to apprise Rexene's management, lay persons, of the status of its license; a detailed legal analysis would not further the purpose of the letter; [*79] and (4) the May 1990 opinions formed the basis for Rexene's motion to dismiss and were embodied in the brief in support of that motion filed three months later. See *Braun, 975 F.2d at 823* (indicating that infringer's good faith and due care was evidenced by the fact that its initial opinion from counsel was followed by an extensive written opinion). Phillips's assertion that the May 17 memorandum does not constitute an "opinion" because it was not unequivocal is also without merit. The Federal Circuit has recognized that "an honest opinion is more likely to speak of probabilities than certainties." *Read Corp., 970 F.2d at 829 n.9.* Given that there was no

case that was directly on point concerning this issue, the fact that the May 17 memorandum did not speak in terms on certainties adds to its sincerity. See id. Accordingly, the Court finds that the opinions of Rexene's attorneys constitute competent advice of counsel.

Phillips therefore has not met its burden of establishing by clear and convincing evidence that Rexene willfully infringed the '851 patent. Phillips is not entitled to an enhanced damages award or attorneys' fees.

### E. Prejudgment Interest

The Supreme [*80] Court has held that [HN14] prejudgment interest should be awarded in most patent cases because prejudgment interest is necessary to fully compensate the patent owner. *General Motors v. Devex, 461 U.S. 648, 655, 76 L. Ed. 2d 211, 103 S. Ct. 2058 (1983)*. Specifically, the Court stated that an award of prejudgment interest:

> is necessary to ensure that the patent owner is placed in as good a position as he [or she] would have been in had the infringer entered into a reasonable royalty agreement. An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his [or her] damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of infringement and the date of the judgment.

*Id. at 655–56* (footnote omitted). Thus, the purpose of awarding prejudgment interest is to compensate the patent owner for the time value of money and the Court must determine which rate of interest will best accomplish that purpose in this case.

The Federal Circuit has given [HN15] district courts great discretion in determining the interest rate for awards of prejudgment [*81] interest. See, e.g., *Uniroyal, Inc. v. Rudkin–Wiley Corp., 939 F.2d 1540, 1545 (Fed. Cir. 1991); Bio-Rad Lab., Inc. v. Nicolet Instrument Corp., 807 F.2d 964, 969 (Fed. Cir. 1986)* ("The rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court."). This broad discretion permits a district court to select an interest rate ranging from the 30-day Treasury bill rate to the prime rate and even beyond. See, e.g., *Uniroyal, 939 F.2d at 1545* ("A trial court is afforded wide latitude in the selection of interest rates . . . and may award interest at or above the prime rate."); *Studiengesellschaft Kohle, M.B.H. v. Dart Indus.,*

*862 F.2d 1564, 1579–80 (Fed. Cir. 1988); National Presto Indus., Inc. v. Black & Decker, Inc.,* No. 89 C 8978, *1992 WL 125559* at *8 (N.D.Ill. 1992) (awarded Treasury bill rate). The Federal Circuit has made it clear that a patentee need not "demonstrate that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate." *Uniroyal, 939 F.2d at 1545* (citing *Studiengesellschaft, 862 F.2d at 1579–80)*; cf. *Allen Archery, Inc. v. Browning* [*82] *Mfg. Co., 898 F.2d 787, (Fed. Cir. 1990)* (district court should not be required to "consider and determine what use the patentee would have made of the royalty payments it should have received").

Both parties agree that Phillips is entitled to prejudgment interest if damages are awarded in this case. n10 The parties, however, disagree as to the appropriate rate of interest. Phillips asserts that the appropriate interest rate is the rate set forth in the License Agreement in section 4.4 for late payments of two percentage points over the prime interest rate, compounded quarterly. [JTX 1018]. Rexene counters that the rate set forth in the License Agreement was intended, in part, to punish a licensee for late payments. Because the purpose of prejudgment interest is compensatory, Rexene asserts that the Court should instead use the prevailing U.S. Treasury Bill rate in calculating prejudgment interest.

> n10 Rexene argues without support that prejudgment interest should not be applied during the period that it was in Chapter 11 bankruptcy proceedings, from October 18, 1991 to September 18, 1992. The bankruptcy proceedings did not delay this case or affect it in any manner. In fact, Rexene's Chapter 11 reorganization plan permitted Phillips to pursue its claim in this Court unencumbered by any restrictions. Absent a stay in the bankruptcy proceedings causing a delay in the proceedings before this Court, this Court can find no authorization for the conclusion that prejudgment interest did not accrue during the time in which Rexene was in bankruptcy.

[*83]

The Court, in its discretion, agrees with Rexene that the prevailing U.S. Treasury Bill rate is the appropriate interest rate for determining prejudgment interest. The Court notes that this rate is the rate set by statute for postjudgment interest. *28 U.S.C. § 1961*. Phillips has not alleged that it borrowed money during the period of infringement or would have invested the additional money to which it is entitled at a higher rate. See *Laitram Corp. v. NEC Corp., 115 F.3d 947, 955 (Fed. Cir. 1997)*. Phillips, as the party bearing the burden of proof on the issue of damages, has failed to establish that the rate of two per-

cent above prime set forth in the License Agreement was necessary to place it in as good a position as it would have been had Rexene entered into a royalty agreement. The Court therefore concludes that the U.S. Treasury Bill rate, compounded quarterly, n11 should be used in calculating prejudgment interest.

> n11 The Court finds it appropriate to compound the interest due in this case on a quarterly basis given the fact that Rexene's payments were due on a quarterly basis.

[*84]

## VI. Conclusion

For all the reasons stated herein, the Court concludes that Rexene infringed the '851 patent. As a result of the finding of infringement, Phillips is entitled to permanent injunction preventing Rexene from infringing the '851 patent and money damages in the amount of $5,743,373, plus prejudgment interest at the U.S. Treasury Bill rate, compounded quarterly, for Rexene's infringement from April 24, 1990 to June 30, 1994. In addition, Phillips may apply to this Court for damages resulting from Rexene's infringement of the '851 patent from June 30, 1994 through the date of this Memorandum Opinion. Judgment shall be entered accordingly.

## JUDGMENT

For the reasons set forth in the Court's Memorandum Opinion of this date, it is

ORDERED, ADJUDGED AND DECREED that:

1. Rexene Corporation infringes United States Letters Patent No. 4,376,851 (the " '851 patent") by virtue of its continued manufacture of crystalline polypropylene after Phillips Petroleum Company terminated its license under

that patent on April 23, 1990. Rexene materially breached its License Agreement with Phillips, and Phillips properly and effectively terminated this agreement.

2. [*85] Rexene's infringement entitles Phillips to the following relief:

a. A permanent injunction preventing Rexene from committing further acts which infringe the '851 patent;

b. Money damages in the amount of $5,743,373 as a result of Rexene's infringement of the '851 patent from April 24, 1990 to June 30, 1990, plus money damages in an amount to be determined at a later date on Phillips's application to the Court for Rexene's post-June 30, 1990 infringing conduct; and

c. Prejudgment interest on the monetary relief, to be calculated at the United States Treasury Bill rate, compounded quarterly.

3. Phillips is not entitled to enhanced damages and/or attorneys' fees under 35 U.S.C. § 284; Rexene did not willfully infringe the '851 patent.

4. Phillips is entitled to its costs in accordance with Local Rule 54.1.

5. Portions of the record in this case were filed under seal. If either party believes that any portion of the Court's Memorandum Opinion should be redacted and not filed as part of the public record in this case, that party shall so inform the Court within three days of receipt of the Memorandum Opinion.

9/4/97

Joseph J. Longobardi, D.J.