# D PART VIII

LEXSEE 2004 U.S. DIST. LEXIS 14949

**SYMBOL TECHNOLOGIES, INCORPORATED, Plaintiff, v. PROXIM INCORPORATED, Defendant.**

Civ. No 01-801-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2004 U.S. Dist. LEXIS 14949*

July 28, 2004, Decided

**PRIOR HISTORY:** *Symbol Techs., Inc. v. Proxim Inc., 2003 U.S. Dist. LEXIS 13767 (D. Del., July 30, 2003)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentee sued defendant company, alleging patent infringement. The court conducted a bench trial to hear evidence on the company's defenses of laches and equitable estoppel.

**OVERVIEW:** As to laches, the company argued that the patentee had either actual or constructive knowledge as early as 1993-94 that the company's products infringed the patents. The company argued that it sustained both economic and evidentiary prejudice as a result of unreasonable delay in bringing suit. The laches defense rested upon whether there were sufficient facts in the patentee's possession to place it on notice of potentially infringing activities and from which a duty to inquire would arise. The court concluded that the publicly available facts did not give rise to a duty to inquire. The patentee had knowledge of the company's power saving feature. If the patent were so broad that any such function in a wireless device might infringe, this might have imposed a duty to inquire further. However, the patent was not of such breadth. The estoppel argument also failed. The company did not provide evidence in support of its claim that the patentee bore a duty to disclose patent rights. In the absence of a duty to speak, the patentee's silence could not constitute the basis for a charge of equitable estoppel as a matter of law. The court also found that prejudgment interest was appropriate.

**OUTCOME:** The company was ordered to pay damages in the amount of $22,865,477, and to pay prejudgment interest in the amount of $3,052,192.

LexisNexis(R) Headnotes

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
[HN1] Laches is a defense to a patent infringement suit. In a legal context, laches may be defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
[HN2] To prevail on its equitable defense of laches, a defendant must prove by a preponderance of the evidence that: (1) the plaintiff delayed filing suit for an unreasonable and inexcusable period from the time that the plaintiff knew or should have known of its patent infringement claim against defendant; and (2) the plaintiff's delay operated to the defendant's prejudice or injury.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN3] The first prong of a laches defense requires proof that the patent holder had either actual or constructive knowledge of infringing activity. Constructive knowledge imposes upon patent holders the duty to police their rights. Under the constructive knowledge theory, a patentee is charged with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry.

*Patent Law > Remedies > Collateral Assessments > Costs*
*Patent Law > Infringement Actions > Defenses > Experimental Use & Testing*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN4] In laches context, a patentee's duty to inquire is subject to a standard of reasonableness. As such, the extent to which a reasonable method of detection of infringement is available to the patentee is relevant. Circumstances which give rise to a duty to inquire must

Case 1:97-cv-00550-SLR   Document 1418-10   Filed 05/24/2005   Page 3 of 14

Page 2
2004 U.S. Dist. LEXIS 14949, *

be pervasive, open, and notorious and include sales, marketing, publication or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN5] The defense of laches focuses on the conduct of the patentee, not the infringer. Nevertheless, the infringer's activities are relevant to whether the patentee's conduct was reasonable, including the infringer's efforts to maintain the secrecy of its processes and its denials of infringement. An infringer cannot cloak its activities in secrecy and simultaneously accuse the patent holder of failing to adequately protect its rights.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*
*Patent Law > Infringement Actions > Infringing Acts > Intent & Knowledge*
[HN6] After determining the point in time at which a patentee had knowledge, actual or constructive, of the infringing activities, the court must then determine whether the delay in bringing suit is unreasonable or inexcusable. If the delay in filing suit is more than six years, a presumption arises that the delay is unreasonable.

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
*Patent Law > Inequitable Conduct > Burdens of Proof*
[HN7] Equitable estoppel is similar to laches but focuses on the reasonableness of the infringer's reliance rather than the unreasonableness of the patentee's delay. To obtain relief from enforcement of a patent under the doctrine of equitable estoppel, the defendant must prove three elements by the preponderance of the evidence: (1) the plaintiff, through misleading conduct, led the defendant to reasonably infer that the plaintiff did not intend to enforce its patent; (2) the defendant relied on the plaintiff's misleading conduct; and (3) material prejudice resulted to the defendant.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN8] Silence may give rise to the defense of equitable estoppel only when coupled with either affirmative conduct or an affirmative obligation.

*Patent Law > Remedies > Collateral Assessments > Prejudgment Interest*
[HN9] The rate, if any, of prejudgment interest to be awarded is within the discretion of the court. A patent holder need not prove that it borrowed at the prime rate in order to be entitled to prejudgment interest on that basis. The determination of whether to award simple or compounded interest is within the discretion of the court. It may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit. Any justification for withholding the award must have some relationship to the award of prejudgment interest itself.

**COUNSEL:** [*1] Andre G. Bouchard, Esquire and Karen L. Pascale, Esquire of Bouchard, Margules & Friedlander, Wilmington, Delaware, Counsel for Plaintiff. Of counsel: Eric J. Lobenfeld, Esquire, Ira J. Schaefer, Esquire, Jonathan M. Sobel, Esquire and Ernest Yakob, Esquire of Hogan & Hartson L.L.P., New York, New York.

Richard L. Horwitz, Esquire, David E. Moore, Esquire of Potter, Anderson & Corroon, LLP, Wilmington, Delaware, Counsel for Defendant. Of counsel: Harry J. Roper, Esquire, George S. Bosey, Esquire, Raymond N. Nimrod, Esquire, Aaron A. Barlow, Esquire and Timothy J. Barron, Esquire of Roper & Quigg, Chicago, Illinois.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:** Dated: July 28, 2004
Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

On December 4, 2001, plaintiff Symbol Technologies, Incorporated ("Symbol") filed this action against defendant Proxim, Incorporated ("Proxim") alleging infringement of four U.S. Patents owned by plaintiff. n1 (D.I. 1) On December 18, 2001, Proxim answered the complaint and asserted, inter alia, a counterclaim of infringement of one of its own patents. n2 (D.I. 6) Plaintiff subsequently [*2] dismissed the '803 patent from its case.

> n1 *U.S. Patent Nos. 5,029,183* ("the '183 patent"), *5,103,461* ("the '461 patent"), *5,479,441* ("the '441 patent") and *5,668,803* ("the '803 patent") (collectively the "Tymes patents").

> n2 *U.S. Patent No. 5,231,634* ("the '634 patent").

A jury trial was held from September 8 through September 12, 2003. The jury rendered a verdict in Symbol's favor, finding that Proxim's OpenAir and 802.11

Case 1:97-cv-00550-SLR   Document 1418-10   Filed 05/24/2005   Page 4 of 14

Page 3
2004 U.S. Dist. LEXIS 14949, *2

products infringe the '183 and '441 patents. Both of these patents relate to a power saving feature in wireless local area network ("WLAN") communications protocols. The jury awarded a six percent royalty on sales of Proxim's OpenAir and 802.11 products.

On November 24, 2003, the court conducted a one day bench trial to hear evidence on Proxim's defenses of laches and equitable estoppel. Proxim asserts the defense of laches only with respect to its OpenAir products and equitable estoppel only with respect to its 802.11 products. For the reasons stated below, the court finds that Proxim [*3] has failed to prove by a preponderance of the evidence its defenses of laches and equitable estoppel; these are the court's findings of fact and conclusions of law pursuant to *Fed. R. Civ. P. 52*.

## II. FINDINGS OF FACT

### A. Background

1. Symbol is a Delaware corporation with corporate headquarters in Holtzville, New York. (D.I. 273) Proxim is a Delaware corporation with corporate headquarters in Sunnyvale, California.

2. Symbols owns the Tymes patents at issue in this action. The '183 patent was issued on June 29, 1991; the '441 patent issued on December 26, 1995. (PTX 1; PTX 2) The application for the '183 patent is the parent of the application for the '441 patent. (PTX 1; PTX 2; PTX 5, PTX 6 at SBLP 165776) Symbol filed a terminal disclaimer of the '441 patent, disclaiming any rights therein beyond the expiration of the '183 patent. (PTX 2; PTX 6 at SBLP 165977-79)

3. The claims of the '183 and '441 patents are directed to methods and systems of transferring data packets between remote units and base stations. (PTX 1; PTX 2) Claim 1 of the '183 patent, a representative claim of the patents at issue, claims:

> A method [*4] of transmitting data packets from one of a plurality of remote terminal units to a base station, comprising the steps of: (a) transmitting a data packet from said one unit to said base station during a first time period selected by the unit; (b) receiving at said one unit from said base station an acknowledge signal during a second period occurring only a fixed time delay after said first time period, said second time period being the same for at least some of said units.

(PTX 1, col. 23, ll. 42-52)

4. The jury found that Proxim's OpenAir products and 802.11 products infringe the Tymes patents. (D.I. 294)

### B. Laches

5. Proxim contends that it is entitled to the defense of laches with respect to its OpenAir products because Symbol had either actual or constructive knowledge as early as 1993-94 that the OpenAir products infringed Symbol's patents. Proxim contends that it sustained both economic and evidentiary prejudice as a result of Symbol's unreasonable delay in bringing suit. (D.I. 340 at 5-6)

6. Symbol first filed its claims for patent infringement against Proxim on May 1, 2001 in the form of a counterclaim in *Proxim Inc. v. 3COM Corp., et al., 2003 U.S. Dist. LEXIS 2556, No. 01-155-SLR.* [*5] *(D.I. 273 at 1)*. The counterclaims did not identify the OpenAir products as the subject of Symbol's infringement allegations. Symbol first accused Proxim's OpenAir products of infringement on December 24, 2002, when it served its expert report concerning infringement. (D.I. 328 at 260-61)

7. The OpenAir products were sold under the RangeLAN2 name. (D.I. 328 at 85-86) The accused OpenAir products included PC cards and access points. (Id. at 24, 27, 86) Proxim began selling the OpenAir product line in 1994.

8. The OpenAir products utilized a proprietary protocol developed by Proxim and known only to members of an industry organization, the Wirless LAN Interoperabilty Forum ("WLIF"). n3 (D.I. 311 at 350-51; D.I. 328 at 17, 244-45) Proxim vigorously guards the confidentiality of its OpenAir source code.

> n3 "Protocol" refers to the rules under which a product operates. A protocol specification is a document detailing the "rules" of the protocol. (D.I. 328 at 244) "Source code" is the computer language through which the protocol is implemented. (Id. at 7-11; D.I. 311 at 383-84)

[*6]

9. Symbol's infringement expert testified that he performed his infringement analysis for the OpenAir products using both the OpenAir protocol description and the OpenAir source code. (D.I. 311 at 354-55, 375-83) The infringement expert testified that, to determine direct infringement, both the protocol and source code were required. (Id. at 386)

10. The OpenAir protocol and source code were proprietary to Proxim. In order for Symbol lawfully to obtain the source conde, it would have had to join Proxim's

WLIF organization. (D.I. 328 at 244) Symbol did not join the WLIF as the WLIF promoted a wireless standard, OpenAir, that directly competed with the 802.11 standard endorsed by Symbol. (Id. at 245)

11. As Proxim was a direct competitor of Symbol, Symbol was aware of Proxim's product lines and product features. (D.I. 328 at 22-27) Through publicly available information, Symbol became aware that Proxim's OpenAir PC cards had advanced power management features. (Id. at 27; DTX 1158; DTX 7153)

12. In April 1995, Proxim made a direct sale of an accused OpenAir PC card to Symbol. (D.I. 328 at 32, 86, 98-101) The PC card was sold to Symbol so that Symbol could determine whether [*7] the OpenAir product could be installed in a Symbol hand-held device for use in a customer network. (Id. at 96-98) In the fall of 1996, Symbol tested both a Proxim PC card and access point with a spectrum analyzer, which measured the amount of information that a laptop computer sends to an access point through the PC card. (D.I. 328 at 33; DTX 1160)

13. In September 1996, senior management at Symbol received an internal memorandum discussing Proxim's OpenAir products which were competitive with Symbol (the "September 1996 memoranda"). (D.I. 328 at 34-38; DTX 1036) It compared the features and functions of Symbol's products with that of Proxim's. Included in the September 1996 memorandum was a discussion concerning Proxim's power management function. (D.I. 328 at 40; DTX 1036) It also showed test results indicating that Proxim's products transferred significantly more files per second when the power management feature was activated. Overall, the September 1996 memorandum reported that the OpenAir products had a competitive advantage over Symbol's own products.

14. The September 1996 memoranda explained that Proxim's products utilized a request-to-send and clear-to-send protocol [*8] ("RTS-CTS"). (DTX 1036) RTS-CTS was the basis of Symbol's infringement expert's testimony that Proxim's products infringed the '183 and '441 patents.

15. Between 1994 and 2000, Proxim advertised and promoted its OpenAir product lines. (D.I. 328 at 108-09) In that time period, Proxim spent approximately $250,000 in advertising for its OpenAir products. (Id. at 108-09)

16. Proxim contends that it was substantially prejudiced by having invested several million dollars in its OpenAir products between 1994 and 2001, that it lost the opportunity to re-engineer its products to avoid infringement, and that it lost the opportunity to negotiate a licensing agreement. Proxim also contends that it sustained evidentiary prejudice which prevented it from raising defenses on the basis of inventorship, invalidity and inequitable conduct.

17. **Conclusions of Law.** It is well established that [HN1] laches is a defense to a patent infringement suit. See *Lane & Bodley Co. v. Locke, 150 U.S. 193, 37 L. Ed. 1049, 14 S. Ct. 78 (1893); Wollensak v. Reiher, 115 U.S. 96, 29 L. Ed. 350, 5 S. Ct. 1137, 1885 Dec. Comm'r Pat. 310 (1885); Mahn v. Harwood, 112 U.S. 354, 28 L. Ed. 665, 5 S. Ct. 174 (1884); A.C. Aukerman Co. v. R.L. Chaides Const. Co. 960 F.2d 1020, 1028 (Fed. Cir. 1992).* [*9] "In a legal context, laches may be defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co., 960 F.2d at 1028-29.*

18. [HN2] To prevail on its equitable defense of laches, Proxim must prove by a preponderance of the evidence that: (1) Symbol delayed filing suit for an unreasonable and inexcusable period from the time that Symbol knew or should have known of its infringement claim against Proxim; and (2) Symbol's delay operated to Proxim's prejudice or injury. *Id. at 1032.*

19. [HN3] The first prong of a laches defense requires proof that the patent holder had either actual or constructive knowledge of infringing activity. See *Johnston v. Standard Min. Co., 148 U.S. 360, 370, 37 L. Ed. 480, 13 S. Ct. 585 (1893); Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 114 F.3d 1547, 1559 (Fed. Cir. 1997).* Constructive knowledge imposes upon patent holders the duty to police their rights. See *Wanlass v. Fedders Corp, 145 F.3d 1461, 1464-67 (Fed. Cir. 1998); Wanlass v. General Electric Co., 148 F.3d 1334, 1338 (Fed. Cir. 1998).* [*10] Under the constructive knowledge theory, a patentee is charged with "such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Johnston, 148 U.S. at 370.*

20. [HN4] A patentee's duty to inquire is subject to a standard of reasonableness. As such, the extent to which a reasonable method of detection of infringement is available to the patentee is relevant. See *Wanlass v. General Elec., 148 F.3d at 1340* (holding that the "frequency with which [infringement] investigations should ... occur[] is a function of their cost and difficulty."); *Wanlass v. Fedders Corp, 145 F.3d at 1464-67* (finding that a finding of laches was not appropriate on summary judgment where record did not demonstrate that a testing of all possible infringing products was feasible and affordable). Circumstances which give rise to a duty to inquire must be "pervasive, open, and notorious" and include "sales, marketing, pub-

Case 1:97-cv-00550-SLR    Document 1418-10    Filed 05/24/2005    Page 6 of 14

Page 5
2004 U.S. Dist. LEXIS 14949, *10

lication or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the [*11] defendant's potentially infringing activities." *Wanlass v. General Elec., 148 F.3d at 1339.*

21. [HN5] The defense of laches focuses on the conduct of the patentee, not the infringer. Nevertheless, the infringer's activities are relevant to whether the patentee's conduct was reasonable, including the infringer's efforts to maintain the secrecy of its processes and its denials of infringement. See *Eastman Kodak Co., 114 F.3d at 1559.* An infringer cannot cloak its activities in secrecy and simultaneously accuse the patent holder of failing to adequately protect its rights. See, e.g., *Fromson v. Western Litho Plate and Supply Co., 670 F. Supp. 861, 868-69 (E.D. Mo. 1987),* rev'd on other grounds by *853 F.2d 1568 (Fed. Cir. 1988).*

22. [HN6] After determining the point in time at which a patentee had knowledge, actual or constructive, of the infringing activities, the court must then determine whether the delay in bringing suit is unreasonable or inexcusable. See *A.C. Auckerman, 960 F.2d at 1032.* If the delay in filing suit is more than six years, a presumption arises that the delay is unreasonable. See *id. at 1035.* [*12]

23. **Absence of Requisite Knowledge.** Proxim produced no evidence that demonstrates Symbol had actual knowledge of Symbol's infringing activities. Instead, Proxim's laches defense rests upon whether there were sufficient facts in Symbol's possession to place Symbol on notice of potentially infringing activities and from which a duty to inquire would arise. The court concludes that under these circumstances, the publicly available facts did not give rise to a duty to inquire.

24. In *Wanlass v. General Elec.,* the Federal Circuit articulated a duty to inquire that will arise when sufficient facts are available to put the patentee on notice of infringement. *148 F.3d at 1339.* A principal justification for this duty is that the burden is less costly on patentees to police their rights than it would be to impose a burden upon potential infringers to review all patent art for potential infringement. *Id.*

25. It is not the case, however, that all inventions, and the activities which may infringe them, are so readily susceptible to low cost detection. See *Wanlass v. Fedders, 145 F.3d at 1467.* The case at bar highlights this tension. Symbol did have [*13] knowledge of Proxim's power save feature. If Symbol's patent were so broad that any power saving function in a wireless device might infringe, this certainly may impose a duty upon Symbol to inquire further. Symbol's patent, however, is not of such breadth.

26. Under different circumstances, Symbol may have had a duty to investigate. For example, if evidence indicated that Symbol actually suspected Proxim's OpenAir products of infringement at a time prior to when it filed suit, but did nothing, laches might attach. Or if Proxim's proprietary source code was reasonably and lawfully available to Symbol, its duty may have been different. Under the facts at bar, however, the court finds that Proxim has not established that Symbol had sufficient knowledge to put it on notice of Proxim's infringing activities.

27. **Absence of Requisite Prejudice.** Even if the court were to find that Symbol had knowledge, constructive or otherwise, of Proxim's infringing activities, Proxim has still failed to prove the requisite prejudice. "Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, [*14] the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *A.C. Auckerman, 960 F.2d at 1032.* In *Wanlass v. General Elec.,* the Federal Circuit found evidentiary prejudice where the defendant had a policy of destroying internal documents after six years, key witnesses were deceased or unavailable, and the defendant no longer had models of some of the accused products. *148 F.3d at 1340.*

28. Proxim contends that it suffered evidentiary prejudice stemming from Symbol's delay in that two witnesses were unable to recall certain facts during depositions and that a certain document was not produced by Symbol during discovery. This, according to Proxim, prejudiced its ability to assert defenses pertaining to inventorship and inequitable conduct.

29. Proxim's inventorship defense supposedly relates to whether John Kramer was a co-inventor of the '441 patent. Initially, Kramer was named as a co-inventor, something which Symbol contends was mistaken and undiscovered until this litigation. (PTX 2) Symbol, pursuant to *35 U.S.C. § 256,* applied for and obtained [*15] a correction from the PTO based upon certifications by both Tymes and Kramer asserting that the original application was in error in that respect. (D.I. 311 at 268-73; PTX 151; PTX 331) At trial, Tymes testified that he was the sole inventor of the '441 patent. (D.I. 311 at 268)

30. Proxim did not raise inventorship at trial as a defense and did not question Tymes on the issue of inventorship in its cross-examination of him. As Kramer has disclaimed any inventorship in the patents at issue and Proxim has no evidence otherwise to counter such a claim, it eludes the court as to how Proxim was in fact prejudiced. Where, as here, a deposed witness has indicated that he does not have a recollection of a particular fact, the lapse in memory is susceptible to more than one reasonable inference; in the absence of other evidence to support defendant's contention, its alleged evidentiary

prejudice is no more likely than not.

31. The second basis for evidentiary prejudice was Symbol's failure to produce a certain document, or perhaps a group of related documents, created by Tymes in preparation for the patent applications. During his deposition, Tymes described preparing a memorandum which [*16] explained format and procedures pertaining to his invention but could not recall specifics about these documents or their present location. (D.I. 328 at 314-15) Like the absence of memory by a witness, the absence of a document that was once known to exist, without more, does not give rise to an inference of evidentiary prejudice. Proxim offered no evidence to suggest that such a document likely contained material that would have aided its invalidity defense of inventorship. n4 Therefore, the court finds that Proxim has not demonstrated that it sustained evidentiary prejudice to support its defense of laches.

> n4 Proxim also, in conclusory fashion, suggests that this unavailable evidence might have aided it in a defense of inequitable conduct. (D.I. 340 at P65) Of course, conclusory assertions of evidentiary prejudice cannot form the basis of a laches defense. See *Meyers v. Asics Corp., 974 F.2d 1304, 1307 (Fed. Cir. 1992)*. Moreover, in the case of inequitable conduct where the law requires proof by clear and convincing evidence, the absence of any evidence of deceit or fraud undermines Proxim's claims of prejudice.

[*17]

32. Economic prejudice results where the infringer "will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *A.C. Auckerman, 960 F.2d at 1033*. There must be a nexus between the patentee's delay and the infringer's injury. See *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 774 (Fed. Cir. 1995)*. Simply that the infringer expended capital in pursuit of its infringing activities does not support a finding of a causal connection. See *Hemstreet v. Computer Entry Systems Corp., 972 F.2d 1290, 1294 (Fed. Cir. 1992)* ("It is not enough that the alleged infringer changed his position—i.e., invested in production of the allegedly infringing device. The change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity.").

33. Proxim has insufficiently demonstrated the existence of actual prejudice that is causally linked to Symbol's delay. The economic prejudice Proxim relies upon is of the ordinary kind that any infringer would incur, namely, the loss of the opportunity to engage in noninfringing economic [*18] activities. While in some cases, a patentee's conduct may justify laches in such circumstances, it does not here. For example, had Proxim proven actual knowledge by Symbol of Proxim's infringing activity, such economic losses might constitute actual prejudice. *Dwight & Lloyd Sintering Co. v. Greenawalt, 27 F.2d 823, 827 (2d Cir. 1928)* ("There is abundant authority to deny an accounting when the patentee has let the infringer slowly build up a large business without protest.").

34. Proxim's allegation of nexus also fails to the extent it relies upon its post hoc awareness of the scope and validity of the Tymes patents. Proxim contends that had it known its products infringed valid patents held by Symbol, it would have designed around them or diverted its investments to noninfringing technologies. (D.I. 347 at 52) This argument is on four corners with that rejected by the Federal Circuit in *State Contracting & Engineering Corp. v. Condotte America, Inc. 346 F.3d 1057 (Fed. Cir. 2003)*. In that case, the infringer argued that had it received earlier notice of the patent at issue in that case, it would have designed around the patent and would not have [*19] included the patented invention in its project bids. *Id. at 1066*. The Federal Circuit rejected this argument as lacking the requisite nexus between the delay and the injury. n5 *Id. at 1067*. In particular, the Federal Circuit noted that the infringer failed to prove that it would have changed its design. Id. Similarly, in Gasser Chair, the Federal Circuit found that an infringer's belief that the patent was invalid undercut its argument that it would have engaged in a different course of conduct. *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 775 (Fed. Cir. 1995)*.

> n5 The Federal Circuit also found that the alleged prejudice was inadequate to serve as a basis for laches, as it was the kind of loss attributable to ordinary liability for infringement. *Id. at 1067*.

35. In the case at bar, Proxim has not demonstrated that the prejudice it allegedly sustained has a nexus to Symbol's delay. Consequently, the court finds that Proxim has failed [*20] to prove the required elements of laches by a preponderance of the evidence.

### C. Equitable Estoppel

36. Proxim contends that Symbol, by not informing the IEEE of the existence of the Tymes patents and their applicability to the 802.11 standard, misled Proxim into believing that Symbol held no patents relating to the 802.11 standard.

37. Proxim first began selling the infringing 802.11 product line in 1998. (D.I. 312 at 675) Proxim's 802.11

Case 1:97-cv-00550-SLR    Document 1418-10    Filed 05/24/2005    Page 8 of 14

Page 7
2004 U.S. Dist. LEXIS 14949, *20

products were sold under various names, including RangeLAN802, Skyline, Harmony and Orinoco.

38. The IEEE 802.11 standard is an industry standard drafted by the working group members of the 802.11 committee, of which Symbol and Proxim were both members. (D.I. 328 at 52)

39. The IEEE Standards Board Bylaws contemplate that IEEE standards may include the use of subject matter covered by known patents or pending patent applications. (PTX 400) The Bylaws require that such patented subject matter may only be included if the patentee provides either: (1) a general disclaimer against assertion of any present or future patent rights against persons or entities practicing a patented invention in order to comply with the IEEE standard; or (2) a statement [*21] that a license will be made available "without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination." (PTX 400)

40. In September 1995, the chairperson of the 802.11 committee sent a letter to all committee members requesting that each member identify whether they held patents related to technology embodied in the draft agreement and whether they would be willing to "license their technology on a non-discriminatory basis and under fair and reasonable terms." (DTX 6166 at P511051) Attached to the chairperson's letter was a sample letter which provided blank spaces for the inclusion of U.S. Patent Numbers. (Id. at P511052)

41. In April 1996, Symbol responded to the chairperson's letter with a letter of assurance. (DTX 6166 at P511048) Symbol's letter did not identify any specific patents or patent applications. (Id.) Instead, the letter stated that in the event the 802.11 standard is adopted, Symbol would "be willing to negotiate a non-exclusive, worldwide license, under the relevant claims of such patent or patents, on a nondiscriminatory basis and on reasonable terms and conditions including its [*22] then current royalty rates." (Id.) Symbol's letter is consistent with submissions made by several other companies. In an August 1996 memorandum, the IEEE Standards Board chairperson provided a list as to which committee members had complied with this request for an assurance letter. Symbol, along with several other companies, was denoted as having an "IP statement available." (Id. at P511030)

42. In 1997, testing was performed at a laboratory at the University of New Hampshire to determine whether products offered by various 802.11 participants had interoperability. (D.I. 328 at 49-50, 197-198) This third-party testing confirmed that Proxim and Symbol's products were interoperable. (Id. At 51-52)

43. **Conclusions of Law.** [HN7] Equitable estoppel is similar to laches but focuses on the reasonableness of the infringer's reliance rather than the unreasonableness of the patentee's delay. To obtain relief from enforcement of a patent under the doctrine of equitable estoppel, Proxim must prove three elements by the preponderance of the evidence: (1) Symbol, through misleading conduct, led Proxim to reasonably infer that Symbol did not intend to enforce its patent; (2) Proxim [*23] relied on Symbol's misleading conduct; and (3) material prejudice resulted to Proxim. See *A.C. Auckerman Co., 960 F.2d at 1028*.

44. [HN8] Silence may give rise to the defense of equitable estoppel only when coupled with either affirmative conduct n6 or an affirmative obligation. n7 Id.

> n6 For example, if a patentee threatened enforcement, but then delayed in bringing suit. See *Meyers, 974 F.2d at 1308-09*.
>
> n7 For example, if a patentee and infringer had a relationship from which there exists an affirmative obligation to speak. See *A.C. Auckerman, 960 F.2d at 1042*.

45. Proxim contends that Symbol had a duty to disclose the existence of patents relevant to the IEEE standards development. Proxim relies upon the Federal Circuit's decision in *Rambus, Inc. v. Infineon Tech Corp., 318 F.3d 1081 (Fed. Cir. 2003)*, to support the existence of a duty to disclose. Proxim's reliance is misplaced.

46. Rambus does not stand for a general duty of disclosure [*24] for participants in an industry standards organization. First, the portion of the Rambus opinion relied upon by Proxim addressed a state law claim of fraud, not equitable estoppel. *Rambus, 318 F.3d at 1096*. Second, the Federal Circuit focused substantially on the contractual duty of disclosure of the specific industry standards organization. *Id. at 1097-1101*. The contractual nature of this duty was further reinforced by court of appeal dicta admonishing open standards committees to adopt clearer policies relating to the disclosure of intellectual property by its members. *Id. at 1102*.

47. If Proxim sought to rely upon the existence of a contractual duty to disclose, it had the burden of proving the existence thereof and the scope thereto. Proxim, however, failed to provide evidence to support its claim that IEEE Standards Board members bore a duty to disclose their patent rights. Indeed, the evidence demonstrates that IEEE Standards Board members could either disclose their specific patents or pledge to license on a reasonable and nondiscriminatory basis, the latter being the course selected by Symbol and several other signifi-

Case 1:97-cv-00550-SLR    Document 1418-10    Filed 05/24/2005    Page 9 of 14

Page 8
2004 U.S. Dist. LEXIS 14949, *24

cant [*25] technology holders. Proxim produced no controlling agreement that expressed a duty to the contrary. Given the course of conduct of the IEEE members, the court finds that no such duty existed. In the absence of a duty to speak, Symbol's silence cannot constitute the basis for a charge of equitable estoppel as a matter of law. *A.C. Auckerman, 960 F.2d at 1042* ("Silence alone will not create an estoppel unless there was a clear duty to speak.").

48. Proxim also contends that Symbol's silence following the interoperability testing between Proxim and Symbol constituted misleading conduct. Proxim, however, offered no evidence that the third-party interoperability testing affirmatively imposed the duty to speak upon any participating 802.11 vendor. In the absence of such a duty, Symbol's silence cannot be misleading as a matter of law. Moreover, Proxim has not shown any evidence of reliance that is connected to the interoperability testing. *Id. at 1043*.

49. Consequently, the court finds Proxim has failed to prove by a preponderance of the evidence its defense of equitable estoppel.

## IV. PREJUDGMENT INTEREST

Symbol filed a motion for an award [*26] of prejudgment interest and for a six percent royalty on future infringing sales by Proxim. (D.I. 324) At the conclusion of the jury trial, the jury found by a preponderance of the evidence that Symbol was entitled to damages both for infringement by the 802.11 products and the OpenAir products. (D.I. 294 at P27) Question 28 asked the jury "what amount of damages in the form of a reasonable royalty do you find that Symbol has proven by a preponderance of the evidence it is entitled to receive from Proxim?" (Id. at P28) Following the question, two boxes were provided for the jury's response: (1) a box which contained a blank line after which the "% royalty rate" appeared; (2) a box which began with a dollar symbol after which a blank line was provided. (Id.) The jury indicated on the verdict form that a six percent royalty rate was awarded. (Id.) The jury drew a dash through the second box containing the dollar symbol.

Proxim contends that the jury's response to the second box indicates that it determined that no damages should be awarded Symbol. (D.I. 346) This argument, however, cannot be reconciled with the verdict form, the jury's full response to question 28 nor Proxim's [*27] argument at trial. The verdict form supplied to the jury was agreed to by both parties. (D.I. 314 at 1073-74) Neither party requested that the jury be asked to make a special finding as to the royalty base. Both parties' experts used a royalty base based upon Proxim's reported sales data for the accused products. (DTX 2008; DTX 2026; DTX 2018; DTX 2036; DTX 2041; D.I. 312 at 584-85; D.I. 313 at 958-59) Indeed, it was Proxim's argument, as proffered through its damages expert, that the proper royalty, if not zero, should be a lump sum. (D.I. 313 at 961) At no point during the trial did Proxim introduce evidence to contradict the royalty base figure. Consequently, the court finds that the undisputed evidence offered at trial supports the conclusion that the proper royalty base is $381,091,287, based upon defendant's reported sales figures for the products found to have infringed the Tymes patents. (DTX 2008; DTX 2011; DTX 2018; DTX 2026; DTX 2036; DTX 2041; D.I. 312 at 584) Consequently, based upon the jury's finding of a six percent royalty, Symbol is entitled to an award of damages in the amount of $22,865,477.

Symbol proposes an award of prejudgment interest based upon the average [*28] annual prime rate compounded annually. (D.I. 324) [HN9] The rate, if any, of prejudgment interest to be awarded is within the discretion of the court. See *Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc., 862 F.2d 1564, 1580 (Fed. Cir. 1988)*. A patent holder need not prove that it borrowed at the prime rate in order to be entitled to prejudgment interest on that basis. See *Uniroyal, Inc. V. Rudkin-Wiley Corp., 939 F.2d 1540, 1545 (Fed. Cir. 1991)*. The determination of whether to award simple or compounded interest is within the discretion of the court. See *Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1555 (Fed. Cir. 1995)*. "It may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit." *General Motors Corp. v. Devex Corp., 461 U.S. 648, 657, 76 L. Ed. 2d 211, 103 S. Ct. 2058 (1983)*. "Any justification for withholding the award ... must have some relationship to the award of prejudgment interest itself." *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc. 246 F.3d 1336, 1361 (Fed. Cir. 2001)*.

Mindful of its discretion, [*29] the court concludes that Symbol is entitled to simple interest based upon the United States Treasury Bill One Year Constant Rate for a period beginning in May 1995 and ending in July 2004. n8 Prejudgment interest, calculated consistent with Symbol's expert's methodology, shall be awarded in the amount of $3,052,192.

   n8 The interest rates employed by the court are as follows: (1995) 5.96%; (1996) 5.52%; (1997) 5.63%; (1998) 5.05%; (1999) 5.08%; (2000) 6.11%; (2001) 3.49%; (2002) 2.00%; (2003) 1.24%; and (2004) 1.29%. See United States Federal Reserve, Selected Interest Rates (2004) at http://www.federalreserve.gov/releases/h15/data.htm.

## V. FUTURE ROYALTIES

Symbol contends that in lieu of a permanent injunction it should be awarded a six percent royalty on sales of infringing products by Proxim occurring after September 2003. (D.I. 324) Symbol relies upon *Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 616, 628 (Fed. Cir. 1985)*, for its argument that it should [*30] receive a court imposed royalty on future sales. In Shatterproof Glass, however, the patentee sought a permanent injunction. The district court denied the injunction and instead ordered a compulsory license to be granted to the infringer. In the case at bar, Symbol has not sought a permanent injunction and Proxim has not sought a compulsory license. In the absence thereof, the court declines to consider whether a judicially determined royalty on future sales is appropriate relief in the present case.

## VI. CONCLUSION

For the reasons stated above, the court finds that Proxim has failed to establish by a preponderance of the evidence its equitable defenses of estoppel and laches. The court also finds that, consistent with the jury's award of a six percent royalty on the infringing products, Symbol is entitled to an award of damages in the amount $22,865,477 and interest in the amount of $3,052,192. An order shall issue.

## ORDER

At Wilmington this 28th day of July, 2004, consistent with the memorandum opinion issued this same day and the jury verdicts of September 29, 2003 and September 12, 2003;

IT IS ORDERED that:

1. Defendant shall pay damages to plaintiff in [*31] the amount of $22,865,477 for defendant's sales of its infringing products between May 1995 and September 2003.

2. Plaintiff's motion for prejudgment interest and a six percent royalty on future infringing sales is granted in part and denied in part. (D.I. 324) Defendant shall pay prejudgment interest to plaintiff in the amount of $3,052,192.

Sue L. Robinson

United States District Judge

LEXSEE 1993 U.S. APP LEXIS 25039

**T. J. SMITH & NEPHEW LTD., Plaintiff-Appellant, v. PARKE, DAVIS & COMPANY, d/b/a DESERET MEDICAL, INC., ACUTEK ADHESIVE SPECIALTIES, INC. and DESERET MEDICAL, INC., Defendants/Cross-Appellants.**

92-1240, 92-1241

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

1993 U.S. App. LEXIS 25039

September 28, 1993, Decided

**NOTICE:** [*1] RULE 47.8. OPINIONS AND ORDERS DESIGNATED AS UNPUBLISHED SHALL NOT BE EMPLOYED AS PRECEDENT BY THIS COURT, AND MAY NOT BE CITED BY COUNSEL, EXCEPT IN SUPPORT OF A CLAIM OF RES JUDICATA, COLLATERAL ESTOPPEL, OR LAW OF THE CASE. ANY PERSON MAY REQUEST THAT AN UNPUBLISHED OPINION OR ORDER BE REPREPARED AND REISSUED FOR PUBLICATION, CITING REASONS THEREFOR. SUCH REQUEST WILL BE GRANTED OR DENIED BY THE PANEL THAT RENDERED THE DECISION.

**SUBSEQUENT HISTORY:** Petition for Rehearing Denied November 12, 1993, Reported at: *1993 U.S. App. LEXIS 29591*. Reported in Table Case Format at: *9 F.3d 979, 1993 U.S. App. LEXIS 36230*.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Utah, Central Division.

**DISPOSITION:** We affirm-in-part, vacate-in-part, and remand.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant patent holder sought review of the judgment of the United States District Court for the District of Utah, which entered judgment in favor of appellant in its patent infringement suit. The sole issue presented for appeal was the measure of damages awarded.

**OVERVIEW:** The district court awarded damages to appellant patent holder in its infringement suit against cross-appellant corporations and both parties appealed. Appellant argued that the district court erred in its determination of a reasonable royalty and failed to apply the collateral sales doctrine or to give sufficient weight to existing licenses under the patent-in-suit and that the prejudgment interest should have been calculated at a higher rate. Cross-appellants argued that the district court erred in finding that a settlement agreement with another company did not release them from liability for the covered time period. The court affirmed in part, vacated in part, and remanded. The court held that to invoke the collateral sales doctrine, appellant was required to show that the patented product was actually responsible for cross-appellants' sales of the nonpatented products and that reasonable royalty was essentially a function of multiple fact determinations. With regard to the cross-appeal, the court held that the district court erred in finding that the agreement did not release cross-appellant from some liability because there was no ambiguity in the language of the release.

**OUTCOME:** The court affirmed in part, reversed in part, and remanded the damages awarded to appellant patent holder. The court held that the release relieved cross-appellant corporations from liability through May 1988 and remanded for a determination of the amount to be awarded for the remaining period. The court instructed the district court to apply the reasonable royalty rate and to adjust the amount of the trebled award and interest accordingly.

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN1] The court reviews the decision of the district court to determine whether it committed legal error or if its findings of fact are clearly erroneous.

*Patent Law > Preclusion > Judicial Estoppel*
*Civil Procedure > Preclusion & Effect of Judgments > Judicial Estoppel*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN2] When deciding non-patent issues such as whether

judicial estoppel applies, the court looks to the law of the appropriate regional circuit. The Tenth Circuit rejects the doctrine of judicial estoppel on the grounds that it would discourage the determination of cases on the basis of the true facts as they might be established ultimately.

*Patent Law > Ownership > Conveyances > Royalties*
*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Remedies > Damages > General Overview*
[HN3] Proof of an established royalty for a patent in suit is indeed one of the strongest measures of a reasonable royalty. However, to show that a royalty is established, it must be paid by enough different licensees to indicate a general acquiescence in its reasonableness.

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Civil Procedure > Costs & Attorney Fees > Attorney Fees*
[HN4] The standard of review with respect to awarding attorney fees based upon finding a case exceptional is abuse of discretion.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN5] Contract interpretation begins with the agreement's plain language. A district court should only consider parol evidence in the event that the terms of the agreement are ambiguous.

**JUDGES:** Before RICH, Circuit Judge, SMITH, Senior Circuit Judge, and SCHALL, Circuit Judge.

**OPINIONBY:** SCHALL

**OPINION:** SCHALL, Circuit Judge.

This is an appeal and a cross-appeal from a judgment of the United States District Court for the District of Utah, Central Division, awarding damages to plaintiff-appellant T. J. Smith & Nephew Ltd. (S & N) following a bench trial in its patent infringement suit against defendants/cross-appellants Parke, Davis & Company, d/b/a Deseret Medical, Inc. (Deseret), Acutek Adhesive Specialties, Inc. (Acutek) and Deseret Medical, Inc. (collectively Parke, Davis). The sole issue presented is the measure of damages. Neither [*2] side disputes that reasonable royalty is the correct approach for determining damages. S & N, however, contends that the district court erred in its determination of a reasonable — royalty. Specifically, S & N argues that the court failed to properly apply the collateral sales doctrine or to give sufficient evidentiary weight to existing licenses under the patent-in-suit S & N further argues that the court should have calculated prejudgment interest at a higher rate than that paid on three month Treasury bills. Finally, S & N contends that the district court erred in not finding the case exceptional and therefore not awarding attorney fees under *35 U.S.C. § 284*. Parke, Davis, in its cross-appeal, argues that the district court erred in finding that a settlement agreement between S & N and Avery International Corporation (Avery) did not release Parke, Davis from liability for the covered time period. We affirm-in-part, vacate-in-part, and remand.

DISCUSSION

I

[HN1] We review the decision of the district court to determine whether it committed legal error or if its findings of fact are clearly erroneous. *Schenck v. Nortron, 713 F.2d 782, 785, 218 USPQ 698, 700 (Fed. Cir. 1983)*; [*3] *Deere & Co. v. International Harvester Co., 710 F.2d 1551, 1558, 218 USPQ 481, 487 (Fed. Cir. 1983)*. We begin by addressing S & N's argument that the court misapplied the collateral sales doctrine. In order to invoke the doctrine, a plaintiff must show that the patented product was actually responsible for the defendant's sales of the non-patented products. *Deere & Co., 710 F.2d at 1558-59, 218 USPQ at 487*; See *Georgia Pacific Corp. v. United States Plywood Corp., 318 F. Supp 1116, 1120, 166 USPQ 235, 247 (S.D.N.Y. 1970)*. The district court's opinion reflects a thorough and careful consideration of the evidence offered on this issue. S & N points to no evidence that persuades us that the district court's finding that Deseret's catheter sales did not depend on sales of Ensure-it is clearly erroneous. On the contrary, the evidence shows that, if anything, Deseret depended on catheter sales to sell Ensure-it.

S & N next argues that Parke, Davis should have been judicially estopped from contending that its sales of catheters and related products are [*4] not collateral to sales of Ensure-it, having successfully taken an arguably opposite position when it obtained a stay of the permanent injunction against its selling Ensure-it. We disagree. [HN2] When deciding non-patent issues such as whether judicial estoppel applies, we look to the law of the appropriate regional circuit. *Wang Labs. Inc. v. Applied Computer Sciences, Inc., 958 F.2d 355, 358, 22 USPQ2d 1055, 1058 (Fed. Cir. 1992)* (finding no estoppel under First Circuit precedent). The Tenth Circuit rejects the doctrine of judicial estoppel on the grounds that it "would discourage the determination of cases on the basis of the true facts as they might be established ultimately." *Parkinson v. California Co., 233 F.2d 432, 438 (10th Cir. 1956)*. Thus, the district court was correct in considering all the evidence bearing on whether Deseret's sales of IVs and related accessories were linked to its sales of Ensure-it. The court's determination that there was no such linkage is well-supported. Therefore, the court correctly concluded that Parke, Davis's catheter sales should not be a factor in

the reasonable royalty [*5] analysis.

S & N also contends that the district court erred in not using the rate paid by S & N's large licensees as the reasonable royalty. [HN3] Proof of an established royalty for the patent in suit is indeed one of the strongest measures of a reasonable royalty. *Nickson Indus. Inc. v. Rol Mfg. Co., 847 F.2d 795, 798, 6 USPQ2d 1878, 1880 (Fed. Cir. 1988)*. However, to show that a royalty is "established," it must be paid by enough different licensees to "'indicate a general acquiescence in its reasonableness.'" *Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078, 219 USPQ 679, 682 (Fed. Cir. 1983)* (quoting *Rude v. Westcott, 130 U.S. 152, 165 (1889))*. We agree that even a license which does not "establish" a royalty rate may be extremely probative of what a willing buyer would pay. However, the particular market circumstances of each party must always be considered. See *Nickson Ind., 847 F.2d at 798, 6 USPQ2d at 1880*. In this case, the district court made numerous findings of fact. Based upon those findings of fact, [*6] it concluded that, under the market circumstances of this case, a license to make and sell S & N's patented product was worth less to Deseret than it would be to other licensees. We discern no clear error in the district court's findings.

The district court found that 10% of net sales would constitute a reasonable royalty. Reasonable royalty is essentially a function of multiple fact determinations. Apart from the collateral sales issue, S & N does not appear to take issue with the court's approach, only with its specific fact findings and assumptions. As these are all reasonable and supported by the evidence, the court's finding as to a reasonable royalty rate is affirmed.

S & N complains also about the district court's use of the Treasury bill rate in calculating prejudgment interest. S & N asserts that it proved that it would have converted a hypothetical royalty to pounds sterling and invested it in the United Kingdom at a higher rate. We review the issue of the interest rate only for abuse of discretion. See *Gyromat Corp. v. Champion Spark Plug Co., 735 F.2d 549, 556-57, 222 USPQ 4, 9-10 (Fed. Cir. 1984)*. We are not persuaded that [*7] use of the Treasury bill rate constituted an abuse of discretion.

Addressing S & N's final contention on appeal, [HN4] the standard of review with respect to awarding attorney fees based upon finding a case exceptional is abuse of discretion. *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc., 781 F.2d 198, 201, 228 USPQ 367, 369 (Fed. Cir. 1986)*. Willful infringement is only one factor in the analysis. We remanded so that the willful infringement factor, previously absent from the court's equation, could be considered. On remand, however, the court's opinion makes clear that it properly considered the willful infringement and found that it had been adequately addressed by trebling the damages. On the record before us, we are not persuaded that an award of attorney's fees was so clearly justified here as to make its denial an abuse of discretion.

II

In its cross-appeal, Parke, Davis argues that the district court erred in finding that the Avery settlement did not release it from some liability. We agree. As a preliminary matter, we reject S & N's argument that this is an issue which should have been raised at the liability trial or on the first [*8] appeal to this court. The argument is flawed because the liability trial took place in October, 1987, and the release was not signed until May, 1988. This court would not have considered on appeal an issue not raised at the trial level. Therefore, Parke, Davis appropriately raised the issue of the release during the damages phase of the case.

The release issue is essentially one of contract interpretation and thus freely reviewable in this court. See *Gould, Inc. v. United States, 935 F.2d 1271, 1273 (Fed. Cir. 1991); Government Sys. Advisors, Inc. v. United States, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988); Joy Mfg. Co. v. National Mine Serv. Co., 810 F.2d 1127, 1129, 1 USPQ2d 1627, 1629 (Fed. Cir. 1987)* (applying contract interpretation law to settlement agreement). The district court read the affidavit of Avery Vice-President Lester Dickard, prepared as part of the settlement, to mean that the release agreement did not apply to Acutek's and Deseret's sales of Ensure-it. This was error. [HN5] Contract interpretation begins with the agreement's plain language. See *Fort Vancouver Plywood Co. v. United States, 860 F.2d 409, 413 (Fed. Cir. 1988)*. [*9] A court should only consider parol evidence in the event that the terms of the agreement are ambiguous. See *Greco v. Department of the Army, 852 F.2d 558, 560 (Fed. Cir. 1988)*. We find no ambiguity in the language of the release, which not only refers to Avery's customers who use its medical grade adhesive, but also names Acutek and Deseret as customers released. There was no reason for the court to have looked beyond the literal terms of the agreement. See *Joy, supra, at 1129*.

At any rate, the Dickard affidavit shows only that Acutek and Deseret did not purchase a composite product (adhesive plus film) from Avery during the relevant time period. It says nothing about sales of the adhesive alone. The "and/or" language of the release clearly includes customers who purchase adhesive alone as well as those who purchase the composite product.

We have concluded that the release was effective to relieve Parke, Davis from liability for sales of Ensure-it through May, 1988. However, we are unable to discern

from the record before us what portion of the net sales of Ensure-it discussed in the district court's Finding [*10] #70 took place during the period covered by the release. Therefore, we vacate the court's award based on the period between May, 1985 and February, 1989. We remand the case to the district court to determine the amount of the award based upon Parke, Davis's sales of Ensure-it from June, 1988 through February, 1989. The court is instructed to apply the reasonable royalty rate to this amount only and to adjust the amount of the trebled award and interest accordingly.