negotiations with Chemetall, testified that "if a person left the company but was in possession of a trade secret, the requirement is that the person couldn't reveal it. He wouldn't be able to publish it in the Wall Street Journal. That's to protect our trade secrets from employees who leave" (Trial Tr. at 186). Mr. Edmonston further testified that it was his understanding and intent that an employee who had signed the confidentiality agreement would be bound by "paragraph 18b of the Chemetall-Morton agreement" -that is, that Chemetall would be considered an assignee of Morton and therefore a successor to the confidentiality provisions previously binding Morton's employees (*Id.* at 187).

*12 Dr. Bick, who negotiated the deal on behalf of Chemetall, testified to the same understanding of the Morton-Chemetall agreement. Dr. Bick testified that it was his intent that an employee who left Morton would not have the right to use the ZMP process technology developed by Morton and sold to Chemetall after leaving Morton, and that this employee could not teach the technology to anyone outside the Chemetall company "who might be interested in using it" (Trial Tr. at 306). Dr. Bick also testified that it was Chemetall's intent to be able to enforce the secrecy obligations of the Morton employees directly, without having to rely on Morton, which was leaving the ZMP business and thus might "not have followed up on things" (*Id.* at 306-07).

This evidence was enough to allow the jury to reasonably find that the intent of Morton and Chemetall was that Chemetall would be able to enforce the secrecy obligation in the Fraval Agreement. Mr. Fraval, however, argues that Chemetall cannot enforce that agreement, for three reasons: (a) that there was an explicit exclusion from assignment to plaintiff of all employment contracts, and the Fraval Agreement falls into this exclusion (Defs.' Mem. at 13-14); (b) that Morton failed to secure an independent secrecy undertaking with Mr. Fraval pursuant to the Asset Purchase Agreement with Chemetall (Defs.' Mem. at 15; Defs.' Reply Mem. at 21-22); and (c) that there is no evidence that plaintiff had an intent that it would become an assignee or successor to the confidentiality provisions of the Fraval agreement (Defs.' Mem. at 14).

The Court rejects the first argument. The confidentiality provision Mr. Fraval signed is not limited to his general employment agreement with Morton but extends, by its own terms, to Mr. Fraval's conduct after the termination of his employment with Morton. The jury reasonably could conclude that Chemetall did not have to take Mr. Fraval on as an employee in order to obtain the benefits of the confidentiality pledge Mr. Fraval made as part of the Fraval Agreement.

Mr. Fraval's second argument is equally unavailing, because there is no authority for the proposition that Morton or Chemetall had to secure an independent secrecy obligation from Mr. Fraval to make binding Mr. Fraval's initial promise to maintain confidentiality in the Fraval Agreement. The jury could reasonably find that Mr. Fraval undertook a secrecy obligation in his agreement with Morton, and that Morton transferred this right to Chemetall. Accordingly, the Court rejects defendants' argument that Mr. Fraval needed to enter into a separate, independent confidentiality agreement with Chemetall.

Finally, in regard to the third argument, the jury reasonably could find that Chemetall was a successor or assign of the Morton ZMP business. In the Fraval Agreement, Mr. Fraval agreed generally that his confidentiality undertaking would "inure to the benefit of the successors and assigns" of Morton. Dr. Bick further testified that paragraph 18(a) and (b) of the Asset Purchase Agreement was intended to provide Chemetall with a right of action against any former Morton employee who attempted to use or teach the technology sold to Chemetall by Morton (Trial Tr. at 306-07). Mr. Edmonston confirmed that this was Morton's understanding of the Asset Purchase Agreement as well (Trial Tr. 186-87). This evidence allowed the jury reasonably to find that even though the Fraval Agreement (not surprisingly) failed to specify whom the future successors or assigns might be, this fact did not give Mr. Fraval an escape hatch through which he could avoid his contractual undertaking.

*13 Accordingly, even were it not waived, Mr. Fraval's Rule 50(b) motion to overturn the breach of contract verdict fails on the merits.

II.
In the alternative to their Rule 50(b) motion, defendants move for a new trial. Under Rule 59(a), "[o]nly when a verdict is contrary to the manifest weight of the evidence should a motion for a new trial challenging the jury's assessment of the facts carry the day." *Cefalu v. Village of Elk Grove,* 211 F.3d 416, 424 (7th Cir.2000). *See also Latino v. Kaizer,* 58 F.3d 310, 314, 315 (7th Cir.1995) ("grant of a motion for a new trial begs more stringent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

review than a denial, and a still more rigorous review when the basis of the motion was the weight of the evidence") (citing *Williams v. City of Valdosta*, 689 F.2d 964, 974 (11 th Cir.1982)). If there is any reasonable basis in the record to support the verdict, then it cannot be overturned in favor of a new trial. *Cefalu*, 211 F.3d at 424 ("As long as there is a reasonable basis in the record to support it, we will not overturn a jury's verdict" (quoting *Robinson v. Burlington N.R. Co.*, 131 F .3d 648, 656 (7th Cir.1997)). *Scaggs v. Consolidated Rail Corp.*, 6 F.3d 1290, 1293 (7 th Cir.1993). The Court's ruling that there was sufficient evidence for a reasonable jury to reach its verdicts on the trade secret misappropriation claim against all defendants, the punitive damages award against defendant Berkovitz, and the breach of contract claim against defendant Fraval, leads the Court to conclude that the jury's verdicts were not against the manifest weight of the evidence.

A Rule 59(a) motion also may be used to seek a new trial on grounds other than weight of the evidence: such as, to "correct manifest errors of law or to present newly discovered evidence." See *Boyd v. Village of Carol Stream*, No. 99 C 6514, 2001 WL 641301 (N.D. Ill., June 1, 2001) (quoting *Rosera v. Int'l. Harvester Co.*, 109 F.R.D. 143, 148 (E.D.Wis.1986)). See also *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1367 (7 th Cir.1996) (a motion for new trial may be granted where "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party") (quoting *Winger v. Winger*, 82 F.3d 140, 143 (7 th Cir.1996). But here, defendants cite no error of law or newly discovered evidence in aid of their motion, and the Court finds that defendants here received a fair trial. Thus, the Court finds that the defendants' motion for judgment notwithstanding the verdict or for a new trial must fail under Rule 59(a).

III.

In light of the jury verdicts, on March 12, 2001, the Court entered judgment in favor of the plaintiff and against the defendants on Counts I (trade secret misappropriation) and II (breach of contract) in the following amounts:

```
Joseph T. Fraval:    Count I    ($1,625.00)(compensatory damages)
                     Count II   ($1,625.00)(compensatory damages)

Arnold Berkovitz:    Count I    ($3,250.00)(compensatory damages)
                                ($3,250.00)(punitive damages)


ZR Energy, Inc.:     Count I    ($131,750.00)(compensatory damages)
```

*14 (3/12/01 Judgment, doc. # 102). The plaintiff now seeks to amend the judgment to include: (a) prejudgment interest on all compensatory damages awarded against all defendants; and (b) post-judgment interest on the original jury award against ZR Energy and Mr. Berkovitz (but not against Mr. Fraval, who has paid the judgment including post-judgment interest).

A.
In diversity cases (such as this one), "federal courts look to state law to determine the availability of (and rules for computing) prejudgment interest." *Medcom Holding Company*, 106 F.3d at 1405. Since the substantive law governing the trade secret and contract claims is supplied by Illinois, so, too, are the principles governing the question of prejudgment interest.

In Illinois, there are three sources that may provide authority for an award of prejudgment interest: (1) statute, see, e.g., *Lovejoy Electronics, Inc. v. O'Berto*, 873 F.2d 1001, 1007 (7 th Cir.1989); (2) agreement of the parties, see, e.g., *Medcom*, 106 F.3d at 1405; and (3) equity, *People ex rel. Hartigan v. Illinois Commerce Commission*, 592 N.E.2d 1066, 1093 (Ill.S.Ct.1992); *In Re Estate of Wernick*, 535 N.E.2d 876, 887-88 (Ill.S.Ct.1989). [FN7] The parties agree that there is no contractual basis for prejudgment interest. But after that point of agreement, the parties' arguments are akin to ships passing in the night. Defendants assert that there is no statutory authorization in the Illinois Trade Secret Act ("ITSA") for prejudgment interest and no basis for prejudgment interest on the contract award--without ever citing *Wernick* or the cases recognizing the equitable authority under Illinois law to award prejudgment interest. For its part, plaintiff rests its claim to prejudgment interest solely on equitable considerations--without ever addressing the question of whether there is statutory authorization for prejudgment interest under the ITSA, or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a basis in equity to award prejudgment interest on a claim for breach of contract. We address the question of authority under the ITSA first, and then move to a discussion of equitable authority.

> FN7. The defendants argue that prejudgment interest is not available under the Illinois Interest Act ("IIA"), 815 ILCS 205/2, because the principle sum was not liquidated or subject to an easy determination before judgment. This point is without consequence, since plaintiff does not premise its request for prejudgment interest on the IIA.

1.

The ITSA provides that a plaintiff may obtain damages for "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." 765 ILCS 1065/4 (1998). The parties have not cited, and the Court has not found, any Illinois state court decisions that address whether this language in the ITSA authorizes a court to award prejudgment interest. In the absence of any guidance from the Illinois Supreme Court, or any binding authority from the Seventh Circuit, this Court must determine how the Illinois Supreme Court would rule if presented with this issue. _Allen v. Transamerica Inc. Co., 128 F.3d 462, 466_ (7 th Cir.1997). Illinois law recognizes that with any question of statutory construction, the best place to start is with the language of the statute itself, _In Re Application of the Cook County Collector of DuPage County for Judgment for Delinquent Taxes for the Year 1992, 692 N.E.2d 264, 267 (Ill.S.Ct.1998)_, and so that is where we begin.

*15 The ITSA does not expressly authorize an award of prejudgment interest. The ITSA identifies two different types of potential damage that a plaintiff may recover: actual loss suffered to the plaintiff by the misappropriation, and unjust enrichment obtained by the defendant to the extent that it is not merely duplicative of plaintiff's loss. One might reasonably construe actual loss and unjust enrichment to encompass the concept of prejudgment interest. The plaintiff's actual loss includes not only revenues it otherwise would have obtained, but interest on the money that it would have been able to earn had the plaintiff received the revenue when it should have; likewise, unjust enrichment to a defendant can fairly be read to include not only the revenue the defendant improperly received, but interest that the defendant earned or could have earned on that money.

However, that same argument can be made for virtually any damages scheme. Anytime a plaintiff is deprived of money it otherwise should have received (or a defendant obtains money that the defendant should not otherwise have had), plaintiff's loss or defendant's unjust enrichment also can be read to include the time value of the money. By this reasoning, any statute that provides generally for an award of "actual loss" or "unjust enrichment" damages could be construed as including an award of prejudgment interest. To accept this construction would lead to the widespread implication of statutory authority for awarding prejudgment interest, in the absence of the Illinois legislature expressly providing that as part of the remedial scheme.

However, when interpreting statutes other than the ITSA, Illinois appellate courts have not shown an inclination to imply an authorization to award prejudgment interest from general statutory language. For example, in _Johnson v. Human Rights Commission, 527 N.E.2d 883, 885_ (Ill.App. 1 st Dist.1988), the Court held that a provision of the Illinois Human Rights Act authorizing any action "to make the individual complainant whole" did not authorize the award of prejudgment interest. Likewise, in _Robles v. Chicago Transit Authority, 601 N.E.2d 869, 882_ (Ill.App. 1 st Dist.1992), the Court held that a provision of the Illinois Wrongful Death Act providing for "fair and just compensation" did not constitute a statutory grant of authority to award prejudgment interest.

Relying on this case law, the Federal Circuit in _C & F Packing Co. v. IBP, Inc., 224 F.3d 1296, 1305 (Fed.Cir.2000)_, held that the ITSA does not authorize an award of prejudgment interest. In reaching that determination, the Court reversed a decision of the district court written by Judge Williams (then a district judge, and now sitting as Circuit Judge on the Seventh Circuit Court of Appeals). 1999 WL 102798. Neither the district court nor the federal circuit decision in _C & F Packing Co._ is binding here. But, in light of the statutory language of the ITSA and the Illinois appellate decisions declining to construe similarly broad provisions to include authorization for statutory prejudgment interest, the Court concludes that if presented with the question, the Illinois Supreme Court would hold that the ITSA does not provide for a statutory authorization to award prejudgment interest.

2.

*16 The absence of express statutory authority, however, does not end the inquiry, because the Court's equitable powers to award prejudgment interest to make an injured party whole are broad. See _In re Estate of Wernick, 535 N.E.2d at 887_; see also _City of Milwaukee v. Cement Div., Nat'l Gypsum, 515 U.S. 189, 195 (1995)_. "Whether equitable circumstances support an award of interest is a matter lying within the sound discretion of the trial judge." _Wernick, 535 N.E.2d at 888_. [FN8]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN8. To the extent defendants suggest that prejudgment interest can only be awarded where there is express authorization by statute or agreement, the cases they cite for this proposition prove their theory to be erroneous. *See, e.g., Continental Casualty Co. v. Commonwealth Edison Co.,* 676 N.E.2d 328, 331-32 (Ill.App. 1 st Dist.1988) (acknowledged validity of equitable prejudgment doctrine but refused to apply it in that case because there was no element of bad conduct and case involved breach of contract, an action at law not equity); *In re Marriage of Pitulla,* 559 N.E.2d 819, 831 (Ill.App. 1 st Dist.1990) (violation of fiduciary or confidential relationship can warrant award of prejudgment interest in equitable circumstances); *Alguire v. Walker,* 506 N.E.2d 1334, 1341 (Ill.App. 1 st Dist.1987) (court did not say equity would never authorize prejudgment interest award; it only said there was no unique basis for prejudgment award in that case). *See also Gray v. Mundelein College,* 695 N.E.2d 1379, 1387(Ill. App. 1 st Dist.1998) (considered only application of Illinois Interest Act, not equity); *Bank of Chicago v. Park National Bank,* 640 N.E.2d, 1288, 1295 (Ill.App. 1 st Dist.1994) (same); *North Shore Marine, Inc. v. Engel,* 401 N.E.2d 269, 273 (Ill.App.2d Dist.1980) (same). Moreover, the Seventh Circuit has recognized that Illinois courts have upheld the equitable power to award prejudgment interest even in the absence of statutory authority. *See, e.g., Lovejoy,* 873 F.2d at 1007.

In *Wernick,* the Illinois Supreme Court applied this general rule to a case involving breach of a fiduciary duty and held that equity required an award of prejudgment interest "to make the injured party complete by forcing the fiduciary to account for profits and interest he gained by the use of the injured party's money." 535 N.E.2d at 888. The Court stressed that prejudgment interest is awarded based on "a concept of fairness and equity, and not as a sanction against the defendant," and that "[f]undamental principles of damages and compensation dictate that when money has been wrongfully withheld the victim receive interest for the wrongdoer's retention of his money." *Wernick,* 535 N.E.2d at 888.

An equitable award of prejudgment interest is warranted in this case based on the same principle. In this case, as in *Wernick,* the jury found that the plaintiff's property had been taken and used based on an illegal act, and that the plaintiff was deprived of the use of funds associated with this property for the time that the defendant had possession of it. In *Wernick,* the property was land, the illegal act was breach of a fiduciary duty, and the funds at issue were the proceeds from sale of the land. Here, the property was the ZMP process sold by Morton to Chemetall, the illegal act was trade secret misappropriation, and the funds at issue were the proceeds of ZMP sales that plaintiff could have made but for the misappropriation of the plaintiff's trade secret.

The holding in *Wernick* is not limited to breach of fiduciary duty cases. [FN9] But, even if it was, this case involves breach of a confidential duty of a fiduciary nature. The jury clearly found that Mr. Fraval breached a duty of confidentiality in sharing his knowledge of Morton's ZMP process with defendants. Moreover, even if ZR Energy and Mr. Berkovitz could not be tagged with a fiduciary or confidentiality breach, the trade secret misappropriation here is tantamount to fraud, which plainly falls within the equitable authority to recompense through prejudgment interest. *See Lovejoy,* 873 F.2d at 1007. Fraud is a "generic term, embracing all multifarious means which human ingenuity can devise, and which are resorted to by one individual to get advantage over another by false suggestions or by suppression of truth and includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." BLACK'S LAW DICTIONARY at 594 (5th ed.1979). As determined by the jury verdict, the misappropriation by ZR Energy and Mr. Berkovitz certainly constitutes an "unfair way by which another is cheated." And, even if trade secret misappropriation were deemed not to rise to the level of a fraudulent act, "within the limits of an adversarial system" the Court has a "responsibility to do justice insofar as [it] can...." *Lovejoy,* 873 F.2d at 1007. Here, the make-whole purpose of prejudgement interest and the evidence in this case, which clearly demonstrates that ZR Energy made sales that would have fallen to plaintiff but for defendants' use of plaintiff's trade secret prior to judgment, militate in favor of a prejudgment interest award. *See, e.g., Roton Barrier,* 79 F.3d at 1123 (affirming use of equity to award prejudgment interest in trade secret misappropriation case). Accordingly, we conclude there is equitable authority under Illinois law to award prejudgment interest on the trade secret misappropriation award, and that this case presents an appropriate circumstance in which to exercise that authority. [FN10]

FN9. *C & F Packing* arguably could be read to state that the court's equitable powers are confined to cases presenting fiduciary or confidential relationships. 224 F.3d at 1305. But, the Seventh Circuit has recognized at a minimum that this equitable power also extends to cases of fraud. *Lovejoy,* 873 F.2d at 1007. And, the

Not Reported in F.Supp.2d
2001 WL 1104604 (N.D.Ill.)
(Cite as: 2001 WL 1104604 (N.D.Ill.))

Page 14

language of Illinois Supreme Court cases is even more sweeping. For example, in *Wernick*, the Illinois Supreme Court noted with approval the "current trend" in other states "to allow an award of interest on funds owing so that justice might be accomplished in each particular case," and noting that in Illinois, "prejudgment interest may be recovered when warranted by equitable considerations[.]" *Wernick*, 353 N.E.2d at 887-88.

FN10. The defendants argue that if the Court awards prejudgment interest it should exclude from that assessment the compensatory damages awarded levied against defendant Berkovitz, because he already has had a punitive damage award levied against him (Defs.' Resp. at 8). This argument is meritless because prejudgment interest is a compensatory remedy, not a penalty. Thus, to award prejudgment interest on the compensatory damage award is to award the full amount of compensatory damages the Court finds the plaintiff entitled to under principles of fairness and equity; it is not to impose an additional penalty. See, e.g., *First Nat'l Bank*, 172 F.3d at 480.

*17 But the Court does not find it appropriate to award prejudgment interest on the full amount of $131,750.00 awarded against ZR Energy. Plaintiff asked the jury to award $435,000.00 in compensatory damages against ZR Energy on the trade secret claim: (a) $77,500.00 in plaintiff's lost profits, and (b) $375,000.00 in alleged diminished value of the trade secret (Trial Tr. 1094-96). The jury award of $131,750.00 shows that the jury did not accept this calculation in full. In reviewing the evidence, the Court believes the evidence supporting the lost profit calculation was stronger than that supporting the lost value calculation. Plaintiff offered evidence of how much ZMP was sold by ZR Energy; evidence that plaintiff would have had those sales if ZR Energy did not make them; and evidence concerning plaintiff's prices and profit margin. By contrast, the lost value calculation was based on an after-the-fact attempt to allocate $550,000.00 assigned in the Asset Purchase Agreement to "intangible" value of assets as between the ZMP process and other assets Morton sold to plaintiff. Moreover, even if the jury accepted plaintiff's allocation of a $375,000.00 value to the ZMP process, the jury reasonably could have determined that if diminished by defendants' actions, the value of the trade secret nonetheless was not reduced to zero, which was the premise of plaintiff's calculation.

Thus, for purposes of awarding interest against ZR Energy, the Court finds it equitable to act on the basis of the jury's $131,750.00 award being divided between lost profits ($77,500.00) and lost value of the trademark ($54,250.00). The Court further awards prejudgment interest only on the lost profits portion of the award, since that reflects lost money on which plaintiff could earn interest. Since interest could not be earned (or lost) on the intangible value of the trademark, the Court does not believe equity warrants an award of prejudgment interest on that portion. The Court will award prejudgment interest on the ITSA awards against Mr. Fraval ($1,625.00) and Mr. Berkovitz ($3,250.00). In the Court's view, these awards seek to deprive those defendants of unjust enrichment for their actions, and prejudgment interest will serve that make-whole purpose.

However, the Court will not assess prejudgment interest on the amount awarded against Mr. Fraval for breach of contract. Illinois law, of course, treats a claim for breach of contract as one that is legal rather than equitable in nature. In the absence of a statutory or contractual authorization for prejudgment interest on the breach of contract award, the Court has found no authority--and plaintiff has cited none--holding that the Court's equitable authority may be used to provide the remedy of prejudgment interest on a breach of contract claim at law. Moreover, the Court notes that the parties to the Fraval Agreement could have bargained for prejudgment interest as a contractual remedy. In light of their unexplained failure to do so, the Court finds no equitable reason to engraft onto the contract a remedy that the parties chose to omit.

*18 Accordingly, the Court proceeds to calculate prejudgment interest on the trade secret compensatory damages awards against ZR Energy ($77,500.00), Mr. Fraval ($1,625.00) and Mr. Berkovitz ($3,250.00). In order to determine what prejudgment interest is to be awarded on each of those verdicts, the Court must consider the interest rate to be applied, the date on which the interest is to begin accruing, and whether the interest is to be compounded and, if so, on what basis. The Court now turns to those questions.

3.

The Court finds that an award of prejudgment interest sufficient to make the plaintiff whole should be calculated according to the prevailing market rate (*i.e.*, the Federal prime rate). *See, e.g., Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 200 F.3d 518, 519 (7th Cir.1999); *First Nat. Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir.1999). *See also In re Estate of Wernick*, 535 N.E.2d 887-889 (suggesting that use of market rather than statutory interest rate is necessary to make party whole); *People v. Illinois Commerce Comm.*, 592 N.E.2d 1066, 1087-88 (Ill.1992) (rejecting statutory

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rate of five percent and choosing market rate of nine percent for prejudgment interest awarded in equity). Based on the most current information (updated July 2, 2001), obtained from the Federal Reserve Bank of New York, the applicable prime rates for the relevant period have been as follows:

| 1998 | | 2000 | |
|---|---|---|---|
| October 16 | 8.00 | February 3 | 8.75 |
| November 18 | 7.75 | March 22 | 9.00 |
| | | May 17 | 9.50 |

| 1999 | | 2001 | |
|---|---|---|---|
| July 1 | 8.00 | January 4 | 9.00 |
| August 25 | 8.25 | February 1 | 8.50 |
| November 17 | 8.50 | March 21 | 8.00 |

See ftp://ftp.nv.frb.org/prime/Prime.txt/.

The plaintiff suggests that the lowest rate in the relevant period--7.75 percent--should apply to its claim for prejudgment interest. Defendants do not offer an alternative rate. Plaintiff's position is reasonable, considering that other courts have applied an average of the prevailing prime rates, see Harrison, 1995 WL 127792,*16, which here would yield a higher percentage than 7.75 percent. Thus, the Court will use the rate of 7.75 percent.

The plaintiff asks that the prejudgment interest be compounded on a monthly basis, because monthly compounding will most closely approximate the actual time value loss of money it incurred as a result of defendants' misappropriation of its trade secret. Courts have approved of awards compounding the prejudgment interest. E.g., Harrison, 1995 WL 127791,*16 (applying the average prime rate compounded monthly); see also Gorenstein Enterprises, Inc. v. Quality Care-USA Inc., 874 F.2d 431, 437 (7th Cir.1989) (compounding of interest left to court's discretion to compensate plaintiff for lost use of money; district court's refusal to compound prejudgment interest can be reversed for an abuse of discretion). Again, the defendants do not offer an alternative compounding period. The Court accepts the monthly compounding rate as reasonable, given that businesses often bill customers on a 30-day or monthly cycle.

*19 Finally, there is the question of the date on which to begin the interest calculation. In the abstract, the answer to that question is simple: prejudgment interest should start accruing from the date that the unjust enrichment began, or that plaintiff began losing money. Perlman v. Zell, 185 F.3d 850, 857-60 (7 th Cir.1999) (under Illinois law, prejudgment interest was applicable from the date payment became due, and not from the date the complaint was filed). But at least as to ZR Energy, determining the starting date is a challenging task because not all of the lost profit accrued on a fixed date. Plaintiff suggests that date should be August 26, 1997 in the case of ZR Energy, as that allegedly is the date that ZR induced Fraval to sign the employment contract; and September 5, 1997 for Mr. Berkovitz and Mr. Fraval, since that is the date that the evidence shows $6,500.00 was paid by Mr. Berkovitz to Mr. Fraval as Mr. Fraval was preparing to come to ZR Energy (and to bring with him plaintiff's trade secret information). Defendants have offered no evidence or argument concerning the propriety of these dates, and have not suggested alternative dates. Nonetheless, while it is not the Court's role to make arguments the parties chose not to offer, "within the limits of an adversarial system our judges have a responsibility to do justice in so far as they can." Lovejoy, 873 F.2d at 1007 (finding no error in the trial court awarding pretrial interest even though a party did not ask for it). Thus, the Court independently considers the propriety of the dates suggested by plaintiff, as well as alternative dates.

The Court finds that plaintiff's proposed date for ZR Energy would result in the calculation of prejudgment interest beginning too early. The evidence shows that ZR Energy made no sales until October 1998 (Trial Tr. at 547). Thus, to peg the start date of calculation of prejudgment interest to a time long before any sales actually were achieved would result in an award of too much prejudgment interest. That is particularly so inasmuch as the sales did not all occur at a fixed point in time, but rather at different intervals over a multi-year period.

In these circumstances, the Court believes that the most

appropriate start date for calculating prejudgment interest as against ZR Energy is November 1998, the first month after ZR Energy first began making sales of ZMP. For purposes of this calculation, the Court will assume that the $77,500.00 accrued equally for that time through February 2001, the last full month before trial. Thus, in calculating prejudgment interest on the sum of $77,500.00, the Court will divide that number by the number of months from November 1998 through February 2001, which results in 28 months, and $2,767.86 per month. The Court will then assess prejudgment interest on the amount allocated to each month, compounded on a monthly basis.

As for the ITSA compensatory damages awards against Mr. Berkovitz ($3,250.00) and Mr. Fraval ($1,625.00), the plaintiff argued a theory, in essence, of unjust enrichment (Trial Tr. 1096-97). The Court finds it equitable to use the date of September 5, 1997 to begin the prejudgment interest calculation as to both of those defendants, as that is the date on which the check was issued.

*20 To calculate monthly compounded interest the following standard formula is used:
    $A = P(1+r/12)n - P$
where A denotes the amount of interest; P equals the principal or owed amount; r equals the annual interest rate; and n equals the number of months.

Because each of the defendants owes plaintiff for some additional days beyond the last monthly increment (12 days in March 2001 in the case of ZR Energy, and 8 days in the case of Messrs. Fraval and Berkovitz), the interest for the remaining days can be adjusted by a fraction reflecting the number of days remaining after the last accrual increment until the day of judgment, divided by 30. The monthly compounded interest formula rests on the 360 days/year, and 30 days per month methodology (12 compounding periods in a year results in 30 days a month). In short, interest for the overhead days can be calculated as follows:

$P(1+rd/12*30) = P(1+rd/360)$

where: P equals present value; d equals the number of days remaining after the last compounding increment until the last day for which interest is due; r equals the annual interest rate.

This methodology, in conjunction with the standard monthly compounding formula, leads to this ultimate, monthly compounded, interest formula:
    $A = P(1+r/12) n*(1+rd/360) - P$
This formula is also used to calculate interest on overdue Federal Government payments under the Prompt Payment Act. 5 C.F.R. § 1315.17 (2001). Assuming these formulas as a base line, the Court has calculated the following prejudgment amounts for each defendant on Count I.

In calculating prejudgment interest against ZR Energy on the sum of $77,500.00, we divided that sum by the number of months from November 1998 through February 2001 (28 months), which results in equal monthly accrual of $2,767.86 per month. Prejudgment interest must be assessed on the amount allocated to each month, and compounded on a monthly basis. The standard formula for calculating monthly compounded interest (which is conceived for calculation of interest on a single sum of money), therefore, needs to be adjusted to reflect the manner in which the Chemetall's loss accrued. Accordingly, after the first month prejudgment interest against ZR Energy-- $M1 = \$2767.86(1+0.0775/12) = \$2785.74$, after two months--$M2 = (M1+ \$2767.86)(1+0.0775/12) = \$5589.46$, after three months-- $M3 = (M2+ \$2767.86)(1+0.0775/12)$, and so forth until the 28th month, when it reached $M28 = (M27+\$2767.86)(1+0.0775/12) = \$85,197.80$. Finally, the inclusion of the additional days from March 1 to March 12 leads to the final calculation of the entire prejudgment interest: $A = \$85,197.80(1+0.0775*12/360) - \$77,500.00$. Application of this methodology brings the total of prejudgment interest due from ZR Energy to $7917.88, [FN11] and increases the total amount due in damages to Chemetall from ZR to $139,667.88.

> FN11. This simplified calculation best illustrates how the prejudgment interest against ZR Energy accrued based on the amount of damages allocated to each month: $(2767.86(1 + .0775/12) 28 + 2767.86(1 + .0775/12) 27 + 2767.86(1 + .0775/12) 26 + 2767.86(1 + .0775/12) 25 + 2767.86(1 + .0775/12) 24 + 2767.86(1 + .0775/12) 23 + 2767.86(1 + .0775/12) 22 + 2767.86(1 + .0775/12) 21 + 2767.86(1 + .0775/12) 20 + 2767.86(1 + .0775/12) 19 + 2767.86(1 + .0775/12) 18 + 2767.86(1 + .0775/12) 17 + 2767.86(1 + .0775/12) 16 + 2767.86(1 + .0775/12) 15 + 2767.86(1 + .0775/12) 14 + 2767.86(1 + .0775/12) 13 + 2767.86(1 + .0775/12) 12 + 2767.86(1 + .0775/12) 11 + 2767.86(1 + .0775/12) 10 + 2767.86(1 + .0775/12) 9 + 2767.86(1 + .0775/12) 8 + 2767.86(1 + .0775/12) 7 + 2767.86(1 + .0775/12) 6 + 2767.86(1 + .0775/12) 5 + 2767.86(1 + .0775/12) 4 + 2767.86(1 + .0775/12) 3 + 2767.86(1 + .0775/12) 2 + 2767.86(1 + .0775/12) 1)(1 + .0775 * 12/360) - 77500 = 7917.88$.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

For the $3,250.00 compensatory damages award against Mr. Berkovitz, the period for calculating prejudgment interest runs from September 5, 1997 through the date of judgment or March 12, 2001, a period of 42 months and 8 days. Substituting the variables in the interest formula we obtain: 3250(1+.0775/12) 42 * (1 + .0775 * 8/360), which brings the total of prejudgment interest owed by defendant Berkovitz to $1,016.33, and increases the total amount of damages due to plaintiff from defendant Berkovitz to $4,266.33.

*21 As for Mr. Fraval, the period for calculating prejudgment interest on fee judgment amount of $1,625.00 is the same as for Mr. Berkovitz: 42 months and 8 days. Using the formula described above, calculation yields a prejudgment interest in the amount of $508.16, which Mr. Fraval now owes (having already paid the judgment amount).

B.

The plaintiff also asks the Court to amend the March 12, 2001 judgment to include post-judgment interest on the compensatory damage awards against the defendants, pursuant to 28 U.S.C. Section 1961. The defendants do not dispute that Section 1961 provides for an award of post-judgment judgment interest in all federal cases, "including diversity cases." *Gorenstein Enterprises, Inc.*, 874 F.2d at 436-37.

The method of calculation of interest on money judgments in civil cases recovered in district courts changed as of December 21, 2000, which amended Section 1961(a). Interest is now calculated at a rate equal to the weekly average one-year constant maturity Treasury yield for the calendar week preceding the date of the judgment, as published by the Board of Governors of the Federal Reserve System. 28 U.S.C. § 1961(a). Such interest should be computed daily from the date of entry of the judgment (in this case the week preceding March 12, 2001) to the date of payment, and should be compounded annually. 28 U.S.C. § 1961(a)-(b).

The weekly average one-year constant maturity Treasury yield for the calendar week ending March 9, 2001 was 4.47 percent. See http://wwwfederalreserve.gov/releases/H15/data/wf/tcm1y.txt. Accordingly, the daily rate of post-judgment interest in this case amounts to 0.0447/365. To calculate daily interest for the entire relevant post-judgment period the following formula may be used: P(r/365 *d), where P is the amount of principle; r expresses interest rate; and d equals the numbers of days for which interest is being calculated.

As for defendant ZR, the jury awarded plaintiff $131,750.00 in compensatory damages ZR has not yet paid these damages. Therefore, the *per diem* rate equals $16.1349 ($131,750.00 * .0447/365). As of September 14, 2001, 186 days after the judgment, the accrued post-judgment interest is $3,001.08. [FN12]

> FN12. The amount of $3,001.08 is a final result of using the formula for post-judgment interest. If the *per diem* rate were used, the result would be $3,001.09. The difference can be ascribed to the imperfections of the decimal system and an approximation of the *per diem* rate to the fourth decimal point.

As for Mr. Berkovitz, the jury awarded plaintiff $3,250.00 in compensatory damages. Mr. Berkovitz has not paid these damages. The *per diem* rate equals $.3980 ($3,250.00 *.0447/365). As of September 14, 2001, 193 days after the judgment, the accrued post-judgment interest would is $74.03.

As for defendant Fraval, the plaintiff acknowledges that he has tendered payment of the judgment amount, including post-judgment interest. There is no further calculation necessary as to him.

IV.

Pursuant to Federal Rule of Civil Procedure 54(d)(1) and 28 U.S.C. § 1920, plaintiff has submitted a bill of costs ("Bill") requesting that costs associated with the litigation be taxed against the defendants in the amount of $29,391.95. [FN13] Defendants request that the Court deny the motion, or in the alternative, limit plaintiff's recovery of costs. For the following reasons, the Court grants in part and denies in part the plaintiff's Bill, and awards costs totaling $26,102.07.

> FN13. The plaintiff arrives at $29,391.95 by taking its original request of $29,554.73, adding $1,043.80, the amount it seeks to add *instanter* based on an undiscovered invoice for exemplification costs from TrialGraphix, and deducting $1,206.58, which plaintiff now concedes is a non-taxable deposition expense (Pl.'s Reply at 1-2). For the reasons stated *infra*, the Court grants plaintiff's request to modify its Bill *instanter*. The Court will refer to the modified bill of costs simply as the "Bill."

A.

*22 Pursuant to Rule 54(d), "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs [.]" Consistent with Rule 54's literal language, "the prevailing party is *prima*

*facie* entitled to costs and it is incumbent on the losing party to overcome the presumption." *McGill v. Faulker*, 18 F.3d 456, 459 (7 th Cir.1994) (quoting *Popeil Brothers, Inc. v. Schick Electric, Inc.*, 516 F.2d 772, 775 (7 th Cir.1975)); *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1409 (7 th Cir.1991) ("Rule 54(d) creates a presumption that the prevailing party will recover costs, and that the ultimate decision to award costs is within the district court's discretion").

The burden of proof is not on the prevailing party to establish that it is entitled to the costs, but on the losing party to establish reasons to deny costs. *Movitz v. First National Bank of Chicago*, 982 F.Supp. 571, 573 (N.D.Ill.1997); *Moriarty v. Glueckert Funeral Home, Ltd.*, No. 95 C 2848, 1999 WL 162792, at *1 (N.D.Ill. March 11, 1999) (citing *Cengr v. Fusibond Piping Systems, Inc.*, 135 F.3d 445, 455 (7th Cir.1998) and *M.T. Bonk Co.*, 945 F.2d at 1409; *Rizzo v. Mr. Coffee, Inc.*, No. 94 C 5825, 1996 WL 84235, at *1 (N.D.Ill. Feb. 26, 1996) ("The losing party must affirmatively demonstrate the prevailing party is not entitled to costs"). Moreover, "the presumption [favoring the award of costs] is difficult to overcome, and the district court's discretion is narrowly confined--the court must award costs unless it states good reasons for denying them." *Weeks v. Samsung Heavy Indus. Co. Ltd.*, 126 F.3d 929, 945 (7 th Cir.1997).

Generally, only two reasons justify denying costs: (1) misconduct by the prevailing party worthy of penalty, or (2) the losing party's inability to pay. *Id.* Although defendants urge that plaintiff be denied its costs "in whole or in part" (Defs.' Mem. at 2), the defendants have provided no evidence that either exception to an award of costs should be invoked by this Court: there is no evidence of misconduct by the plaintiff; and defendants have not demonstrated an inability to pay, which requires a showing of indigency. *Reed v. Int'l Union of United Auto., Aerospace, & Agric. Implement Workers of America*, 945 F.2d 198, 204 (7 th Cir.1991); *Bass v. Zeta Consumer Prods.*, No. 98 C 8235, 1999 WL 1129603, at *1 (N.D.Ill., Dec. 3, 1999). Thus, under prevailing law, the plaintiff is entitled to an award of recoverable costs in this case.

B.

An award of costs should be entered if a listed expense is authorized by statute and is both reasonable and necessary to the litigation. *Northbrook Excess & Surplus Ins. Co. v. Proctor & Gamble Co.*, 924 F.2d 633, 642 (7 th Cir.1991). *See also Cefalu v. Village of Elk Grove*, 211 F.3d 416, 427 (7th Cir.2000). Under 28 U.S.C. § 1920, a federal court may tax as costs:

*23 (1) Fees of the clerk and marshal;
(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
(5) Docket fees under section 1923 [of the U.S.Code]; and
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 [of the U.S.Code].

Applying these standards, the Court turns to an analysis of the specific costs sought by plaintiff.

1. Fees of the Clerk.

Plaintiff requests $150.00 in fees of the clerk and provides a receipt of services in support of this claim (Pl.'s Bill, Ex. 1). Such fees are taxable as costs under Section 1920. *Movitz*, 982 F .Supp. at 574. The plaintiff's documentation supports its claim and the defendants do not object to it (Defs.' Mem. at 3); therefore, the Court will award the plaintiff the fees it paid to the clerk in the amount of $150.00.

2. Fees of the Marshal.

The plaintiff also seeks $50.00 in fees for subpoena service of the Cohen Group. The defendant does not object to the necessity of this item of cost, but objects to this charge on the grounds that: (1) the $50.00 fee exceeds that charged by the Marshal Service, and (2) the "reasonableness" of this charge cannot be examined because the invoice does not identify "what was served, at what address such service was accomplished, and how long such service took" (Defs.' Mem. at 9).

Courts in this district have held that an award of costs for private process of service is authorized under Section 1920, and that a charge of more than $50.00 can be reasonable. *E.g., Mundadi v. Nikken Inc.*, No. 91 C 7425, 1993 WL 54534, at *5 (N.D.Ill. March 1, 1993). However, the Seventh Circuit has held private service expenses may be awarded only so long as they do not exceed those which the Marshal Service would have charged, stating that "we think it best to resolve the ambiguity of Section 1920 [which does not speak to private process servers and only addresses Marshal services] in favor of permitting the prevailing party to recover service costs that do not exceed the marshal's fees, no matter who actually effected service." *Collins v. Gorman*, 96 F.3d 1057, 1060 (7 th Cir.1996); *Barnett v. City of Chicago*, No. 92 C 1683, 1999 WL 138813, at *3 (N.D.Ill. March 5, 1999) ("[s]ubpoena costs are taxable to

the extent the Marshal Service is authorized to charge for such costs under 28 U.S.C. § 1921(a)"); E.E.O.C. v. Yellow Freight System, Inc., No. 98 C 2725, 1999 WL 965854, at *2 (N.D.Ill. Oct. 14, 1999) (the amount recoverable for service of process by a private service may not exceed the amounts charged by the marshal service). [FN14]

> FN14. Plaintiff cites Great Lakes Dredge & Dock Co. v. City of Chicago, No. 94 C 2579, 2000 WL 1898533, at *4 (N.D.Ill., Sept. 18, 2000), for the proposition that the Marshal Service rate does not act as a cap on reimbursement for private service costs. However, we are bound by the Seventh Circuit's ruling in Collins, which was not brought to the attention of the court in the Great Lakes case.

The standard rate for the Marshal Service to serve a subpoena is $40.00 for the first two hours and $20.00 per hour thereafter, in addition to $0.31 per mile. See Yellow Freight System, 1999 WL 965854, at *2. As defendants point out, the plaintiff's invoice does not break down "how long such service took" or where service was accomplished. The Court is, therefore, left to speculate how long--over the standard two hour, $40.00 fee--the process server spent trying to effect service. Moreover, the Court cannot calculate how far the process server had to travel and thus how much to award for mileage. Although $50.00 might be reasonable if the process server traveled some distance over a two-hour period, without more evidence awarding $50.00 would require the Court to engage in guesswork, and the Court will not award fees on that basis. However, it is clear that the minimum cost had service been achieved by the Marshal Service would be $40.00. Thus we reduce plaintiff's request for costs of service on the Cohen Group from $50.00 to $40.00.

3. Fees of the Court Reporters.

*24 Plaintiff requests $5,974.68 for court reporters' fees incident to the taking of depositions and $4,754.25 for the reporters' fees in preparing the trial transcripts. Under Section 1920, plaintiffs may recover costs for copies necessarily obtained for use in the case. "The phrase 'for use in the case' refers to materials actually prepared for use in presenting evidence to the court." McIlveen v. Stone Container Corp., 910 F.2d 1581, 1584 (7 th Cir.1990) (quoting E.E.O.C. v. Kenosha Unified School Dist. No. 1, 620 F.2d 1220, 1227-28 (7 th Cir.1980)). To substantiate this claim, the plaintiff includes a summary of the costs of deposition and trial transcripts, along with receipts which include the number of pages, the per page amount, and the dates of when the depositions took place.

Defendants object to the per page amount for the original transcripts and the per page amounts for the first copy of the transcripts to each party. In addition, the defendants object to the plaintiff's request for charges related to "condensed transcripts" (Defs.' Opp. at 5), ASCII diskette copies (Id. at 6), shipping and handling charges (Id. at 6), photocopying of exhibits used at the depositions (Id. at 7), and binding and processing of the depositions (Id. at 8). Based on these objections, the defendants seek to reduce the sum that plaintiff requests by $1,437.68 with regard to deposition transcripts (Id. at 8). With regard to the trial transcripts, the defendant seeks to disallow the costs completely or, in the alternative, to reduce the charges by $934.45 (Id. at 11). The Court will address each of these contentions in turn.

a. Deposition Transcripts.

Deposition transcript charges are taxable if the deposition appears reasonably necessary "in light of the facts known at the time of the deposition." M.T. Bonk Co., 945 F.2d at 1410. See also Cengr v. Fusibond Piping Sys., Inc., 135 F.3d 445, 455 (7th Cir.1998) (issue is whether deposition was "reasonably necessary" to the case at the time it was taken). A court is to presume that deposition transcripts are reasonable and necessary unless the defendants prove otherwise. Movitz, 982 F.Supp. at 575. Here, the defendants do not dispute that the depositions of the respective witnesses were necessary or reasonable; their objections stem from the amount of costs that plaintiff requests (Defs.' Mem. at 4). Under Local Rule 54.1(b), the taxable cost of deposition transcripts "shall not exceed the regular copy rate as established by the Judicial Conference of the United States and in effect at the time the transcript or deposition was filed unless some other rate was previously provided for by order of court." See also Cengr, 135 F.3d at 456 (judicial rates apply to private as well as official court reporters); Moriarty, 1999 WL 162792, at *1. The Judicial Conference has established a maximum rate of $6.00 per page for an hourly transcript; $5.00 per page for a daily transcript; $4.00 per page for an expedited transcript; $3.00 per page for an original transcript; and $0.75 per page for the first copy of a transcript furnished to each party. See Cengr, 135 F.3d at 456; Moriarty, 1999 WL 162792, at *1. [FN15]

> FN15. In Cengr, the Seventh Circuit summarized the judicial conference rates applicable to various types of transcripts.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2001 WL 1104604 (N.D.Ill.)  
(Cite as: 2001 WL 1104604 (N.D.Ill.))

Page 20

| Type of Transcript | Original | First Copy to Each Party | Each Additional Copy to the Same Party |
|---|---|---|---|
| Ordinary Transcript | $3.00 | $0.75 | $0.50 |
| Expedited Transcript | $4.00 | $0.75 | $0.50 |
| Daily Transcript | $5.00 | $1.00 | $0.75 |
| Hourly Transcript | $6.00 | $1.00 | $0.75 |

These rates are still used and applied by district courts in the Northern District of Illinois. *See, e.g., AA Sales & Assoc., Inc. v. JT & T Prods. Corp.*, No. 98 C 7954, 2001 WL 641498,*5 (N.D. Ill., June 4, 2001) (citing VI JUDICIAL CONFERENCE OF THE UNITED STATES, GUIDE TO JUDICIARY POLICIES & PROCEDURES, COURT REPORTERS MANUAL Ch. 20, pt. 20.3 (1998).

(1) Full-Sized Transcripts.

*25 The defendants argue that the cost of the original transcripts should be reduced using the judicial conference rates. The Court agrees, and therefore will award for each original transcript the actual court reporter charge or $3.00 per page, for originals and $.75 per page for copies, whichever is less. The Court awards the plaintiff (a) $798.00 for the original transcript of Joseph Fraval (266 pages x $3.00/page), (b) $415.95 for the original transcript of Arnold Berkovitz (141 pages x $2.95/page), (c) $159.30 for the original transcript of Stanley Cohen (54 pages x $2.95/page), (d) $81.75 for the copy of the transcript of Manfred Bick (109 pages x $.75/page), (e) $87.00 for the copy of the transcript of John Wojciechowski (116 pages x $.75/page), (f) $495.00 for the combined original transcripts of Hans Ager, Mitchell Godfrey, and Robert Maxey (52 pages x $3.00/page for Mr. Ager, 77 pages x $3.00/page for Mr. Godfrey, 36 pages x $3.00/page for Mr. Maxey), (g) $585.00 for the combined original transcripts of Suzanne Linehan and Robert Edmonston (195 pages x $3.00/page), (h) $801.00 for the combined original transcripts of Donald Lee Smith and Mary Lynn Parke (185 pages x $3.00/page for Mr. Smith, 82 pages x $3.00/page for Ms. Parke), and (i) $135.00 for the original transcript of the continued testimony of Joseph Fraval (45 pages x $3.00/page). Thus, the Court awards a total of $3,558.00 for the deposition transcripts of the aforementioned witnesses.

(2) Condensed Transcripts/ASCII Diskettes/Deposition Exhibit Photocopies.

Defendants further argue that the costs such as condensed transcripts, ASCII diskettes, and photocopying of exhibits during the depositions are not taxable as costs under Section 1920 (Defs.' Mem. at 6-7). Plaintiff now concedes that a reduction for these costs is appropriate (Pl.'s Reply at 1-2), and with good reason. The items listed above were prepared for the convenience of the plaintiff and not for the purpose of presenting evidence to the Court; they are, therefore, not recoverable. *See Rizzo*, 1996 WL 84235, at *4 ("[c]opies of court filing for a party's personal use, extra copies of filed papers and correspondence, and copies of cases are not recoverable"); *Yellow Freight System*, 1999 WL 965854, at *3 (court found deposition transcript contained on a computer diskette supplementary to the printed deposition and was therefore only a convenient means to preserve the testimony of the witness). Thus, the Court will eliminate from the plaintiff's costs the total additional costs of $833.78 related to the condensed deposition transcripts ($115) (Defs.' Opp. at 5-6); ASCII diskettes ($95) (Defs.' Opp. at 6); and deposition exhibit photocopies ($623.78) [FN16]

> FN16. $562.38 (copies of plaintiff's exhibits) + $61.40 (additional copies of defendants' exhibits) = $623.78.

(3) Shipping and Handling/Court Reporter Attendance/Binding and Processing.

The defendants further dispute plaintiff's charges for the costs of shipping and handling ($195.10), binding and processing ($36.00), and the attendance charge of the court reporter at the deposition of Stanley Cohen ($75.00) for a total of $231.10 (Defs.' Mem. at 6-8). However, fees incidental to a deposition and for court reporter attendance at depositions are generally recoverable. *See Finchum v.. Ford Motor Company*, 57 F.3d 526, 534 (7 th Cir.1995) (where court labeled *per diem* costs and delivery costs of court reporter "incidental" to taking of depositions and award of costs to prevailing party was not abuse of discretion by district court); *SK Hand Tool Corp. v. Dresser Indus., Inc.*, 852 F.2d 936, 944 n. 10 (7th Cir.1988) (district court has discretion to award miscellaneous deposition charges); *Winery v. City of Chicago*, No. 98 C 1208, 2000 WL 1222152, at *3 (citing *Finchum*, 57 F.3d at 534) (where recovery of costs by the prevailing party associated with the delivery of a deposition was allowed).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*26 With respect to shipping and handling charges (related to delivery of deposition transcripts, copies and originals) totaling $195.10, defendants contend that such fees and charges are not specifically provided for by Section 1920 and are "disallowed on the grounds that such expenses are generally considered overhead, or part of the cost of operating a law firm" (Defs.' Mem. at 6 (citing *Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1144 (7th Cir.1994)). The plaintiff claims that such costs are reimbursable because they are "reasonably incident to the taking of depositions" (Pl.'s Reply at 2 (citing cases above)). After review of these cases, the Court finds that *Downes* does not stand for the proposition that shipping and handling expenses incidental to depositions are not taxable costs that may be awarded under Section 1920. Conversely, the *Finchum* court recognized costs "incidental to the taking of depositions, such as the *per diem* and delivery charges (or shipping and handling) by the court reporter may be awarded, even though "not specifically mentioned in the statute." 57 F.3d at 534 (citing *SK Hand Tool Corp. v. Dresser Indus. Inc.*, 852 F.2d 936, 944 n. 10 7 th Cir.1988) *cert. denied*, 492 U.S. 918 (1989)). The Court here holds that plaintiff is entitled to recover fees for shipping and handling in the amount of $195.10.

With respect to binding expenses, the defendants simply argue that such charges are not specifically provided for by Section 1920 and are "presumably" included in the per page transcription rates established by the judicial conference (Defs.' Mem. at 8). In the absence of any proof to substantiate that presumption, the Court agrees with the plaintiff that this modest cost is a reasonable incident of a deposition. The Court therefore finds that $36.00 in binding expenses (twelve transcripts @ $3.00 per transcript = $36.00) will be awarded.

Finally, the defendants challenge only one *per diem* court reporter charge: that of the court reporter who reported the deposition of Stanley Cohen ($75.00). The defendants argue that the invoice "provides no basis upon which to examine the reasonableness of the hourly charge" (Defs.' Mem. at 8). The invoice reflects a charge of $75.00 based on a minimum attendance fee (Pl.'s Bill, Ex. 2). [FN17] The Cohen transcript does not disclose what time the deposition ended, so we cannot with precision determine the hourly rate that would result from this minimum fee. However, the Court does not find it inappropriate for a court reporter to charge--and for plaintiff in turn to recover--a minimum fee for a short deposition. The Court will therefore include in taxable costs the $75.00 fee for the court reporter on the Cohen deposition.

FN17. The plaintiff attached all of its supporting documentation to the Bill without exhibit numbers or tabs. For convenience (and to track plaintiff's apparent intention as evidenced by its reference to exhibit numbers in its Bill), the Court will identify each document chronologically by an exhibit number representing each document in the order in which they are stapled together (*e.g.*, Ex. 1, 2, 3, 4 etc.).

Thus, the Court awards the plaintiff $3,864.10 to recover the charges necessary and reasonable to the depositions of the respective witnesses.

*b. Trial Transcripts.*

The plaintiff requests a total of $4,754.25 for expedited and hourly transcripts of: the March 2, 2001 pre-trial hearing; [FN18] the original transcripts (and one copy) from the proceedings at trial on of March 5-8, 2001; [FN19] 43 pages of hourly transcript from March 8, 2001 trial proceedings; [FN20] and the original transcript from the proceedings at trial on March 9, 2001. [FN21]

> FN18. 97 pages @ $4.00/page = $388.
>
> FN19. 3/5 Pretrial = 116 pages @ $4.00/page = $464.00; 3/5-3/8 Trial = 796 pages @ $4.00/page = $3,184.00 *plus* 43 pages @ $0.75/page = $32.25 (1st Copy) or $3216.25.
>
> FN20. 43 pages @ $6.00/page = $258.00.
>
> FN21. 107 pages @ $4.00/page = $428.00.

*27 Section 1920 states that the fees of the court reporter for all or any part of the stenographic transcript are taxable if "necessarily obtained for use in the case." This phrase has been interpreted to mean that "the materials were actually prepared for use in presenting evidence to the court." *McIlveen v. Stone Container Corp.*, 910 F.2d 1581, 1584 (7th Cir.1990). In addition, "[e]xcept as otherwise ordered by the court, only the cost of the original of such transcript or deposition together with the cost of one copy each where needed by counsel ... shall be allowed." *Cengr*, 135 F.3d at 455.

Defendants do not challenge the need for trial transcripts as reasonably necessary for the preparation of trial and/or post-trial motions; instead, defendants level specific challenges to certain costs related to each transcript at issue (Defs.' Mem. at 9-11).

(1) March 2, 2001 Transcript.

The plaintiff requests $388.00 as the transcription cost of the March 2, 2001 proceedings (Pl.'s Reply at 3). The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendants challenge the reasonableness of this charge on the basis that it reflects an expedited rate ($4.00 per page versus the standard $3.00 per page). In particular, the defendants contend that an expedited transcript from the March 2 proceedings was not necessary for post-trial motions, which were not due to be filed until March 26 (Defs.' Mem. at 9-10). Moreover, defendants contend that the higher charge for an expedited transcript is not warranted where plaintiff has failed to explain the relevance or necessity of this particular transcript to the post-trial filings (Id.). In its reply, the plaintiff claims that this transcript was used not for post-trial motions, but for trial itself. Because the cost of pre-trial and trial transcripts is generally recoverable, Weeks v. Samsung Heavy Indus. Co., 126 F.3d 926, 945-46 (7th Cir.1997), and because this was a proceeding that limited and clarified the issues that would be addressed at trial, Movitz, 982 F.Supp. at 575 ("[a] prevailing party can recover costs for transcripts of pre-trial hearings if the case is complex, and the pre-trial hearings limited or clarified the issues"), plaintiff argues that an expedited transcript was reasonably necessary because trial was scheduled to commence on March 5, three days later (Pl.'s Reply at 3). The Court finds that the March 2 pretrial transcript was obtained "for use in the case," as contemplated by Section 1920, McIlveen, 910 F.2d at 1584, and given the short time-frame between the hearing and trial, an expedited copy was warranted. Thus, the transcript cost of $388.00 will be awarded in full.

(2) March 5-9, 2001 Transcripts.

The plaintiff seeks reimbursement of $4,366.25 in costs for the remaining trial transcripts ($4,754.25--$388.00 for the March 2 transcript). The plaintiff argues that it needed these transcripts to prepare and respond to post-trial motions (Pl.'s Reply at 4-5). We agree.

*28 The Court also finds that the expedited transcript of trial testimony by Dr. Mary Parke on March 8 was reasonable, as that was specifically used in closing argument the next day. Thus, we award expedited costs for that transcript at the hourly rate. However, the cost of the "first Copy" price of the 43 pages of Dr. Parke's trial transcript from March 8th will be excluded from the total award ($0.75/page * 43 pages), because the plaintiff had the original transcript for post-trial motions. Because the Court has awarded the cost of this original transcript (at the hourly rate), we will exclude the cost of the first copy ($32.35) from the total award.

As for the costs sought for the other trial transcripts, plaintiff has made a sufficient showing that expedited delivery was needed. The transcripts were not ordered until after trial, when plaintiff knew they would be needed for post-trial motions and, of more immediate concern, motion practice directed at the scope of the injunction against defendants. On March 12, 2001, the Court ordered motions directed to the injunction to be filed by March 26, 2001, and the transcripts would be reasonably necessary for that briefing. Moreover, the Court notes that the Court reporter's bills show that expedited delivery only insured that the transcripts would be delivered within seven days--or by March 20 or 21. To order the transcripts on an ordinary-delivery basis may have resulted in there not being received until after the deadline for briefing the injunction issue. Thus, the Court awards the costs of these transcripts at the expedited ($4.00/page) rate. [FN22]

> FN22. Defendants contend that the transcription costs of the March 9 hearing are not recoverable because the invoice "fails to identify what was transcribed" (Defs.' Mem. at 10). In its reply, the plaintiff attaches the first and last pages of the March 9th transcript, prepared by B. Lara, showing the date transcribed and the number of pages (107) (Pl.'s Reply at 4, Ex. A). The invoice submitted for $428.00 indicates that 107 pages were transcribed. Because the number of pages is consistent and because March 9 is the only day of trial with a missing invoice, the Court can reasonably conclude by process of elimination that the March 9 transcript is represented by the invoice requesting payment of $428.00. Like the other invoices, this invoice indicates, in handwriting, that it was paid by the plaintiff's law firm.

Thus, the Court awards the plaintiff $388.00 for the original transcript of the March 2, 2001 proceeding, [FN23] and $4,334.00 to cover the original transcription costs of the March 5-9, 2001 proceedings. [FN24]

> FN23. 97 pages x $4.00/page (March 2, 2001 proceedings) = $388.00.
>
> FN24. 116 pages x $4.00/page (March 5 (p.m.), 2001 trial transcript) = $464.00
> 796 pages x $4.00/page (March 5 (a.m.)-8 (excluding Parke, 2001 trial transcript) = $3,184.00
> 43 pages x $6.00/page (March 8 (Parke), 2001 trial transcript) = $258.00
> 107 pages x $4.00/page (March 9, 2001 trial transcript) = $428.00

4. Fees and Disbursements for Witnesses.

The plaintiff requests a total of $921.20 for its witnesses

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

expenses including: witness fees, travel expenses, and subsistence allowances (Pl.'s Mem. at 4). For the reasons that follow, the Court awards these costs in full.

*a. Witness Fees.*

A prevailing party is generally entitled to witness fees. 28 U.S.C. § 1920(3). A witness in attendance in court or before any person authorized to take their deposition shall be paid an attendance fee of $40.00 per day for each day's attendance. 28 U.S.C. § 1821(b); *see, e.g., Robinson v. Burlington Northern Railroad Co*., 963 F.Supp. 691, 693 (N.D.Ill.1997). Defendants do not dispute the witness fees for Cohen, Parke or Smith. Thus, the Court awards plaintiff $120.00 for the appearance of these three witnesses.

Defendants do dispute the attendance costs of Messrs. Wojciechowski and Edmonston, contending that plaintiff offered no evidence that these witnesses were actually paid. The Court finds that this argument is without merit. The invoices from these witnesses submitted by plaintiff as Exhibit 4 show that they were paid by plaintiff an hourly rate for their time, which far exceeds (and subsumes) the $40.00 attendance fee. Defendants cite no authority that a party cannot recover statutory witness fees merely because it has paid the witness in excess of that amount. The Court finds that plaintiff is entitled to recover $40.00 each in attendance fees for Messrs. Wojciechowski and Edmonston.

*b. Travel and Subsistence Allowances.*

\*29 The plaintiff requests travel and subsistence allowances for their witnesses totaling $721.20 ($921.20--$200.00 for 5 witnesses at $40.00 per witness), all of which is attributable to Mr. Edmonston's attendance at trial. Plaintiff seeks to recover Mr. Edmonston's charges for ground transportation ($194.70); flight transportation ($365.50); and a subsistence fee ($161.00). For the reasons that follow, the Court awards the plaintiff a portion of Mr. Edmonston's travel and subsistence allowance expenses.

Under 28 U.S.C. § 1920, a prevailing party is entitled to travel and subsistence expenses, so long as the witness "utilize[s] a common carrier and the most economical rate reasonably available." In its reply brief, the plaintiff has provided receipts that demonstrate compliance with Section 1920 (Pl.'s Reply at 6 (Exs. C & D)). *See Cefalu v. Village of Elk Grove*, 1998 WL 409690, at \*11 (N.D.Ill., July 15, 1998) (disallowing travel expenses for which receipts were not provided), vacated in part (not relevant here) by 211 F.3d 416, 429 (7th Cir.2000); *Webcraft Technologies, Inc. v. The Lehigh Press, Inc.*, 1992 WL 59110, at \*2 (N.D.Ill ., March 13, 1992) (witness expense reports, submitted without receipts or ticket stubs, insufficient for bill of costs).

The Court finds that the $365.50 cost of the flight taken by Mr. Edmonston was reasonable. Mr. Edmonston took ground travel from Wayland, Massachusetts to Manchester, New Hampshire in order to board a substantially less expensive flight to Chicago (Pl.'s Reply at 6). But we are surprised that the cost of a one-hour ride to go from Wayland to Manchester could cost $194.70 (Pl.'s Reply, Ex. C). In the absence of proof that this was the "most economical rate reasonably available" for ground transport, the Court disallows that cost.

The plaintiff is entitled to recovery of the per diem cost of $161.00 for Mr. Edmonston's stay in Chicago. That amount is reasonable, and in fact is approximately the $159.00 cost of Mr. Edmonston's hotel stay alone--which is not unreasonable for a hotel in Chicago. *See, Robinson,* 963 F.Supp. at 693 (holding that prevailing party was entitled to $161.00, the *per diem* allowance for Chicago according to the Clerk of the Court, pursuant to Section 1321(d)). Accordingly, the Court awards the plaintiff an additional $526.50 ($365.50 + 161.00), in addition to the $200.00 for the witness fees of Cohen, Parke, Smith, Wojciechowski and Edmonston for a total award of $726.50 for witness fees and disbursements.

5. Exemplification Expenses.

The plaintiff seeks reimbursement for exemplification expenses totaling $16,687.02 (Pl.'s Bill at 5; Pl.'s Reply at 11). These expenses include the costs associated with the preparation of exhibits and demonstrative aids for trial by TrialGraphix ($11,989.12) (*Id.*); the edited video of the plant inspection and 3 copies (plus shipping and handling) ($531.00) (Pl.'s Reply at 7); and rental of the audio visual equipment ($4,166.90) (Pl.'s Bill Ex. 27). [FN25]

> FN25. In its reply brief, the plaintiff seeks to amend its Bill *instanter* to include the amount of $1,043.80 for exemplification costs to TrialGraphix, which was posted on a second invoice and discovered after the first Bill was submitted to the Court. Defendants have filed no motion opposing the addition of this request, and has not challenged it on the merits. The Court will grant this request because the exhibits listed on this invoice were reasonable and necessary for use in the trial.

\*30 The Seventh Circuit has held that "[s]o long as the means of presentation furthers the illustrative purpose of an exhibit, we believe it is potentially compensable as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exemplification." *Cefalu*, 211 F.3d at 428. The defendant contends that the costs paid to TrialGrapbix should be denied, because the plaintiff did not seek prior approval from the Court for this expense (Defs.' Mem. at 14). In *Cefalu*, the Seventh Circuit did not adopt the "prior approval" approach of an earlier Seventh Circuit case, *Wahl v. Carrier Mfg. Co.*, 511 F.2d 209, 217 (7th Cir.1975), but instead adopted a much broader approach to exemplification expenses by defining such expenses as encompassing not only graphs and charts, but also sophisticated multi-media presentations, allowing for costs that include expenses for use of recent technological advances. 211 F.3d at 428-29. However, the Seventh Circuit cautioned that while an item may qualify as exemplification, district courts must still determine whether it was "necessarily obtained for use in the case" pursuant to Section 1920(4).

For the reasons given below, exemplification costs will be awarded in the amount of $14,994.53.

*a. Videotape.*

Plaintiff seeks to recover $531.00 related to the videotape of a plant inspection of ZR Energy facilities, including the cost of three copies, shipping and handling, and editing. This $531.00 figure includes $140.00 for editing the tape, and $76.50 for two VHS copies and their respective shipping charges. Although the plaintiff was responsible for having the videotape prepared for trial, the defendants, rather than the plaintiff, actually used the videotape during the trial (Pl.'s Reply at 7). Thus, defendants can hardly dispute that the video was necessary and that it was prepared "for use in the case." However, the defendants seek a reduction of the allowable costs to eliminate the $140.00 for editing, and the $76.50 attributable to two copies.

The Court finds that the editing of the video was necessary in order to delete excerpts that were not pertinent and/or redundant, and to reveal only relevant information to the jury. However, the plaintiff has offered no explanation as to why it was reasonable or necessary to have more than one copy made, and the Court perceives none. Consequently, the $76.50 in costs associated with copying, shipping and handling of two of the three copies of this video was not reasonably necessary for use at trial, but instead appear to have been incurred for plaintiff's attorneys' convenience. Thus, according to the Court's calculations, the plaintiff would be entitled to $454.50 ($531.00-$76.50) associated with the videotape. [FN26]

> FN26. In its reply, the plaintiff only requests $391.50. This number must be a typographical error, given the plaintiff's clear intent to seek recovery of "the costs of editing the videotape for the jury" (Pl.'s Reply at 7). As indicated, the total cost of the video, as represented by the invoice submitted in the original bill of costs, was $391.50. The cost of editing was $140.00. The Court finds that plaintiff is entitled to an award of $454.50, despite its apparent typographical error.

*b. Enlarged Trial Exhibits.*

The plaintiff seeks $11,989.12 in expenses for its enlarged trial exhibits, which included enlarged reproductions of the contract language and color-coded, side-by-side descriptions of the parties' ZMP manufacturing processes as compared to the process disclosed in the Eagle-Picher Report. "To evaluate the necessity of a particular type of exemplification, the Court may consider 'whether the nature and context of the information being presented genuinely called for the means of illustration that the party employed." ' *Leggett*, 149 F.Supp.2d at 397 (quoting *Cefalu*, 211 F.3d at 428). The defendants make two arguments for reduction of the exemplification costs plaintiff seeks.

*31 First, defendants argue that the Court should not allow recovery because the large exhibits were redundant given that the witnesses and jurors each had copies of the exhibits and unnecessary since not all of the enlarged exhibits were used and only two of them were permitted to go to the jury room during deliberations (Defs.' Mem. at 15). While the jurors and witnesses had 8" x 11" copies of the exhibits, the ultimate outcome in the case may have hinged upon the jury's understanding of critical language in certain documents, and upon the specific similarities and/or differences between the two companies' procedures (and that of the Eagle-Picher Report) exemplified by PX 132, 134 and 135. "Enlargement costs are taxable if the exhibits were 'necessary to the understanding of an issue and a material aid to the jury ... [and not] merely illustrative of expert testimony, other adequate evidence, or argumentative." ' *Robinson*, 963 F.Supp. at 696 (quoting *Endress + Hauser, Inc. v. Hawk Measurements Sys. Pty, Ltd.*, 922 F.Supp. 158, 162 (S.D.Ind.1996)). The Court finds that the enlarged trial exhibits here likely were helpful to the jury in understanding the evidence. In order to accurately identify the exact step where a particular chemical reaction occurred, the plaintiff's enlarged exhibits helped the Court (and thus presumably the jury) understand the points being made. Conversely, pointing to a single page in a large trial notebook with multiple pages of exhibits would not have effectively shown to the jurors the most important features of the chemical reaction. See *Northbrook Excess and Surplus Ins. Co. v. Proctor & Gamble*, 924 F.2d 633, 644 (7 th