Not Reported in F.Supp.2d  
2001 WL 1104604 (N.D.Ill.)  
(Cite as: 2001 WL 1104604 (N.D.Ill.))

Page 25

Cir.1991) (court, in its discretion, allowed for recovery of costs associated with graphs, photos, and charts which allowed the jury to understand complex issues involved in the case). Thus, the Court rejects defendants' redundancy argument.

*Second,* defendants argue that the Court should not allow recovery of the amounts paid to TrialGraphix for plaintiff's enlarged demonstrative illustration boards because the TrialGraphix invoice attached to the Bill does not provide any detailed information regarding what services it performed, what documents it enlarged, or the per item charge. Instead, "the document merely provides a total balance figure (including tax) and a recitation that such balance relates to the claim (Defs.' Mem. at 15). However, the plaintiff has rectified that problem in its reply, which included detailed receipts and charts showing the exact nature of the service provided by Trial Graphix (Pl.'s Reply at 7-11 (Ex. F)). Defendants have not sought to file any supplemental document challenging the reasonableness of these figures.

Therefore, the Court awards the plaintiff $11,989.12, the costs billed by TrialGraphix for the exhibits used in court.

c. *Audiovisual Equipment.*

Plaintiff seeks an award of $4,166.90 for the cost of certain audiovisual equipment. Defendants raise three arguments in seeking to reduce that amount.

*32 *First,* defendants argue that any amount that the Court deems reasonable must be reduced by half, because prior to trial the parties agreed to split the costs of the audiovisual equipment (Defs .' Mem. at 15). Plaintiff agrees that there was a pretrial agreement to split those costs, but asserts that the agreement did not trump the right of whoever prevailed at trial to recover the costs of the audiovisual equipment--and plaintiff seeks to recover the full amount, since it fronted the money for the audiovisual equipment and defendants paid none of their share. Defendants have offered no documentation of the specific terms of this cost-sharing agreement, and in the absence of specific proof, the Court will not hold that the agreement supersedes the plaintiff's right to recover reasonable costs for the audiovisual equipment as the prevailing party under Rule 54.

*Second,* plaintiff suggests that if the agreement did not foreclose plaintiff from seeking the full reasonable costs of the audiovisual equipment, than plaintiff should nonetheless be barred from recovering because it did not seek advance authorization from the Court for the expenditure (Defs.' Mem. at 15- 16). As we explained above, the recent Seventh Circuit decision in *Cefalu,* 211 F.3d 416, did not require that a party seek prior approval as a condition to later seeking recovery of costs for technological aids, and so the Court does not impose that requirement either.

*Third,* plaintiff argues that the costs must be disallowed or reduced because plaintiff has failed to explain the necessity of renting the audiovisual equipment (Defs.' Mem. at 15-16). That argument is not one that defendants gracefully can make, since they agreed in advance to share the costs of the audiovisual expenditures, and defendants do not argue that they were unaware of what equipment plaintiff intended to rent or how much it would cost. Indeed, defendants themselves used certain of the equipment (the TV monitor, the VHS player, and the flat paneled monitors) to display two video tapes to the jury. Nonetheless, several other items of high-priced technological equipment served no purpose at trial other than to take up space in the courtroom. Accordingly, the Court reduces the amount that it will award as reasonably necessary costs for the audiovisual equipment to the rental charge for the TV monitor, VHS player and flat paneled monitor (collectively, $2,060.00); six percent tax on that rental amount ($123.60); plus a portion of the delivery, setup, pickup and technical support charged for the equipment ($367.31), for a total of $2,550.91. [FN27]

> FN27. The total delivery, setup, pickup and technical support charge was $600.00. The Court has calculated the amount of this support charge to be awarded as costs by determining the percentage of the awarded equipment costs to the total equipment costs incurred ($2,060.00 divided by $3,365.00), and applying that same percentage to the support costs incurred.

6. Copies of Notebooks and Exhibits.

Plaintiff seeks $2,110.88 for copies of trial exhibits and materials "necessarily obtained for use in the case." 28 U.S.C. § 1920(4). The defendants argue that plaintiff's request is "fatally flawed" because the plaintiff did not provide "detail as to the actual documents photocopied." Plaintiff, however, specified the type of items copied: ten sets of notebooks of exhibits (eight for the jurors, one for the court, and one for the witness). Each notebook contained copies of both the plaintiff and defendant's exhibits, and the plaintiff notes that the costs for in-house copies are not being sought.

*33 The prevailing party is not required to submit a bill of costs so detailed as to make it economically impossible to recover photocopying costs, but where a court is unable to determine whether the copies in question were reasonably necessary for use in the case, the claim for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 26
2001 WL 1104604 (N.D.Ill.)
(Cite as: 2001 WL 1104604 (N.D.Ill.))

costs should be denied. *American Automotive Accessories, Inc. v. Fishman*, 991 F.Supp. 995, 997 (N.D.Ill.1998); *Place v. Abbott Laboratories*, No. 94 C 5491, 1999 WL 569580, at *3 (N.D.Ill. July 30, 1999) (citing *Moore v. The University of Notre Dame*, 22 F.Supp.2d 896, 914 (N.D.Ind.1998)). The burden is on the party seeking reimbursement for photocopying costs to show that the photocopied items were necessary; if that party fails to meet the burden, the court should not award costs for those items. *Place*, 1999 WL 569580, at *3 (citing *Lawyer v. 84 Lumber Co.*, No. 96 C 0356, 1998 WL 111703, at *6 (N.D.Ill. Mar. 12, 1998)). Plaintiff can recover costs only for copies necessarily obtained for use in the case. "The phrase 'for use in the case' refers to materials 'actually prepared for use in presenting evidence to the court." ' *McIlveen v. Stone Container Corp.*, 910 F.2d 1581, 1584 (7 th Cir.1990) (quoting *E.E.O.C. v. Kenosha Unified School Dist. No. 1*, 620 F.2d 1220, 1227-28 (7 th Cir.1980)). Courts have held that Section 1920(4) allows the prevailing party to recover costs incurred in copying exhibits submitted to the courts as well as those used at trial. *Movitz*, 982 F.Supp. at 577 (citing *Finchum*, 57 F.3d at 534; *M.T. Bonk Co.*, 945 F.2d at 1410).

In this case, the Court required that trial notebooks containing the numerous pre-admitted exhibits be given to each juror. The exhibit books were used extensively by both parties throughout the trial, and facilitated the presentation of evidence. The Court finds that these documents were clearly identified, reasonable and necessary to the jury's understanding of the issues, and made for use in the case. Thus, recovery of reasonable costs for these copies is "clearly allowable." *Finchum*, 57 F.3d at 534.

The plaintiff has submitted invoices setting forth the per page copying charge, and a breakdown of the number of copies, including black and white, color and oversized. These invoices list as costs for the copies amounts ranging from $0.20 to $1.50 (Pl.'s Bill, Ex. 37). The Court finds the costs charged for these copies is excessive and thus unreasonable; courts in this district have held that photocopying charges in the range of $0.10 to $0.15 is reasonable. See *Jennings*, 1998 WL 704106, at *2 (in-house copies at eleven cents per page reasonable.); *American Automotive*, 991 F.Supp. at 998 (in-house copy cost at $.15 per page is reasonable). But, the Court is mindful of the fact that many of plaintiff's copies were color or oversized copies and that the outside print shops charged more than $0.15 for these copies. The Court finds that these copies were not reasonably necessary for use in the trial: the enlarged, color exhibits greatly aided the jurors' understanding of the case as it was presented, but additional *color* copy prints and *oversized* copy prints were not necessary within the individual binders. The need for binding and tabs was reasonably necessary to organize the voluminous information contained in the notebooks and to refer to the exhibits quickly during testimony. Thus, the Court will award the plaintiff costs associated with the copies at a rate of $0.15 per copy, along with the incidental charges for binding and tabs, which the Court finds necessary and reasonable. The plaintiff is therefore awarded a total of $1,604.94 as reimbursement for costs associated with the trial exhibits and notebooks.

\* \* \*

*34 Based on the foregoing analysis, the Court awards plaintiff costs totaling $26,102.07, which includes the following:

```
Fees of Clerk and Marshal:      $      190.00

Fees of the Court Reporters:         8,586.10

Witness Fees/Disbursements:            726.50

Exemplification Expenses:           14,994.53

Trial Exhibit Notebooks:             1,604.94
```

## CONCLUSION
For the reasons set forth above:

(1) Defendants' motion for a judgment as a matter of law or, alternatively, for a new trial, pursuant to Fed.R.Civ.P. 50 and 59 (doc. # 110) is denied;

(2) Plaintiff's motion to amend the judgment to include prejudgment and post-judgment interest (doc. # 144) is granted in part. The judgments against ZR Energy, Mr. Fraval and Mr. Berkovitz on the trade secret claim are increased to $139,667.88, $2,133.16 and $4,266.33,

Not Reported in F.Supp.2d
2001 WL 1104604 (N.D.Ill.)
(Cite as: 2001 WL 1104604 (N.D.Ill.))

Page 27

respectively, to include prejudgment interest to March 12, 2001. Post-judgment interest shall accrue on the judgments against ZR Energy and Mr. Berkovitz at the rate of $16.13 and $.3980 per day, respectively, from March 12, 2001. In all other respects, the motion is denied; and

(3) Plaintiff's bill of costs is granted in part and denied in part. Plaintiff is awarded $26,102.07 in taxable costs under Rule 54(d).

2001 WL 1104604 (N.D.Ill.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
2000 WL 33709289 (D.Ariz.)
(Cite as: 2000 WL 33709289 (D.Ariz.))

Page 1

**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Arizona.
DUREL CORPORATION, a Delaware corporation,
Plaintiff-Counterdefendant,
v.
OSRAM SYLVANIA, INC., a Delaware corporation,
Defendant-Counterclaimant.
No. CIV 95-1750PHXEHCER.

April 27, 2000.

ORDER GRANTING DUREL'S POSTTRIAL MOTION No. 2

RAFEEDIE, Senior District J.

*1 Having considered the pleadings filed in connection with plaintiff-counterdefendant Durel's Post-Trial Motion No. 2, and deeming the matter suitable for resolution without the need for oral argument, the Court HEREBY GRANTS Durel's motion.

Although the Court has substantial discretion in determining whether to award prejudgment interest, prejudgment interest should be awarded under 35 U.S.C. § 284 absent some justification for withholding such an award. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983). The Court, however, may limit prejudgment interest, or deny it altogether, if the patent owner has been responsible for undue delay in prosecuting the lawsuit. *Id.*

Sylvania contends that Durel is not entitled to prejudgment interest, or at least is not entitled to prejudgment interest after April 1, 1999, because Durel delayed in prosecuting this case. Specifically, Sylvania maintains that Durel delayed the trial by failing to timely disclose its Type B Process, and that if Durel had made such a timely disclosure, the case would have been tried in March 1999 instead of in January 2000. Sylvania, however, has not presented any evidence that the trial would have occurred in March 1999, and a detailed examination of the docket in this case suggests that the case may not have proceeded to trial as scheduled, as illustrated by the multiple extensions of the trial date which occurred prior to March 1999. Accordingly, the Court does not find that Durel unduly delayed in prosecuting this case, and therefore, the Court also finds that Durel is entitled to an award of prejudgment interest in accordance with the general rule awarding such interest.

Durel requests prejudgment interest in the amount of $13,228,632, which is based on a calculation using the prime rate compounded annually. Although Sylvania does not dispute that its expert used the prime rate to calculate prejudgment interest for Sylvania's patent infringement case, Sylvania nevertheless argues that the Court should use a Treasury Bill rate of interest to calculate Durel's prejudgment interest. As Sylvania concedes, the Court has broad discretion in setting a prejudgment interest rate, and in light of the fact that Sylvania used the prime rate to calculate its own prejudgment interest, the Court finds that Durel's use of the prime rate is appropriate in this case.

Therefore, the Court HEREBY GRANTS Durel's Post-Trial Motion No. 2, and hereby directs the Clerk's Office to enter judgment for an award of prejudgment interest in the amount of $13,228,632.00.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve, by United States mail or by telefax, copies of this Order on counsel for the parties in this matter.

2000 WL 33709289 (D.Ariz.)

Motions, Pleadings and Filings (Back to top)

• 2:95CV01750 (Docket) (Aug. 23, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
2003 WL 21639116 (N.D.Ill.)
(Cite as: 2003 WL 21639116 (N.D.Ill.))

Page 1

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
GLENAYRE ELECTRONICS, INC., Plaintiff,
v.
Philip JACKSON, an individual, Defendant.
Philip JACKSON, Counterclaim-Plaintiff,
v.
GLENAYRE ELECTRONICS, INC., Metrocall, Inc.,
Arch Wireless, Inc., Primeco
Personal Communications, L.P., and John Does (1-10), Counterclaim-Defendants.
No. 02 C 0256.

July 9, 2003.

MEMORANDUM OPINION AND ORDER

LEINENWEBER, J.

*1 On April 1, 2003, the jury in this case returned a verdict against Plaintiff Glenayre Electronics, Inc. ("Glenayre") finding infringement of Claims 5 and 79 of defendant Philip Jackson's ("Jackson") U.S. Patent No. 4,596,900 (the " '900 Patent"). The jury awarded Jackson $12,000,000 in damages. Presently before the Court is: (i) Glenayre's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial ("Motion JMOL"); (ii) Jackson's Motion to Amend the Judgment to Add Prejudgment Interest ("Interest Motion"); and (iii) Glenayre's Motion for Stay Pending Resolution of Post-Trial Motions ("Stay Motion"). For the following reasons, the Motion JMOL is granted in part and denied in part, the Interest Motion is granted and the Stay Motion is denied as moot.

LEGAL STANDARDS
Rules 50 and 59

Glenayre brings its renewed Motion JMOL pursuant to Federal Rules of Civil Procedure 50(b) and 59. In it, Glenayre asks the Court to review whether there was sufficient evidence underlying the jury's finding that certain elements in Claims 5 and 79 are present in the MVP; Glenayre also moves for a remittitur of the jury's damages award.

Rules 50(b) and 59 differ both in the scope of allowable relief and the applicable standards of review. Rule 50(b) would permit the Court to enter judgment as a matter of law or, alternatively, to order a new trial. Rule 59, on the other hand, would only allow the Court to order a new trial. Under Rule 50, a court may enter judgment as a matter of law on a claim if "there is no legally sufficient evidentiary basis for a reasonable jury to find for th [e non-moving] party on [an] issue" necessary to the maintenance to that claim. Fed.R.Civ.P. 50(a)(1). In carrying out a Rule 50 inquiry, the Court must determine "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed.... In other words, [the Court is] limited to assessing whether no rational jury could have found for the [non-movant]." *Mathur v. Bd. of Trustees of So. Ill. Univ.*, 207 F.3d 938, 941 (7th Cir.2000). Under Rule 59, however, a "district court may properly grant a new trial if the verdict is contrary to the clear weight of the evidence ." *Smith v. Great Am. Restaurants, Inc.*, 969 F.2d 430, 434 (7th Cir.1992); see also 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2806 at 75 (2d Ed.1995) [hereinafter "Wright, Miller & Kane"] (Under Rule 59, "[i]f, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.").

All of the issues raised in Glenayre's Motion JMOL will be reviewed under the standards of Rule 59. *Cf. Midland Mgmt. Corp. v.. Computer Consoles Inc.*, 87 C 0791, 1993 WL 316725, at *1 (N.D.Ill. Aug. 17, 1993) (Posner, J.) ("[A] motion for a new trial may be made even if no motions for judgment as a matter of law have been submitted."). However, to the extent that Glenayre seeks review under Rule 50(b), it will only be permitted insofar as Glenayre previously "mo[ved] for judgment as a matter of law at the close of all the evidence" under Rule 50(a) and only on the grounds identified in that pre-verdict motion. Fed.R.Civ.P. 50(a)-(b); Advisory Committee Notes to the 1991 Amendments to Rule 50 ("[T]he post-verdict motion is a renewal of an earlier motion made

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21639116 (N.D.Ill.)
(Cite as: 2003 WL 21639116 (N.D.Ill.))

Page 2

at the close of the evidence.... A post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion."); see also Duro-Last, Inc. v. Custom Seal, Inc., 321 F.3d 1098, 1107 (Fed.Cir.2003) ( "In view of a litigant's Seventh Amendment rights, it would be constitutionally impermissible for the district court to re-examine the jury's verdict and to enter JMOL on grounds not raised in the pre-verdict JMOL."); Laborers' Pension Fund v. A & C Envtl., Inc., 301 F.3d 768, 775, 777 (7th Cir.2002); Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd., 100 F.3d 1353, 1364 (7th Cir.1996) ("This Court gives effect to the plain language of Rule 50(b) by requiring that a motion for judgment as a matter of law be made at the close of all evidence in order to be preserved for post-trial consideration."); United States E.E.O.C. v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1286 (7th Cir.1995); Hudak v. Jepsen, 982 F.2d 249, 250 (7th Cir.1992) ("It is well established in this Circuit that the sufficiency of the evidence supporting jury submission of a case or the jury's findings is not reviewable on appeal unless the party seeking review has made a timely motion for a directed verdict in the trial court."). These procedural requirements under Rule 50(b) serve the salutary purpose of allowing the opposing party "an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment." Advisory Committee Notes to the 1991 Amendments to Rule 50.

*2 Glenayre's Rule 50(a) motion at the close of all the evidence was directed solely to whether Jackson had adduced sufficient evidence that, as required by Claims 5 and 79 of the '900 Patent, the MVP has a gate means "coupled" with a detecting means which functions "normally to prevent the detecting means from producing a sequence detection signal corresponding to a received sequence of predetermined tone signals" (Nov. 21, 2002 Claims Construction Order ("CC Order")). (Tr. at 615-23.) Accordingly, only that particular issue will receive the benefit of review under the standards of Rule 50(b).

*Infringement*
The claims at issue in this case are "means-plus-function" claims. They are therefore governed by 35 U.S.C. § 112, ¶ 6, which provides as follows:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.
35 U.S.C. § 112, ¶ 6.

This case was submitted to the jury solely on the theory that the MVP literally infringed the '900 Patent. "Literal infringement of a § 112, ¶ 6 limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification. Functional identity and either structural identity or equivalence are both necessary." Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1267 (Fed.Cir.1999) (citations omitted; emphasis in original). Structural equivalence for purposes of Section 112, Paragraph 6 turns on "whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial." Valmont Indus., Inc. v. Reinke Mfg. Co., 983 F.2d 1039, 1043 (Fed.Cir.1993).

*DISCUSSION*
*Gate Means Coupled to Detecting Means*
Glenayre contends that insufficient evidence underlies the jury's finding that the MVP has a gate means "coupled" with a detecting means which functions "normally to prevent the detecting means from producing a sequence detection signal corresponding to a received sequence of predetermined tone signals." Glenayre claims in particular that "Dr. Silva's testimony, at best, establishes only that a 'control signal' in the MVP is not produced until a password is entered," but does not "establish[ ] that this is achieved by inhibiting the precursor 'sequence detection signal' as actually required by Claims 5 and 79." (Motion JMOL at 17.) Glenayre further notes that Dr. Silva placed the purported detecting means and the purported gate means in the MVP in physically different areas of the MVP (namely, in the "T1 interface card and time space controller" (detecting means) and the "central controller" (gate means)), a fact Glenayre takes to demonstrate an absence of "coupling."

*3 The Court rejects Glenayre's arguments. Dr. Silva gave expert testimony that the MVP contained both a detecting means (Tr. at p. 340, 1. 23--p. 341, 1.7) and a gate means (Tr. at p. 355, ll 14-21) and offered his conclusion that Claims 5 and 79 of the '900 Patent read on the MVP. That his testimony may have placed these means in "totally separate parts of the MVP" (Motion JMOL at 18) is beside the point. The question, as Glenayre conceded when initially making its Rule 50(a) motion for judgment as a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

matter of law, is whether there is "some kind of operative association." (Tr. at 618.) "Coupling" naturally denotes that these means must "be interacting with each other. They have to be sending something back and forth." (*Id.*) The evidence at trial would have allowed a rational jury to conclude just that. In addition to Dr. Silva's testimony, the jury had before it the MVP itself and heard a detailed explanation of its function from Mr. Bettis. (Tr. at 544-68 .) For example, Mr. Bettis showed the jury the interconnected shelves of the MVP, and explained that "the time space controller really interfaces the control shelf back to all these other shelves to allow them to talk" (Tr. at 546) and that "the [time space controller] and the central controller, it's always communicating through this one buffer" (Tr. at 550). He also testified that the time space controller will not shift into "command" mode (in which the MVP detects and carries out touch-tone commands) until *after* a valid password is entered. (Tr. at 550-54, 566-67, 569.) From this a rational jury *could* have concluded that the MVP contains gate means "coupled" to detecting means that carry out a function identical to the one articulated in Claims 5 and 79. In addition, under Rule 59, this finding was not against the clear weight of the evidence.

Accordingly, Glenayre's motion for judgment as a matter of law or a new trial on the issue whether the MVP has a gate means "coupled" with a detecting means which functions "normally to prevent the detecting means from producing a sequence detection signal corresponding to a received sequence of predetermined tone signals" is denied.

*Control Means*
Claims 5 and 79 identify a "control means" that "respond[s] to the sequence detection signal produced by the detecting means by producing a corresponding control signal." (CC Order.) Glenayre seizes on the word "corresponding" in this functional description and argues that "this means that each control sequence of Touch-Tones [such as " *,1"] entered into Jackson's device results in the production of a *unique* 'control signal." ' (Motion JMOL at 13 (emphasis supplied).) Put more precisely, Glenayre argues that Claims 5 and 79 require that the control input of an infringing device lead to the "production of one, and only one, 'corresponding control signal." ' (*Id.*)

Based on this interpretation, Glenayre contends that the jury's verdict is contrary to the clear weight of the evidence because it is "undisputed" that, in the MVP, entry of the same control sequence (such as "1") "can have profoundly different 'control effects' depending on what menu and table are in use at any time." (Motion JMOL at 15 ("So, sometimes pressing 1 may mean, 'Go to the Sales Department,' whereas another time pressing a 1 might mean, 'I want to change my password,' or a 1 might mean, 'I want to leave a voicemail message,' or something like that. It depends on what menu you're in right now.") (quoting testimony of Alan Samuels, Tr. at 585).) This is essentially the same argument Glenayre offered in its Motion for Summary Judgment on Claims 1, 3, 59 and 69. In the context of that motion, however, Glenayre's argument was compelling, as those particular claims contain specific elements that forbid the production of different control signals in response to a given control sequence (*i.e.,* the "gating means" of Claims 1 and 59 and the "flip-flop means" of Claims 3 and 69). But Claims 5 and 79 do not include a like limitation; no element of those claims would necessarily preclude a result wherein successive entry of the same control sequence stimulated a change in the state of the controlled device. Accordingly, Glenayre's motion for a new trial on this issue is denied.

*Access Limiting Circuit Means*
*4 Glenayre also requests a new trial on the question whether the MVP's string-compare password validation technique is insubstantially different than the '900 patent's one-digit-at-a-time password validation technique. Dr. Silva testified at length about this issue during trial, and concluded that the modus operandi of, and result achieved by, the password verification system in the MVP is identical to, or only insubstantially different from, the access limiting circuit means of the '900 patent. (*See, e.g.,* Tr. at 316-17, 344- 45, 352-53.) The jury was certainly entitled to credit Dr. Silva's conclusions. Given all the evidence before the jury on this issue, the Court cannot conclude that the jury's verdict was against the clear weight of the evidence. Accordingly, Glenayre's motion for a new trial on this issue is denied.

*Counter Means*
Glenayre next argues that the jury's finding that the MVP has a "counter means" coupled to the gate means, and that the counter means functions to enable operation of the detecting means, is against the clear weight of the evidence. The Court disagrees. In its CC Order, the Court held that the "function of the counter means is to count the number of tone signals that are entered until the number of signals entered equals the number of digits in the access code. If the correct tone signals were entered, the

counter means enables operation of the detecting means." At trial, Dr. Silva identified the "source code or portions of the source code that are responsible for the counting function" in the MVP. (Tr. at 349.) He described in some detail how that source code operates (Tr. at 351, 449-50) and then opined as follows:

Q: And does the Glenayre MVP have a counter means?
A: Yes, sir.
Q: What is that counter means?
A: Well, that's the electronic circuits that were empowered by that code we were discussing just a few minutes ago.
(Tr. at 355.)

Moreover, the jury's finding that the structure of the counter means in the MVP is "coupled" to the gate means is not against the clear weight of the evidence. The jury not only heard Dr. Silva's explanation of the purported counter means in the MVP, but also, as noted previously, heard Mr. Bettis explicate the various interconnections and operative linkages between the MVP's digital signal processor, its time space controller, and its central controller. (Tr. at 545-55; cf. also id. at p. 355, 1. 22--p. 356, 1. 22.) In addition, both the counter means source code and the gate means source code were before the jury in a single source code document (Def.'s Ex. 102). Based on the totality of evidence before the jury, the Court cannot conclude that the jury's finding that the MVP's counter means is "coupled" (either identically or in an insubstantially different way) with the gate means was against the clear weight of the evidence. Cf. Wright, Miller & Kane, § 2806 at 74 ("[A] decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter.").

*Remittitur*

*5 Glenayre also moves the Court for a remittitur of the jury's $12,000,000 damages award. This motion is properly considered under Rule 59, see Wright, Miller & Kane, § 2807 at 78, and is well-taken.

The Court may not disturb the jury's damages award unless it was "grossly excessive or monstrous, clearly not supported by evidence, or based only on speculation or guesswork." Oiness v. Walgreen Co., 88 F.3d 1025, 1031 (Fed.Cir.1996) (internal quotation marks omitted); see also Am. Nat'l Bank & Trust Co. of Chicago v. Regional Transp. Auth., 125 F.3d 420, 437 (7th Cir.1997) (remittitur only appropriate where jury award is "monstrously excessive, born of passion and prejudice, or not rationally connected to the evidence."). If the Court determines that the damages award was excessive, the proper course is either to order a new trial limited to the issue of damages, or to deny the motion for a new trial on the condition that the prevailing party file a remittitur in a stated amount. See Wright, Miller & Kane, § 2815 at 159-60, 169. In light of the Seventh Amendment, a court may only reduce a damages award "to the highest amount that the jury could properly have awarded." See id. at 167; Unisplay, S.A. v. Am. Electronic Sign Co., Inc., 69 F.3d 512, 519 (Fed.Cir.1995); see also Dimick v. Schiedt, 293 U.S. 474, 486 (1935) ("Where the verdict is excessive, the practice of substituting a remission of the excess for a new trial is not without plausible support in the view that what remains is included in the verdict along with the unlawful excess--in that sense that it has been found by the jury--and that the remittitur has the effect of merely lopping off an excrescence.").

By statute, a patentee whose patent has been infringed is entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. "The royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant." Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1554 (Fed.Cir.1995) (en banc). There was no "established" royalty rate in this case. Cf. Nickson Indus., Inc. v. Rol Mfg. Co., Ltd., 847 F.2d 795, 798 (Fed.Cir.1988); Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078 (Fed.Cir.1983) (for a royalty to be "established" it "must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention"). Thus, the reasonable royalty calculation must be based on a hypothetical negotiation, an exercise in abstraction which "requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began." Rite-Hite Corp., 56 F.3d at 1554.

*6 Here, the infringement began no earlier than 1988 (the rollout date for the MVP). It is crucial to remember, however, that although the earliest date of infringement sets the timeframe for the hypothetical negotiation, Jackson may only recover damages for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the period stretching from the date when Jackson first affirmatively *notified* Glenayre of its infringement through the date of expiration of the '900 Patent. 35 U.S.C. § 287. In this case, that damages period extends only from December 19, 2001 through June 24, 2003.

Although performing this hypothetical analysis under 35 U.S.C. § 284 will necessarily involve some measure of extrapolation and prediction, it nonetheless must rest on "sound economic and factual predicates." *Riles v. Shell Exploration and Prod. Co.,* 298 F.3d 1302, *1311 -1311 (Fed.Cir.2002). That said, a wide range of factors can be relevant to such a hypothetical negotiation, *see Micro Chem., Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1393 (Fed.Cir.2003); *TWM Mfg. Co., Inc. v. Dura Corp.,* 789 F.2d 895, 898 (Fed.Cir.1986); *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), and in fact the Court's instructions to the jury identified 12 separate factors that could be considered (Tr. at 741-42).

Although there was no evidence of a firmly "established" royalty rate, Jackson did introduce six license agreements involving the '900 Patent negotiated in arms-length transactions with third parties containing representative royalty terms ("Jackson Licenses"). These prior license agreements "should carry considerable weight in calculating a reasonable royalty rate." *Unisplay, S.A. v. American Elec. Sign Co.,* 69 F.3d 512, 519 (Fed.Cir.1995); *see also Riles v. Shell Exploration and Prod. Co.,* 298 F.3d 1302, 1313 (Fed.Cir.2002) (plaintiff's damages expert improperly "ignored [plaintiff's] established licensing practice"); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.,* 862 F.2d 1564, 1568 (Fed.Cir.1988) ("[T]he patentee's usual licensing approach should be considered in assessing a reasonable royalty."). In addition, Glenayre itself introduced two license agreements reflecting royalty rates it paid for rights to use other patents covering an integrated voicemail system ("Glenayre Licenses"). Of all the evidence presented in this case, the Jackson Licenses and the Glenayre Licenses together constitute the most cogent, probative basis for determining the amount of a reasonable royalty.

The Jackson Licenses reflect lump-sum amounts that, according to Jackson, were based upon the following royalty rates calculated as a percentage of sales: Cobra Electronics (2.5%); Sanyo Electronics (2.8%); Unical-Northwestern Bell (5%); Swatch (2.5%); Samsung Electronics ($380,000 lump-sum payment--no percentage indicated); Brother Industries (3%). It bears emphasis that each of the Jackson Licenses were granted for terms greater than the 18-month damages period in this case, and broadly granted the right to use every aspect of the '900 Patent. The Glenayre Licenses, on the other hand, conferred an unrestricted right to use patents covering a complete, complex voicemail system and required a royalty payment of 6% of sales plus either a $250,000 cash payment or 30,000 shares of Glenayre common stock.

*7 The unbounded rights to use every aspect of the patents that are the subject of the Glenayre Licenses and the Jackson Licenses distinguishes them from the more limited license that would result from a hypothetical negotiation in this case. That is, because only Claims 5 and 79 of the '900 Patent were in issue at trial, the jury's liability verdict rested entirely on a narrow finding that the MVP infringed the particular password verification system disclosed in those specific claims. This means that a hypothetical negotiation between the parties in this case would have been directed only to a license for that specific portion of the '900 Patent, unlike the Jackson Licenses and Glenayre Licenses which are unrestricted in the scope of the usage rights granted.

Record evidence developed during trial showed that Glenayre's actual sales of MVP products throughout the damages period up until January 1, 2003 totaled $27,000,000. (Tr. at 270-71.) Assuming a best-case sales scenario for Glenayre through the end of the damages period based on available sales numbers from 2002, it is uncontested that overall sales of MVP products during the damages period would equal approximately $40,000,000. Based on that benchmark sales total, the jury's $12,000,000 damages award reflects a whopping royalty rate of 30%, a rate five times greater than the very highest rate disclosed in any license agreement offered into evidence.

There is absolutely no support in the record for such an extravagantly high royalty percentage. Couched in the language of the governing legal standard, the jury's damages award was "grossly excessive," "clearly not supported by evidence," and smacks of "speculation or guesswork" or an otherwise impermissible intent to punish Glenayre. *Oiness,* 88 F.3d at 1031; *see also Modine Mfg. Co. v. Allen Group, Inc.,* No. C-85-6946-DLJ, 1989 WL 205782 (N.D.Cal. Nov. 30, 1989), *aff'd* 917 F.2d 538 (Fed.Cir.1990). Indeed, given the range of royalties previously accepted by Jackson in the Jackson Licenses, the range of royalties previously paid out

by Glenayre under the Glenayre Licenses, the limited duration and scope of the necessary license in this case (restricted, as it is, to the particular password verification system disclosed in Claims 5 and 79 and an 18-month damages period), and the absence of any expert testimony on the subject of damages, *cf. Hanson,* 718 F.2d at 1078-79, the highest possible royalty rate the jury could have properly awarded, consistent with the relevant evidence before them, was 6% of MVP sales during the damages period plus a $250,000 lump-sum payment, or $2,650,000. *Cf. Unisplay, S.A. v. Am. Electronic Sign Co., Inc.,* 69 F.3d 512, 519 (Fed.Cir.1995) (A jury's damages award "must be within the range encompassed by the record as a whole."); *Trell v. Marlee Electronics Corp.,* 912 F.2d 1443, 1446 (Fed.Cir.1990) ("Although there is room for exercise of a common-sense estimation of what the evidence shows would be a 'reasonable' award,' the district court must consider what is reasonable 'under all the circumstances." ' (internal quotation marks omitted)).

*8 Accordingly, the Court denies Glenayre's motion for a new trial on damages on the condition that Jackson consent to a remittitur of the jury's damages award to $2,650,000. If Jackson refuses, the Court orders a new trial on damages.

*Prejudgment Interest*

Should Jackson accept the remittitur, there is then the matter of prejudgment interest. Glenayre and Jackson agree that prejudgment interest is appropriate, 35 U.S.C. § 284, but wrangle over both the applicable interest rate and whether the damages amount was awarded as a lump-sum or as a stream of royalty payments to be spread out over time.

Prime rate is appropriate in this case. *See Gorenstein Enters., Inc. v. Quality Care-USA, Inc.,* 874 F.2d 431, 436 (7th Cir.1989) (Posner, C.J.) ("For the future, we suggest that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate."). In addition, there can be little doubt based on the record evidence (in particular, the Glenayre Licenses and the Jackson Licenses) that the jury awarded--and that Glenayre believed the jury to have awarded (*see, e.g.,* Motion JMOL at 1, 7-8)-- a lump-sum damages amount. Accordingly, assuming Jackson accepts the remittitur and obviates the need for a new trial on damages, the Court concludes that interest should be awarded on the reduced $2,650,000 damages amount at the prime rate charged monthly by banks on short-term business loans, with interest compounded monthly from December 19, 2001 through April 1, 2003, the date of judgment. *Cf. Mendenhall v. Barber-Greene Co.,* 80 C 6747, 1990 WL 156519, at *3 (N.D.Ill. Oct. 5, 1990).

*CONCLUSION*

For the foregoing reasons, Glenayre's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial is GRANTED IN PART AND DENIED IN PART, Jackson's Motion to Amend the Judgment to Add Prejudgment Interest is GRANTED, and Glenayre's Motion for Stay Pending Resolution of Post-Trial Motions is DENIED AS MOOT. If Jackson does not consent to a remittitur of the jury's damages award to $2,650,000 by filing an appropriate document to that effect within twenty-one (21) days of the date of this Memorandum Opinion and Order, the Court orders that a new trial limited to the issue of damages be granted.

IT IS SO ORDERED.

2003 WL 21639116 (N.D.Ill.)

Motions, Pleadings and Filings (Back to top)

• 2004 WL 2257409 (Trial Motion, Memorandum and Affidavit) Reply of Glenayre Electronics, Inc. to the Orum & Roth Firm's Opposition to Glenayre's Motion for Sanctions (Aug. 05, 2004)

• 2004 WL 2257407 (Trial Motion, Memorandum and Affidavit) Jackson and Orum & Roth's Response to Glenayre's Motion for Sanctions (Jul. 29, 2004)

• 2004 WL 2257406 (Trial Motion, Memorandum and Affidavit) Reply of Glenayre Electronics, Inc. to the Niro Firm's Opposition to Glenayre's Motion for Sanctions (Jul. 15, 2004)

• 2004 WL 2257404 (Trial Motion, Memorandum and Affidavit) Niro, Scavone, Haller & Niro's Brief in Opposition to Glenayre's Motion for Sanctions Against Jackson's Lawyers (Jul. 13, 2004)

• 2004 WL 2257403 (Trial Motion, Memorandum and Affidavit) Jackson's Reply to Glenayre's Response to Jackson's Motion to Set Trial on Remaining Issues (Jun. 22, 2004)

• 2004 WL 2257402 (Trial Motion, Memorandum and Affidavit) Glenayre's Response to Jackson's Motion to Set Trial on the Remaining Issues (Jun. 15, 2004)

• 2004 WL 2257400 (Trial Motion, Memorandum

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and Affidavit) Mr. Jackson's Reply in Support of his Motion to Enforce (May. 11, 2004)

• 2003 WL 23819482 (Trial Motion, Memorandum and Affidavit) Response to Motion for Approval of Security on Appeal (Aug. 19, 2003)

• 2003 WL 23419108 (Trial Motion, Memorandum and Affidavit) Motion for Approval of Security on Appeal (Aug. 18, 2003)

• 2003 WL 23419113 (Trial Motion, Memorandum and Affidavit) Motion for Approval of Security on Appeal (Aug. 18, 2003)

• 2003 WL 23819786 (Trial Motion, Memorandum and Affidavit) Philip Jackson's Reply in Support of His Bill of Costs (May. 27, 2003)

• 2003 WL 23419102 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Glenayre's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial (May. 21, 2003)

• 2003 WL 23819783 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Glenayre's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial (May. 21, 2003)

• 2003 WL 23819780 (Trial Motion, Memorandum and Affidavit) Supplemental Response in Support of Glenayre's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial (May. 15, 2003)

• 2003 WL 23419097 (Trial Motion, Memorandum and Affidavit) Glenayre's Agreed Motion to File Oversize Reply Brief (May. 14, 2003)

• 2003 WL 23819779 (Trial Motion, Memorandum and Affidavit) Jackson's Reply in Support of His Motion to Amend Judgment to Add Prejudgment Interest (Apr. 30, 2003)

• 2003 WL 23419082 (Trial Motion, Memorandum and Affidavit) Glenayre's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial (Apr. 17, 2003)

• 2003 WL 23419088 (Trial Motion, Memorandum and Affidavit) Motion for Stay Pending Resolution of Post-Trial Motions (Apr. 17, 2003)

• 2003 WL 23419073 (Trial Motion, Memorandum and Affidavit) Phil Jackson's Motion to Amend the Judgment to Add Prejudgment Interest (Apr. 07, 2003)

• 2003 WL 23419055 (Trial Motion, Memorandum and Affidavit) Phil Jackson's Motion for Judgment as a Matter of Law Striking Glenayre's "Non-Infringing Substitutes" Defense (Mar. 31, 2003)

• 2003 WL 23419060 (Trial Motion, Memorandum and Affidavit) Glenayre's Brief in Opposition to Jackson's Proposed Jury Instruction No. 26C (Mar. 31, 2003)

• 2003 WL 23419067 (Trial Motion, Memorandum and Affidavit) Glenayre's Brief in Opposition to Jackson's Proposed Jury Instruction No. 26C (Mar. 31, 2003)

• 2003 WL 23819776 (Trial Motion, Memorandum and Affidavit) Glenayre's Brief in Opposition to Jackson's Proposed Jury Instruction No. 26B (Mar. 31, 2003)

• 2003 WL 23819778 (Trial Motion, Memorandum and Affidavit) Glenayre's Brief in Opposition to Jackson's Proposed Jury Instruction No. 26C (Mar. 31, 2003)

• 2003 WL 23419047 (Trial Motion, Memorandum and Affidavit) Glenayre's Bench Memorandum Regarding Jackson's Proposed Damages Evidence (Mar. 26, 2003)

• 2003 WL 23819773 (Trial Motion, Memorandum and Affidavit) Glenayre's Bench Memorandum Regarding Jackson's Proposed Damages Evidence (Mar. 26, 2003)

• 2003 WL 23419032 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Motion to Permit Testimony About Jackson's Licenses (Mar. 25, 2003)

• 2003 WL 23419037 (Trial Motion, Memorandum and Affidavit) Bench Memorandum Supporting Use of Glenayre's Revenues and Profits During Entire Period of Infringement (Mar. 25, 2003)

• 2003 WL 23419042 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Bench Memorandum Supporting Admission of Inventor Testimony Concerning Reasonable Royalty (Mar. 25, 2003)

• 2003 WL 23819768 (Trial Motion, Memorandum and Affidavit) Bench Memorandum Supporting Use of Glenayre's Revenues and Profits During Entire

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21639116 (N.D.Ill.)
(Cite as: 2003 WL 21639116 (N.D.Ill.))

Page 8

Period of Infringement (Mar. 25, 2003)

• 2003 WL 23819771 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Bench Memorandum Supporting Admission of Inventor Testimony Concerning Reasonable Royalty (Mar. 25, 2003)

• 2003 WL 23819766 (Trial Motion, Memorandum and Affidavit) Bench Memorandum Concerning Whether Phil Jackson May Call Glenayre's Witnesses (Mar. 24, 2003)

• 2003 WL 23819761 (Trial Motion, Memorandum and Affidavit) Glenayre Electronics' Response to Jackson's Motion in Limine to Bar Reference to Other Litigation and the Amount of any Prior Settlements (Mar. 21, 2003)

• 2003 WL 23819763 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Reply in Support of His Motion in Limine to Preclude Glenayre from Relying on Legal Advice as a Defense to the Charge of Willfulness (Mar. 21, 2003)

• 2003 WL 23819765 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Reply in Support of His Motion In Limine to Preclude Reference to Patent Claims No Longer at Issue (Mar. 21, 2003)

• 2003 WL 23419026 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Glenayre's Motion in Limine to Strike Testimony of Joseph Agiato (Mar. 20, 2003)

• 2003 WL 23819767 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Glenayre's Motion in Limine to Strike Testimony of Joseph Agiato (Mar. 20, 2003)

• 2003 WL 23819758 (Trial Motion, Memorandum and Affidavit) Phil Jackson's Response to Glenayre's Motion in Limine to Exclude Cranman and Gafford Testimony (Mar. 19, 2003)

• 2003 WL 23819760 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Response to Glenayre's Motion to Exclude Evidence of Licensing Activities (Mar. 19, 2003)

• 2003 WL 23819750 (Trial Motion, Memorandum and Affidavit) Phil Jackson's Response to Glenayre's Motion in Limine to Strike Testimony of Joseph Agiato (Mar. 18, 2003)

• 2003 WL 23419014 (Trial Motion, Memorandum and Affidavit) Glenayre's Motion in Limine to Exclude Untimely Identified Evidence (Mar. 17, 2003)

• 2003 WL 23419021 (Trial Motion, Memorandum and Affidavit) Motion in Limine to Exclude Evidence of Jackson's Licensing Activities Until and Unless Liability for Patent Infringement is First Established (Mar. 17, 2003)

• 2003 WL 23418958 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Motion in Limine to Bar Use of Expert Testimony on "Claim Construction" (Mar. 14, 2003)

• 2003 WL 23418982 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Motion in Limine to Preclude Glenayre from Relying on Legal Advice as a Defense to the Charge of Willfulness (Mar. 14, 2003)

• 2003 WL 23418991 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Motion in Limine to Bar Reference to Other Litigation and the Amount of any Prior Settlements (Mar. 14, 2003)

• 2003 WL 23418998 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Motion in Limine to Bar Evidence of Invalidity and Unenforceability or Reliance on Prior Art (Mar. 14, 2003)

• 2003 WL 23418952 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Glenayre's Supplemental Motion for Summary Judgment (Mar. 13, 2003)

• 2003 WL 23418973 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Motion to Proceed First in the Presentation of Proof at Trial (Mar. 13, 2003)

• 2003 WL 23419007 (Trial Motion, Memorandum and Affidavit) Phil Jackson's Brief in Opposition to Glenayre's Supplemental Motion for Summary Judgment (Mar. 13, 2003)

• 2003 WL 23819744 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Glenayre's Supplemental Motion for Summary Judgment (Mar. 13, 2003)

• 2003 WL 23819748 (Trial Motion, Memorandum and Affidavit) Phil Jackson's Brief in Opposition to Glenayre's Supplemental Motion for Summary Judgment (Mar. 13, 2003)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

- 2003 WL 23418965 (Trial Motion, Memorandum and Affidavit) Agreed Motion for Leave to File Oversize Brief (Mar. 12, 2003)

- 2003 WL 23819755 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Response to Glenayre's Motion for Separate Trials (Mar. 10, 2003)

- 2003 WL 23418944 (Trial Motion, Memorandum and Affidavit) Supplemental Motion for Summary Judgment (Feb. 26, 2003)

- 2003 WL 23819741 (Trial Motion, Memorandum and Affidavit) Glenayre's Response to Phil Jackson's Cross Motion to Strike Parts of Glenayre's Reply Brief (Jan. 21, 2003)

- 2003 WL 23418923 (Trial Motion, Memorandum and Affidavit) Phil Jackson's Brief Opposing Glenayre's Motion to Strike Dr. Silva's Declaration (Jan. 06, 2003)

- 2003 WL 23819738 (Trial Motion, Memorandum and Affidavit) Phil Jackson's Brief Opposing Glenayre's Motion to Strike Dr. Silva's Declaration (Jan. 06, 2003)

- 2002 WL 32452638 (Trial Motion, Memorandum and Affidavit) Glenayre's Motion to Strike Declaration of Leroy Silva (Dec. 27, 2002)

- 2002 WL 32452625 (Trial Motion, Memorandum and Affidavit) Motion to Join PMJ Family Limited Partnership (Dec. 10, 2002)

- 2002 WL 32452618 (Trial Motion, Memorandum and Affidavit) Motion to Extend Time for the Filing of a Brief in Opposition to Glenayre's Motion for Summary Judgment (Nov. 22, 2002)

- 2002 WL 32681616 (Trial Motion, Memorandum and Affidavit) Glenayre's Reply to Jackson's Amended Counterclaim (Oct. 30, 2002)

- 2002 WL 32451242 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Glenayre's Proposed Claim Construction (Oct. 29, 2002)

- 2002 WL 32452612 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Glenayre's Proposed Claim Construction (Oct. 29, 2002)

- 2002 WL 32681609 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Glenayre's Proposed Claim Construction (Oct. 29, 2002)

- 2002 WL 32452606 (Trial Motion, Memorandum and Affidavit) Plaintiff's Agreed Motion to File Oversize Reply Brief (Oct. 25, 2002)

- 2002 WL 32452581 (Trial Pleading) Amended Answer and Counterclaim of Philip Jackson (Oct. 16, 2002)

- 2002 WL 32452598 (Trial Motion, Memorandum and Affidavit) Philip Jackson's Brief on Claim Construction (Oct. 16, 2002)

- 2002 WL 32681592 (Trial Pleading) Amended Answer and Counterclaim of Philip Jackson (Oct. 16, 2002)

- 2002 WL 32681600 (Trial Motion, Memorandum and Affidavit) Philip Jackson's Brief on Claim Construction (Oct. 16, 2002)

- 2002 WL 32452589 (Trial Motion, Memorandum and Affidavit) Agreed Motion for Leave to File Oversize Brief (Oct. 11, 2002)

- 2002 WL 32682529 (Trial Motion, Memorandum and Affidavit) Glenayre's Response to Jackson's Motion to "Clarify" this Court's September 27 Order (Oct. 08, 2002)

- 2002 WL 32452575 (Trial Motion, Memorandum and Affidavit) Supplemental Brief in Support of Motion to Clarify (Oct. 07, 2002)

- 2002 WL 32452558 (Trial Motion, Memorandum and Affidavit) Motion to Clarify the Court's September 27, 2002 Order (Oct. 01, 2002)

- 2002 WL 32682523 (Trial Motion, Memorandum and Affidavit) Supplemental Brief in Support of Motion to Clarify (Oct. 2002)

- 2002 WL 32452563 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion for Summary Judgment of Non-Infringement (Sep. 26, 2002)

- 2002 WL 32452568 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for Summary Judgment of Non-Infringement (Sep. 26, 2002)

- 2002 WL 32682518 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for Summary Judgment of Non-Infringement (Sep. 26, 2002)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

• 2002 WL 32452554 (Trial Motion, Memorandum and Affidavit) Glenayre's Markman Brief on Claim Construction (Sep. 20, 2002)

• 2002 WL 32681586 (Trial Motion, Memorandum and Affidavit) Glenayre's Markman Brief on Claim Construction (Sep. 20, 2002)

• 2002 WL 32452534 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Combined Motion for Judgment on the Pleadings Against all Affirmative Defenses and for Summary Judgment of Patent Validity and Enforceability (Aug. 16, 2002)

• 2002 WL 32452545 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Mr. Jackson's Combined Motion for Judgment on the Pleadings Against all Affirmative Defenses and for Summary Judgment of Patent Validity and Enforceability (Aug. 16, 2002)

• 2002 WL 32452550 (Trial Motion, Memorandum and Affidavit) Mr. Jackson's Motion for Entry of Default Against Glenayre Electronics, Inc. (Aug. 16, 2002)

• 2002 WL 32682511 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Mr. Jackson's Combined Motion for Judgment on the Pleadings Against All Affirmative Defenses and for Summary Judgment of Patent Validity and Enforceability (Aug. 16, 2002)

• 2002 WL 32452529 (Trial Motion, Memorandum and Affidavit) Motion to Extend Discovery Deadline to Serve Limited Document Subpoenas on Third Party Customers of Glenayre (Aug. 09, 2002)

• 2002 WL 32452526 (Trial Pleading) Answer to Counterclaim (Aug. 08, 2002)

• 2002 WL 32682506 (Trial Pleading) Answer to Counterclaim (Aug. 08, 2002)

• 2002 WL 32682500 (Trial Motion, Memorandum and Affidavit) Glenayre's Response to Motion to File Surreply (Jun. 14, 2002)

• 2002 WL 32452523 (Trial Motion, Memorandum and Affidavit) Motion for Leave to File Surreply (Jun. 13, 2002)

• 2002 WL 32682493 (Trial Motion, Memorandum and Affidavit) Correction to Glenayre's Reply in Support of Motion for Reconsideration (Jun. 11, 2002)

• 2002 WL 32682491 (Trial Motion, Memorandum and Affidavit) Glenayre's Reply in Support of Motion for Reconsideration (Jun. 10, 2002)

• 2002 WL 32452518 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Glenayre's Motion to Stay and Enjoin (May. 09, 2002)

• 2002 WL 32682485 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Glenayre's Motion to Stay and Enjoin (May. 09, 2002)

• 2002 WL 32682478 (Trial Pleading) Answer and Counterclaim of Philip Jackson (Apr. 15, 2002)

• 2002 WL 32682471 (Trial Motion, Memorandum and Affidavit) Reply in Support of Motion to Dismiss (Mar. 05, 2002)

• 2002 WL 32682468 (Trial Motion, Memorandum and Affidavit) Response to Motion to Dismiss (Feb. 26, 2002)

• 2002 WL 32452517 (Trial Motion, Memorandum and Affidavit) Jackson's Motion to Dismiss or Stay (Feb. 04, 2002)

• 2002 WL 32682462 (Trial Pleading) Complaint (Jan. 10, 2002)

• 1:02CV00256 (Docket) (Jan. 10, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
2004 WL 1656547 (N.D.Ill.)
(Cite as: 2004 WL 1656547 (N.D.Ill.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
LAMPI CORPORATION, an Alabama corporation,
Plaintiff,
v.
AMERICAN POWER PRODUCTS, INC., a
California corporation, Defendant.
No. 93 C 1225.

July 22, 2004.

Michael Ridgeway Hull, Hill & Simpson, Daniel J. O'Connor, Philip J. Zadeik, Baker & McKenzie, Chicago, IL, for Plaintiff.

American Power Products, Inc., Afzal Hussain, Chino, CA, pro se.

Charles W. Shifley, Timothy C. Meece, Banner & Witcoff, Ltd., Robert Morton Ward, Hill & Simpson, Robert J. Crawford, J. Bradford Leaheey, Barry D. Blount, Daniel Foster Coughlin, Howrey Simon Arnold & White, LLP, Edward W. Remus, McAndrews, Held & Malloy, P.C., David L. Witcoff, Joseph P. Reagen, Gardner Carton & Douglas LLP, Ronald B. Coolley, Stephen Gary Rudisill, Keith Carter Hannigan, Jenkens & Gilchrist, Chicago, IL, G. Keith deBrucky, Placentia, CA, for Defendant.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.

*1 This matter is before the Court on the issue of damages in light of our February 12, 2003 ruling in which we concluded that defendant American Power Products, Inc.'s 5-piece flourescent night-light literally infringes claim 11 of plaintiff Lampi Corporation's U.S. Patent No. 5,169,227 and that claim 11 is not invalid for obviousness under 35 U.S.C. § 103. For the following reasons, we award Lampi $202,535.50 in damages plus prejudgment interest.

BACKGROUND

For a history of the facts and legal issues involved in this dispute, please see Lampi Corp. v. American Power Products, Inc., 2003 WL 732338 (N.D.Ill. Feb.14, 2003); Lampi Corp. v. American Power Products, Inc., 228 F.3d 1365 (Fed.Cir.2000); Lampi, LLC v. American Power Products, Inc., 65 F.Supp.2d 757 (N.D.Ill.1999); Lampi Corp. v. American Power Products, Inc., 1997 WL 392239 (N.D.Ill. July 8, 1997); Lampi Corp. v. American Power Products, Inc., 1995 WL 723764 (N.D.Ill.Dec.5, 1995); Lampi Corp. v. American Power Products, Inc., 1994 WL 501996 (N.D.Ill. Sept.12, 1994). For purposes of this opinion, we will assume familiarity with these prior rulings.

Originally, Lampi Corporation accused two configurations of night-lights sold by American Power Products ("APP") as infringing claims of Lampi's U.S. Patent No. 5,169,227 (the " '227 patent"). In our opinion of August 31, 1999, we concluded, after the benefit of a bench trial, that APP had not infringed the asserted claims of Lampi's '227 patent. Additionally, we rejected APP's contention that the asserted claims were invalid.

Following the issuance of our opinion, the parties appealed to the Court of Appeals for the Federal Circuit. Thereafter, the Federal Circuit issued a ruling affirming in part, vacating in part and remanding this case for further proceedings consistent with its opinion. Specifically, the Federal Circuit affirmed our finding that the configuration of APP's 3-piece fluorescent night-light did not infringe any claim of the '227 patent. However, the Federal Circuit determined that our interpretation of the limitation "housing having two half-shells" in claim 11 was incorrect and that we should re-evaluate whether APP's 5-piece flourescent night-light actually infringed the '227 patent in light of the revised claim construction. In addition, the Federal Circuit instructed us to address APP's argument that claim 11 of the '227 patent is invalid for obviousness.

On remand from the Federal Circuit and after the parties submitted briefs and presented oral arguments, this Court entered a Memorandum, Opinion and Order on February 14, 2003 finding that APP's 5-piece fluorescent night-light infringed claim 11 of the '227 patent and that claim 11 is not obvious. We now must determine the amount of damages to be awarded Lampi to compensate for APP's sales of its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
2004 WL 1656547 (N.D.Ill.)
**(Cite as: 2004 WL 1656547 (N.D.Ill.))**

infringing 5-piece fluorescent night-light.

## DISCUSSION
### I. Spoilation of Evidence

Before resolving the issue of damages, however, we first must address Lampi's threshold argument that it is entitled to an adverse inference based on APP's alleged destruction of relevant sales records and summaries. Lampi asserts that it is entitled to an inference that the sales records, which were destroyed, would have been unfavorable to APP. Specifically, Lampi argues that it is entitled to a negative inference that fifty percent of APP's total sales post-July 1993 were the infringing configuration based on the alleged spoilation of the monthly sales records. We disagree.

*2 In *Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874 (Fed.Cir.1986), the Federal Circuit recognized that an adverse inference may be drawn when a party has destroyed evidence and that such spoilation of evidence was done in bad faith. 790 F.2d at 878. In *Eaton,* the defendants destroyed copies of certain documents. However, the originals had been previously produced during discovery. The Federal Circuit concluded that the test to determine when an adverse inference may be drawn does not apply when the evidence destroyed already had been produced. *Id.* The Federal Circuit recognized that the effect of the destruction of the copies was negligible because the original of the documents were, in fact, produced earlier in discovery. Moreover, the Federal Circuit pointed out that the plaintiff had not shown that the documents would have been critical or controlling on the issue of liability.

Similarly, in this case, APP has produced the underlying raw data, including the original invoices, from which APP's sales by model number for the relevant damages period can be calculated. Thus, the effect of the destruction of certain summary sales reports is negligible. Indeed, we believe that Lampi would not have relied upon only the summary sales reports to quantify APP's sales but instead would have reviewed and analyzed the underlying raw data, which was produced, to calculate APP's sales. In addition, Mr. Kessler, APP's former vice-president of sales and marketing, testified that the monthly sales reports, which were destroyed, were summary reports and not accurate.

Based on the record before us, this Court finds, as a matter of fact, that APP did not willfully destroy any sales records, and we also do not believe that the reports were discarded in bad faith. Thus, we will not grant Lampi any relief based on the alleged spoliation of evidence, and we conclude that Lampi is not entitled to any adverse inference in its damages calculations.

### II. Lost Profits

Lampi argues that this Court should award lost profits for APP's sales of its infringing 5-piece flourescent night-light. Section 284 of title 35 of the United States Code provides:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 284. Beyond a reasonable royalty, a patentee may seek lost profit damages for infringement. To recover lost profits, Lampi must show "causation in fact, establishing that but for the infringement, [it] would have made additional profits." *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1349 (Fed.Cir.1999). Lampi bears the burden of proving lost profits by a preponderance of the evidence. *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1029 (Fed.Cir.1996).

Lampi proposes three theories under which it is entitled to recover lost profits. Lampi first asserts that it competed with APP in a two-supplier market and that it is entitled to an inference of "but for" causation. To establish lost profits under a two-supplier theory, Lampi must show: (1) the relevant market contains only two suppliers; (2) its own manufacturing and marketing capability to make sales that were diverted to the infringer; and (3) the amount of profit it would have made from these diverted sales. *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed.Cir.2003). Lampi's second theory is the *Panduit* test in which a court may infer "but for" causation if a patentee proves: (1) demand for the patented product; (2) an absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) quantifiable profits. *Panduit Corp. v. Stahlin Bros. Fibreworks, Inc.*, 575 F.2d 1152 (6th Cir.1978). The Federal Circuit recently reconciled the two-supplier test with the *Panduit* test finding that "[i]n essence, the two-supplier market test collapses the first two *Panduit* factors into one 'two suppliers in the relevant market' factor." *Micro Chem., Inc.* 318 F.3d at 1124.

*3 Applying these theories to the facts at issue in this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

case, we are not persuaded that Lampi and APP competed in a two-supplier market or that Lampi can satisfy its claim for lost profits under the remaining factors of the *Panduit* test. Indeed, Lampi overlooks the fact that countless other night-lights, albeit non-flourescent night-lights, were available on the market prior to 1993 and then after 1993, the record shows that there were other flourescent light-lights available in the market. Lampi also ignores the availability of APP's non-infringing alternative the 3-piece style lamp, which became available on the market sometime in mid-1993. Moreover, we are not convinced, based on the record before us, that Lampi had the manufacturing and marketing capability to make APP's infringing sales. Thus, Lampi cannot establish by a preponderance of the evidence that it should be awarded lost profits under either a two-supplier market theory or pursuant to the *Panduit* factors.

Lampi's third lost profits theory is premised on an alleged market share analysis. Lampi seeks lost profits on a market share basis from July 1993 through 1998. In its analysis, Lampi considers only the sales of APP and Lampi and does not include the market share of General Electric, U.S. Energy or any other flourescent night-light sellers. Indeed, Lampi admitted at trial that it was not introducing any evidence regarding the sales volume of any other flourescent night-light seller. Because Lampi's market share calculations do not recreate sales from the entire marketplace from July 1993 through 1998, these calculations are not based on a sound factual or economical predicate required to establish "but for" causation. *See Grain Processing*, 185 F.3d at 1350. Thus, Lampi's market share analysis is fatally flawed, and therefore, Lampi cannot show "but for" causation. For all of these reasons, we conclude that Lampi is not entitled to recover lost profits.

III. Reasonable Royalty

Because Lampi failed to carry its burden of establishing lost profits, we will award Lampi a "reasonable royalty for the use made of the invention." 35 U.S.C. § 284. The methodology for arriving at a reasonable royalty is left to the court's discretion. *SmithKline Diagnostics Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1164 (Fed.Cir.1991). However, before the Court addresses the issue of what the royalty should be, we must first determine the recovery period and the number of infringing sales.

A. Recovery Period

The first issue to consider in calculating Lampi's damages is to determine the appropriate period of recovery. The '227 patent issued on December 8, 1992. Lampi is an exclusive licensee of the '227 patent in the United States. When a patentee, or its licensee, manufactures a patented product but does not prove that the product was marked with the patent number, § 287 bars any recovery of damages prior to the date the infringer was "notified of the infringement." 35 U.S.C. § 287. Lampi, a licensee of the '227 patent, did not introduce any evidence at trial that the patented night-lights were marked with the patent number. Thus, damages may not be recovered before the date APP received notice of infringement.

*4 The only evidence in the record of when APP was potentially notified of the alleged infringement is a December 17, 1992 letter counsel for Lampi sent to Mr. Wasif Siddiqi, president of APP. The letter enclosed a copy of the '227 patent and explained that Lampi was "studying this patent in connection with potential infringement of one or more of the claims thereof by products sold by your company, American Power Products, specifically, your plug-in type fluorescent lamp." A copy of the patent was included with this letter. Lampi argues that this letter is sufficient to constitute notification of potential infringement as required by § 287. We disagree.

Although APP received this letter from Lampi about its concern of potential infringement, the actual notice requirement of § 287(a) is satisfied only "when the recipient is informed of the identity of the patent and the activity that is believed to be an infringement, accompanied by a proposal to abate the infringement, whether by license or otherwise." *SRI International, Inc. v. Advanced Technologies Laboratories, Inc.*, 127 F.3d 1462, 1470 (Fed.Cir.1997). In this case, the notice did not come from the patent holder but rather from Lampi as a licensee of the patent. In *Lans v. Digital Equipment Corp.*, 252 F.3d 1320 (Fed.Cir.2001), the Federal Circuit reiterated that "actual notice under § 287(a) 'must be an affirmative act on the part of the patentee which informs the defendant of infringement.' " 252 F.3d at 1327-28, quoting *Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed.Cir.1994). In addition, the letter only states that Lampi is investigating the possibility of infringement. Lampi does not identify any specific activity much less any specific accused product or products that are believed to be infringing nor does it contain a specific charge of infringement. Finally, the letter does not contain any proposal to abate the alleged potential

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

infringement.

Based on Federal Circuit precedent, it is the conclusion of this Court that the letter Lampi sent to APP on December 17, 1992 is not sufficient to trigger notification as required by § 287. Thus, Lampi cannot recover any damages for APP's sales of infringing lamps prior to February 26, 1993, which is the date on which Lampi filed the present action. *See* 35 U.S.C. § 287 ("Filing an action for infringement shall constitute such notice.").

B. Number of Infringing Sales

Next, the Court must determine how many infringing night-lights were sold after February 26, 1993. After this Court issued its opinion finding infringement, we invited briefing on the issue of damages. In its damages submissions, Lampi argues that it is entitled to an adverse inference that fifty percent of APP's total sales were infringing. However, as stated above, we have concluded that Lampi is not entitled to any adverse inference based on its allegations that APP destroyed evidence. Thus, we must determine how many units APP actually sold of its infringing 5-piece flourescent night-light.

*5 Lampi did not propose any number of infringing sales based on model number to differentiate between infringing units and non-infringing units sold. Instead, Lampi simply calculated APP's total sales of its night-lights (both infringing and non-infringing models) and decreased that number by fifty percent as its proposal for the number of infringing sales of the 5-piece night-light. However, we have rejected this calculation.

The only evidence in the record of the number of infringing sales based on unit or model number are those calculations proposed by APP. Lampi argues that we should reject APP's calculations because they rely on evidence that is not part of the record. Yet, we specifically requested that the parties submit materials to support their damages calculations. Indeed, the Court as well as the parties acknowledged that, if there were a finding of infringement, then additional evidence would have to be submitted for the damages calculations. Moreover, the evidence that Lampi relies upon to support its number of total sales is the same trial exhibits and underlying documents that APP uses to support its calculations of actual infringing units.

Lampi seeks damages for APP's sales of Model Number 3311, 3411, 3344, 4444, 5522, 5533, 5544, 5555, 5566, 5577, 5588, and 5599. APP, however, asserts that there is no evidence in the record regarding the configuration of APP's Model Numbers 3311 and 3411 and further argues that Model Numbers 3311 and 3411 night-lights had the non-infringing configuration. Lampi does not dispute or contradict these assertions. Therefore, our damages calculations will be limited to sales of APP's 5-piece night-lights under Model Numbers 3344, 4444, 5522, 5533, 5544, 5555, 5566, 5577, 5588, and 5599.

Both Lampi and APP point to and rely upon Exhibits 16 and 56-B in their damages presentations to support their position for the damages calculations and the number of APP's infringing sales. Our review of these documents reveals that APP's sales by model number for February 1993 through June 1996 may be ascertained from documents produced by APP during discovery (AP10202-AP10205), which are the underlying documents from which Exhibit 16 was created, and APP's sales by model number from July 1996 through trial can be found in Exhibit 56-B and its underlying documents. It is significant to note that Exhibit 56-B was created by Lampi's own damages expert after he inspected APP's invoices and then complied a spreadsheet of information that itemized sales and pricing information from those invoices and that Lampi relies upon this exhibit and the underlying documents to support its proposed number for APP's total sales. Exhibit 56-B was created from that summary of APP"s invoices and the data contained in Exhibit 16. Indeed, APP accepted a stipulation at trial that Lampi's expert would testify as to this tabulations and that his work was accurate subject to a post-trial deposition of Mr. Egan and a decision by APP on whether cross-examination is needed.

*6 Based on Exhibits 16 and 56-B, APP has submitted that the Court should calculate Lampi's damages based on a total of 405,071 infringing sales since the filing of the lawsuit on February 26, 1993. Based on the record before us and the materials submitted to the Court to support the parties' proposed damages calculations, we adopt APP's proposed number of 405,071 units as the number of APP's infringing sales.

C. Amount of the Royalty

A royalty may be based upon an established royalty, if there is one, or if not, upon the result of hypothetical negotiations between the plaintiff and defendant. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed.Cir.1995) (en banc). There is not an established royalty rate in this case. Thus, to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1656547 (N.D.Ill.)
(Cite as: 2004 WL 1656547 (N.D.Ill.))

Page 5

determine a reasonable royalty, we must analyze the results of a hypothetical negotiation between APP and Lampi, which is an exercise in abstraction that "requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began." Rite-Hite Corp., 56 F.3d at 1554. Although performing this hypothetical analysis under 35 U.S.C. § 284 necessarily involves some measure of extrapolation and prediction, it nonetheless must rest on "sound economic and factual predicates." Riles v. Shell Exploration and Prod. Co., 298 F.3d 1302, 1311-1312 (Fed.Cir.2002). That said, a wide range of factors can be relevant to such a hypothetical negotiation. See, e.g., Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1393 (Fed.Cir.2003); TWM Mfg. Co., Inc. v. Dura Corp., 789 F.2d 895, 898 (Fed.Cir.1986); Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y.1970).

As an initial matter, we note for the record that Lampi has suggested a $1.00 per unit royalty while APP has proposed a $.20 per unit royalty. A reasonable royalty is the amount that a person or company desiring to sell the patented product would be willing to pay as a royalty and still be able to sell the patented product at a reasonable profit. Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc., 750 F.2d 1552, 1568 (Fed.Cir.1984). In this analysis, we also consider some of the Georgia Pacific factors, including, among others: (1) the relationship between the parties; (2) Lampi's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention; (3) the duration and term of the patent; (4) the utility and advantages of Lampi's night-light and the nature of the invention and its commercial embodiment; and (5) the extent of use of the invention and the value of that use. Georgia-Pacific Corp., 318 F.Supp. at 1120. Based on these factors and the hypothetical negotiations that this Court assumes would have occurred in December 1992, we have determined that the parties would have negotiated a royalty of $.50 per unit.

Lampi argues that APP would have been in a desperate situation during negotiations and that APP would not have had much leverage. However, at the time of the hypothetical negotiations, APP already had its non-infringing 3- piece night-light under development. Thus, it is this Court's belief, based on the record before us, that APP would have been in a stronger position to negotiate a lower royalty. Zygo Corp. v. Wyko Corp., 79 F.3d 1563, 1571-72 (Fed.Cir.1996) ("Wyko would have been in a stronger position to negotiate a lower royalty rate knowing it had a competitive non-infringing device 'in the wings.' "). Indeed, Mr. Hussain testified that APP would have stopped production rather than pay a royalty of more than $.15 based on the fact that APP was developing a non-infringing alternative. Given this backdrop, we do not believe that APP would have agreed to a $1.00 per unit, but rather only would have agreed to pay a lesser amount to Lampi until its non-infringing unit became available on the market.

*7 In addition, the evidence illustrates that Lampi's patented night-light did not offer any greater functional or utilitarian advantages over other flourescent night-lights, including APP's products. Demand for APP"s non-infringing 3-piece night-light was strong, and there was no evidence presented that Lampi's patented night-light had any performance advantage over APP's non-infringing product. Moreover, because APP had a non-infringing alternative, its use of Lampi's invention was limited. After the '227 patent issued and APP's non-infringing product became available on the market, the value of the APP"s use of the invention diminished, and APP had no need to continue producing its infringing product. These considerations also weigh heavily in favor of a lower royalty rate.

However, we believe that APP's proposed rate of $.15 per unit royalty is too little. There is no evidence that Lampi had entered into any other licensing agreement for the flourescent night-light, and APP was selling its night-light at more than two dollars below Lampi's price. A royalty of $.15 per unit would have been insignificant under the circumstances. In addition, APP was selling its infringing night-light at the time Lampi's patent issued. Therefore, at the time of the hypothetical negotiation, the parties would have been considering a license for the full seventeen years of the life of the patent. APP would not have been able to use the negotiation tactic of threatening to wait until the patent expired to continue its sales of the infringing night-light. Thus, we believe that the Lampi would not have agreed to APP's proposed royalty of $.15 and would have been able to negotiate a higher rate. Based on the evidence presented to us at trial and in the materials submitted to us for the damages calculations, we conclude that a $.50 per unit royalty is reasonable and based on sound economic and factual predicates.

IV. Wilful Infringement, Enhanced Damages and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Attorneys' Fees

Lampi also requests that the Court enhance damages and award attorneys' fees. The patent statute authorizes a district court to "increase damages up to three times the amount found or assessed," 35 U.S.C. § 284, and "in exceptional cases [to] award reasonable attorney's fees to the prevailing party," 35 U.S.C. § 285. The party seeking an exceptional case status has the burden of proving that its case is exceptional by clear and convincing evidence. *Badalamenti v. Dunham's Inc.*, 896 F.2d 1359, 1364 (Fed.Cir.1990).

Circumstances that support a finding of an exceptional case include inequitable conduct in the procurement of a patent, willful infringement, misconduct during litigation, vexatious or unjustified litigation, or a frivolous suit. *Standard Oil Co. v. American Cynamid Co.*, 774 F.2d 448, 455 (7th Cir.1985). Willfulness is shown when, upon consideration of the totality of the circumstances, clear and convincing evidence establishes that the infringer acted in disregard of the patent, and that the infringer had no reasonable basis for believing it had a right to engage in the infringing acts. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1354 (Fed.Cir.1999). An inference of bad faith may be found through wrongful intent, recklessness, or gross negligence. *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed.Cir.1990). Enhanced damages have been awarded when a party is found to have willfully infringed or to have acted in bad faith. *See Electro Med. Sys., S.A. v. Cooper Life Scis, Inc.*, 34 F.3d 1048, 1056 (Fed.Cir.1994). "The paramount determination ... is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Id*.

*8 Based on the totality of the circumstances, it is the opinion of this Court that APP had a good faith belief in the reasonableness of its defense of non-infringement and that there was little, if any, evidence of wilfulness or bad faith sufficient to meet the criterion of "exceptional case" or to warrant the award of attorneys' fees. Indeed, in our previous opinion, we recognized that "this was a close call and there were strong arguments on both sides." *Lampi,* 2003 WL 732338, at *6. Thus, we decline to enhance damages or award attorneys' fees in this case.

V. Prejudgment Interest

Finally, there is the matter of prejudgment interest. Prejudgment interest is appropriate pursuant to 35 U.S.C. § 284, and the parties do not dispute that prime rate is appropriate in this case. *See Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir.1989) ("For the future, we suggest that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate."). However, Lampi argues that the prejudgment interest should be compounded monthly while APP asserts that interest should be compounded annually. Whether interest should be compounded is left to the discretion of the Court. *Bio-Rad laboratories, Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed.Cir.1986). We agree with the parties that prejudgment interest should be awarded at the prime rate, and we find that the interest should be compounded monthly. *Cf. Mendenhall v. Barber-Greene Co.*, 1990 WL 156519, at *3 (N.D.Ill. Oct.5, 1990). Thus, we conclude that prejudgment interest should be awarded on the total damages at the prime rates charged monthly by banks, with the interest compounded monthly.

CONCLUSION

For all of the foregoing reasons, we award Lampi $202,535.50 in damages plus prejudgment interest. The parties are ordered to submit calculations for prejudgment interest and any claims for costs on or before August 20, 2004.

It is so ordered.

2004 WL 1656547 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 1:93CV01225 (Docket) (Feb. 26, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.