# EXHIBIT 3

LEXSEE 1995 U.S. DIST. LEXIS 22397

CODE-ALARM, INC., Plaintiff and Counter-Defendant, v. ELECTROMOTIVE TECHNOLOGIES CORPORATION and DIRECTED ELECTRONICS, Defendants and Counter-Plaintiffs.

Civil No. 87-74022

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

*1995 U.S. Dist. LEXIS 22397*

April 28, 1995, Decided
April 28, 1995, Filed

**SUBSEQUENT HISTORY:** Affirmed by *Code-Alarm, Inc. v. Electromotive Techs. Corp.*, 114 F.3d 1206, 1997 U.S. App. LEXIS 20409 (Fed. Cir., 1997)

**PRIOR HISTORY:** *Code-Alarm, Inc. v. Electromotive Technologies Corp.*, 1993 U.S. App. LEXIS 22550 (Fed. Cir., Sept. 2, 1993)

**DISPOSITION:** Judgment entered awarding Defendant damages, costs, and attorneys fees.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The Court of Appeals for the Federal Circuit reversed a predecessor judge's finding that plaintiff had not infringed a patent for a motion sensitive security system. On remand, the court referred the case to a special master who conducted a trial on the issue of damages and filed a report containing recommendations. Plaintiff and defendants filed objections.

**OVERVIEW:** The special master recommended that the "entire market value rule" be applied in computing damages using a reasonable royalty rate of 2-1/2 percent. The court determined that the special master's finding that the infringing shock sensor was the most important component of plaintiff's security systems and that no acceptable non-infringing sensor was available was clearly not erroneous. The bottom line was to award damages to compensate for infringement and the court was satisfied that the combination of the royalty base and the royalty rate accomplished that objective. As to willfulness, the court ruled that the special master's finding as to the date that enhancement began was clearly erroneous. Plaintiff's conduct in manufacturing and selling the infringing sensor, once it learned of the patent at issue, was unreasonable and hence willful. Noting that the record was replete with evidence of misconduct by plaintiff in the manner in which it litigated the case, the court concluded that the special master's findings supported his recommendation to award reasonable attorney's fees.

**OUTCOME:** The court upheld the special master's finding with respect to the rule to be applied in computing damages, determined that the special master's finding as to the date enhancement began was clearly erroneous, directed that pre-judgment interest be computed at the rate of prime plus two percent, and upheld the special master's recommendation as to attorney's fees.

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Special Masters*
[HN1] The Court is obligated to accept a special master's findings of fact unless clearly erroneous. *Fed. R. Civ. P. 54(d)(2)*.

**COUNSEL:** [*1] JOHN G. CHUPA, General Counsel, CODE-ALARM, INC., Madison Heights, MI. RAYMOND SCOTT, HOWARD & HOWARD, Bloomfield Hills, MI, Attorneys for Code-Alarm.

Case 1:97-cv-00550-SLR     Document 1426-10     Filed 06/08/2005     Page 3 of 10

Page 2
1995 U.S. Dist. LEXIS 22397, *

ERNIE L. BROOKS, KEVIN J. HEINL, Brooks & Kushman, P.C., Southfield, MI. DANIEL J. O'CONNOR, DAVID I. ROCHE, Baker & McKenzie, Chicago, IL, Attorneys for Directed.

ROBERT E. STRAUSS, PLANTE STRAUSS & VANDERBURGH, Santa Ana, CA, Attorneys for Electromotive.

**JUDGES:** AVERN L. COHN, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** AVERN L. COHN

**OPINION:**

I. Introduction

This is a patent case, addressing U.S. Patent Number 4,584,569 (the '569 patent), issued on April 22, 1986 to Michael J. Lopez, Howard A. Williams, Jr., and Henry J. Salvator for a Motion Sensitive Security System, and subsequently assigned to defendant/counter-plaintiff Electromotive Technologies, Inc. (Electromotive). On July 28, 1992, the Court (a predecessor judge) found the '569 patent valid and not infringed by plaintiff/counter-defendant Code-Alarm, Inc. (Code). On September 2, 1993, the Court of Appeals for the Federal Circuit, in an unreported decision (Case No. 92-1537), reversed the finding of non-infringement. The validity finding was not appealed. On February 1, 1994, the [*2] Court referred the case to a special master for a report and recommendation on the issue of damages. The special master, on July 22, 1994, after a multi-day trial, recommended (1) the application of the "entire market value rule" and a royalty of 2 1/2 % of plaintiff's net sales of shock sensors sold alone and as a part of vehicle security systems from the on-set of infringement in 1986 through March, 1994; (2) a finding that plaintiff was guilty of willful infringement and misconduct and an award of treble damages on plaintiff's sales from April, 1982 through March, 1994; (3) an award of pre-judgment interest on the compensatory damages; and (4) because of willful infringement and misconduct during litigation, an award of the reasonable attorney fees incurred from April, 1992 to the present. n1 For reasons not fully explained, the special master did not recommend a dollar amount of net sales to constitute the royalty base, or the rate of pre-judgment interest. All of the parties took exception to the special master's recommendations and accompanying report.

> n1 Defendant/counter-plaintiff Directed Electronics, Inc. (Directed), who was given an exclusive license by Electromotive was allowed to intervene on February 2, 1994. Review of the papers relating to Directed's effort to intervene suggests its interest was to assure the issuance of the permanent injunction against infringement and nothing more. The special master recommended that compensatory damages, treble damages, and attorney's fees be awarded separately to Directed for the period of its license. No useful purpose would be served by the Court's dividing damages between Electromotive and Directed and, therefore, separate amounts will not be stated.

[*3]
In mid-January the Court conducted a hearing on the objections to the special master's report and recommendation, and took testimony on the issue of royalty base and pre-judgment interest. The amount of attorney fees was still open at the conclusion of the hearing. The hearing was largely mooted when the parties came to agreement on the royalty base and its components after considerable urging by the Court.

Now before the Court for decision after further briefing are the issues of the "entire market rule," willfulness, the period of enhancement, and the rate of pre-judgment interest. None of the parties have taken exception to the Court's announced intention at the conclusion of the hearing not to compound pre-judgment interest and to use a factor of 1.5 as the multiplier for willfulness.

For the reasons which follow, the Court finds:

1. The "entire market value rule" is appropriate, so the reasonable royalty of 2-1/2 % shall be applied to net sales of sensors sold alone and as a part of vehicle security systems sold from the on-set of infringement in 1986 through March, 1994. n2

> n2 Beginning April 1, 1994, Code changed the design of its sensor to avoid the injunction against infringement entered on February 14, 1994. The design around effort is the subject of a supplemental complaint filed by Electronics and Directed. Hopefully the parties are conscious of the observation in *American Graphophone Co. v. Leeds & Cotten Co., 170 F. 327, 329 (2nd Cir. 1909)*, "Even patent litigation must end somewhere."

[*4]
2. Code was guilty of willful infringement from November, 1990 forward, so the compensatory damages

Case 1:97-cv-00550-SLR    Document 1426-10    Filed 06/08/2005    Page 4 of 10

Page 3
1995 U.S. Dist. LEXIS 22397, *

awarded for the period November, 1990 to March, 1994 shall be multiplied by a factor of 1.5. Code was also guilty of misconduct on frequent occasions during the course of the case.

3. Pre-judgment interest should be computed at the rate of prime plus 2 %.

4. Electromotive is entitled to reasonable attorney's fees from the inception of the case through March, 1994 with the exception of the attorney's fees directly related to the aborted first trial caused by the death of the then trial judge.

5. Directed is not entitled to attorney fees.

II. n3

> n3 In the discussion which follows the parties should bear in mind that the Court by and large adopts the special master's findings and conclusions as its findings and conclusions. The special master did a good and thorough job. [HN1] The Court is obligated to accept the special master's findings of fact unless clearly erroneous. *Fed. R. Civ. P. 54(d)(2)*. Except as to the date which willful infringement began and the date from which attorney's fees should be computed, there is no finding of fact of the special master which is clearly erroneous.

[*5]

Reasonable Royalty

A.

The special master, as noted above, recommended that the "entire market value rule" be applied in computing damages using a reasonable royalty rate of 2-1/2 %. Plaintiff's arguments against the recommendation are not persuasive. The special master found that the infringing shock sensor was the most important component of plaintiff's security systems and that no acceptable non-infringing sensor was available. This finding is not clearly erroneous, and is amply supported by the special master's particular findings. The particular findings need not be repeated here. Plaintiff's argument that the "entire market value rule" is applicable only in a lost profits computation is plain wrong. In *Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116, 1131 (S.D.N.Y. 1970)*, aff'd. *446 F.2d 295 (2d Cir. 1971)*, the seminal case on what is a reasonable royalty, the Court said:

> The Court finds that, at the time of the hypothetical negotiations, GP would reasonably have expected to derive substantial additional profits from collateral sales of other products (particularly non-specialty items) sold along with its striated fir [*6] plywood, a specialty item. . . . This is a significant factor to be considered by the Court in determining the reasonable royalty because it has the logical tendency, as a matter of simple economics, to increase the amount of the reasonable royalty.

In *Deere & Company v. International Harvester Company, 1982 U.S. Dist. LEXIS 10155, 218 U.S.P.Q. 403 (S.D. Del. 1982)*, aff'd *710 F.2d 1551 (Fed. Cir. 1983)*, the district court found that a 15 % royalty rate on net sales of corn heads which were used with corn combines was reasonable. The high royalty rate was based in part on the district court's finding that the corn head "created a vast additional market for combines," *218 U.S.P.Q. at 405*, and that the infringer "should have been willing to pay a very substantial percentage of net sales royalty, even exceeding its expected profit on corn heads to protect its combine sales and profits." *218 U.S.P.Q. at 407* (emphasis added).

If the Court were to reduce the royalty base by excluding the dollar value of non-infringing components of the infringing sensors, the 2-1/2 % royalty rate would have to be raised, because the damages [*7] award must take into account the increased collateral sales of non-infringing items attributable to the infringement. In the circumstances here, as described by the special master, the bottom line is "awarding damages to compensate for infringement" and the Court is satisfied that the combination of the royalty base and the royalty rate accomplishes that objective. In other words, there is a relationship between royalty rate and royalty base, and one cannot be considered without the other. The special master's recommendation balances the two appropriately.

B.

While the Court initially thought there was merit in the argument that the royalty base should be reduced by one-third to give weight to Electromotive's expert's view that plaintiff was entitled to consideration of the "other good features" in its system, the Court is now satisfied that such is not the case. The expert was also of the view that the reasonable royalty rate should be 10 %. The special master heard the experts' testimony and implicitly found there should be no reduction in the royalty base. For the Court to say otherwise would be tantamount to a finding that the special master's view was clearly erroneous. This [*8] the Court cannot say.

III.

Willful Infringement

As to willfulness, the special master was too generous in his recommendation that enhancement begin in April, 1992. This finding is clearly erroneous. By November, 1990 plaintiff had no comfortable reason to believe it could continue to manufacture and sell the infringing sensor without risking a likely finding of infringement. All that plaintiff had to go on at that time was its president's emotional belief that he could win in Court. In October, 1987, plaintiff received an opinion that the '569 patent might be invalid. After the aborted first trial and the unsuccessful effort at reexamination by the Patent Office, there was no longer any reasonable basis for the view that the '569 patent would be held invalid.

The same October, 1987 opinion stated that plaintiff's sensor infringed the '569 patent. Plaintiff at no time subsequent had any basis to form a belief otherwise. In November, 1990, plaintiff was again told that it was infringing the '569 patent. The fact that the Court found otherwise following trial is of no moment. That finding was reversed and offers no basis for arguing that infringement was not willful. There is simply [*9] nothing in the record that remotely suggests plaintiff's conduct, once it learned of the '569 patent, was not willful as to infringement. Giving plaintiff the benefit of a doubt, there was initially some modest basis for a reasonable belief that the '569 patent might be held invalid. The reasonableness of that belief expired with the reexamination determination. From thereon plaintiff's conduct in manufacturing and selling the infringing sensor was unreasonable and hence willful. See *Electro Medical Systems S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1056 (Fed. Cir. 1994)* ("Willfulness is shown when . . . the infringer had no reasonable basis for believing it had a right to engage in the infringing acts."); *Westvaco Corp. v. International Paper Co., 991 F.2d 735, 743 (Fed. Cir. 1993)* (stating that infringer's belief in invalidity or noninfringement must be reasonable to avoid enhancement); *Read Corp. v. Portec, Inc., 970 F.2d 816, 826-827 (Fed. Cir. 1992)* (concluding that "the paramount determination in deciding to grant enhancement . . . is the egregiousness of the defendant's conduct based on all the facts and circumstances"). [*10]

IV.

Pre-Judgment Interest

The rate at which prejudgment interest is to be computed is a discretionary matter. Initially, the Court was of the view the rate should be prime, and simple rather than compound. In its post-hearing papers, Electromotive called the Court's attention to the fact that in prior cases the Court set the rate at prime plus 2 % simple. Consistency suggests the rate should be the same here. Accordingly, prejudgment interest shall be computed at the rate of prime plus 2 % simple. See Kearns v. Chrysler Corporation, Civil No. 82-70748 (Memorandum And Order of September 27, 1990).

V.

Attorney's Fees

A.

The record is replete with evidence of misconduct by plaintiff in the manner in which it litigated the case, and the special master's findings in this regard are not clearly erroneous. Plaintiff persistently attempted to revisit the issue of validity after the Court ruled otherwise, and plaintiff did not appeal. Plaintiff, following the special master's report and recommendation, endeavored to persuade the Court of a weak financial condition and an inability to pay any substantial damages. The fallaciousness of that position was exposed in the January hearing, [*11] particularly in light of plaintiff's stock buy-back program and extensions of bank credits at favorable rates after the Court of Appeals' finding of infringement. Plaintiff consistently attempted to argue irrelevancies such as the "code-learning" component of its security systems. Plaintiff stubbornly refused to stipulate to the components of the royalty base for the computation of damages and in the process denigrated its own exhibit Px144, which it at one time it agreed was accurate. See ETC's And Directed Notion Under *28 U.S.C. 1922* For Sanctions, filed March 6, 1995. The special master's report describes other instances of misconduct. Code, simply put, demonstrated little respect for the integrity of the patent litigation process.

B.

The matter of attorney's fees requires only a brief discussion. The finding of willfulness, coupled with the finding of misconduct, means that Code should bear Electromotive's attorney's fees reasonably incurred in the prosecution of the case. See *Beckman Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1551 (Fed. Cir. 1989)*; *35 U.S.C § 285*. The attorney's fees incurred for the [*12] aborted first trial are best left to each side given that the unfortunate circumstances which obtain were no one's fault. No good reason though has been shown to allow Directed attorney's fees. One firm of attorneys was sufficient to carry this day on liability and should have been enough to complete the case on damages. Directed's desire to participate in the damages phase is not a good reason to require Code to pay for that effort.

VI.

Conclusion

Case 1:97-cv-00550-SLR    Document 1426-10    Filed 06/08/2005    Page 6 of 10

Page 5
1995 U.S. Dist. LEXIS 22397, *

The parties should be able to agree on a final judgment on damages. Attorney's fees, if not agreed to, should be brought on for the Court's consideration by motion.

AVERN COHN

UNITED STATES DISTRICT JUDGE

DATED: April 28, 1995

Detroit, Michigan

Westlaw.

Not Reported in F.Supp.  
1996 WL 722007 (W.D.N.Y.)  
(Cite as: 1996 WL 722007 (W.D.N.Y.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, W.D. New York.  
John MICHAELS, Plaintiff,  
v.  
ART BETTERLEY ENTERPRISES, INC., Defendant.  
No. 90-CV-1015E(M).

Dec. 13, 1996.

James P. Renda, Renda, Pares & Pfalzgraf, Buffalo, NY, for plaintiff.

Peter K. Sommer, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, NY, for defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

ELFVIN, District Judge.

*1 Michaels, in this action brought under Title 35 of the United States Code, claims that Art Betterley Enterprises, Inc. ("Betterley, Inc.") was infringing his patent -- United States Patent No. 4,622,090 ("the Patent") -- and seeks damages therefor. Jurisdiction is bottomed on 28 U.S.C. § 1338(a) and venue is proper pursuant to 28 U.S.C. § 1400(b). Following a non-jury trial, this Court found Betterley, Inc. liable for such infringement and dismissed Michaels's Fourth Cause of Action seeking enhanced damages for alleged willful infringement as well as Betterley, Inc.'s two Counterclaims. Findings of Fact, Conclusions of Law and Order signed December 8, 1995 ("December 8 Order"), at 41. The damage portion of this lawsuit was tried before this Court April 8-9, 1996. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the following are this Court's Findings of Fact, Conclusions of Law and Order concerning damages.

Although familiarity with the prior proceedings is assumed, pertinent background facts will be briefly reviewed. On October 25, 1985 Michaels filed an application for a patent on a routing apparatus which could cut a V-shaped groove in veneers, plastic laminates and the like. December 8 Order, at 9. In December of that year Michaels and his partner [FN1] approached Arthur W. Betterley -- President of Betterley, Inc. -- regarding a potential licensing agreement for the router. Ibid. In June 1986 the parties entered into an agreement ("the Agreement") whereby Betterley, Inc. was granted the exclusive rights to manufacture, distribute, sell at wholesale or retail and promote the hand-held mitre-folding router. Ibid. The duration of the Agreement was to be five years -- unless Betterley, Inc. failed to pay Michaels twenty dollars for each router and ten percent of the wholesale price of each replacement cutting blade sold during any previous month -- with minimum royalty payments of $6,000 per year. Id., at 10. The Patent was issued to Michaels November 11, 1986. Ibid. Betterley, Inc. began to manufacture and sell the routers under the Agreement and properly paid the royalties pursuant such through May 1990. Ibid. Thereafter, Betterley, Inc. manufactured and sold 700 infringing routers. [FN2] In early 1993 Betterley, Inc. began to manufacture, distribute and sell a mitre-fold router which the plaintiff concedes does not infringe the Patent. December 8 Order, fn. 40.

FN1. Michaels's partner -- William G. Tucker -- holds no ownership interest in the Patent and is not a party to the proceedings.

FN2. The parties stipulated that, after it had stopped paying royalties in May of 1990, Betterley, Inc. manufactured and sold a total of 662 hand-held mitre-fold routers and a total of 38 stationary mitre-fold routers. Pre-Trial Statement, ¶ 12. Such were held to infringe on the Patent. December 8 Order, at 39-41.

During the damages trial Michaels introduced evidence that, in 1989, the Robert Bosch Power Tool Corporation ("Bosch") [FN3] expressed an interest in entering into a licensing or other marketing arrangement with him for his stationary mitre-fold router. Plaintiffs Exhibit TX ("TX") 63 and TX 64. However, after evaluating the product, Bosch determined that such was not feasible and elected not to pursue the stationary unit. TX 58, Deposition of Chris Carlson, Bosch Product Manager ("Carlson Dep"), pp. 19-20. Sometime between 1990 and early 1992 Michaels sent a hand-held mitre-fold router to Bosch which, after evaluating the router, determined

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:97-cv-00550-SLR    Document 1426-10    Filed 06/08/2005    Page 8 of 10

Not Reported in F.Supp.                                                                                     Page 2
1996 WL 722007 (W.D.N.Y.)
(Cite as: 1996 WL 722007 (W.D.N.Y.))

that, although the product did not meet Bosch's engineering or safety requirements and a number of changes and modifications to the product were recommended by its engineering department, it was interested in making a modified version of the product in-house. Carlson Dep, pp. 36-37. In a letter dated April 9, 1992 Carlson presented a "proposal" for Michaels's consideration by which Bosch sought virtually exclusive rights to the hand-held mitre-fold router [FN4] and desired to undertake all phases of the manufacturing in exchange for which it "would agree to pay [to Michaels] a royalty of $18 per complete [router] *** and $2 per cutter [blade] when sold as a separate component." Ibid. The letter also clearly advised Michaels that "this is not a formal offer" and that, if the basic terms were acceptable to him, the parties "would proceed with a formal contract *** which would require approval by Bosch ***." Ibid. In a letter dated May 18, 1992 Carlson repeated substantially the proposal contained in his April letter and added that "[c]urrent forecasts projection for the first year [[of sales] are 1500." TX 70. Therein Carlson requested that Michaels "consider *** this initial framework" and indicated that, if "the general points" were acceptable, "we will pursue the project with a formal cost analysis, submit [such] for staff approval, and if approved, a contract will be drawn up ***." Ibid. At this stage there were clearly several significant "steps to go" before a licensing agreement could be inferred, especially inasmuch as a "product design" had not even been finalized and Bosch had not yet performed an investigation into the scope of protections vel non provided by the Patent -- something it would have done had the negotiations further developed. Carlson Dep, pp. 77, 93. Carlson characterized the projected sales figure as "tentative" although certainly not random. Id., p. 96. Finally, in July 1992, Bosch's willingness to vigorously pursue a licensing agreement with Michaels became chilled due to the instant litigation "and the presence of a competitive version [of the router] on the market." Having viewed Carlson's video deposition testimony, this Court finds such unbiased and very credible.

> FN3. At trial there were references made to Robert Bosch Corporation, its affiliated company Robert Bosch Power Tool Corporation (also referred to as Robert Bosch Power Tool, Inc.) and a company named S-B Power tool company which was formed as a result of a joint venture pursued by Bosch and Skil Corporation. For the present purposes, all such entities are referred to herein simply as "Bosch".

> FN4. With the exception of a version manufactured by Michaels's own company, JCM Industries, Inc.

*2 Michaels also presented during the damages trial the expert testimony of Richard A. Shick, Ph.D. He based his testimony in part on reports prepared by John S. Murphy, Ph.D., who had been originally retained by the plaintiff as an expert but had died prior to trial. Both experts reviewed the Agreement between Betterley, Inc. and Michaels as well as the correspondence between Bosch and Michaels and determined that there were "two 'arms length' offers of royalty agreements" which represented "two instances of a 'willing buyer and willing seller.'" TX 73; TX 75. Such is simply not correct. There was no contract or near-contract between Bosch and Michaels, only preliminary discussions and negotiations. Both economists based their analysis in part on the incorrect assumption that Bosch had made an offer to Michaels in 1989. Such is directly in conflict with the testimony of Carlson, who indicated that Bosch had determined not to pursue the stationary model -- the only model under consideration at that time -- due to the difficulties the product had meeting Bosch requirements. Furthermore both economists, without credible justification, assumed that Bosch would have entered into an exclusive licensing agreement with Michaels but for Betterley, Inc.'s conduct. Such is conjectural. Finally, both experts presented damage calculations relying entirely upon the estimated sales figures of the stationary routers contained in correspondence dated 1989 which reflected a Bosch proposal which Carlson conclusively testified had been abandoned -- and therefore presented meaningless data -- and upon the tentative projected sales figures of the hand-held routers Carlson provided in his preliminary proposals. Such calculations are groundless and have no weight. Both experts purported to be following the "reasonable royalty approach" but based their calculations upon unsupported and speculative data. TX 73; TX 75. Moreover, for reasons which will become clear, their understanding and application of such approach is flawed. Finally, this Court finds that twenty dollars per router called for in the Agreement is a reasonable royalty inasmuch as it reflects an actual agreement and is a royalty rate which is substantially similar to but is nevertheless clearly more reliable than the tentative figures presented in the preliminary negotiations between Bosch and Michaels.

In the damage phase of a patent infringement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lawsuit, the analysis begins with 35 U.S.C. § 284 which states in part that, upon a finding of infringement, "the court shall award [the patentee] damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." A patent owner is to be fully compensated for any damages which he suffered as a result of the infringement. _General Motors Corp. v. Devex Corp., 461 U.S. 648, 654-655 (1983)_ ("_Devex_"); 35 U.S.C. § 284. The patentee is entitled to be placed in the pecuniary condition he would have enjoyed but for the defendant's infringement. _Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1064-1065 (Fed. Cir. 1983)_; _King Instruments Corp. v. Perego, 65 F.3d 941, 947-951 (Fed. Cir.), reh. den., reh. en banc declined, 72 F.3d 855 (1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1675 (1996)_. The infringer is liable for the patentee's economic injury that is an objectively reasonable and foreseeable consequence of the infringement. _Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1546-1547 (Fed. Cir.) (en banc), cert. denied, 516 U.S. 867, 116 S.Ct. 184 (1995)_. Damages may be determined using any method shown to be suitable under the particular facts and circumstances of the case and demonstrated to reliably and accurately measure such within a "reasonable probability". _King Instruments Corp._, at 952; _Minco, Inc. v. Combustion Engineering, Inc., 95 F.3d 1109, 1118 (Fed. Cir. 1996)_. Furthermore, "[o]nce a patentee shows causation, *** the trial court may resolve doubts underlying the precise measurement of damages against the infringer." _Ibid._ However, "[d]amage awards can not be based upon speculation or optimism, but must be [adequately] established by [[the] evidence" presented. _Hebert v. Lisle Corp., 99 F.3d 1109, 1119 (Fed. Cir. 1996)_. If the patent owner fails to sustain his burden to adequately establish by a preponderance of the evidence "actual or nearly actual damages," the court should award as minimum damages a reasonable royalty for the unauthorized use made of the patent. _Fromson v. Western Litho Plate and Supply Co., 853 F.2d 1568, 1574 (Fed. Cir. 1988)_; _Rite-Hite Corp._, at 1554 ("A patentee is entitled to no less than a reasonable royalty on an infringer's sales" if actual damages cannot be ascertained.). "Where an established royalty exists, it will usually be the best measure of what is a 'reasonable' royalty" for the purpose of calculating damages when the record does not permit actual damages to be credibly determined. _Nickson Industries, Inc. v. Rol Mfg. Co., Ltd., 847 F.2d 795, 798 (Fed. Cir. 1988)_; _Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320, 1328 (Fed. Cir. 1987)_ (It is reasonable to use an established royalty in arriving at a fair measure of damages to a patentee who has authorized the use of his patent.). [FN5]

> FN5. A variation from such established royalty rate may be equitable under appropriate circumstances -- _e.g._, when the evidence clearly shows that infringement of the patent at issue is or was so widespread that the pertinent royalty in the industry is artificially low (_Nickson Industries, Inc._, at 798) or when it is clear that probable or threatened litigation over the patent strongly influenced the terms of licensing agreements actually entered into (_Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078 (Fed. Cir. 1983)_); however such or similar exceptional circumstances warranting departure from the royalty rates presented at trial were not demonstrated to be present in this case, especially in light of the fact that both parties presented royalty rates which were substantially similar.

*3 Both parties urge this Court to use the statutorily enunciated reasonable royalty approach to determine damages. However, the plaintiff insists that this Court should ultimately calculate such reasonable-royalty damages using the tentative figures extracted or derived from the preliminary negotiations between Bosch and Michaels. Such proposition is more closely akin to and more properly characterized as a disguised request for speculative consequential lost profits. Bosch clearly represented that it had no desire to pursue Michaels's stationary mitre-fold router and -- although it initially expressed an interest in the hand-held version -- Carlson indicated that Bosch had never gone beyond the early process of discussing the general ground work to determine the viability of further negotiations regarding the hand-held router. In such context, the terms, figures, projections and forecasts extracted from the correspondence between Michaels and Bosch do not represent the type of data from which reliable and reasonably probable actual damages can be calculated. In the final analysis, this Court finds that Michaels has not proven that his inability to consummate with Bosch a licensing agreement concerning its use of the Patent and his resultant failure to realize the speculative gains portrayed in Bosch's preliminary marketing projections were proximately caused by Betterley, Inc.'s infringing conduct.

Inasmuch as Betterley, Inc. has been found liable for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

infringing on the Patent but evidence of the plaintiff's actual damages has been found insufficient, this Court must award minimum damages to adequately compensate for such infringement measured by "a reasonable royalty for the [actual] use made of the [Patent] by the infringer." 35 U.S.C. § 284. This Court having found that twenty dollars per router is a reasonably royalty rate and the parties having stipulated that 700 infringing routers -- stationary and hand-held -- were sold by Betterley, Inc., the reasonable-royalty damages calculation is simply the product of the reasonable royalty rate multiplied by the number of infringing units distributed which yields $14,000 in damages and which this Court finds adequate to compensate for the infringement.

The remaining issue to be determined is prejudgment interest. When patent infringement has been found and damages determined, an award of prejudgment interest on the damages is the rule, not the exception. *Devex*, 461 U.S. at 656-657. Prejudgment interest helps ensure that the patent holder is adequately compensated for the infringement and remunerates him for the foregone use of his money from the date of the injury to the date of the judgment. *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996). The trial court is afforded wide latitude in its selection of the appropriate interest rate to be applied, and a rate above the prime rate may be used. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed Cir. 1991). Prejudgment interest is to be awarded from the date infringement began to the date of judgment. *Nickson Industries, Inc.*, 847 F.2d at 800. The plaintiff presented evidence that four percent "is a reasonable proxy for the real rate of interest [but that such] omits inflation expectations" and that eight percent "is the average rate of return earned on AAA rated corporate bonds over the last 30 years *** [and is] a reasonable rate of return to be earned on investments with out taking undue risk." TX 76. The defendant did not present any evidence to the contrary. The evidence also clearly demonstrates that Betterley, Inc. began infringing on the Patent no later than June 1, 1990 and ceased doing so sometime in 1993. Based upon the evidence, this Court will award prejudgment interest at the rate of eight percent to be compounded yearly from June 1, 1990. [FN6]

> FN6. Although a more precise assessment and/or apportionment of prejudgment interest might be desirable, the evidence is not conducive to and does not permit such.

*4 Finally, this Court does not find this case to be exceptional or otherwise one warranting an award of attorney's fees. 35 U.S.C. § 285.

Accordingly, for the reasons set forth above, it is hereby FOUND and CONCLUDED that Betterley, Inc. is liable to Michaels for reasonably royalties amounting to $14,000 plus prejudgment interest and ORDERED that Betterley, Inc. pay to Michaels $14,000 plus eight percent annual interest accruing from June 1, 1990 until the date on which a judgment is entered in accordance with this decision and that this case shall be closed.

1996 WL 722007 (W.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:90CV01015 (Docket) (Sep. 26, 1990)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.