IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| CORDIS CORPORATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 97-550-SLR |
| v. | ) | |
| | ) | **REDACTED** |
| MEDTRONIC VASCULAR, INC. and | ) | **PUBLIC VERSION** |
| BOSTON SCIENTIFIC CORPORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF CORDIS'S
MOTION FOR ENTRY OF FINAL JUDGMENT**

*Of Counsel*:

Gregory L. Diskant
Eugene M. Gelernter
Michael J. Timmons
Scott B. Howard
Kathleen M. Crotty
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036

Dated: May 8, 2008

ASHBY & GEDDES
Steven J. Balick (#2114)
John G. Day (#2403)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff Cordis Corporation*

{00215715;v1}

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES

INTRODUCTION .................................................................................................1

PRIOR PROCEEDINGS .....................................................................................6

    1.    The Initial Trials in 2000 ......................................................................6

    2.    This Court's Decisions in 2002 on Post-Trial Motions.......................6

    3.    The Federal Circuit's Decision in *Cordis I* ........................................7

    4.    The Re-trials in 2005 ............................................................................7

    5.    The Federal Circuit's Decision in *Cordis II* ......................................7

ARGUMENT ........................................................................................................8

I.      THE APPLICABLE LEGAL STANDARD ............................................8

II.    FOR CLAIM 23, *CORDIS II'*S REVISED CONSTRUCTION OF
      "SMOOTH" DOES NOT WARRANT ANY FURTHER PROCEEDINGS
      ON OBVIOUSNESS................................................................................11

    A.    The Decision in *Cordis II* ................................................................12

    B.    Prior Proceedings on Obviousness....................................................13

        1. The Initial Trials in 2000 ..............................................................13

        2. The Re-trials in 2005 ....................................................................14

            a.    Claim 23's Requirement of a Device that is
                  Suitable for Intraluminal Delivery ...........................................15

            b.    BSC Argued in the Re-trial that the Ersek
                  Device is, or Could Be Modified to Be,
                  Suitable for Intraluminal Delivery ...........................................15

        3. In the Re-Trial and on Appeal, BSC Conceded the
           Nonobviousness of Intraluminal Delivery....................................19

    C.    BSC Cannot Show that the Initial Construction of
        "Smooth Surface" Was Prejudicial Error Warranting a
        New Obviousness Trial on Claim 23 .................................................21

    D.    Medtronic Cannot Seek a New Obviousness Trial Based
        on the Revised Construction of "Smooth Surface".........................22

        1. The Decision in *Cordis II* Forecloses Any Argument by
           Medtronic That It Deserves a New Obviousness Trial
           Under the Revised Construction of "Smooth Surface"................22

        2. Medtronic Could Not Show that It Was Substantially
           Prejudiced by the Earlier Construction of "Smooth Surface".......23

i

**TABLE OF CONTENTS**
(continued)

Page

III.  FOR CLAIM 44, BSC CANNOT SHOW THAT *CORDIS I*'S REVISED
CONSTRUCTION OF "SLOTS FORMED THEREIN" WARRANTS
ANY FURTHER PROCEEDINGS ON OBVIOUSNESS ................................24

  A.  Method Claim 44 ...............................................................................25

  B.  BSC Has Twice Waived its Obviousness Argument for Claim 44 ......25

    1. The Trial in 2000 ...........................................................................25

    2. The Re-trial in 2005 ......................................................................25

  C.  The Initial Construction of "Slots Formed Therein"
Did Not Prejudice BSC on Claim 44 Obviousness..............................28

IV.  DEFENDANTS CANNOT SHOW THAT *CORDIS I*'S CONSTRUCTION
OF "SUBSTANTIALLY UNIFORM THICKNESS" WARRANTS ANY
FURTHER PROCEEDINGS ON DAMAGES ...........................................30

  A.  The ACS Stents Are Cut from a Tube and Have a
Substantially Uniform Thickness........................................................31

  B.  Defendants' "Flaring" Theory is Unaffected by the
Change in Claim Construction for "Substantially Uniform Thickness" ..............33

  C.  The Dimensions of the ACS Stents Make it Mathematically
Impossible for Defendants to Show that They Were
Prejudiced by the Initial Claim Construction.....................................35

V.  THIS COURT SHOULD TAKE THE REMAINING STEPS NEEDED
FOR ENTRY OF FINAL JUDGMENT ON DAMAGES .............................35

  A.  This Court Should Account for Post-Verdict Sales of
BSC's NIR Stent Using a Formula That BSC Proposed.........................36

  B.  The Court Should Award Prejudgment Interest at an
Appropriate Rate ...............................................................................37

    1. Prejudgment Interest Should Be Awarded at the Prime Rate ...........37

      a.  This Court Already Has Determined that Prejudgment
Interest Against BSC Should Be Awarded at the Prime
Rate Compounded Monthly .............................................................37

      b.  Awarding Interest at the Prime Rate or at a Higher Rate is
Appropriate and Consistent with the Practice in This
Court and Other Courts.....................................................................38

    2. Prejudgment Interest Should Be Awarded at the "Pre-tax" Rate....................39

CONCLUSION...................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### CASES

*A&L Tech. v. Resound Corp.,*
  1995 WL 415146 (N.D. Cal. June 29, 1995) ...................................................39

*ATM Express, Inc. v. Montgomery, Ala.,*
  516 F. Supp. 2d 1242 (M.D. Ala. 2007) ........................................................40

*Aircraft Repair Servs. v. Stambaugh's Air Serv., Inc.,*
  175 F.3d 314 (3d Cir. 1999)................................................................25, 27

*Applera Corp. v. Micromass UK, Ltd.,*
  204 F. Supp. 2d 724 (D. Del. 2002), *aff'd,*
  2003 WL 1795593 (Fed. Cir. Mar. 11, 2003) ...............................................39

*Bio-Rad Labs, Inc. v. Nicolet Instrument Corp.,*
  807 F.2d 964 (Fed. Cir. 1986)......................................................................38

*Bourns v. United States,*
  537 F.2d 486 (Ct. Cl. 1976) ....................................................................21, 29

*Brunswick Corp. v. United States*, 36 Fed. Cl. 204
  (Fed. Cl. 1996), *aff'd,*152 F.3d 946 (Fed. Cir. 1998) ...................................40

*C.R. Bard, Inc. v. Medtronic, Inc.*, 1999 WL 458305
  (D. Del. June 15, 1999), *aff'd in part, rev'd in part*
  *on other grounds*, 250 F.3d 760 (Fed. Cir. 2000) .....................................38, 39

*Cardinal Chem. Co. v. Morton Int'l, Inc.,*
  508 U.S. 83 (1993)................................................................................26, 27

*Cordis Corp. v. Medtronic AVE, Inc.,*
  339 F.3d 1352 (Fed. Cir. 2003).....................................................................1, 7

*Cordis Corp. v. Medtronic Vascular, Inc. and Boston Scientific Corp.,*
  511 F.3d 1157 (Fed. Cir. 2008)................................................................*passim*

*EEOC v. Westinghouse Elec. Corp.,*
  925 F.2d 619 (3d Cir. 1991)..........................................................................25

*Eaton Corp. v. Rockwell Int'l Corp.,*
  323 F.3d 1332 (Fed. Cir. 2003).............................................................9, 10, 31

## TABLE OF AUTHORITIES
### (continued)

Page

*Engel Indus., Inc. v. Lockformer Co.,*
    166 F.3d 1379 (Fed. Cir. 1999)........................................................................23

*Environ Prods., Inc. v. Furon Co.,*
    215 F.3d 1261 (Fed. Cir. 2000)........................................................................9

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.,*
    64 F.3d 1553 (Fed. Cir. 1995)........................................................................27

*Finisar Corp. v. DirecTV Group, Inc.,*
    ___ F.3d ____, 2008 WL 1757675 (Fed. Cir. April 18, 2008)..........................9, 31, 35

*General Motors Corp. v. Devex Corp.,*
    461 U.S. 648 (1983)........................................................................38

*General Motors Corp. v. New A.C. Chevrolet, Inc.,*
    263 F.3d 296 (3d Cir. 2001)........................................................................10

*Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.,*
    874 F.2d 431 (7th Cir. 1989)........................................................................38

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
    392 U.S. 481 (1968)........................................................................40

*Hughes Aircraft Co. v. United States*, 86 F.3d 1566
    (Fed. Cir. 1996), *vacated on other grounds,*
    520 U.S. 1183 (1997)........................................................................39, 40

*IMX, Inc. v. LendingTree, LLC,*
    C.A. No. 03-1067-SLR (D. Del. April 25, 2007)........................................................................36

*IMX, Inc. v. LendingTree, LLC,*
    469 F. Supp. 2d 203 (D. Del. 2007)........................................................................39

*Ivy v. Mansfield,*
    2007 WL 4105280 (Fed. Cir. Nov. 19, 2007)........................................................................10

*Kalman v. Berlyn Corp.,*
    914 F.2d 1473 (Fed. Cir. 1990)........................................................................40

*Lucent Techs., Inc. v. Newbridge Networks Corp.,*
    168 F. Supp. 2d 181 (D. Del. 2001)........................................................................9

## TABLE OF AUTHORITIES
### (continued)

Page

*Mars, Inc. v. Conlux USA Corp.*, 818 F. Supp. 707
    (D. Del. 1993), *aff'd*, 16 F.3d 421 (Fed. Cir. 1993) ....................39

*McDonough Power Equip., Inc. v. Greenwood,*
    464 U.S. 548 (1984)........................................................8, 9

*Medinol Ltd. v. Guidant Corp.,*
    341 F. Supp. 2d 301 (S.D.N.Y. 2004)................................21, 29

*Mobil Oil Corp. v. Amoco Chem. Corp.,*
    915 F. Supp. 1333 (D. Del. 1994)....................................39

*Philips Elecs. N.A. Corp. v. Contec Corp.,*
    2004 WL 1622442 (D. Del. July 12, 2004) ............................39

*Polaroid Corp. v. Eastman Kodak Co.,*
    1990 WL 324105 (D. Mass. Oct. 12, 1990)............................40

*Power Mosfet Techs., LLC v. Siemens AG,*
    378 F.3d 1396 (Fed. Cir. 2004)........................................27

*Primos, Inc. v. Hunter's Specialties, Inc.,*
    451 F.3d 841 (Fed. Cir. 2006)........................................9-10

*In re Seagate Tech., LLC,*
    497 F.3d 1360 (Fed. Cir. 2007)........................................38

*Standard Mfg. Co. v. United States,*
    42 Fed. Cl. 748 (1999) ..............................................39

*TA Instruments, Inc. v. Perkin-Elmer Corp.,*
    277 F. Supp. 2d 367 (D. Del. 2003)..................................39

*Teleflex, Inc. v. Ficosa N. America Corp.,*
    299 F.3d 1313 (Fed. Cir. 2002)....................................*passim*

*Tristata Tech., Inc. v. Mary Kay, Inc.,*
    423 F. Supp. 2d 456 (D. Del. 2006)..................................39

*True North Composites, L.L.C. v. Trinity Indus., Inc.,*
    191 F. Supp. 2d 484 (D. Del. 2002)..................................9

## TABLE OF AUTHORITIES
### (continued)

Page

*Union Carbide Chems. & Plastics Tech. Corp. v.*
    *Shell Oil Co.*, 2004 WL 1305849 (D. Del. June 9, 2004),
    *aff'd in part, rev'd in part on other grounds,*
    425 F.3d 1366 (Fed. Cir. 2005)................................................................39

*Uniroyal, Inc. v. Rudkin-Wiley Corp.,*
    939 F.2d 1540 (Fed. Cir. 1991)................................................................38

*Westwood Chem., Inc. v. United States,*
    525 F.2d 1367 (Ct. Cl. 1975) ...........................................................21, 29

### STATUTES AND RULES

35 U.S.C.§ 285(1) ........................................................................................37

35 U.S.C. § 305.................................................................................6, 7, 26

Fed. R. Civ. P. 54(B)...................................................................................7

Fed. R. Civ. P. 61 ....................................................................................8, 31

### OTHER AUTHORITIES

Vol. 11, Wright, Miller & Kane, *Federal Practice & Procedure*, § 2883 .......................10

{00215715;v1}

## INTRODUCTION

Cordis brings this motion for entry of final judgment following the issuance of the Federal Circuit's mandate. This case in now in its second decade. During that time, Cordis has prevailed in four liability trials (two for each defendant), two damages trials (one for each defendant), and two appeals. *See Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352 (Fed. Cir. 2003) ("*Cordis I*"); *Cordis Corp. v. Medtronic Vascular, Inc. and Boston Scientific Corp.*, 511 F.3d 1157 (Fed. Cir. 2008) ("*Cordis II*"). Although defendants have lost repeatedly at trial and on appeal, they have succeeded in prolonging this case until after the Palmaz '762 patent expired, thereby depriving Cordis of the exclusivity to which it has established it was entitled.

This case is now ripe for entry of final judgment. No issues material to liability remain, and it is time to end this case. Unfortunately, based on their arguments in the Federal Circuit, we expect that defendants will try to further prolong this case by seeking yet additional re-trials. However, defendants cannot show that any changes in claim construction materially affected the obviousness analysis or the damages analysis, or prejudiced them in any way. As a result, there is no basis for "any further proceedings," and this Court should take the steps needed "to bring these matters to a close." *Id.* at 1180, 1186.

As to validity, we expect BSC to argue that the Federal Circuit's comments refining the meaning of "smooth surface" (in *Cordis II*) and "slots formed therein" (in *Cordis I*) warrant yet another re-trial for claims 23 and 44, respectively. However, BSC cannot show that any differences in claim construction prejudiced its ability to contest validity. The present circumstances are reminiscent of the remand from the Federal Circuit's decision in *Cordis I*. On remand from *Cordis I*, both defendants argued that changes in claim construction for "slots formed therein" and "substantially uniform thickness" warranted new validity trials, but then

presented obviousness theories in the re-trials that did not depend on the change in claim construction. This fact did not escape the Court's attention (D.I. 1391 at Tr. 1743:19-1744:9):

> THE COURT: …. [T]he invalidity case was permitted to be tried based on the changed claim construction. …. [T]he changed claim construction involved one limitation, and a very narrow kind, and I think I came into this case thinking that the prior art and the invalidity issue were substantially narrow. Medtronic has presented a broad ranging invalidity case. I'm not confident that was appropriate under my rulings ….

This time around, the slight differences between the initial and revised constructions of "smooth" (in claim 23) and "slots formed therein" (in claim 44) are plainly inconsequential to the validity of the '762 patent. Neither the revised construction of "smooth" (meaning smooth enough to be intraluminally delivered) nor the revised construction of "a plurality of slots formed therein" (meaning a plurality of slots, regardless of how they are made) makes any difference in the validity analysis for Dr. Palmaz's pioneering invention.

Defendants have already had two opportunities to challenge validity, and the minor changes in claim construction should not give them a third opportunity. In the initial trials in 2000, both defendants chose not to assert any obviousness challenge to the '762 patent. As this Court knows from its extensive experience presiding over patent cases, such a waiver speaks volumes about the novelty of the Palmaz invention. In the 2005 re-trials, the defendants succeeded in reviving their waived arguments based on allegations, later shown to be baseless, that the changes in claim construction warranted a second chance – and then they abandoned altogether any reliance on the changes. Indeed, BSC's expert conceded that the kinds of changes implicated by the revised claim constructions are irrelevant to the obviousness analysis, characterizing them as "little design details" that are "optional." D.I. 1372 at Tr. 929:17, 948:20-949:8. In the re-trials, both defendants simply recycled the obviousness challenges that they

chose not to present at trial in 2000. Both juries rejected those theories, resulting in verdicts that were upheld both by this Court and the Federal Circuit.

Since there is virtually no difference between a stent that is smooth to the touch "without roughness, points, bumps or ridges" (the original construction) and one that is smooth enough for intraluminal delivery (the revised definition), it is no surprise that in the 2005 re-trials on the validity of claim 23, both defendants already litigated (and lost) the *same issues* that would be presented now under the revised construction of "smooth." In particular, they argued that it was obvious to modify Ersek by flattening it, smoothing its outwardly projecting edges and making it suitable for intraluminal delivery – precisely the revised definition of smooth. *See* D.I. 1372 at 913:6-929:20 (BSC's expert); D.I. 1390 at Tr. 1541:1-23 (Medtronic's expert). Cordis never disputed that Ersek *could* be modified to be intraluminally deliverable. Its point – accepted by the jury – was that there was no reason under the sun for anyone to modify the Ersek open surgery device in 1985 to turn it into a intraluminal stent.

After hearing the evidence in the re-trials, both juries rejected defendants' arguments. Their conclusions undoubtedly were facilitated by defendants' concessions – flatly inconsistent with their obviousness case – of the novelty and importance of Dr. Palmaz' invention. Medtronic's expert described the Palmaz stent – intraluminally delivered through a body passageway from a remote location – as *"pioneering"* and as a *"modern medical miracle."* D.I. 130 at Tr. 1567:4-24. BSC told the jury that Dr. Palmaz's *"idea of putting the stent on a balloon, delivering it intraluminally"* was *"a great idea"* that Dr. Palmaz is *"entitled to credit for … and he has received it, in spades."* D.I. 1369 at Tr. 127:17-128:6.

The change in claim construction does not make Dr. Palmaz's invention any less "pioneering" (to quote Medtronic's expert) or any less of a "great idea" (to quote BSC's counsel).

In fact, the revised construction of "smooth" only underscores the nonobviousness of Dr. Palmaz's invention since the revised definition expressly requires "intraluminal delivery," which, as this Court has recognized, is "the antithesis" of Ersek (D.I. 1251 at 13): "*[S]tents delivered intraluminally ... and the Ersek fixation sleeve ... are 'disparate devices with no logical connection to one another.*'" *Id.* at 10-11. Likewise, as to claim 44 (which explicitly requires "putting the stent on a balloon, delivering intraluminally"), there is no room to argue that the change in the construction of "slots formed therein," from slots "formed in the wall surface of a tubular member, as by the removal of material" (D.I. 790 at 3) to slots formed by any method of manufacture (D.I. 1373 at Tr. 1352:9-11), has anything to do with the novelty of the "modern medical miracle" (Medtronic) for which Dr. Palmaz has received credit "in spades" (BSC). Moreover, the overwhelming evidence of secondary considerations is equally applicable to a stent defined by either the original or the revised claim constructions.

There also is no need for new trials on damages. The Federal Circuit directed this Court to consider whether further proceedings are needed, noting this Court's prior statement that a new trial on damages "may be required" in light of the revised construction of "substantially uniform thickness." *Cordis II*, 511 F.3d at 1186. In the damages trials in 2000, both juries found that the ACS stents have a substantially uniform thickness and infringed claim 23, defeating defendants' assertion that the ACS stents were *noninfringing* alternatives.

The issue now is whether new damages trials are warranted because the definition of "substantially uniform thickness" has changed since that time, from uniform within 0.001 inch to largely or approximately uniform without a variation of 100%. No new trials are needed. As this Court has noted, of all the stents sold by the original defendants in this case, the ACS stent is the "most closely patterned after some of the claims because it's a tube, if slots were taken out."

D.I. 1326 at Tr. 36:7-10. Even ACS has never denied that its stent – cut from a uniform tube –
has a substantially uniform thickness, and this Court so found, as a preliminary matter, on
Cordis's 1998 motion for a preliminary injunction. D.I. 284 at 10. An arbitration panel also so
found in awarding Cordis $425 million for ACS's infringement of claim 23. More important, in
the 2000 trials, both original juries found infringement of this claim element by the ACS stent
under a claim construction that was ***more demanding*** than the current construction. For an ACS
stent to be uniform within 0.001 inch, as the 2000 juries found, means it is uniform within 10-
40%, which is a far greater degree of uniformity than the 100% outer limit under the revised
construction. There is nothing left to try.

 Moreover, the theory that defendants presented in the damages trials is entirely
unaffected by the change in claim construction. In the damages trials, it was undisputed that the
ACS stents' metal struts – cut from a uniform tube – do not change in thickness when the stent is
expanded. That should have been the end of the matter – and both juries found that it was.
Nonetheless, defendants argued that the ACS struts ***flared*** outwards by more than 0.001 inch
(and more than 100%) upon expansion. Cordis showed that this flaring was immaterial. It
demonstrated that the thickness of the wall is measured by the uniform thickness of the metal
struts, not by their flaring. Both juries accepted Cordis's argument. And in 2000 and 2005, both
BSC liability juries reached the same conclusion when BSC raised the same defense based on the
flaring of its NIR stent. The Federal Circuit upheld the verdict of infringement, holding that the
jury was entitled to conclude, notwithstanding the flaring, "that the thickness of the metal struts
was the proper measure of the thickness of the stent wall." *Cordis II*, 511 F.3d at 1181. The
parties already had a trial about whether the thickness of the ACS stent is measured by the

uniform thickness of its metal struts or by their flaring, and the jury agreed with Cordis. The change in claim construction is immaterial to this issue and does not warrant a new trial.

After more than a decade of litigation, few defendants anywhere can be said to have "had their day in court" to as great an extent as these defendants, and the time has come for this case to end. This Court should take the straightforward steps that are necessary "to bring these matters to a close." *Cordis II*, 511 F.3d at 1186. In particular, this Court should: (a) account for post-verdict sales of the NIR (using a formula that BSC proposed), and (b) award prejudgment interest against both defendants.

## PRIOR PROCEEDINGS

### 1.    The Initial Trials in 2000

After a trial in 2000, the jury concluded that Medtronic's MicroStent II and GFX stents infringe claims 23, 51 and 54 of the Palmaz '762 patent, and claims 1 and 3 of the Schatz '984 patent. Medtronic did not present any obviousness defense for the '762 patent; the jury rejected its obviousness defense for the '984 patent. The jury awarded damages of $271 million.

After a separate two-week trial, a separate jury concluded that claims 23 and 44 of the Palmaz '762 patent are infringed by BSC's NIR stent. Like Medtronic, BSC did not present any obviousness defense for the '762 patent. Its only validity defense was directed at claim 44 and was based on 35 U.S.C. § 305. (The claim 44 invalidity finding was reversed in *Cordis II*.). The jury awarded damages of $324 million against BSC.

### 2.    This Court's Decisions in 2002 on Post-Trial Motions

In a post-trial decision, this Court accepted defendants' assertions that Cordis was not entitled to assert the doctrine of equivalents ("DOE") for two limitations –"substantially uniform thickness" and "a plurality of slots formed therein" – and granted JMOL on that basis in Medtronic's favor. D.I. 1127 at 27-32. This Court then entered judgment under

Fed. R. Civ. 54(b), allowing Cordis to take an immediate appeal as to Medtronic. D.I. 1154. Based on the same reasoning, this Court granted BSC a new trial on literal infringement for "substantially uniform thickness." D.I. 1153 at 2-4.

### 3.    The Federal Circuit's Decision in *Cordis I*

In *Cordis I*, 339 F.3d 1352, the Federal Circuit ruled in Cordis's favor on all issues. It rejected two claim constructions that this Court had adopted at Medtronic's urging, construing "a plurality of slots formed therein" to simply require a plurality of slots, without regard to how the slots are made, *id.* at 1356-60, and construing "substantially uniform thickness" as requiring the wall's thickness to be largely or approximately uniform, with the caveat that a wall with 100% variations in thickness would lack a "substantially uniform thickness." *Id.* at 1360-62. It also held that Cordis was not estopped from relying on the DOE for both limitations and reversed the decision granting JMOL of noninfringement.

### 4.    The Re-trials in 2005

Although *Cordis I's* change in claim construction did not materially alter the obviousness analysis, defendants persuaded this Court on remand that re-trials on obviousness were needed in light of *Cordis I's* revised constructions of "slots formed therein" and "substantially uniform thickness." However, after relying on the change in claim construction to obtain re-trials, both defendants' obviousness theories in the re-trials did not depend on the change in claim construction. After hearing the evidence, both juries found the asserted claims were infringed and not obvious. This Court denied defendants' post-trial motions. D.I. 1434.

### 5.    The Federal Circuit's Decision in *Cordis II*

Medtronic and BSC appealed from the judgments on nonobviousness and infringement, and Cordis cross-appealed from the earlier ruling that claim 44 of the '762 patent is invalid under 35 U.S.C. § 305. In *Cordis II*, 511 F.3d 1157, the Federal Circuit ruled in Cordis's

favor on all liability issues. On April 9, 2008, the Federal Circuit denied defendants' motions for

rehearing. *See* Ex. A hereto.

The Federal Circuit left the following issues for this Court to resolve: As to

obviousness: (1) for claim 23, whether *Cordis II*'s adoption of a functional definition of "smooth

surface," as smooth enough to be capable of intraluminal delivery, requires "any further

proceeding" on obviousness, *Cordis II*, 511 F.3d at 1180, and (2) for claim 44, whether BSC

waived an obviousness defense, and if not, whether any further proceedings are appropriate in

light of *Cordis I*'s revised construction of "slots formed therein," D.I. 1454 at 3. As to damages,

the Federal Circuit noted that this Court had stated that a new trial "may be required" on whether

the ACS stents are non-infringing substitutes and left it to this Court to determine "what remains

to be done to bring these matters to a close." *Cordis II*, 511 F.3d at 1186.

## **ARGUMENT**

## I.    **THE APPLICABLE LEGAL STANDARD**

The "harmless error" standard of Fed. R. Civ. P. 61 is the applicable standard for

determining, after a jury trial, whether an error in claim construction requires a new trial. Rule

61 states:

> ***Unless justice requires otherwise, no error*** in admitting or excluding
> evidence – or any other error by the court or a party – ***is ground for
> granting a new trial***, for setting aside a verdict, or for vacating,
> modifying or otherwise disturbing a judgment or order. ***At every stage
> of the proceeding, the court must disregard all errors*** and defects ***that
> do not affect any party's substantial rights.***

By its express terms, Rule 61 applies "[a]t every stage of the proceeding." *Id.* It

is fully applicable on remand from an appellate decision. *McDonough Power Equip., Inc. v.

Greenwood*, 464 U.S. 548, 552 n.3 (1984) ("[T]he normal procedure is to remand such issues to

the district court for resolution."). The "salutary policy" embodied in Rule 61 is that courts

should "ignore errors that do not affect the essential fairness of the trial" and "should exercise

judgment in preference to the automatic reversal for 'error'" (*McDonough*, 464 U.S. at 553-54):

> Trials are costly, not only for the parties, but also for jurors performing
> their civic duty and for society which pays the judges and support
> personnel who manage the trials. It seems doubtful that our judicial
> system would have the resources to provide litigants with perfect
> trials, were they possible, and still keep abreast of its constantly
> increasing case load.

In applying the harmless error standard, the burden is on the verdict loser to

demonstrate that an error "was so prejudicial as to substantially influence the jury." *True North*

*Composites, L.L.C. v. Trinity Indus., Inc.*, 191 F. Supp. 2d 484, 516 (D. Del. 2002), *aff'd in part,*

*rev'd in part on other grounds*, 65 Fed. Appx. 266 (Fed. Cir. 2003); *see also Eaton Corp. v.*

*Rockwell Int'l Corp.*, 323 F.3d 1332, 1344 (Fed. Cir. 2003) (a party who seeks a new trial based

on an erroneous jury instruction must "demonstrate that the error was prejudicial"); *Lucent*

*Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 254 (D. Del. 2001) (same).

"The mere fact that a new claim construction has been adopted on appeal is

insufficient, in and of itself, to require a new trial," and does not warrant a new trial unless the

verdict loser demonstrates that the error was "prejudicial." *Eaton*, 323 F.3d at 1344; *see also*

*Finisar Corp. v. DirecTV Group, Inc.*, ___ F.3d ____, 2008 WL 1757675 at *8 (Fed. Cir. April

18, 2008) (an "erroneous construction of 'information database' [was] harmless" and had "no

discernable effect on the jury's verdict"). The standard for determining whether an error is

prejudicial or harmless under Rule 61 is well settled:

> Prejudicial error is an error that ... 'appears to the court inconsistent
> with substantial justice' .... *If an asserted error did not prejudice any*
> *substantial interest of a party, that error is deemed harmless and the*
> *jury verdict is not disturbed.*

*Environ Prods., Inc. v. Furon Co.*, 215 F.3d 1261, 1265 (Fed. Cir. 2000) (finding that an error in

jury instructions was harmless and refusing to order a new trial); *see also Primos, Inc. v.*

*Hunter's Specialties, Inc.*, 451 F.3d 841, 852-53 (Fed. Cir. 2006) (affirming the district court's denial of a new trial where an error in jury instructions was not prejudicial); *Eaton*, 323 F.3d at 1344 (finding no prejudicial error); *Ivy v. Mansfield*, 2007 WL 4105280 at *2 (Fed. Cir. Nov. 19, 2007) (unpublished) ("An error is considered prejudicial when it affects the essential fairness of the adjudication .... A court may consider non-prejudicial those errors that do not influence the essential fairness of the proceedings.").

A court does not need to rule out "every reasonable possibility of prejudice" to find that an error was harmless. *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 329 (3d Cir. 2001). In deciding whether an error was prejudicial, "[t]he entire record must be considered and the probable effect of the error determined in light of all the evidence." Vol. 11, Wright, Miller & Kane, *Federal Practice & Procedure*, § 2883. "[I]t is only those errors that have caused substantial harm to the losing party that justify a new trial." *Id.* at § 2805.

*Teleflex, Inc. v. Ficosa N. America Corp.*, 299 F.3d 1313 (Fed. Cir. 2002), shows how the "harmless error" standard should be applied. In *Teleflex*, as here, a jury found that the asserted claim was infringed and nonobvious. On appeal, the Federal Circuit held that the district court's claim construction was unduly narrow. Even though the construction adopted on appeal was *broader* than the initial construction, the Federal Circuit concluded that a new trial on obviousness was *not* appropriate because, on the facts of the case, the outcome on obviousness was "unaffected by our correction of the district court's claim construction." *Teleflex*, 299 F.3d at 1334. The Federal Circuit also held that a new infringement trial would be inappropriate because, on the evidence presented, a reasonable jury that found infringement under an unduly narrow claim construction could not have reached a different result under the correct, broader

construction. *Id.* at 1328-29. The same reasoning applies here – both on obviousness and on the damages question of whether the ACS stents are *non-infringing* alternatives.

## II.   FOR CLAIM 23, *CORDIS II*'s REVISED CONSTRUCTION OF "SMOOTH" DOES NOT WARRANT ANY FURTHER PROCEEDINGS ON OBVIOUSNESS

For claim 23 of the '762 patent, the Federal Circuit has directed this Court to consider "on the facts of this case" whether "any further proceeding" on obviousness is needed in light of *Cordis II*'s adoption of a functional definition for "smooth." 511 F.3d at 1180. As discussed below (at pages 22-24), this issue applies to BSC only.

"[O]n the facts of this case," *id.*, BSC cannot show that it was prejudiced by the earlier construction, which construed "smooth" to mean "a continuously even surface, without roughness, points, bumps or ridges, especially to the touch." D.I. 790 at 3. Nor can BSC show that the revised construction gives it an obviousness defense that was unavailable earlier. BSC has already tried – and lost – a case on whether it was obvious to modify Ersek to make it smooth enough for intraluminal delivery.

In fact, the explicit adoption of the functional definition – construing "smooth" to mean smooth enough for the inventor's purpose of intraluminal delivery – underscores a basic difference between claim 23 and Ersek. As this Court has recognized, the Ersek device is "*not [intended] for ... intraluminal delivery*" and is "*the antithesis*" of the intraluminally deliverable device of claim 23. D.I. 1251 at 13. "*[S]tents delivered intraluminally ... and the Ersek fixation sleeve ... are 'disparate devices with no logical connection to one another.*'" *Id.* at 10-11. Rather than giving BSC a basis for a new obviousness defense, the functional definition of "smooth" puts the final nail in BSC's coffin.

A.    **The Decision in *Cordis II***

On appeal in *Cordis II*, BSC argued, *inter alia*, that this Court erred in denying JMOL of noninfringement for claim 23's "smooth" limitation. The Federal Circuit affirmed the finding of infringement, albeit on different grounds than adopted by this Court. In particular, it rejected the construction of "smooth" that this Court had adopted at Medtronic's urging and adopted in its place the functional definition that Cordis advocated (as meaning a surface that is "smooth enough to be capable of intraluminal delivery"). 511 F.3d at 1180. It then held that the NIR stent has a "smooth surface" under this functional definition. *Id.*

In adopting this functional definition, the Federal Circuit noted Cordis's argument in the file history that "smooth means smooth enough to serve the inventor's purpose." That purpose, the Court found, was to enable intraluminal delivery from a remote location (*id.* at 1179):

> The clear purpose of the invention in this case, Cordis noted, was "to provide a low-profile, small diameter product that is *smooth enough that it can be delivered from a remote location to a desired location without the risk of damaging the body passageway."* Cordis further explained that, as indicated in the Andros declaration, the term "smooth" means "an absence of roughness that would make it inappropriate to deliver an Ersek-type device by catheterization."

The Federal Circuit further noted (*id.*):

> The Andros declaration, which Cordis cited to the Examiner, stated that *the term "smooth,"* as used to refer to the outer wall surface of a stent of the type disclosed in the '762 patent, *"is understood* by those skilled in the art *to mean that the wall surface* is not rough and *does not have outwardly projecting edges that would preclude intraluminal delivery* and deployment of a low-profile graft *from a remote location through a body passageway to a desired location*.

As the Federal Circuit recognized, Cordis relied on the "smooth" limitation – smooth enough for intraluminal delivery – in the PTO *"to distinguish the Ersek device*, which Cordis described as having a rough outer surface that prevented intraluminal delivery." *Id.*

The Federal Circuit's revised claim construction rendered moot certain DOE arguments that BSC had offered, but for obviousness it was a very minor change. At most, there is an imperceptible difference between a stent that is smooth to the touch and one that is smooth enough for intraluminal delivery. Nonetheless, BSC argued on appeal in *Cordis II* that a new obviousness trial on claim 23 would be needed if the Federal Circuit adopted a functional definition of "smooth." (This argument was only relevant to claim 23 because claim 44 does not include the "smooth" limitation.). Because BSC raised this issue for the first time in its reply brief, Cordis never had a chance to respond. The Federal Circuit did not decide this issue and left it for this Court to decide, "on the facts of this case," whether any further proceeding on obviousness is needed under the functional definition of "smooth." 511 F.3d at 1180.

B.    **Prior Proceedings on Obviousness**

In 2000, BSC chose to waive any assertion of obviousness for the "expandable intraluminal vascular graft" of claim 23. After waiving this issue altogether in 2000, BSC was given a second bite at the apple in 2005. BSC then litigated the functional question of whether it would have been obvious to modify the Ersek device to make it suitable for intraluminal delivery – and it lost. The jury rejected BSC's obviousness defense and the Federal Circuit affirmed. There is no basis for another trial on these issues.

1.    **The Initial Trials in 2000**

Before the initial trial, BSC's expert Dr. Cumberland served a report stating that claims 23 and 44 of the '762 patent "would have been obvious" in light of Ersek and other prior art references. Ex. B hereto at 8-9. Dr. Cumberland asserted that the Ersek device "would be useful as an ***intraluminal*** vascular graft" and "could be used as a stent." *Id.* at 33. Recognizing the weakness of this argument, BSC chose *not* to present an obviousness defense to either claim at trial. D.I. 200 in 198-cv-197-SLR at Tr. 1636:4-9.

-13-

The Medtronic trial was much the same. After expert reports and discovery on obviousness, Medtronic also chose not to offer any obviousness defense for the '762 patent at trial. It did present an obviousness defense (which the jury rejected) for the Schatz '984 patent.

## 2.     The Re-trials in 2005

In *Cordis I*, the Federal Circuit ruled in Cordis's favor on claim construction, infringement and validity. With their defenses dwindling, the defendants decided to resurrect the obviousness defenses they had deemed unworthy of asserting earlier. They argued on remand that *Cordis I*'s changed construction of "slots formed therein" and "substantially uniform thickness" required new trials on obviousness.

The re-trials revealed that defendants had used the change in claim construction as a pretext. The obviousness theories that they presented in the re-trials were entirely unaffected by the change in claim construction. This Court took note of this during the Medtronic re-trial: "[B]ased on the changed claim construction .... I came into this case thinking that the prior art and the invalidity issue were substantially narrow. Medtronic AVE has presented a ... broad ranging invalidity case. I'm not confident that was appropriate under my rulings ...." D.I. 1391 at Tr. 1743:19-1744:9. As for BSC, it affirmatively discounted the relevance to the obviousness analysis of "little design details" that "are just obvious for one to change or adjust." D.I. 1372 at Tr. 929:17-20, 948:20-949:8.

At the 2005 trials, no expert for BSC or Medtronic said a word about the changed construction of "slots formed therein" or "substantially uniform thickness." Indeed, except in passing, they did not even refer to those claim limitations in their obviousness analysis. Instead, both defendants focused on the requirement of intraluminal delivery.

a.    **Claim 23's Requirement of a Device that
is Suitable for Intraluminal Delivery**

Even before the Federal Circuit adopted the functional definition of "smooth

surface," claim 23 always was directed at a device that is suitable for use as an intraluminal graft.

By its express terms, the claim covers "[a]n expandable *intraluminal* vascular graft" and requires

"a first diameter which permits *intraluminal delivery* into a body passageway having a lumen."

As explained in the '762 specification, the patent uses the term "intraluminal"

delivery to refer to delivery from a remote location to a desired location without surgically

exposing the area to be treated (col. 1:30-34):

> *Intraluminal endovascular grafting* involves the percutaneous
> insertion into a blood vessel of a tubular prosthetic graft and its
> delivery via catheter to the desired location within the vascular system.

Intraluminal delivery is thus unlike conventional open surgery, which involves cutting open the

area to be treated.  The '762 specification draws an explicit contrast between intraluminal

delivery and conventional, open surgery (at col. 1:34-37):

> Advantages of [intraluminal delivery] over conventional vascular
> surgery include obviating the need for surgically exposing, incising,
> removing, replacing or bypassing the defective blood vessel.

b.    **BSC Argued in the Re-trial that the Ersek Device is, or Could
Be Modified to Be, Suitable for Intraluminal Delivery**

Because claim 23 requires intraluminal delivery – whether or not that is part of

the definition of "smooth" – the obviousness issue at the re-trial focused on the functional

question whether the Ersek device is, or could be modified to be, suitable for intraluminal

delivery.  Initially, BSC's expert testified that the Ersek device itself was suitable for

"intraluminal delivery" because "[y]ou can slide it into a lumen." D.I. 1372 at Tr. 930:7-8.

According to Dr. Snyder, "that's all intraluminal means:  Goes into a lumen or is placed in a

lumen." *Id.* at Tr. 931:2-6.  Using this aberrant definition – unrelated to the inventor's purpose –

Dr. Snyder described the Ersek device as an "intraluminal" device because it

is "meant to go inside of a lumen," *id.* at Tr. 931:4, albeit in conventional

open surgery from a small distance, as shown in Fig. 1 of the Ersek patent.



FIG. 1

Because this argument is facially implausible, BSC quickly

moved on and devoted most of its case to the real question -- whether it was

obvious to modify Ersek to make it suitable for intraluminal delivery from a

remote location. The mountain that BSC needed to climb was to demonstrate why the Ersek

device would have had any relevance to stents delivered intraluminally when they are, in this

Court's words, "disparate devices with no logical connection to one another." D.I. 1251 at 11.

The case that BSC presented in the 2005 re-trial based on the original construction of "smooth"

is no different than the case it would present now, after the definition of "smooth" has been

revised to mean smooth enough for intraluminal delivery.

Attempting to climb that mountain in 2005, Dr. Snyder began by explaining that

expanded metal, from which Ersek was made, can easily be flattened (D.I. 1372 at Tr. 915:5-10):

> [R]emember, Dr. Ersek said it's desirably not flattened. He liked
> the not flattened kind. But you can also tell the manufacturer I like
> it flattened and they simply roll it back down so those twisted
> edges get pushed back down. And you can buy it either way.

Dr. Snyder then pointed to a passage in Ersek teaching that "the edges may be cuffed if desired

or simply smoothed to facilitate entry," *id.* at Tr. 950:12-13, quoting the '744 patent at 3:13-14,

which he interpreted as teaching that "you might want to do that to make it easier to slide the

thing in ...." *Id.* at 21-22. Using language almost identical to the revised functional definition of

smooth, Dr. Snyder then asserted that Ersek taught making the device "smooth" enough to be

"insertable" for any "application:" ***"So he's telling us, you might be interested in seeing how***

***smooth it needs to be in order to – to make it insertable for your application."*** *Id.* at Tr. 951:1-

3. Having asserted that Ersek teaches making the Ersek device "smooth" enough to be "insertable" for one's particular "application" – including intraluminal delivery, if desired – Dr. Snyder concluded that claim 23 was "obvious in light of Ersek, and with motivation, if you need it, from the Palmaz abstract." *Id.* at Tr. 957:9-10.

        To support these opinions, BSC's experts described an "experiment" (*id.* at Tr. 913:6-8, 925:14-19) in which the outwardly projecting edges of an Ersek-type device were flattened and smoothed, and the resulting device was delivered on a catheter by BSC's medical expert (Dr. Low) through the arteries of a pig. *Id.* at Tr. 913:6-927:18; Tr. 1083:7-1098:4. The point of this exercise was to show that an Ersek-type device could be modified for delivery intraluminally by catheter from a remote location. D.I. 1373 at 1179:5-8, *see also id.* at Tr. 1270:11-19 (BSC closing argument). According to Dr. Snyder, this was a "piece of cake." D.I. 1372 at Tr. 927:6-8. BSC's experts relied on this "experiment" in asserting that the modified Ersek-type device was suitable for intraluminal delivery because "there was no puncturing or shredding of the balloons" and no "indication that [the modified Ersek device] shredded or cut the artery." *Id.* at Tr. 925:24-927:18, *see also id.* at Tr. 1094:11-1098:4.

        The flattened Ersek-type device that was created by BSC's experts was intraluminally deliverable and met every limitation of the earlier claim construction. It also meets every limitation of the revised construction because, as the Federal Circuit found with respect to the BSC's NIR stent, *Cordis II*, 511 F.3d at 1180, there can be no factual dispute that such a stent is smooth enough to be intraluminally delivered.

        Cordis never denied that it was *possible* to modify the Ersek device by flattening its outwardly projecting edges, and never denied that a device modified in this manner would be smooth to the touch *and* smooth enough for intraluminal delivery from a remote location. But as

the jury found, this was not enough to make claim 23 obvious. ***BSC did not, and could not,***
***show that one of ordinary skill in 1985 would have had any reason to flatten the outwardly***
***projecting edges of the Ersek device to make it suitable for intraluminal delivery.***

As Cordis's expert Dr. Buller demonstrated, the Ersek device itself is not suitable
for intraluminal delivery. As he explained, the '762 patent uses the term "intraluminal delivery"
to mean delivery from a remote location to a desired location through the vessel by catheter
without surgically exposing the area to the treated, which does not describe Ersek. D.I. 1370 at
Tr. 500:5-12, 501:24-502:11, 503:6-17, 508:1-6. Rather, Ersek has "a multitude of narrow
projecting edges, which act as a stapler" and serve Ersek's intended purpose of providing a
substitute for sutures in open surgery. *Id.* at Tr. 498:1-19. "This has nothing to do with
Dr. Palmaz's intraluminal delivery." *Id.* at Tr. 508:1-6.

As for the creation of "flattened Ersek," Ersek itself warns against this
modification, explaining that the outwardly projecting edges of the Ersek device are "desirably
not flattened." Ex. C at col. 3:1. BSC's expert conceded on cross-examination that flattening the
outwardly projecting edges of an Ersek device was "contrary to the teachings of Ersek" and
"[t]hat's what the Patent Office concluded." D.I. 1372 at Tr. 1063:6-1064:2. Dr. Buller also
testified that it would not have been obvious to modify the Ersek device to make it suitable for
intraluminal delivery. As he explained, flattening the outwardly projecting edges of the Ersek
device would "take[] away the whole purpose" of the Ersek device and would be inconsistent
with Ersek's teachings. D.I. 1370 at Tr. 511:15-19. Thus, Ersek teaches away from claim 23
under both the initial construction and the revised construction of "smooth."

Finally, Dr. Buller testified that he "agree[d] completely ..." with statements in
the Andros declaration that Cordis submitted to the PTO during the '762 reexamination –

statements that the Federal Circuit relied upon for its revised construction of "smooth" – that:
(i) *"[t]he Ersek device cannot be intraluminally delivered* as that term is understood by those skilled in the art," *id.* at Tr. 507:15-508:6; (ii) *"[n]o responsible physician would consider intraluminally delivering the Ersek [device]* ... since the outwardly projecting edges ... would present a clear risk to the patient," *id.* at Tr. 508:7-21; and (iii) "any attempt to deliver the Ersek fixation sleeve by catheterization [*i.e.*, intraluminally] would result in shredding the walls of the body passageway." *Id.* at Tr. 508:7-509:21. As he testified, *it "would be quite wrong to consider [the Ersek] device as intraluminally deliverable."* Id.

### 3. In the Re-Trial and on Appeal, BSC Conceded the Nonobviousness of Intraluminal Delivery

Although BSC's expert testified that it was obvious to modify the Ersek device to make it suitable for intraluminal delivery from a remote location, BSC made it easy for the jury to reject that defense by affirmatively conceding – in its opening statement and its closing – that Dr. Palmaz's method of intraluminally delivering a stent was a "great idea" and a patentable invention. BSC made this concession for tactical reasons, as part of its trial strategy. Dr. Palmaz had won worldwide fame for inventing the stent, with his prototypes on display in the Smithsonian. D.I. 1369 at Tr. 236:25-237:8. This fact was devastating to BSC's obviousness case, but BSC had to find a way to acknowledge it. Thus, it tried to generate credibility by admitting the *nonobviousness* of Dr. Palmaz's method of intraluminally delivering his stent, while simultaneously straining to read apparatus claim 23 (which is directed at an "expandable *intraluminal* vascular graft") as if it did not require intraluminal delivery – and then contending that claim 23 was obvious.

Thus, BSC told the jury in its opening statement that "[Dr. Palmaz's] idea of putting the stent on a balloon, *delivering it intraluminally*" (D.I. 1369 at Tr.127:17-19) was *"a*

*great idea"* (*id.* at Tr. 128:3-6), **one that Dr. Palmaz is "entitled to credit for** … and he has

received it, in spades" (*id.* at Tr. 127:23-128:1). BSC attributed Dr. Palmaz's fame to his

invention of this admittedly nonobvious method (D.I. 1373 at Tr. 1242:23-1243:3):

> **What did Dr. Palmaz receive all his awards for? … The process of**
> **having a stent on a balloon and actually putting it in by a catheter**
> and blowing it up and taking the balloon out, and so forth. **That's**
> **what he got his awards for.**

BSC returned to this theme in summation, describing intraluminal delivery as what Dr. Palmaz

"actually invented" (*Id.* at Tr. 1241:15-20):

> **Remember what it is that Palmaz actually invented.** He invented a
> method of expanding a metal tube on a balloon and then implanting it
> as a stent. **Deliver it by catheter and you implant it as a stent.**

On appeal in *Cordis II*, BSC repeated the same arguments. It contrasted

Dr. Palmaz's "noninvasive method" of intraluminal delivery with Ersek's "invasive surgical

method" in order to bolster its assertions that the apparatus of claim 23 does not require

performance of the method and that this Court erred in denying a new trial on obviousness for

claim 23. Ex. D at 82 (underlining in original). As it did in the re-trial, BSC tried to use the

admitted *nonobviousness* of Dr. Palmaz's "noninvasive method" of intraluminal delivery as a

way of pointing out the supposed obviousness of apparatus claim 23.

Of course, if the "noninvasive method" of intraluminal delivery was nonobvious –

as BSC conceded, in the re-trial and on appeal – then (as the jury found) it would hardly have

been obvious to modify the Ersek device to make it suitable for use in that nonobvious method.

Neither BSC nor its experts ever explained why one of ordinary skill in the art would have had

any reason to modify the Ersek device so as to make it suitable for use in an admittedly

nonobvious method. The jury found claim 23 to be nonobvious and this Court upheld its verdict.

The Federal Circuit likewise rejected the challenges BSC made to the verdict of nonobviousness.

**C.    BSC Cannot Show that the Initial Construction of "Smooth Surface" Was Prejudicial Error Warranting a New Obviousness Trial on Claim 23**

Any error in the initial construction of "smooth surface" was harmless to BSC. Initially, the change in claim construction was minor. A stent that is smooth under the original construction – smooth to the touch – is smooth enough for intraluminal delivery, and a stent that is smooth enough for intraluminal delivery is also smooth in any ordinary use of language. The difference between the terms – if there is one – is virtually imperceptible. Indeed, it was with specific reference to the smooth limitation that Dr. Snyder observed that such "little design details ... are just obvious for one to change or adjust." D.I. 1372 at Tr. 929:17-20, 948:20-949:8. "[L]ittle design details" are not the kind of significant differences that could warrant a new trial on obviousness. *See Westwood Chem., Inc. v. United States*, 525 F.2d 1367, 1375 (Ct. Cl. 1975); *Bourns v. United States*, 537 F.2d 486, 492,-94 (Ct. Cl. 1976); *Medinol Ltd. v. Guidant Corp.*, 341 F. Supp. 2d 301 (S.D.N.Y. 2004). Indeed, claim 23 required an "expandable *intraluminal* vascular graft" even before the change in claim construction.

Moreover, BSC has already had one trial on the functional issue of whether it would have been obvious in 1985 to modify the Ersek device to make it smooth enough for intraluminal delivery – and it lost. There is no basis for another trial on that issue. In fact, the Federal Circuit's revised functional definition highlights the basic distinction between Ersek and the claim 23 invention, a point that this Court and the Federal Circuit repeatedly have made.

As this Court has recognized, *"stents delivered intraluminally ... and the Ersek fixation sleeve ... are 'disparate devices with no logical connection to one another.'"* D.I. 1251 at 10-11. The Ersek device is *"not [intended] for ... intraluminal delivery"* and is *"the antithesis"* of the intraluminally deliverable device of claim 23. *Id.* at 13. As this Court also recognized, Ersek teaches away from the modifications necessary to make it suitable for

-21-

intraluminal delivery: "*[M]aking the outside of the Ersek fixation sleeve smooth rather than rough would be contrary to the teachings of Ersek ....*" *Id.* at 10.  Similarly, when the Federal Circuit adopted its revised construction, it emphasized that Cordis had relied on the functional definition of "smooth surface" during the '762 reexamination "*in order to distinguish the Ersek device ....*" *Cordis II*, 511 F.3d at 1179.

These findings confirm that BSC was not prejudiced by the earlier construction of "smooth surface."  On the evidence presented in the re-trial, a reasonable jury that found nonobviousness under the earlier definition of smooth would have reached the same result under the revised, functional definition.  The outcome on obviousness was "unaffected by [the] correction of the district court's claim construction." *Teleflex*, 299 F.3d at 1334.

### D.    Medtronic Cannot Seek a New Obviousness Trial Based on the Revised Construction of "Smooth Surface"

#### 1.    The Decision in *Cordis II* Forecloses Any Argument by Medtronic That It Deserves a New Obviousness Trial Under the Revised Construction of "Smooth Surface"

The change in the construction of "smooth" cannot possibly aid Medtronic.  In addition to the claims of the Palmaz '762 patent, Medtronic also was found to infringe claims 1 and 3 of the Schatz '984 patent, which does not contain the "smooth" limitation.  Perhaps for that reason, Medtronic (unlike BSC) did not argue on appeal that its stents lack a "smooth surface."  After Cordis demonstrated – in a unified brief addressing *both* defendants' appeals – that the correct construction of "smooth surface" was the functional definition that the Federal Circuit later adopted, Medtronic (again, unlike BSC) did not argue that a new obviousness trial was needed if the Federal Circuit adopted that definition.  Moreover, after BSC made that argument and after the *Cordis II* was decided, Medtronic filed a petition for rehearing in which it raised other issues without asserting that the revised construction entitles it to a new obviousness trial.

By not raising this issue at any time on appeal, Medtronic waived the issue and cannot raise it

now. *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999).

The Federal Circuit rejected Medtronic's position on obviousness in no uncertain

terms, concluding that Medtronic "has not remotely demonstrated that it is entitled to a new trial

on obviousness." *Cordis II*, 511 F.3d at 1172.  Consistent with the Federal Circuit's mandate,

this Court could not order a new obviousness trial for Medtronic.

### 2.    Medtronic Could Not Show that It Was Substantially Prejudiced by the Earlier Construction of "Smooth Surface"

In any event, Medtronic – like BSC – already has had one re-trial on whether it

would have been obvious in 1985 to modify the Ersek device to make it suitable for intraluminal

delivery.  It cannot show that it was prejudiced by the earlier claim construction.

During the Medtronic re-trial, Dr. Ersek testified as a witness on Medtronic's

behalf.  Like BSC's expert Dr. Snyder, he used the term "intraluminal delivery" in a different

sense than the '762 patent, testifying that the Ersek device was "intraluminally deliverable"

because "[it] goes inside of the vessel." D.I. 1390 at Tr. 1362:2-18.  In addition, Medtronic's

medical expert asserted – as BSC's experts asserted – that one could modify the Ersek device by

smoothing its outwardly projecting edges "so that you can allow intraluminal, in other words,

through the vessel entry." *Id.* at Tr. 1541:1-23; *see also id.* at Tr. 1551:15-1552:15.  As in the

BSC re-trial, these arguments were flatly inconsistent with Medtronic's concession that Dr.

Palmaz's invention was a "modern medical miracle." *Id.* at Tr. 1567:16-24.

In response, Cordis's expert Dr. Buller explained that the Ersek device "has

nothing to do with the nonsurgical [intra]luminal delivery … approach, the invention of

Dr. Palmaz." D.I. 1388 at Tr. 761:11-22; *see also id.* at 686:11-688:20; 741:6-761:22, 772:11-

778:18.  He also explained that flattening the outwardly projecting edges of the Ersek device to

make it suitable for intraluminal delivery would be contrary to Ersek's teachings. *Id.* at Tr.

781:3-11. As in the BSC re-trial, the jury accepted the testimony of Cordis's expert and rejected

the defendant's assertions. There is no basis for another trial on these issues. *Teleflex*, 299 F. 3d

at 1334.

### III.    FOR CLAIM 44, BSC CANNOT SHOW THAT *CORDIS I*'s REVISED CONSTRUCTION OF "SLOTS FORMED THEREIN" WARRANTS ANY FURTHER PROCEEDINGS ON OBVIOUSNESS

The obviousness defense that BSC presented on claim 23 in the re-trial did not

depend in any way on *Cordis I*'s revised construction of "slots formed therein." Yet after the

decision in *Cordis II*, BSC argued in a petition for rehearing that that construction warrants yet

another obviousness trial, this time on claim 44.[1] The Federal Circuit denied BSC's rehearing

petition, and left it to this Court to determine, in light of its "familiarity with the proceedings in

this case ... to determine whether BSC's defense of obviousness with respect to claim 44 has

been waived and, if not, what further proceedings are appropriate." D.I. 1454 at 3.

As discussed below, BSC waived an obviousness defense for claim 44 by not

raising that defense in the trial in 2000 or again the re-trial in 2005. Even absent a waiver, BSC

cannot show that it was prejudiced on claim 44 by the earlier construction of "slots formed

therein." At worst, the earlier construction was harmless error. Indeed, ***during the re-trial***

***under the revised claim construction of "slots formed therein," BSC conceded the***

***nonobviousness of the claim 44 method*** and used the admitted nonobviousness of that method to

bolster its obviousness argument for apparatus claim 23. BSC's admissions in the re-trial defeat

any argument that it was prejudiced by the earlier claim construction.

---

[1]    In seeking another obviousness trial on claim 44, BSC has not relied – and could not rely – on either *Cordis I*'s revised construction of "substantially uniform thickness" or on *Cordis II*'s revised construction of "smooth" because "substantially uniform thickness" and "smooth" are not limitations of claim 44.

A.    **Method Claim 44**

By its express terms, claim 44 is directed at "[a] method of using a balloon

expandable stent prosthesis within a coronary artery having an area of stenosis." Claim 44

recites the steps of: (1) "disposing the stent prosthesis upon a catheter having an inflatable

balloon portion," (2) "inserting the stent prosthesis and catheter within the passageway by

percutaneous catheterization," (3) "delivering the catheter and stent prosthesis to the area of

stenosis without surgically exposing the area of the passageway," and (4) "expanding and

deforming the stent prosthesis" by expanding the balloon on which it is mounted.

B.    **BSC Has Twice Waived its Obviousness Argument for Claim 44**

1.    **The Trial in 2000**

Prior to the initial trial, BSC's expert Dr. Cumberland asserted in his expert report

that claim 44 is obvious in light of Ersek and other references. *See* Ex. B at 8-9. However, BSC

chose not to offer this defense in the initial trial. D.I. 200 (98-cv-197-SLR) at Tr. 1636:4-9.

BSC made this decision for purely tactical reasons – *not* because of the initial construction of

"slots formed therein." Indeed, Cordis's experts agreed that Ersek had of "slots formed therein"

under the construction that was applied in the 2000 trials. *E.g.*, Ex. E at 6-7, Ex. F at 5.

The obviousness defense for claim 44 that BSC would seek to present now is

identical in all respects to the obviousness defense it chose *not* to present at trial in 2000. BSC

waived that defense by choosing not to raise it at trial in 2000, and cannot seek to assert it now.

*See Aircraft Repair Servs. v. Stambaugh's Air Serv., Inc.*, 175 F.3d 314, 321-22 (3d Cir. 1999);

*EEOC v. Westinghouse Elec. Corp.*, 925 F.2d 619, 631 (3d Cir. 1991).

2.    **The Re-trial in 2005**

BSC waived obviousness for claim 44 a second time, in the re-trial under the

revised construction of "slots formed therein."

After the decision in *Cordis I*, this Court allowed the parties to serve supplemental expert reports on validity "to address the new claim construction." D.I. 1228 at 3. Cordis then served expert reports on obviousness for claims 23 and 44. *See* Ex. G at 2-3 and 28-48. On the eve of the re-trial, BSC moved *in limine* to preclude Cordis from proving nonobviousness for claim 44. D.I. 1287-5. BSC stated that it would not raise obviousness for that claim and that allowing Cordis to introduce evidence of its nonobviousness would "inflate Dr. Palmaz's contribution" by injecting into the case the novelty of "the general method of implanting balloon expandable stents." *Id.* at 3. In other words, BSC's position was that allowing evidence of the nonobviousness of method claim 44 would impede BSC's ability to litigate obviousness for apparatus claim 23. BSC's election not to raise an obviousness defense for claim 44 made it unnecessary for Cordis to present responsive evidence of claim 44's nonobviousness, and Cordis "d[id] not oppose [BSC's *in limine*] motion." D.I. 1299-5.[2]

The re-trial revealed why BSC chose not to raise an obviousness defense for claim 44. As discussed above (at pages 19-20), part of BSC's strategy in the re-trial was to *concede* the nonobviousness of Dr. Palmaz's method of intraluminal delivery and try to use the admitted *nonobviousness* of this method to bolster its arguments about the supposed *obviousness* of apparatus claim 23. *See, e.g.*, D.I. 1373 at Tr. 1265:11-1266:9. Thus, BSC's counsel told the

---

[2] Following the decision in *Cordis II*, BSC argued in its petition for rehearing that it had been precluded from raising obviousness for claim 44 in the re-trial because that claim supposedly had been "adjudicated" invalid under § 305 in this Court's March 2002 order. D.I. 1127 at 51-56. That is not correct. The March 2002 order was an interlocutory ruling and, as such, did not "adjudicate" anything. Prior to the entry of judgment on March 27, 2006 (D.I. 1432), BSC had the right to raise an obviousness defense for claim 44 and this Court had jurisdiction to address the issue. *See Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 100 (1993) ("usually … the better practice [is to] inquir[e] fully into the validity of [the] patent").

jury in his opening statement that "[w]hat's interesting" about claim 23 is that it does not include

other limitations – which are expressly recited in claim 44 (D.I. 1369 at Tr. 126:2-10):

> [F]irst of all, [claim 23 is] not about coronary applications.... [It] is not
> limited to coronaries at all.... Second, you don't see the word balloon in
> this claim [23] anywhere. This claim does not limit it to a balloon
> expandable stent.

BSC's counsel then described Dr. Palmaz's "idea of putting the stent on a balloon, delivering it

intraluminally" (*id.* at Tr. 127:17-19) – the method of claim 44 – as "a great idea" (*id.* at Tr.

128:3-6), one that Dr. Palmaz is "entitled to credit for ... and he has received it, in spades" (*id.* at

Tr. 127:23-128:1). *See also id.* at Tr. 133:8-14; D.I. 1373 at Tr. 1242:23-1243:3. BSC took the

same approach on appeal in *Cordis II*, telling the Federal Circuit that the differences between

Dr. Palmaz's "noninvasive <u>method</u>" of intraluminal delivery and "the invasive surgical <u>method</u>

described by Ersek" makes the method claims (*e.g.*, claim 44) less vulnerable to a validity

challenge than apparatus claim 23. Ex. D at 82 (underlining in original).

As these statements show, BSC's decision not to raise an obviousness defense for

claim 44 was part and parcel of its trial strategy. BSC wanted to remove claim 44 obviousness

from the re-trial so that it could admit the nonobviousness of the claim 44 method and then use

its admitted nonobviousness to bolster its obviousness argument on apparatus claim 23. Having

decided for tactical reasons not to raise an obviousness defense for claim 44 in the re-trial, BSC

again waived the issue and cannot raise it now. *Aircraft Repair,* 175 F.3d at 321-22.

Indeed, this Court should not tolerate BSC's tactic of withholding its obviousness

defense for claim 44 in the first trial and again in the re-trial, and then seeking to litigate it now.

This kind of piecemeal litigation is simply an attempt to put off the day of judgment and should

not be rewarded. *Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1413-14 (Fed. Cir.

2004); *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1560-61 (Fed. Cir. 1995).

**C.    The Initial Construction of "Slots Formed Therein"
Did Not Prejudice BSC on Claim 44 Obviousness**

Separate and apart from the issue of waiver, BSC cannot meet its burden of

showing that it was prejudiced on claim 44 by the initial construction of "slots formed therein."

The new construction of "slots formed therein" does not give BSC any new triable issue on claim

44 obviousness.  Indeed, in the re-trial – after the definition of "slots formed therein" was revised

– BSC *conceded* that the method of the Ersek patent is "totally different" from Dr. Palmaz's

method, described in claim 44, of intraluminally delivering his balloon-expandable slotted stent.

D.I. 1373 at Tr. 1245:17-1246:9

The simple truth is that claim 44's nonobviousness never depended on the

construction of "slots formed therein."  Rather, the nonobviousness of claim 44 derives from the

nonobvious invention of the balloon-expandable stent.  BSC has admitted this.  *See* pages 19-20,

26-27, *supra*.  In the re-trial – conducted under the revised construction of "slots formed therein"

– BSC acknowledged in its opening statement that ***"Dr. Palmaz is entitled to a patent on the***

***balloon expandable stent, to combine[ ] the expandable stent with a balloon.  He's entitled to***

***that."***  D.I. 1369 at Tr. 133:8-14.  Claim 44 requires exactly what BSC's counsel admitted is

nonobvious – the combination of the expandable stent and a balloon.

BSC's admission in the re-trial, under the revised construction, that the method of

claim 44 is nonobvious, defeats any argument that it was prejudiced on claim 44 obviousness by

the earlier construction.  That is, BSC has admitted that the change in the claim construction did

not create a triable issue of fact.  Indeed, the jury in the re-trial applied the revised construction

of "slots formed therein" in rejecting BSC's obviousness theory for apparatus claim 23.  There is

even less basis for asserting obviousness of claim 44, which is explicitly directed at a method of

using that apparatus in combination with a balloon catheter to treat stenosis in a coronary artery.

Forming slots "in the wall surface of a tubular member, as by the removal of material," as required under the initial claim construction, D.I. 790 at 3, could not possibly have been the point of novelty of claim 44. As BSC's expert testified, various ways of doing this were "conventional" ('762 specification at col. 7:14-17) and well-known as of 1985. Dr. Snyder explained at his deposition that "techniques to cut apertures ... [in a tube] were available [in 1985]," Ex. H at 135:18-23, and that using these known techniques "would have been an obvious way" to cut slots in a tube. *Id.* at 135:7-17; *see id.* at 161:22-162:5. To be borrow Dr. Snyder's words, the choice among conventional methods for manufacturing a tube with slots is a "little design detail[ ] that you might choose, .... that are just obvious for one to change or adjust." D.I. 1372 at Tr. 929:15-20. It is not the kind of significant differences that could warrant a new trial on obviousness. *Westwood*, 525 F.2d at 1375; *Bourns*, 537 F.2d at 492-94; *Medinol*, 341 F. Supp. 2d 301.

More basically, under both the initial and the revised claim construction, when one moves from apparatus claim 23 to method claim 44, one "inflate[s] Dr. Palmaz's contribution" (in BSC's words) by adding the novel requirement of intraluminal delivery on a balloon catheter, as invented by Dr. Palmaz. D.I. 1287-5 at 3. In his summation in the re-trial, BSC's counsel conceded (D.I. 1373 at Tr.1241:15-20, 1265:20-24):

> *[Palmaz] invented a method of expanding a metal tube on a balloon and then implanting it as a stent. Deliver it by catheter and you implant it as a stent. He invented the combination of putting the stent on a balloon. Okay? Agreed. He invented that.*

> \*              \*              \*

> *[W]hat [Dr. Palmaz] invented was a stent that you put on a balloon, ... and the process of delivering it on the balloon catheter and implanting it in the artery.* That's what he invented and on that, everything is fine.

The initial construction did not impede BSC's ability to raise an obviousness defense. Moreover, the revised construction did not give BSC any obviousness defense for claim 44 that was not available earlier. To the contrary, in the re-trial, BSC admitted the validity of claim 44, thereby acknowledging the immateriality of the change in claim definition. At most, the earlier construction was harmless error. *Teleflex*, 299 F.3d at 1334.

IV.   **DEFENDANTS CANNOT SHOW THAT *CORDIS I's* CONSTRUCTION OF "SUBSTANTIALLY UNIFORM THICKNESS" WARRANTS ANY FURTHER PROCEEDINGS ON DAMAGES**

In *Cordis II*, the Federal Circuit left it for this Court "to determine what remains to be done to bring these matters to a close." 511 F.3d at 1186. The Federal Circuit declined to reinstate the damages verdicts from 2000 because "there may be other issues that need to be addressed before a final judgment can be entered in these cases." *Id.* at 1185-86. It referred in particular to this Court's March 27, 2006 Opinion (D.I. 1435) in noting that "the district court stated at one point that a new trial on damages may be required to determine whether other stents can be considered noninfringing alternatives under the construction of 'substantially uniform thickness' from AVE's prior appeal." 511 F.3d at 1185-86; *see* D.I. 1435 at 5 (stating that "a new damages trial [may] be necessary" to address whether the ACS stents were "[acceptable] non-infringing alternatives"). In its March 27, 2006 opinion, this Court stated (*id.*):

> The jury at the previous [damages] trial was not instructed as to the
> new construction [of substantially uniform thickness], and whether
> or not the ACS stents infringe the '762 patent … is an issue which
> is relevant to the presence of available noninfringing alternatives.

In the 2000 damages trial, defendants asserted that the ACS stents are *non-infringing* alternatives because they supposedly lack a "substantially uniform thickness," as required by claim 23. Both juries rejected that argument under the initial construction, finding uniformity within 0.001 inch. The question on remand is whether the revised construction,

-30-

which eliminates the strict 0.001 requirement, warrants a new trial. Under Rule 61 and cases

applying it, the change in the construction of "substantially uniform thickness" would not require

a new trial on this issue unless defendants could show prejudicial error from the earlier claim

construction. *Finisar*, 2008 WL 1757675 at *8; *Eaton*, 323 F.3d at 1344; *Teleflex*, 299 F.3d at

1328-29. Defendants cannot show prejudice. To the contrary, a reasonable jury that found

uniformity under the original construction of "substantially uniform thickness" would necessarily

have found uniformity under the revised construction." The change in claim construction had

"no discernable effect on the jury's verdict ...." *Id.*[3]

### A.    The ACS Stents Are Cut from a Tube and Have a Substantially Uniform Thickness

Because the ACS stents are made by removing material from a preexisting tube –

just like the preferred embodiment of the '762 patent – they have the same uniform thickness as

the preexisting tube from which they are made. *See* D.I. 206 at Tr. 3210:11-18, 3202:22-3231:8

(testimony of Cordis's engineering expert from the BSC damages trial); D.I. 216 at Tr. 3088:22-

25, 3090:23-3091:1, 3095:10-3096:3 (same from the Medtronic damages trial). In recognition of

this fact, this Court has stated, "the ACS stent ... was [the] most closely patterned after some of

the claims because it's a tube, if slots were taken out." D.I. 1326 at Tr. 36:7-10. This was true

under the initial claim construction, and it remains true under the broader, revised construction.

When ACS was a party to this action, it conceded that its stents have a

"substantially uniform thickness," both on Cordis's motion for a preliminary injunction and again

on Cordis's motion for summary judgment. Based on the undisputed facts, this Court recognized

---

[3] Defendants have never asserted, and could not assert, that the Federal Circuit's revised construction of two other claim terms – "a plurality of slots formed therein" and "smooth surface" – provides any basis for a new damages trial on whether the ACS stents are non-infringing alternatives. In particular, defendants have not denied, and could not deny, that the ACS stents meet these limitations under the revised construction because they have: (a) a plurality of slots, and (b) a surface that is smooth enough for intraluminal delivery.

in ruling on Cordis's preliminary injunction motion that Cordis had shown a likelihood of success in showing that the ACS stents have a substantially uniform thickness. D.I. 284 at 10. Thereafter, in an arbitration involving the ACS stents, ACS again conceded that its stent has a substantially uniform thickness. After a two-week trial in 2003, the arbitration panel concluded that ACS's stents infringed the '762 patent and Cordis received a $425 million award.

At the 2000 trials, the relevant facts about ACS's stents were undisputed. As Cordis's expert Dr. Collins explained, the ACS stents are made by removing material from uniformly thick tube – just like the preferred embodiment of the '762 patent. D.I. 216 at Tr. 3095:10-17; D.I. 206 at Tr. 3210:10-20. This method of manufacture gives the ACS stents a uniform thickness, "which is the wall thickness of the initial tube." D.I. 216 at Tr. 3095:10-17; *see also* D.I. 206 at Tr. 3217:12-3218:16 ("the metal that make[s] up the [ACS] stent[s]" has the same "uniform thickness" as the uniformly thick tube from which they are made).

Dr. Collins also explained that the metal that makes up the wall of the ACS stents has the same uniform thickness in both the unexpanded and expanded diameters. Thus, the ACS stents meet the original construction of uniformity within 0.001 inch, and the revised construction of uniformity within 100%. In fact, the uncontradicted evidence was that the metal struts in ACS's wall surface are uniform within manufacturing tolerances of 10% – well short of the 100% outer limit under the revised construction. This translates into variations of only 0.00055 inch (5.5 ten-thousandths of an inch) for the ACS stent with the thickest struts and only 0.00025 inch (2.5 ten-thousandths of an inch) for the model with the thinnest struts, D.I. 216 at Tr. 3185:9-3186:14 – far below both the 0.001 inch outer limit of the earlier claim construction and the 100% outer limit of the revised construction.

**B.    Defendants' "Flaring" Theory is Unaffected by the Change
in Claim Construction for "Substantially Uniform Thickness"**

Faced with uncontradicted evidence that the metal walls of the ACS stent are

uniformly thick, defendants chose to ignore the thickness of the metal.  Rather, their theory on

"substantially uniform thickness" was the same theory that BSC

offered in its liability trials for the NIR stent's U-loops – that

outward flaring of a stent's struts is a variation in thickness, even

if the metal's thickness remains uniform.  In the damages trials,

BSC's expert applied the same "flaring" theory to the crowns of

the ACS stents.  *See* D.I. 207 at Tr.3325:17-3327:8.  Medtronic

offered the same theory, D.I. 218 at Tr. 3759:17-3760:23, but

without the benefit of expert testimony.  *Id.* at Tr. 3570:9-23.



**BSC's NIR stent**



**ACS Multi-Link stent**

For both the ACS stents and BSC's NIR stent,

defendants' "flaring" theory confused the ***protrusion*** of a stent's

struts with their ***thickness***.  As Cordis's experts testified in both

damages trials and in both BSC liability trials, what needs to

have a "substantially uniform thickness" is the metal that makes

up a stent's struts.  D.I. 206 (98-cv-197-SLR) at Tr. 3217:25-

3218:6; D.I. 216 (98-cv-197-SLR) at Tr. 3095:25-3096:3; D.I.

1370 at Tr. 458:16-459:17.  The "substantially uniform

thickness" limitation accordingly is met if the thickness of the



**ACS's Lau '154 patent**

metal is substantially uniform, even if the struts tend to flare outward before expansion (in the

case of the BSC NIR) or after expansion (in the case of the ACS stents).  *See* D.I. 206 (98-cv-

197-SLR) at Tr. 3217:12-3218:16; D.I. 216 (98-cv-197-SLR) at Tr. 3103:2-3105:2; D.I. 198 (98-

cv-197-SLR) at Tr. 1190:6-24; D.I. 1370 at Tr. 458:16-459:17. As the stent expands, "the wall thickness ... does not change." D.I. 206 at Tr. 3218:7-16 (BSC damages trial). "[W]hen you expand [the stent], you're just bending the metal. You're not changing the thickness of the metal." D.I. 216 at Tr. 3095:18-3096:3 (Medtronic damages trial); *see also id.* at Tr. 3103:17-3105:2.

      All four juries that considered this issue – the juries in both damages trials (under the earlier claim construction) involving the ACS stents and the juries in the two BSC liability trials (under both the earlier and the revised construction) involving BSC's NIR stent – agreed with Cordis's expert and rejected defendants' effort to confuse flaring with thickness.

      Moreover, the Federal Circuit rejected the same argument when BSC raised it on appeal in *Cordis II*. In affirming the judgment of infringement against BSC under the revised construction of "substantially uniform thickness," the Federal Circuit held that jurors "could reasonably conclude" – as the jurors did in both damages trials and in both BSC liability trials – that flaring of a stent's struts is irrelevant to their thickness and "that ***the thickness of the metal struts was the proper measure of the thickness of the stent wall.***" 511 F.3d at 1181.

      This issue is unaffected by *Cordis I*'s revision of the claim construction for "substantially uniform thickness." Whether flaring of a uniformly thick strut represents a change in its thickness does not depend on whether one construes "substantially uniform thickness" as excluding variations of 0.001 inch (as under the earlier construction) or as requiring a thickness that is largely or approximately uniform within 100% (as under the revised construction). Reasonable juries that rejected defendants' "flaring" theory under the initial construction would have reached the same conclusion under the correct, revised construction. Defendants cannot show that they were prejudiced by the initial claim construction. *Teleflex*, 299 F.3d at 1328-29.

C.    **The Dimensions of the ACS Stents Make it Mathematically
Impossible for Defendants to Show that They Were Prejudiced
by the Initial Claim Construction**

"[O]n the facts of this case," *Cordis II*, 511 F.3d at 1180, the dimensions of the

ACS stents make it mathematically impossible for the defendants to show that they were

prejudiced by the initial claim construction of "substantially uniform thickness." Uncontradicted

evidence in the damages trials established that the ACS stent with the thinnest struts has struts

with a thickness of 0.0025 inch; the model with the thickest struts has struts with a thickness of

0.0055 inch. *See* D.I. 216 at Tr. 3092:13-23 (Medtronic damages trial); D.I. 206 at Tr.3213:5-13

(BSC damages trial). As applied to the model with the thinnest struts, the earlier construction

(which variations of excluded as little as 0.001 inch) excluded variations of as little as 40%

(0.001 inch being 40% of 0.0025 inch) – far less than the 100% outer limit under the revised

construction. As applied to the model with the thickest struts, the earlier construction excluded

variations of as little as 18% (0.001 inch being approximately 18% of 0.0055 inch) – even farther

from the revised construction's 100% outer limit.

Thus, as applied to the ACS stents, the earlier construction was narrower than the

revised construction and excluded variations that would be within the scope of "substantial

uniform thickness" under the revised construction. If the ACS stents have a substantially

uniform thickness under the initial narrower claim construction – and two juries so found – then

they unquestionably have a substantially uniform thickness under the correct, broader

construction. *Teleflex*, 299 F.3d at 1329; *Finisar*, 2008 WL 1757675 at *8.

V.    **THIS COURT SHOULD TAKE THE REMAINING STEPS NEEDED
FOR ENTRY OF FINAL JUDGMENT ON DAMAGES**

Only two steps are needed to calculate damages and thus bring this case to its

long-awaited conclusion. Both steps are straightforward. First, as to BSC only, the damages

verdict must be updated to account for sales of the NIR stent that BSC made after the damages

trial. This can be done using a formula that BSC proposed, which Cordis is willing to accept.

Second, as to both defendants, this Court should award prejudgment interest. This should be

done using the prime rate, as advocated by BSC in prior litigation.

### A.    This Court Should Account for Post-Verdict Sales of BSC's NIR Stent Using a Formula That BSC Proposed

Cordis and BSC have not agreed on much in this case, but in prior briefing they

agreed that a damage award should include an accounting for sales of the NIR that BSC made

after the trials in 2000. *See* D.I. 1097 at 10; *see also IMX, Inc. v. LendingTree, LLC*, C.A. No.

03-1067-SLR (D. Del. April 25, 2007) (Robinson, J.) (slip op.) (Ex. I) (ordering defendant to

account for sales of infringing product made after the damages trial). Although the parties

initially disagreed on how to account for post-trial sales of the NIR, Cordis is willing to use the

formula that BSC proposed. BSC's formula has two components: (1) a "lost profits" component,

and (2) a "reasonable royalty" component.

**For the "lost profits" component:** the calculation involves multiplying the

applicable number of unit sales times the relevant profit margin. BSC proposed calculating

Cordis's additional lost profits "by multiplying Cordis' share of the non-infringing market times

the number [of] NIR units sold in the post-trial period," D.I. 1097 at 13, and then multiplying

that number times "the average of the profit per unit figures proposed by the parties' experts for

Q3 2000 ... to arrive at a lost profits damages award for the post-trial period." *Id.* at 14. This is

acceptable to Cordis. **For the "reasonable royalty" component**: BSC proposed that the

remaining post-verdict sales of the NIR "would be subject to a reasonable royalty of 20%, as

found by the jury." *Id.* Again, this is acceptable to Cordis.

With Cordis having accepted BSC's formula, there should be no dispute as to an accounting for post-verdict sales of the NIR. We will confer with BSC concerning the extent of sales of the NIR following the damages trials, and then expect to submit a calculation of Cordis's damages from BSC's post-verdict sales.

**B.    The Court Should Award Prejudgment Interest at an Appropriate Rate**

The only other step needed to finalize a damage award is calculating prejudgment interest. Under the patent statute, an award of damages must include "***interest*** and costs *as fixed by the court*." 35 U.S.C. § 285(1). Cordis's damages expert has calculated prejudgment interest for Medtronic using the prime rate, *see* Ex. J hereto, and will calculate prejudgment interest for BSC after counsel confer on the extent of BSC's post-trial sales of the NIR.

**1.    Prejudgment Interest Should Be Awarded at the Prime Rate**

**a.    This Court Already Has Determined that Prejudgment Interest Against BSC Should Be Awarded at the Prime Rate Compounded Monthly**

In 2004, BSC and its Scimed subsidiary prevailed in part in another stent case captioned *Scimed Life Sys., Inc. v. Johnson & Johnson*, C.A. No. 99-904-SLR (the "*Scimed* case"). BSC then asked this Court to award "prejudgment interest based on the prime rate compounded monthly." D.I. 308 in the *Scimed* case at 2 (Ex. K hereto). This Court awarded prejudgment interest at the rate BSC requested and stated that the same rate would be applied in *all* cases involving these parties (D.I. 314 in the *Scimed* case) (Ex. L hereto):

> The court … is in agreement with [Cordis'] position that ***prejudgment interest shall be calculated consistently in all the cases involving these parties. Therefore, by asking for the higher rate in the instant litigation [C.A. No. 99-904-SLR], [BSC and Scimed] shall be paying the higher rate in other litigation if judgment is entered against them.***

Consistent with this Order, prejudgment interest should be awarded at the rate BSC requested in the *Scimed* case, *i.e.*, "at the prime rate compounded monthly."

**b.    Awarding Interest at the Prime Rate or at a Higher Rate is Appropriate and Consistent with the Practice in This Court and Other Courts**

Selection of an appropriate rate for prejudgment interest is a matter entrusted to the "sound discretion of the district court." *C.R. Bard, Inc. v. Medtronic, Inc.*, 1999 WL 458305 at *15 (D. Del. June 15, 1999) (Robinson, J.), *aff'd in part, rev'd in part on other grounds*, 250 F.3d 760 (Fed. Cir. 2000). District courts have "wide latitude in the selection of interest rates ... and may award interest *at or above the prime rate.*" *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991)

In exercising their discretion, district courts "must be guided by the purpose of prejudgment interest," *Bio-Rad Labs, Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986), which is to fully compensate the patentee, not only for the money it would have received but for the infringement, "but also [for] the foregone use of the money between the time of the infringement and the date of the judgment." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655-56 (1983); *see also In re Seagate Tech., LLC*, 497 F.3d 1360, 1380 (Fed. Cir. 2007) (same). Prejudgment interest is designed to restore the patent owner to the position it would have been in absent the infringement. *General Motors*, 461 U.S. at 655.

As this Court has held, "*the prime rate best serves this purpose,* because the prime rate represents the cost of borrowing money," and thus provides fair compensation for the loss of the use of money over time. *C.R. Bard*, 1999 WL 458305 at *15; *see also Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436-37 (7th Cir. 1989) (Posner, J.) ("we suggest that district judges use the prime rate for fixing prejudgment interest"). For this reason,

this Court routinely awards prejudgment interest at the prime rate. *See, e.g., IMX, Inc. v. LendingTree, LLC*, 469 F. Supp. 2d 203, 227-28 (D. Del. 2007) (Robinson, C.J.).[4]

### 2.    Prejudgment Interest Should Be Awarded at the "Pre-tax" Rate

In prior briefing, Medtronic argued that this Court should use a "tax-adjusted rate" to calculate prejudgment interest. In other words, Medtronic argued that before calculating prejudgment interest the Court should first reduce the damages award by the taxes that Cordis's parent company (Johnson & Johnson) would have paid if Medtronic had taken a royalty instead of infringing. This approach runs counter to numerous decisions by this Court and other courts.[5]

As the Federal Circuit has held, an "after-tax approach" like the one Medtronic advocated "(1) ha[s] been rejected by the case law; (2) would be speculative due to [the plaintiff's] particular tax situation ...; and (3) was not provided for by Congress ...." *Hughes Aircraft Co. v. United States*, 86 F.3d 1566, 1575 (Fed. Cir. 1996); *see also Standard Mfg. Co. v. United States*, 42 Fed. Cl. 748, 778 (1999) ("This court is satisfied that appropriate taxation will occur at the time when an award is received in this case, and declines to apply defendant's approach."); *A&L Tech. v. Resound Corp.*, 1995 WL 415146 at *5 (N.D. Cal. June 29, 1995).

Moreover, an award that was discounted for taxes before calculating prejudgment interest would itself be subject to taxation, effectively subjecting the injured party to a "double

---

[4] *See also Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 2004 WL 1305849 at *19-20 (D. Del. June 9, 2004) (Robinson, C.J.), *aff'd in part, rev'd in part on other grounds*, 425 F.3d 1366 (Fed. Cir. 2005); *TA Instruments, Inc. v. Perkin-Elmer Corp.*, 277 F. Supp. 2d 367, 380-81 (D. Del. 2003) (Robinson, C.J.); *C.R. Bard v. Medtronic*, 1999 WL 458305 at *15 (D. Del.) (Robinson, J.); *Tristata Tech., Inc. v. Mary Kay, Inc.*, 423 F. Supp. 2d 456, 471-72 (D. Del. 2006); *Philips Elecs. N.A. Corp. v. Contec Corp.*, 2004 WL 1622442 (D. Del. July 12, 2004); *Applera Corp. v. Micromass UK, Ltd.*, 204 F. Supp. 2d 724, 783 (D. Del. 2002), *aff'd*, 2003 WL 1795593 (Fed. Cir. Mar. 11, 2003); *Mobil Oil Corp. v. Amoco Chem. Corp.*, 915 F. Supp. 1333, 1369-73 (D. Del. 1994); *Mars, Inc. v. Conlux USA Corp.*, 818 F. Supp. 707, 720-21 (D. Del. 1993), *aff'd*, 16 F.3d 421 (Fed. Cir. 1993) (all awarding interest at the prime rate).

[5] *E.g., IMX*, 469 F. Supp. 2d at 227-28 (Robinson, C.J.); *Union Carbide*, 2004 WL 1305849 at *19-20 (Robinson, C.J.); *TA Instruments*, 277 F. Supp. 2d at 380-81 (Robinson, C.J.); *C.R. Bard*, 1999 WL 458305 at *15 (Robinson, J.).

deduction for taxation, leaving [the injured party] with less income than it would have received if [the wrong-doer] had not injured it." *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 503 (1968). For this reason, the Federal Circuit and other courts refuse to base damage awards on "after-tax" calculations.[6] Because of the same "concerns" about double taxation, the Federal Circuit has rejected using an "after-tax" rate to calculate prejudgment interest (referred to as "delay damages" in Court of Claims cases). *See Hughes Aircraft Co. v. United States*, 86 F.3d 1566, 1574-75 (Fed. Cir. 1996), *vacated on other grounds*, 520 U.S. 1183 (1997).[7] This Court should not adopt an approach that the Federal Circuit has rejected.

## CONCLUSION

This Court should take the steps needed to finalize a damages award by: (a) accounting for BSC's post-verdict sales of the NIR under a formula BSC proposed; and (b) awarding prejudgment interest at the prime rate. It should then direct the entry of final judgment.

ASHBY & GEDDES

*Of Counsel:*
Gregory L. Diskant
Eugene M. Gelernter
Michael J. Timmons
Scott B. Howard
Kathleen M. Crotty
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036

Dated: May 8, 2008

*/s/ Tiffany Geyer Lydon*

Steven J. Balick (#2114)
John G. Day (#2403)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888
*Attorneys for Plaintiff Cordis Corporation*

---

[6] *See Hanover Shoe*, 392 U.S. at 502-03 (1968) (rejecting an "after tax" approach to damages); *Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1482-83 (Fed. Cir. 1990) (same); *ATM Express, Inc. v. Montgomery, Ala.*, 516 F. Supp. 2d 1242, 1250 n.11 (M.D. Ala. 2007) (refusing "to reduce [plaintiff's] lost profits award by the amount of income taxes payable on that award [because] [t]o do so, the Court would subject [the plaintiff] to double taxation").

[7] *See also Brunswick Corp. v. United States*, 36 Fed. Cl. 204, 220 (Fed. Cl. 1996), *aff'd*, 152 F.3d 946 (Fed. Cir. 1998) (declining to adjust prejudgment interest by accused marginal tax rate and concluding that Brunswick's [d]amages shall be taxed only at the time of receipt by Brunswick"); *Polaroid Corp. v. Eastman Kodak Co.*, 1990 WL 324105 at *84 (D. Mass. Oct. 12, 1990) (rejecting the use of an "after tax" rate for prejudgment interest).