IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CORDIS CORPORATION, ) | |
| ) | |
| Plaintiff, ) | C.A. No. 97-550 (SLR) |
| ) | |
| v. ) | **PUBLIC VERSION** |
| ) | |
| MEDTRONIC VASCULAR, INC. and ) | |
| BOSTON SCIENTIFIC CORPORATION, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**MEDTRONIC VASCULAR'S ANSWERING BRIEF IN OPPOSITION TO
CORDIS'S MOTION FOR ENTRY OF JUDGMENT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Karen Jacobs Louden (# 2881)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 638-9200
klouden@mnat.com

OF COUNSEL:

D. Michael Underhill
Eric J. Maurer
Jack A. Simms, Jr.
Christopher L. Hayes
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Washington, DC 20015
(202) 237-2727
munderhill@bsfllp.com
emaurer@bsfllp.com
jsimms@bsfllp.com
chayes@bsfllp.com

*Attorneys for Defendant Medtronic Vascular,
Inc.*

Confidential Version Filed: June 10, 2008
Public Version Filed: June 16, 2008

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITES ..................................................................................... iii

INTRODUCTION ................................................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ................................................ 2

SUMMARY OF ARGUMENT ............................................................................... 2

STATEMENT OF FACTS ...................................................................................... 3

ARGUMENT .......................................................................................................... 7

I.     Final Judgment Should Not Be Entered Because The Federal Circuit's Broader Claim Construction Necessitates a New Trial on Validity. ...................... 7

     A.     The Court Is Not Foreclosed from Granting Medtronic a New Trial On Validity ................................................................................. 8

     B.     The Broadened Construction of the '762 Patent Claims "Changed the Rules of the Game", and Requires a New Trial on Invalidity. ................. 11

          1.     A New Trial on the Invalidity of Claims 23, 51, and 54 of the '762 Patent Should Be Granted Because the Claim Construction Error Was Not Harmless. ....................................... 11

          2.     Cordis's Remaining Argument Against Retrial Is a Diversion. ... 15

     C.     The Court Should Not Enter Judgment Until All Issues Concerning the '762 Patent and the Accused Products Are Resolved. ........................ 16

II.     Further Damages Proceedings Are Needed to Resolve the Case on Remand. ..... 17

     A.     If either Medtronic or BSC Invalidates the '762 Patent, the Damages Verdict from 2000 Cannot Stand. ............................................................ 17

     B.     Even if the '762 Patent Is Found Valid, This Court Should Decide Medtronic's Motion for JMOL on Lost Profits Damages, Filed in 2001. 19

III.     Cordis Is Not Entitled to the Prejudgment Interest It Seeks. ............................... 19

     A.     Cordis's Request for Prejudgment Interest Should be Limited Because of Its Delay in Prosecuting this Lawsuit.................................... 20

     B.     Prejudgment Interest Should Be Calculated Based on The Post-Tax Application of the U.S. Treasury Bill Rate, Compounded Quarterly....... 22

1.    The Prejudgment Interest Portion of Any Award Should Be Calculated on a Post-Tax Basis.................................................... 23

2.    Any Award of Prejudgment Interest In This Case Should Be Calculated Using the United States Treasury Bill Rate, Compounded Quarterly............................................................... 25

3.    Alternatively, The Court Should Apply the Statutory Post-Judgment Rate.......................................................................... 29

4.    The Correct Amount of Prejudgment Interest is $60,081,914...... 30

5.    Post-Judgment Interest................................................................. 30

CONCLUSION.............................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*,
  C.A. No. 95-218 (SLR), 1998 WL 151411 (D. Del. March 13, 1998) ................................... 28

*Allen Archery, Inc. v. Browning Mfg. Co.*,
  898 F.2d 787 (Fed. Cir. 1990) ........................................................................... 26-27

*Alpex Computer Corp. v. Nintendo Co. Ltd.*,
  1994 WL 681752, 34 U.S.P.Q. 2d 1167 (S.D.N.Y. 1994), *aff'd in part, rev'd in part
  on other grounds*, 102 F.3d 1214 (Fed. Cir. 1996) .................................................. 25

*ATM Express, Inc. v. Montgomery, Alabama*,
  516 F. Supp. 2d. 1242 (M.D. Ala.2007) .............................................................. 23

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*,
  761 F. Supp. 1032 (S.D.N.Y. 1991), *aff'd in part, rev'd in part on other grounds*, 1
  F.3d 1214 (Fed. Cir. 1993) ................................................................................. 27

*Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*,
  807 F.2d 964 (Fed. Cir. 1986) ........................................................................... 21-22

*Carden v. Westinghouse Elec. Corp.*,
  850 F.2d 996 (3d Cir. 1988) ............................................................................... 8, 12

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
  381 F.3d 1371 (Fed. Cir. 2004) ......................................................................... 1, 15

*Centricut, LLC v. Esab Group, Inc.*,
  C.A. No. 99-039-M, 2003 WL 22415605 (D.N.H. Oct. 23, 2003) ......................... 30

*Cordis Corp. v. Boston Scientific et al.*,
  03-027 (D. Del.) .................................................................................................. 16

*Cordis Corp. v. Medtronic AVE, Inc.*,
  339 F.3d 1352 (Fed. Cir. 2003) (*"Cordis I"*) .................................................. 5

*Cordis Corp. v. Medtronic AVE, Inc.*,
  511 F.3d 1157 (Fed. Cir. 2008) (*"Cordis II"*) ............................................. Passim

*C.R. Bard, Inc. v. Medtronic, Inc.*,
  C.A. 96-589-SLR, 1999 WL 458305 (D. Del. June 15, 1999) ............................... 24

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*,
    246 F.3d 1336 (Fed. Cir. 2001)...............................................................20

*Datascope Corp. v. SMEC, Inc.*,
    879 F.2d 820 (Fed. Cir. 1989)........................................................... 28-29

*Ecolab, Inc. v. Gardner Mfg. Co., Inc.*,
    Civ. No. 98-2294, 2003 WL 1856434 (D.Minn. Apr. 9, 2003)..............28

*Electro Scientific Indus., Inc. v. General Scanning, Inc.*,
    247 F.3d 1341 (Fed. Cir. 2001).............................................................25

*Engel Indus., Inc. v. Lockformer Co.*,
    166 F.3d 1379 (Fed. Cir. 1999)...............................................................8

*Exxon Chem. Patents, Inc. v. The Lubrizol Corp.*,
    137 F.3d 1475 (Fed. Cir. 1998)......................................................... 9-10

*Forrest v. Beloit Corp.*,
    424 F.3d 344 (3d Cir. 2005).................................................................11

*Gaus v. Conair Corp.*,
    No. 94 Civ. 5693, 2003 WL 223859 (S.D.N.Y. Feb. 23, 2003), *rev'd on other
    grounds*, 363 F.3d 1284 (2004)...........................................................28

*General Motors Corp. v. Devex Corp.*,
    461 U.S. 648 (1983)............................................................. 20, 23-24, 27

*Gyromat Corp. v. Champion Spark Plug Co.*,
    735 F.2d 549 (Fed. Cir. 1984)...............................................................29

*Hanover Shoe Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968).............................................................................23

*Hill v. Reederei F. Laeisz G.M.B.H.*,
    435 F.3d 404 (3d Cir. 2006)..................................................................11

*Hughes Aircraft Co. v. United States*,
    86 F.3d 1566 (Fed. Cir. 1996)...............................................................23

*IMX v. Lending Tree, LLC*,
    469 F. Supp. 2d 203 (D. Del. 2007).......................................................24

*Intex Plastic Sales Co. v. Hall*,
    No. C-85-2987-JPV, 1991 WL 270167 (N.D. Cal. July 10, 1991) ........................28

*Itron v. Benghiat*,
    No. Civ. 99-501, 2003 WL 22037710 (D. Minn. Aug. 29, 2003) ..........................28

iv

*John Mezzalingua Assocs. v. Antec Corp.*,
   C.A. No. 01-CV-482-J-25HTS, 2002 WL 32107641 (M.D. Fla. Oct. 22, 2002)..................30

*Joy Techs., Inc. v. Flakt, Inc.*,
   954 F. Supp. 796 (D. Del. 1996).......................................................................27

*Kalman v. Berlyn Corp.*,
   914 F.2d 1473 (Fed. Cir. 1990)........................................................................23

*KSR Int'l Co. v. Teleflex Inc.*,
   127 S. Ct. 1727 (2007).................................................................................7, 9

*Laitram Corp. v. NEC Corp.*,
   115 F.3d 947 (Fed. Cir. 1997).....................................................................19, 27

*Lam, Inc. v. Johns-Manville Corp.*,
   718 F.2d 1056 (Fed. Cir. 1988).......................................................................27

*Litton Sys., Inc. v. Honeywell, Inc.*,
   140 F.3d 1449 (Fed. Cir. 1998)......................................................................8, 12

*McDonough Power Equip., Inc. v. Grenwood*,
   464 U.S. 548 (1984).....................................................................................11

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
   2002 U.S. Dist. LEXIS 26812 (S.D. Cal. Sept. 6, 2002).......................................30

*Mercexchange, L.L.C. v. eBay, Inc.*,
   275 F. Supp. 2d 695 (E.D. Va. 2003), *aff'd in part, rev'd in part on other grounds*,
   401 F.3d 1323 (Fed. Cir. 2005)........................................................................27

*Mobil Oil Corp. v. Amoco Chems. Corp.*,
   915 F. Supp. 1333 (D. Del. 1995).....................................................................27

*National Presto Indus., Inc. v. Black & Decker, Inc.*,
   No. 89 C 8978, 1992 WL 125559 (N.D. Ill. May 27, 1992) ...................................28

*Oiness v. Walgreen Co.*,
   88 F.3d 1025 (Fed. Cir. 1996)...................................................................23-24, 27

*Optivus Tech., Inc. v. Ion Beam Applications S.A.*,
   469 F.3d 978 (Fed. Cir. 2006).........................................................................10

*Pharmacia & Upjohn v. Mylan Pharms., Inc.*,
   170 F.3d 1373 (Fed. Cir. 1999)....................................................................10, 18

*Phillips Petroleum Co. v. Rexene Corp.*,
   C.A. No. 90-208 (LON), 1997 WL 781856 (D. Del. Sept. 4, 1997) ................... 28-29

*Polaroid Corp. v. Eastman Kodak Co.*,
  No. 76-1634-MA, 1990 WL 324105 (D. Mass. Oct. 12, 1990)..............................................28

*Rates Tech. Inc. v. Redfish Telemetrix, Inc.*,
  No. 99-CV-4644(RR), 2001 WL 1825854 (E.D.N.Y. Dec. 20, 2001) ...................................29

*Schering Corp. v. Precision-Cosmet Co., Inc.*,
  614 F. Supp. 1368 (D. Del. 1985)................................................................................... 28-29

*Symbol Techs., Inc. v. Proxim, Inc.*,
  C.A. No. 01-801 (SLR), 2004 WL 1770290 (D. Del. July 28, 2004)....................................28

*TA Instruments v. The Perkin-Elmer Corp.*,
  277 F. Supp. 2d 367 (D. Del. 2003).....................................................................................24

*The Johns Hopkins University v. Cellpro, Inc.*,
  152 F.3d 1342 (Fed. Cir. 1998)......................................................................................8, 14

*Translogic Tech., Inc. v. Hitachi, Ltd.*,
  250 Fed. Appx. 988, 2007 WL 2973955 (Fed. Cir. Oct. 12, 2007) ........................... 10, 17-18

*Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*,
  No. H-03-2910, 2006 WL 3227315 (S.D. Tex. Nov. 6, 2006) ..............................................29

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
  Nos. 99-CV-274-SLR, 99-846-SLR, 2004 WL 1305849 (D. Del. June 9, 2004) ..................24

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
  939 F.2d 1540 (Fed. Cir. 1984)....................................................................................20, 27

## STATUTES

28 U.S.C. § 1961 ........................................................................................................... 29-30

## RULES

Fed. R. Civ. P. 61 ........................................................................................................... 11-12

## <u>INTRODUCTION</u>

To support its motion for entry of final judgment (D.I. 1455), Cordis claims that the Federal Circuit's broadening of the "smooth" limitation in the '762 patent is an "immaterial" change from the narrower construction that governed during the 2000 and 2005 trials. Cordis is wrong. The Federal Circuit adopted Cordis's proposed construction and used that construction to find that Boston Scientific's ("BSC") NIR stent infringed the "smooth surface" limitation:

> Although the district court gave the jury a narrower definition at trial, Cordis has argued on appeal that the instruction actually given by the district court was unnecessarily restrictive, and we agree. Under the correct instruction, a reasonable jury would necessarily have found that the NIR stent infringed the "smooth surface" limitation.

*Cordis Corp. v. Medtronic AVE, Inc.*, 511 F.3d 1157, 1179 (Fed. Cir. 2008) ("*Cordis II*").

Having argued that this Court's construction was too restrictive and having relied on the broader construction of "smooth surface" to win on infringement, Cordis must also live with the same construction to determine validity. At the 2005 trial, Cordis relied on the narrower (and incorrect) construction of "smooth surface" to argue to the jury that that limitation was not present in or suggested by the prior art, and the jury found the '762 patent valid. Because the jury may have relied on a legally improper ground based on the narrow claim construction, it is necessary for this Court to hold a new validity trial using the correct construction. *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 381 F.3d 1371, 1383 (Fed. Cir. 2004) ("It is well established that when an incorrect jury instruction — such as an incorrect claim construction — removes from the jury a basis on which the jury could reasonably have reached a different verdict, the verdict should not stand.")

## NATURE AND STAGE OF THE PROCEEDINGS

The Federal Circuit mandate issued on April 16, 2008. (D.I. 1453.) As with the first appeal in this action, the Federal Circuit expressly declined Cordis's request for entry of judgment against BSC and Medtronic. Instead it remanded to this Court to reexamine invalidity and damages issues in light of its changed claim constructions of "smooth surface," "slots formed therein," and "substantially uniform thickness." *Cordis II*, 511 F.3d at 1180, 1185-86.

On May 8, 2008, Cordis filed a motion for entry of final judgment. (D.I. 1455). This is Medtronic's answering brief in opposition to that motion.

## SUMMARY OF ARGUMENT

1.    The Federal Circuit remanded to the district court the issue of whether to grant a new trial on the invalidity of the '762 patent in light of the changed construction of "smooth surface." The Court should grant a new trial because the Federal Circuit interpreted the "smooth surface" limitation more broadly than this Court. As a result, when the jury found the '762 patent valid in the 2005 trial, it did so in reliance on an unduly narrow claim construction. When the broader construction is applied, the prior art takes on added relevance, invalidating the '762 patent.

2.    Judgment should not be entered until after the invalidity retrial and other related proceedings are resolved. The outcomes of a pending appeal brought by BSC in a related action, as well as reexamination proceedings involving the patents-in-suit, could potentially conflict with a judgment entered in Cordis's favor in this action. If the '762 patent is invalidated, any judgment entered by this Court should be vacated. Cordis would not be harmed by any delay in entry of judgment. As Cordis acknowledges, the MSII, GFX and GFX2 stents have long since been discontinued, the '762 patent has expired, and pre-judgment interest on past damages will

2

accrue. The Court thus should defer entry of judgment until the outstanding issues on the '762 patent and the accused products are resolved.

3. If the '762 patent is invalidated, a new damages trial will be required because the jury in the 2000 trial relied on both the '762 and '984 patents to calculate damages. In addition, no judgment should be entered until after the Court has considered Medtronic's JMOL motion from 2001, which the Court previously ruled was moot in light of its grant of JMOL of non-infringement in favor of Medtronic.

4. The Court should refrain from calculating prejudgment interest until all remaining issues in this case are resolved. If, however, the Court determines a calculation of prejudgment interest is appropriate at this juncture, it should reject the overstated award of prejudgment interest that Cordis seeks. Cordis's request for an improper bonus of *approximately $192 million* would place Cordis in a position better than it would have been absent the alleged infringement, and is flatly inconsistent with the compensatory and non-punitive purpose of prejudgment interest. This Court should exercise its discretion and calculate prejudgment interest on an after-tax basis using the U.S. Treasury Bill rate, compounded quarterly. This calculation is consistent with the purpose of prejudgment interest: it adequately compensates Cordis for foregone royalties and does not penalize Medtronic by imposing an improperly inflated amount of interest.

## STATEMENT OF FACTS

At Cordis's urging, the Federal Circuit has twice broadened this Court's claim constructions. Both times, Cordis successfully argued for broader claim constructions to avoid findings of non-infringement.

Cordis filed this action on October 1997, alleging that Medtronic's MicroStent I ("MSI"), MicroStent II ("MSII"), GFX, and GFX2 stents infringe the '762, '417, and '984 patents. On December 26, 1997, Cordis moved for a preliminary injunction based on the '417 and '984

patents.  (D.I. 117-120.)  After several months of discovery, Cordis abruptly withdrew its motion on July 20, 1998.  (D.I. 286.)  It later dropped the '417 patent entirely from the case.  (D.I. 662.) Almost a year after withdrawing its preliminary injunction motion, Cordis added another patent — the '332 patent — to the proceedings.  (D.I. 449.)  But Cordis dropped the '332 patent after it received an unfavorable claim construction.  (D.I. 891.)

In 1998, this Court granted summary judgment of no literal infringement on the two remaining patents — the '762 and '984 patents — to Medtronic based on the Court's original claim construction of "slots formed therein."  (D.I. 462 at 20; D.I. 463 at 2; *see also* D.I. 1127 at 29 n.12.)

In November 2000, a jury found that Medtronic infringed under the doctrine of equivalents claims 23, 51, and 53 of the '762 patent, and claims 1 and 3 of the '984 patent.  (D.I. 955; *see also* D.I. 1013.)[1]  In March 2002, the Court granted Medtronic's motion for JMOL of non-infringement based on the "slots formed therein" limitation.  (D.I. 1127 at 32, 37; D.I. 1128.)  The Court also granted BSC a new infringement trial, and conditionally granted Medtronic a new infringement trial based on the "substantially uniform thickness" limitation. (D.I. 1153 at 4, 8.)

In June 2002, Cordis appealed this Court's JMOL and conditional new trial rulings as to Medtronic.  (D.I. 1155.)  Cordis argued that these rulings were based on improperly narrow constructions of "slots formed therein" and "substantially uniform thickness."  The Federal Circuit agreed with Cordis.  It broadened the Court's claim constructions and reversed the Court's summary judgment, JMOL and new trial rulings.  *Cordis Corp. v. Medtronic AVE, Inc.,*

---

[1]     The jury's verdict was for the MSII, GFX, and GFX2 stents.  The Court held that Cordis did not present sufficient evidence at trial that the MSI infringed the patents for that issue to go to the jury.  (D.I. 1127 at 19 n.5; D.I. 965 at 2202-03; D.I. 966 at 2275-86.)

339 F.3d 1352, 1360 (Fed. Cir. 2003) ("*Cordis I*").  The following chart shows how the Federal

Circuit changed these claim constructions:

| District Court's Original (Narrower) Construction | Federal Circuit's Broader Construction |
|---|---|
| "Slots formed therein" means that "slots must be formed in the wall surface of a tubular member, as by the removal of material."  (D.I. 790 at 3.) | "Nothing about the phrase 'slots formed therein' suggests that the slots must be formed by a particular process; the phrase certainly does not indicate that the wall must be formed first and the slots formed later."  *Cordis I*, 339 F.3d  at 1356. |
| "Substantially uniform thickness" means "[t]he thickness of all points along the wall surface of the tubular member, both at its first and second diameters, must be substantially the same. Variances as little as .001 fall outside the scope of 'substantially uniform."  (D.I. 790 at 2.) | "The patents do not set out any numerical standard by which to determine whether the thickness of the wall surface is 'substantially uniform.'"  "Substantially uniform thickness" means that "the walls must be of largely or approximately uniform thickness;" "the thickness of the wall surface [must] be sufficiently uniform along its length and between members to allow uniform expansion of the stent."  *Cordis I*, 339 F.3d at 1360.  "[A] wall that varies in thickness by as much as 100 percent cannot be said to be of "substantially uniform thickness" either literally or by equivalents."  *Id.* at 1362. |

The Federal Circuit remanded, *Cordis I*, 339 F.3d at 1365, and Cordis retried its claims

against Medtronic and BSC in March 2005.  To counter Medtronic's and BSC's arguments that

the claims of the '762 patent are obvious, Cordis argued, among other things, that the prior art

did not teach the "smooth surface" limitation.  (D.I. 1388 at 760:19-761:2, 775:3-16; D.I. 1370 at

504:17-22.)  Both juries accepted Cordis' arguments and upheld validity.  (D.I. 1358, 1366.)

Medtronic and BSC appealed.  (D.I. 1437.)  In its responsive brief filed on January 7,

2007, Cordis argued, as an alternative ground for upholding the judgment of infringement

against BSC, that the Federal Circuit should broaden this Court's construction of the "smooth surface" limitation. *Cordis*, 511 F.3d at 1179.[2]

The Federal Circuit agreed with Cordis that the district court's construction of "substantially smooth" was "unnecessarily restrictive." *Cordis II*, 511 F.3d at 1179. It broadened the construction and ruled as a matter of law that BSC's stents literally infringe the "smooth surface" limitation. *Id.* The following chart shows the Federal Circuit's changed construction:

| District Court's Original (Narrower) Construction | Federal Circuit's Broader Construction |
|---|---|
| "Smooth surface" means "a 'continuously even surface, without roughness, points, bumps or ridges, especially to the touch.'" (D.I. 790 at 3; D.I. 1357 at 23.); *Cordis II*, 511 F.3d at 1178. | A stent is "smooth" "if it [i]s smooth enough to be capable of intraluminal delivery." *Cordis II*, 511 F.3d and 1180. |

The Federal Circuit acknowledged that its new, broader construction of "smooth surface" might require further proceedings on other issues. It rejected Cordis' request for entry of judgment against BSC and Medtronic and remanded to this Court to consider invalidity and damages issues in light of the changed claim constructions of "smooth surface," "slots formed therein," and "substantially uniform thickness," saying:

> Whether, on the facts of this case, the broader definition [of "smooth surface"] requires any further proceeding with respect to the issue of obviousness, however, is not a matter that the parties have addressed in any detail on appeal and is best left for the district court to resolve on remand, particularly in light of the district court's intimate familiarity with the extensive and complex proceedings in this difficult case.

---

[2]    This Court's original construction of "smooth surface" is similar to the construction proposed by Medtronic in May, 2000. (D.I. 718 at 2 ("'Smooth Surface'" means that the "outside of the wall surface of the unexpanded tubular member have an even and level surface, without roughness, bumps or projections that can be seen or felt. Stents having portions that project out of the outer surface of the stent are not 'smooth.'").)

* * * *

> Cordis has asked this court to direct the district court to reinstate the damages verdicts from the 2000 trial.  We decline to do so because there may be other issues that need to be addressed before a final judgment can be entered in these cases.  For example, we have noted that the district court may have to revisit the issue of obviousness raised by BSC at the 2005 trial in light of the revised claim construction we have adopted for the term "smooth surface."

*Cordis II*, 511 F.3d at 1180, 1185-86.

In July, 2005, almost a year before Medtronic appealed, Medtronic's counsel petitioned the PTO to reexamine the '762 patent.  The PTO granted the reexamination, which is ongoing. On May 7, 2008, in an office action the PTO rejected, *inter alia*, claims 23, 51 and 54 — all of the '762 patent claims at issue in this litigation — as anticipated by Dr. Palmaz's prior publications. Those publications disclose the subject matter of those claims more than a year prior to the filing date.  (Ex. 1, attached hereto.)  The PTO is also considering whether to reexamine the '984 patent.  (Ex. 2, attached hereto.)  If the PTO pursues this reexamination, it will consider whether the validity of the patent is impacted by the Supreme Court's April 2007 *KSR* decision, which overruled certain Federal Circuit cases that apply an unduly rigid obviousness analysis.  *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1734-35 & 1741 (2007).

## ARGUMENT

### I.   Final Judgment Should Not Be Entered Because The Federal Circuit's Broader Claim Construction Necessitates a New Trial on Validity.

Medtronic should be granted a new validity trial on claims 23, 51, and 54 of the '762 patent. The Federal Circuit rejected Cordis' request for entry of judgment and remanded for this Court to decide whether a new trial or other proceedings are required. *Cordis II*, 511 F.3d at 1180, 1185-86.  Those proceedings are necessary.

Because the broader construction of "smooth surface" "changed the rules of the game," certain prior art clearly became much more relevant. *The Johns Hopkins University v. Cellpro, Inc.*, 152 F.3d 1342, 1357 (Fed. Cir. 1998). Because the jury was instructed on the original, narrower claim construction in deciding the validity of the '762 patent, a new trial is required. *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1465 (Fed. Cir. 1998) ("[A]n appellate court must [] vacate a jury verdict and remand for a new trial if a jury may have relied on an impermissible basis in reaching its verdict."); *see also Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996, 1000 (3d Cir. 1988) ("In our jurisprudence it has been established that a general verdict must be set aside where the jury has been instructed that it could rely on two or more independent grounds or claims and one of those grounds or claims turns out to be insufficient.").

### A.    The Court Is Not Foreclosed from Granting Medtronic a New Trial On Validity.

The Federal Circuit's mandate does not, as Cordis suggests, preclude this Court from granting Medtronic a new trial on validity. It instructs the Court to consider whether further proceedings are warranted, and does not restrict its instruction to BSC. The Federal Circuit specifically *declined* Cordis's invitation to reinstate the damages verdict against *both* Medtronic and BSC "because there may be other issues that need to be addressed before a final judgment can be entered in these cases." *Cordis II*, 511 F.3d at 1185-86. One of those issues is "[w]hether, on the facts of this case, the broader definition [of "smooth surface"] requires any further proceeding with respect to the issue of obviousness." *Id.* at 1180. The Federal Circuit concluded that this issue "is best left for the district court to resolve on remand . . ." *Id.*

Issues reserved for the district court — such as the Federal Circuit's remand to this Court to decide whether further proceedings are required — are not foreclosed from consideration. *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999) ("*Only* the issues

actually decided — those within the scope of the judgment appealed from, *minus those explicitly reserved or remanded by the court* — are foreclosed from further consideration.") (emphasis added).

Cordis argues that the Federal Circuit rejected Medtronic's obviousness challenge, but ignores that Medtronic's obviousness challenge was based on the Supreme Court's *KSR* decision. *Cordis II*, 511 F.3d at 1172.[3]  The Federal Circuit's instruction to consider whether further proceedings are appropriate is based on entirely different grounds — the Federal Circuit's acceptance of Cordis's request for a broader construction of "smooth surface." *Cordis II*, 511 F.3d at 1180, 1185-86.  Medtronic's request for a new trial is therefore appropriate. *Exxon Chem. Patents, Inc. v. The Lubrizol Corp.*, 137 F.3d 1475, 1478 (Fed. Cir. 1998) (even though Federal Circuit held that plaintiff was "entitled to a judgment of noninfringement as a matter of law" and that the reversal was "without remand for a second trial," a new trial on infringement under the doctrine of equivalents was permitted because the Federal Circuit noted "that the issue was not briefed or argued" and stated that it "'express[ed] no view on that question.'").

Cordis's argument that Medtronic should have been required to raise these issues on appeal is meritless.  Cordis raised the issue whether this Court correctly interpreted "smooth" only *after* Medtronic filed its opening appellant brief.  Cordis raised the issue in its responsive brief in opposition to *BSC's* appeal; it sought a broader construction of "smooth" as an alternative ground for upholding the judgment of infringement *against BSC*. *Cordis II,* 511 F.3d

---

[3]    In its motion, Cordis argues that the "Federal Circuit rejected Medtronic's position on obviousness in no uncertain terms, concluding that Medtronic 'has not remotely demonstrated that it is entitled to a new trial on obviousness.'" (D.I. 1456 at 23).  Cordis plainly misstates the record.  The quotation from the Federal Circuit opinion related to Medtronic's argument that the jury instructions on obviousness were erroneous.  The Federal Circuit in no way "rejected Medtronic's position on obviousness," as Cordis contends.

at 1179.  Cordis did not make this argument with respect to Medtronic and Medtronic had no reason or opportunity to respond.[4]

Finally, allowing BSC but not Medtronic to have a new trial on validity makes no sense. The effect of the broadening of the "smooth surface" limitation applies equally to both parties. The additional resources that would be required are minimal. Moreover, it would make no sense to allow a new trial based on a broader claim construction of "smooth surface" on claim 23 of the '762 patent — the only '762 patent claim being asserted against both BSC and Medtronic — while allowing the validity verdict for claims 51 and 54 to stand even though that verdict is based on the same erroneous construction. This result would be particularly perverse if BSC invalidates claim 23 of the '762 patent, as Cordis would be collaterally estopped from disputing the invalidity of that claim against Medtronic. *Pharmacia & Upjohn v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1379-82 (Fed. Cir. 1999) (collateral estoppel arises from an invalidity judgment in a copending case despite pending JMOL motion and possibility of appeal).  And once invalidated, any judgment against Medtronic based on the '762 patent should be vacated.  *See Translogic Tech., Inc. v. Hitachi, Ltd.*, 250 Fed. Appx. 988, 2007 WL 2973955, at *1 (Fed. Cir. Oct. 12, 2007) (Because the patent was invalidated by a reexamination proceeding, "this court vacates the district court's [judgment of infringement and damages] and remands this case to the district court for dismissal.").

---

[4]    Cordis cites no authority for the proposition that Medtronic was required to raise the issue in its reply brief or in a petition for rehearing.  Neither are suitable vehicles for raising new appellate issues.  *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 989 (Fed. Cir. 2006) (reply briefs); *Exxon Chemical,* 137 F.3d at 1482 (petitions for rehearing).

**B.    The Broadened Construction of the '762 Patent Claims "Changed the Rules of the Game," and Requires a New Trial on Invalidity.**

**1.    A New Trial on the Invalidity of Claims 23, 51, and 54 of the '762 Patent Should Be Granted Because the Claim Construction Error Was Not Harmless.**

Cordis argues that a new trial on the '762 patent should not be granted because Medtronic "already has had one re-trial on whether it would have been obvious in 1985 to modify the Ersek device to make it suitable for intraluminal delivery [, as is now required by "smooth surface]." (D.I. 1456 at 23.)  This argument is a non sequitur; it ignores that the incorrect construction of "smooth," which Cordis argued to the jury, could have influenced the jury.  Cordis is correct that — even apart from intraluminal delivery being a requirement of "smooth" — "intraluminal delivery" is independently (and explicitly) required for infringement of claim 23, 51, and 54. (*See* Ex. 3, '762 patent at col. 12:3-5.)  Although Cordis argued to the jury that the intraluminal delivery limitation was also missing from the prior art, there is no evidence that Cordis's "intraluminal delivery" argument is the one that the jury found persuasive.  It is just as likely that the jury relied on Cordis's argument that the prior art did not disclose the unduly narrow "smooth surface" limitation.  (D.I. 1388 at 760:19-761:2, 775:3-16; D.I. 1370 at 504:17-22; *see also* D.I. 1388 at 749:5-20, 758:2-7; D.I. 1391 at 1878:6-18, 1880:24-1881:24.)

The Federal Circuit and Cordis characterized the original construction of this limitation as "unnecessarily restrictive."  *Cordis II*, 511 F.3d at 1179.  This error was not harmless.  "'An error will be deemed harmless only if it is '*highly probable*' that the error did *not* affect the outcome of the case.'"  *Hill v. Reederei F. Laeisz G.M.B.H.*, 435 F.3d 404, 411 (3d Cir. 2006) (emphasis added); *Forrest v. Beloit Corp.*, 424 F.3d 344, 349 (3d Cir. 2005) (same); *cf. McDonough Power Equip., Inc. v. Grenwood*, 464 U.S. 548, 553 (1984) (harmless error statute that applies to appellate courts "incorporates the same principle as that found in Rule 61"; "it is

well settled that the appellate courts should act in accordance with the salutary policy embodied in Rule 61").

The improperly narrow construction of "smooth surface" provided the jury with an improper basis for finding claims 23, 51, and 54 of the '762 patent valid. Indeed, the Court's jury charge instructed the jury to compare the claim limitations to the prior art, evaluate the differences between them, and determine whether there was a suggestion to incorporate those claim limitations. (D.I. 1357 at 29, 35.) The erroneous construction of "smooth," combined with Cordis's arguments to the jury that the "smooth surface" limitation was not disclosed in the prior art, invited the jury to rely on an impermissible basis for upholding the validity of the '762 patent. A new trial is therefore required. *Litton Sys.,* 140 F.3d at 1465 ("[A]n appellate court must [] vacate a jury verdict and remand for a new trial if a jury may have relied on an impermissible basis in reaching its verdict."); *see also Carden*, 850 F.2d at 1000 ("In our jurisprudence it has been established that a general verdict must be set aside where the jury has been instructed that it could rely on two or more independent grounds or claims and one of those grounds or claims turns out to be insufficient.").

Cordis's argument that the Federal Circuit's broadening of "smooth surface" is an immaterial change is wrong, and Cordis knows it. The original (narrower) construction of "smooth surface" required, *inter alia*, a "continuously even surface." (D.I. 1357 at 23.) The new construction requires that the surface be "smooth enough to be capable of intraluminal delivery," *Cordis*, 511 F.3d and 1180 — a requirement that Cordis concedes (and emphasizes in its brief) was *already required by other language in the claims.* (D.I. 1456 at 15). If the narrower construction of smooth truly was a "minor" difference, then there would have been no reason for Cordis to argue to the jury that *both* the "intraluminal delivery" and "smooth surface"

requirements were missing from the prior art.  And there would have been no reason for Cordis to argue to the Federal Circuit that the construction of "smooth surface" should be broadened to capture the BSC stents.

The difference between the old and new constructions is substantial.  As Cordis implicitly recognized on appeal, a stent meeting the new construction of "smooth" (such as BSC's NIR) may or may not meet the original construction.  The original "smooth surface" construction required a "continuously even surface," as well as a surface without any "bumps or ridges."  (D.I. 1357 at 23.)  Even the '762 patent makes clear that not all intraluminally deliverable stents meet this definition.  Figure 6 discloses a graft that is intraluminally deliverable even though it has "outwardly extending projections 92" or "ridges 93" that help anchor the stent.  (Ex. 3, '762 patent,



*Fig. 6*

col. 10:26-44.)  Although this stent meets the new, broader definition of "smooth surface" (because it is intraluminally deliverable), it does *not* meet the original, narrower, definition of "smooth surface" (because it has "ridges").

Under the new construction, the differences between claims 23, 51, and 54 of the '762 patent and the prior art are not nearly as great as they were under the original (narrower) construction.  For example, in the 2005 trial, Medtronic argued that it would have been obvious to have flattened the twisted strands of the Ersek device to form a surface meeting the original (narrow) construction of "smooth."  (*See, e.g.*, D.I. 1390 at 1555:4-6.)  Under the old definition of "smooth," the strands would have had to have been *completely* flattened, so as to have a "continuously even surface" without any "bumps or ridges."   Under the new construction,

13

flattening may not even be required at all for intraluminal delivery. Indeed, the '762 patent contemplates that a protective sheath can be used to encase the stent. (Ex. 3, '762 patent at col. 9:20-25.) And even if *some* flattening was required, the degree of flattening needed necessarily would be much less than under the old construction. This distinction is significant because Cordis's primary argument about why those skilled in the art would not have completely flattened Ersek is that the alteration is contrary to Ersek's alleged teaching that projections are needed to securely fix Ersek to the vessel wall. But flattening Ersek only a small amount so that projections remain maintains this purpose while also meeting the new construction of "smooth." Indeed, as described above, Figure 6 of Palmaz's '762 patent teaches just such a device—it is an intraluminally deliverable stent with projections to provide better anchoring. In short, the difference in claim construction could and would affect the jury's validity analysis.

Other prior art also takes on increased relevance. *See Cellpro,*, 152 F.3d at 1357 (Because the new claim construction "changed the rules of the game," "new prior art became potentially relevant to the validity of those claims."). For example, Palmaz's 1984 Abstract discloses an "intraluminal graft" with soldered cross-points. (Ex. 4 at p. 3.) This stent likely did not meet the old construction of smooth because the soldered cross-points would form bumps on the stent surface. It would, however, necessarily meet the new definition of smooth, which merely requires that the graft be deliverable intraluminally. Other Palmaz publications from 1980 and 1983 — his "monographs" — also become more relevant. (Exs. 5 - 6.) Both disclose this same wire mesh design. And though the 1980 monograph discloses the slotted tube design, it does not characterize it as smooth. Under the new construction, the stents disclosed in these prior publications are necessarily smooth. And, as evidenced by the PTO's rejection of the asserted claims of the '762 patent, these monographs anticipate the claims. (Ex. 1.)

The Court should grant a new trial. *Cardiac Pacemakers,* 381 F.3d at 1383 ("It is well established that when an incorrect jury instruction — such as an incorrect claim construction — removes from the jury a basis on which the jury could reasonably have reached a different verdict, the verdict should not stand.")

### 2. Cordis's Remaining Argument Against Retrial Is a Diversion.

Cordis's theme as to why — despite the facts and law being in Medtronic's favor — a retrial should nonetheless not be granted is that Medtronic allegedly "abandoned altogether any reliance on the changes" in the claim constructions in the earlier 2005 retrial.[5]

Aside from being irrelevant to the issue of whether a retrial should be granted in *this instance*, Cordis' argument is nonsensical. An obviousness inquiry requires a comparison of each and every claim limitation to the prior art. (D.I. 1357 at 29.) That is what both Medtronic and Cordis did. Moreover, Cordis argues that Medtronic did not mention the changed constructions at trial, but ignores that Medtronic was not permitted to do so; the Court prohibited any references to the previous trial and appellate proceedings. (D.I. 1329 at 5-6, 10.) Cordis further ignores that the relevant question for the jury was not to evaluate the changes in claim construction but rather to determine whether the asserted claims of '762 patent are invalid as then construed.

Nevertheless, to alleviate any concerns Cordis has over arguments being made that are not relevant to the "smooth" limitation, *Medtronic will agree to limit the invalidity retrial on the*

---

[5]     Cordis also attempts to create another diversion when it argues that Medtronic conceded during the 2005 trial that "Dr. Palmaz's invention was a 'modern medical miracle.'" (D.I. 1456 at 23). Medtronic in fact conceded no such thing. In the cited portions of the trial transcript, Medtronic's expert, Dr. Heuser, was asked whether "coronary stenting" was a "modern medical miracle" and was not asked about Dr. Palmaz's invention. (Tr. 1567:16-24). Dr. Palmaz did not invent coronary stenting, however.

*'762 patent to whether the prior art discloses or suggests the "smooth surface" limitation, if Cordis will agree to do the same.*

### C.    The Court Should Not Enter Judgment Until All Issues Concerning the '762 Patent and the Accused Products Are Resolved.

As this Court has acknowledged on various occasions, many of the stent cases before the Court are interrelated and have various moving pieces "given the complexity of the market in light of the extensive litigation between the primary market players."  (Ex. 7, 8/9/05 Order in C.A. No. 98-80 (SLR)).  This case is no exception.  Indeed, it is for this reason that the Court generally has deferred damages proceedings pending resolution of liability issues.  (*See id.* (denying request to set damages and willfulness trial in the Lau case); D.I. 1253 at 27 (9/22/04 Tr. 27, bifurcating damages "until we have addressed as a final matter validity and infringement."); D.I. 1435 (denying Cordis' motion to reinstate damages verdict)).

Notwithstanding this, Cordis seeks entry of judgment of damages of $271 million and of prejudgment interest between $243 and $251 million, even though the validity of the '762 patent is very much in play in other proceedings.  (D.I. 1456, Ex. J at ¶ 3, and Ex. J at Ex. 1.)

BSC's  appeal in another case concerning the '762 patent before this Court is currently pending in the Federal Circuit.  (*Cordis Corp. v. Boston Scientific et al.*, 03-027 (SLR) (D. Del.).)  At issue there is whether Palmaz's 1983 and 1980 monographs (Exs. 5 - 6) are "printed publications" under section 102(b).  The PTO recently addressed this same issue in the '762 reexamination, where it held that the monographs are printed publications and rejected all '762 patent claims asserted against Medtronic here.  (Ex. 1.)  If the Federal Circuit also rules that these monographs are printed publications, this Court should find the '762 patent claims invalid as a matter of law, because they clearly teach all elements of the '762 patent claims asserted by Cordis against Medtronic.  The PTO also has rejected the asserted claims of the '762 patent in an

office action.  If the rejection stands, any judgment against Medtronic will have to be vacated. *Translogic*, 250 Fed.Appx. 988, 2007 WL 2973955, at *1 (Because the patent was invalidated by a reexamination proceeding, "this court vacates the district court's [judgment of infringement and damages] and remands this case to the district court for dismissal.").

In addition to the open damages issues addressed in Argument II, *infra,* an added complexity is that the MSII, GFX and GFX2 stents at issue here also were found to infringe in the non-final proceedings on the Lau patents, also before this Court (C.A. No. 98-80).  The possibility of damages proceedings in both cases raises the specter of inconsistent findings (particularly as to the marketplace in the "but for" world) and a need for coordination between the two cases.

Cordis would not be harmed by any delay in entry of judgment.  As Cordis acknowledges, the MSII, GFX and GFX2 stents have long since been discontinued, the '762 patent has expired, and pre-judgment interest on past damages will accrue.  The Court thus should defer entry of judgment until the outstanding issues on the '762 patent and the accused products are resolved.

## II.    Further Damages Proceedings Are Needed to Resolve the Case on Remand.

We expect that the Court's resolution of the validity issues on remand will render Cordis's requested damage calculations completely unnecessary; at a minimum, they are premature.

### A.    If either Medtronic or BSC Invalidates the '762 Patent, the Damages Verdict from 2000 Cannot Stand.

The jury's 2000 prior damages verdict was based on an infringement finding of *both* the '762 patent and the '984 patent.  (D.I. 1118 at 28-29 (jury instructed to assume that both the '762 and '984 patents were valid for purposes of reasonable royalty calculation); *see also* D.I. 216

(from docket in C.A. No. 98-197), 12/19/2000 Tr. at 29999:3-8 and 3053:9-20.)  If the '762 patent is invalidated on retrial, the Court will need to take two steps to address the prior damages award:  (1) grant JMOL that Cordis is not entitled to lost profits; and (2) order a new trial on the amount of the reasonable royalty that Cordis is due on the '984 patent for domestic sales.

If claim 23 of the '762 patent is found invalid, Cordis will not be entitled to lost profits. Lost profits damages, which constitute the bulk of the damages award in the 2000 trial, will be unavailable because, as a matter of law, the ACS stents will be acceptable non-infringing alternatives.  The parties stipulated during the 2000 damages trial that the ACS stents are acceptable substitutes for Cordis's stents.  (D.I. 1118 at 20.)  The sole issue was whether those stents infringed claim 23 of the '762 patent.  (D.I. 1118 at 20-21.)  If claim 23 is invalidated, the ACS stents necessarily become acceptable non-infringing alternatives, precluding an award of lost profits.  (*Id.* at 18-21.)[6]

Moreover, JMOL as to lost profits would be appropriate if claim 23 is invalidated in a retrial with BSC.  In that scenario, Cordis would be collaterally estopped from disputing that the claim is invalid.  *Pharmacia*, 170 F.3d at 1379-82 (collateral estoppel arises from an invalidity judgment in a copending case despite pending JMOL motion and possibility of appeal).  And once invalidated, any judgment against Medtronic based on the '762 patent should be vacated. *See Translogic*, 250 Fed.Appx. 988, 2007 WL 2973955, at *1 (Because the patent was invalidated by a reexamination proceeding, "this court vacates the district court's [judgment of infringement and damages] and remands this case to the district court for dismissal.")

---

[6]    Cordis did not argue during the 2000 trial that the ACS stents infringe the other patent-in-suit, the '984 patent.  (D.I. 1118 at 20-21.)  Nor could it have.  The '984 patent requires the use of one and only one connector member; the ACS stents use multiple connector members.

If the '762 patent claims are invalidated, the jury's royalty award for domestic sales also will need to be vacated, and a new trial conducted on that issue. The royalty awarded by the jury assumed that both the '762 and '984 patents were valid for purposes of the hypothetical negotiations. (D.I. 1118 at 28-29.) And the parties took into account both patents in their royalty calculations. (D.I. 216 (from docket in C.A. No. 98-197), 12/19/2000 Tr. at 2999:3-8 and 3053:9-20.) Moreover, if the ACS stents no longer infringe claim 23 of the '762 patent, these non-infringing alternatives will necessitate a lower royalty. (D.I. 1118 at 33.)

**B.    Even if the '762 Patent Is Found Valid, This Court Should Decide Medtronic's Motion for JMOL on Lost Profits Damages, Filed in 2001.**

However the '762 validity issue is decided, the Court should decide Medtronic's pending motion for JMOL on damages, filed in 2001. That motion is based on the grounds that (1) Cordis is not entitled to lost profits because it failed to prove marketing capacity; and (2) Cordis failed to prove the absence of noninfringing alternatives. (D.I. 1063; D.I. 1064 at 30-34.) Neither this Court nor the Federal Circuit ever ruled on these issues. Instead, this Court held that the motion was moot in light of its grant of summary judgment of non-infringement to Medtronic. If the '762 patent is found to be valid, Medtronic's JMOL motion on lost profits damages is no longer moot. *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 952-53 (Fed. Cir. 1997) (holding that the district court was obligated on remand to rule on remaining JMOL motions it previously ruled were moot). Because the motions were filed in 2001 — prior to the two Federal Circuit decisions — Medtronic asks that it be permitted to update and resubmit its renewed JMOL on lost profits damages.

**III.    Cordis Is Not Entitled to the Prejudgment Interest It Seeks.**

Cordis's request for prejudgment interest is premature, and Cordis's calculations are wrong.

### A.    Cordis's Request for Prejudgment Interest Should be Limited Because of Its Delay in Prosecuting this Lawsuit.

A trial court has discretion to deny all or a portion of the prejudgment interest due to a plaintiff's delay in prosecuting the action. *See General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656-57 (1983) (the trial court has discretion to deny an award of prejudgment interest where the patentee causes undue delay); *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1362 (Fed. Cir. 2001) (affirming district court's denial of prejudgment interest; plaintiff's "delay was self-serving and resulted in prejudice to the defendants"); *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1546 (Fed. Cir. 1984) (affirming exclusion of prejudgment interest based on plaintiff's delay).

Cordis's litigation tactics significantly delayed this action. In particular, Cordis:

- moved for a preliminary injunction based on the '417 patent, even though it had no hope of establishing irreparable injury; and

- injected a fourth patent — the '332 patent — into the action, knowing that it was of limited applicability and would delay the trial.

Cordis's preliminary injunction motion, filed in 1997 on the day after Christmas, was a complete waste of time. (D.I. 117-120.) For the next several months, the parties operated under an accelerated discovery schedule in which documents were exchanged, and depositions taken. (D.I. 130-31, 202-05, 232-35, 244-45, 250, 255, 258, 262, 272, 280.) On July 20, 1998, after the Court denied Cordis's motion for preliminary injunction against ACS, Cordis unceremoniously withdrew its motion for preliminary injunction against Medtronic. (D.I. 286.) It later dropped the '417 patent from the case. (D.I. 662.) The discovery leading up to the preliminary injunction hearing proved to be largely duplicative of, and subsumed by, the discovery that followed.

Then, in April, 1999—a year and a half after filing suit—Cordis added a submarine patent (the '332 patent) into the proceedings.  (D.I. 428.)  It did so despite having represented at a January 28, 1999 scheduling conference that discovery was essentially complete and asking for a November 1999 trial date to be scheduled.  (D.I. 400, 1/28/99 Tr. at 11:16-17; 13:14; 15:25-16:3; 45:15-16.)   At that conference, Cordis also disclosed that it intended to amend the complaint and to add new infringement claims.  (*Id.* at 45:17-46:6.)  The Court warned Cordis that if it "want[ed] to get to trial in November [1999] and everything that needs to be done has been done, then [Cordis should not] talk about adding new patents and new products."  (*Id.* at 24.)  The Court set trial for March 6, 2000, but warned that the addition of new claims or new products could "add months" to the trial date.  (*Id.* at 24; 60:17-18.)  Cordis was undeterred and added the '332 patent anyway.

Cordis's addition of the '332 patent served no purpose other than to prolong discovery. Consistent with the Court's warning, the trial moved to November 2000; and on the eve of that trial, Cordis dropped the '332 patent.  (D.I. 891.)  Indeed, the Court recognized the delayed trial was Cordis's fault:  Cordis was "absolutely . . . aware of the fact that it has been Cordis's strategy to start off these cases with a preliminary injunction, to sue multiple defendants, not one, to add patents" and but for Cordis's own litigation decisions, "we would have been at trial" long ago.  (D.I. 468, 6/22/99 Tr. at 35-36.)

At a minimum, Cordis's actions delayed the trial by eight months (from March 2000 to November 2000).  And Medtronic was prejudiced by Cordis's actions, incurring unnecessary costs and expenses.  *See Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 968 (Fed. Cir. 1986).

21

Medtronic anticipates that in its reply Cordis will repeat the same flawed counterargument it first made in a 2005 brief — that it was Medtronic, not Cordis, that delayed the trial by requesting permission to file summary judgment motions. (D.I. 1421 at 4.) According to Cordis, the "ensuing summary judgment motions delayed the trial by many months without removing any patents or claims from the case." (*Id.*) This argument does not square with the record. ***First***, Medtronic's summary judgment motion significantly narrowed the issues in the case. The Court granted Medtronic summary judgment of no literal infringement on the '762 and '984 patents. (D.I. 462 at 20; D.I. 463 at 2.) ***Second***, Medtronic's August 1998 request for summary judgment motions was based on Cordis's withdrawal of its motion for preliminary injunction. (D.I. 291 at 21:22-22:21.) Because of Cordis's ill-conceived motion, the parties conducted extensive discovery that Medtronic believed demonstrated that it was entitled to summary judgment. (Id.) ***Third***, Cordis filed a summary judgment motion at the same time. (D.I. 303.) ***Fourth***, Cordis offers no evidence that the summary judgment motions resulted in "many months" of delay. The evidence is to the contrary—after the August 27-28, 1998 summary judgment motions were filed, discovery quickly resumed. (D.I.s 350-58, 363- 72.)

In sum, the Court should exercise its discretion and deny Cordis prejudgment interest at least for this eight-month delay.

### B.     Prejudgment Interest Should Be Calculated Based on The Post-Tax Application of the U.S. Treasury Bill Rate, Compounded Quarterly.

Cordis seeks an improper windfall of approximately *$192 million* through its request for pre-tax, prime rate prejudgment interest compounded on a monthly basis. (D.I. 1456 at 37-40).[7]

---

[7]     This figure is the difference between the amount identified as the "Total Balance as of 9/30/08" ($523,051,158) identified in Cordis's expert declaration (D.I. 1456 (Ex. J at Ex. 1)) and the sum of the 9/30/08 Closing Balances of Domestic ($329,805,934) and International Damages ($1,351,065) identified in the Declaration of Medtronic's Expert, Colin Blaydon. (*See* Ex. 8 at Exs. E and F).

This Court should exercise its discretion to calculate prejudgment interest in a manner consistent with its purpose: "Prejudgment interest has no punitive, but only compensatory, purposes." *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996) (reversing award of prejudgment interest on portion of damages award which violated compensatory purpose of prejudgment interest); *General Motors*, 461 U.S. at 655-56 (finding that the purpose of prejudgment interest is to "make the patent owner whole"). To ensure that any award of prejudgment interest is consistent with its compensatory purposes, it should be tax-adjusted at a rate based on the U.S. Treasury Bill rate (the "Treasury Rate"), compounded quarterly.

### 1.     The Prejudgment Interest Portion of Any Award Should Be Calculated on a Post-Tax Basis.

Cordis mischaracterizes Medtronic's request as one for "double taxation," and it cites case law reciting the (undisputed) rule that it would be unfair to reduce the *principal* portion of a damage award to account for taxes, because the recipient will have to pay the taxes on the damage award. (D.I. 1456 at 39-40 (citing *Hanover Shoe Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 503 (1968) (finding error in appellate remand for a reduction in damage award principal by actual taxes; this would lead to "double deduction for taxation, leaving [plaintiff] with less income than it would have had if [defendant] had not injured it.").)[8] But these cases are irrelevant here: *Medtronic does not ask this Court reduce the jury's $271 million damage award by a single penny to account for taxes.*

---

[8]     Cordis cites to cases relying on *Hanover Shoe* for this irrelevant proposition. (Brief at 39-40 (citing *Hughes Aircraft Co. v. United States*, 86 F.3d 1566, 1574-75 (Fed. Cir. 1996), *vacated*, 520 U.S. 1183 (1997) (relying on *Hanover Shoe* for the rule that "courts do not have to reduce a damage award by the amount of taxes that would have to be paid" and affirming rejection of defendant's argument that damage award should be reduced by taxes paid by plaintiff); *Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1482-83 (Fed. Cir. 1990) (citing *Hanover Shoe* for double taxation issue and finding error in reduction of taxes from damage award); *ATM Express, Inc. v. Montgomery, Alabama*, 516 F. Supp. 2d. 1242, 1250 at n.11 (M.D. Ala. 2007) (relying on *Hanover Shoe*  and refusing to reduce plaintiff's damage award by income taxes payable on that amount:  "To do so, the Court would subject [plaintiff] to double taxation.").)

Instead, Medtronic requests only that *prejudgment interest* be calculated in a manner that takes into account the fact that Cordis would have paid a portion of the damages award in taxes, and that portion should not therefore be compounded in calculating *prejudgment interest*. In the but-for world, Cordis claims that it would have earned these funds during the damages period, on which it would have paid taxes. It is beyond dispute that interest could *not* have accrued to Cordis's benefit on the amounts Cordis would have paid to taxing authorities. Cordis therefore overreaches when it claims that it is entitled to compounded prejudgment interest on amounts that it would have been paid in taxes. Cordis's parent, Johnson & Johnson, has been profitable during each year of the damages period and would therefore have owed federal income taxes on damages it would have earned absent the infringement. Accordingly, Cordis would only have been able to invest and earn interest on its after-tax damages. (Ex. 8, at ¶ 9.) The requested windfall would frustrate the compensatory purpose of prejudgment interest and would require Medtronic to pay Cordis amounts it never would have earned. *Oiness*, 88 F.3d at 1033; *General Motors*, 461 U.S. at 655-56.

Cordis's reliance on decisions from this Court for its position is misplaced. (D.I. 1456 at 39, n.5) *None* address whether prejudgment interest should be calculated on a tax-adjusted basis.[9] Similarly, Cordis's expert declaration is silent on this issue. (D.I. 1456 (Ex. J).)

---

[9]     *See* D.I. 1456 at 39, n.5 (citing *IMX v. Lending Tree, LLC*, 469 F. Supp. 2d 203, 227-228 (D. Del. 2007) (discussing whether prejudgment interest was appropriate and whether prime rate applied); *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, Nos. 99-CV-274-SLR, 99-846-SLR, 2004 WL 1305849 at *19-20 (D. Del. June 9, 2004) (resolving dispute between application of simple or compounded interest), *aff'd in part, rev'd in part on other grounds*, 425 F.3d 13666 (Fed. Cir. 2005); *TA Instruments v. The Perkin-Elmer Corp.*, 277 F. Supp. 2d 367, 380-381 (D. Del. 2003) (determining whether prime rate applies); *C.R. Bard, Inc. v. Medtronic, Inc.*, No. C.A. 96-589-SLR, 1999 WL 458305 at *15 (D. Del. June 15, 1999) (determining rate of prejudgment interest and whether it should be compounded), *aff'd in part, rev'd in part on other grounds*, 250 F.3d 760 (Fed. Cir. 2000).)

The Federal Circuit, however, has approved accounting for a plaintiff's tax liability in calculating prejudgment interest on damage payments. *See Electro Scientific Indus., Inc. v. General Scanning, Inc.*, 247 F.3d 1341, 1354 (Fed. Cir. 2001) (approving a calculation that "took the tax-free interest rate into account and resulted in a more accurate calculation reflecting a taxed principal"); *see also Alpex Computer Corp. v. Nintendo Co. Ltd.*, 1994 WL 681752, 34 U.S.P.Q. 2d 1167, 1209 (S.D.N.Y. 1994) (after-tax calculation of prejudgment interest presented "economically most accurate measure of prejudgment interest" because the plaintiff "lost the time-value of money on only the after-tax amounts"), *aff'd in part, rev'd in part on other grounds*, 102 F.3d 1214 (Fed. Cir. 1996).

The application of a tax adjusted prejudgment interest calculation also finds support in economic theory. *See* Fisher, Franklin, "Janis Joplin's Notebook and the Theory of Damages," Industrial Organization, Economics and Law, Ed. Montz. (MIT Press 1991) (finding that adjusting for taxes when calculating prejudgment interest is the only economically sound model for such calculations) (Ex. 9); Lanzillotti, R.F. and Esquibel, A. K., "Measuring Damages in Commercial Litigation:  Present Value of Lost Opportunities," Journal of Accounting, Auditing and Finance, pp. 125-142 (Ex. 10).

> **2.    Any Award of Prejudgment Interest In This Case Should Be Calculated Using the United States Treasury Bill Rate, Compounded Quarterly.**

As an initial matter, Cordis references this Court's April 24, 2004 order in *Scimed Life Sys v. Johnson & Johnson*, C.A. 99-904-SLR ("*Scimed*") setting prejudgment interest at the prime rate, compounded monthly. (D.I. 1456 at 37 (citing D.I. 314 in *Scimed*, dated April 24, 2004 (D.I. 1456 (Ex. L).)  But Medtronic *was not party* to *Scimed* and cannot be bound by an order in that case. *Scimed* involved different parties, different patents, different legal and factual issues and insignificant damages.  Unlike this case, *Scimed* did not involve prejudgment interest

potentially valued at *hundreds of millions of dollars*.  Indeed, in *Scimed,* the amount of prejudgment interest was so small that the parties never even briefed whether prejudgment interest should be set at the prime rate.  It would be particularly inequitable for Medtronic to bear the burden of the higher interest rate in this matter where it did not even receive the (tiny) benefit of the higher interest rate awarded to the plaintiffs in *Scimed*.[10]

If this Court enters final judgment and awards prejudgment interest, it should exercise its discretion to calculate prejudgment interest using the Treasury Rate, compounded quarterly. Application of the Treasury Rate is in this case is particularly consistent with the compensatory purpose of prejudgment interest.  (Ex. 8, Blaydon Decl. ¶ 9.)  As a general matter, "[t]he three-month Treasury Bill represents a benchmark as the shortest term, risk-free investment available to ordinary investors" and is a good measure "for the [Plaintiff's] foregone use of the money." *Allen Archery, Inc. v. Browning Mfg. Co.*, 898 F.2d 787, 789 (Fed. Cir. 1990) (quoting district court decision, and affirming-in-part district court's prejudgment interest award).

Moreover, Cordis has presented no evidence of the interest rates it obtains when it borrows funds, or that it even borrowed funds during the damages period.  Indeed, the publicly available information about J&J's bond sales during the damages period demonstrate that the rates that J&J offered on its bonds are closer to the Treasury Rate than prime:  *e.g.*, J&J offered a 4.75% bond rate in early 1998 (compared to 8.5% prime rate), and 5.15%, 5.55%, and 5.95% bond rates in August of 2007 (compared to 8.25% prime rate).

Where there is no evidence a plaintiff borrowed funds at a rate higher than the Treasury Rate, district courts have recognized – and the Federal Circuit has affirmed – that the use of the

---

[10]    This Court noted that "by asking for the higher rate in the [*Scimed*] litigation, plaintiffs' shall be paying the higher rate in other litigation if judgment is entered against them." (D.I. 1456, Ex. L at n.1.)

Treasury Rate to calculate prejudgment interest is the most appropriate means of compensation. *See Laitram Corp.*, 115 F.3d at 955 (affirming order setting prejudgment interest at the Treasury rate where "there was no evidence that [Plaintiff] borrowed money at a higher rate, what that rate was, or that there was a causal connection between any borrowing and the loss of the use of the money awarded as a result of [defendant's] infringement."); *Allen Archery, Inc. v. Browning Mfg. Co.*, 898 F.2d 787, 789 (Fed. Cir. 1990); *Mercexchange, L.L.C. v. eBay, Inc.*, 275 F. Supp. 2d 695, 717-18 (E.D. Va. 2003) (noting "plaintiff has offered no evidence … that it was forced to borrow money at a rate equal to or above the prime rate."), *aff'd in part, rev'd in part on other grounds*, 401 F.3d 1323 (Fed. Cir. 2005); *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 761 F. Supp. 1032, 1040-41 (S.D.N.Y. 1991) ("WSI has not demonstrated that interest at a rate higher than the Treasury Bill rate is necessary to compensate it for economic loss caused by BIC's infringement."), *aff'd in part, rev'd in part on other grounds*, 1 F.3d 1214 (Fed. Cir. 1993); *see also Joy Techs., Inc. v. Flakt, Inc.*, 954 F. Supp. 796, 808 (D. Del. 1996) (granting prejudgment interest at Treasury Bill rate where evidence of rate claimant actually paid to borrow funds was inconsistent).[11]

Because Cordis's unsupported request for the prime rate is inconsistent with the purpose of prejudgment interest (*see, e.g., General Motors*, 461 U.S. at 655-56; *Oiness*, 88 F.3d at 1033),

---

[11]     In some instances, courts have affixed the prime rate where (unlike this case) a plaintiff has presented evidence that the prime rate was a better measure of compensatory damages.   *E.g., Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991) (affirming order selecting prime rate because claimant presented evidence that its "poor financial condition during the pendency of the litigation required it to finance its operations with monies borrowed at rates *above the prime rate*") (emphasis added); *see also Mobil Oil Corp. v. Amoco Chems. Corp.*, 915 F. Supp. 1333, 1371-72 (D. Del. 1995) (selecting prime rate where "Mobil established that its worldwide average short term borrowing rate during the period … was at least the prime rate"); *Lam, Inc. v.* Johns-*Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir. 1988) (affirming award of prime rate where plaintiff affirmatively demonstrated that it borrowed at or above prime in order to continue its operations: "Once the claimant has affirmatively demonstrated that a higher rate should be used, the district court may fix the interest at that higher rate.") (citations omitted).  Cordis has presented no such evidence here.

Medtronic respectfully requests that this Court exercise its discretion to apply the Treasury Rate, compounded quarterly, to any award of prejudgment interest granted to Cordis.  *See Symbol Techs., Inc. v. Proxim, Inc.*, C.A. No. 01-801 (SLR), 2004 WL 1770290, *10 (D. Del. July 28, 2004) ("[T]he court concludes that Symbol is entitled to simple interest based upon the United States Treasury Bill One Year Constant Rate …."); *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, C.A. No. 95-218 (SLR), 1998 WL 151411, *54 (D. Del. March 13, 1998) ("The court, in its discretion, agrees with the parties that the prevailing three-month U.S. Treasury Bill rate is the appropriate rate for determining prejudgment interest."); *Polaroid Corp. v. Eastman Kodak Co.*, No. 76-1634-MA, 1990 WL 324105, *84 (D. Mass. Oct. 12, 1990) (awarding T-Bill rate for prejudgment interest where consideration of the record revealed "no evidence that the company borrowed money at any particular interest rate or that it was in dire financial condition and forced into the borrower's market during the infringement period.").[12]

This Court should also reject Cordis's request to the extent that it seeks to improperly inflate an award of prejudgment interest by monthly compounding.  Cordis has presented no evidence that monthly compounding is appropriate or otherwise consistent with the compensatory purpose of prejudgment interest.  Indeed, courts have awarded prejudgment interest compounded on a *quarterly* basis in similar circumstances, where there is no evidence

---

[12]     *See, also, e.g., Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 829 (Fed. Cir. 1989) (finding Treasury Bill rate would adequately compensate patentee); *National Presto Indus., Inc. v. Black & Decker, Inc.*, No. 89 C 8978, 1992 WL 125559, *8 (N.D. Ill. May 27, 1992) (awarding T-Bill rate); *Itron v. Benghiat*, No. Civ. 99-501, 2003 WL 22037710, * 17 (D. Minn. Aug. 29, 2003) (awarding T-Bill rate); *Ecolab, Inc. v. Gardner Mfg. Co., Inc.*, Civ. No. 98-2294, 2003 WL 1856434 at *1 (D.Minn. Apr. 9, 2003) (awarding average T-Bill rate); *Gaus v. Conair Corp.*, No. 94 Civ. 5693, 2003 WL 223859, *21 (S.D.N.Y. Feb. 23, 2003) (awarding T-Bill rate), *rev'd on other grounds*, 363 F.3d 1284 (2004); *Phillips Petroleum Co. v. Rexene Corp.*, C.A. No. 90-208 (LON), 1997 WL 781856, *28 (D. Del. Sept. 4, 1997); *Intex Plastic Sales Co. v. Hall*, No. C-85-2987-JPV, 1991 WL 270167, at *5 (N.D. Cal. July 10, 1991) (awarding T-Bill rate where higher rate was "too speculative"); *Schering Corp. v. Precision-Cosmet Co., Inc.*, 614 F. Supp. 1368, 1384 (D. Del. 1985) (awarding T-Bill rate).

that monthly compounding is appropriate or necessary to compensate the patent holder.  *E.g.,*

*Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*, No. H-03-2910, 2006

WL 3227315, *6 (S.D. Tex. Nov. 6, 2006) ("Because Transocean has failed to demonstrate that

the prime rate or a higher rate is necessary to fully compensate it for GSF's infringement, the

court concludes that the prejudgment interest should be based on the three-month United States

Treasury Bill rate, compounded quarterly"); *BIC Leisure Prods.*, 774 F. Supp. at 837

("Windsurfing has offered no reason that it is appropriate to compound the award's interest

component more frequently than the three-month maturity length of the Treasury bills provide

the basis of Windsurfing's compensation for its foregone use of funds. Accordingly, interest is to

be calculated with quarterly compounding."); *Rates Tech. Inc. v. Redfish Telemetrix, Inc.*, No.

99-CV-4644(RR), 2001 WL 1825854, *7 (E.D.N.Y. Dec. 20, 2001) (awarding prejudgment

interest based on T-Bill rate, compounded quarterly); *see, also, e.g., Datascope Corp. v. SMEC,*

*Inc.*, 879 F.2d 820, 829 (Fed. Cir. 1989) (affirming award of prejudgment interest compounded

annually as within district court's discretion); *Gyromat Corp. v. Champion Spark Plug Co.*, 735

F.2d 549, 557 (Fed. Cir. 1984) ("[W]e cannot say that the district court abused its discretion in

computing prejudgment interest on the basis of the simple statutory rate, not compounded.").

### 3. Alternatively, The Court Should Apply the Statutory Post-Judgment Rate.

Another alternative for prejudgment interest is the statutory post-judgment interest rate.

28 U.S.C. § 1961.  Several courts have used the post-judgment interest rate to limit prejudgment

interest to the statutory Treasury Rate.  *See, e.g., Phillips Petroleum Co. v. Rexene Corp.*, C.A.

No. 90-208 (LON), 1997 WL 781856, *28 (D. Del. Sept. 4, 1997) (noting that the Court's

decision to grant the T-bill rate is consistent with 28 U.S.C. § 1961); *Schering Corp. v.*

*Precision-Cosmet Co.*, 614 F. Supp. 1368, 1383-1384 (D. Del. 1985) (granting a T-bill based

rate because plaintiff "offered no evidence which would support an award above the statutory rate."); *Centricut, LLC v. Esab Group, Inc.*, C.A. No. 99-039-M, 2003 WL 22415605, *2 (D.N.H. Oct. 23, 2003) (specifically adopting the T-bill rate of 28 U.S.C. § 1961 for prejudgment interest absent any compelling evidence to grant a higher rate); *John Mezzalingua Assocs. v. Antec Corp.*, C.A. No. 01-CV-482-J-25HTS, 2002 WL 32107641, *2 (M.D. Fla. Oct. 22, 2002) (specifically adopting the T-bill rate of 28 U.S.C. § 1961 for prejudgment interest); *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 2002 U.S. Dist. LEXIS 26812, *28-31 (S.D. Cal. Sept. 6, 2002) (granting T-Bill based rate, in part, to align award with 28 U.S.C. § 1961). Cordis offers no proof that it is entitled to a rate of interest beyond that established by 28 U.S.C. § 1961 for post-judgment interest.

### 4.     The Correct Amount of Prejudgment Interest is $60,081,914.

Dr. Colin Blaydon has calculated the interest from the date of the first Medtronic sales on an after-tax, compounded 90 day U.S. Treasury bill rate for the reasons set forth above and described in his attached declaration. (*See* Ex. 8 at Exs. E & F.). This amount is $60,081,914. If the Court should determine that Medtronic would be liable for prejudgment interest for the time period from March 6, 2000 to November 6, 2000, then the amount would be $69,733,026. (*Id.* at Exs. C & D).

### 5.     Post-Judgment Interest

If awarded, post-judgment interest should be computed in accordance with 28 U.S.C. § 1961.

## <u>CONCLUSION</u>

For the foregoing reasons, Medtronic requests that the Court deny Cordis's motion for entry of final judgment, and grant Medtronic a retrial on the validity of the '762 patent.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Karen Jacobs Louden

Karen Jacobs Louden (# 2881)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 638-9200
klouden@mnat.com

OF COUNSEL:

D. Michael Underhill
Eric J. Maurer
Jack A. Simms, Jr.
Christopher L. Hayes
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Washington, DC 20015
Telephone:  202.237.2727
Fax:  202.237.6131
munderhill@bsfllp.com
emaurer@bsfllp.com
jsimms@bsfllp.com
chayes@bsfllp.com

*Attorneys for Defendant Medtronic Vascular, Inc.*

Dated:  June 10, 2008
2362526

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on June 16, 2008 I electronically filed the foregoing with the Clerk of the Court using CM/ECF which will send notification of such filing to Steven J. Balick and Josy W. Ingersoll.

I further certify that on June 16, 2008, I served copies of the foregoing to the following counsel in the manner indicated:

**VIA HAND DELIVERY AND E-MAIL**

Steven J. Balick
Tiffany Geyer Lydon
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
sbalick@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorney for Cordis Corporation*

**VIA E-MAIL**

Gregory L. Diskant
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
gldiskant@pbwt.com

*Attorney for Cordis Corporation*

**VIA HAND DELIVERY AND E-MAIL**

Josy W. Ingersoll
Young, Conway, Stargatt & Taylor
Rodney Square North
Wilmington, DE 19801
jingersoll@ycst.com

*Attorney for Boston Scientific Corporation*

**VIA E-MAIL**

George E. Badenoch
Kenyon & Kenyon
One Broadway
New York, NY 10004
gbadenoch@kenyon.com

*Attorney for Boston Scientific Corporation*

/s/ Karen Jacobs Louden
Karen Jacobs Louden
klouden@mnat.com