# Exhibit Q

## Redacted in its Entirety

# Exhibit
# R

## Redacted in its Entirety

# Exhibit S

## Redacted in its Entirety

Exhibit
T

FILE HISTORY FOR US PATENT 4,739,762
(Reexamination No. 90/004,785) (Vol. 2)
JOINTLY SUBMITTED ON BEHALF OF CORDIS
CORPORATION, BSC CORPORATION, SCIMED
LIFE SYSTEMS, INC. AND MEDTRONIC
DATED: April 4, 2000

PLAINTIFF'S
EXHIBIT
13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CORDIS CORPORATION. | ) |
| | ) |
| Plaintiff. | ) |
| | ) |
| v. | ) |
| | ) |
| ADVANCED CARDIOVASCULAR | ) |
| SYSTEMS. INC., GUIDANT CORPORATION. | ) |
| MEDTRONIC AVE. INC., | ) |
| BOSTON SCIENTIFIC CORPORATION, and | ) |
| SCIMED LIFE SYSTEMS. INC., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) Civ. No. 97-550-SLR |
| | ) (Consolidated) |
| ADVANCED CARDIOVASCULAR | ) |
| SYSTEMS, INC. | ) |
| | ) |
| Counterclaim Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CORDIS CORPORATION and | ) |
| EXPANDABLE GRAFTS PARTNERSHIP, | ) |
| | ) |
| Counterclaim Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| BOSTON SCIENTIFIC CORPORATION, and | ) |
| SCIMED LIFE SYSTEMS, INC., | ) |
| | ) |
| Counterclaim Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| MEDTRONIC AVE. INC.. | ) |
| | ) |
| Counterclaim Plaintiff, | ) |

|  |  |
|---|---|
| v. | ) |
| | ) |
| CORDIS CORPORATION. JOHNSON & | ) |
| JOHNSON, and EXPANDABLE GRAFTS | ) |
| PARTNERSHIP. | ) |
| | ) |
| Counterclaim Defendants. | ) |
| | ) |

| | | |
|---|---|---|
| MEDTRONIC AVE, INC.. | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | |
| v. | ) | C.A. No. 97-700-SLR |
| | ) | |
| CORDIS CORPORATION, JOHNSON & | ) | |
| JOHNSON, and EXPANDABLE GRAFTS | ) | |
| PARTNERSHIP, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| BOSTON SCIENTIFIC CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 98-19-SLR |
| | ) | |
| ETHICON, INC.; CORDIS CORPORATION; | ) | |
| and JOHNSON & JOHNSON | ) | |
| INTERVENTIONAL SYSTEMS CO., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**FILE HISTORY FOR U.S. PATENT 4,739,762**
**(Reexamination No. 90/004,785) (Vol. 2)**
**JOINTLY SUBMITTED ON BEHALF OF CORDIS CORPORATION,**
**BOSTON SCIENTIFIC CORPORATION,**
**SCIMED LIFE SYSTEMS, INC. AND MEDTRONIC AVE, INC.**

Dated: April 4, 2000

By: _____
Josy W. Ingersoll (I.D. #1088)
Christian Douglas Wright (I.D. #3554)

NY01 269775 v 1

YOUNG CONAWAY STARGATT
& TAYLOR, LLP.
11th Floor, Rodney Square North
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600

Attorneys for Defendants
BOSTON SCIENTIFIC CORPORATION, and
SCIMED LIFE SYSTEMS, INC.

Of Counsel:

Charles R. Brainard
George E. Badenoch
Paul A. Bondor
George O. Winborne
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 425-7200

By: _____
Patricia Smink Rogowski (I.D. #2632)
Francis DiGiovanni (I.D. #3189)
CONNOLY BOVE LODGE & HUTZ LLP
1220 Market Street
Post Office Box 2207
Wilmington, Delaware 19899-2207
(302) 658-9141

Attorneys for Defendants
MEDTRONIC AVE. INC.

Of Counsel:

William E. Wallace, III
Richard S. Meyer
Penelope M. Lister
MORGAN, LEWIS & BOCKIUS LLP
Washington, D.C. 20036-5869
(202) 467-7000

NY01 269775 v 1

Richard L. Klein
MEDTRONIC AVE, INC.
3576 Unocal Place
Santa Rosa, California 95403

By: _____
Steven J. Balick (I.D. #2114)
Steven T. Margolin (I.D. #3110)
ASHBY & GEDDES
One Rodney Square
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

Attorneys for Plaintiffs
CORDIS CORPORATION

Of Counsel:
Gregory L. Diskant
Eugene M. Gelernter
Michael J. Timmons
PATTERSON, BELKNAP,
        WEBB & TYLER, LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

NY01 269775 v 1

𝒞

**UNITED S  .ES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address    **COMMISSIONER OF PATENTS AND TRADEMARKS**
Washington, D.C. 20231

| SERIAL NUMBER    FILING DATE | PATENT UNDER REEXAMINATION | ATTORNEY DOCKET NO |
|---|---|---|

| | EXAMINER |
|---|---|
| ART UNIT    PAPER NUMBER | |
| ·73.    *13* | |

DATE MAILED:  06/01/98

## OFFICE ACTION IN REEXAMINATION

1-12-98    2-18-98
[X] Responsive to the communication(s) filed on  1-20-98    4-9-98          [ ] This action is made FINAL.

A shortened statutory period for response to this action is set to expire  *TWO*  month(s) from the date of this letter. Failure
to respond within the period for response will cause termination of the proceeding and issuance of a reexamination certificate in
accordance with this action. 37 CFR 1.550(d).  **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

**PART I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. [X] Notice of References Cited by Examiner, PTO-892.       3. [ ] Notice of Informal Patent Drawing, PTO-948.

2. [X] Information Disclosure Citation, PTO-1449.            4. [ ] _____

**PART II    SUMMARY OF ACTION:**

1a. [X] Claims _____ *1-43* _____ are subject to reexamination.

1b. [ ] Claims _____ are not subject to reexamination.

2. [ ] Claims _____ have been cancelled.

3. [X] Claims _____ *17, 32* _____ are confirmed.

4. [ ] Claims _____ are patentable.

5. [X] Claims ___ *1-16, 18-31, 33-43* ___ are rejected.

6. [ ] Claims _____ are objected to.

7. [ ] The formal drawings filed on _____ are acceptable.

8. [ ] The drawing correction request filed on _____ is [ ] approved, [ ] disapproved.

9. [ ] Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has [ ] been received,
[ ] not been received, [ ] been filed in Serial No. _____ filed on _____

10. [ ] Since the proceeding appears to be in condition for issuance of a reexamination certificate except for formal matters,
prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11,
435 O.G. 213.

11. [ ] Other

cc: Requester

PTOL-466 (2-90)

**PWRAP 003003**

Reexamination Control No. 90/004,785            Page 12

Art Unit: 3731

    It would have been obvious to locate the fixation sleeve
either to the inside or the outside of the Kononov prosthesis in
the same manner set forth in the combination of Lazarus and Ersek
above and for substantially the same reasons.  The Kononov
prosthesis is wrapped in a spiral around the catheter and is
uncoiled as it expands in diameter during balloon inflation.  Since
the prosthesis is in the form of a spiral, any suturing of the
fixation sleeve to the prosthesis would naturally be limited to an
arc which is slightly less than 360 degrees around the
circumference of the prosthesis to allow the prosthesis to uncoil.

    Tubular sheath 1 of Kononov would shield the inner wall of the
body passageway from the narrow outwardly projecting edges of the
fixation sleeve in substantially the same way that the guide 18 of
Lazarus would perform this function as explained above.  Since
staples are located on each end of the Kononov prosthesis, it would
have been obvious to use a fixation sleeve at each end.

    As to claims 35-38, Kononov shows a first retainer ring member
1 and a second retainer ring member (the distal portion of tube 2
which is within the ring member 1) which would confine the
prosthesis (the Ersek fixation sleeve) between them and thus mount
and retain the prosthesis.

    Claims 9-12 are rejected under 35 U.S.C. 103(a) as being
unpatentable over Kononov in view of Ersek as applied to claim 1
above, and further in view of either Fischell et al. (4,768,507) or

PWRAP 003014

Reexamination Control No. 90/004,785                    Page 13

Art Unit: 3731

Bokros et al. (3,526,005). Including a biologically inert coating
on the Ersek fixation sleeve in order to provide decreased
thrombogenicity of the sleeve would have been obvious for the
reasons set forth above.

    Claims 39, 42 and 43 are rejected under 35 U.S.C. 103(a) as
being unpatentable over Kononov in view of Ersek as applied to
claims 1, 35 and 37 above, and further in view of Bokros et al.
(3,526,005). Using tantalum as the material for the Ersek fixation
sleeve in order to provide good compatibility with the body would
have been obvious for the reasons set forth above.

    Claims 13-16, 18, 23, 24, 29-31, 33 and 34 are rejected under
35 U.S.C. 102(b) as anticipated by or, in the alternative, under 35
U.S.C. 103(a) as obvious over Ersek (3,657,744). Ersek shows an
expandable graft or prosthesis 16 which meets all of the structural
limitations in the claims. The Ersek fixation sleeve 16 is a graft
or prosthesis since it is implanted within a blood vessel.
Alternatively, it would have been obvious that the Ersek fixation
sleeve 16 is a graft or prosthesis since it is implanted within a
blood vessel. The Ersek member 16 is an "intraluminal" member and
has a first diameter "which permits intraluminal delivery" as
required by claims 13 and 24 for the following reasons. First, the
Ersek member 16 of figure 1 is delivered into the lumen of the
aorta 11 and arteries 13, 14 as seen in this figure while the Ersek
member 16 of figure 8 is delivered into the lumen of the aorta as

Reexamination Control No. 90/004,785                    Page 14

Art Unit: 3731

described in col. 4, lines 41-46. Second, assuming arguendo that
the delivery of the Ersek member 16 is not considered to be
"intraluminal" because the member is not delivered to its desired
location in the artery from a distant insertion site, the Ersek
member, without modification, is capable of being so delivered by
percutaneous   insertion   into   the   artery   by   appropriate
instrumentation.  Since the apparatus rather than the method of
delivering the apparatus is claimed, the Ersek member meets all of
the limitations in these claims.  As to claims 23 and 34, the
outside of the wall surface of the Ersek tubular member 16 is
"smooth".  Although the Ersek members 22 which form the wall are
twisted to the configuration shown in figure 5 such that the
outside of the wall surface is, for the most part, narrow edges
rather than the wider surfaces of the ribbor-like members 22, each
of these narrow edges is smooth.  As one follows the narrow
outwardly directed edges, no abrupt obstacle is met.  The affidavit
of Erik K. Antonsson, Ph.D., P.E., C35148-84 (Appendix VIII,
Exhibit G) (Ersek Notebook) which was cited on sheet 17 of 20 in
the information disclosure statement filed April 9, 1998 has
accompanying photographs of an "Ersek style stent".   These
photographs show the outside surface of the sleeve has having
gentle undulations rather than abrupt obstacles in it.  The areas
where the ribbon-like members curve and twist (at the intersection
of the members) appear to be gently (or smoothly) curved and

Reexamination Control No. 90/004,785                Page 15

Art Unit: 3731

twisted and do not include an abrupt obstacle. Ultimately, whether
or not an object is considered to be smooth is largely subjective.
Smoothness is relative. No surface is perfectly "smooth".

Claims 19-22 and 25-28 are rejected under 35 U.S.C. 103(a) as
being unpatentable over Ersek (3,657,744) in view of either
Fischell et al. (4,768,507) or Bokros et al. (3,526,005).
Including a biologically inert coating on the Ersek fixation sleeve
in order to provide decreased thrombogenicity of the sleeve would
have been obvious for the reasons set forth above.

Claims 40 and 41 are rejected under 35 U.S.C. 103(a) as being
unpatentable over Ersek in view of Bokros et al. (3,526,005).
Using tantalum as the material for the Ersek fixation sleeve in
order to provide good compatibility with the body would have been
obvious for the reasons set forth above.

Claims 1-3 and 7-11 are rejected under 35 U.S.C. 103(a) as
being unpatentable over Kononov (U.S.S.R. 660,689) in view of
Kornberg (4,617,932) and Lazarus (4,787,899). Initially, it is
noted that Kononov indicates that prosthesis 3 is placed on the
inflatable balloons with each end opposite a balloon. Then, the
prosthesis is coiled into a spiral around elastic tube 5. (col. 2,
lines 14-20) The term "spiral" is broad enough to include two
possibilities. The first possibility is that the prosthesis is
wrapped around tube 5 in a manner similar to the way a grip is
wrapped on a tennis racquet. That is, the edge of the grip forms

Reexamination Control No. 90/004,785                    Page 16

Art Unit: 3731

a helix and each winding of the grip partially overlaps the previous winding. The second possibility is that the prosthesis is wrapped around tube 5 in a manner similar to the way the prosthesis in Beck et al. (U. S. Patent No. 4,877,030) is wrapped (or coiled) around the balloon. (This patent is not being applied as a reference but is merely cited for purposes of illustration.) That is, the rectangular sheet of prosthesis is rolled (or coiled) into a tube while keeping its edges aligned so that an end view or a cross-sectional view reveals the shape of a spiral. One of ordinary skill in the art would believe that the second meaning of "spiral" either definitely or probably applies to the Kononov prosthesis for the following reasons. First, no helical or diagonal lines within prosthesis 3 to indicate a helical edge of the prosthesis are seen in the figure. Second, Kononov indicates that prosthesis 3 is placed on the inflatable balloons with each end opposite a balloon prior to wrapping it. One could not keep both ends of the prothesis fixed while wrapping the prosthesis to form of a <u>single</u> helix. Therefore the Kononov prosthesis will be considered to be wrapped according to the second meaning of "spiral" in this rejection.

Kononov substantially discloses the claimed method. However, Kononov fails to show a plurality of slots in the tubular prosthesis. Kornberg teaches that a tubular prosthesis for the intraluminal repair and treatment of aortic aneurysms should

PWRAP 003018

# 17/
A

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Reexamination Control No. 90/004,785 | ) |
| | ) |
| Filed:        October 6, 1997 | )    Group Art Unit:  3731 |
| | ) |
| In Re U.S. Patent No. 4,739,762 | )    Primary Examiner: |
| | )        Michael Thaler |
| Issued:        April 26, 1988 | ) |
| | ) |
| Inventor:    Julio C. Palmaz | ) |

<u>AMENDMENT</u>

Responsive to the Office Action mailed June 1, 1998, please amend the above-

identified application as follows.

<u>In The Claims:</u>

1.    (Amended) A method for implanting a prosthesis within a body passageway

comprising the steps of:

utilizing a thin-walled, tubular member as the prosthesis, the tubular member having a

plurality of slots formed therein, the slots being disposed substantially parallel to the

longitudinal axis of the tubular member;

disposing the prosthesis upon a catheter;

inserting the prosthesis and catheter within the body passageway by catheterization of

said body passageway; and

expanding and deforming the prosthesis at [a desired] the location of an obstruction *existing natural*

within the body passageway by expanding a portion of the catheter associated with the

Control No. 90/004,785                                    Page 1 of 34

prosthesis to force the prosthesis radially outwardly into contact with the body passageway,

the prosthesis being deformed beyond its elastic limit.

13.    (Amended)  An expandable intraluminal vascular graft, comprising:

a thin-walled tubular member having first and second ends and a wall surface

disposed between the first and second ends, the wall surface having a substantially uniform

thickness and a plurality of slots formed therein, the slots being disposed substantially

parallel to the longitudinal axis of the tubular member;

the tubular member having a first diameter which permits intraluminal delivery of the

tubular member into a body passageway having a lumen and wherein the outside of the wall

surface of the tubular member is a smooth surface when the tubular member has the first

diameter; and

the tubular member having a second, expanded and deformed diameter, upon the

application from the interior of the tubular member of a radially, outwardly extending force,

which second diameter is variable and dependent upon the amount of force applied to the

tubular member, whereby the tubular member may be expanded and deformed to expand the

lumen of the body passageway.

Please cancel claim 23.

24.    (Amended)  An expandable prosthesis for a body passageway, comprising:

a thin-walled tubular member having first and second ends and a wall surface

disposed between the first and second ends, the wall surface having a substantially uniform

PWRAP 003039 SUB

thickness and a plurality of slots formed therein, the slots being disposed substantially

parallel to the longitudinal axis of the tubular member,

the tubular member having a first diameter which permits intraluminal delivery of the

tubular member into a body passageway having a lumen and wherein the outside of the wall

surface of the tubular member is a smooth surface when the tubular member has the first

diameter; and

the tubular member having a second, expanded and deformed diameter, upon the

application from the interior of the tubular member of radially, outwardly extending force,

which second diameter is variable and dependent upon the amount of force applied to the

tubular member, whereby the tubular member may be expanded and deformed to expand the

lumen of the body passageway.

Please cancel claim 34.

35.    (Amended)  An apparatus for intraluminally reinforcing a body passageway,

comprising:

an expandable and deformable, thin-walled tubular prosthesis having first and second

ends, and a wall surface disposed between the first and second ends, the wall surface having a

substantially uniform thickness and a plurality of slots formed therein, the slots being

disposed substantially parallel to the longitudinal axis of the prosthesis, the prosthesis having

a first diameter which permits intraluminal delivery of the prosthesis into a body passageway

having a lumen and wherein the outside of the wall surface of the prosthesis is a smooth

surface when the prosthesis has the first diameter; and

2.    Ersek U.S. Patent No. 3,657,744 - In contrast to the minimally invasive procedure of Dr. Palmaz, the Ersek patent teaches a method of implanting a prosthesis in a living body during an open surgical procedure.

The Ersek patent teaches the use of an expandable sleeve fixation device 16 to secure a vessel graft or a heart valve into the body. The theory of the Ersek patent is to provide a rapid fixation technique, which supposedly obviates the need to suture the prosthetic member into the body. Ersek teaches a complex surgical procedure wherein one or more fixation sleeves is or are secured to the prosthesis to be implanted, the abdominal or chest cavity is opened, the diseased portion of the body is removed, body passageways are clamped, and the fixation sleeves are forced into place, where expansion of the sleeve or sleeves is then done. There is no teaching within the Ersek patent that the sleeve 16 may be utilized to *treat* an obstructed body passageway. The sole and only teaching within the Ersek patent regarding utilization of sleeve 16 is as a *fixation device* in substitution for sutures. To aid in fixation and to resist forces tending to pull out the implanted prosthetic device, the Ersek sleeve has outwardly projecting sharp metal edges.

As is clear from the last paragraph of column 2, and the first paragraph of column 3 of the Ersek patent, the fixation sleeve 16 is formed of expanded metal. The configuration of expanded metal is well-known, and is accurately illustrated in Figure 5 of Ersek. As is evident from the Ersek specification (Column 2, lines 56-75 through Column 3, lines 1-9) sleeve 16 has the first diameter configuration of Figure 5 prior to further expansion by expander tool 18. A sample of conventional expanded metal was shown to Examiner Thaler

PWRAP 003048 SUB

at the July 8th interview, and that sample is accurately depicted in its first diameter configuration in Exhibit 1 hereto. As shown therein and in Ersek Figure 5, in the first diameter configuration, the wall of sleeve 16 is of varying thickness because the strands of the sleeve have twisted out of the plane of the starting material. Moreover, the bonds or bridges at the junctions of the strands protrude inwardly and outwardly of the plane of the starting material, and as a result the Ersek sleeve 16 has a non-uniform wall of varying thickness.

Since the bonds or bridges extend generally radially outwardly of the sleeve 16, the sleeve has 100% variance in thickness as compared to the thickness of the starting material in the areas of the bonds or bridges. The strands of the Ersek fixation sleeve are inclined with respect to the plane of the starting material. The strands have an inwardly projecting inner edge that is spaced inwardly of the plane of the starting material by the width of the strand at one end thereof and disposed in the plane of the starting material at the opposite end thereof. The strands have an outwardly projecting edge that is disposed in the plane of the starting material at one end thereof and which is spaced outwardly from the plane of the starting material by the width of the strand at the opposite end thereof. The sleeve 16 has a plurality of outwardly projecting edges which, Ersek teaches, embed themselves into the vessel wall to hold the sleeve 16 and its associated graft in place. The inner and outer surfaces of the Ersek sleeve 16 are not smooth, as that term is understood by persons of skill in the art (Andros Declaration, paragraphs 18 and 21). See also dictionary definitions of smooth - "having an even or level surface; having no roughness or projections that can be seen or felt", and rough

PWRAP 003049 SUB

- "not smooth or level; having bumps, projections, etc." (Exhibit 2 hereto) from which it is

clear that such terms are commonly understood antonyms, and mutually exclusive of one

another. Because the Ersek sleeve 16 does not have a smooth outer surface, it can not be

intraluminally delivered, as that term is understood by persons of skill in the art (Andros

Declaration, paragraphs 16 and 21).

Furthermore, there is no teaching in the Ersek patent that the fixation sleeve 16 may

have a "variable" second diameter; instead, the Ersek sleeve 16 has a first diameter as

mounted on the expander tool 18 and a second fixed diameter which results from actuation of

the expander tool 18 (Andros Declaration, paragraph 22). Still further, there is no express

teaching within the Ersek patent that the expander tool 18 also expands the lumen of the body

passageway; all that is taught is that the tool expands the sleeve 16 sufficiently to embed the

outwardly projecting edges thereon into the wall of the vessel (Andros Declaration,

paragraph 22).

The deficiencies of the Ersek patent are recognized by others. For example, in the

Antonsson Affidavit referred to on page 14 of the Action dated June 1, 1998, which includes

photographic exhibits of a model (also shown to, and discussed in detail with, Examiner

Thaler at the above-mentioned interviews) of an "Ersek-style" fixation sleeve submitted to

the Patent and Trademark Office in connection with a reexamination of Palmaz U.S. Patent

No. 4,733,665, it is concluded in paragraph 9 that the outer wall surface of the Ersek fixation

sleeve is not smooth, not even substantially smooth. In paragraph 10 of the Antonsson

Affidavit, it is stated that the wall thickness "varied at different points" and "ranged from a

minimum thickness of 0.0035 inches to a maximum thickness of 0.0045 inches." While the photographs appended to the Antonsson Affidavit illustrate a model of an Ersek sleeve in an expanded configuration (expanded on a mandrel and not by a balloon), the second diameter or expanded configuration is substantially the same as the first diameter unexpanded configuration, i.e., the wall is of variable, and not substantially the same, thickness in both configurations, and the wall surface is rough, in both configurations. It should be borne in mind that Professor Antonsson was a retained expert by Cook, Inc., the accused infringer, in litigation instituted by Johnson & Johnson Interventional Systems, Co. (JJIS), and was a witness whose interests are adverse to those of Dr. Palmaz.

Similarly, Advanced Cardiovascular Systems, Inc. (ACS), a major competitor of Dr. Palmaz's[*] licensee, JJIS and its successor Cordis Corporation, acknowledged that Ersek does not have a smooth surface.

Appended hereto as Exhibit 3 is a copy of Lau et al. U.S. Patent No. 5,514,154, assigned to ACS, as well as a copy of an Amendment filed in response to an Office Action dated January 31, 1995 in the application for the '154 patent. ACS was successful in obtaining their patent by distinguishing their product as having a smooth outer wall surface prior to expansion, in contrast to Ersek, which had projections on its outer wall surface prior to expansion. At the bottom of page 5 of the enclosed Amendment, ACS stated that "the

---

[*] The '762 Palmaz patent is owned by Expandible Grafts Partnership (EGP) and exclusively licensed to JJIS and its successor, Cordis.

PWRAP 003051 SUB

3.    Claims 13-34, 40 and 41 Are Not Anticipated By, Or Obvious From, Ersek

Independent claims 13 and 24, particularly as amended herewith to include the subject matter of original claims 23 and 34, contain meaningful structural recitations that are not present in, or suggested by, Ersek.

Ersek does not disclose a "thin-walled" tubular member. The Ersek fixation sleeve has a thickness at the bridge or bond areas that is several times the thickness of the starting material.

The wall of the Ersek sleeve, to the extent that it exists, is comprised of twisted, inclined strands, which present inwardly and outwardly projecting edges and bridge portions that extend radially outwardly of the sleeve. This configuration does not provide "a surface", that is "disposed between the first and second ends" of a tubular member as is recited in claims 13 and 24.

As is evident from the specification of the '762 patent, with particular reference to Figure 1A, the connecting members and elongate members that collectively form the tubular member 71 have an outer surface that is disposed in a common cylindrical plane. No comparable wall surface is present in Ersek's fixation sleeve, and it would render Ersek inoperable for its intended purpose to modify sleeve 16 and eliminate the outwardly projecting edges, since the thus modified sleeve would eliminate the very structure contemplated by Ersek for retaining the associated graft or heart valve within the body passageway.

Control No. 90/004,785                                     Page 17 of 34

Clearly, the Ersek sleeve cannot be fairly said to have a wall surface with "a substantially uniform thickness". The expanded metal Ersek sleeve has bridge portions that are several times as thick as the strands. The bridge areas extend generally radially outwardly of the sleeve 16. The strands extending between the bridge portions are twisted to have inwardly and outwardly projecting edges. This irregular and variable configuration is rough and is the antithesis of "substantially uniform thickness". The use of the term "substantially uniform" does not exclude some variations in dimension between the inner and outer surfaces of the wall. Even so, it is clear that Ersek's rough and irregular wall does not have substantially uniform thickness. Antonsson Affidavit, paragraph 10.

Independent claims 13 and 24 also distinguish over Ersek in the recitation of "the tubular member having a first diameter which permits intraluminal delivery". Intraluminal delivery in the context of the Palmaz patent is a term which has a well-understood meaning, i.e., delivery through the lumen of a body passageway from a remote location to the desired location without surgically exposing the desired location of the body passageway. (Andros Declaration, paragraph 16; Column 1, lines 30-37 of '762 patent.) Merely placing one end of an Ersek fixation sleeve into a surgically exposed open end of a body passageway, e.g., iliac arteries 13 and 14, is not intraluminal delivery as that expression is used in claims 13 and 24. Those skilled in the art would not even consider intraluminally delivering the expanded metal sleeve of Ersek through the vasculature of a lumen, since the sharp metal outwardly projecting edges thereon would present a clear risk to the patient (Andros Declaration, paragraph 21). Certainly, the rigid expander tool 18 of Ersek would be incapable of

Control No. 90/004,785                                                      Page 18 of 34

intraluminally delivering sleeve 16. (Andros Declaration, paragraph 21.) Moreover, there is no reason to use a suture substitute (Ersek's fixation sleeve) in a site or location where no suturing takes place (site or location where Palmaz stent is implanted).

While the Ersek fixation sleeve 16 may have a second expanded size, such second size is fixed by the predetermined stroke of rod 33 and is not variable and dependent, as expressly set forth in the claims. As is clear from lines 15 and 16 of column 3 of Ersek, different size sleeves are chosen for the implant being made. Thus, there is also no teaching or suggestion in Ersek that sleeve 16 has a second expanded diameter which is "variable and dependent upon the amount of force applied to the tubular member," as is set forth in independent claims 13 and 24. The ability to have effective control over the final expanded diameter is an important aspect of the invention of the '762 patent.

Moreover, it is questionable whether or not the Ersek sleeve has "a" second diameter. It should be noted that when the sleeve 16 is expanded, the force applied by rings 35 are at spaced locations adjacent the ends of the sleeve. No outwardly directed force is applied to the mid-portion of the sleeve, and while no Ersek device is available for evaluation, it appears that the mid-portion of the sleeve would have a lesser diameter than the ends thereof. With that configuration, only end portions of the sleeve will be forced into intimate contact with the interior of the vessel passageway, forming at best seals of marginal integrity that clearly would be susceptible to leakage.

Also, there is no express teaching in Ersek that expansion of sleeve 16 expands the lumen of the body passageway. Examination of the iliac artery 13 in Figure 1 does not show

Control No. 90/004,785                                              Page 19 of 34

it expanded. Even if it can be argued that the expander tool 18 would inherently function to expand the lumen, such expansion would be incidental and not recognized by those skilled in the art as a teaching of expanding the lumen.

Lastly, independent claims 13 and 24 have been amended to include the subject matter of dependent claims 23 and 34, respectively. No change of substance has been made regarding claims 23 and 34, and such claims with identical scope have merely been rewritten in independent form. There is no question but that Ersek completely fails to disclose a tubular member wherein the outside of the wall surface is a smooth surface, when the tubular member has the first diameter. It is important to remember that "smooth" characterizes the outside of the wall surface that is defined as disposed between the first and second ends of the tubular member. No portion of the outward surface of the Ersek sleeve is "smooth", as that term is understood by those of skill in the art, and certainly no relatively smooth portion of the outside surface of Ersek extends from end-to-end of the sleeve.

Claims 14-22, which depend from claim 13, and claims 25-33, which depend from claim 24, are allowable for all of the reasons advanced above, and for the further reason that each claim sets forth further features of the '762 invention.

With respect to claims 40 and 41, Bokros adds nothing to cure the basic deficiencies of Ersek, and thus claims 40 and 41 are believed to be patentable for the reasons set forth above regarding claims 13 and 24 and for the further reason that claims 40 and 41 each further characterize the graft and prosthesis defined in their parent claims.

Control No. 90/004,785                                    Page 20 of 34

Thus, there is absolutely no teaching or suggestion of the invention set forth in claims

13 and 24 in Ersek and the Examiner's interpretation of Ersek may seem obvious only by

applying hindsight following the teachings of Dr. Palmaz.  This is improper.  See, for

example, *W. L. Gore Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553, 220 U.S.P.Q.

303, 312, 313 (Fed. Cir. 1983), where it was stated:

> To imbue one of ordinary skill in the art with knowledge
> of the invention in suit, when no prior art reference or references
> of record convey or suggest that knowledge, is to fall victim to
> the insidious effect of a hindsight syndrome wherein that which
> only the inventor taught is used against its teacher.

> It is difficult but necessary that the decisionmaker forget
> what he or she has been taught at trial about the claimed
> invention and cast the mind back to the time the invention was
> made (often as here many years), to occupy the mind of one
> skilled in the art who is presented only with the references, and
> who is normally guided by the then-accepted wisdom in the art.
> Had that been here done the inventions set forth in claims 3 and
> 19 of the '566 patent could only have been held non-obvious to
> those skilled in the art at the time those claimed inventions were
> made.

4.    Lazarus U.S. Patent No. 4,787,899 and Kononov U.S.S.R. 660,689

The Examiner has treated the teachings of Lazarus and Kononov as equivalent to one

another in applying the references to the claims, and applicant does not disagree that these

references can be considered to disclose somewhat similar devices, systems and methods.

Because the description in the Lazarus patent is somewhat more complete, applicants'

remarks will be primarily directed to this reference, although most such remarks have equal

applicability to Kononov.

Control No. 90/004,785                                    Page 21 of 34

# Exhibit

# U

**FILE HISTORY FOR US PATENT 4,739,762**
(Reexamination No. 90/004,785) (Vol. 3)
**JOINTLY SUBMITTED ON BEHALF OF CORDIS
CORPORATION, BSC CORPORATION, SCIMED
LIFE SYSTEMS, INC. AND MEDTRONIC
DATED: April 4, 2000**

PLAINTIFF'S
EXHIBIT
14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORDIS CORPORATION,                                    )
                                                       )
                    Plaintiff,                         )
                                                       )
        v.                                             )
                                                       )
ADVANCED CARDIOVASCULAR                                )
SYSTEMS, INC., GUIDANT CORPORATION,                    )
MEDTRONIC AVE, INC.,                                   )
BOSTON SCIENTIFIC CORPORATION, and                     )
SCIMED LIFE SYSTEMS, INC.,                             )
                                                       )
                    Defendants,                        )
                                                       )
        and                                            )        Civ. No. 97-550-SLR
                                                       )        (Consolidated)
ADVANCED CARDIOVASCULAR                                )
SYSTEMS, INC.                                          )
                                                       )
                    Counterclaim Plaintiff,            )
                                                       )
        v.                                             )
                                                       )
CORDIS CORPORATION and                                 )
EXPANDABLE GRAFTS PARTNERSHIP,                         )
                                                       )
                    Counterclaim Defendants,           )
                                                       )
        and                                            )
                                                       )
BOSTON SCIENTIFIC CORPORATION, and                     )
SCIMED LIFE SYSTEMS, INC.,                             )
                                                       )
                    Counterclaim Plaintiffs,           )
                                                       )
        and                                            )
                                                       )
MEDTRONIC AVE, INC.,                                   )
                                                       )
                    Counterclaim Plaintiff,            )

NY01 269775 v 1

v.                                              )
                                                )
CORDIS CORPORATION, JOHNSON &                   )
JOHNSON, and EXPANDABLE GRAFTS                  )
PARTNERSHIP,                                    )
                                                )
          Counterclaim Defendants.              )
                                                )
MEDTRONIC AVE, INC.,                            )
                                                )
          Plaintiff,                            )
                                                )
v.                                              )
                                                )        C.A. No. 97-700-SLR
CORDIS CORPORATION, JOHNSON &                   )
JOHNSON, and EXPANDABLE GRAFTS                  )
PARTNERSHIP,                                    )
                                                )
          Defendants.                           )
                                                )

BOSTON SCIENTIFIC CORPORATION,                  )
                                                )
          Plaintiff,                            )
                                                )
v.                                              )        Civil Action No. 98-19-SLR
                                                )
ETHICON, INC.; CORDIS CORPORATION;              )
and JOHNSON & JOHNSON                            )
INTERVENTIONAL SYSTEMS CO.,                     )
                                                )
          Defendants.                           )
                                                )

**FILE HISTORY FOR U.S. PATENT 4,739,762**
**(Reexamination No. 90/004,785) (Vol. 3)**
**JOINTLY SUBMITTED ON BEHALF OF CORDIS CORPORATION,**
**BOSTON SCIENTIFIC CORPORATION,**
**SCIMED LIFE SYSTEMS, INC. AND MEDTRONIC AVE, INC.**

Dated: April 4, 2000

                              By:  _____
                              Josy W. Ingersoll (I.D. #1088)
                              Christian Douglas Wright (I.D. #3554)

NY01 269775 v 1

YOUNG CONAWAY STARGATT
& TAYLOR, LLP.
11th Floor, Rodney Square North
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600

Attorneys for Defendants
BOSTON SCIENTIFIC CORPORATION, and
SCIMED LIFE SYSTEMS, INC.

Of Counsel:

Charles R. Brainard
George E. Badenoch
Paul A. Bondor
George O. Winborne
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 425-7200

By: _____
Patricia Smink Rogowski (I.D. #2632)
Francis DiGiovanni (I.D. #3189)
CONNOLY BOVE LODGE & HUTZ LLP
1220 Market Street
Post Office Box 2207
Wilmington, Delaware 19899-2207
(302) 658-9141

Attorneys for Defendants
MEDTRONIC AVE, INC.

Of Counsel:

William E. Wallace, III
Richard S. Meyer
Penelope M. Lister
MORGAN, LEWIS & BOCKIUS LLP
Washington, D.C. 20036-5869
(202) 467-7000

NY01 269775 v 1

Richard L. Klein
MEDTRONIC AVE, INC.
3576 Unocal Place
Santa Rosa, California 95403

By: _____
Steven J. Balick (I.D. #2114)
Steven T. Margolin (I.D. #3110)
ASHBY & GEDDES
One Rodney Square
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

Attorneys for Plaintiffs
CORDIS CORPORATION

Of Counsel:
Gregory L. Diskant
Eugene M. Gelernter
Michael J. Timmons
PATTERSON, BELKNAP.
    WEBB & TYLER, LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

NY01 269775 v 1

#20 / D

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Reexam Control No. 90/004,785        )
                                     )
Filed: October 6, 1997               )      Art Unit 3731
                                     )
For: U.S. Patent No. 4,739,762       )      Examiner M. Thaler
                                     )
Inventor: Julio C. Palmaz            )

GROUP 330

A M E N D M E N T

Assistant Commissioner for Patents
Washington, D.C.  20231

Dear Sir:

Please rescind the previous cancellation of claims 23 and 34 so that the

patentability of these claims may now be confirmed.

Please cancel claims 13 and 24.

Please amend claims 14, 16, 17, 18, 19, 25, 29, 31, 32 and 33 as follows:

14.    (Amended)  The expandable intraluminal vascular graft of claim [13]

23, wherein the slots are uniformly and circumferentially spaced from adjacent slots and the

slots are uniformly spaced from adjacent slots along the longitudinal axis of the tubular

member, whereby at least one elongate member is formed between adjacent slots.

16.    (Amended)  The expandable intraluminal vascular graft of claim [13]

23, wherein the tubular member does not exert any outward, radial force while the tubular

member has the first or second, expanded diameter.

17.     (Amended) The expandable intraluminal vascular graft of claim [13] 23, wherein the slots have a substantially rectangular configuration when the tubular member has the first diameter; and the slots have a substantially hexagonal configuration when the tubular member has the second, expanded diameter.

18.     (Amended) The expandable intraluminal vascular graft of claim [13] 23, wherein the slots have a configuration which is substantially a parallelogram after the tubular member has been expanded and deformed into the second expanded diameter.

19.     (Amended) The expandable intraluminal vascular graft of claim [13] 23, wherein the tubular member has a biologically inert coating on the wall surface.

25.     (Amended) The expandable prosthesis for a body passageway of claim [24] 34, wherein the tubular member has a biological inert coating on the wall surface.

29.     (Amended) The expandable prosthesis of claim [24] 34, wherein the slots are uniformly and circumferentially spaced from adjacent slots and the slots are uniformly spaced from adjacent slots along the longitudinal axis of the tubular member, whereby at least one elongate member is formed between adjacent slots.

31.     (Amended) The expandable prosthesis of claim [24] 34, wherein the tubular member does not exert any outward, radial force while the tubular member has the first or second expanded diameter.

32.     (Amended) The expandable prosthesis of claim [24] 34, wherein the slots have a substantially rectangular configuration when the tubular member has the first diameter, and the slots have a substantially hexagonal configuration when the tubular member has the second, expanded diameter.

Control No. 90/004,785                                           Page 2

33.    (Amended)  The expandable prosthesis of claim [24] 34, wherein the

slots have a configuration which is substantially a parallelogram after the tubular member has

been expanded and deformed into the second expanded diameter.

## R E M A R K S

This Amendment is being made to comply with a specific request made during

a telephone discussion initiated by Examiner Thaler to the undersigned on August 20, 1998.

The purpose of this Amendment is to present claims 23 and 34 in a manner so

that their patentability can be confirmed.  Claims 14, 16, 17, 18, 19, 25, 29, 31, 32 and 33

have been amended so that they now depend from a patentable claim 23 or 34.

Applicant respectfully requests the issuance of a Notice of Intent to Issue a

Reexamination Certificate with respect to this reexamination proceeding.


Respectfully submitted,

Date:  August 21, 1998

John P. Milnamow
Registration No. 20,635


ROCKEY, MILNAMOW & KATZ, LTD.
Two Prudential Plaza
180 North Stetson Avenue, Suite 4700
Chicago, Illinois 60601
(312) 616-5400

**PWRAP 003245**

## CERTIFICATE OF DELIVERY

I hereby certify that this paper is being hand-delivered to the U.S. Patent and
Trademark Office on _August 24, 1998_ .


_Somchay Chinyavong_

**PWRAP 003246**

Control No. 90/004,785

Page 4

Reexamination Control No. 90/004,785                    Page 2

Art Unit: 3731

<u>EXAMINER'S AMENDMENT</u>

Authorization for this examiner's amendment was given in a
telephone interview with Mr. Milnamow on August 24, 1998.

Claims 40 and 41 have been amended as follows:

~40. (Amended) The expandable intraluminal vascular graft of
claim [13] 23, wherein tantalum is utilized for the tubular member.

41. (Amended) The expandable prosthesis of claim [24] 34,
wherein tantalum is utilized for the tubular member.

<u>REMARKS</u>

Claims 40 and 41 have been amended so that they now depend
from a confirmed claim 23 or 34.

<u>REASONS FOR ALLOWANCE</u>

<u>Claim 1</u>

Claim 1, as amended, includes the step of expanding and
deforming the prosthesis **at the location of an existing natural
obstruction within the body passageway**.  Initially, it should be
noted that the examiner considers the word "existing" in this
phrase to require that the natural obstruction exist while the step
of expanding and deforming the prosthesis is occurring.  However,
the limitation is considered by the examiner to be broad enough to
include the possibility that the existing natural obstruction is
one which has been reduced in size by balloon angioplasty or other
methods.

Reexamination Control No. 90/004,785                    Page 3

Art Unit: 3731

    Claim 1, prior to the amendment, was rejected under 35
U.S.C. 103(a) as being unpatentable over Lazarus (4,787,899) in
view of Ersek (3,657,744). This rejection is no longer considered
to be proper. Even if an Ersek type of fixation sleeve were placed
on the Lazarus graft, it would not have been obvious to locate this
assembly within the body passageway at the location of an existing
natural obstruction since the placement of the assembly at the
obstruction would only further reduce the diameter of the lumen by
adding at least one additional layer to the obstruction. Such a
result would clearly be undesirable since the fluid flow through
the body passageway would be reduced. Even if an Ersek type of
fixation sleeve were placed on the Lazarus graft, an artisan
following the teachings of Lazarus and Ersek would not have found
it to be obvious to expand the body lumen at a natural obstruction
by expanding the Ersek fixation sleeve to compress the natural
obstruction since there is no teaching in Ersek of using the
fixation sleeve to expand the body lumen and there is no teaching
in Lazarus of using the graft to expand the body lumen. In
addition, the supplemental declaration of George Andos, M.D. under
37 C.F.R. 1.132 indicates on paragraph 3 therein, that it was not
known, nor would it have been obvious, to locate a flexible Lazarus
DACRON graft in an obstructed, or stenosed, location of a blood
vessel.

PWRAP 003255

Reexamination Control No. 90/004,785                    Page 4

Art Unit: 3731

Claim 1, prior to the amendment, was also rejected under 35
U.S.C. 103(a) as being unpatentable over Kononov (U.S.S.R. 660,689)
in view of Ersek (3,657,744). The Kononov (U.S.S.R. 660,689) device
is similar in many respects to that disclosed in Lazarus. This
rejection is no longer considered to be proper for substantially
the same reasons as those given above.

Claim 1, prior to the amendment, was also rejected under 35
U.S.C. 103(a) as being unpatentable over Kononov (U.S.S.R. 660,689)
in view of Kornberg (4,617,932) and Lazarus (4,787,899). This
rejection is no longer considered to be proper for substantially
the same reasons as those given above. Even if slots were
incorporated into the Kononov prosthesis in view of Kornberg and
even if the Kononov staples were formed by deforming them beyond
their elastic limit in view of Lazarus, it would not have been
obvious to locate this assembly within the body passageway at the
location of an existing natural obstruction for the reasons given
above.

### Claim 44

Claim 44 is a new claim. This claim includes the step of
expanding and deforming the stent prothesis at an area of stenosis
within the coronary artery. This claim is more limited than
amended claim 1. It would not have been obvious to locate either
the Lazarus or the Kononov device within the coronary artery at the

Reexamination Control No. 90/004,785                    Page 5
Art Unit: 3731

area of stenosis for substantially the same reasons as those given
above.

### Claims 23 and 34

Claims 23 and 34 have not been amended.  These claims were
rejected under 35 U.S.C. 102(b) as being anticipated by or, in the
alternative, under 35 U.S.C. 103(a) as being obvious over Ersek
(3,657,744).  This rejection is no longer considered to be proper.
Each of these claims includes the limitation "wherein the outside
of the wall surface of the tubular member is a smooth surface when
the tubular member has the first diameter".  Upon reconsideration,
the outside of the wall surface of the Ersek (3,657,744) fixation
sleeve is not considered to be smooth.  The Ersek fixation sleeve
is formed of expanded metal.  A sample of conventional expanded
metal was shown to the examiner during the July 8, 1998 interview.
The sample is depicted in Exhibit 1 of the July 22, 1998 amendment.
The sample has the same basic shape as that shown in figure 5 of
Ersek.  As one follows the outside surface of one of the strands of
the sample, one meets an abrupt obstacle at the bridge (at the
junction of the strands) since the bridge has a thickness which is
twice as great as the strand.  The outside of the wall surface of
the Ersek fixation sleeve includes a multitude of these obstacles
(one at each bridge), making it rough rather than smooth.
Therefore, the Ersek reference fails to meet the smooth surface
limitation quoted above.  Further, making the outside of the Ersek

PWRAP 003257

Reexamination Control No. 90/004,785                    Page 6

Art Unit: 3731

fixation sleeve smooth rather than rough would be contrary to the
teachings of Ersek since the rough surface formed by narrow
outwardly projecting edges is intended to embed itself into the
tissue wall upon expansion of the sleeve (col. 3, lines 1-6).

<u>Claims 35 and 37</u>

    Claims 35 and 37 have been amended.  These claims, prior to
the amendment, were rejected under 35 U.S.C. 103(a) as being
unpatentable over Lazarus (4,787,899) in view of Ersek (3,657,744).
These claims were also rejected under 35 U.S.C. 103(a) as being
unpatentable over Kononov (U.S.S.R. 660,689) in view of Ersek
(3,657,744).    These rejections are no longer considered to be
proper.  Amended claims 35 and 37, like unamended claims 23 and 34,
include the limitation "wherein the outside of the wall surface of
the tubular member is a smooth surface when the tubular member has
the first diameter".  Ersek fails to meet this limitation as
indicated above.  Even if an Ersek type of fixation sleeve were
placed on the Lazarus or Kononov graft, its outside wall surface
would not be smooth as claimed.

    Claims 35 and 37, prior to the amendment, were also rejected
under 35 U.S.C. 103(a) based upon Kononov in view of Kornberg
(4,617,932).  This rejection is no longer considered to be proper.
Claims 35 and 37 include the limitation "the wall surface having a
substantially uniform thickness".  Even if the Kornberg type of
struts 12 were included in the Kononov prosthesis, the prosthesis

Reexamination Control No. 90/004,785                    Page 7

Art Unit: 3731

would not have a substantially uniform thickness as now claimed since the thickness of the prosthesis at the struts would be substantially greater than the thickness of the prosthesis where no struts were located.

Claims 35 and 37, prior to the amendment, were also rejected under 35 U.S.C. 103(a) based upon Lazarus. This rejection is no longer considered to be proper. Even if the combination of the Lazarus graft 12 and staples 16 is considered to be the claimed prosthesis, the combination does not have a substantially uniform thickness as now claimed, since the thickness of the wall of the prosthesis where the staples overlie the graft 12 includes the thickness of the staples 16 plus the thickness of the graft 12 while the thickness of the wall of the prosthesis at areas where the staples do not overlie the graft 12 is only the thickness of the graft 12.

### Claim 51

Claim 51 is a new claim. This claim is even more limited than original claims 13 and 24. Claim 51, like unamended claims 23 and 34, includes the limitation "wherein the outside of the wall surface of the tubular member is a smooth surface when the tubular member has the first diameter". Ersek fails to meet this limitation as indicated above.

**PWRAP 003259**

Reexamination Control No. 90/004,785                    Page 8

Art Unit: 3731

<u>In Conclusion</u>

As indicated above, none of the claims can be properly
rejected using the same references and grounds of rejection applied
in the first Office Action.   No other combination of these
references can be used to properly reject any of the claims as they
now stand.   In addition to these references, all of the other
references of record have been carefully considered.  <u>None</u> of the
references of record, whether considered separately or in any
combination, can be used to properly reject any of the claims as
they now stand.

Any inquiry concerning this communication or earlier
communications from the examiner should be directed to Michael
Thaler whose telephone number is (703) 308-2981.

                                        MICHAEL THALER
mht                                     PRIMARY EXAMINER
August 25, 1998                         ART UNIT 3731

PWRAP 003260

# Exhibit

# V

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2005 JAN 25  PM 4: 18

| | |
|---|---|
| CORDIS CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 97-550-SLR |
| | ) (Consolidated) |
| MEDTRONIC VASCULAR, INC., | ) |
| BOSTON SCIENTIFIC CORPORATION, | ) |
| and SCIMED LIFE SYSTEMS, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**BOSTON SCIENTIFIC CORPORATION AND
BOSTON SCIENTIFIC SCIMED, INC.'S MOTIONS *IN LIMINE*
(NOS. 1 THROUGH 7)**

Josy W. Ingersoll (I.D. #1088)
Christian Douglas Wright (I.D. #3554)
Karen E. Keller (I.D. #4489)
YOUNG CONAWAY STARGATT &
  TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
(302) 571-6600

Attorneys for Defendants
BOSTON SCIENTIFIC CORPORATION,
and BOSTON SCIENTIFIC SCIMED, INC. (formerly
SCIMED LIFE SYSTEMS, INC.)

Of Counsel:
George E. Badenoch
Charles R. Brainard
Albert J. Breneisen
Mark A. Chapman
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 425-7200

January 25, 2005

**OPENING BRIEF IN SUPPORT OF BSC'S MOTION *IN LIMINE* NO. 5:**

**TO PRECLUDE CORDIS FROM OFFERING EVIDENCE RELATING TO
THE NONOBVIOUSNESS OF CLAIM 44 OF THE '762 PATENT**

\* \* \* \* \*

**TABLE OF CONTENTS**

**Page**

FACTS ....................................................................................................................... 1

ARGUMENT ............................................................................................................. 2

CONCLUSION .......................................................................................................... 3

i

# TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*,
   229 F.3d 1120 (Fed. Cir. 2000) ................................................................. 2

*Cordis Corp. v. Medtronic AVE, Inc.*,
   194 F. Supp. 2d 323 (D. Del. 2002) ....................................................... 1

*Mossman v. Broderbund Software, Inc.*,
   Case No. 98-71244-DT, 1999 U.S. Dist. LEXIS 8014 (E.D. Mich. May 18, 1999) ...... 2


**Statutes**

35 U.S.C. § 103 (2004) .................................................................... 1, 2

35 U.S.C. § 305 (2004) ................................................................ 1, 2, 3

BSC respectfully moves *in limine* to preclude Cordis from offering evidence relating to the issue of whether claim 44 of the '762 patent is invalid for obviousness under 35 U.S.C. § 103, because that issue is moot, and such evidence would be confusing and unfairly prejudicial to BSC.

## FACTS

The '762 patent in suit is a continuation-in-part of the parent application that issued as the '665 patent. Although the '665 patent broadly claims the general concept of balloon expandable stents and their use, Cordis has never asserted, and long ago covenanted not to assert, the '665 patent against BSC. Unlike the '665 patent, the '762 patent is a narrow patent that focuses on Dr. Palmaz's slotted tube stent and its use.

At the previous trial in 2000, the only claims of the '762 patent that Cordis asserted against the NIR stent were device claim 23 and method claim 44. Only claim 23 is at issue in the new trial.

At the previous trial, the jury found that BSC had contributorily infringed the method of claim 44, but that claim 44 was invalid because Cordis had added the claim solely to cover competitive stents, such as the NIR stent, which is not a permissible reason for adding a claim in a reexamination under 35 U.S.C. § 305. After trial, this Court denied BSC's motion for JMOL of noninfringement of claim 44, and denied Cordis' motion for JMOL that claim 44 was not invalid under 35 U.S.C. § 305. *See Cordis Corp. v. Medtronic AVE, Inc.*, 194 F. Supp. 2d 323, 349-53 (D. Del. 2002).

Despite this final determination by this Court that claim 44 is invalid, Cordis' experts apparently plan to testify that both claims 23 and 44 of the '762 patent are not

invalid for obviousness under the new claim construction.  (7/30/04 Buller report (Ex. A)
at 2, 31-33, 37-38; 7/30/04 Collins report (Ex. B) at 3-4, 6, 21, 26.)

## ARGUMENT

Cordis should be precluded from offering evidence relating to the issue of
whether claim 44 of the '762 patent is invalid for obviousness under 35 U.S.C. § 103,
because that issue is moot, and such evidence would be confusing and unfairly prejudicial
to BSC.

The only obviousness issue that is justiciable at this stage is the issue of whether
claim 23 is obvious under the new claim construction.  The issue of whether claim 44 is
obvious is moot because claim 44 has been finally determined to be invalid under 35
U.S.C. § 305.  *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d
1120, 1122 (Fed. Cir. 2000) (affirming district court's decision that the claims of the
patent-in-suit are obvious over the prior art and not addressing the issue of whether the
claims are invalid based on public use as moot); *Mossman v. Broderbund Software, Inc.*,
Case No. 98-71244-DT, 1999 U.S. Dist. LEXIS 8014 (E.D. Mich. May 18, 1999)
(granting defendants' motion for summary judgment of invalidity, finding that claims of
the patent-in-suit are invalid as anticipated and indefinite, but denying defendants'
motion for summary judgment of invalidity for failure to disclose best mode as moot).
Indeed, the issue of whether claim 44 is obvious will remain moot unless and until Cordis
successfully appeals this Court's decision not to set aside the verdict that claim 44 is
invalid under 35 U.S.C. § 305.  If and when that occurs, depending on the posture of the
case at that time, the issue of whether claim 44 is obvious may need to be resolved, but
the Court cannot and should not attempt to address that contingency now.

To permit Cordis to offer evidence regarding the nonobviousness of claim 44 also would needlessly confuse the jury by injecting extraneous issues into the trial that are not properly justiciable. Moreover, such evidence would confuse the jury in a manner that would be unfairly prejudicial to BSC, because it would divert the jury's attention from the obviousness of the narrow device of claim 23, which is properly in issue, to the obviousness of the general method of implanting balloon expandable stents, which is not properly in issue. The general method of implanting balloon expandable stents is the subject of the parent Palmaz '665 patent, which Cordis long ago agreed not to assert against BSC. Cordis should not be permitted to circumvent this covenant by injecting claim 44 into the trial in an attempt to inflate Dr. Palmaz's contribution and confuse the jury into thinking that the general method of implanting balloon expandable stents is in issue. The only issue properly before the jury is whether the narrow device claimed in claim 23 would have been obvious.

## CONCLUSION

For the reasons set forth above, BSC respectfully requests that the Court grant its motion *in limine* no. 5.

3

# Exhibit W

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| CORDIS CORPORATION, | ) | **CONFIDENTIAL:** |
|  | ) | **FILED UNDER SEAL** |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) | C.A. No. 97-550-SLR |
| MEDTRONIC VASCULAR, INC., BOSTON | ) |  |
| SCIENTIFIC CORPORATION, and SCIMED | ) |  |
| LIFE SYSTEMS, INC., | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |
| MEDTRONIC VASCULAR, INC., | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) | C.A. No. 97-700-SLR |
| CORDIS CORPORATION, JOHNSON & JOHNSON | ) |  |
| and EXPANDABLE GRAFTS PARTNERSHIP, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## CORDIS' RESPONSE IN OPPOSITION TO BSC'S MOTIONS *IN LIMINE*

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19801
(302)645-1888

*Attorneys for Cordis Corporation*

*Of counsel*:

Gregory L. Diskant
Eugene M. Gelernter
Christopher M.P. Jackson
Wendy Kemp Akbar
Catherine Williams
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
212-336-2999

Dated:  February 7, 2005
153201.1

## CORDIS' RESPONSE IN OPPOSITION TO BSC'S MOTION *IN LIMINE* NO. 5, TO PRECLUDE CORDIS FROM OFFERING EVIDENCE RELATING TO THE NONOBVIOUSNESS OF CLAIM 44

BSC's *In Limine* Motion No. 5 seeks an order barring Cordis from introducing evidence relating to the nonobviousness of claim 44 of the '762 patent. Cordis does not oppose this motion, and does not intend to offer evidence on that subject.

Claim 44 (unlike claim 23) does not include the "substantially uniform thickness" limitation. As a result, the jury's verdict of infringement of claim 44 was not affected by the revised claim construction. In Cordis' view, issues involving infringement or validity of claim 44 are outside the scope of this trial.

At trial in 2000, the jury found that claim 44 was infringed by BSC, but was invalid under Section 305 of the patent statute, 35 U.S.C. § 305. In ruling on post-trial motions, this Court denied BSC's JMOL motion on infringement for claim 44. Cordis v. Medtronic AVE, 194 F. Supp. 323, 349-51, and denied Cordis' motion for JMOL on validity under § 305. Id. at 351-53. Although this Court agreed with Cordis that validity under § 305 was a question of law for the court, not a jury question, id. at 351-52, it found that "claim 44 was added solely to cover competitors' stents, and not for a permissible reason under § 305." Id. at 353. Cordis has not yet had an opportunity to appeal this Court's ruling on claim 44 validity.

Cordis agrees that the issues for trial do not include the validity of claim 44.

# Exhibit X

Page 546

```
                                - VOLUME C -
                  IN THE UNITED STATES DISTRICT COURT
                  IN AND FOR THE DISTRICT OF DELAWARE
                               - - -
CORDIS CORPORATION,              :         CIVIL ACTION
        Plaintiff               :
                                :
        vs.                     :
                                :
MEDTRONIC AVE, INC., BOSTON     :
SCIENTIFIC CORPORATION and      :
SCIMED LIFE SYSTEMS, INC.,      :
        Defendants              :         NO. 97-550 (SLR)
                               - - - -
BOSTON SCIENTIFIC CORPORATION   :         CIVIL ACTION
and SCIMED LIFE SYSTEMS, INC.,  :
        Plaintiffs              :
                                :
        vs.                     :
                                :
ETHICON, INC., CORDIS CORP.     :
and JOHNSON & JOHNSON           :
INTERVENTIONAL SYSTEMS CO.,     :
        Defendants              :         NO. 98-19 (SLR)
                               - - - -
CORDIS CORPORATION,             :         CIVIL ACTION
        Plaintiff               :
                                :
        vs.                     :
                                :
MEDTRONIC AVE, INC., BOSTON     :
SCIENTIFIC CORPORATION and      :
SCIMED LIFE SYSTEMS, INC.,      :
        Defendants              :         NO. 98-197 (SLR)
                                      Wilmington, Delaware
                                      Monday, March 21, 2005
                                      9:05 o'clock, a.m.

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

                                      Valerie J. Gunning and
                                      Leonard A. Dibbs,
                                      Official Court Reporters
```

Page 547

APPEARANCES:

    ASHBY & GEDDES
    BY: STEVEN J. BALICK, ESQ.

        -and-

    PATTERSON, BELKNAP, WEBB & TYLER LLP
    BY: GREGORY L. DISKANT, ESQ.,
        EUGENE M. GELERNTER, ESQ.,
        WILLIAM F. CAVANAUGH, JR., ESQ.,
        MICHAEL TIMMONS, ESQ. and
        SCOTT HOWARD, ESQ.
        (New York, New York)

        -and-

    JOHNSON & JOHNSON
    BY: ERIC I. HARRIS, ESQ.

        Counsel for Cordis Corporation

    YOUNG, CONAWAY, STARGATT & TAYLOR
    BY: JOSY W. INGERSOLL, ESQ.

        -and-

    KENYON & KENYON
    BY: GEORGE BADENOCH, ESQ.,
        MARK CHAPMAN, ESQ. and
        WALTER HANLEY, ESQ.
        (New York, New York)

        Counsel for Boston Scientific
        Corporation

                   - - -

Page 548

PROCEEDINGS

(Proceedings commenced at 9:05 a.m., and the following occurred without the presence of the jury.)

THE COURT: Mr. Diskant?

MR. DISKANT: Your Honor, we have a few issues to raise before the examinations begin, I'm sorry to say. In one way or another, they all relate to the issue that we raised last week, which was BSC's attempt to suggest that there was only one claim in issue, and that they were entitled to some kind of mileage after that. Your Honor last week admonished them that that was misleading and asked them to stop.

We received demonstratives today, last night, for the anticipated testimony of their first expert, Dr. Snyder, which are riddled with this kind of comparison. I raise it now because Dr. Buller is about to begin cross and I fear they may attempt the same cross with him.

I will hand up a package of documents.

First, what is happening is the theory of BSC's case has radically changed. The first document in your pile is Dr. Snyder's expert report on which we prepared the case. And if you just look at Paragraph 7,

Page 549

he summarizes the theory of their case, which is one of ordinary skill who knew about balloon angioplasty, knew that the Palmaz abstract discloses the concept of a balloon expandable stent, and then the Ersek structures of particular design that one would combine.

And so basically their theory of the case was that Claim 23 as it is, in fact, is, a structure claim for use in a particular method and then they were combining the method with the structure in order to make it that obvious in this case.

The Palmaz abstract has all but disappeared. It was not mentioned in opening. There is maybe one slide, Mr. Snyder's demonstratives on it, and they've turned their case into simply a structure case. They have now recast Claim 23 as just a structure and the structure is Ersek.

Now, I think that's a fundamental change, but I can live with that. I can litigate that completely different case. That's not the point of my comment except to put in context what they are doing as a result of their fundamental change in their defense strategy.

Now, to develop that strategy, the first, I think the single worst thing they are doing is focusing on the cancellation of Claim 13. In the opening, Mr.

Page 702

1  properly rejected using the same references and grounds
2  of rejection applied in the first office action.
3          That was what Mr. Badenoch was asking you
4  about?
5  A.  Yes.
6  Q.  The arguments that the examiner made in the first
7  office action he now says, none of the claims can be
8  properly rejected using the same -- using those references.
9          Is that the point?
10  A.  That's absolutely right.  This is the examiner's
11  conclusion at the end of this process.  The examiner
12  looked at Ersek and all of these thing and said none of
13  these things can reject Dr. Palmaz's invention.
14  Q.  And then he says, no other combination of these
15  references can be used to properly reject any of the
16  claims as they now stand.  In addition to these
17  references, all of the other references of record have
18  been carefully considered.  None of the references of
19  record, whether considered separately or in any
20  combination, can be used to properly reject any of the
21  claims as they now stand.
22          What references did you understand the
23  examiner was referring to?
24  A.  The three things that have been raised, and in
25  particular, Ersek, but also Lazarus and Russian reference

Page 703

1  called Kononov.
2  Q.  He says all of the other references of record have
3  been carefully considered.
4          Did that include --
5  A.  There's a huge -- huge list.  If you look at the
6  re-examination, I can't remember if it's in evidence,
7  but if you look at the '762 re-examination, there's a
8  huge list of documents and references and things that
9  were put in front of the examiner to consider and this
10  is a vast list, including Ersek, Kononov and Lazarus.
11  Q.  Did it include Dotter's disclosure of percutaneous
12  angioplasty?
13  A.  Yes.  His 1969 disclosure, it included that.
14  Q.  Did it include Grunzig's pioneering disclosure of
15  balloon angioplasty?
16  A.  Yes.
17  Q.  Did it include all the self-expanding stents you've
18  been talking about?
19  A.  Yes.
20  Q.  All right.  Now, the examiner emphasizes the word
21  none.  I would just like to ask you whether you agree
22  with that emphasis?
23  A.  Absolutely, I do.  I've looked at all of these
24  documents myself, and I don't believe that any of them
25  on their own or combined together made Dr. Palmaz's

Page 704

1  invention obvious or anticipated.
2  Q.  And why is it that you believe that Dr. Palmaz's
3  combination of elements in Claim 23 is not obvious?
4  A.  Because it is a truly unique combination.  You
5  can't as I said previously think did Dr. Palmaz invent
6  slots, did he invent a tube, did he invent metal.  What
7  he invented was this unique combination that you put
8  together to allow patients to be treated without major
9  surgery, to allow a procedure to be done through the
10  lumen without opening up exposing, cutting or doing any
11  of the sort of things that Ersek taught.
12  Q.  Let's take a look at Claim 23 again.
13          Now, Mr. Badenoch asked you some questions
14  about commercially successful coronary balloon expandable
15  stents.  And I'm not sure he was focusing exactly on
16  what your testimony was.
17          Do you have an opinion as to the relationship
18  between the elements set forth in Claim 23 and successful
19  balloon expandable coronary stents?
20  A.  Yes.  I believe that all of the successful balloon
21  expandable coronary stents use this unique combination of
22  elements as put forward in Dr. Palmaz's Claim 23 of his
23  '762 patent.  They use this combination of elements in
24  the way that Dr. Palmaz taught.
25  Q.  Do they all have first diameters for intraluminal

Page 7

1  delivery?
2  A.  Yes.  They all have first small diameters to allow
3  you to deliver along the lumen, to avoid surgery.
4  Q.  Do they all have second expanded and deformed
5  diameters upon the application of radially outwardly
6  extending force that's variable and used to expand the
7  lumen?
8  A.  Yes, they do.
9  Q.  And structurally, do they all have a thin-walled
10  tubular member with longitudinal slots?
11  A.  Yes.  This is exactly what Dr. Palmaz taught.  All
12  of the commercially available balloon expandable coronary
13  stents have the longitudinal slots that can open up like
14  an expansion joint to allow it to open up to a larger
15  size and support the body passageway in the coronary
16  artery.
17  Q.  Mr. Badenoch showed you the table of contents of one
18  of these handbooks of coronary stents.
19          Mr. Croce gave some testimony about the second
20  generation of coronary stents that entered the U.S. market
21  in 1977 and 1978.
22          What stents were those?
23  A.  Sorry.  19 --
24  Q.  1997 and 1998, the second generation -- when the
25  second generation of coronary stents entered the U.S.

Page 706

1  market.
2  A.  NIR stent, AVE stent, they all came in the late
3  1990s.
4  Q.  All right.  Together with Cordis, do they dominate
5  the stent market?
6  A.  Yes.
7  Q.  Let's take a look at the stents that entered the
8  market in 1997.
9        AVE's stent, does it have longitudinal slots
10 as described by Dr. Palmaz?
11 A.  Yes, it does.
12       Could we possibly turn the lights down?  I
13 can't see that well the screen.
14       Thank you.
15 Q.  Can you point this out?
16 A.  Here are shown three of the commercial leaders over
17 the years and here is the AVE product with a closeup of
18 it here with slots, longitudinal slots running along the
19 length of the stent.  Here is the ring structure I've
20 talked about previously.
21       Here is the NIR stent, the BSC stent we
22 talked about during this litigation.  Here are the slots
23 that allow it to expand and it runs around the
24 circumference as I talked about previously.
25       Here's another stent, a Multi-Link stent by

Page 707

1  Guidant, ACS company.  Again, here are the slots running
2  around and that allow it to open up.  All of the
3  commercially expandable commercially balloon expandable
4  stents use the invention of a slotted tube structure that
5  can open up to a second diameter to support the passageway.
6  Q.  Let's add Cordis' BX Velocity.  Does Cordis' BX
7  Velocity use the slots of Claim 23?
8  A.  Yes.  It's the one that has the right to do so.
9  It practices Dr. Palmaz's invention.  Here is the stent,
10 the BX Velocity.  It's the same basic stent that produces
11 the Cipher, the drug-eluting stent and here is the slot,
12 here it's running around the circumference and this is
13 what allows it to expand and support the wall.
14       And you can see the similarity.  Here is the
15 Cordis product.  Here's the Boston SciMed product.
16 Here's the AVE product, here's the ACS product.  They
17 are all using Dr. Palmaz's invention.
18 Q.  Is there any dispute in this case that BSC's NIR
19 stent has longitudinal slots?
20 A.  No.  I don't think there's any dispute.
21 Q.  In fact, is there any dispute in this case about
22 any limitation at all except whether the NIR stent has
23 a wall substantially -- of substantially uniform
24 thickness?
25 A.  My understanding is that Boston SciMed are not

Page 708

1  disputing any other claim limitation other than the
2  substantially uniform thickness that we've talked about
3  at length.
4  Q.  Does the NIR stent have a wall of substantially
5  uniform thickness?
6  A.  Yes, it does.
7        MR. DISKANT:  Thank you.
8        Nothing else, your Honor.
9        THE COURT:  All right.  You may step down.
10       THE WITNESS:  Thank you.
11       THE COURT:  Thank you.
12            (Witness excused)
13                    - - -
14       MR. DISKANT:  With this, your Honor, our
15 presentation of evidence is completed and Cordis rests
16 its case.
17       Thank you, ladies and gentlemen.
18       THE COURT:  All right.  Let's save any other
19 discussions until our next break.
20       MR. BADENOCH:  Fine, your Honor.
21       Ladies and gentlemen, you've now heard one
22 side of the case and we're going to present our case.
23 Our first witness is Paul Laviolette.  And he is the
24 Chief Operating Officer of Boston Scientific.  He's going
25 to tell you a little bit about Boston Scientific and

Page 709

1  discuss its sale of the NIR stent.  He has been a member
2  of Boston Scientific's Senior Management Team and
3  Executive Committee since 1994, before we began selling
4  the NIR stent.
5        And he'll be examined by my partner, Walt
6  Hanley.
7                    - - -
8        DEFENDANTS' TESTIMONY
9
10       ... PAUL ARTHUR LaVIOLETTE, having
11       been duly sworn as a witness, was
12       examined and testified as follows ...
13       MR. HANLEY:  Good afternoon, ladies and
14 gentlemen.
15       DIRECT EXAMINATION
16 BY MR. HANLEY:
17 Q.  Good afternoon, LaViolette.
18       Would you please tell us by whom you're
19 currently employed?
20 A.  I'm employed for Boston Scientific Corporation.
21 Q.  And how long have you been with the company?
22 A.  Since 1994, so going on 12 years.
23 Q.  What are your current duties and responsibilities?
24 A.  Well, I'm the Chief Operating Officer at BSC, so
25 my responsibilities encompass all day-to-day operating

Exhibit
Y

Page 1

```
- VOLUME A -
IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE
- - -

CORDIS CORPORATION,            :       CIVIL ACTION
          Plaintiff            :

     vs.                       :

MEDTRONIC AVE, INC., BOSTON    :
SCIENTIFIC CORPORATION and     :
SCIMED LIFE SYSTEMS, INC.,     :
          Defendants           :       NO. 97-550 (SLR)
                                - - -
BOSTON SCIENTIFIC CORPORATION  :       CIVIL ACTION
and SCIMED LIFE SYSTEMS, INC., :
          Plaintiffs           :

     vs.                       :

ETHICON, INC., CORDIS CORP.    :
and JOHNSON & JOHNSON          :
INTERVENTIONAL SYSTEMS CO.,    :
          Defendants           :       NO. 98-19 (SLR)
                                - - - - -
CORDIS CORPORATION,            :       CIVIL ACTION
          Plaintiff            :

     vs.                       :

MEDTRONIC AVE, INC., BOSTON    :
SCIENTIFIC CORPORATION and     :
SCIMED LIFE SYSTEMS, INC.,     :
          Defendants           :       NO. 98-197 (SLR)
                                - - -
                           Wilmington, Delaware
                           Thursday, March 17, 2005
                           9:35 o'clock, a.m.

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
                                - - -
                           Valerie J. Gunning and
                           Leonard A. Dibbs,
                           Official Court Reporters
```

Page 2

```
1  APPEARANCES:

2     ASHBY & GEDDES
      BY: STEVEN J. BALICK, ESQ.
3
4        -and-
5
      PATTERSON, BELKNAP, WEBB & TYLER LLP
6     BY: GREGORY L. DISKANT, ESQ.
          EUGENE M. GELERNTER, ESQ.
7         WILLIAM F. CAVANAUGH, JR., ESQ.
          MICHAEL TIMMONS, ESQ. and
8         SCOTT HOWARD, ESQ.
          (New York, New York)
9
10       -and-
11
      JOHNSON & JOHNSON
12    BY: ERIC I. HARRIS, ESQ.
13       Counsel for Cordis Corporation
14
      YOUNG, CONAWAY, STARGATT & TAYLOR
15    BY: JOSY W. INGERSOLL, ESQ.
16
17       -and-
18    KENYON & KENYON
      BY: GEORGE BADENOCH, ESQ.
19        MARK CHAPMAN, ESQ. and
          WALTER HANLEY, ESQ.
20        (New York, New York)
21       Counsel for Boston Scientific
          Corporation
22
23       - - -
24
25
```

Page 3

```
3
4      (Proceedings commenced at 9:35 a.m.)
5
6           THE COURT:  Good morning, counsel.
7      (Counsel respond "Good morning, your Honor.")
8           THE COURT:  Deja vu all over again.
9           We see jurors in the back.  So, as soon as
10   they're kind of gathered, we'll bring them in.  I
11   understand that there are no issues, problems before
12   jury selection, so we'll just go forward.
13           MR. BADENOCH:  Your Honor, one --
14           THE COURT:  Yes?
15           MR. BADENOCH:  -- noncontroversial on the
16   voir dire.  Albert Brenneisen is not here.  Walt Hanley
17   is.  So on Page 6, when you read counsel...
18           THE COURT:  Well, I don't generally read.
19   They have the list.  So I can add that name.
20           Let me just make sure I have it right.
21   H-a-n-l-e-y?
22           MR. HANLEY:  Correct, your Honor.
23           THE COURT:  All right.
24           (At this point the prospective jurors were
25   brought into the courtroom.)
```

Page 4

```
1           THE COURT:  Good morning, ladies and gentlemen.
2   I'm Judge Robinson and I will be presiding over a trial
3   for which a jury is about to be drawn in the case
4   captioned Cordis Corporation versus Boston Scientific
5   Corporation, et al.  Briefly stated, this is a patent
6   action, arising under the patent laws of the United
7   States, involving stents, which are medical devices
8   implanted in arteries.
9           The trial will last five days.  I time my
10   trials so the attorneys have to complete their trial
11   presentations within these limits.  However, jury
12   deliberations may require you to be present longer than
13   five days.
14           Our trial days will run approximately from
15   9:30 a.m. to 4:30 p.m.
16           In light of this brief summary, I'm going to
17   ask you certain questions, the purpose of which is to,
18   one, enable the Court to determine whether any prospective
19   juror should be excused for cause and, two, to enable
20   counsel for the parties to exercise their individual
21   judgment with respect to peremptory challenges, that is
22   challenges for which no reason need be given by counsel.
23           If any of you answer any question yes, please
24   stand up and, upon being recognized by the Court, state
25   your juror number.
```

Page 121

1  trial: My partner, Walt Hanley, my partner, Mark
2  Chapman, and Josy Ingersoll from the firm here, Young
3  Conaway in Wilmington.
4        Boston Scientific is not as big as Johnson &
5  Johnson. We don't sell baby oil or Band-Aids or those
6  things, but it was founded in 1979 specifically to go
7  into the business of minimally invasive surgery, the
8  kind of things you've been seeing on the screen with
9  those animations, where instead of having open, traumatic
10  surgery, you implant small devices, you have these
11  procedures where you use a catheter that goes in through
12  the blood vessel to the location. That's our business.
13  Boston Scientific specializes in small implantable
14  devices, minimally invasive surgery. And we've been in
15  that business longer than Johnson & Johnson.
16        We have with us here from Boston Scientific
17  the Chief Patent Counsel in charge of this, Mr. Gillman.
18  And I would also say that the Boston Scientific, as you
19  heard, did invest in this technology. The Nir stent
20  that's accused in this case, which Boston Scientific
21  purchased, was developed by a small innovative company
22  called Medinol Limited. You heard that that was a good
23  product, even from the plaintiffs.
24        And we have the Chief Technical Officer here
25  of Medinol as well, doctor Jacob Richter.

Page 122

1        Now, I listened to the opening statement of
2  plaintiff's counsel and I thought it was a bit one-sided
3  but, you know, I'm biased. I'm on the other side. I'm
4  sure you were expecting that. You know you're going to
5  hear the other side from me.
6        He kind of made it sound like this great
7  development of going from open-heart surgery all the way
8  up to these wonderful procedures we have today was all
9  basically attributable to Dr. Palmaz. And I think you
10  probably realize that's a bit one-sided. Dr. Palmaz did
11  make a contribution, no question. But so did many
12  others. Many people contributed to this thing before Dr.
13  Palmaz and many important contributions were made after,
14  including contributions by Boston Scientific.
15        Johnson & Johnson is not the only company to
16  invest millions of dollars in risky new medical
17  technology. That's our business. Boston Scientific
18  has invested comparable amounts in risky new
19  technologies.
20        The -- let me give you just a few important
21  examples of how this development actually occurred. Dr.
22  Palmaz didn't invent stents and he's not going to say
23  that he did. The inventor of stents is Dr. Charles
24  Dotter, who back in 1969, he also invented, incidentally,
25  this is his coil stent you see on the screen there, he

Page 123

1  also invented this procedure, where you go into the
2  blood vessel with a guide wire and you put things over
3  the wire to locate the site like a stent, this minimally
4  invasive procedure.
5        And Dr. Palmaz also did not invent the first
6  controllably expandable stent. There is another device
7  in the prior art that you're going to hear a lot about
8  that was invented by Dr. Robert Ersek. Dr. Ersek had
9  an expandable metal tube, you're going to learn it's
10  got almost all of the very same features as Dr. Palmaz's
11  first tube. It's expanded. It's controllable. You put
12  it into the end of a lumen and he used it in surgical
13  procedures to attach a graft and put it into the end of
14  a lumen.
15        Dr. Palmaz also did not invent -- that was
16  1972, incidentally. Dr. Palmaz did not invent balloon
17  angioplasty. The real key to these procedures, as you
18  heard, is the invention of Dr. Andreus Gruntzig. Dr.
19  Grunzig, he's the one that came up with the idea of
20  balloon angioplasty, where you go in through the blood
21  vessel like this instead of open-heart surgery. You
22  have this balance balloon, as you saw on counsel's
23  animation, which opens the artery up, with a high-pressure
24  balloon. That was Dr. Gruntzig.
25        So you have all these procedures and

Page 124

1  inventions preceding Dr. Palmaz.
2        What did Dr. Palmaz do? Well, he did have a
3  very good idea. What he did was to take an expandable
4  tube, like Ersek, put it on the balloon, and then go in
5  and expand it with the balloon at the same time and
6  implant it that way. That's what he did. That's the
7  balloon expandable stent invention. And it was a good
8  idea. And he has been paid handsomely for it.
9        But that is not what this case is about.
10  Not only is Cordis's story a bit one-sided, it's off
11  point, too.
12        This case is about a single claim in the
13  patent that you have in your books there and this claim
14  is different. It's not the balloon expandable stent
15  invention.
16        Can we put up the claim?
17        This is the claim that counsel put up. You
18  will be hearing about this throughout the trial.
19        There are two parts to it. It's a combined
20  claim. You see the number 13 at the top. Then there's
21  a whole list of things. I'm not going to read it now.
22  Then there's 23.
23        And 23 refers to 13. So although Claim 23 is
24  the only asserted claim in this case, it includes the
25  elements of 13 and 23.

## Page 125

1   Now, this has got a lot of medical jargon in
2   it here, but briefly, the point is this. This claim
3   covers an expandable metal tube that you stick into an
4   artery or some other vessel, blood vessel, and it has
5   certain structural features. And that's all.
6        Let me show you. If we compare it to -- this
7   is Dr. Palmaz's preferred tube in his patent. Basically,
8   when it says, this says it's expandable. Okay.
9   Intraluminal. That means a lumen is any body passageway.
10  Vascular means it's a blood vessel. Graft means it hold
11  open and supports.
12        Then you have a bunch of elements: A
13  thin-walled tubular member. Well, it's a thin-walled tube.
14        It's got first and second ends.
15        It's got a wall surface between the two ends.
16        The wall surface has to be substantially
17  uniformly thick. We're going to talk about that, as you
18  can gather from the opening.
19        It has to have a plurality of slots in it.
20        It has to have a first diameter that is small
21  enough that you can put it in the lumen. You have to be
22  able to deliver it in the lumen.
23        And it has to have a second diameter that
24  is -- that you -- that you get when you expand it.
25        Now, later on we'll also have a smooth surface,

## Page 126

1   but just pause here for a second.
2        What's interesting is what you don't see in
3   this claim. This is not about -- first of all, it's not
4   about coronary applications. The word coronary is nowhere
5   in the claim, the thing that made all this money,
6   Palmaz/Schatz. That's a coronary stent. This one is not
7   limited to coronaries at all.
8        Second, you don't see the word balloon in
9   this claim anywhere. This claim does not limit it to a
10  balloon expandable stent.
11            - - -
12        MR. BADENOCH (Continuing): This is the
13  expandable tube, just like Ersek, except that there's a
14  few features on the wall surface, smoothness and
15  thickness, that are different.
16        What it says about the force to expand the
17  balloon. It doesn't say to expand the balloon. It says
18  any radially outwardly extending force. With this claim
19  you can put a balloon in here and expand --
20            - - -
21
22
23
24
25

## Page 127

2        MR. BADENOCH (Continuing): You can put a
3   mechanical tool in and expand it. You can expand it
4   with anything that you can expand and plastically expand
5   and deform that, as much as you want.
6        And that's important for a number of reasons.
7   You're going to be asked basically two questions in this
8   case. The questions are is this one asserted claim?
9   It's the only claim that's asserted in the case. Is
10  this claim valid and is it infringed by the Nir stent?
11        Now, on validity, just to make the point
12  clear, the question you'll be asked is, is the
13  expandable stent described in Claim 23 obvious? It's
14  an expandable tube. We're going to be comparing it to
15  Ersek's expandable tube and talking about those
16  differences and that's going to be your question.
17        The question is not is Dr. Palmaz's balloon
18  expandable stent invention obvious. His idea of putting
19  the stent on a balloon, delivering it intraluminally,
20  implanting at the same time, all of those ideas that
21  counsel talked about, that's not this claim. You're
22  not being asked to decide that question.
23        And we're certainly not here in court this
24  week to decide whether Dr. Palmaz is entitled to credit
25  for what he did do. Of course, he is, and he has

## Page 128

1   received it, in spades. We'll come to that. But we're
2   here to discuss a much more limited issue.
3        The other thing I should point out as far as
4   the actual more balanced story, the -- after Dr. Palmaz,
5   I mean, Dr. Palmaz had a great idea of putting a stent
6   on a balloon. His tube itself, well, you saw it, is kind
7   of a rigid tube and by itself, that wasn't really such a
8   great idea. It was okay for a while, while it was alone
9   on the market, but when newer stents came along,
10  clearly, they were better. No question.
11        You heard, for example, about the skepticism.
12  Yes, doctors were very skeptical. But what were they
13  skeptical about?
14        They weren't skeptical about this claim.
15  They were not skeptical. They were skeptical about the
16  fact, as counsel explained, leaving a little metal
17  device in the artery where you have blood flow. That
18  was what they were skeptical about. That's what SciMed
19  was worried about. That's what all these other
20  companies were worried about. And they were worried
21  about that for good reason.
22        If you have metal in the bloodstream, you
23  create clots. It's called thrombosis, and that can be
24  a serious problem. And the idea of putting these metal
25  stents in, okay, it would help hold it open, but if the

Page 129

1 metal hung in the artery, you would get thrombosis,
2 and that's what they were worried about. They were not
3 skeptical about if you have this kind of tube, and if
4 you put a force inside it and blow it up, would those
5 slots turn into diamonds?
6          You know, that's this. If you take -- this
7 is kind of like a child's gate at the top of the stairs
8 and you apply force. Look. These slots open into
9 diamonds. If you have a cylinder, that is what happens.
10          Nobody was skeptical of that. That's obvious.
11 Everybody learns this when they are three. Okay?
12          So what the doctors were worried about was
13 the metal in the artery. And Dr. Palmaz didn't solve
14 that problem. Dr. Palmaz -- I mean doctor -- Antonio
15 Columbo came up with a solution. He realized, and he
16 published this later, he realized that if you have new
17 balloons with a lot more force so that you can put the
18 metal, press the stent much more firmly into the artery,
19 which is elastic, so that the metal gets covered, then
20 you can avoid what they were doing with early stenting.
21          Early stents, they put them in and because
22 of this thrombosis, they had to use a very harsh drug
23 regimen. It was called Coumadin. It's a very
24 aggressive blood thinner. It's also called Warfarin.
25 The same stuff is used as a rat poison. It's very

Page 130

1 harsh. And you'll find in these Stress and Benestent
2 studies that they talk about, yes, there was improvement,
3 modest, but there was improvement that the stent held
4 the artery open longer. That's true. You'll also
5 see in the very same studies the patients had to stay in
6 the hospital longer because of this Coumadin treatment
7 and the complications and the side effects.
8          And that wasn't Dr. Palmaz's contribution.
9 Dr. Columbo, very famous interventional cardiologist in
10 Italy, came up with that, published it when other
11 doctors began to realize how you could do this. By having
12 the balloons inflated with more pressure, that's when
13 these stents started to take off.
14          That's another thing. The big market that
15 made all the money here was coronaries. And Dr. Palmaz
16 is not a cardiologist and he did not invent the design
17 that is the coronary stent. Dr. Palmaz's tube, that's
18 too rigid. That's used in peripherals. It's too rigid
19 to put in a coronary. There was a flexibility problem.
20 In order to come up with that Palmaz/Schatz stent, they
21 had to find some way to make it more flexible and they
22 did. They had this little thing that flexes. It's like
23 two boxcars where you saw a link there. They didn't
24 show it, but you could see it on the stent they put up.
25          And that idea came from Dr. Schatz, his

Page 131

1 partner, not Dr. Palmaz. In fact, Dr. Palmaz actually
2 opposed that idea, as he'll agree. He will agree he
3 turned down the idea. The flexibility contribution,
4 key to the coronary market where all the money came
5 from, that came from Dr. Schatz.
6          So my point here is that Dr. Palmaz can't be
7 given credit for everything. He's given tremendous
8 credit for what he did do. This claim, however, is on
9 the expandable tube part and that's not something that
10 I think you're going to find valid when we present all
11 the evidence.
12          Now, since then, you heard about other
13 stents are on the market. They've talked about they have
14 newer models now. That's true. They have BX velocity.
15 They have Cipher. And in between there's something
16 interesting. In between, when the -- this original tube
17 that they had, the Palmaz/Schatz stent and the new
18 Cordis products, other products, including the Nir, had
19 the market. Why? Because of those other features that
20 turned out to be extremely important.
21          The commercial success that they are going to
22 talk about, it's not all based on Dr. Palmaz. You know
23 it's not because otherwise, how could one stent that
24 they put on, the Palmaz invention, suddenly disappear,
25 suddenly get replaced by ours and others and then get

Page 132

1 replaced again by theirs?
2          Today everybody is making drug-eluting
3 stents. Boston Scientific is the leader in that. Cordis
4 has a product, too. They, in fact, improved restenosis
5 much more than the Palmaz stent.
6          So the story as a whole, many contributors.
7          Now, why is it so important to pay attention
8 to what this claim actually says, the one claim in the
9 case? Three reasons.
10          First, it's extremely important because it's
11 why you realize that all of this praise, the story you
12 heard, is off point. It's interesting background about
13 Dr. Palmaz, but it's not what the case is actually going
14 to be about.
15          All this praise that you heard of Dr. Palmaz,
16 it's not about the design of that tube. It's about his
17 contribution of combining the tube with the balloon, the
18 balloon expandable stent, which is not what this claim
19 is limited to.
20          The skepticism about -- of the doctor, that's
21 not about this tube either. They all know it could be
22 expanded. It was about the problem of metal in the
23 bloodstream, which was answered by Dr. Columbo.
24          The commercial success, it's not to the tube
25 either.

Page 135

1  upon Cordis for the information and he has to accept,
2  when they tell him facts and submit affidavits and
3  evidence, he can't go out and hire his own experts.
4  He does not have an adversarial proceeding like you're
5  going to see. He does not have experts coming in on
6  both sides and being cross-examined like you will. He
7  does not have nearly the time to study this as you're
8  going to have. And that's why it's important.
9  There are a lot of cases -- the Patent Office
10  has issued over six million patents since it was founded.
11  They are issuing them at the rate of over a hundred
12  thousand a year now. They're not all valid, which
13  wouldn't surprise you. There are juries like you looking
14  at these all the time.
15  And in some cases, it's a question, the
16  examiner simply didn't know the prior art. Sometimes he
17  got information that turned out to be wrong. That's what
18  these cases are for.
19  This case actually turns out to provide a
20  perfect example. You are wondering, okay. They got a
21  patent on the balloon expandable stent. Fine. They
22  have other patents, other claims on that. They are not
23  asserted here. Okay.
24  How did they get a patent on an expandable
25  tube like this? How did they do that?

Page 135

---

So in this sense, Cordis' story is a little
2  bit of a smokescreen. There's a bait and switch here.
3  Don't be taken in by it. Dr. Palmaz deserves all of
4  the credit he has been given for what he did do, and we
5  agree with that, but the claim asserted in this case is
6  not for that combination.
7  It's also important because this claim is
8  invalid. Put simply, it's too broad because it's not
9  limited to what was Dr. Palmaz's balloon expandable
10  stent invention. Maybe just to explain, under the
11  patent law, patents build on other patents. If you have
12  a patent on a combination, Dr. Palmaz is entitled to a
13  patent on the balloon expandable stent, to combined the
14  expandable stent with a balloon. He's entitled to that.
15  He's not entitled to a patent on any stent. Dr. Dotter
16  invented that years earlier.
17  He's not entitled to a patent on any
18  expandable tube or the expandable stent like Ersek.
19  Ersek did that first. He's certainly not entitled to a
20  patent on a balloon.
21  It's like if you have a patent on a roller
22  skate, because you invent the combination, you're
23  entitled to a patent on the roller skate, but you don't
24  get a patent on a shoe and you don't get a patent on
25  the wheels. Those are components. We're talking about

---

Page 134

1  here a component, the expandable tube, which is just
2  like Ersek and the prior art.
3  The other reason that this is important is
4  that because it's just like Ersek, they had to add
5  specific structural details, including the substantially
6  uniform thickness provision, into the claim, and that
7  limited their claim on that. And, as a result, we don't
8  infringe because the Nir stent simply doesn't meet that.
9  It does not meet that requirement at all.
10  Now, I'm going to come back to both of these
11  things in just a little bit more detail, but you may be
12  asking, first, the validity question. Why do you have
13  to decide this? You saw the video. The examiner has
14  already reviewed it. The video says you have to review
15  it again.
16  You may still be wondering why.
17  Well, the answer is because there's a patent
18  examiner in the office who does this but, frankly, the
19  examiners don't always get it right. They are very
20  busy. They have limited time and resources. They
21  conduct the proceedings, as you heard in the video, in
22  private. In other words, we're not there as competitors
23  to advise the examiner of any information. It's a
24  secret process going on between Cordis and the examiner,
25  and he has to accept what they tell him. He depends

---

Page 136

1  Well, it's interesting. The way they did it
2  the first time around, they turned in the application.
3  The examiner didn't know about Ersek, neither did Dr.
4  Palmaz. It went right through because they didn't find
5  any prior art that was like this until it was allowed.
6  Later, they discovered Ersek. And they knew
7  there was a problem, so they took it back to the Patent
8  Office for what's called a re-examination. The same kind
9  of process, but you have it examined again, because
10  there's new information.
11  They said, Ersek, this is Cordis, raised a
12  substantial new question of patentability and they were
13  right. It went back to the Patent Office and the
14  examiner agreed immediately and the examiner rejected
15  this claim, the whole thing as anticipated by Ersek.
16  He said, look, Ersek has got the same thing
17  you've got in the claim. This claim is simply for the
18  structure of the expandable tube. It does not say
19  balloon. It's not about the method of delivery. It's
20  not about any of those other ideas that he said. It's
21  just about the tube and he rejected that.
22  And you can tell why this is important
23  because this is the same examiner. He allowed it the
24  first time. The same examiner turns around in the
25  re-examination and now he rejects it.

# Exhibit Z

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORDIS CORPORATION,<br>*Plaintiff*,<br>v.<br>MEDTRONIC AVE, INC., BOSTON<br>SCIENTIFIC CORPORATION and<br>SCIMED LIFE SYSTEMS, INC.,<br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 97-550-SLR |
| MEDTRONIC AVE, INC.,<br>*Plaintiff*,<br>v.<br>CORDIS CORPORATION, et al.,<br>*Defendants*. | )<br>)<br>)<br>)<br>) | C.A. No. 97-700-SLR |
| BOSTON SCIENTIFIC CORPORATION,<br>*Plaintiff*,<br>v.<br>ETHICON, INC., et al.,<br>*Defendants*. | )<br>)<br>)<br>)<br>) | C.A. No. 98-19-SLR |
| CORDIS CORPORATION,<br>*Plaintiff*,<br>v.<br>BOSTON SCIENTIFIC CORPORATION, et al.,<br>*Defendants*. | )<br>)<br>)<br>)<br>) | C.A. No. 98-197-SLR |

## CORDIS' OPENING BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT ON OBVIOUSNESS

*Of Counsel*:

Gregory L. Diskant
Eugene M. Gelernter
William F. Cavanaugh, Jr.
Michael J. Timmons
Scott B. Howard
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

Dated: October 5, 2004
148423.1

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware
(302) 645-1888
*Attorneys for Cordis Corporation*

flexible links] – does not distinguish the claimed combination from the prior art and as such, does not present a triable issue." Id. at *14.

The same reasoning applies here. Just as narrowing connectors to enhance flexibility was known in the art, so too the requirement for forming slots "in the wall surface of a tubular member, as by the removal of material" was "known in the art." Bourns, 537 F.2d at 493-94. Likewise, the need to set some tolerance was known in the art and the requirement limiting variations in thickness to less than 0.001 inch does not yield "new and unexpected results." Huang, 100 F.3d at 139. In the context of the combination as a whole, these requirements were not – and as a matter of law, could not be – the source of the '762 patent's validity at trial in 2000. Deleting them now does not warrant a new trial on obviousness. Westwood Chem., 525 F.2d at 1375; Bourns, 537 F.2d at 492-94; Medinol, 2004 WL 1243605 at *8-14; Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., ___ F.3d ___, 2004 WL 1925607 (Fed. Cir. Aug. 31, 2004) (adopting a broader claim construction than the one used at trial, but nonetheless reinstating the earlier verdict on obviousness).

## II.    AT TRIAL, DEFENDANTS WAIVED ANY OBVIOUSNESS CHALLENGE TO THE SCOPE THAT THE CLAIMS HAVE UNDER THE REVISED CLAIM CONSTRUCTION

There is another separate and independent reason why defendants are not entitled to a new trial on obviousness.

As noted above, Cordis asserted a scope of equivalents at trial that was as broad as the claims' literal scope under the revised claim construction. In responding to Cordis' proof of infringement under the doctrine of equivalents, defendants had an opportunity to challenge that claim scope. They had a strong incentive to do so, because they would have avoided a finding of infringement under the doctrine of equivalents if they had succeeded. Despite that opportunity and incentive, AVE decided not to raise the issue. BSC raised the issue, but then abandoned it.

By failing to pursue an obviousness challenge to the claim scope that Cordis asserted at trial under the doctrine of equivalents, AVE and BSC waived an obviousness challenge to that claim scope. They are not entitled to a "second bite at the apple." USA Petroleum, 13 F.3d at 1280, 1282; see also NLRB v. Dole, 334 F.3d at 490; EEOC v. Westinghouse, 925 F.2d at 631. Because that claim scope is as broad as the claims' literal scope under the revised construction, defendants' waiver applies here and bars their current obviousness challenge.

The facts giving rise to this waiver are all undisputed:

- The claim scope that Cordis sought at trial under the doctrine of equivalents was as broad as the claims' literal scope under the revised construction.

- AVE and BSC had the opportunity to raise the same obviousness challenge they want to raise now, by asserting that the prior art would have made this claim scope obvious to one of ordinary skill.

- At trial, AVE did not raise an obviousness challenge to that claim scope, despite an opportunity and incentive to do so.

- At trial, BSC raised the issue, but then abandoned it.

**A.    Defendants Had an Opportunity and Incentive at Trial to Raise an Obviousness Challenge to the Claim Scope that Cordis Asserted Under the Doctrine of Equivalents**

If defendants had succeeded in an obviousness challenge to the claim scope that Cordis asserted under the doctrine of equivalents, that would have given them a complete defense to Cordis' charge of infringement under the doctrine of equivalents. Wilson Sporting Goods Co. v. David Geoffrey & Assocs., 904 F.2d 677 (Fed. Cir. 1990); Interactive Pictures Corp. v. Infinite Pictures, Inc., 274 F.3d 1371, 1380 (Fed. Cir. 2001); Marquip, Inc. v. Fosber America, Inc., 198 F.3d 1363, 1367 (Fed. Cir. 1999); Streamfeeder, LLC v. Sure-Feed Sys., Inc., 175 F.3d 974, 981-

85 (Fed. Cir. 1999); <u>Jurgens v. McKasy</u>, 927 F.2d 1552, 1561 (Fed. Cir. 1991). Defendants had

both the opportunity and an incentive to raise that challenge.

In the teleconference on September 22, 2004, BSC emphasized that the jury was not

instructed that 100% variations are an outer limit on the range of equivalents. In fact, as noted

above, the issue was litigated, with Cordis affirmatively telling the jury that the 100% variation

described by Ersek was not the Palmaz invention, and with BSC not even requesting a charge on

that concession. More important for present purposes, the absence of such an instruction made it

easier, not harder, for defendants to raise an obviousness challenge under <u>Wilson Sporting</u>

<u>Goods</u>. After all, their two main references – Ersek and the Palmaz Abstract – have 100%

variations in thickness. The Palmaz Abstract teaches a device made of "woven, stainless steel

wire" with a double thickness at the cross-points, Ex. K, and as the Federal Circuit noted, the

Ersek device has double thickness at each of its numerous bridge portions. <u>Cordis Corp. v.</u>

<u>Medtronic AVE, Inc.</u>, 339 F.3d 1352, 1355 (Fed. Cir. 2003). Defendants could have asserted

that these references make obvious the scope of equivalents Cordis asserted. They did not do so.

### B.    At Trial, AVE Chose Not to Raise an Obviousness Defense to the a Scope of Equivalents Asserted by Cordis

Despite an opportunity and incentive, AVE did not raise an obviousness challenge to the

claim scope that Cordis asserted under the doctrine of equivalents.

### C.    At Trial BSC Raised and then Abandoning an Obviousness Challenge to the Scope of Equivalents Asserted By Cordis

At trial, BSC also had an incentive and opportunity to mount an obviousness attack on

the claim scope that Cordis asserted under the doctrine of equivalents – a claim scope that is as

broad as the claims' literal scope under the revised construction.

20

1.      **BSC Raised an Obviousness Challenge**
        **During the Liability Phase and then Abandoned It**

During the trial's liability phase, BSC raised – and then abandoned – an obviousness

challenge to the claim scope that Cordis asserted under the doctrine of equivalents.  BSC's

counsel raised the issue at trial during cross-examination of Cordis' engineering expert, Dr.

Collins, when he asked Dr. Collins if he had taken the prior art into account in his equivalents

analysis, "so that you would limit the equivalents [under Wilson Sporting Goods] in a way that

you would not end up covering what was in the prior art?"  D.I. 198 at Tr. 1277:15-22.  BSC's

counsel then asked Dr. Collins to agree that Cordis would not be entitled to a scope of

equivalents that covered prior art references such as Ersek:

> Q.      …. [I]s it your understanding that considering the question
> of equivalents, that the range of equivalents should be narrower
> than a range which covers prior-art patents like Ersek?
>
> A.      …. [C]ertainly I'd expect that I couldn't look to the prior
> art and find – find the equivalent.  Otherwise, it wouldn't be
> patentable.

D.I. 199 at Tr. 1323:2-14.  BSC's counsel continued to press the subject, and Dr. Collins

repeatedly agreed that Cordis would not be entitled to a claim scope under the doctrine of

equivalents that covered prior art references such as Ersek.  See Section I(A)(2), supra.

The obvious aim of this cross-examination was to set the stage for testimony by BSC's

experts that the claim scope Cordis asserted under the doctrine of equivalents was obvious in

light of Ersek and other references.  BSC's expert Dr. Cumberland had raised that issue in his

expert report.  But when BSC's experts testified, they carefully avoided the subject.  And after

raising the issue in opening statements and in cross-examining Dr. Collins, BSC chose not to

mention it in closing argument.  See Section I (A)(2), supra.

2.    **BSC Twice Stipulated to Forego an Obviousness
      Challenge with Respect to Damages**

In order for Cordis to recover the "lost profits" damages it sought against BSC, Cordis

needed to show that AVE's stents were not "non-infringing substitutes" for the NIR.  To prove

that AVE's stent infringed under the Court's earlier claim construction – i.e., to prove that they

were not "non-infringing substitutes" – Cordis needed to rely on the doctrine of equivalents.  See

D.I. 462 (June 18, 2004 Order) at 20-21.

If BSC had been able to sustain an obviousness challenge to the scope of equivalents

Cordis asserted against the AVE stents, it could reduced the $324 million damage award by

many millions of dollars.  Yet BSC decided to forego that obviousness challenge.  It entered into

two separate stipulations to that effect.

The first stipulation was entered into prior to trial and addressed the accused products in

the AVE case – the MicroStent II and GFX stents.  D.I. 787 at 1; D.I. 788 at 3-4; D.I. 789 at 1;

D.I. 205 at Tr. 2860:19-2861:6.  The second stipulation was entered into during the trial's

damages phase, and covered AVE's "S Series" stents.  The "S Series" stents were not covered by

the first stipulation; they were not accused products in the AVE case; and they were not the

subject of a verdict by the AVE jury.  D.I. 205 at Tr. 2836:6-18, 2863:9-14.  In both stipulations,

BSC agreed not to contest Cordis' allegation that AVE's stents – which could only infringe under

the doctrine of equivalents under the Court's pre-trial rulings – were not "non-infringing

substitutes" for the NIR.

D.    **Defendants' Waiver of an Obviousness Challenge to the
      Scope of Equivalents Asserted by Cordis Bars Them From
      Raising An Obviousness Challenges to that Claim Scope**

By not raising an obviousness challenge to the scope of equivalents that Cordis asserted

at trial, AVE waived an obviousness challenge to that claim scope.  BSC waived an obviousness

challenge to that claim scope by raising an obviousness challenge and then abandoning it. Neither defendant is entitled to a "second bite at the apple." USA Petroleum, 13 F.3d at 1280, 1282; NLRB v. Dole, 334 F.3d at 490; EEOC v. Westinghouse, 925 F.2d at 631. Because the scope of equivalents that Cordis asserted at trial is at least as broad as the claims' literal scope under the revised construction, defendants' waiver bars them from challenging the obviousness of the claims' literal scope under the revised construction. USA Petroleum, 13 F.3d at 1280, 1282; NLRB v. Dole, 334 F.3d at 490; EEOC v. Westinghouse, 925 F.2d at 631.

Moreover, the mandate rule "forecloses relitigation of all issues previously waived by the defendant[s]," Quintieri, 306 F.3d at 1225 – including an obviousness challenge to that claim scope. By their own waiver, defendants established the nonobviousness of that claim scope as the "law of the case." Magnesystems, 933 F. Supp. at 949-50. Under the mandate rule, they are not entitled to revisit the issue now. Id.; see also Abbott, 2003 WL 22462614 at *2.

## III.    HAVING LITIGATED THE OBVIOUSNESS OF THE '984 INVENTION AND LOST, AVE IS NOT ENTITLED TO RE-TRY THE ISSUE NOW

The same considerations, and others, apply to the Schatz '984 patent. (The '984 patent was asserted against AVE only, and not against BSC.).

### A.    This Court Did Not Authorize Post-trial Expert Reports on '984 Validity

The Court authorized the recent round of post-trial expert reports and expert discovery on validity in its May 14, 2004 Order. D.I. 1228. That Order included a section entitled "**Validity of the '762 patent**," id. at 3 (emphasis in original), which allowed "supplementation of the parties' expert reports on validity to address the new claim construction on the 'slots formed therein' and 'substantially uniform thickness' limitations." Id. At no time did the Court grant AVE leave to serve supplemental expert reports on the validity of the Schatz '984 patent.

# Exhibit

# AA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORDIS CORPORATION,<br>_Plaintiff,_<br>v.<br>MEDTRONIC AVE, INC., BOSTON<br>SCIENTIFIC CORPORATION and<br>SCIMED LIFE SYSTEMS, INC.,<br>_Defendants._ | )<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 97-550-SLR |
| MEDTRONIC AVE, INC.,<br>_Plaintiff,_<br>v.<br>CORDIS CORPORATION, et al.,<br>_Defendants._ | )<br>)<br>)<br>)<br>) | C.A. No. 97-700-SLR |
| BOSTON SCIENTIFIC CORPORATION,<br>_Plaintiff,_<br>v.<br>ETHICON, INC., et al.,<br>_Defendants._ | )<br>)<br>)<br>)<br>) | C.A. No. 98-19-SLR |

## COMBINED REPLY BRIEF IN SUPPORT OF CORDIS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT
## AGAINST AVE AND BSC ON '762 AND '984 OBVIOUSNESS

_Of Counsel:_
Gregory L. Diskant
Eugene M. Gelernter
Michael J. Timmons
Wendy Kemp Akbar
Catherine A. Williams
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware
(302) 645-1888
_Attorneys for Cordis Corporation_

Dated: November 22, 2004
150405.1

## 2.    **BSC**

BSC does not dispute that it had an opportunity and incentive to raise a <u>Wilson Sporting Goods</u> issue for the "substantially uniform thickness" limitation. Instead, BSC focuses on "slots formed therein." It argues (Br. at 15-16) that it had no incentive *in the liability phase* to show that the prior art rendered obvious the scope of equivalents for "slots formed therein." However, the liability phase was not the only phase of this case. BSC does not deny that it had an incentive to raise the issue *in the damages phase*, to reduce the damage award. <u>See</u> Cordis' Opening Br. at 22.

Despite that opportunity, BSC made a tactical decision not to raise the issue. It stipulated on two occasions not to raise it – once *before* the damages trial and again *during* the damages trial. The fact that BSC twice agreed *not* to raise the issue does not mean it had lacked an opportunity to do so. Instead, it waived any validity challenge.

Left with no real answer to its waiver, BSC asserts that "differences between a <u>Wilson Sporting Goods</u> analysis and a traditional validity challenge … make Cordis' waiver theory inappropriate." BSC Br. at 19. BSC makes this argument by misreading a quote from <u>Key Mfg. Group, Inc. v. Microdot, Inc.</u>, 925 F.2d 1444, 1449 (Fed. Cir. 1991), that <u>Wilson Sporting Goods</u> "'does not envision application of a full-blown patentability analysis.'" BSC Br. at 19. But, as Chisum makes clear, the aspects of a "full-blown patentability analysis" not envisioned by <u>Wilson Sporting Goods</u> are issues unrelated to obviousness, such as written description and enablement. 5A Donald S. Chisum, <u>Chisum on Patents</u> § 18.04[2][d][ii][D] (2004). <u>Key</u> confirms this in the passage immediately following the snippet BSC selectively quotes (<u>id.</u>, 925 F.2d at 1449):

> <u>Wilson</u> simply acknowledges that prior art limits the coverage
> available under the doctrine of equivalents. …. The question

under <u>Wilson</u> is whether the [asserted scope of equivalents] "could
have been allowed by the PTO over the prior art."

<u>Conroy v. Reebok Int'l Ltd.</u>, 14 F.3d 1570 (Fed. Cir. 1994), which BSC cites, confirms that a

<u>Wilson Sporting Goods</u> analysis involves application of "standards of patentability consistent

with our jurisprudence regarding anticipation and obviousness." <u>Conroy</u>, 14 F.3d at 1576-77.

*          *          *

AVE and BSC had an opportunity and incentive to show that the prior art renders

obvious a claim scope that is co-extensive with the claims' literal scope under the revised

construction. Having waived the issue at trial, they are in "no position" to resurrect it after an

appeal. <u>Westinghouse</u>, 925 F.2d at 631.

**C.**     <u>**The Court Has Not "Rejected" or "Implicitly Rejected" Cordis' Positions**</u>

Without quoting any portion of any Court order, defendants repeatedly state that this

Court has "rejected" or "implicitly rejected" Cordis' arguments. <u>E.g.</u>, BSC Br. at 1, 2, 14; AVE

Br. at 3, 12-13, 23. Repeating this mantra does not make it correct.

AVE argues (Br. at 12-13, 23) that the Court "implicitly rejected" Cordis' arguments in its

Order dated May 14, 2004, but it cannot point to anything in the Order to back up that assertion.

In fact, the Order explicitly recognized that once expert discovery ends a case-dispositive motion

may be "the most appropriate means to resolve this litigation." D.I. 1228 at 3. Cordis is now

bringing the case-dispositive motion that the Order contemplates.

By e-mail dated May 26, 2004 (Exhibit 1 hereto), Cordis asked for clarification on the

issue at hand – whether the Court had, in fact, denied Cordis' motion to reinstate the obviousness

verdict. If the Court had denied Cordis' motion, it would have been easy to say so. But that was

not the Court's response. In an email dated May 28, 2004, the Court responded that "Judge

Robinson has reviewed your email and has these comments: …. Validity: The court obviously

13

Exhibit
BB

Page 2222

~ VOLUME I ~
IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

```
CORDIS CORPORATION,             :     CIVIL ACTION
              Plaintiff         :
         vs.                    :
MEDTRONIC AVE, INC., et al.,    :     NO. 97-550 (SLR)
BOSTON SCIENTIFIC               :     CIVIL ACTION
CORPORATION, et al.,            :
              Plaintiffs        :
         vs.                    :
ETHICON, INC., et al.,          :
              Defendants        :     NO. 98-19 (SLR)
CORDIS CORPORATION,             :     CIVIL ACTION
              Plaintiff         :
         vs.                    :
BOSTON SCIENTIFIC               :
CORPORATION, et al.,            :
              Defendants        :     NO. 98-197 (SLR)
```

Wilmington, Delaware
Wednesday, December 6, 2000
9:00 o'clock, a.m.

BEFORE: HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

- - - - -

Official Court Reporters

Page 2223

APPEARANCES:

ASHBY & GEDDES
BY: STEPHEN J. BALICK, ESQ.

-and-

PATTERSON, BELNAP, WEBB & TYLER, LLP
BY: GREGORY L. DISKANT, ESQ.,
EUGENE M. GELERNTER, ESQ.,
WILLIAM F. CAVANAUGH, ESQ. and
MICHAEL J. TIMMONS, ESQ.
(New York, New York)

-and-

JOHNSON & JOHNSON
BY: ERIC I. HARRIS, ESQ.

Counsel for Plaintiffs

YOUNG, CONAWAY, STARGATT & TAYLOR
BY: JOSY W. INGERSOLL, ESQ.

-and-

KENYON & KENYON
BY: GEORGE E. BADENOCH, ESQ.,
PAUL A. BONDOR, ESQ.,
ALBERT J. BRENEISEN, ESQ.,
MICHAEL ZACHARY, ESQ. and
ARTHUR GRAY, ESQ.
(Washington, D.C.)

Counsel for Defendants

- - - - -

Page 2224

# PROCEEDINGS

(Proceedings commenced at 9:00 a.m., and the following occurred without the presence of the jury.)

THE COURT: I understand there is an issue.

MR. DISKANT: Yes, your Honor. The defendants wish to play today the videotape deposition of Dr. Stanley Carson. We do not object to that. Also, however, they wish to introduce into evidence Dr. Stanley Carson's sworn declaration.

That is classic hearsay. Dr. Carson was examined. He was asked questions. He was cross-examined. They had the opportunity to bring him here to Court live if they wanted.

But a written witness statement does not come into evidence, it doesn't go back to the jury so they can read it. It is inadmissible. We object to it.

MR. BADENOCH: Your Honor, the problem is this: Dr. Carson is, of course, not under our control. He lives in California. Unlike a situation where we were taking a — if we had had an opportunity to examine him on direct and they had cross-examined, which is not the situation here — what happened here is he filed a

Page 2225

declaration in the Cook case. He was then fully cross-examined on the declaration by counsel for ETP and counsel for Cordis.

What we have done to create the video is to collect from that — from what is basically hostile examination the most coherent testimony that we can.

In that testimony, there is clear references to a paragraph of the declaration he is talking about. And in order to make sense of what he is talking about, the jury needs to see the text of what it is that he is being cross-examined about by counsel for EGP and/or Cordis.

The other thing is that, basically, — so for context, it is absolutely necessary. Because they cross-examined, basically, the policy on hearsay is that you don't allow hearsay because there is no chance to confront and cross-examine the witness. That is not true here.

What we have is kind of like the English system or the system in many courts in this country where you have direct testimony put in by a statement and then you have live cross-examination.

The other thing is the dates. They are in the part that they are going to play to attack Dr. Carson, who is going to point out that he was paid for an

Page 2282

```
1        THE COURT: I am going to take five minutes.
2  And we will come back.
3        (Short recess taken.)
4              - - -
5        (Court resumed after the recess, and the
6  following occurred without the presence of the jury.)
7
8        MR. DISKANT: Your Honor, before the jury
9  comes in, I had a comment for a moment on the suggestion
10 that there is any sandbagging going on here, because that
11 concerns me greatly.
12       We have tried this case efficiently. The
13 examination of Dr. Fischell by Boston took 15 minutes.
14 Our cross-examination took 30 minutes. It was,
15 respectfully, I believe, directly responsive to the
16 allegations that were intended to be raised by the direct.
17 That has been a consistent pattern throughout this case.
18 Boston has consistently examined witnesses for 50 percent
19 more time than we have. I have no control over those
20 choices. Those are the choices they have made. We have
21 made the choices that we have made in order to present
22 the case that we wanted to present, including a rebuttal
23 case responding to their evidence.
24       And we intend to continue to try the case
25 efficiently. Boston is making its choices and we are
```

Page 2283

```
1  making our choices. There is no intention to do anything
2  other than to try the case that we set out to try within
3  the time parameters that your Honor has suggested.
4        THE COURT: I understand that. If you want
5  to present this evidence in your rebuttal case you may.
6  All I am saying is you cannot present it now.
7        MR. DISKANT: Thank you, your Honor.
8        THE COURT: Is this witness still on the
9  stand?
10       MR. GELERNTER: We don't have any further
11 questions.
12       MR. ZACHARY: I will have about two questions
13 on redirect.
14       THE COURT: Let's bring the jury in.
15       (At this point the jury entered the courtroom
16 and took their seats in the box.)
17       THE COURT: Mr. Gelernter.
18       MR. GELERNTER: Dr. Fischell, I don't have any
19 further questions.
20       THE COURT: Mr. Zachary.
21       MR. ZACHARY: Thank you, your Honor.
22       REDIRECT EXAMINATION
23 BY MR. ZACHARY:
24 Q. Dr. Fischell, do you still have Exhibit 5089 in
25 front of you that Mr. Gelernter was asking you some
```

Page 2284

```
1  questions about?
2  A. Yes.
3  Q. I just wanted to confirm, Dr. Fischell, the date
4  on this document is January 24, 1996.
5  A. On my copy it looks like January 25, 1996. If you
6  could enlarge it...
7        I see at the bottom, yes, January 24, 1996.
8  Yes, sir.
9  Q. Mr. Turnlund, the engineer at IsoStent, did this
10 drawing on or about January 24, 1996?
11 A. Yes. He did this drawing from what I believe was
12 my sketch.
13 Q. I have handed you a copy of the '370 patent, which
14 is Exhibit 5001, plaintiff's exhibit, and also a copy of
15 Defendant's Exhibit 11,308. And do you see that in the
16 '370 patent, on the second page, you have a list of prior-
17 art references that the Patent Office had received?
18 A. Yes, I see the list.
19 Q. In the upper right-hand corner, there is a
20 reference to a patent issued to Pinchasik, the 373 patent?
21 A. Yes, I see that.
22             - - -
23
24
25
```

Page 2285

```
1
2  Q. And is Defendant's Exhibit 11,308 a copy of the patent
3  to Pinchasik?
4  A. It appears to be.
5        MR. ZACHARY: Your Honor, I offer Defendant's
6  Exhibit 11,308 in evidence.
7        MR. GELERNTER: No objection.
8        THE COURT: All right.
9  ***   (Defendant's Exhibit No. 11,308 was received
10 into evidence.)
11 BY MR. ZACHARY:
12 Q. One further question, Dr. Fischell. You indicated
13 during your testimony you met with Cordis' counsel prior
14 to coming here today to testify?
15 A. I met with Cordis' counsel over the last several
16 years.
17 Q. But in preparation for your testimony today, you
18 did meet with Cordis' counsel; correct?
19 A. Yes.
20       MR. ZACHARY: Thank you. No further questions.
21       MR. GELERNTER: No question your Honor.
22       THE COURT: All right. You may step down, sir.
23 Thank you very much.
24       (Witness excused)
25             - - -
```

## Page 2286

1     MR. BADENOCH: Ladies and gentlemen, our
2 next witness is going to be presented on the videotape.
3 It's Dr. Stanley Carson, who will talk to you about what
4 he recalls about some of the early -- the first ideas of Dr.
5 Palmaz. And he is not here, so we're going to play it on
6 videotape.
7     Excuse me, Dr. Fischell.
8     There is a reference to a paragraph of an
9 affidavit. The affidavit will not be in evidence, so I'm
10 going to read the paragraph to you so you will know what
11 Dr. Carson is talking about on the video.
12     In the affidavit, Dr. Carson says at paragraph
13 6:
14     "In the course of performing this work, Dr.
15 Palmaz asked me if I had any idea how the restenosis
16 problem could be addressed so that vessels could be kept
17 open. I told him that I would create a permanently
18 expandable metal stent that could be inserted over an
19 angioplasty balloon and be delivered percutaneously to the
20 point of vessel blockage, thereby permitting the balloon
21 to be inflated so as to open up the vessel and thereafter
22 to be deflated and withdrawn, leaving the stent in place
23 in the vessel to keep it open on a hopefully permanent
24 basis. I explained my conception to Dr. Palmaz as a
25 children's Chinese finger puzzle with cross-hatched

## Page 2287

1 expandable members. I had to explain this concept to Dr.
2 Palmaz on more than one occasion, as he had never heard
3 of a Chinese finger puzzle before."
4     MR. DISKANT: What is going to happen now,
5 ladies and gentlemen, is Boston is going to play you
6 excerpts from Dr. Carson's deposition that was taken five
7 years ago and that they would like you to hear. And then
8 we will have an opportunity to play you some additional
9 excerpts that we think you might be interested in. And
10 just to keep all these facts in sequence, you should
11 understand the following dates:
12     On September 22, 1994, Cordis sued Cook,
13 another manufacturer of balloon expandable stents.
14     Four and a half months later, on February 6th,
15 1995, Cook signed an agreement with Dr. Stanley Carson,
16 purchasing his alleged intellectual property rights and
17 paying him $50,000.
18     Four months later, on June 14, 1995, Dr.
19 Carson wrote and sworn to a declaration supporting his
20 claim to be a co-inventor with Dr. Palmaz after he had
21 signed the initial agreement with Cook and after he
22 received the $50,000.
23     That's the declaration Mr. Badenoch just read
24 to you.
25     First, we'll hear what Boston would like to

## Page 2288

1 you hear from Dr. Carson's testimony and then we'll play
2 our excerpts.
3     (Videotape played as follows.)
4     "Question: Would you state your name for the
5 record, please?
6     "Answer: Stanley Carson.
7     "Question: Where were you born, sir?
8     "Answer: I was born in Kendallville, Indiana.
9     "Question: Where do you live now?
10     "Answer: Now, I live in Los Alamitos,
11 California.
12     "Question: When were you born?
13     "Answer: Would you repeat that?
14     "Question: Date of birth. When were you born?
15     "Answer: 12/1/41.
16     "Question: Dr. Carson, I'm going to hand you
17 what I've marked as Exhibit 2, which is your affidavit with
18 the attachments to it.
19     "Sir, who drafted that affidavit?
20     "Answer: By drafts, you mean typed it out?
21     "Question: No, sir. I mean came up with the
22 words to original place in that affidavit.
23     "Answer: I came up with the words largely.
24 Of course, I had discussion with my attorney.
25     "Question: Who is your attorney?

## Page 2289

1     "Answer: Aaron Kramer.
2     "Question: And are you paying Mr. Kramer's
3 fees?
4     "Answer: No, I'm not paying his fee directly.
5     "Question: Cook & Company is?
6     "Answer: Cook & Company is paying his fees
7 directly, I believe.
8     "Question: Now, in this affidavit, which is
9 Exhibit 2, true and correct? Is everything in there
10 stated true?
11     "Answer: To the best of my belief at this
12 time, yes.
13     "Question: Approximately how much did you
14 make from your practice in 1994?
15     "Answer: It's a pretty good year. I couldn't
16 give you the exact amount as our year ends in August. But
17 my -- and I pretty much let my wife take care of these
18 details, but it was a very, very busy year. And my guess
19 is that it will be in the in the neighborhood of between
20 two and four hundred thousand dollars in gross income in
21 the practice.
22     "Question: Now, let's step back for a second.
23     "You read the Patent '665, and you say that
24 made you feel that Dr. Palmaz committed fraud on you.
25 Why?

Page 2290

1    "Answer: Yes. Inasmuch as I understand fraud
2    that -- I need to clarify that.
3        "I was upset when I read this, and I felt I
4    had been misled.
5        "Question: And why?
6        "Answer: There's more than one item, and I
7    may not take these in the order that they appear in this.
8        "Question: Okay. Go ahead. If you can
9    remember off the top of your head, go ahead and tell me.
10       "Answer: There are drawings here, and the
11   first drawing I recognize as being very similar to and
12   very much akin to the one that I made, that I gave to Dr.
13   Palmaz when I first proposed this idea.
14       "Question: Are you referring --
15       "Answer: That is referred to as 1-A and 1-B
16   in this document.
17       "Question: Okay. And --
18       "Mr. Kramer: The record should reflect you're
19   holding up the patent when you say this document, the '665
20   patent.
21       "Go ahead.
22       "The witness: Yes, I think it's also labeled
23   here at the top as patent.
24       "Now, I would assume perhaps -- I may be all
25   wrong -- but also for other reasons that the patent, if

Page 2291

1    it existed -- and, you know, I didn't have any reason to
2    question it being -- I don't think I thought about it.
3    But Johnson & Johnson's putting money into the market,
4    there's probably a patent.
5        "I had worked with them long enough to know
6    that they like to protect, as does everybody, their
7    investments.
8        "Now, I would have felt that the patent would
9    revolve around a particular design, configuration,
10   manufacturer and use of the Palmaz configuration, or
11   Palmaz stent it's been referred to, which is a specific
12   type of stent.
13       "That's one item.
14       "And so here is another drawing that I don't
15   think is original with Dr. Palmaz, but it now appears in
16   this patent and --
17       "Question: Could you, for the record, say --
18   when you said this -- another drawing --
19       "Answer: Another drawing, Figure 1-A and 1-B.
20   2-A and 2-B appears to be that of the Palmaz stent. The --
21   that's a bit annoying. It was to me at the time.
22       "The other thing is that -- another thing is --
23   not just the other thing, but another thing is that, quite
24   frankly, in reading this, it appears to me that what has
25   been covered by this patent is delivering a stent on a

Page 2292

1    balloon to a specific location.
2        "And I don't feel now, to this day, that that
3    was his original concept. I feel I presented that concept
4    to him. And at the time that I did it, I spent a lot of
5    time explaining the stent and the concept and didn't get
6    any feeling that this is anything but unfamiliar territory
7    to him at that time.
8        "The other thing that's going on here is
9    that -- I don't know whether these are page or paragraph
10   numbers here, the numbers at the top.
11       "Question: Are page numbers.
12       "Answer: All right. I'm going to refer,
13   then, to Page No. 4 on the document '665.
14       "Mr. Kramer: Let me explain this. That's
15   Page No. 4, Column 4.
16       "And then if you want to look under Column 4
17   where you see the numbers here, you can refer specifically
18   to those numbers.
19       "That would be Column 4, Line 10, for example,
20   would be that line. That's the way you read these?
21       "Answer: Four lines above Line 10 on Column 4
22   in '665, it states that a further feature of the present
23   invention is that a wire mesh tube may be utilized as the
24   intraluminal graft, which is I don't believe how I
25   visualized the Palmaz stent as being a wire mesh.

Page 2293

1        "I feel that the wire mesh was one of the
2    ideas that I had originally proposed to Palmaz and to
3    Vascor.
4        "And reading on Column 3, same line --
5        "Mr. Kramer: Yes, yes.
6        "Answer: Same lines. Okay. -- Line 25 and
7    in that same paragraph down from that --
8        "Mr. Kramer: You can read them into the
9    record, if you wish.
10       "The witness: Okay.
11       "Answer: 'The present invention includes, an
12   expandable, tubular shaped membrane -- member having first
13   and second ends and a wall surface disposed between the
14   first and second ends, the wall surface being formed by a
15   plurality of intersecting elongate members' -- which to me
16   appears to be a wire mesh.
17       "And again, I was a bit shocked.
18       "One other item comes to mind is the date.
19       "Question: And what about that upset you?
20       "Answer: Well, there was a reason that I
21   signed this November 15th, 1985 document to Dr. Palmaz.
22   And I have just been reminded of the date, because I had
23   sought this down and given a copy to Brian Bates.
24       "And at the time that I signed this was not
25   for purposes of payment, per se. At least that's not why

## Page 2294

1    I was told I was signing this patent.
2         "So I feel that if he were going to patent my
3    ideas, that he should at least have told me.
4         "Question: The proposal to -- that you refer
5    to as the proposal to Hancock -- Vascor, tell me what that
6    was like.
7         "Answer: Well, it was a pretty basic proposal
8    in that we felt we needed to, in discussions with Dave
9    Lentz, outline why something was needed, what was being
10   done now and what we were proposing.
11        "Question: When you say 'we,' who's the
12   other -- who's the 'we?'
13        "Answer: In discussions with Dave Lentz, he
14   felt they needed this to fund it. They were fairly
15   unfamiliar with catheters and catheter work, that they
16   were not -- that wasn't part of their -- apparently,
17   their mission.
18        "Question: But I thought you said we drafted
19   something. Who drafted something?
20        "Answer: I don't -- we thought is what I recall
21   saying."
22              - - -
23
24
25

## Page 2295

1
2         "Question: Was there a written proposal given
3    to Vascor?
4         "Answer: Yes.
5         "Question: Who drafted that proposal?
6         "Answer: I drafted it, along with Dr. Palmaz.
7    We both worked on it. We exchanged copies and came up with
8    a final.
9         "Question: What did it say?
10        "Answer: Best of my recollection, it stated
11   that arteries that are obstructed cause problems --
12        "The Reporter: I am sorry.
13        "The Witness: -- arteries that are obstructed
14   cause problems in the human body and that one of the ways
15   to open the arteries or to get necessary blood flow
16   through the arteries was to dilate the artery.
17        "One problem with the technique of dilating an
18   artery is that some arteries couldn't be dilated to
19   adequate size and that some arteries would rebound after
20   dilatation, and thrombosis in some arteries or clot
21   formations in some arteries would occur after dilatation.
22        "Basically stated, what we felt between us,
23   the current state of the art of balloon dilatation was
24   the arteries.
25        "And that in order to offset the dilatation

## Page 2296

1    or the recurrence after dilatation or the unsuccessful
2    dilatation when an artery rebounds and perhaps keep the
3    artery open longer but, certainly, initially, give more
4    successful result, was to put a stent at the time of the
5    dilatation, and the stent would keep the artery open by
6    its configuration, framework, support.
7         "We spent a lot of time in the proposal, in
8    our discussions between Dr. Palmaz, myself and Dr. Lentz
9    as to what would be acceptable with them as a proposal,
10   in deciding how much time in the proposal to give to the
11   current state of the art and catheters being used and so
12   on, because we felt we were presenting it to people that
13   weren't right in the midst of doing CAT digitization and
14   this sort of thing.
15        "Then we went to describe -- to make a
16   proposal in the last part of it after outlining the
17   problem and the possible solution for the problem in a
18   way that it could be done.
19        "There's some drawings. Both of those
20   drawings, I think, were in the proposal.
21        "The drawings that I looked at earlier,
22   they're on one sheet of paper. They were held up for
23   the camera.
24        "I don't think they're in that format, as I
25   recall. They may be. But to show what it might look

## Page 2297

1    like.
2         "This is just a proposal. We have had not
3    made one. We wanted to show how it might be delivered.
4    We wanted to show how it might be made -- not how, but
5    what it might be made of because the people that I was
6    working with at Vascor and Hancock, a lot of the research
7    that has been done has been on materials that can be used
8    and retained in the vascular system.
9         "Question: I'm sorry. A lot of research who
10   has done? That you have done or that they have done?
11        "Answer: That I had done with them had been
12   done on the use of different materials in the vascular
13   system that would or would not be acceptable to be left
14   in the vascular system.
15        "Question: When was the proposal written?
16        "Answer: Most of the proposal, I believe, was
17   written in the early eighties. Early eighties.
18        "Question: 1980?
19        "Answer: Yes.
20        "Question: Well, let me ask you something.
21   Had you thought of this concept prior to Dr. Palmaz asking
22   you the question that you talk about in Paragraph 6?
23        "Answer: I thought of the idea of leaving
24   something in the blood vessel, yes.
25        "Question: Had you thought of the idea of --

Page 2298

1 as it is described in Paragraph 6 of your affidavit, prior
2 to that time.
3      "Mr. Kramer: You mean the whole concept?
4      "Mr. Chasnoff: Yes, sir.
5      "The Witness: Not the whole concept. And I
6 didn't think of all of this at once. It was overnight.
7      "Mr. Chasnoff: Okay.
8      "Question: When did you first start thinking
9 of this concept?
10      "Answer: Well, originally, it would be in late
11 '79, maybe middle '79.
12      "If you're relating it to the idea of just
13 having some type of balloon staying in the artery, which
14 was how I would picture it, you would open the balloon
15 and -- isn't that -- it is a beautiful shape of the artery
16 around the balloon, but it would be nice if we could just
17 leave the balloon there. Some people say that kiddingly
18 to each other, watching these things. Residents and so on.
19      "Of course, that doesn't work, because there's
20 no flow through the balloon, so we're not getting any
21 blood flow.
22      "Then he asked the question, and it occurred
23 to me that we could put something on the balloon and leave
24 it there.
25      "Question: So my understanding is that when

Page 2299

1 Dr. Palmaz asked you the question, that you --
2      "Answer: Well --
3      "Question: -- got the idea of leaving a
4 permanent expandable metal stent in the artery?
5      "Answer: I don't know if that's the first
6 time, but on or about that time.
7      "It had come on with respect, I think, to a
8 particular collapse of one we just couldn't dilate at
9 the time. I just refocused the thinking around this.
10      "That's my answer.
11      "Question: Can you remember who the
12 particular patient was?
13      "Answer: No, I don't.
14      "Question: Do you remember what kind of
15 problems you had or what the surgery was of or the
16 procedure that was undergone when you had this problem --
17      "Answer: I think --
18      "Question -- that prompted you to think of
19 this idea?
20      "Answer: I believe this was a dilatation of
21 an iliac artery and that we were either unsuccessful or
22 that it had collapsed or that we originally got it a
23 little bit, but it just wasn't adequate.
24      "It didn't look as good as we'd like it to
25 look.

Page 2300

1      "Question: Who came up with the idea after
2 you told Dr. Palmaz about this, as you claim in Paragraph
3 6, of trying to follow through and do something with it.
4      "Mr. Kramer: Objection as vague.
5      "Question: If you can answer it, please go
6 ahead.
7      "Answer: It is been a lot of time explaining
8 the conception, as I referred to it here, and also Chinese
9 finger puzzles, as referred to in here, which is the same
10 thing, I'll say, as Chinese handcuffs.
11      "And I pointed out that I had some research
12 projects going and that if we could come up with a
13 proposal, that we might be able to, in effect, get this
14 funded by the people I was already working with, at least
15 get us some seed money which would be enough to initiate
16 the study.
17      "And I had requested -- I really had in mind
18 the fact that Dr. Palmaz, being a role gist and being
19 interested in balloon angioplasty and not having as many
20 research duties and projects going as I already had, this
21 would be a good research thing for him to do. And I think
22 he felt the same way.
23      "Question: Did you anticipate that there
24 would be problems in bringing this -- making this device
25 work answer?

Page 2301

1      "Answer: I -- what I envisioned the main
2 problem to be was to actually develop a particular device
3 that could be implanted, the -- largely the manufacture,
4 the construction of such device.
5      "We already had balloons and sheaths and guide
6 wires and angioplasty.
7      "So I looked upon the manufacture and the
8 construction of the device as being a problem, one for
9 which some engineering help available from Vascor would
10 be desirable.
11      "Question: Did you anticipate the problems
12 only being engineering problems?
13      "Answer: Not necessarily.
14      "But I felt that was one of the big, major
15 problems to address at that time.
16      "Question: Did you see the need -- did you
17 recognize that there would need to be a great deal of
18 medical studies and tests before it could be approved by
19 the FDA?
20      "Answer: I was aware the FDA required --
21 would require a number of studies and tests, some of which
22 we had already -- I had performed on other grafts for
23 Vascor.
24      "Question: And when you went to Vascor, was
25 it your idea that you would walk away from -- that you

Exhibit
CC

Page 2812

```
 1                    - VOLUME L -
                IN THE UNITED STATES DISTRICT COURT
 2             IN AND FOR THE DISTRICT OF DELAWARE
                        - - - - -
 3   CORDIS CORPORATION,        :      CIVIL ACTION

 4              Plaintiff       :

 5        vs.                   :

 6   MEDTRONIC AVE, INC., et al.  :    NO. 97-550 (SLR)

 7   BOSTON SCIENTIFIC          :      CIVIL ACTION
     CORPORATION, et al.,       :
 8              Plaintiffs      :

 9        vs.                   :

10   ETHICON, INC., et al.,     :

11              Defendants      :      NO. 98-19 (SLR)
                        - - - - -
12   CORDIS CORPORATION,        :      CIVIL ACTION

13              Plaintiff       :

14        vs.                   :

15   BOSTON SCIENTIFIC          :
     CORPORATION, et al.,       :
16                              :

17              Defendants      :      NO. 98-197 (SLR)

18                         Wilmington, Delaware
                           Monday, December 11, 2000
19                         9:00 o'clock, a.m.

20

21   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

22                        - - - - -

23                    Official Court Reporters

24

25
```

Page 2813

```
 1   APPEARANCES:

 2
         ASHBY & GEDDES
 3       BY: STEPHEN J. BALICK, ESQ.

 4
               -and-
 5
         PATTERSON, BELNAP, WEBB & TYLER, LLP
 6       BY: GREGORY L. DISKANT, ESQ.
             EUGENE M. GELERNTER, ESQ.
 7           WILLIAM F. CAVANAUGH, ESQ. and
             MICHAEL J. TIMMONS, ESQ.
 8           (New York, New York)

 9
               -and-
10
         JOHNSON & JOHNSON
11       BY: ERIC I. HARRIS, ESQ.

12
             Counsel for Plaintiffs
13
         YOUNG, CONAWAY, STARGATT & TAYLOR
14       BY: JOSY W. INGERSOLL, ESQ.

15
               -and-
16
         KENYON & KENYON
17       BY: GEORGE E. BADENOCH, ESQ.,
             PAUL A. BONDOR, ESQ.,
18           ALBERT J. BRENEISEN, ESQ.,
             MICHAEL ZACHARY, ESQ.,
19           ARTHUR GRAY, ESQ.,
             EDWARD T. COLBERT, ESQ.,
20           T. CY WALKER, ESQ. and
             JOHN BATEMAN, ESQ.
21           (Washington, D.C.)

22           Counsel for Defendants

23                        - - - - -

24

25
```

Page 2814

```
 1

 2                P R O C E E D I N G S

 3

 4        (Proceedings commenced at 9:00 o'clock a.m.,
 5   and the following occurred without the presence of the
 6   jury.)

 7

 8        (At this point the jury entered the courtroom
 9   and took their seats in the box.)

10

11        THE COURT: This is just a brief good morning.
12   Hope you all had a good weekend. We will, I think, schedule
13   lunch from 12:30 to 1:30, so if you have questions during
14   that time, we are not necessarily going to be around our
15   phone. So we get an hour off during the day. If we don't
16   hear from you, I will send a friendly note in about 4:00
17   o'clock to see where you stand, whether you want to adjourn
18   at 4:30 or 5:00, or whether you want to deliberate later on.
19        So we will keep in touch with you, at least in
20   that regard. And obviously, if you have got questions, we
21   will try to get back to you as soon as we can.
22        Thank you very much. Have a good day.
23        (At this point the jury then left the
24   courtroom, and the following occurred without the
25   presence of the jury.)
```

Page 2815

```
 1        THE COURT: All right. I need an hour off, so
 2   12:30 to 1:30, theoretically, we will have off, unless
 3   they send us a question that we have to answer. Hopefully
 4   we will have that off. When we get questions, we will let
 5   you know. If we have any other news we will certainly
 6   give you a call. Hope we have one number per side.
 7        MR. CAVANAUGH: Your Honor, being the eternal
 8   optimist that I am, there are issues relating to damages
 9   that we would have to talk about. I don't know if your
10   Honor wants to set some time today to do that.
11        THE COURT: We can. I absolutely have to get
12   something done this morning. I don't know how we are
13   going to manage all of this. We can meet at 11:00.
14        MR. CAVANAUGH: That is fine.
15        MR. BADENOCH: Your Honor, I think that is
16   probably fine. We have different attorneys who will be
17   handling the damages phase.
18        MR. CAVANAUGH: I spoke to Mr. Colbert last
19   night from Kenyon, who is handling damages for them. He
20   said that was great with him.
21        But I will call and double-check.
22        We will assume 11:00, your Honor.
23        THE COURT: All right. Thank you.
24        (Court recessed at 9:02 a.m.)
25                        - - -
```

Page 2828

1
2          (Proceedings resumed at 11:34 a.m.).
3
4          THE COURT: I guess the first thing we need to
5   do is address timing, because by my calculations, at most,
6   we have 24 hours left. I don't know whether you need
7   those. I certainly would suggest you don't use them unless
8   you need them. But that is all the time I can squeeze out
9   of the day here.
10         MR. CAVANAUGH: Your Honor, I think you had
11  allocated eleven hours per side for damages. That should
12  be fine.
13         MR. COLBERT: I agree, except I thought it was
14  11-1/2. A total of 23 hours.
15         THE COURT: Given the fact that Boston used an
16  extra hour in its liability case, I think eleven hours is
17  more than sufficient. So that is eleven hours each. That
18  means we will start at 9:00 again, which is different from
19  our schedule, and have a half-hour for lunch.
20         That is the only way I can squeeze the hours in,
21  since we are only getting less than three in today.
22         So that is that issue.
23         Do you have something to say?
24         MR. CAVANAUGH: Yes. We both have something
25  to say. There are a couple of issues.

Page 2829

1          One, why don't I just list the issues and you
2   can decide how you want to take them in order.
3          The first issue is whether pre-judgment
4   interest should be tried to the jury or to your Honor. I
5   have been in cases where judges have allowed it to go to
6   the jury on an advisory basis. There is a dispute between
7   the experts as to what the appropriate rate is to use. I
8   tried a case in front of Judge Buchwalter in the Eastern
9   District of Pennsylvania where it went to the jury, took
10  it on an advisory basis.
11         I leave it to your Honor.
12         THE COURT: This jury has enough today. No.
13         MR. CAVANAUGH: That is fine, your Honor.
14         The second issue has to do with the AVE
15  verdict. We do intend to tell this jury about the AVE
16  verdict. That was how we structured these trials, so
17  that there would be a finding that the AVE stents were
18  not noninfringing alternatives.
19         There is a related issue to that, that is the
20  AVE S series, which your Honor will recall was not part
21  of the last case. We intend to prove that those are also
22  not noninfringing alternatives because they are virtually
23  identical, certainly as to Claim 23 of the '762, as the
24  GFX, GFX 2.
25         So what we would propose to do in order to

Page 2830

1   prove that in the damages phase is, the jury is told
2   about the verdict, they understand through Mr. Collins
3   the basis for the GFX infringement, and then we will,
4   through a different witness, simply show pictures and
5   describe the characteristics of the S series to
6   demonstrate that they are not noninfringing alternatives.
7          We don't need an expert to do that. We have
8   Federal Circuit case law that says we don't need expert
9   proof in order to establish infringement and we certainly
10  don't need it to prove it on this damage issue.
11         The next issue we have is --
12         MR. COLBERT: Would you like to address them
13  one at a time, your Honor?
14         THE COURT: I would like to address them one at
15  a time.
16         MR. COLBERT: Your Honor, I can't imagine a
17  reason for putting in the AVE case. It is extremely
18  inflammatory and prejudicial.
19         I have offered to counsel for Cordis a
20  stipulation. We would stipulate that Boston Scientific
21  will treat the GFX, GFX 2, the Micro Stents, the products
22  that were accused in the first phase of this trial against
23  AVE, as infringing products.
24         We, frankly, don't think the S series stents
25  belong in this case at all. The S series stents, there

Page 2831

1   was no evidence with regard to the S series stents in the
2   earlier case. They are not accused in this action. We
3   have no expert report on it.
4          The testimony and documents that are being
5   proffered by Cordis to prove the S series stents infringe
6   are sort of in the nature of generalized comments. The
7   commercial documents are very much the same.
8                        - - -
9          MR. COLBERT (Continuing): As Mr. Diskant is
10  very careful during the liability phase of this case to
11  point out detailed analyses of the commercial embodiments
12  of the accused products in the patents and that there is
13  no evidence, no proffered evidence in the case. We think
14  it is so prejudicial and inflammatory, your Honor, we
15  would, rather than have that verdict come in, we would
16  rather stipulate the S-series stents as well are out, but
17  we don't believe we should be required to do that.
18         If we stipulate, your Honor, the GFX, GFX 2
19  and MicroStents infringe, then they should be free to argue
20  that they're the same, but they shouldn't be allowed to put
21  the verdict in. We think that would be the appropriate
22  thing to do, if the Court wants allow them to try to prove
23  the S-series stents infringe.
24         MR. CAVANAUGH: Your Honor, we simply stipulate
25  the jury may be left with the impression that Boston had

Page 2832

1  made decisions as to what does or does not infringe as to
2  the AVE stents. I think we're entitled to show that a
3  jury has found that the GFX 2 infringes Claim 23 of the
4  '762 patent and then we will demonstrate similarities
5  between the S series and the GFX 2. We don't require
6  expert testimony to do that. The pictures and the
7  dimensions speak for themselves.
8       THE COURT: Go back to the first thing you
9  said about -- you said something, Mr. Cavanaugh, about the
10  reason you need the verdict form as opposed to just a
11  stipulation that these are infringing products is because
12  Boston shouldn't be allowed, the jury might think Boston
13  bought something?
14       MR. CAVANAUGH: My concern is Boston will say
15  yes, we stipulate that the GFX 2 infringes, but we don't
16  stipulate that the S series infringes, leading the jury
17  to believe that somehow there are these differences
18  between the product and that Boston is picking and
19  choosing which infringe and which do not infringe.
20       That's not the case. These cases were
21  structured in such a way so that, when we got to the BSC
22  damages phase, the jury would know that the AVE stents
23  infringe. And when we get to the AVE damages phase, BSC,
24  they will know that the BSC NIR stent infringes. That's
25  the way we structured these cases, your Honor. And I

Page 2833

1  think starting to talk about stipulations instead of what
2  actually happened is prejudicial to us.
3       MR. COLBERT: Your Honor, I could solve Mr.
4  Cavanaugh's problem.
5       Instead of saying there is a stipulation, if
6  you gave the jury a direction that those are infringed, for
7  example, I think the appropriate thing to do is just say
8  the parties agree. I don't understand Mr. Cavanaugh's
9  particular problem with that. I'm not going to argue
10  that there was any decisional process made. I'm not going
11  to present to the jury any argument that this was a
12  conscious decision, just that the parties stipulate.
13       Your Honor, rather than my saying it, your
14  Honor could say that the parties have agreed that those
15  infringe, or you could say the parties do not dispute
16  that those infringe. Either one of those should solve
17  his problem.
18       MR. CAVANAUGH: Your Honor, I frankly don't
19  see the prejudice to Boston. Another jury has found that
20  another company's stent infringed.
21       THE COURT: I have not done it this way, to
22  tell you the truth, but I can't imagine that it's
23  appropriate or necessary to show one jury a verdict form
24  from another jury. That just strikes me as absolutely
25  inappropriate.

Page 2834

1       MR. COLBERT: Your Honor, if I may, just a
2  moment.
3       Mr. Cavanaugh is right, this case was
4  structured so when the AVE case was over, to quote Mr.
5  Cavanaugh, this jury would know that the AVE stents
6  infringe. Subsumed within that is they would know the
7  accused AVE stents infringed. We're willing to agree
8  to that.
9       Secondly, this is not just a damages trial.
10  The ACS stent infringement issue as a liability issue has
11  to be decided here. And this would be one of the most
12  inflammatory prejudicial things to have in front of the
13  jury when they're trying to decide whether or not the ACS
14  products also infringe.
15       THE COURT: I agree. And I still find this
16  utterly -- this is patent law -- if we have to have
17  basically many liability trials on the ACS trial and the
18  S series, then the last thing I'm going to do is let the
19  jury verdict in.
20       However you want to structure it, Cordis, aside
21  from the verdict, if you want me to instruct, whatever
22  language you want to use is fine, but we're not going to
23  let the AVE jury verdict in.
24       Now, with respect to the S series, I frankly
25  don't know what kind of evidence is needed. Apparently,

Page 2835

1  we can't have a whole liability phase on these things, so
2  it's something less than that. And with eleven hours, I
3  can't imagine it would be very much at all.
4       MR. CAVANAUGH: It's actually very brief, your
5  Honor. It's probably combined half an hour of testimony,
6  because the products really are very similar. And the
7  jury will also be told there is a pending lawsuit against
8  the S series.
9       MR. CAVANAUGH: Your Honor, we could make
10  this simpler. If they don't have a basis to challenge the
11  S series, if they will simply stipulate that the S series
12  also infringes, it's a lot simpler case.
13       MR. COLBERT: Of course.
14       MR. CAVANAUGH: I don't even have to put in
15  that case because they have not identified any difference
16  between the GFX 2 and the S series that would give rise
17  to a noninfringement argument.
18       MR. COLBERT: I'm sure Mr. Cavanaugh would like
19  me to stipulate the NIR products infringe as well.
20       MR. CAVANAUGH: That is no longer necessary.
21       MR. COLBERT: In point of fact, your Honor, is
22  that Boston Scientific is not responsible for proving
23  whether or not the S series stents infringe. Cordis must
24  prove whether or not the S series is a noninfringing
25  alternative or not. We do not have to prove it's a

Page 2836

1   noninfringing alternative.

2   THE COURT: Then it's their burden. I guess

3   if there is whatever case law you have that I can read in

4   the next 45 minutes, that gives me some guidance as to

5   what is appropriate evidence in this kind of proceeding,

6   then that will be helpful. So that settles that.

7   MR. CAVANAUGH: Okay. Your Honor, I think

8   what we would ask for is an instruction from your Honor

9   that the AVE MicroStent 2, GFX 1, and GFX 2 have been

10   found to infringe Claim 23 of the '762 patent.

11   MR. COLBERT: And your Honor, I think that that

12   is just a way of having your Honor with a stipulation do

13   what Cordis would like to do, which is have the fact of the

14   verdict before the jury. I think what they should be told

15   is there is no dispute here as to whether or not the GFX,

16   GFX 2 and MicroStent products infringe and they will be

17   treated as infringing parties for purposes of this case.

18   MR. CAVANAUGH: Your Honor, there has been a

19   finding. This jury does know about the lawsuits. Mr.

20   Croce testified about the lawsuits. I'm fine with not

21   going into that there has been a jury verdict. That a

22   jury was similar to them was here earlier in the month.

23   If your Honor will instruct that there has been a finding,

24   because that is the reality, your Honor, that is what

25   occurred and that's why we structured these cases this

Page 2837

1   way.

2   They're also going to hear about the fact

3   there was an ACS settlement. We can't go into the details

4   of it. Given your Honor's in limine ruling, neither side

5   can go into it, but that's a fact that the jury will know

6   about. The jury knows that we filed lawsuits against

7   three companies. They're going to -- they know what

8   happened in this case. They're going to hear testimony

9   about the ACS settlement and they should be told by your

10   Honor that there has been a finding that they infringe.

11   There is nothing inflammatory about that.

12   There is nothing prejudicial about that. That is a fact

13   which we should be able to rely on. And I will not, if

14   your Honor gives that instruction, I will not go into

15   anything relating to how that finding occurred.

16   THE COURT: I agree. I don't know when it is

17   you want me to say that, but I agree that that is not

18   inflammatory. It is the truth. And I agree to give that.

19   MR. COLBERT: Your Honor, if I may say briefly.

20   As I understand what they have asked the Court

21   to do is to instruct the jury there has been a verdict,

22   not give the verdict to the jury, but to instruct the jury

23   that there has been a verdict against those products which

24   is precisely the same as giving them the verdict.

25   THE COURT: No.

Page 2838

1   MR. CAVANAUGH: Saying there is a finding is

2   not the same as saying there is no disagreement.

3   THE COURT: Trust me, it's not the same as

4   giving one jury another jury's verdict on everything in

5   that case. It is a finding of that other jury.

6   MR. COLBERT: Your Honor, if that is your

7   Honor's decision, then I would like to go back. I'd like

8   to think a moment but, as I pointed out, we still think

9   it's so inflammatory and prejudicial we may be more

10   inclined to accept the stipulation we will treat the S

11   series stents as noninfringing rather than risk that

12   prejudice.

13   That is an offer that was made, and we may

14   accept that to keep the fact of the verdict and the

15   verdict itself away from the jury. And if you give me a

16   few minutes, perhaps we will come back at the close of

17   what we're doing right now. If that is the case, that

18   should resolve the issue.

19                         - - -

20

21

22

23

24

25

Page 2839

1

2   THE COURT: All right. I have to say, I will

3   never structure trials like this again. If the whole

4   purpose of doing this and bringing the first poor jury back

5   the second time was to avoid the truth, which is that they

6   found infringement, then this whole exercise has been a

7   waste. And I have learned all sorts of things.

8   I don't need to hear from anybody. You go

9   ahead and discuss. You let me know what your decision is.

10   Let's move on.

11   MR. COLBERT: We have a couple of other

12   issues, your Honor. One of which is, there is a question

13   about Government sales. Our expert, Dr. Bell, has

14   excluded Government sales because, under 28 U.S.C. Section

15   1498, it is very clear that sales to the United States

16   Government or products made for the United States

17   Government are not subject to a damage award in the United

18   States District Court. The only remedy that exists for a

19   patentee is to seek a claim in the U.S. Court of Claims

20   against the Government.

21   In Re: McHooker, which involved double-luminal

22   hemodialysis catheters, which is 831 F. Supp. 1354, 1393,

23   expressly in that case excluded the Government's sales

24   from the damage consideration in that case.

25   We think there is really no way that I can

Jury Trial - Volume L                       Condenscit™                        Monday, December 11, 2000

Page 2860

1  MicroStent 2, GFX, and GFX 2 stents infringe Claim 23 of
2  the '762 patent.
3      THE COURT: I didn't think we did the
4  MicroStent 2.
5      MR. CAVANAUGH: We did the 2. We didn't do
6  the 1.
7      THE COURT: All right. Well, the first thing
8  you proposed, which is what I'm making my decision on, is
9  the AVE, the MicroStent 2, GFX and GFX 2 has been found to
10 infringe Claim 23 of the '762 patent.
11     MR. CAVANAUGH: That's what I thought I said.
12 Mr. Diskant wasn't sure.
13     THE COURT: Anything else? I don't know when
14 to say that, though. When is it that I'm supposed to say
15 this?
16     MR. CAVANAUGH: Your Honor, I think it should
17 be very early in the case. And I have no problem if it
18 was in the preliminary instruction.
19     MR. BADENOCH: Your Honor, if I can just make
20 one statement... Because I was involved in the part where
21 we discussed the phase of the trial that you referred to.
22 The reason for structuring the trial this way was not, not
23 so that we would tell the jury how something was found,
24 merely so we would know the answer whether it was
25 infringing or not.

Page 2861

1      The reason we structured the trial this way was
2  now we know the answer. The AVE GFX stents infringe.
3  That's a reason to tell them that. It's not a reason to
4  tell them there is a finding as if it were either a verdict
5  or judicially sanctioned, merely that they now must treat
6  the AVE stents as infringing.
7      THE COURT: All right. Well, I'm not -- it
8  doesn't seem to fit anyplace in the preliminary instructions,
9  to tell you the truth.
10     MR. CAVANAUGH: That's fine, your Honor. We
11 would ask for it somewhat early in the case so that the
12 jury, because we are going to talk about the AVE stents
13 and the jury needs a context, and I'm going to reference
14 it in my opening statement. And what I would propose to
15 say is, you know, Judge Robinson will tell you there has
16 been a finding.
17     THE COURT: All right. And Boston Scientific
18 is still opposed to simply being -- letting Mr. Cavanaugh
19 state the parties agree that the MicroStent 2, so that
20 it's not coming from me kind of in a vacuum? Wouldn't
21 that be better for you if I made my ruling on that?
22     MR. COLBERT: I have no objection to saying
23 there is no dispute or an agreement, but I don't want Mr.
24 Cavanaugh to be talking about a decision or verdict of an
25 earlier case.

Page 2862

1      THE COURT: All right. That's your decision,
2  so I will --
3      MR. COLBERT: But, your Honor, if I may, in
4  terms of the timing of this...
5      THE COURT: Yes.
6      MR. COLBERT: And I said we want to caucus for
7  a minute. But if we don't decide to accept the offer to
8  stipulate so that that fact of the verdict goes before the
9  jury, I would suggest that the time to do it would be, the
10 only time it should be done is at the end of the case, the
11 final instructions, rather than during the case.
12     MR. CAVANAUGH: Your Honor, the expert and
13 our Vice President who is going to talk about the S series,
14 their testimony would make no sense unless we have that
15 instruction. The jury is not going to understand why
16 we're not talking about that.
17     THE COURT: Well, I'll tell you what. You all,
18 Boston Scientific, gather your heads together and decide
19 what you are going to do. I'll think about the timing
20 and we'll get together five minutes before 1:30. All
21 right?
22     MR. CAVANAUGH: Thank you, your Honor.
23     (Luncheon recess taken at 12:20 p.m.)
24          - - -
25

Page 2863

1
2          AFTERNOON SESSION
3
4      (Proceedings resumed at 1:27 p.m., and the
5  following occurred without the presence of the jury.)
6
7      THE COURT: Is there anything we need to
8  discuss before the jury comes in?
9      MR. CAVANAUGH: No, your Honor. I think we
10 have arrived at an agreement on the S series. Boston
11 Scientific will agree that the GFX, GFX 2, and the S
12 series stents infringe Claim 23 of the '762 patent. As a
13 result, I will not make any reference to the jury verdict
14 or that there has been a finding of infringement.
15     THE COURT: Thank you very much. Let's bring
16 our jury in.
17     (At this point the jury entered the courtroom
18 and took their seats in the box.)
19     THE COURT: Members of the jury: Since you
20 have found Boston Scientific liable for infringement of at
21 least one of Cordis' patents, you must now determine the
22 amount of damages to which Cordis is entitled for Boston
23 Scientific's infringement.
24     Just as they presented evidence to you on
25 infringement and validity, Cordis and Boston Scientific

Exhibit

DD

INTERNATIONAL INSTITUTE FOR CONFLICT PREVENTION & RESOLUTION

Before an Arbitration Panel Convened by
Alternative Dispute Resolution in Technology Disputes

---

JOHNSON & JOHNSON, a New Jersey Corporation and
CORDIS CORPORATION, a Florida Corporation,

Claimants

v.

MEDTRONIC, INC., a Minnesota Corporation and
MEDTRONIC AVE, INC., a California Corporation,

Respondents

---

## AWARD OF ARBITRATORS

ISSUES TO BE DECIDED:

1. Do Johnson & Johnson and its Affiliates have a license under the Settlement and
   License Agreement dated November 4, 1997, as amended, to Medtronic
   Affiliate's patents owned by that Affiliate before November 4, 1997, even though
   Medtronic acquired that Affiliate after November 4, 1997?

   Answer: No

   If yes, do Medtronic, Inc. and its Affiliates enjoy the same benefit under the
   Settlement and License Agreement dated November 4, 1997, as amended? That
   is, do Medtronic and its Affiliates have a license under the License Agreement, as
   amended, to a Johnson & Johnson Affiliate's patents owned by that Affiliate
   before November 4, 1997, even if Johnson & Johnson acquired that Affiliate after
   that date?

   Answer: Not applicable because of negative answer to preceding question.

AWARD OF ARBITRATORS – 2

2. Have J & J and its Affiliates granted Medtronic and its Affiliates a license under the Settlement and License Agreement dated November 4, 1997, as amended, to make, use, offer to sell, or sell the following accused products at issue in *Cordis Corp. v. Medtronic AVE, Inc., C.A. No. 00-886-SLR (D. Del. 2000)?*

Answer:

S540 Coronary Stent Systems

Yes _X_ (for Medtronic and its Affiliates)  No____ (for J&J and its Affiliates)

S670 Coronary Stent Systems

Yes _X_ (for Medtronic and its Affiliates)  No____ (for J&J and its Affiliates)

S660 Coronary Stent Systems

Yes _X_ (for Medtronic and its Affiliates)  No____ (for J&J and its Affiliates)

S7 Coronary Stent Systems

Yes _X_ (for Medtronic and its Affiliates)  No____ (for J&J and its Affiliates)

Driver Coronary Stent Systems

Yes _X_ (for Medtronic and its Affiliates)  No____ (for J&J and its Affiliates)

X3 Renal Stent Systems

Yes _X_ (for Medtronic and its Affiliates)  No ____ (for J&J and its Affiliates)

AWARD OF ARBITRATORS – 3

3.  Does the covenant not to sue in the Settlement and License Agreement dated November 4, 1997, as amended, bar J&J's and Cordis' claims that Medtronic AVE has infringed the Cordis patents in dispute in *Cordis Corp. v. Medtronic AVE, Inc.*, C.A. No. 00-886-SLR (D. Del. 2000)?

Answer:    Yes _X_              No ____

Date: February 20, 2006            By: _____

                                       Hon. Susan S. Soussan

Date:                               By:

                                       David Plimpton, Esq.

Date:                               By: _Zela G. Claiborne_

February 20, 2006

                                       Zela G. Claiborne, Esq.

02/20/2006 13:51    Four Seasons Hotel Austin - Concierge    512 885 7810    2/4

INTERNATIONAL INSTITUTE FOR CONFLICT PREVENTION & RESOLUTION

Before an Arbitration Panel Convened by
Alternative Dispute Resolution in Technology Disputes

---

JOHNSON & JOHNSON, a New Jersey Corporation and
CORDIS CORPORATION, a Florida Corporation,

Claimants

v.

MEDTRONIC, INC., a Minnesota Corporation and
MEDTRONIC AVE, INC., a California Corporation,

Respondents

---

## DISSENT FROM
## AWARD OF ARBITRATORS

ISSUES TO BE DECIDED:

1.  Do Johnson & Johnson and its Affiliates have a license under the Settlement and License Agreement dated November 4, 1997, as amended, to Medtronic Affiliate's patents owned by that Affiliate before November 4, 1997, even though Medtronic acquired that Affiliate after November 4, 1997?

    Answer:  No

    If yes, do Medtronic, Inc. and its Affiliates enjoy the same benefit under the Settlement and License Agreement dated November 4, 1997, as amended?  That is, do Medtronic and its Affiliates have a license under the License Agreement, as amended, to a Johnson & Johnson Affiliate's patents owned by that Affiliate before November 4, 1997, even if Johnson & Johnson acquired that Affiliate after that date?

    Answer:  Not applicable because of negative answer to preceding question.
    AWARD OF ARBITRATORS - 2

(1)

02/20/2006 13:51    Four Seasons Hotel Austin - Concierge    512 685 7810    3/4

DISSENT FROM
AWARD OF ARBITRATORS

2. Have J & J and its Affiliates granted Medtronic and its Affiliates a license under the Settlement and License Agreement dated November 4, 1997, as amended, to make, use, offer to sell, or sell the following accused products at issue in *Cordis Corp. v. Medtronic AVE, Inc.*, C.A. No. 00-886-SLR (D. Del. 2000)?

Answer:

S540 Coronary Stent Systems

Yes____(for Medtronic and its Affiliates)   No _X_(for J&J and its Affiliates)


S670 Coronary Stent Systems

Yes____(for Medtronic and its Affiliates)   No _X_(for J&J and its Affiliates)


S660 Coronary Stent Systems

Yes____(for Medtronic and its Affiliates)   No _X_(for J&J and its Affiliates)


S7 Coronary Stent Systems

Yes____(for Medtronic and its Affiliates)   No _X_(for J&J and its Affiliates)


Driver Coronary Stent Systems

Yes____(for Medtronic and its Affiliates)   No _X_(for J&J and its Affiliates)


X3 Renal Stent Systems

Yes____(for Medtronic and its Affiliates)   No _X_(for J&J and its Affiliates)


(2)

02/20/2006 13:51    Four Seasons Hotel Austin - Concierge    512 685 7810    4/4

DISSENT FROM
AWARD OF ARBITRATORS

**3.** Does the covenant not to sue in the Settlement and License Agreement dated November 4, 1997, as amended, bar J&J's and Cordis' claims that Medtronic AVE has infringed the Cordis patents in dispute in *Cordis Corp. v. Medtronic AVE, Inc.*, C.A. No. 00-886-SLR (D. Del. 2000)?

Answer:    Yes____                No__X__

Date:                                          By:

                                               Hon. Susan S. Soussan

Date: FEBRUARY 20, 2006                         By:

                                               David Plimpton, Esq.

Date:                                          By:

                                               Zela G. Claiborne, Esq.

(3)