# Exhibit
# EE

Redacted in its Entirety

# Exhibit FF

Page 3470

```
                        - VOLUME O -
                IN THE UNITED STATES DISTRICT COURT
                IN AND FOR THE DISTRICT OF DELAWARE

 CORDIS CORPORATION,              :      CIVIL ACTION

         Plaintiff               :

         vs.                     :

 MEDTRONIC AVE, INC., et al.     :      NO. 97-550 (SLR)

 BOSTON SCIENTIFIC               :      CIVIL ACTION
 CORPORATION, et al.,            :

         Plaintiffs              :

         vs.                     :

 ETHICON, INC., et al.,          :

         Defendants              :      NO. 98-19 (SLR)

 CORDIS CORPORATION,             :      CIVIL ACTION

         Plaintiff               :

         vs.                     :

 BOSTON SCIENTIFIC               :
 CORPORATION, et al.,            :

         Defendants              :      NO. 98-197 (SLR)

                        Wilmington, Delaware
                        Thursday, December 14, 2000
                        8:00 o'clock, a.m.

                        - - - - -

 BEFORE: HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

                        - - - - -

                        Official Court Reporters
```

Page 3471

APPEARANCES:

        ASHBY & GEDDES
        BY: STEPHEN J. BALICK, ESQ.

                -and-

        PATTERSON, BELKNAP, WEBB & TYLER, LLP
        BY: GREGORY L. DISKANT, ESQ.
            EUGENE M. GELERNTER, ESQ.
            WILLIAM F. CAVANAUGH, ESQ. and
            MICHAEL J. TIMMONS, ESQ.
            (New York, New York)

                -and-

        JOHNSON & JOHNSON
        BY: ERIC I. HARRIS, ESQ.

            Counsel for Plaintiffs

        YOUNG, CONAWAY, STARGATT & TAYLOR
        BY: JOSY W. INGERSOLL, ESQ.

                -and-

        KENYON & KENYON
        BY: GEORGE E. BADENOCH, ESQ.
            PAUL A. BONDOR, ESQ.
            ALBERT J. BRENEISEN, ESQ.
            MICHAEL ZACHARY, ESQ. and
            ARTHUR GRAY, ESQ.
            (Washington, D.C.)

            Counsel for Defendants

                - - - - -

Page 3472

PROCEEDINGS

(Proceedings commenced at 8:03 o'clock a.m., and the following occurred without the presence of the jury.)

THE COURT: I'm confident you all know the drill, so I guess we'll go page by page and try to work through the issues, if there are any. Hopefully, none too significant.

The first page? Page 1, 2, 3, 4, 5, 6. I'm so tired of this. We need to get a new example about circumstantial evidence. I am so tired of this example, but we're not going to be creative today.

Credibility of witnesses, number of witnesses, expert witnesses, deposition testimony. Did we hear deposition testimony?

MR. GRAY: Your Honor, we have none.

THE COURT: Good. Anything you can read.

MR. GRAY: Wait.

MR. COLBERT: We may, your Honor. We just may.

THE COURT: Okay. So I will just put a question mark on this one.

Page 3473

Page 11, the parties and their contentions.

MR. GRAY: Your Honor, we have a problem with the second paragraph. Again, a re-examination certificate and a patent.

MR. GRAY: We'll recap the only claim involved and say that the trial is Claim 23 of the '762 patent.

THE COURT: Okay. So the suggested change is to cap — Claim 23 of the '762 patent, period.

MR. GRAY: Yes, your Honor.

THE COURT: All right. Is there any objection to that?

MR. CAVANAUGH: No, your Honor. We would propose adding to that — your Honor, if I could hand up — these are a few additional, very short charges we didn't talk about, and the first one would be added to the section.

THE COURT: All right.

MR. GRAY: Your Honor, we don't agree with this as a matter of law.

THE COURT: What are we all looking at? Amount and type of infringement are relevant?

MR. CAVANAUGH: Yes.

THE COURT: That wouldn't go under the caption, the parties, though, would it?

MR. CAVANAUGH: No, your Honor, it would not

Jury Trial - Volume O    Condenselt™    Thursday, December 14, 2000

Page 3602

1  incremental sales. It only applies to sales that Cordis
2  would not have made.
3      THE COURT: And which motion in limine was
4  this?
5      MR. CAVANAUGH: Your Honor, I don't remember
6  the number.
7      MR. COLBERT: I didn't bring it either, your
8  Honor, because your Honor ruled on it and denied Mr.
9  Cavanaugh's motion.
10     MR. CAVANAUGH: Your Honor, the point is the
11  license is on all sales. It's a license for all sales.
12     Yes, for calculating damages, it's only
13  applied to those sales for which we're not entitled to
14  lost profits. But they've entirely shifted the
15  hypothetical negotiation in their favor, and I would
16  submit contrary to the law, by suggesting it's only on
17  incremental sales.
18     MR. COLBERT: Your Honor, I think it's their
19  Motion 21 and I believe your Honor's response was that
20  we were not going to be precluded from introducing this
21  testimony and that Mr. Cavanaugh would be fully free to
22  interrogate Dr. Bell and to cross him to his heart's
23  content.
24     THE COURT: Well, at this point, it seems to
25  me as though the evidence is appropriate and relevant,

Page 3603

1  and if there is a problem with the inferences that can
2  be drawn from that, that can be addressed by counsel.
3      I know that — well, so that's what we're
4  going to do at this point.
5      MR. CAVANAUGH: That's fine. Your Honor,
6  we'll renew our objection for the record.
7      THE COURT: All right. Thank you.
8      (Short recess taken.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3604

1
2      (Court resumed after the recess.)
3
4      THE COURT: Let's bring the jury in.
5      (At this point the jury entered the courtroom
6  and took their seats in the box.)
7      THE COURT: Mr. Colbert?
8      MR. COLBERT: Yes. Thank you, your Honor.
9      At the break, your Honor, I had asked to admit
10  4700. Is it admitted?
11     THE COURT: 4700 was —
12     MR. COLBERT: That was the document Dr. Bell
13  talked about just at the break.
14     THE COURT: Yes, with Cordis' objection noted.
15     MR. CAVANAUGH: Thank you, your Honor.
16  ***    (Defendant's Exhibit No. 4700 was received into
17  evidence.)
18     MR. COLBERT: May I show it?
19     THE COURT: Yes.
20     MR. COLBERT: Yes, please. Put it up. Just
21  show the top here.
22  BY MR. COLBERT:
23  Q. This is a Cordis franchise strategic plan 2000 to
24  2005, the document you were reading from?
25  A. It was.

Page 3605

1      MR. COLBERT: Could you put up the last page,
2  please? The third page of this document?
3      Go to the last page, signature page. I'm
4  sorry.
5      Could you highlight this part right here
6  (indicating)?
7  BY MR. COLBERT:
8  Q. That's Mr. Croce who testified in this case?
9  A. Correct.
10  Q. It's August 1, 1998. That's approximately the time
11  negotiations would begin?
12  A. Correct.
13  Q. All right. Thank you.
14     MR. COLBERT: You may take it down. Thank you.
15  BY MR. COLBERT:
16  Q. Now, just briefly, we'll go through this. Each of
17  these lines — please describe each of these points just
18  very briefly.
19  A. Sure. The broader product line issues is, again,
20  related to availability and more diameters and more
21  lengths. Remember that was one of the reasons why we had
22  to take some sales out earlier.
23     The — and as well BSC's broad line of
24  cardiovascular products.
25     Advances in medical applications, there was

Page 3606

1 the finesse trial that involved the NIR stents about
2 navigating or stenting in more difficult lesions. BSC
3 is assuming the risk of success and product liability.
4 Obviously, if something were to happen to a patient as a
5 result of a BSC stent, then it's BSC's responsibility,
6 obviously not Cordis' responsibility.
7        And BSC had available to it, and on the
8 market, of course, alternative noninfringing stent
9 technology. It had the Radius and the Wall stent, and
10 the Radius was another one of the stents that was in
11 some sense favorably referred to in one of these opinion
12 boards. Actually, the one that we had shown earlier.
13 Q. Okay. And just so we're clear, earlier you were
14 talking about the range of catheter delivery and you
15 read a document that was shown to you and talked about
16 the best in class balloon.
17 A. Correct.
18 Q. Is that referring to the catheter delivery system?
19 A. Correct. Yes.
20 Q. Thank you.
21        Okay. Now, what is the outcome of the
22 application of these factors, Dr. Bell, in your analysis?
23 A. Well, I think that, again, we're going to have a
24 negotiation between that 9 percent, which was the 1986
25 royalty on EGP and Cordis for the Palmaz/Schatz patents

Page 3607

1 and half of the anticipated NIR profit, which would have
2 been the result of equal parties coming to the table with
3 equal bargaining positions and each equally expected to
4 assume responsibility for the future anticipated success
5 of the product.
6        In fact, where I come out in terms of where
7 in that range as a point estimate, if you will, of a
8 royalty rate, I come out at 12.7 percent. And that's
9 how I get from 9 to 16.3 down to a point of 12.7, is
10 based on consideration of other Georgia-Pacific factors.
11 Q. All right. Now, did you do anything to compare
12 that 12.7 to other rates in the industry?
13 A. I did.
14 Q. And what did you do?
15 A. Well, here's an example. Here's our 12.7. There's
16 the 9 for Palmaz/Schatz. Obviously, 12.7 is greater than
17 9.
18        Another example that occurred around this time
19 was with regard to the Fischell -- with regard to IsoStent,
20 which was a company owned by the Fischells. This is not
21 the -- well, it was owned by the Fischells. And in
22 October of '98, J&J purchased IsoStent and part of the
23 rationale for the purchase and the support for the
24 purchase price was an expectation that J&J would be able
25 to save royalties on intellectual property that the

Page 3608

1 Fischells had that were related to stent technology.
2 And they were expecting to save royalties of 7.5 percent
3 per unit.
4        It's 8.5 on year because they would only save
5 7.5 percent. They would still have to pay 1 percent.
6        So together it was 8-1/2 percent, and that's
7 obviously a basis under which Johnson & Johnson bought
8 IsoStent and provided the principal financial rationale
9 for the purchase.
10 Q. Did you find any licenses on stent delivery system
11 devices?
12 A. Well, yes. Yes, I did. And, in fact, you know,
13 we looked at other agreements that Cordis had relating
14 to stent technology and relating to delivery system
15 technology.
16        We didn't include, you know, agreements that
17 were in settlement of litigation and we didn't include
18 agreements that were part of a big purchase of another
19 company. We didn't include agreements that were part
20 of a broad supply arrangement. You know, we only wanted
21 to look at arm's-length agreements that are like the
22 agreements we had been negotiating here.
23        And look at the -- at the agreements that
24 Cordis had and they're listed in my spread sheets. And
25 the range on all of those agreements was from 1 percent

Page 3609

1 up to as much as 9 percent.
2        And similarly with BSC, looked at their
3 agreements in this area, and there the royalties ranged
4 from 2-1/2 to 8 percent. And, again, that's all listed
5 in the exhibits.
6        MR. COLBERT: Could you put the Elmo on,
7 please? Thank you.
8 BY MR. COLBERT:
9 Q. Did you include in your spread sheet data that led
10 to your summary, did you include the listing of the
11 individual license in which you derived the list of the
12 Cordis and Boston Scientific --
13 A. Yes.
14 Q. Is it CRA 2016?
15 A. I believe so, yes.
16 Q. I would like to show you CRA 2016.
17        MR. COLBERT: Your Honor, I understand Mr.
18 Cavanaugh had a pending question about the spread sheets.
19 I would like to show it.
20        Is there an objection?
21        MR. CAVANAUGH: Your Honor, I have no problem
22 as a demonstrative.
23        MR. COLBERT: Okay.
24 BY MR. COLBERT:
25 Q. Is this the document that led to the chart showing

# Exhibit GG

Jury Trial - Volume M                 Condenseit™                    (ISSUE), December 12, 20??

Page 2976

```
                - VOLUME M -
           IN THE UNITED STATES DISTRICT COURT
           IN AND FOR THE DISTRICT OF DELAWARE

CORDIS CORPORATION,              :       CIVIL ACTION

        Plaintiff

        vs.

MEDTRONIC AVE, INC., et al.      :       NO. 97-550 (SLR)

BOSTON SCIENTIFIC                :       CIVIL ACTION
CORPORATION, et al.,

        Plaintiffs

        vs.

ETHICON, INC., et al.,           :
                                         NO. 98-19 (SLR)
        Defendants

CORDIS CORPORATION,              :       CIVIL ACTION

        Plaintiffs

        vs.

BOSTON SCIENTIFIC                :
CORPORATION, et al.,

        Defendants                       NO. 98-197 (SLR)

                         Wilmington, Delaware
                         Tuesday, December 12, 2000
                         9:07 o'clock, a.m.

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

                 - - - - -

                 Official Court Reporters
```

Page 2977

```
APPEARANCES:

        ASHBY & GEDDES
        BY: STEPHEN J. BALICK, ESQ.

                 -and-

        PATTERSON, BELNAP, WEBB & TYLER, LLP
        BY: GREGORY L. DISKANT, ESQ.
            EUGENE M. GELERNTER, ESQ.
            WILLIAM F. CAVANAUGH, ESQ. and
            MICHAEL J. TIMMONS, ESQ.
            (New York, New York)

                 -and-

        JOHNSON & JOHNSON
        BY: ERIC I. HARRIS, ESQ

        Counsel for Plaintiffs

        YOUNG, CONAWAY, STARGATT & TAYLOR
        BY: JOSY W. INGERSOLL, ESQ

                 -and-

        KENYON & KENYON
        BY: GEORGE E. BADENOCH, ESQ.
            PAUL A. BONDOR, ESQ.
            ALBERT J. BRENESEN, ESQ.
            MICHAEL ZACHARY, ESQ and
            ARTHUR GRAY, ESQ.
            (Washington, D.C.)

        Counsel for Defendants

                 - - - - -
```

Page 2978

## PROCEEDINGS

(Proceedings commenced at 9:07 o'clock a.m., and the following occurred without the presence of the jury.)

THE COURT: I trust there's nothing we have to address before the jury comes in, before the morning break?

MR. CAVANAUGH: That's correct, your Honor.

Your Honor, I should tell you when the damage experts testify, Mr. Hoffman for us, Dr. Bell, they're going to have a lot of demonstratives, but some of those demonstratives are also, we believe, summary exhibits under 1006, and we'll move some of those by agreement into evidence.

THE COURT: All right. Good.

Generally, if you agree, I will not disagree. Generally.

MR. CAVANAUGH: All right. There's always exceptions to the rule.

THE COURT: There are always exceptions.

(At this point the jury entered the courtroom and took their seats in the box.)

THE COURT: Good morning, ladies and gentlemen.

Page 2979

Mr. Cavanaugh?

MR. CAVANAUGH: Thank you, your Honor.

Good morning, ladies and gentlemen. Our first witness this morning will be Bob Croce from Johnson & Johnson. You may remember Mr. Croce testified in the liability phase. We're going to cover a few new subjects today. And he won't be on the stand too long. And so let's get started.

Bob?

            - - -

        PLAINTIFF'S TESTIMONY

            CONTINUED

... ROBERT W. CROCE, having been previously duly sworn as a witness, was recalled and testified further as follows ...

        DIRECT EXAMINATION

BY MR. CAVANAUGH:

Q. Good morning, Mr. Croce.

A. Good morning.

Q. Could you just remind the jury what your position is at Johnson & Johnson?

A. I'm Company Group Chairman and I have responsibility for Cordis worldwide.

**Page 3040**

1 And so what I had to do next was to compute
2 how much it would have cost to make those additional
3 stents. And there I had to go to the books of accounting
4 at Cordis, and by going through their books I was able to
5 determine it would be a little more than $110 million to
6 make the additional sales, to make the products and to
7 sell them.
8 Q. What is the next step?
9 A. The next step is to subtract one from the other.
10 That was easy. That got me 357, $358 million in lost
11 profits, and that's what I believe are the lost profits
12 on those stent sales that Cordis would have made.
13 Q. And is that the total amount of the lost profit
14 component of your damage calculation?
15 A. That's the total amount of the first component,
16 the lost profit component of the damage calculation, yes.
17 Q. Now, are those profits calculated before or after
18 taxes?
19 A. That's all done on a pre-tax basis. If Cordis had
20 actually made those sales, we'd now have to pay taxes on
21 those — on its income. When Cordis receives a check at
22 the end of this trial, it's going to have to pay taxes on
23 that, so everything that — everything we do here is
24 pre-tax and we don't get into the intricacies of Johnson &
25 Johnson's tax return.

**Page 3041**

1 Q. What is the next — what is the other component of
2 your damage calculation?
3 A. Well, here we've talked about 64 percent of the —
4 of the stents, the infringing stents and, as we know, for
5 the other 36 percent, Cordis is entitled to at least a
6 reasonable royalty. They wouldn't have made these sales,
7 but they were, in fact, manufactured and sold by Boston
8 Scientific. They were infringing sales and Boston
9 Scientific owes Cordis a reasonable royalty for having
10 done that.
11 Q. What do you mean by a royalty?
12 A. Royalty is an amount that you pay for using somebody
13 else's intellectual property. I think of it like rent.
14 The other person continues to own the property, but you
15 use it for a while, and you basically pay rent for using
16 it. Sometimes it's a percentage of the sales. Sometimes
17 it's a big up-front check. Sometimes it's a check at the
18 end. It's something that you pay for using somebody
19 else's intellectual property.
20 Q. How did you go about determining the royalty rate
21 in this case?
22 A. Well, I did what's pretty much standard in these
23 circumstances. I sat back and thought about a whole
24 bunch of things as to what would have happened if these
25 two parties had actually sat down in July or August of

**Page 3042**

1 1998 and talked to one another about what a reasonable
2 royalty would be.
3 And I had help in doing that. There's a long
4 list of factors, some 14 or 15 factors, to begin
5 considering that — the so-called Georgia-Pacific factors
6 that I think were mentioned yesterday.
7 So I used those and I thought about what a
8 reasonable royalty ought to be between the two parties.
9 Q. What conclusion did you arrive at?
10 A. I concluded that 40 percent — a 40-percent royalty
11 based on Boston Scientific's sales would, in fact, be a
12 reasonable royalty for the intellectual property that is
13 at issue here.
14 Q. How does that translate into damages?
15 A. Well, what one does is one multiplies, then, the
16 actual or the sales that Boston Scientific made at their
17 selling price. Take 36 percent of their stent sales over
18 the various quarters and multiply by their actual selling
19 price, and then multiply that number by 40 percent, and
20 that works out to be about $115 million for this final
21 component.
22 Q. Okay.
23 (Pause.)
24 BY MR. CAVANAUGH:
25 Q. Now, the reasonable royalty damages are calculated

**Page 3043**

1 on this, the 36 percent?
2 A. That's correct. And lost profits on the 64 percent.
3 Q. All right. And you — what you are essentially
4 doing is taking the NIR selling price on those 195,000,
5 taking 40 percent of that and we get the number of 115
6 million?
7 A. You get the number of 115 million. In fact, I do
8 it on a detailed basis by quarter and basically create
9 this pie chart, if you will, and spread sheet form for
10 every quarter and do it based on their actual selling
11 prices that quarter and so forth. When all is said and
12 done, you're absolutely right. What we've got is those
13 stents multiplied by Boston's selling price multiply by
14 40 percent.
15 Q. What is the final step in the process?
16 A. The final step in the process is to add the two
17 together, and when you add the 357 and 115, you get $473
18 million. And that was an easy step.
19 (Mr. Cavanaugh handed an exhibit to the
20 witness.)
21 BY MR. CAVANAUGH:
22 Q. Mr. Hoffman, I've shown you PX-3899. What is that?
23 A. That's, I believe, an exact copy of currently what's
24 on the screen.
25 MR. CAVANAUGH: Your Honor, we'd move PX-3899

Jury Trial - Volume M                                    Condensed

## Page 3208

1 with the corrugations being the serpentine pattern we
2 talked about before with the Palmaz ring.
3 Q. Does the corrugated ring of the Tristar stent work
4 the same way as the Palmaz ring in the '762 patent?
5 A. Exactly the same way, yes.
6 Q. Underneath corrugated ring it says multiple rings
7 connected with multiple links. Using the Tristar, would
8 you explain what that is?
9 A. Sure. As I was describing before, with a Palmaz
10 ring, the way you can make a stent longer or shorter is by
11 using more of the Palmaz rings. So here, we just see, you
12 know, one, two, three, four, five, and you can have as
13 many or as few as you wanted.
14     So that's what's meant by multiple rings in
15 the stent here. And they're connected with multiple links.
16     In this case, you can see a link here, which
17 connects this ring to that ring and you can't see it, but
18 on the back side, there's another ring -- another connector.
19 So there's more than one connector that connects each ring
20 to its neighboring ring.
21 Q. And is there any difference between the geometry
22 you see in the Tristar with the connections and the NIR
23 stent connections that we learned about in the liability
24 phase of this case?
25 A. Yes. Absolutely. And the differences stem from --

## Page 3209

1 probably the easiest way to look at the differences is
2 the fact that, if you remember when we were describing
3 the NIR, we were talking about them as being out of phase,
4 and that meant when you had the serpentines, that the
5 peaks of the serpentines were aligned, where here, if you
6 look at this pattern, you will notice that this part of
7 the -- this slot (indicating) within the ring is in the
8 same position as the one right next to it. So this is
9 in phase.
10     So as a result, the end of one of the --
11 ring portions is lined up with the -- the peak. One side,
12 it's lined up with a valley of the other.
13     So if you look at how you connect one to the
14 other, the distance is much, much longer, so the connector
15 is much longer than the connector in the NIR stent. And
16 it connects the peak of one serpentine ring to the valley,
17 if you will, of the other serpentine ring.
18 Q. Does the connector have a link in the Tristar have
19 any effect on how the corrugated ring expands?
20 A. No, not at all. The way this expands is driven by
21 the Palmaz ring, or the corrugated ring. That's what
22 controls the expansion, as we talked about before. And
23 the connector basically goes along for the ride.
24 Q. Can we focus in on the lower right-hand corner
25 portion of the orange one, please? Great.

## Page 3210

1     Hear it says, it provides high radial strength
2 without compromising flexibility or uniform scaffolding.
3     Could you explain what in the Tristar provides
4 high radial strength?
5 A. It's identical to the fundamental Palmaz and NIR,
6 that the radial strength comes from the -- what they
7 are calling the corrugated ring or the Palmaz ring.
8     MR. TIMMONS: If we could just focus in on
9 the stent... Big screen. Thank you.
10 BY MR. TIMMONS:
11 Q. How is the -- how are all three ACS stents
12 manufactured?
13 A. They're manufactured by starting with a stainless
14 steel tube, and removing material from that. In this
15 case, the material is removed by a laser process.
16 Q. How are the -- how is the embodiment in the '762
17 patent made?
18 A. The preferred embodiment of the '762 is identical.
19 You start with a stainless steel tube and you remove
20 material from that stainless steel tube.
21 Q. The commercial embodiments of the Palmaz/Schatz and
22 Palmaz stents, how are they made?
23 A. Again, identical. Starting with a stainless steel
24 tube and removing material from the stainless steel tube
25 to create the pattern that you see.

## Page 3211

1 Q. Are there any differences between the way that the
2 Tristar is made and the way that the NIR stent is
3 manufactured?
4 A. Yes. The NIR is manufactured starting with a flat
5 sheet. You cut that pattern in the flat sheet and roll it
6 up. In order to get the mechanical properties that you
7 need, they're welded together. And as a result, you don't
8 have -- in this product you don't have any weld points to
9 worry about. And also we had talked about some of the U
10 connectors that would spring back a little bit after being
11 formed, and they potentially would protrude off of the
12 surface a little bit.
13     We don't have any similar kind of U connectors
14 or any protruding surfaces on the ACS design.
15 Q. So the lack of U's protruding and the lack of welds
16 on the Tristar stent and the other ACS stents, does that
17 have any effect at all on your infringement analysis of
18 Claim 23?
19 A. Particularly as compared to the NIR analysis, it
20 makes it a much more straightforward analysis to do,
21 because you don't have to worry about, you know, whether
22 or not the weld is important, whether or not the U is
23 projecting off a little bit more. Everything made here
24 is from the stainless steel tube and all on one
25 cylindrical claim.

Jury Trial - Volume M

## Page 3212

1 Q. Let's turn to Claim 23. I will ask for PX-3, which
2 is in evidence.
3        During the liability phase, we looked at the
4 NIR stent in two different ways. First, as each segment
5 being the tubular member and then the stent as a whole
6 being a tubular member.
7        Can we do that for the ACS stents also?
8 A. Absolutely. Analysis can be done identically.
9 Q. Do you have an opinion as to whether or not the ACS
10 Multi-Link Duet stents and Tristar stents infringe Claim
11 23 of the '762 patent?
12 A. I have an opinion. And that's that they do, indeed,
13 infringe.
14 Q. That's true whether you look at the Tristar or any
15 of the ACS stents as a whole or each as a corrugated
16 individual ring?
17 A. That's right. Either way of looking at it, my
18 conclusion is the same.
19 Q. Let's turn to each of the individual claim elements.
20 And the first one is expandable intraluminal vascular
21 graft, comprising. Are the ACS stents an expandable
22 intraluminal vascular graft?
23 A. Absolutely. They're marketed and sold that way as
24 stents.
25 Q. That's another way of saying stent?

## Page 3213

1 A. Absolutely. (Absolutely above)
2 Q. Next element. A thin-walled tubular member having
3 first and second ends. And let's focus in on thin-walled
4 first.
5        Do the ACS stents satisfy the thin-walled
6 requirement?
7 A. Certainly. When you look at the thin-walled
8 requirement, the wall has little extent from one side to
9 another. The purpose of that is to allow it to be
10 balloon expandable, what we've talked about before. In
11 this case, the stent is certainly balloon expandable and
12 the material thickness is on the order of 5-1/2 thousandths
13 of an inch, which is obviously quite small.
14 Q. Dr. Collins, we've placed on the left-hand side the
15 Court's definition. And do you understand that the --
16 that definition of thin-walled requires that it be
17 thin-walled to both its first and second diameters?
18 A. Yes.
19 Q. The ACS stents, are they thin-walled, first and
20 second diameters?
21 A. Yes. The wall, it's difficult to see it when you
22 look at the stent as a whole, but when you expand it from
23 the first diameter to the second diameter, the material
24 does not change. The material's thickness stays the same.
25 Q. That's true for both the corrugated ring and the

## Page 3214

1 stent as a whole?
2 A. Absolutely, yes.
3 Q. The second part of this element is tubular member
4 Do the ACS stents meet this claim definition?
5 A. Yes, they do. Again, you can look at it either as
6 the stent as a whole or each one of the Palmaz rings or
7 corrugated rings being a tubular member. That they're
8 hollow, elongated, cylindrical structure with two ends.
9 And you look at it as the stent as a whole, there's
10 absolutely no question but that it's elongated. It's much
11 longer than it is in diameter. But when you look at each
12 one of the ring elements, there are some designs, like the
13 Multi-Link, in which the length of the ring element is a
14 little bit shorter than its diameter, where for the Duet
15 and Tristar, it is a little bit longer than its diameter.
16 Q. Let's recap for a second.
17        So when you look at the stent as a whole, it
18 meets the tubular member element literally?
19 A. Exactly. Absolutely.
20 Q. And if these individual rings are elongated, also --
21 A. Correct.
22 Q. Let's talk about the situations where this ring is
23 not elongated.
24 A. Okay.
25 Q. Do you have an opinion as to whether or not that

## Page 3215

1 non-elongated corrugated ring as an equivalent of an
2 elongated tubular member?
3 A. Absolutely. The reason, from an engineering
4 perspective in particular, what matters is that you have
5 a slot and that slot is longer than it is wide and whether
6 or not the whole ring happens to be a little bit more, a
7 little bit less than a ratio of one, it does not matter
8 at all.
9 Q. During the liability phase of this case, we talked
10 about a very similar analysis of the NIR stent. We went
11 through the function, way and result of an elongated
12 tubular member under the '762 patent.
13        In your opinion, do the corrugated rings of
14 the Multi-Link or the ACS stents, are they the equivalent
15 of an elongated tubular member?
16 A. Yes, they are, in that they provide the same
17 function, do it in the same way and give you the same
18 result.
19 Q. Is -- what is -- do the individual rings of the ACS
20 stents expand and support tissue whether or not they're
21 elongated?
22 A. Absolutely.
23 Q. Is that the identical function to the Palmaz/Schatz?
24 The Palmaz tubular member, if it's elongated?
25 A. That's correct.

Jury Trial - Volume M

Page 3216

1  Q. Do the corrugated rings of the ACS stents perform
2  this function in the same way as a tubular member of the
3  '762 patent?
4  A. Yes, they do. And again the way this expands is the
5  balloon will start to push the stent out. The bars or
6  struts bend and they plastically deform as they expand in
7  diameter, and the surgeon is allowed to control that
8  expansion, and there's no springiness in that process
9  because of the plastic deformation process.
10  Q. And the corrugated rings of the -- of the ACS stents
11  that aren't elongated, do they achieve the same result as
12  the elongated tubular member of the '762 patent?
13  A. Absolutely. They provide uniform support to the
14  tissue wall and they do it in a way that allows a surgeon
15  to control what the final diameter is. Once it's reached
16  that final diameter, it stays where the surgeon wants it.
17  Q. So, in your opinion, does the -- do the ACS stents
18  meet the thin-walled tubular member having first and
19  second ends as claim element?
20  A. Absolutely, yes.
21  Q. Let's turn to the next claim element: A wall surface
22  disposed between the first and second ends.
23       Do the ACS stents meet this definition?
24  A. Most definitely. Here, the definition is that the
25  outer surface of the tubular member must be disposed in a

Page 3217

1  common cylindrical plane. Well, you start with a cylinder
2  and then material is removed from that cylinder. So you
3  don't have to worry about bumps or anything else. This
4  is a very straight cylinder from which material is removed
5  and certainly meets that -- that definition exactly.
6  Q. The lack of U's and welds, does that have any effect
7  in your analysis of this claim element?
8  A. Basically, I think it makes the analysis much more
9  straightforward and much simpler thing to look at.
10  Q. So it's -- it's simpler than the NIR analysis?
11  A. Much more simpler than the NIR analysis, correct.
12  Q. The next claim element is a wall surface having a
13  substantially uniform thickness.
14       Do the ACS stents meet this claim element,
15  whether or not we look at them as corrugated rings or
16  as a stent as a whole?
17  A. Absolutely. Again, you start with a stainless
18  steel tube. These tubes are made of medical grade metal.
19  In the manufacturing process, their wall thicknesses are
20  very carefully controlled. And then material is removed
21  from that, etching out the pattern, which leaves you with
22  a uniform wall. You look at multiple rings, they're all
23  made from the same tube, so they all have the same uniform
24  wall thickness.
25  Q. What has to have a substantially uniform thickness,

Page 3218

1  just to be clear?
2  A. If you will, the struts, the struts are what -- are
3  the metal that make up the stent, and they have to be of
4  uniform thickness.
5  Q. That's the metal that basically surrounds the slots?
6  A. That's correct.
7  Q. And directing you again to the Court's definition,
8  it's requires that the wall surface be substantially
9  uniform, both at its first and second diameters.
10       Is the material surrounding the slots the
11  same thickness in both the first and second diameters,
12  once the ACS stents are expanded?
13       - - -
14  A. Absolutely. As the stent expands, the wall thickness
15  material does not change. You can see that, from the first
16  diameter to the second diameter, it stays the same.
17  Q. Let's go on to the next claim element, which is a
18  plurality of slots formed therein.
19       In your opinion, does the ACS stent meet the
20  plurality of slots claim?
21  A. Absolutely. You can see there are a number of slots
22  as you go around the circumference. The Palmaz ring, it's
23  made up of slots, multiple slots.
24       - - -
25

Page 3219

1
2  A. (Continuing) And certainly as you start to couple
3  multiple rings together, there are just more slots.
4  Q. And you talked earlier about how the stents are
5  formed. Does these stents -- does the manufacturing
6  process of the ACS process comply with the --
7  A. Absolutely. They do it in an identical way as the
8  preferred embodiment.
9       MR. TIMMONS: The next element, please.
10  BY MR. TIMMONS:
11  Q. Are the slots disposed substantially parallel to
12  the longitudinal axis of the tubular member?
13  A. They certainly are. The easiest way is probably
14  looking at the blowup. You can see the orientation of a
15  slot, which is along the axis of the stent.
16  Q. And does that geometry have any importance as to how
17  the stent works?
18  A. It's absolutely critical to the functioning. It
19  provides the space for the stents to open up and
20  plastically deform.
21  Q. Is that anything like the coil stents we talked
22  about during the liability phase?
23  A. No. It's 180 degrees literally from the coil stents
24  where the openings are perpendicular to the axis. It's
25  identical to the Palmaz ring design.

Jury Trial - Volume M                        Conduction

**Page 3220**

1  Q. Just a couple more elements. The next one is the
2  tubular member have a first diameter. Do the ACS stents
3  meet that first element?
4  A. They have a first diameter which allows it to be
5  delivered to the site.
6  Q. A second diameter?
7  A. Yes. Second diameter is expanded and deformed
8  diameter. When you apply a pressure from the balloon, it
9  opens it up, plastically deforming the walls and generating
10 a larger deformed diameter.
11 Q. And the very last element in Claim 23 requires that
12 the outside of the wall surface of the tubular member be
13 smooth in the first diameter.
14       Do the ACS stents meet this claim element?
15 A. Absolutely. You are starting with a smooth stainless
16 steel tube and you are just removing material from it. So
17 it is.
18 Q. Again, U's not protruding or no U's at all and the
19 welds. Does that make any difference?
20 A. It makes the analysis that much more straightforward
21 to do.
22 Q. It means to you that this is a smooth surface?
23 A. Smooth surface. No question.
24 Q. Just to sum up, what's your opinion as to whether
25 or not the ACS stents meet Claim 23 of the '762 patent?

**Page 3221**

1  A. I think we've gone through each one. I've had no
2  question but each of those stents meet all of the claim
3  elements in Claim 23.
4  Q. Let's turn to something a little bit new, and I just
5  want to talk to you a little bit about BSC's position on
6  whether or not ACS meets these claim elements.
7        And do you understand that the -- that BSC and
8  its experts assert that the -- each ring upon expansion is
9  a little bit flaring at the end of those rings?
10 A. Yes, I do understand that.
11 Q. Does this position have any effect in your
12 infringement analysis of Claim 23?
13 A. No. I've looked at it and I believe it has
14 absolutely no impact at all in any of the claim elements.
15 Therefore, it has no impact on my decision.
16 Q. Let's look at this flaring, and it's in PX-276 at
17 Page 344 in the orange book. Focusing on the top.
18       Can you explain what we're seeing here?
19 A. Sure. This is a -- an ACS, a Multi-Link stent,
20 which is expanded to its second or expanded diameter.
21 And the flaring that you're talking about is probably
22 best seen by looking at the ends. And, again, it's always
23 hard to look at a three-dimensional product like this in
24 the two-dimensional image and really have a sense.
25       But if you look at, for example, that part of

**Page 3222**

1  the ring, you can see it appears to be canting out a
2  little bit. You can see an element out here that's can't
3  go out a little bit, and that's the flaring you're
4  referring to.
5  Q. Is that the Multi-Link stent?
6  A. Yes.
7        MR. TIMMONS: Can we do a split-screen? What
8  we're going to do is put up one of the pictures that Dr.
9  Snyder has attached to his expert report.
10       (Pause while counsel conferred.)
11       MR. TIMMONS: Is it all right, your Honor?
12 There's no objection.
13       Flip it around, so we can be in the same
14 orientation.
15 BY MR. TIMMONS:
16 Q. Tell me what's shown in this picture from Dr. Snyder.
17 A. This is a stent that I understand was implanted in a
18 pig artery, a non-diseased pig artery, and then excised
19 and cleaned up in and a picture was taken of it.
20 Q. Is this also a Multi-Link stent?
21 A. Yes.
22 Q. Do you understand that the ACS stents may flare
23 upon expansion?
24 A. Sure. Yes.
25 Q. What, if anything, are factors that may control

**Page 3223**

1  the amount that it flares upon expansion?
2  A. There are a number of design parameters and expansion
3  rates, but equally important is the -- are the conditions
4  under which it's expanded. You can imagine if it's
5  expanded in air, and I don't know for a fact, but I
6  believe the one on the left was expanded in air. There's
7  no force on the outside which is going to tend to push
8  these struts back onto the surface.
9        If you go to the extreme and expand it in a
10 very rigid vessel, you're going to be squeezing the stent
11 up against the wall and it's going to conform to the
12 balloon much more carefully.
13       Or an intermediate position, where you've
14 got some resistance, where you will have from a healthy
15 pig tissue that's going to tend to keep the flaring to a
16 minimum.
17 Q. To the extent -- can you explain the differences
18 between expanding the stent in a healthy artery and a
19 diseased artery?
20 A. As an engineer, the differences I will be looking
21 at are what are the external forces in the geometry that
22 you are expanding into. So if you are expanding into a
23 perfectly uniform geometry, a constant -- constant
24 material characteristics, you'll get one result. If you
25 are expanding into something which is highly not uniform

# Exhibit

# HH

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CORDIS CORPORATION,                              )
                                                  )
            Plaintiff,                            )
                                                  )
        v.                                        )          Civil Action No. 97-550-SLR
                                                  )            (consolidated)
BOSTON SCIENTIFIC CORPORATION                    )
and SCIMED LIFE SYSTEMS, INC.,                   )
                                                  )
            Defendants.                           )
_____          )
                                                  )
BOSTON SCIENTIFIC CORPORATION                    )
and SCIMED LIFE SYSTEMS, INC.,                   )
                                                  )
            Plaintiffs,                           )
                                                  )
        v.                                        )          Civil Action No. 98-19-SLR
                                                  )
ETHICON, INC., CORDIS CORPORATION                )
and JOHNSON & JOHNSON                             )
INTERVENTIONAL SYSTEMS CO.,                       )
                                                  )
            Defendants.                           )
_____          )
                                                  )
CORDIS CORPORATION,                              )
                                                  )
            Plaintiff,                            )
                                                  )
        v.                                        )          Civil Action No. 98-197-SLR
                                                  )
BOSTON SCIENTIFIC CORPORATION                    )
and SCIMED LIFE SYSTEMS, INC.,                   )
                                                  )
            Defendants.                           )

**JURY VERDICT**

We, the jury, unanimously find as follows:

## I.  LOST PROFITS DAMAGES

What amount of lost profits damages, if any, do you find that Cordis is entitled to for sales Cordis would have made but for Boston Scientific's infringement of claim 23 of the '762 patent?

$ 253,595,750

## II.  REASONABLE ROYALTY

A.  What royalty rate did you find that Cordis was entitled to in determining the reasonable royalty for Boston Scientific's infringement of claim 23 of the '762 patent?



20 %

B.  What amount of damages do you find that Cordis is entitled to as a reasonable royalty for sales of the NIR stent that Cordis would not have otherwise made?

$ 70,807,500

2

Each juror should sign the verdict form to reflect that a unanimous verdict has been reached.

Dated: December *15* , 2000

_Landis F. Barson_
**FOREPERSON**

_Danielle M. Stella_

_D. Brent Bailey_

_Gregory L. Cole_

_Olga C. Maloney_

_Carol B. Kendall_

_Shawn Garrison_

_Kris Brooks_

_Donald D. Mitchell_

3

# Exhibit
# II

Jury Trial - Volume N                 CondenseIt™              Wednesday, December 13, 2000

Page 3258

```
                - VOLUME N -
         IN THE UNITED STATES DISTRICT COURT
         IN AND FOR THE DISTRICT OF DELAWARE

CORDIS CORPORATION,            :   CIVIL ACTION

        Plaintiff             :

   vs.                        :

MEDTRONIC AVE, INC., et al..   :   NO. 97-550 (SLR)

BOSTON SCIENTIFIC              :   CIVIL ACTION
CORPORATION, et al.,

        Plaintiffs            :

   vs.                        :

ETHICON, INC., et al.,        :

        Defendants           :   NO. 98-19 (SLR)

CORDIS CORPORATION,           :   CIVIL ACTION

        Plaintiff            :

   vs.                       :

BOSTON SCIENTIFIC            :
CORPORATION, et al.,

        Defendants          :   NO. 98-197 (SLR)

                         Wilmington, Delaware
                         Wednesday, December 13, 2000
                         9:40 o'clock, a.m.

          - - - - -

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

          - - - - -

                         Official Court Reporters
```

Page 3259

1  APPEARANCES:

   ASHBY & GEDDES
   BY: STEPHEN J. BALICK, ESQ.

        -and-

   PATTERSON, BELKNAP, WEBB & TYLER, LLP
   BY: GREGORY L. DISKANT, ESQ.,
       EUGENE M. GELERNTER, ESQ.
       WILLIAM F. CAVANAUGH, ESQ. and
       MICHAEL J. TIMMONS, ESQ.
       (New York, New York)

        -and-

   JOHNSON & JOHNSON
   BY: ERIC I. HARRIS, ESQ.

        Counsel for Plaintiffs

   YOUNG, CONAWAY, STARGATT & TAYLOR
   BY: JOSY W. INGERSOLL, ESQ.

        -and-

   KENYON & KENYON
   BY: GEORGE E. BADENOCH, ESQ.,
       PAUL A. BONDOR, ESQ.,
       ALBERT J. BRENEISEN, ESQ.
       MICHAEL ZACHARY, ESQ. and
       ARTHUR GRAY, ESQ.
       (Washington, D.C.)

        Counsel for Defendants

        - - - - -

Page 3260

PROCEEDINGS

(Proceedings commenced at 9:40 o'clock a.m.,
and the following occurred without the presence of the
jury.)

THE COURT: I understand we have an issue. I
have had an emergency to take care of. So if it has to
be addressed before the morning break, we will. Otherwise,
I have held the jury up and would like to get proceeding.
Mr. Cavanaugh?
MR. CAVANAUGH: I don't know what it is, your
Honor.
THE COURT: Mr. Walker.
MR. WALKER: We wanted to confirm how you would
like us to handle -- we anticipate we will want to make a
few motions after they rest their case and we would like
to know how you would like to handle that in front of the
jury.
THE COURT: You do not handle it in front of
the jury. We have motions and I will take them sometime
when the jury is not here.
Let's bring the jury in. And I apologize for
holding you all up.

Page 3261

(At this point the jury entered the courtroom
and took their seats in the box.)
THE COURT: Members of the jury, I had to deal
with some issues. I am the one who held you up. I
apologize.
We will continue at this point.
Mr. Cavanaugh.
MR. CAVANAUGH: Thank you, your Honor. Good
morning, ladies and gentlemen.
Our next and last witness will be Mr. Jesse
Penn, who is the President of Cordis Cardiology. He is
going to talk to you about manufacturing and capacity
issues.
        - - -
PLAINTIFF'S TESTIMONY
CONTINUED

... JESSE R. PENN, having been
duly sworn as a witness, was examined
and testified as follows ...
DIRECT EXAMINATION
BY MR. CAVANAUGH:
Q. Mr. Penn, what is your current position?
A. I am the President of Cordis Cardiology USA.
Q. When did you begin working for Johnson & Johnson?

Cordis v. Boston, CA No. 97-550 (RRM), etc.                    Page 3258 - Page 3261

Jury Trial - Volume N          CondenseIt™         Wednesday, December 13, 2000

### Page 3322

1 in yellow. So here I will follow a corrugated ring. You
2 see again the purple dots indicating the points where
3 measurements were made. And in this case, there were
4 320 measurement points.
5 Q. Who did the laser measurements?
6 A. The technicians at Scimed.
7 Q. How many ACS Multi-Links were measured?
8 A. One.
9 Q. Was the stent that was examined and measured, was
10 that expanded or unexpanded?
11 A. This was an expanded stent.
12 Q. Now, who did the measurement comparisons in order
13 to determine the heights of the projecting edges?
14 A. I did that.
15 Q. Could you explain how you did that?
16 A. Yes. I followed the same methodology, the same
17 idea that I did with the NIR. The question was: Do these
18 tips right here, does a tip like this one, or this one, or
19 this one, and so on, does it truly tip out and how much
20 does it tip out.
21     To do that, again I used the closest point
22 and found a tip such as this one would protrude
23 significantly from what I called the Y intersections here.
24 So I compared the U tips to the Y intersections and found
25 the degree to which they tip out.

### Page 3323

1 Q. And when you compared those two points, what did
2 you find?
3 A. I found that typically a point like this would
4 protrude 3.6 thousandths of an inch from its nearest
5 neighbor, such as this one. I also looked at how far
6 they tip out, this point tips out from this point and
7 found that they tip out about three-thousandths of an
8 inch. That is interesting, because here we are about
9 two-thirds of the way back from the tip, back here, and
10 most of the deflection is gone. These points are almost
11 down at the base, as it were. So it illustrates how these
12 really do curve up at the end as is illustrated in the
13 patent and apparent in the photographs.
14 Q. Let me just make sure I understand. Does that
15 mean that the points that are away from the tip are
16 already bending up and out of the plane?
17 A. But only just a little, so there is more flexion
18 up here at the end than there is down here.
19 Q. Now, you mentioned that on the average you found
20 the protrusions of the use to extend 3.6 thousandths of
21 an inch?
22 A. That's right.
23 Q. Can you just point out where that is on the stent,
24 please?
25 A. Again, probably the easiest place to look is right

### Page 3324

1 here. I have my red dot as best as I can hold it on the
2 tip of a U and its nearest neighbor is this point right
3 here. And this point sits 3.6 thousandths of an inch
4 above this point.
5 Q. And does that occur in each of these corrugated
6 rings all along the stent?
7 A. Yes.
8 Q. So your numbers are average numbers?
9 A. Yes. The number I gave is an average.
10 Q. Now, based on the measurements that you observed,
11 I would like to go through the claim, please. Now,
12 focusing for the moment, I would like to first focus on
13 the term thin-walled as has been interpreted by the Court.
14 The Court's interpretation of thin-walled is that the wall
15 of the tubular member must have extent from one surface to
16 its opposite at both its first and second diameters.
17     In the first diameter, do you find that the
18 ACS Multi-Link stent conforms to the Court's definition?
19 A. As far as I know, in the first diameter, it does.
20 Q. What about in the expanded or second diameter?
21 A. In the second diameter, it does not. Again, because
22 of these outwardly projecting edges, which Cordis argued
23 in its prosecution or its endeavor to have the '762 patent
24 granted, Cordis argued that outwardly projecting edges can
25 cause selective thickening. I think were their words, of

### Page 3325

1 the stent.
2 Q. And do you find selective thickening of the stent
3 in the ACS Multi-Link when it is expanded?
4 A. Yes.
5 Q. Let's go to the next chart, which has wall surface.
6     Do you find that the – the Court has defined
7 wall surface as the outer surface of the tubular member
8 must be disposed in a common cylindrical plane.
9     You previously described what you understood
10 common cylindrical plane to mean?
11 A. Yes.
12 Q. Is the Multi-Link in the expanded state disposed in
13 a common cylindrical plane, in your opinion?
14 A. No. Clearly, you can't find a cylindrical plane
15 in which all these points even approximately lie.
16 Q. Can you just illustrate that a little?
17 A. Again, because of these outwardly projecting edges,
18 you can't find a cylindrical plane that includes these
19 points up on this tip and also includes these points down
20 here at the base.
21 Q. And does that mean you can't find a common
22 cylindrical plane either along the entire tube or in
23 the separate corrugated rings?
24 A. Either way, you can't find one.
25     MR. BRENEISEN: Let's go to the substantially

Page 3326

1 uniform thickness.
2 BY MR. BRENEISEN:
3 Q. The Court has defined substantially uniform
4 thickness as the thickness at all points along the wall
5 surface of the tubular member, both at its first and
6 second diameters, must be substantially the same.
7 Variances as little as one thousandth of an inch fall
8 outside the scope of substantially uniform.
9     In the ACS Multi-Link stent, do you find that
10 the stent is substantially uniform in thickness?
11 A. No, I don't.
12 Q. And your measurements showed that it was 3.6
13 thousandths?
14 A. These tip out 3.6 thousandths of an inch. If you
15 try to account for a little variability even back at the
16 base you still get at least 3.7 thousandths variation in
17 thickness.
18     - - -
19
20
21
22
23
24
25

Page 3327

1
2 Q. So that that would be in the terms that are in the
3 dimensions set forth in the Court's definition, what you
4 found they extended 0.0036; is that correct?
5 A. Yes. That's right.
6 Q. More than three times the variance that is defined in
7 the Court's definition?
8 A. That's right.
9 Q. I'm going to hand you, Dr. Snyder, two photographs,
10 one is Defendant's Exhibit 5829-A and the other is
11 Defendant's Exhibit 5229-B, and I'll ask you if you
12 could tell us what these are?
13 A. These are two different photographs taken in an
14 electron microscope of a Multi-Link stent that was
15 expanded in the right coronary artery of a pig.
16     MR. BRENEISEN: I would offer Defendant's
17 Exhibits 5829-A and 5229-B.
18     MR. DISKANT: I have no objection.
19     THE COURT: Thank you.
20 *** (Defendant's Exhibits No. 5829-A and 5229-B
21 were received into evidence.)
22     MR. BRENEISEN: Can we have up 5229-B?
23 BY MR. BRENEISEN:
24 Q. What are we looking at now, Dr. Snyder?
25 A. Again, we're looking at the twofold corrugated

Page 3328

1 rings, and half ring at the top and bottom, so it's a
2 closeup of part of the stent after it has been taken out
3 of the pig and the tissue has been removed. And we see
4 that in a coronary artery, we see both the tilt and the
5 tipping at the end of these U-shaped members, so we see
6 the outwardly projecting members that the designer is
7 looking for in the design of this stent.
8     MR. BRENEISEN: Could we have the other
9 photograph? 5829-A?
10 BY MR. BRENEISEN:
11 Q. Not quite the same quality as the other one, but
12 does that show the outwardly projecting edges?
13 A. Yes. We don't have a side view of any of them here,
14 but I think you can see the perspective on this one and
15 on this one.
16 Q. And these are both photographs of the stents that
17 were removed from the pig?
18 A. From the pig, right.
19 Q. Now, were you here when Dr. -- Well, having looked
20 at these photographs, how does that affect your opinion?
21 A. It confirms that this tipping effect occurs, this
22 projecting edge effect occurs in a real coronary artery
23 as well as in NIR.
24 Q. Now, Dr. Collins, he mentioned that these were not
25 of stents that were implanted in a stenosed pig. Do you

Page 3329

1 remember that?
2 A. Yes.
3 Q. Meaning that it was not a heavily stenosed artery
4 that it was put into?
5 A. That's right.
6 Q. In an animal with pre-existing stenosis in the
7 vessel, when a stent is implanted, is the artery dilated
8 before the implantation?
9 A. Yes. If you have a patient with a substantial
10 narrowing of an artery, these narrowings are very, very
11 substantial. The opening is very small in order to
12 justify going through the procedure. So the instructions
13 for use of the stents tell you to take a conventional
14 angioplasty balloon, the old-fashioned pre-stent method
15 of thread that through the narrowing pre-expand the
16 vessel to break that material and open it up and now you
17 have the result that you would have gone home with in the
18 old-fashioned balloon angioplasty, and then that is
19 followed by going in with the stent placement balloon
20 with the stent on it and deploying the stent in order to
21 hold the vessel up.
22 Q. And what happens to the stenosis when you go
23 through the angioplasty process?
24 A. You tend to break and compress this material that
25 has been blocking the artery and you open it back up.

# Exhibit
# JJ

Jury Trial - Volume P                Condenselt™                Friday, December 15, 2000

Page 3757

```
            - VOLUME P -
    IN THE UNITED STATES DISTRICT COURT
    IN AND FOR THE DISTRICT OF DELAWARE

CORDIS CORPORATION,              CIVIL ACTION

        Plaintiff

        vs.

MEDTRONIC AVE, INC., et al;      NO. 97-550 (SLR)

BOSTON SCIENTIFIC                CIVIL ACTION
CORPORATION, et al.,

        Plaintiffs

        vs.

ETHICON, INC., et al.,

        Defendants          NO. 98-19 (SLR)

CORDIS CORPORATION,              CIVIL ACTION

        Plaintiff

        vs.

BOSTON SCIENTIFIC
CORPORATION, et al.,

        Defendants          NO. 98-197 (SLR)

            Wilmington, Delaware
            Friday, December 15, 2000
            7:35 o'clock a.m.

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury


            Official Court Reporters
```

---

Page 3759

PROCEEDINGS

        (Proceedings commenced at 7:35 o'clock a.m.,
and the following occurred without the presence of the
jury.)

        THE COURT: Good morning.
        Let's get down to business. I guess we will
go through the jury instructions then the verdict, so that
we all have time to gather ourselves before we actually
present this to the jury. I guess we can go page by page,
or if you want to tell me the first -- wait a minute.
        On Page 3, I have not stricken things from the
record at this point. So do I have everyone's permission
to cross out the instruction. Yes.
        That is Page 4, Page 5 --
        MR. GRAY: Your Honor, I think we are up through
Page 10, with the deposition.
        THE COURT: Anything before Page 13 from
Cordis?
        MR. DISKANT: No, your Honor.
        MR. GRAY: Your Honor, 14, at least one valid
patent claim, we don't see a reason for the at least.
        THE COURT: Because you found, okay

---

Page 3758

APPEARANCES:

    ASHBY & GEDDES
    BY: STEPHEN J. BALICK, ESQ

        -and-

    PATTERSON, BELKNAP, WEBB & TYLER, LLP
    BY: GREGORY L. DISKANT, ESQ.
        EUGENE M. GELERNTER, ESQ.
        WILLIAM F. CAVANAUGH, ESQ. and
        MICHAEL J. TIMMONS, ESQ.
        (New York, New York)

        -and-

    JOHNSON & JOHNSON
    BY: ERIC I. HARRIS, ESQ

        Counsel for Plaintiff

    YOUNG, CONAWAY, STARGATT & TAYLOR
    BY: JOSY W. INGERSOLL, ESQ

        -and-

    KENYON & KENYON
    BY: GEORGE E. BADENOCH, ESQ.
        PAUL A. BONDOR, ESQ.
        ALBERT J. BRENESEN, ESQ.
        MICHAEL ZACHARY, ESQ and
        ARTHUR GRAY, ESQ.
        (Washington, D.C.)

        Counsel for Defendants

---

Page 3760

        MR. GRAY: In the third line, where it says
entitled to the full amount: of damages, we don't see the
need for the word full.
        THE COURT: That is true. They are entitled
to a full amount of damages.
        MR. GRAY: Full implies more than --
        THE COURT: It implies a complete, not an
overflowing amount of damages, or does not imply something
more than they are entitled to.
        MR. GRAY: Total amount!
        MR. DISKANT: It is the right amount.
        MR. GRAY: It seems to have a connotation,
your Honor. Maybe it's just me.
        THE COURT: We will leave it at full.
        MR. DISKANT: Your Honor, when we take out
the word at least, it gives a strange emphasis to the
one. It seems to me we should say because you found
Claim 23 of the '762 patent to be valid and infringed,
then keep going.
        MR. GRAY: That would be fine, your Honor.
        THE COURT: All right. 15
        MR. GRAY: In the second paragraph, your
Honor, it says it is not relevant to the question of
damages. I think more properly, it is not relevant to
the question of lost profit to a reasonable royalty,

---

**Page 3885**

1 it is entitled to recover
2  The patent laws provide that in the case of
3 infringement of a valid patent claim, the owner of the
4 patent shall be awarded damages adequate to compensate for
5 the infringement, but in no event less than a reasonable
6 royalty for the use made of the invention by the infringer.
7 Damages are compensation for all losses suffered as a
8 result of the infringement.
9  It is not relevant to the question of damages
10 whether Boston Scientific benefited from, realized
11 profits from or even lost money as a result of the acts
12 of infringement. The only issue is the amount necessary
13 to adequately compensate Cordis for Boston Scientific's
14 infringement. Adequate compensation should return Cordis
15 to the position it would have occupied had there been no
16 infringement.
17  I will now explain how you should determine
18 an appropriate damages award.
19  Cordis has the burden of proving its damages
20 by what is called a preponderance of the evidence. That
21 means that Cordis has to produce evidence which, when
22 considered in light of all of the facts, leads you to
23 believe that what Cordis claims is more likely true than
24 not.
25  To put it differently, if you were to put

**Page 3886**

1 Cordis and Boston Scientific's evidence on the opposite
2 sides of a scale, the evidence supporting Cordis' claims
3 would have to make the scales tip somewhat on its side.
4 If the scales are even, or tip toward Boston Scientific's
5 side, then Cordis has not carried its burden of proof
6  To get lost profits as damages, Cordis must
7 demonstrate that there was a reasonable probability that,
8 in the absence of infringement, it would have made Boston
9 Scientific's sales. Cordis not need to negate all
10 possibilities that a purchaser might have bought a
11 different product or might have foregone the purchase
12 altogether.
13  Once Cordis has established the reasonableness
14 of the conclusion that the infringing sales caused Cordis'
15 lost profits, the burden is placed on Boston Scientific
16 to show that this conclusion is not reasonable.
17  In determining damages, you must first
18 determine if Cordis has proven its entitlement to lost
19 profits. Only if you find that Cordis is not entitled to
20 lost profits on certain sales, you will then determine
21 Cordis' damages based upon a reasonable royalty.
22  Cordis is seeking lost profits in the form of
23 diverted sales. The patent owner must establish a
24 causation between his lost profits and the infringement.
25 A factual basis for the causation is that, but for the

**Page 3887**

1 infringement, the patent owner would have made the sales
2 that the infringer made. In order to show that Cordis
3 would have made the sales Boston Scientific made, Cordis
4 must show that -- these typos continue to creep into my
5 instructions -- must show that:
6  One, there was a demand for the patented
7 product.
8  Two, Cordis had the ability to meet the market
9 demand.
10  And, three, no acceptable noninfringing
11 substitutes were available.
12  However, as to this last element, as I will
13 explain in a moment, it is not necessary for Cordis to
14 prove that Cordis and Boston Scientific were the only two
15 suppliers of stents in order for Cordis to recover lost
16 profits on some percentage of Boston Scientific's sales
17  Cordis need not negate every possibility that
18 purchasers of Boston Scientific's products might have
19 bought another product. It is Cordis' burden to prove,
20 you however, that there were no substitute products that
21 were both noninfringing and acceptable.
22  To establish its entitlement to lost profits
23 based on lost sales, one of the things that Cordis must
24 prove is that there were no acceptable noninfringing
25 substitutes to the patented products during the period of

**Page 3888**

1 infringement. There are two parts to determining whether
2 a particular product qualified as a noninfringing
3 substitute:
4  First, it must be determined whether that
5 product infringes Claim 23 of the '762 patent. That
6 determination is made by applying the instructions
7 regarding infringement and the meaning of patent claims
8 in dispute contained on Pages 21 through 40 of the set
9 of jury charges applicable to the earlier phase of the
10 trial.
11  Second, it must be determined whether the
12 product would have been an acceptable substitute to the
13 patented product. In order to be an acceptable substitute,
14 the product in question must have the advantages of the
15 patented invention that were important to customers  A
16 product that does not have those advantages would not be
17 an acceptable substitute to the customer who wanted those
18 advantages.
19  If, however, the realities of the marketplace
20 are that competitors other than Cordis would likely have
21 captured the sales made by Boston Scientific, even despite
22 a difference in the products, then Cordis is not entitled
23 to lost profits on any sales that would have been captured
24 by those competitors.
25  The parties agree that the Radius and Magic

**Page 3889**

1  Wall stent do not infringe Claim 23 of the '762 patent.
2  The parties also agree that the Cook GR 1 and GR 2 stents
3  and the Medtronic Wiktor stents were licensed by Cordis
4  and that they were lawfully on the market as of the date
5  that they became licensed.
6       However, Cordis and Boston Scientific disagree
7  as to whether those stents would have been acceptable
8  substitutes for the patented products.  Boston Scientific
9  contends that they would have been acceptable substitutes,
10  while Cordis contends that they would not have been.  In
11  reaching your conclusion on this issue, you must apply the
12  standard for what constitutes an acceptable substitute
13  that I just told you about.
14       Both Cordis and Boston Scientific agree that
15  the stents made by ACS are substitutes for the patented
16  products.  The parties agree that the ACS stents are
17  noninfringing substitutes to the patented products after
18  April 3, 2000, because Cordis and ACS on that date entered
19  into a settlement agreement, which included a grant of a
20  license to ACS under the '762 patent.
21       Cordis and Boston Scientific differ as to
22  whether the ACS stents should be considered as
23  noninfringing substitutes prior to April 3, 2000.  Cordis
24  contends that the ACS stents are not noninfringing
25  substitutes prior to that date because Cordis contends

**Page 3890**

1  that they infringed Claim 23 of the '762 patent prior to
2  that date.  Boston Scientific contends that the ACS
3  stents are noninfringing substitutes because Boston
4  Scientific contends that they have never infringed the
5  '762 patent – and that should be infringed Claim 23 of
6  the '762 patent.
7       Cordis has the burden of proving that the ACS
8  stents should not count as noninfringing substitutes prior
9  to April 3, 2000 by a preponderance of the evidence.
10       You must, therefore, determine whether ACS's
11  stents infringe Claim 23 of the '762 patent.  In making
12  this determination, you should apply the instructions
13  regarding infringement and the meaning of patent claims
14  in dispute contained on Pages 21 through 40 of the set of
15  jury instructions applicable to the earlier phase of the
16  trial.
17       If you find that the ACS stents infringe
18  Claim 23 of the '762 patent, then the ACS stents were not
19  a noninfringing substitute until April 3, 2000.  If you
20  find that the ACS stents do not infringe Claim 23 of the
21  '762 patent, then the ACS stents were noninfringing
22  substitutes from the date ACS entered the United States
23  market, October 3, 1997.
24       Further, AVE markets the MicroStent, GFX 1,
25  GFX 2, and S series stents.  It is agreed between the

**Page 3891**

1  parties that these stents infringe Claim 23 of the '762
2  patent, and, therefore, are not noninfringing substitutes.
3       During the course of the trial, you may have
4  heard about various settlement agreements between Cordis
5  and other parties, which may have licensed one or more of
6  the patents at issue in the liability phase of the trial
7       Settlement agreements are not evidence
8  regarding the value of a patent, the validity of a patent,
9  or infringement of a patent.  Parties settle lawsuits for
10  various business reasons that may have nothing to do with
11  respective views of the worth of any patent claim.
12  Therefore, you should not consider the fact that a party
13  entered into a settlement agreement as evidence that it
14  infringed a patent, or that it agreed that it infringed
15  the patent, or even that it believed it infringed a patent
16       You must decide the issue of infringement for
17  yourselves.
18       As I said before, to establish its entitlement
19  to lost profits based on lost sales, one of the things
20  that Cordis must prove is that there was demand for the
21  patented products attributable to the claimed features of
22  that product.  Demand for the patented products can be
23  proven by significant sales of Cordis' products or by
24  significant sales of Boston Scientific's products
25       As I indicated before, Cordis is only entitled

**Page 3892**

1  to lost profits for sales it would have made but for the
2  infringement.  Accordingly, to be entitled to its lost
3  profits based on additional sales that it claims it would
4  have made, Cordis must prove that it would have had the
5  ability to manufacture or otherwise obtain its product
6  to make those additional sales, as well as the marketing
7  capability to make those additional sales
8       It is not necessary for Cordis to prove that
9  Cordis and Boston Scientific were the only two suppliers
10  in the market in order for Cordis to demonstrate
11  entitlement to lost profits for some of Boston Scientific's
12  sales.  If the realities of the marketplace are such that
13  noninfringing substitutes were available from suppliers
14  who would have made only some, but not all, of the sales
15  that were made by Boston Scientific, then Cordis may be
16  entitled to lost profits on a percentage of the infringing
17  sales.
18       The burden is on Cordis, however, to show to
19  a reasonable probability that it would have sold that
20  percentage if the NIR stents had never existed.  By the
21  same token, even if you find that Cordis and Boston
22  Scientific would have been the only two suppliers of
23  products having the advantages of the patented product,
24  it does not necessarily mean that Cordis would have made
25  all of Boston Scientific's sales.  The burden is on Cordis

# Exhibit

# KK

Jury Trial  Volume J

Page 2480

```
 1              - VOLUME J -
 2       IN THE UNITED STATES DISTRICT COURT
         IN AND FOR THE DISTRICT OF DELAWARE
 3   CORDIS CORPORATION,           :   CIVIL ACTION
 4        Plaintiff               :
 5        vs.                      :
 6   MEDTRONIC AVE, INC., et al.,  :   NO. 97-550 (SLR)
 7   BOSTON SCIENTIFIC             :   CIVIL ACTION
     CORPORATION, et al.,          :
 8        Plaintiffs              :
 9        vs.                      :
10   SCIMED, INC., et al.,         :
11        Defendants              :   NO. 98-19 (SLR)
12   CORDIS CORPORATION,           :   CIVIL ACTION
13        Plaintiff               :
14        vs.                      :
15   BOSTON SCIENTIFIC             :
16   CORPORATION, et al.,          :
17        Defendants              :   NO. 98-197 (SLR)
18                                Wilmington, Delaware
19                                Thursday, December 7, 2006
                                  7:35 o'clock, a.m.
20
21
22   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
23
                   Official Court Reporters
24
25
```

Page 2481

```
 1  APPEARANCES:
 2
 3      ASHBY & GEDDES
        BY: STEPHEN J. BALICK, ESQ.
 4
 5
 6      PATTERSON, BELKNAP, WEBB & TYLER, LLP
        BY: GREGORY L. DISKANT, ESQ.,
 7          EUGENE M. GELERNTER, ESQ. and
            WILLIAM F. CAVANAUGH, ESQ. and
 8          MICHAEL J. TIMMONS, ESQ.
            (New York, New York)
 9
10              -and-
11
12      JOHNSON & JOHNSON
        BY: ERIC I. HARRIS, ESQ.
13
            Counsel for Plaintiffs
14
15      YOUNG, CONAWAY, STARGATT & TAYLOR
        BY: JOSY W. INGERSOLL, ESQ.
16
17              -and-
18
        KENYON & KENYON
19      BY: GEORGE E. BADENOCH, ESQ.,
            PAUL A. BONDOR, ESQ.,
20          ALBERT J. BRENEISEN, ESQ.,
            MICHAEL ZACHARY, ESQ. and
21          ARTHUR GRAY, ESQ.
            (Washington, D.C.)
22
            Counsel for Defendants
23
                   -----
24
25
```

Page 2482

P R O C E E D I N G S

(Proceedings commenced at 7:35 o'clock a.m., and the following occurred without the presence of the jury.)

THE COURT: All right. A couple preliminary explanations, so then we can go through this for purposes of stating your objections for the record, correcting typos, making minor revisions.

First of all, with — and I don't know where we stand with this, but in terms of whether there still is a question of prosecution history estoppel before the '762 patent, having reviewed the new Circuit case in Festo, and I have no idea, this is on Page 24 of 80 or whatever I have of Lexis. I think clearly that's a question for the Court.

And so, if it's an issue, it's not an issue for the jury.

MR. GRAY: Your Honor, I'm sorry, but may I just interrupt for a second?

THE COURT: Yes.

MR. GRAY: We agree. We have a JMOL on that issue I would like to hand up (handing documents to the

Page 2483

Court).

THE COURT: With respect to contributory infringement, we struggled — we being me and my Law Clerks — struggled with the question, and I didn't find the — I didn't find the case law particularly persuasive but for one case, because this one case is the only one that actually addressed the issue. Everything else, it was just trying to look at the facts and divine what the situation was.

And this is the case from the Northern District of California, 1999. I have no idea how to pronounce this. Farugia (phonetic) Laboratories. That Court said there's got to be some connection. It's not a substantial relationship. It's not no connection. It's some connection.

Now, I, frankly, don't know whether that has been established. I think its posit has been established.

So if we need, we can try to fit in argument about that, but that's why I chose that language. It's based on that case.

MR. DISKANT: Your Honor, we disagree with it as a matter of law and, therefore, object to the charge, but on my rebuttal with Dr. Buller, I will make sure it gets connected up. So I don't think there will be a factual problem.

Jury Trial - Volume 3

**Page 2508**

1  into the U.S.
2      This overruled several of the cases Boston
3  Scientific relied on.
4      MR. GRAY: Your Honor, it's not a 271(g) issue
5  at all. We argued this before. 271(g) is a process
6  carried out to sell a product of that process. This is
7  not that case. This is a process claim having nothing to
8  do with the production of a product. This is a method
9  claim having to do with the method. And if the method is
10  not carried out within the United States, then there can
11  be no infringement of the method.
12      271(g) is totally irrelevant to this issue.
13      THE COURT: All right. Do you have -- I
14  don't recall -- actually, I don't recall whether there
15  was case law that you cited for this proposition or do
16  you have any?
17      MR. HOWARD: Yes, your Honor. The Avery
18  decision, which was attached to our most recent
19  submission.
20      THE COURT: I know you have case law. I was
21  asking Boston Scientific.
22      MR. ZACHARY: Yes, your Honor. There are
23  cases. We cited them in the last -- in the jury
24  instructions. I believe we may have a copy.
25      THE COURT: I think I've got it. I just have

**Page 2509**

1  to find it.
2      MR. DISKANT: Your Honor, I'm concerned about
3  potentially misleading argument on this issue, so I think
4  another sentence might be useful.
5      There's no dispute that, at least for some of
6  the NIR stents in this case, all the steps take place in
7  the U.S., which is to say Boston Scientific receives them,
8  utilizes them by disposing them on catheter. It sells
9  them to doctors. Doctors complete all the final steps.
10      They attempted to offer some evidence through
11  Mr. Nicholas that some of the NIR stents are mounted in
12  Ireland. Through Dr. Buller this morning, will clarify
13  that 75 percent of the stents sold in the U.S. have been
14  mounted in the U.S.
15      This issue, if it's going to actually be a
16  case, will be a damages issue, not an infringement issue.
17  It would be inappropriate for Boston to suggest because
18  some of the stents are mounted outside of the U.S., that
19  somehow constitutes a defense. It doesn't if they
20  contributorily infringe with a Singer NIR stent. That's
21  good enough for the purposes of this part of the
22  proceeding.
23      So I appreciate the charge that says you need
24  not find that every NIR stent is --
25      THE COURT: How about, you need only find that

**Page 2510**

1  one?
2      MR. DISKANT: One. That will be just fine.
3  Because I think it's going to be confusing to the jury
4  and really is at best -- if it's an issue, it's a
5  damages issue, not a --
6      MR. GRAY: Your Honor, what is the suggested
7  cure that Mr. Diskant -- proposes?
8      THE COURT: Well, I'm not sure. I think
9  that's still in progress. I think the suggested cure is
10  that -- to use -- I got on the other hands a lot from
11  Boston.
12      On the other hand, if you find -- and that's
13  where -- if you find that any of the stents of Claim 44
14  are carried -- if you find that --
15      MR. GRAY: If you want to put on the other
16  hand, you will find that all steps --
17      THE COURT: Well, tell me something. Is
18  there any doubt that there's at least one NIR stent
19  manufactured -- I mean, where all the steps are carried
20  out here in the United States, because if there really
21  isn't any doubt, this truly isn't a worthwhile
22  instruction, because it does not get us anyplace. And
23  if what you are telling me is some doubt, then I will
24  put it in.
25      But I believe it does not matter about the

**Page 2511**

1  quantity. If there are some NIR stents that routinely
2  are mounted and everything happens in the United States,
3  and this isn't a helpful instruction to the jury in
4  terms of infringement.
5      MR. ZACHARY: Your Honor, I hope I'm being
6  helpful here. I worked on the Fischell case mostly, not
7  the Palmaz, so forgive me if I misspeak.
8      As I understand Claim 44, Claim 44 has five
9  elements in it that are supposed to be performed in the
10  United States.
11      The second step that Mr. Diskant is focusing
12  on is mounting the stent on a catheter. The first step
13  you take before that is utilizing a stent of a certain
14  sort.
15      And I think -- I stand to be corrected. I
16  will have to confer with Mr. Badenoch. But I think that
17  the first step, our contention would be that that does
18  take place in all cases ourside the United States.
19      I don't want to suggest that without
20  conferring with him, but I believe that to be the case.
21      MR. DISKANT: I don't think that's -- Medinol
22  manufactures the stent in Israel. It then sells it to
23  Boston. Boston receives it and the first step just
24  requires utilizing it in the U.S.
25      Boston unequivocally utilizes it in the U.S.

Jury Trial – Volume J                    Condenseit™                    Thursday, December 7, 2000

1     Patent law provides that any person or
2 business entity which makes, uses or sells without the
3 patent owner's permission, any product apparatus or
4 method, legally protected by at least one valid claim of
5 the patent within the United States before the patent
6 expires infringes the patent.
7     Cordis is asserting that Boston Scientific
8 directly infringed all of the asserted claims except
9 Claim 44 of the '762 patent.
10     There are two ways in which a patent claim
11 may be directly infringed. First, a claim may be
12 literally infringed. Second, a claim may be infringed
13 under what is called the doctrine of equivalents. With
14 respect to Claim 44, Cordis does not claim that Boston
15 Scientific itself directly infringes the claim but, rather,
16 alleges that Boston Scientific is liable for contributory
17 infringement.
18     Boston Scientific denies all of Cordis'
19 infringement allegations.
20     The preambles to all the asserted claims use
21 the transitional phrase comprising. Comprising is
22 interpreted the same as including or containing. In
23 patent claims, comprising means that the claims are open-
24 ended. As such, the claim is not limited to only what
25 is in the claim based on its explanation. If you find

1 that the NIR stent includes each element in an asserted
2 claim, the fact that it may also include an additional
3 element is irrelevant. The presence of additional
4 elements in the NIR stent does not mean that the NIR
5 stent does not infringe an asserted claim.
6     For the NIR stent to literally infringe any
7 of the asserted patent claims, the subject matter of the
8 patent claim must be found in the NIR stent. In other
9 words, any of the asserted patent claims is literally
10 infringed if the NIR stent includes each and every element
11 in the asserted patent claim. If the NIR stent omits any
12 single element decided in a given patent, Boston
13 Scientific does not literally infringe that claim. You
14 must determine literal infringement with respect to each
15 asserted claim individually. Please remember the question
16 is whether the NIR stent infringes any asserted claims of
17 the patents and not whether the NIR stent is similar to a
18 product made by Cordis. Accordingly, you must be certain
19 to compare the NIR stent with the claim it is alleged to
20 infringe and not with any product made by Cordis.
21     If you have found that any of the asserted
22 claims is literally infringed, you may nonetheless
23 consider whether the NIR stent is so far changed in
24 principle from the literal words of the claim that a
25 doctrine called the reverse doctrine of equivalents is

1 applicable.
2     Application of the reverse doctrine of
3 equivalents is the exception, not the rule, and is limited
4 to those situations where a defendant's product is so far
5 changed in principle that, although it performs the same
6 or a similar function to produce substantially the same
7 result as that defined by a patent claim, it does so in
8 a substantially different way.
9     If you find noninfringement under the reverse
10 doctrine of equivalents then you should not consider
11 infringement under the doctrine of equivalents.
12     If you do not find literal infringement, you
13 may consider infringement under the doctrine of
14 equivalents. Under the doctrine of equivalents, you may
15 find that the NIR stent infringes an asserted patent
16 claim if, for each element of the claim that is not
17 literally present, the NIR stent contains an equivalent
18 of that element. This instruction applies only to the
19 claims of the '762 and '332 patents.
20     Cordis is not contending that the NIR stent
21 infringes the '312 or '370 patents under the doctrine of
22 equivalents. Application of the doctrine of equivalents
23 is the exception, however, not the rule. Patent claims
24 must be clear enough so that the public has fair notice
25 of what was patented.

1     Notice permits other parties to avoid actions
2 which infringe the patent and to design around the patent.
3 On the other hand, the patent owner should not be deprived
4 of the benefits of his patent by competitors who
5 appropriate an invention while avoiding the literal
6 language of the patent claims. The test to determine
7 equivalents under the doctrine of equivalents is whether
8 the differences between the claim element, which you have
9 found not to be literally present, and the element present
10 in the NIR stent are insubstantial. If you find that the
11 claim element and the element of the NIR stent have only
12 insubstantial differences, then you will have determined
13 that the element in the NIR stent is equivalent to the
14 claimed element.
15     On the other hand, if you find that the claim
16 element and the element in the NIR stent have substantial
17 differences, then you will have determined that the
18 element in the NIR stent is not equal, then, to the
19 claimed element.
20     In determining whether the differences are
21 substantial or insubstantial, you may also consider
22 whether or not the claimed element and the element in
23 the NIR stent perform substantially the same function in
24 substantially the same way to produce substantially the
25 same result. Keep in mind that the doctrine of equivalents

# Exhibit LL



US004739762B1

# REEXAMINATION CERTIFICATE (3650th)

## United States Patent [19]

**Palmaz**

[11] **B1 4,739,762**

[45] Certificate Issued **Oct. 27, 1998**

[54] **EXPANDABLE INTRALUMINAL GRAFT, AND METHOD AND APPARATUS FOR IMPLANTING AN EXPANDABLE INTRALUMINAL GRAFT**

[75] Inventor: **Julio C. Palmaz**, San Antonio, Tex.

[73] Assignee: **Expandable Grafts Partnership**, San Antonio, Tex.

**Reexamination Request:**
No. 90/004,785, Oct. 6, 1997

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | 4,739,762 |
| Issued: | Apr. 26, 1988 |
| Appl. No.: | 923,798 |
| Filed: | Nov. 3, 1986 |

**Related U.S. Application Data**

[63] Continuation-in-part of Ser. No. 796,009, Nov. 7, 1985, Pat. No. 4,733,665.

[51] Int. Cl.6 ............................................ A61M 29/00
[52] U.S. Cl. .................. 606/108; 604/104; 604/96; 623/1
[58] Field of Search .......................... 606/155, 156, 606/108, 198, 191, 195; 623/1, 12

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| Re. 34,327 | 7/1993 | Kreamer | 623/1 |
| 2,070,073 | 2/1937 | Walton | 210/499 |
| 2,854,982 | 10/1958 | Pagano | 128/348 |
| 2,854,983 | 10/1958 | Baskin | 604/96 |
| 3,334,629 | 8/1967 | Cohn | 128/325 |
| 3,526,005 | 9/1970 | Bokros et al. | 623/1 X |
| 3,540,431 | 11/1970 | Mobin-Udin | 128/1 R |
| 3,562,820 | 2/1971 | Braun | 3/1 |
| 3,599,641 | 8/1971 | Sheridan | 604/283 |
| 3,657,744 | 4/1972 | Ersek | 3/1 |
| 3,834,394 | 9/1974 | Hunter et al. | 128/325 |
| 3,858,441 | 1/1975 | Comeau | 138/93 |
| 3,874,388 | 4/1975 | King et al. | 128/334 |

| | | | |
|---|---|---|---|
| 3,893,344 | 7/1975 | Hunter | 128/325 |
| 3,952,747 | 4/1976 | Kimmell, Jr. | 128/1 R |
| 3,968,800 | 7/1976 | Vilasi | 128/343 |
| 4,047,252 | 9/1977 | Liebig et al. | 3/1.4 |
| 4,056,854 | 11/1977 | Boretos et al. | 3/1.5 |

(List continued on next page.)

**FOREIGN PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 183 372 | 10/1985 | European Pat. Off. . | |
| 0 177 330 A2 | 10/1986 | European Pat. Off. . | |
| 0 274 846 A1 | 12/1987 | European Pat. Off. . | 29/2 |
| 0 282 175 A1 | 2/1988 | European Pat. Off. . | 29/2 |
| 2 410 933 | 3/1974 | Germany . | |
| 3205942 A1 | 9/1983 | Germany . | |
| 57-35985 | of 1982 | Japan . | |
| 660689 | 5/1979 | U.S.S.R. . | |
| 0669689 | 5/1979 | U.S.S.R. . | |
| 0764684 | 9/1980 | U.S.S.R. . | |
| 1 205 743 | 9/1970 | United Kingdom . | |
| WO 83/03752 | 4/1983 | WIPO . | |

**OTHER PUBLICATIONS**

The rationale For Patch–Graft Angioplasty After Carotid Endarterectomy: Early and Long–Term Follow–Up, Stroke. vol. 15, No. 6, Nov. 1984.

Aterial Vascular Engineering, Inc.'s First Amended Complaint For Declaratory Relief Of patent Invalidity, Unenforceability, Noninfringement, And For Antitrust Violations (Jan. 27, 1998), *Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable Grafts Partnership*, Civil Action No. 97–700.

(List continued on next page.)

Primary Examiner—Michael H. Thaler

[57] **ABSTRACT**

An expandable and deformable intraluminal vascular graft is expanded within a blood vessel by an angioplasty balloon associated with a catheter to dilate and expand the lumen of a blood vessel. The graft may be a thin-walled tubular member having a plurality of slots disposed substantially parallel to the longitudinal axis of the tubular member.





# B1 4,739,762
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,061,134 | 12/1977 | Samuels et al. | 128/1 |
| 4,076,285 | 2/1978 | Martinez | 285/332 |
| 4,105,022 | 8/1978 | Anthonikiw et al. | 128/2.05 F |
| 4,140,126 | 2/1979 | Choudhury | 128/334 |
| 4,190,909 | 3/1980 | Ablaza | 3/1.4 |
| 4,195,637 | 4/1980 | Gruntzig et al. | 128/348 |
| 4,198,982 | 4/1980 | Fortner et al. | 128/334 |
| 4,214,587 | 7/1980 | Sakura, Jr. | 128/334 |
| 4,295,464 | 10/1981 | Shihata | 128/1 |
| 4,299,226 | 11/1981 | Banka | 128/344 |
| 4,300,244 | 11/1981 | Bokros | 3/1.4 |
| 4,313,231 | 2/1982 | Koyamada | 3/1.4 |
| 4,319,363 | 3/1982 | Ketharanathan | 3/1.4 |
| 4,340,046 | 7/1982 | Cox | 128/207.17 |
| 4,390,599 | 6/1983 | Broyles | 428/597 |
| 4,448,195 | 5/1984 | Le Veen et al. | 128/344 |
| 4,479,497 | 10/1984 | Fogarty | 128/344 |
| 4,493,711 | 1/1985 | Chin et al. | 604/271 |
| 4,494,531 | 1/1985 | Gianturco | 128/1 R |
| 4,503,569 | 3/1985 | Dotter | 128/303 R |
| 4,512,338 | 4/1985 | Balko et al. | 128/341 |
| 4,531,933 | 7/1985 | Norton et al. | 604/8 |
| 4,550,447 | 11/1985 | Seiler, Jr. et al. | 623/1 |
| 4,560,374 | 12/1985 | Hammerslag | 604/49 |
| 4,572,186 | 2/1986 | Gould et al. | 128/341 |
| 4,577,631 | 3/1986 | Kreamer et al. | 623/12 X |
| 4,586,505 | 5/1986 | Sisson et al. | 128/344 |
| 4,604,762 | 8/1986 | Robinson | 623/1 |
| 4,617,932 | 10/1986 | Kornberg | 623/1 X |
| 4,619,261 | 10/1986 | Guerriero | 128/325 |
| 4,641,653 | 2/1987 | Rockey | 604/96 |
| 4,643,184 | 2/1987 | Mobin-Udin | 128/345 |
| 4,647,416 | 3/1987 | Seiler, Jr. et al. | 264/118 |
| 4,649,922 | 3/1987 | Wiktor | 128/344 |
| 4,655,771 | 4/1987 | Wallsten | 623/1 |
| 4,660,560 | 4/1987 | Klein | 128/344 |
| 4,665,918 | 5/1987 | Garza et al. | 128/343 |
| 4,676,241 | 6/1987 | Webb et al. | 128/207 |
| 4,681,110 | 7/1987 | Wiktor | 128/343 |
| 4,699,611 | 10/1987 | Bowden | 604/1 |
| 4,705,517 | 11/1987 | DiPisa, Jr. | 623/12 |
| 4,710,181 | 12/1987 | Fuqua | 604/280 |
| 4,723,549 | 2/1988 | Wholey et al. | 128/344 |
| 4,731,054 | 3/1988 | Billeter et al. | 604/93 |
| 4,733,665 | 3/1988 | Palmaz | 128/343 |
| 4,740,207 | 4/1988 | Kreamer | 623/1 |
| 4,760,849 | 8/1988 | Kropf | 128/341 |
| 4,768,507 | 9/1988 | Fischell et al. | 128/303 |
| 4,771,773 | 9/1988 | Kropf | 128/303 |
| 4,776,337 | 10/1988 | Palmaz | 128/343 |
| 4,787,899 | 11/1988 | Lazarus | 623/1 |
| 4,842,575 | 6/1989 | Hoffman, Jr. et al. | 600/36 |
| 4,848,343 | 7/1989 | Wallsten et al. | 128/343 |
| 4,875,480 | 10/1989 | Imbert | 128/343 |
| 4,877,030 | 10/1989 | Beck et al. | 623/1 X |
| 4,878,906 | 11/1989 | Lindemann et al. | 623/1 |
| 4,902,289 | 2/1990 | Yannas | 623/1 |
| 4,954,126 | 9/1990 | Wallsten | 600/36 |
| 4,994,022 | 2/1991 | Sugiyama et al. | 604/96 |
| 4,998,539 | 3/1991 | Delsanti | 128/898 |
| 4,998,923 | 3/1991 | Samson et al. | 606/194 |
| 5,037,392 | 8/1991 | Hillstead | 604/96 |
| 5,041,126 | 8/1991 | Gianturco | 606/195 |
| 5,059,211 | 10/1991 | Stack et al. | 606/198 |
| 5,061,275 | 10/1991 | Wallsten et al. | 623/1 |
| 5,102,417 | 4/1992 | Palmaz | 606/195 |
| 5,104,399 | 4/1992 | Lazarus | 623/1 |
| 5,192,307 | 3/1993 | Wall | 623/1 |
| 5,266,073 | 11/1993 | Wall | 623/1 |
| 5,275,622 | 1/1994 | Lazarus et al. | 623/1 |
| 5,306,286 | 4/1994 | Stack et al. | 606/198 |
| 5,314,444 | 5/1994 | Gianturco | 606/195 |
| 5,397,345 | 3/1995 | Lazarus | 623/1 |
| 5,527,336 | 6/1996 | Rosenbluth et al. | 606/192 |
| 5,562,728 | 10/1996 | Lazarus et al. | 623/1 |
| 5,662,700 | 9/1997 | Lazarus | 623/1 |
| 5,669,936 | 9/1997 | Lazarus | 623/1 |
| B1 4,733,665 | 1/1994 | Palmaz | 606/108 |

## OTHER PUBLICATIONS

Cordis Corporation and Expandable Grafts Partnership's Complaint And Demand For Jury Trial (Feb. 6, 1998). *Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc.*, Delaware District Court Case No. 98–65.

Cordis Corporation's Motion to Amend the Complaint and to Add a Party (Feb. 2, 1998). *Cordis Corporation v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc.*, Delaware District Court Case No. 97–550–SLR.

Cordis Corporation's Motion For Consolidation Pursuant to Rule 42(a) (Feb. 6, 1998). *Cordis Corporation v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc.*, Delaware District Court Case No. 97–550–SLR and *Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc.*, Delaware District Court Case No. 98–65.

Cordis Corporation's Answer and Counterclaim (Feb. 27, 1998). *Arterial Vascular Engineering, Inc. v. Cordis Corporation et al.*, Delaware District Court Case No. 97–700–SLR.

Expandable Grafts Partnership's Answer To Arterial Vascular Engineering, Inc.'s First Amended Complaint; And Counterclaim Jul. 27, 1998). *Arterial Vascular Engineering, Inc. v. Cordis Corporation et al.*, Delaware District Court Case No. 97–700–SLR.

Reply of Plaintiff Arterial Vascular Engineering, Inc. To Counterclaims of Defendant Cordis Corporation (Mar. 31, 1998). *Arterial Vascular Engineering, Inc. v. Cordis Corporation et al.*, Delaware District Court Case No. 97–700–SLR.

Reply of Plaintiff Arterial Vascular Engineering, Inc. To Counterclaims of Defendant Expandable Grafts Partnership (Mar. 31, 1998). *Arterial Vascular Engineering, Inc. v. Cordis Corporation et al.*, Delaware District Court Case No. 97–700–SLR.

Answer and Counterclaims of Defendant Advanced Cardiovascular Systems, Inc. (Mar. 9, 1998). *Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc.*, Delaware District Court Civil Action No. 97–550–SLR (Consolidated).

B1 4,739,762
Page 3

Boston Scientific Corporation and SCIMED Life Systems, Inc.'s Answer to the Second Amended Complaint in Case No. 97–550 and to the Identical Compliant Assigned Case No. 98–65 (Apr. 15, 1998). *Cordis Corporation and Expandable Grafts Partnership v. Advanced Vascular Engineering, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc.,* Delaware District Court Civil Action No. 97–550-SLR.

Expandable Grafts Partnership's EGP's Answers and Objections to AVE's First Set of Interrogatories (Mar. 22, 1998), *Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc.,* Delaware District Court Civil Action No. 97–550-SLR.

Defendant Arterial Vascular Engineering, Inc.'s Responses to Plaintiff's First Set of Interrogatories Nos. 1–13 (Apr. 28, 1998). *Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc.,* Delaware District Court Civil Action No. 97–550-SLR.

Advanced Cardiovascular Systems, Inc. and Guidant Corporation's First Supplemental Response to Plaintiff's First Set of Interrogatories (No. 13) (Feb. 3, 1998), *Cordis Corporation v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc.,* Delaware District Court Civil Action No. 97–550-SLR.

Boston's Skeleton Argument (undated), *Boston Scientific Limited and Boston Scientific International B.V. v. Expandable Grafts Partnership and Boston Scientific Limited and Boston Scientific International B.V. v. Julio C. Palmaz* High Court of Justice, Chancery Division, Patents Court.

Skeleton Argument of Palmaz/EGP (undated), *Boston Scientific Limited and Boston Scientific International B.V. v. Julio C. Palmaz and Expandable Grafts Partnership,* High Court of Justice, Chancery Division, Patents Court.

Boston's Closing Submissions (undated), *Boston Scientific Limited and Boston Scientific International B.V. v. Expandable Grafts Partnership and Boston Scientific Limited and Boston Scientific International B.V. v. Julio C. Palmaz* High Court of Justice, Chancery Division, Patents Court.

EGP's Final Submissions (undated), *Boston Scientific Limited and Boston Scientific International B.V. v. Julio C. Palmaz and Expandable Grafts Partnership,* High Court of Justice, Chancery Division, Patents Court.

Judgment (Jun. 26, 1998), *Boston Scientific Limited and Boston Scientific International B.V. v. Julio C. Palmaz and Expandable Grafts Partnership,* High Court of Justice, Chancery Division, Patents Court.

Affidavit of Dr. Julio C. Palmaz (Dec. 5, 1997), *Boston Scientific Limited and Boston Scientific International B.V. v. Julio C. Palmaz,* High Court of Justice, Chancery Division, Patents Court.

Affidavit of Ben D. Tobor (Dec. 8, 1997), *Boston Scientific Limited and Boston Scientific International B.V. v. Julio C. Palmaz,* High Court of Justice, Chancery Division, Patents Court.

Affidavit of Martin Aufenanger (Dec. 8, 1997), *Boston Scientific Limited and Boston Scientific International B.V. v. Julio C. Palmaz,* High Court of Justice, Chancery Division, Patents Court.

Deposition of Nigel P. Buller, M.D. (Dec. 20, 1997). *Cordis Corporation v. Advanced Cardiovascular Systems,* District Court of Delaware Case No. 97–550.

Deposition of Alfred Steward Windeler, Ph.D. (Jan. 28, 1998), *Cordis Corporation v. Advanced Cardiovascular Systems,* District Court of Delaware Case No. 97–550.

Deposition of Richard A. Bowman (Jan. 9, 1998). *Cordis Corporation v. Advanced Cardiovascular Systems,* District Court of Delaware Case No. 97–550.

Deposition of Gary Schneiderman (Jan. 16, 1998). *Cordis Corporation v. Advanced Cardiovascular Systems,* District Court of Delaware Case No. 97–550.

Deposition of Julio Cesar Palmaz (Dec. 29, 1997), *Cordis Corporation v. Advanced Cardiovascular Systems,* District Court of Delaware Case No. 97–550.

"Repositioning of Biliary Endoprosthesis with Gruntzig Balloon Catheters," EP Harries–Jones, S Fataar and EJ Tuft, *AJR* 138:771–772 (Apr. 1982).

"Effect of Maxillary Osteotomy on Subsequent Craniofacial Growth in Adolescent Monkeys," R Nanda, J. Sugawara and RG Topazian, *Am J Orthod* (May 1983).

"Expandable Intraluminal Vascular Graft: A Feasibility Stidy," J. Palmaz, R. Sibbitt, F. Tio, S. Reuter, J. Peters, F. Garcia, *Surgery,* vol. 99, pp. 199–205 (Feb. 1986).

"Atherosclerotic Rabbit Aortas: Expandable Intraluminal Grafting", J. Palmaz, S. Windeler, F. Garcia, F. Tio, R. Sibbitt, S. Reuter, *Radiology,* vol. 160, pp. 723–726 (Sep. 1986).

*JACC,* vol. 9, No. 2, Abstracts p. 106A (Feb. 1987).

"Intravascular Stents to Prevent Occlusion and Restenosis After Transluminal Angioplasty," U Sigward, J Puel, V Mirkovitch, F Joffre and L Kappenberger, *N Engl J Med,* 316:701–6 (Mar. 19, 1987).

"Percutaneous Endovascular Graft: Experimental Evaluation," DD Lawrence, C Charnsangavej, KC Wright, C Gianturco and S Wallace, *Radiology,* 163:357–360 (May 1987).

"Self–Expanding Metallic Stents: Preliminary Evaluation in an Atherosclerotic Model," N Rollins, KC Wright, C Cjarnsangavej, S Wallace and C Gianturco, *Radiology,* vol. 163, No. 3, pp. 739–742 (Jun. 1987).

"Balloon–Expandable Intracoronary Stents in the Adult Dog," RA Schatz, JC Palmaz, FO Tio, F Garcia, O Garcia and SR Reuter, *Circulation,* vol. 76, No. 2, pp. 450–457 (Aug. 1987).

"Self–Expanding Endovascular Prosthesis: An Experimental Study," H Rosseau, J Puel, F Joffre, U Sigwart, C Duboucher, C Imbert, C Knight, L Kropf and H Wallstein, *Radiology,* 164:709–714 (Sep. 1987).

"Normal and Stenotic Renal Arteries: Experimental Balloon–Expandable Intraluminal Stenting," JC Palmaz, DT Kopp, H Hayashi, RA Schatz, G Hunter, FO Tio, O Garcia, R Alvarado, C Rees and SC Thomas, *Radiology,* 164:705–708 (Sep. 1987).

"Gianturco Expandable Wire Stents in the Treatment of Superior Vena Cava Syndrome Recurring After Maximum–Tolerance Radiation," J Rosch, JE Bedell, J Putnam, R Antonovic and B Uchida, *Cancer,* 60:1243–1236 (Sep. 15, 1987).

"One Year of Percutaneous Coronary Stenting,", U Sigwart, C Imbert, A Essinger, A Fischer, H Sadeghi L Kappenberger, *Circulation,* P II. vol. 76, No. 4 (Oct. 1987).

B1 4,739,762
Page 4

"Early and Late Results of Inracoronary Arterial Stenting After Coronary Angioplasty in Dogs " GS Roubin, KA Robinson, SB King, C Gianturco, AJ Black, JE Brown, RJ Siegel and JS Douglas, Circulation, vol. 76, No. 4, pp. 891–897 (Oct. 1987).

"Intravascular Stents to Prevent Restenosis After Transluminal Coronary Angioplasty." J Puel, H Rosseau, F Joffre, S Hatem, JM Fauvel, JP Bounhoure and CT Rangucil, Circulation, Pt. II, vol. 76, No. 4, 0105 (Oct. 1987).

"Abstracts From the 60th Scientific Sessions," Circulation, Pt. II, vol. 76, No. 4, IV–232 (Oct. 1987).

"Balloon Expandable Intra-Arterial Stents: Effect of Anticoagulation on Thrombus Formation," Circulation, JC Palmaz, OJ Garcia, DT Kopp, RA Schatz, FO Tio, and V Claravino, Circulation, Pt. II, vol. 76, No. 4 (Oct. 1987).

J Cardiovasc. Surg., vol. 28, No. 5, pp. 39–41 (Sep.–Oct. 1987).

"Perkutan Implantierbare, Durch Ballon Aufdehnbare Gefäßprothese." EP Strecker, P Romaniuk, B Schneider, M Westphal, E Zeitler, HRD Wolfund and N Freudenberg, Disch Med Wschr, 113:538–542 (1988).

"Modified Gianturco Expandable Wire Stents in Experimental and Clinical Use." J Rosch, JSE Putnam and BT Uchida, Circe, Porto Cervo, vol. 31, No. 2, pp. 100–103 (1988).

"Implantation of Balloon-Expandable Intravascular Grafts by Catherization in Pulmonary Arteries and Systemic Veins," CE Mullins, MP O'Laughlin, GW Vick, DC Mayem RJ Myers, DL Kearney, RA Schatz and JC Palmaz, Circulation, vol. 77, No. 1, pp. 188–199 (1988).

"Modifications of Gianturco Expandable Wire Stents," BT Uchida, JS Putnam and J Rösch, AJR, 150:1185–1187 (May 1988).

Dotter, Charles T. and Judkins, Melvin P., "Transluminal Treatment of Arteriosclerosis Obstruction," Circulation 1964; 30:654–670 (CO31558–575).

Rashkind W.J/. Miller, W.W.: Creation of an atrial septal defect without thoracotomy: A palliative approach to complete transposition of the great arteries. JAMA, 1966, 196; 991–92.

Peter Eichelter, MD, and Worthington G. Schenk. Jr..MD Buffalo, "Prophylaxis of Pulmonary Embolism", Arch Surg–vol. 97, Aug. 1968, pp. 348–356.

James W. Pate, M.C., F.A.C.S., David Melvia, M.D., Richard C. Cheek, M.D., "A New Form of Vena Caval Interruption". Annals of Surgery, Jun. 1969, pp. 873–880.

Kazi Mobin–Uddin, MB, BS; Robert McLean; Hooshang Bolooki, MD; and James R. Jude, MD, Coral Gables, Fla., "Caval Interruption for Prevention of Pulmonary Embolism". Arch Surg/vol. 99, Dec. 1969.

James A. Hunter, M.D., Robert Sessions, Richard Buenger, M.D., "Experimental Balloon Obstruction of the Inferior Vena Cava", Annals of Surgery, Feb. 1970, pp. 315–320.

Lazar Greenfield, M.D., James R. McCurdy, M.D., Phillip P. Brown, M.D., and Ronald C. Elkins, M.D., Oklahoma City, Okla.,: "A New Intracaval Filter Permitting Continued Flow and Resolution of Emboli". Apr. 1973, Surgery, vol. 73, No. 4, pp. 599–606.

Kazi Mobin–Uddin, Joe R. Utley, and Lester R. Bryant, "The Inferior Vena Cava Umbrella Filter". Progress in Cardiovascular Diseases, vol. XVII, No. 5, (Mar./Apr.), 1975, pp. 391–399.

Goldstein et al., "Transcather Occlusion of Abdominal Tumors" Radiology 120: 539–545 (Sep. 1976) (C14058–65).

Morris Simon, M.D., Roy Kaplow. Ph.D., Edwin Salzman, M.D., and David Freiman, M.D., "A Vena Cava Filter Using Thermal Shape Memory Alloy" Radiology. 125: pp. 89–94, Oct. 1977.

The Surgical Experience and a One to Sixteen Year Follow–Up of 277 Abdominal Aortic Aneurysm. Gardner et al., American Journal of Surgery, 135, pp. 226–230 (1978).

Edwards, "Arterial Grafts" Archives of Surgery, 113: 1225–33 (Nov. 1978) (C14200–208).

Lunderquist et al., "Guidewire for Percutaneous Transheptic Cholangiography," Radiology 132: 228 (Jul. 1979) (C14114–15).

Campbell et al., "Expanded Microporous Polytetra Fluoroethylene as a Vascular Substitute: A two year Follow Up." Surgery 85: 177–78 (1979) (C14193–199).

Semb B.K.H., Tjonneland, S., Stake G., et al.: "Balloon valvotomy" of congenital pulmonary valve steonsis with tricuspid valve insufficiency. Cardiovasc. Radial., 1979: 2:238–241.

Hoevels et al., "Percutaneous Transheptic Insertion of a Permanent Endoprosthesis in Obstructive Lesions of the Extrahepatic Bile Ducts." Gastrointest. Radiol. 4: 367–77 (1979) (C14402–13).

George E. Cimochowsky, M.D., Richard H. Evans, M.D., Christopher K. Zairins, M.D., Chien–Tai Lu, M.D., and Tom R. DeMeester, M.D., Chicago, Ill., "Greenfield Filter Versus Mobin–Uddin Umbrella", J Thorac Cardiovasc Surg, 79: pp. 358–363, 1980.

Cope, "Balloon Dilatation of Closed Mesocaval Shunts." AJR 135: 989–993 (Nov. 1980) (C14337–41).

Dotter, Charles T., "International Radiology–Review of an Emerging Field," Seminars in Roentgenology, vol. XVI, No. 1 (Jan.) 1981 (C029209–210).

Smith et al., "Safe and Effective Catheter Angiography Through Prosthetic Vascular Grafts," Radiology 138: 487–88 (Feb. 1981) (C14216–17).

Fogarty, T.J.; Chin, A., Shoor, P.M., et al: Adjunctive intraoperative arterial dilation: Simplified instrumentation technique. Arch. Surg. 1981, 116(11): 1391–8.

Harries–Jones et al., "Repositioning of Biliary Endoprothesis with Grüntzig Balloon Catheters." AJR 138: 771–772 (Apr. 1982) (C13820–22).

Honickman et al., "Malpositioned Biliary Endoprotheosis; Retrieval Using a Vascular Balloon Catheter," Radiology 144: 423–425 (Jul. 1982) (C13817–19).

Ring et al. "A Simple, Indwelling Biliary Endoprosthesis Made from Commonly Available Catheter Material" AJR 139: 615–617 (Sep. 1982) (C14054–57).

Aubrey M. Palestrant, M.D., Martin Prince, B.S., Morris Simon, M.D., "Comparative In Vitro Evaluation of the Nitinol Inferior Vena Cava Filter", Radiology: 145, pp. 351–355, Nov. 1982.

Kan, J.S., White R.L, Mitchell, S.E.: et al.: Percutaneous balloon valvuloplasty: A new method for treating congenital valve stenosis. N. Eng J Med., 1982: 307:540–542.

Palmaz et al., "Removable Biliary Endoprosthesis." AJR 140: 812–814. Apr. 1983.

Coons et al., "Large–Bore, Long Biliary Endoprosthesis (Biliary Stents) for Improved Drainage." Radiology 148: 89–94 (Jul. 1983) (C13772–78).

Andrew Cragg, Gunnar Lund. Erich Salomonowitz, Joseph Rysavy, Flavio Castaneda, Wilfrido Castaneda–Zuniga, Kurt Amplatz. "A New Percutaneous Vena Cava Filter", AJR 141: pp. 601–604, Sep. 1983.

B1 4,739,762
Page 5

Kadian Jr., et al., "A Simple Method for Insertion of Large Untapered Catheters" *AJR* 141: 792 (Oct. 1983) (C13808).

Teplick et al. "A New Biliary Endoprosthesis" *AJR* 141: 799–801 (Oct. 1983) (C14097–14100).

Castaneda–Zuniga, Ed. "Transluminal Angioplasty." 1983. (C14281–328).

Roehm, Jr., et al., "Percutaneous Transcatheter Filter for the Inferior Vena Cava." *Radiology*, vol. 150. No. 1. pp. 255–257 (Jan. 1984).

Andrew H. Cragg, M.D., Gunnar Lund, M.D., Joseph A. Rysavy, B.A., Erich Salomonowitz, M.D., Wilfrido R. Castaneda–Zuniga, M.D., Kurt Amplatz, M.D., "Percutaneous Arterial Grafting". *Radiology*, vol. 150, No. 1, Jan. 1984, pp. 45–49. (C014108–113).

Kadian, Jr. et al., "Biliary Endoprostheses, Insertion Using a Combined Peroral–Transhepatic Method." Radiology 1984; 150:828–830 (C14268–70).

Lund, et al., "A New Vena Cava Filter for Percutaneous Placement and Retrieval: Experimental Study", *Radiology*, vol. 152, No. 2. Aug., 1984, pp. 369–372.

Fogarty, T.J.., Kinney, T.B.; Finn, J.C.: Current status of dilatation catheters and guiding instruments. *Am. J. Cardiol.*, 1984, 15; 53(12): 97C–101C.

Fogarty, T.J.; Kinney, T.B., Intraoperative Coronary artery balloon–catheter dilatation. *Am. Heart J.* 1984, 107(4):845–51.

Fogarty et al., "Intraoperative Coronary Artery Balloon–Catheter Dilation." *American Heart Surgery* 107: 845–51 (1984) (C14209–15).

Labadibi Z., Wu, R.J., Walls, T.J.: Percutaneous balloon aortic valvuloplasty: Results in 23 patients. *Am. J. Cardiol* 1984; 53; 194.

Inoue, K., Owani, T. Nahamura, T. Et al., Clinical application of transmitral commissurotomy by a new balloon catheter, *J. Thorac. Cardiovascular Surg.* 1984; 87:394.

Rolf W. Gunther, M.D., Hans Schild, M.D., Axel Fries, S. Storkel, M.D., "Vena Caval Filter to Prevent Pulmonary Embolism: Experimental Study", *Radiology*, vol. 156, No. 2, Aug. 1985, pp. 315–320.

Donald F. Denny, John J. Cronan, Gary S. Dorfman, Cordell Esplin, "Percutaneous Kimray–Greenfield Filter Placement by Femoral Vein Puncture", AJR 145: pp. 827–829, Oct. 1985.

Chuslip Charnangevej, M.D., Sidney Wallace, M.D.. Kenneth C. Wright, Ph.D., Humberto Carrasco, M.D., Cesare Gianturco, M.D., "Endovascular Stent for Use in Aortic Dissection: An in Vitro Experiment", *Radiology* 1985; vol. 157, pp. 323–324.

Papanicolaou, et al. "Insertion of a Biliary Endoprosthesis Using a Balloon Dilatation Catheter." Gastrointest. Radio. 10:394–96 (1985). (C013809–11).

Carrasco et al., "Expandable Biliary Endoprosthesis: An Experimental Study," *American Journal of Roentgenology*, 145 (1985), 1279–1281 (C013998–00).

Wallace et al. "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications," *Radiology* 1986; 158: 309–312 (Feb. 1986) (C13994–97).

Rosch et al., "Transjugular–Intrahepatic Portacaval Shunt: An Experimental Work." *The American Journal of Surgery* 590–92 (C14575–77).

Kononov Discovery Deposition. Nov. 7–9, 17, 1996 (pp. 35–36, 41–43, 92–100, 122–125, 293–318, 455–457 redacted as confidential) Appendix V. Exhibit P)(Kononov Notebook).

Kononov Evidentiary Deposition, Nov. 18–19, 1996 (Appendix V. Exhibit P)(Kononov Notebook).

Cook's Supplemental Responses to JIIS Discovery Request Nos. 15, 19, 20, 23, 24 and 39 (Appendix IV, Exhibit I) (Kononov Notebook).

Coons Supplemental Report, pp. 1–3 and Exhibits B–E thereto (Appendix VI, Exhibit M) (Kononov Notebook).

Coons Deposition, pp. 70–82 and 99–100 (Appendix V. Exhibit F) (Kononov Notebook).

Gardner Deposition, pp. 168–227, 232–257 (Appendix V. Exhibit K) (Kononov Notebook).

Palmaz Deposition. Dec. 5, 1996, pp. 1837–1860 (Appendix V, Exhibit AA) (Kononov Notebook).

Wholey Deposition, pp. 148–175 (Appendix V. Exhibit KK) (Kononov Notebook).

Criado Deposition, pp. 101–116 (Appendix V. Exhibit G) (Lazarus Notebook).

Kononov Discovery Deposition. Nov. 7, 1996, pp. 83–100 (pp. 92–100 redacted) (Appendix V. Exhibit P) (Lazarus Notebook).

Kononov Discovery Deposition, Nov. 9, 1996, pp. 458–470 (Appendix V. Exhibit P) (Lazarus Notebook).

Kononov Evidentiary Deposition. Nov. 18–19, 1996, pp. 126–142 (Appendix V. Exhibit P) (Lazarus Notebook).

Deposition testimony of Julius G. Hammerslag, May 11, 1996 (Appendix V, Exhibit M) (Hammerslag Notebook).

Cook's Supplemental Answers to JIIS' Discovery Request Nos. 6, 18–23, 34 and 37. Responses to request Nos. 19, 21, 22, 23 (Appendix IV, Exhibit F) (Hammerslag Notebook).

Cook's Supplemental Responses to JIIS' Discovery Request Nos. 18, 22 and 23. (Appendix IV. Exhibit H) (Hammerslag Notebook).

Adelman Report, pp. 4–8, 15–16. (Appendix VI. Exhibit A) (Hammerslag Notebook).

Coons Report, pp. 1, 6–7, 18–24, and Exhibits B–E thereto (Appendix VI. Exhibit L) (Hammerslag Notebook).

Coons Supplemental Report, pp. 2–3, and Exhibits B–E thereto (Appendix VI. Exhibit M) (Hammerslag Notebook).

Goolkasian Report, pp. 4, 13–18 (Appendix VI. Exhibit U) (Hammerslag Notebook).

Harmon Report, pp. 3–4, 26–27 (Appendix VI. Exhibit V) (Hammerslag Notebook).

Segan Answering Report, pp. 6–8, 10–11 (Appendix VI. Exhibit FF) (Hammerslag Notebook).

Wholey Report, pp. 5–7, 9–10 (Appendix VI. Exhibit KK) (Hammerslag Notebook).

Beck Deposition, pp. 216–228 (Appendix V. Exhibit A) (Hammerslag Notebook).

Buller Deposition, pp. 401–429 (Appendix V. Exhibit D) (Hammerslag Notebook).

Coons Deposition, pp. 83–84 (Appendix V. Exhibit F) (Hammerslag Notebook).

Emhardt Deposition, pp. 418–431 (Appendix V. Exhibit I) (Hammerslag Notebook).

Gardner Deposition. pp. 239–252, 339–376, 440–444 (Appendix V. Exhibit K) (Hammerslag Notebook).

Hodgson Deposition, pp. 79–88 (Appendix V. Exhibit N) (Hammerslag Notebook).

Kula Deposition, pp. 630–635, 647–651 (Appendix V. Exhibit Q) (Hammerslag Notebook).

Lipow Deposition, pp. 77–78, 114–177, 206–229, 263–344 (Appendix V. Exhibit U) (Hammerslag Notebook).

Palmaz Deposition, Feb. 6, 1996, pp. 919–923 (Appendix V. Exhibit AA) (Hammerslag Notebook).

B1 4,739,762
Page 6

Palmaz Deposition, Apr. 16, 1996, pp. 1089–1112, 1252–1271 (Appendix V, Exhibit AA) (Hammerslag Notebook).

Tobor Deposition, pp. 280–297 (Appendix V, Exhibit II) (Hammerslag Notebook).

Wholey Deposition, pp. 207–239 (Appendix V, Exhibit KK) (Hammerslag Notebook).

Gianturco U.S. Patent No. 5,041,126 (Application No. 244,669) (Appendix VIII, Exhibit B1) (Hammerslag Notebook).

Office Action, dated Oct. 2, 1989 in Application S.N. 244,669, p. 2 (Appendix VIII, Exhibit B2) (Hammerslag Notebook).

Jun. 29, 1994 Memorandum by Raymond Mehler (Appendix VIII, Exhibit A1) (Hammerslag Notebook).

Jul. 11, 1994 letter from H. Collins, Patent Counsel at Cordis to D. Latham, Medtronics (Appendix VIII, Exhibit A2) (Hammerslag Notebook).

Jul. 14, 1994 letter from D. Latham, Senior Patent Attorney at Medtronics to D. Hall, Cordis Corporation (Appendix VIII, Exhibit A3) (Hammerslag Notebook).

U.S. Patent No. 4,969,458 (Appendix VIII, Exhibit C1) (Hammerslag Notebook).

Office Action in Application S.N. 69,636 dated Mar. 17, 1988, p. 3. (Appendix VIII, Exhibit C2) (Hammerslag Notebook).

Response to Office Action, pp. 4–8 (Appendix VIII, Exhibit C3) (Hammerslag Notebook).

JJIS' Memorandum of Law on the Interpretation of the Asserted Claims of the '665 Patents pp. 4–5, 20–23 (Appendix VII, Exhibit A) (Ersek Notebook).

JJIS' Reply Memorandum of Law on the Interpretation of the Asserted Claims of the '665 Patent, pp. 30–33 (Appendix VII, Exhibit C) (Ersek Notebook).

Frenchick Deposition, JJIS 30(b)(6) witness on infringement, pp. 472–486 (Appendix V, Exhibit J) (Ersek Notebook).

Cook's Supplemental Responses to JJIS' Discovery Request Nos. 15, 19, 20, 23, 24 and 39, pp. 6–8 (Appendix IV, Exhibit I) ) (Ersek Notebook).

Adelman Report, pp. 7–8, 10–11, 16 (Appendix VI, Exhibit A) (Ersek Notebook).

Andros Report, entire document (Appendix VI, Exhibit B) (Ersek Notebook).

Collins Answering Report, entire document (Appendix VI, Exhibit J) (Ersek Notebook).

Coons Report, pp.. 8, 18–24, Exhibits B–3 (Appendix VI, Exhibit L) (Ersek Notebook).

Coons Supplemental Report, p. 3, Exhibits B–E (Appendix VI, Exhibit M) (Ersek Notebook).

Gardner Report, pp. 29–34 (Appendix VI, Exhibit S) (Ersek Notebook).

Goolkasian Report, pp. 2–3, 19–25, (Appendix VI, Exhibit U) (Ersek Notebook).

McIntosh Report, entire document (Appendix VI, Exhibit BB) (Ersek Notebook).

Segal Answering Report, pp. 6–8 (Appendix VI, Exhibit FF) (Ersek Notebook).

Wholey Report, pp. 6–10, 15–18 (Appendix VI, Exhibit KK) (Ersek Notebook).

Buller Deposition, pp. 354–360, 396–401 (Appendix V, Exhibit D) (Ersek Notebook).

Collins Deposition, pp. 59–95, 107–126 (Appendix V, Exhibit E) (Ersek Notebook).

Criado Deposition, Mar. 5, 1996, pp. 62–100, 126–143, 148–158, 170–172, 225–279 (Appendix V, Exhibit G) (Ersek Notebook).

Cumberland Deposition, pp. 25–27, 64–72 (Appendix V, Exhibit H) (Ersek Notebook).

Gardner Deposition, Dec. 18–19, 1996, pp. 162–170, 239–250, 429–440 (Appendix V, Exhibit K) (Ersek Notebook).

Hammerslag Deposition, pp. 74–75, 86–89 (Appendix V, Exhibit M) (Ersek Notebook).

Hodgson Deposition, Dec. 5, 1996, pp. 43–54, 57–78, 86–91, 112–163, 171–178, 188–211 (Appendix V, Exhibit N) (Ersek Notebook).

Kononov Discovery Deposition, Nov. 9, 1996, pp. 465–468 (Appendix V, Exhibit P) (Ersek Notebook).

Kononov Evidentiary Deposition, Nov. 18, 19, 1996, pp. 92–96, 204–205, 208–224, 246–252 (Appendix V, Exhibit P) (Ersek Notebook).

Kula Deposition, Apr. 10, 1996, pp. 626–743 (Appendix V, Exhibit Q) (Ersek Notebook).

Leewood Deposition, pp. 63–77, 232–239, 241–246 (Appendix V, Exhibit S) (Ersek Notebook).

Lipow Deposition, Mar. 12, 1996, pp. 51–55, 120–122, 206–213 (Appendix V, Exhibit U) (Ersek Notebook).

Lipow Deposition, Mar. 13, 1996, pp. 374–386, 547–562 (Appendix V, Exhibit U) (Ersek Notebook).

Lipow Deposition, Mar. 14, 1996, pp. 572–605, 617–625, 643–644 (Appendix V, Exhibit U) (Ersek Notebook).

McIntosh Depositon, pp. 4–91, 103–197 (Appendix V, Exhibit V) (Ersek Notebook).

Palmaz Deposition, Apr. 16, 1996, pp. 1206–1232 (Appendix V, Exhibit AA) (Ersek Notebook).

Palmaz Deposition, Dec. 5, 1996, pp. 1777–1781 (Appendix V, Exhibit AA) (Ersek Notebook).

Palmaz Testimony, Dec. 5, 1991, pp. 11–24 (Appendix X, Exhibit B) (Ersek Notebook).

Palmaz Testimony, Dec. 6, 1991, pp. 32–63 (Appendix X, Exhibit B) (Ersek Notebook).

Tio Deposition, pp. 431–438 (Appendix V, Exhibit HH) (Ersek Notebook).

Tobor Deposition, Oct. 11, 1995, pp. 155–162, 189–236 (Appendix V, Exhibit II) (Ersek Notebook).

Tobor Deposition, May 1, 1996, pp. 684–723 (Appendix V, Exhibit II) (Ersek Notebook).

Tobor Deposition, Tobor, May 2, 1996, pp. 884–915 (Appendix V, Exhibit II) (Ersek Notebook).

Waller Deposition, pp. 32–33, 183–193, 206–244 (Appendix V, Exhibit JJ). (Ersek Notebook).

Wholey Deposition, Dec. 7, 1996, pp. 119–148, 175, 183–184 (Appendix V, Exhibit KK) (Ersek Notebook).

Windeler Testimony, Oct. 11, 1991, pp. 60–78, 99–103 (Appendix X, Exhibit C) (Ersek Notebook).

Affidavit of Erik K. Antonsson, Ph.D., P.E., C35148–84 (Appendix VIII, Exhibit G) (Ersek Notebook).

Petition to Reissue (Mar. 17, 1995) (Canada) (Appendix II, Exhibit K) (Ersek Notebook).

Decision of the Technical Board of Appeal (2 Apr. 1996) (EPO) (Appendix II, Exhibit R), (Ersek Notebook).

Minutes of the Oral Proceedings (2 Apr. 1996) (EPO) (Appendix II, Exhibit S) (Ersek Notebook).

Reply to Official Communication dated Oct. 6, 1989 (31 Jan. 1990) (EPO) (Appendix II, Exhibit HH) (Ersek Notebook).

Amendment and Argument in Japanese Application No. 225376/91 (Dec. 11, 1996)(Appendix II, Exhibit MM) (Ersek Notebook).

B1 4,739,762
Page 7

Notification from Japanese Patent Office Regarding Document filed by Third Party to Reject Japanese Application No. 225376/91 (Aug. 20, 1996) (Appendix II, Exhibit OO) (Ersek Notebook).

Letter from John & Kernich requesting surrender of South African Patent No. 86/8414 (Aug. 5, 1996)(Appendix II, Exhibit UU) (Ersek Notebook).

Submission of New Claims (Mar. 19, 1990) (EPO) (Appendix II, Exhibit KKK) (Ersek Notebook).

Communication of European Search Report (Jul. 13, 1989) (Appendix II, Exhibit LLL) (Ersek Notebook).

Submission by Third Party to Japanese Patent Office (Jun. 14, 1996) (Appendix II, Exhibit MMM) (Ersek Notebook).

Response to May 13, 1994 Communication (Nov. 4, 1994) (EPO) (Appendix II, Exhibit QQQ) (Ersek Notebook).

Communication (May 13, 1994) (EPO) (Appendix II, Exhibit RRR) (Ersek Notebook).

Response to Second Official Report (Oct. 19, 1994) (Australia) (Appendix II, Exhibit TTT) (Ersek Notebook).

Second Official Report (Mar. 10, 1994) (Australia) (Appendix II, Exhibit UUU) (Ersek Notebook).

Response to First Official Report (Feb. 22, 1994) (Australia) (Appendix II, Exhibit VVV) (Ersek Notebook).

First Official Report (Feb. 23, 1993) (Australia) (Appendix II, Exhibit WWW) (Ersek Notebook).

Response to Official Report (Sep. 5, 1996) (Australia) (Appendix II, Exhibit YYY) (Ersek Notebook).

Official Report (Feb. 19, 1996 ) (Australia) (Appendix II, Exhibit ZZZ) (Ersek Notebook).

Statements Submitted to EPO by Opposer (18 Mar. 1996) (Appendix II, Exhibit T) (Ersek Notebook).

Notice of Issues to be Addressed at Oral Proceedings (27 Feb. 1996) (EPO) (Appendix II, Exhibit U) (Ersek Notebook).

Brief Submitted by Opposer (18 Jan. 1996) (EPO) (Appendix II, Exhibit V) (Ersek Notebook).

Patentee Submission of Amended Claims and Statement of Arguments (20 Jan. 1995) (EPO) (Appendix II, Exhibit W) (Ersek Notebook).

Brief Submitted by Opposer (11 Jul. 1995) (EPO) (Appendix II, Exhibit X) (Ersek Notebook).

Statement of Grounds of Appeal (22 Nov. 1993) (EPO) (Appendix II, Exhibit Y) (Ersek Notebook).

Revocation of European Patent (12 Jul. 1993) (EPO) (Appendix II, Exhibit Z) (Ersek Notebook).

Brief Submitted by Opposer (17 May 1993) (EPO) (Appendix II, Exhibit AA) (Ersek Notebook).

Response to Official Communication dated Nov. 8, 1991 (EPO) (17 Aug. 1992 ) (Appendix II, Exhibit BB) (Ersek Notebook).

Notice of Opposition by Advanced Surgical Intervention Inc. (30 Oct. 1991) (EPO) (Appendix II, Exhibit CC) (Ersek Notebook).

Notice of Opposition by Boston Scientific Corp. (30 Jan. 1991 ) (EPO) Appendix II, Exhibit DD) (Ersek Notebook).

Translation of Submission by Third Party Trial–Demanding Brief (Nov. 8, 1996) (Japan) (Appendix II, Exhibit NN) (Ersek Notebook).

Patrick W. Serruys, Rotterdam, Thoraxcentre Interventional Cardiology Group, Handbook of Coronary Stents, 1997.

Brief of Terumo Kobushiki Kaisha to Invalidate Patent, Nov. 8, 1996 (Appendix II, Exhibit AAAA) (Esek Notebook).

Reply to Patent Opposition and Request for Amendment, Sep. 25, 1997 (Appendix II, Exhibit BBBB) (Ersek Notebook).

Declaration of Lee P. Bendel.

Affidavit of Julio C. Palmaz.

Declarationof Marvin L. Woodall.

Expert Report of Dr. Nigel Pearson Buller.

Petition To Revoke European Patent No. 0 221 570 (UK) (13 Mar. 1997).

Amended Particulars Of Objections (European Parent No. 0 221 570 (UK) (27 Oct. 1997).

Plea of Invalidity Of EP Patent 0 221 570 B1 (Italy) (21 Mar. 1997).

Writ Of Summons In Nullity By Boston Scientific Of European patent Nos. 0 221 570 And 0 335 341 (France) (17 Mar. 1997).

Writ Of Summons On Nullity By Saint–Come Of European Patent 0 221 570 B1 (France) (12 Mar. 1997).

Brief Of Response Submitted By Dr. Palmaz (France) (23 Oct. 1997).

English Translation Of Certain Portions Of Nullity Action By Biotronik Against European Patent No. 0 221 570 (Appendix II, Exhibit Q).

Plea Of Invalidity Of European Patent No. 0 221 570 By Boston Scientific (Netherlands) (13 Mar. 1997).

Memorandum Of Oral Pleading Filed On Behalf Of Boston Scientific (Netherlands) (12 Sep. 1997).

Plea Notes Filed On Behalf Of Palmaz (Netherlands) 12 Sep. 1997).

Provisional Judgment Of District Court In The Hague (Netherlands) (29 Oct. 1997).

Arterial Vascular Engineering, Inc.'s "Complaint For Declaratory Relief Of Patent Invalidity, Unenforceability, Noninfringement, And For Antitrust Violations", Case No. 97–700, Dec. 26, 1997.

Cordis Corporation's "Complaint For Patent Infringement And Demand For Jury Trial", Case No. 97–550, Oct. 3, 1997.

Cordis Corporation's "First Amended Complaint And Demand For Jury Trial", Case No. 97–550–SLR, Oct. 21, 1997.

Boston Scientific Corporation and SCIMED Life System, Inc.'s "Answer", Case No. 97–550–SLR, Nov. 12, 1997.

Cordis Corporation's "Cordis's Motion For A Preliminary Injunction Against Arterial Vascular Engineering, Inc.", Case No. 97–550–SLR, Dec. 29, 1997.

Cordis Corporation's "Cordis Corporation's Motion For a Preliminary Injunction", Case No. 97–550, Oct. 8, 1997.

B1 4,739,762

1

# REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.

ONLY THOSE PARAGRAPHS OF THE SPECIFICATION AFFECTED BY AMENDMENT ARE PRINTED HEREIN.

Column 7, after line 20:

*With reference to FIGS. 1A and 1B, it is seen that certain of the slots 82 formed in tubular member 71 are open ended slots. The circumferentially adjacent slots 82, whether open ended or closed, define ring portions that are defined by a plurality of peak portions and valley portions. In the preferred embodiment, the ring portions at the first and second ends 72, 73 are not in phase with each other. Also in the preferred embodiment, open ended slots are defined by a pair of spaced apart elongate members 75 that are connected together by a connecting member 77 that extends between one end of each of the elongate members 75.*

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims 23 and 34 is confirmed.

Claims 13 and 24 are cancelled.

Claims 1, 14, 16–19, 25, 29, 31–33, 35, 37, 40 and 41 are determined to be patentable as amended.

Claims 2–12, 15, 20–22, 26–28, 30, 36, 38, 39, 42 and 43, dependent on an amended claim, are determined to be patentable.

New claims 44–59 are added and determined to be patentable.

1. A method for implanting a prosthesis within a body passageway comprising the steps of:
   utilizing a thin-walled, tubular member as the prosthesis, the tubular member having a plurality of slots formed therein, the slots being disposed substantially parallel to the longitudinal axis of the tubular member;
   disposing the prosthesis upon a catheter;
   inserting the prosthesis and catheter within the body passageway by catheterization of said body passageway; and
   expanding and deforming the prosthesis at [a desired] *the location of an existing natural obstruction* within the body passageway by expanding a portion of the catheter associated with the prosthesis to force the prosthesis radially outwardly into contact with the body passageway, the prosthesis being deformed beyond its elastic limit.

14. The expandable intraluminal vascular graft of claim [13] *23*, wherein the slots are uniformly and circumferentially spaced from adjacent slots and the slots are uniformly spaced from adjacent slots along the longitudinal axis of the

2

tubular member, whereby at least one elongate member is formed between adjacent slots.

16. The expandable intraluminal vascular graft of claim [13] *23*, wherein the tubular member does not exert any outward, radial force while the tubular member has the first or second, expanded diameter.

17. The expandable intraluminal vascular graft of claim [13] *23*, wherein the slots have a substantially rectangular configuration when the tubular member has the first diameter; and the slots have a substantially hexagonal configuration when the tubular member has the second, expanded diameter.

18. The expandable intraluminal vascular graft of claim [13] *23*, wherein the slots have a configuration which is substantially a parallelogram after the tubular member has been expanded and deformed into the second expanded diameter.

19. The expandable intraluminal vascular graft of claim [13] *23*, wherein the tubular member has a biologically inert coating on the wall surface.

25. The expandable prosthesis for a body passageway of claim [24] *34*, wherein the tubular member has a biological inert coating on the wall surface.

29. The expandable prosthesis of claim [24] *34*, wherein the slots are uniformly and circumferentially spaced from adjacent slots and the slots are uniformly spaced from adjacent slots along the longitudinal axis of the tubular member, whereby at least one elongate member is formed between adjacent slots.

31. The expandable prosthesis of claim [24] *34*, wherein the tubular member does not exert any outward, radial force while the tubular member has the first or second expanded diameter.

32. The expandable prosthesis of claim [24] *34*, wherein the slots have a substantially rectangular configuration when the tubular member has the first diameter, and the slots have a substantially hexagonal configuration when the tubular member has the second, expanded diameter.

33. The expandable prosthesis of claim [24] *34*, wherein the slots have a configuration which is substantially a parallelogram after the tubular member has been expanded and deformed intop the second expanded diameter.

35. An apparatus for intraluminally reinforcing a body passageway, comprising:
   an expandable and deformable, thin-walled tubular prosthesis having first and second ends, and a wall surface disposed between the first and second ends, the wall surface having a *substantially uniform thickness and a* plurality of slots formed therein, the slots being disposed substantially parallel to the longitudinal axis of the prosthesis, *the prosthesis having a first diameter which permits intraluminal delivery of the prosthesis into a body passageway having a lumen and wherein the outside of the wall surface of the prosthesis is a smooth surface when the prosthesis has the first diameter;* and
   a catheter having an expandable, inflatable portion associated therewith and including means for mounting and retaining the expandable, thin-walled tubular prosthesis on the expandable, inflatable portion,
   whereby upon inflation of the expandable, inflatable portion of the catheter, the prosthesis is expanded and deformed radially outwardly into contact with the body passageway.

37. An apparatus for expanding the lumen of a body passageway comprising:
   an expandable and deformable thin-walled intraluminal vascular graft having first and second ends, and a wall

B1 4,739,762

3

surface disposed between the first and second ends, the wall surface having a *substantially uniform thickness and a plurality of slots formed therein, the slots being disposed substantially parallel to the longitudinal axis of the graft, the vascular graft having a first diameter which permits intraluminal delivery of the graft into a body passageway having a lumen and wherein the outside of the wall surface of the graft is a smooth surface when the graft has the first diameter;* and

a catheter having an expandable, inflatable portion associated therewith and including means for mounting and retaining the expandable, deformable intraluminal vascular graft on the expandable, inflatable portion,

whereby upon inflation of the expandable, inflatable portion of the catheter, the intraluminal vascular graft is expanded and deformed radially outwardly into contact with the body passageway.

40. The expandable intraluminal vascular graft of claim [13] 23, wherein tantalum is utilized for the tubular member.

41. The expandable prosthesis of claim [24] 34, wherein tantalum is utilized for the tubular member.

44. A method for implanting a balloon expandable stent prosthesis within a passageway of a coronary artery having an area of stenosis, comprising the steps of:

utilizing a thin-walled, tubular member as the stent prosthesis, the tubular member having a plurality of slots formed therein, the slots being disposed substantially parallel to the longitudinal axis of the tubular member;

disposing the stent prosthesis upon a catheter having an inflatable balloon portion;

inserting the stent prosthesis and catheter within the passageway by percutaneous catheterization;

delivering the catheter and stent prosthesis to the area of stenosis without surgically exposing the area of the passageway; and

expanding and deforming the stent prosthesis at the area of stenosis within the coronary artery passageway by expanding the inflatable balloon portion of the catheter associated with the stent prosthesis to force the stent prosthesis radially outwardly into contact with the area of stenosis in the passageway, the stent prosthesis being controllably deformed beyond its elastic limit.

45. The method of claim 44 wherein at least certain of the slots are defined by a pair of spaced apart elongate members that are connected together at one end of each of the elongate members so as to define an open ended slot.

46. The method of claim 44, wherein said tubular member includes at least one ring portion defined by circumferentially adjacent slots so as to define a plurality of peak portions and valley portions.

47. The method of claim 46, wherein said tubular member has a first end and a second end and includes one of said ring portions at said first and second ends thereof.

48. The method of claim 46, wherein the tubular member is formed from a plastically deformable material.

49. The method of claim 46, wherein the stent prosthesis after expansion has mechanical strength sufficient to provide radial support of the body passageway and prevent migration of the stent prosthesis within the body passageway.

50. The method of claim 46, wherein the tubular member has an outer wall surface and the slots formed in the outer

4

wall surface upon expansion of the tubular member define open areas of approximately eighty percent (80%) of the area of the wall surface.

51. In combination, a balloon expandable stent prosthesis for implantation in the passageway of a coronary artery having an area of stenosis and a catheter, comprising:

an expandable stent prosthesis being a thin-walled tubular member having first and second ends and a wall having an outer wall surface disposed between the first and second ends, the wall having a substantially uniform thickness and a plurality of slots formed therein, the slots being disposed substantially parallel to the longitudinal axis of the tubular member;

a catheter having an expandable, inflatable balloon portion;

the tubular member being disposed on the balloon portion of the catheter;

the tubular member having a first diameter which permits intraluminal delivery of the tubular member and the catheter into a lumen of a coronary artery having an area of stenosis and wherein the outside of the wall surface of the tubular member is a smooth surface when the tubular member has the first diameter; and

the tubular member having a second, expanded and deformed diameter upon the application from the interior of the tubular member of radially, outwardly extending force, by inflating the balloon portion of the catheter, which second diameter is variable and controlled by the amount of force applied to the tubular member, whereby the tubular member may be expanded and deformed to expand the coronary artery in the area of stenosis.

52. The combination of claim 51, wherein at least certain of the slots are defined by a pair of spaced apart elongate members that are connected together at one end of each of the elongate members so as to define an open ended slot.

53. The combination of claim 52, wherein a connecting member extends between and connects said one end of each of the elongate strut members.

54. The combination of claim 51, wherein said tubular member includes at least one ring portion defined by circumferentially adjacent slots so as to define a plurality of peak portions and valley portions.

55. The combination of claim 54, wherein said tubular member includes one of said ring portions at its first and second ends.

56. The balloon expandable stent prosthesis of claim 55, wherein the ring portions at the first and second ends are not in phase with each other.

57. The combination of claim 51, wherein the tubular member is formed of a plastically deformable material.

58. The combination of claim 51, wherein the tubular member in its second, expanded diameter has mechanical strength sufficient to provide radial support of the coronary artery and prevent migration of the tubular member from the area of stenosis.

59. The combination of claim 51, wherein the slots formed in the wall surface of the tubular member in its second, expanded diameter define open areas of approximately eighty percent (80%) of the area of the wall surface.

* * * * *

# Exhibit
# MM



**Page 1288**

```
 1                  - VOLUME F -
 2        IN THE UNITED STATES DISTRICT COURT
          IN AND FOR THE DISTRICT OF DELAWARE
 3  CORDIS CORPORATION,          CIVIL ACTION
 4        Plaintiff
 5        vs.
 6  MEDTRONIC AVE, INC., et al.    NO. 97-550 (SLR)
 7  BOSTON SCIENTIFIC             CIVIL ACTION
    CORPORATION, et al.,
 8        Plaintiffs
 9        vs.
10  ETHICON, INC., et al.,
11        Defendants            NO. 98-19 (SLR)
12  CORDIS CORPORATION,          CIVIL ACTION
13        Plaintiff
14        vs.
15  BOSTON SCIENTIFIC
16  CORPORATION, et al.,
17        Defendants            NO. 98-197 (SLR)
18                            Wilmington, Delaware
19                            Friday, December 1, 2000
                              8:05 o'clock, a.m.
20
21
22  BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
23
24                  Official Court Reporters
25
```

**Page 1289**

```
 1  APPEARANCES:
 2
 3  ASHBY & GEDDES
    BY: STEPHEN J. BALICK, ESQ.
 4
 5        -and-
 6  PATTERSON, BELNAP, WEBB & TYLER, LLP
    BY: GREGORY L. DISKANT, ESQ.
 7      EUGENE M. GELERNTER, ESQ.
        WILLIAM F. CAVANAUGH, ESQ. and
 8      MICHAEL J. TIMMONS, ESQ.
        (New York, New York)
 9
10        -and-
11
12  JOHNSON & JOHNSON
    BY: ERIC I. HARRIS, ESQ.
13
        Counsel for Plaintiffs
14
15  YOUNG, CONAWAY, STARGATT & TAYLOR
    BY: JOSY W. INGERSOLL, ESQ.
16
17        -and-
18  KENYON & KENYON
    BY: GEORGE E. BADENOCH, ESQ.
19      PAUL A. BONDOR, ESQ.
        ALBERT J. BRENEISEN, ESQ.
20      MICHAEL ZACHARY, ESQ. and
        ARTHUR GRAY, ESQ.
21      (Washington, D.C.)
22        Counsel for Defendants
23
```

**Page 1290**

```
 1
 2              P R O C E E D I N G S
 3
 4      (Proceedings commenced at 8:05 a.m., and the
 5  following occurred without the presence of the jury.)
 6
 7      THE COURT: Because we don't have a whole lot
 8  of time, I don't know that there's much disagreement about
 9  the law. I think it would be more helpful to me to get a
10  feel for what the evidence is so that I can determine
11  whether the evidence crosses the line in terms of the
12  legal underpinnings.
13      MR. DISKANT: Respectfully, your Honor, I
14  think there's great disagreement about the law, and I
15  respectfully request a few minutes to address that.
16      THE COURT: That's fine. I mean, I have the
17  law in front of me, so it will be interesting to see where
18  the disagreement lies.
19      MR. DISKANT: That's fine your Honor.
20      Their issue -- they claim that you need more
21  than knowledge of the chart, the patent and the charge of
22  infringement. They claim that we must show, or they are
23  allowed to show that they did not intend to infringe a
24  valid and enforceable patent.
25      The Arrow case is the first case on the
```

**Page 1291**

```
 1  subject. I think it unequivocally rejects their position.
 2  The Arrow case, on Page 1534, the Supreme Court said,
 3  With respect to a charge of contributory infringement,
 4  does require that the alleged contributory infringer
 5  knew of a combination for which his component that was
 6  especially designed was both patenting and infringing.
 7  They say the answer is yes.
 8      Here's the evidence they then cite. Arrow
 9  clearly had such knowledge for by letter dated January 2,
10  1954, AB informed Arrow that it held a patent, that it
11  granted a license under the patent to GM, to no one else,
12  and that it was obvious from the foregoing that Arrow
13  would be infringing.
14      Thus, the Court's interpretation of the
15  knowledge requirement of Fords Arrow, no defense. No
16  defense.
17      The Supreme Court in Arrow said that because
18  defendant knew about the patent and knew about the charge
19  of infringement, it had no defense under the knowledge
20  requirement. It did not matter whether Arrow could come
21  in and say, Well, we have a noninfringement position. It
22  did not matter whether Arrow could come in and say, we
23  have an invalidity defense. It did not matter that Arrow
24  could come in and say, we think the patent is
25  unenforceable.
```

1  Was the NIR also presented in one of the
2  papers at that meeting?
3  A. Yes. Yes, it was.
4  Q. Now, are the live cases longer than the papers?
5  A. Well, the cases -- the papers might be 15 minutes
6  and they might have a 15 or 20 minute Q&A session after
7  it, and then maybe if people are really interested,
8  they'll linger in small groups and talk some more.
9  But the prescribed time is very short,
10  because people have to get on to the next thing.
11  The live case demonstrations are a little
12  different. Now you're talking about an entire procedure,
13  so the patient is prepared and on the table and then
14  the -- the angiograms or the diagnosis is reviewed with
15  a live audience. There's a panel discussion with the
16  audience around. Sort of differential diagnosis.
17  What's wrong with this patient. What do we think?
18  What's the history? What are the different ways in which
19  this patient might be treated?
20  In fact, although the physician doing the
21  procedure doesn't really respond to it, the panel
22  moderator at the Thorax Center, who is actually
23  presenting this beamed satellite, that person will
24  actually ask the audience if they agree about the
25  diagnosis. Raise of hands, or what do they think the

1  treatment ought to be? How many think this? How many
2  think that?
3  And it's quite an extraordinary event. And
4  after all of that and everyone has had sort of a chance
5  to decide, then the physician will actually do what he
6  does and it may or may not coincide with what the group
7  thinks.
8  It's a didactic. It's a teaching exercise.
9  The intent of it is to help everyone go through the same
10  exercise together in terms of what's the problem, what
11  are the alternate ways to fix it? How do people mostly
12  think about it? And then we let the physician go and do
13  what he does and then everyone learns from that result.
14  So it's a longer -- it's a ten, twenty, thirty,
15  sometimes hour-long presentation.
16  Q. How is the stent or -- let me ask: Who selects
17  the stent that's actually used in these --
18  A. Well, that's selected by the physician doing the
19  procedure. And a physician is not going to select a
20  stent that is other than the one he thinks is exactly
21  right for the patient. This is a coronary artery. This
22  is a very sick patient. This is a very important
23  procedure. So that choice will be his alone, or hers.
24  Q. And so if you look at the program, which I believe
25  starts on Page 6 in the program there, it goes through.

1  MR. BADENOCH: Could we enlarge in the middle,
2  please, the first live cases?
3  THE WITNESS: That's an example of where the
4  live case was scheduled.
5  BY MR. BADENOCH:
6  Q. That's why the live cases don't stay what stent is
7  used in the program in advance?
8  A. Well, they also don't say what center. It could be
9  Washington, it could be Japan, it could be Rome, Milan.
10  It could be anywhere in the world.
11  And until, in fact, they know who that is,
12  it's impossible to say who it's going to be. We certainly
13  couldn't put it in this document, which goes out months
14  before.
15  So it's usually decided that day, that morning
16  of that live case.
17  Q. So what do you remember about the stent selected
18  for the live cases at this program in December of 1995?
19  A. Well, as I said earlier, we had really just done
20  our own research on the NIR, and so we were very
21  enthusiastic about it. And I went to the Thorax Center
22  because of all of the stents, all of the stents that were
23  available or to be available would be showcased there,
24  in papers and scientific sessions, et cetera. And all
25  the companies that are there and representing them have

1  booths and scientific papers. And you can go and talk
2  and meet. And I, of course, did that.
3  I was astonished to find that a very
4  overwhelming number of the live cases were done with NIR,
5  as I said. And, of course, we had nothing to do with
6  that, but it turned out to be a rather exhilirating
7  session for all of us, because it had been overwhelmingly
8  the device of choice in that particular year. And it was
9  just a NIR buzz. It was quite something. And we had
10  nothing to do with it but, of course, we were quite
11  enthusiastic about it.
12  Q. Do you think it is possible that anyone could have
13  attended that meeting and come away not knowing about the
14  NIR?
15  A. Impossible.
16  Q. And in the program, do you remember whether Tim
17  Fischell was at that meeting?
18  A. Tim was there. Dr. Fischell was there. In fact, he
19  made a presentation at the --
20  Q. Does Boston Scientific sell the NIR stent today?
21  A. Yes, we do.
22  Q. And in marketing the NIR stent today, could you
23  explain briefly, what is the role of Medinol and what is
24  the role of the Boston Scientific?
25  A. Well, Medinol is our business partner. As I said

Page 1464

1 earlier, they really are involved in the design, the
2 R&D, the manufacturing and supply of this device to
3 Boston Scientific.
4     Boston Scientific's primary role is the
5 development of the catheter delivery systems. That's
6 what we do. Mounting of the stent on the delivery system,
7 and then supplying, selling, marketing that delivery
8 system worldwide.
9     We have a collaborative, though, relationship
10 beyond that, that talks about regulatory, talks about
11 clinical and it talks about really the whole strategy of
12 the new product development activity. We do those kinds
13 of things together.
14 Q. Where are the stents, the NIR stents today actually
15 mounted on the balloons?
16 A. Medinol supplies all of the stents that they
17 manufacture to our facilities in Ireland. And then they
18 are mounted on catheters in Ireland. The great majority
19 of them are. And there's a small amount of that activity
20 going on in the United States as well.
21 Q. In addition to its use in coronaries, has the NIR
22 stent been approved by the FDA for any other applications?
23 A. Yes. It is approved for peripheral use as well.
24 Q. Is the NIR stent an important product of Boston
25 Scientific?

Page 1465

1 A. It is a very important product for our company, and
2 it is a -- a stent technology that, through all the
3 iterations of competitive activity and et cetera, we've
4 learned something we didn't know, and that was that when
5 we launched it, it was already a third- or fourth-
6 generation device, and the ones that are coming onto the
7 market today are just now beginning to demonstrate the
8 attributes that the Richters and Medinol developed into
9 the NIR stent several years ago when we launched it. It's
10 a very important device to us and it's a very valuable
11 device for physicians to have as an alternative when they
12 choose to treat patients with this disease.
13 Q. Does Boston Scientific own patents?
14 A. Yes, we do own patents.
15 Q. Approximately how many patents do you have?
16 A. Well, we have approximately, I think in the range of
17 2000 patents. We have probably a thousand patents pending
18 at any one time. And, as a matter of fact, I'm not sure
19 this is a big deal, but last year Fortune Magazine
20 reviewed technology in America and they looked at all the
21 companies that were in the business in patents and we were
22 noted as one of the top 50 prolific patenters in the
23 country in the technology sector.
24 Q. Are patents important to Boston Scientific?
25 A. Patents are very important to Boston Scientific,

Page 1466

1 and they're important in multiple ways. Maybe not
2 obvious, but historically we've always used patents not
3 really to keep others out. We have historically viewed
4 patents as creating the opportunity to preserve our
5 ability to compete. We defend what we do with patents
6 and they are extremely important to our ongoing business.
7 Q. Does Boston Scientific have any policies designed
8 to guard against infringing patent rights of others?
9 A. We have policies. I'm sure all companies do. And
10 we do. And we are trying to be very zealous and very
11 careful and mindful of the fact that when we introduce a
12 new device, that we research it very carefully to assure
13 ourselves that not only is this device safe and effective,
14 but that it does not infringe any intellectual property
15 that we're aware of at that time.
16 Q. At the time that Boston Scientific launched the
17 NIR stent, were you confident you would not be infringing
18 the rights of anyone else?
19 A. Yes, we were.
20     MR. BADENOCH: Thank you, Mr. Nicholas.
21     Your witness.
22     THE WITNESS: Thank you.
23          CROSS-EXAMINATION
24 BY MR. CAVANAUGH:
25 Q. Good afternoon, Mr. Nicholas.

Page 1467

1 A. Hello.
2 Q. We have not met before. My name is Bill Cavanaugh
3 and I represent Johnson & Johnson.
4 A. Thank you, Bill.
5 Q. Mr. Nicholas, am I correct that, back in 1986, you
6 had occasion to meet Dr. Palmaz?
7 A. I have known Dr. Palmaz longer than that.
8 Q. Okay. But in 1986, he came up to see you and your
9 group up in Massachusetts, did he not?
10 A. He came up to Boston many, many times about this
11 matter. Yes.
12 Q. Okay. And there was a time he came up in roughly
13 the mid-1980's, where he showed you his idea for a stent;
14 correct?
15 A. Put that in context. Dr. Palmaz met with a number
16 of our people at the RSNA in '84 and had many discussions.
17 And it was in, I think, late '85 that Joseph Lowe made
18 the decision that it probably made sense for Dr. Palmaz
19 and some others to come visit. And they did. They came
20 and visited me in my office.
21 Q. Okay. And he showed you his stent idea?
22 A. He talked about it. He showed it to us. He had
23 different sort of prototypes of things, cardboard tubes
24 and other things and some of the stuff I think we've
25 actually seen here today.

# Exhibit NN

## Redacted in its Entirety

# Exhibit OO

## Redacted in its Entirety