# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| CORDIS CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 97-550-SLR |
| | ) | (CONSOLIDATED) |
| MEDTRONIC VASCULAR, INC. | ) | |
| BOSTON SCIENTIFIC CORPORATION, | ) | |
| and SCIMED LIFE SYSTEMS, INC., | ) | |
| Defendants. | ) | |

|  |  |  |
|---|---|---|
| BOSTON SCIENTIFIC CORPORATION, | ) | |
| and SCIMED LIFE SYSTEMS, INC. | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 98-19-SLR |
| ETHICON, INC., | ) | |
| CORDIS CORPORATION, and | ) | |
| JOHNSON & JOHNSON | ) | |
| INTERVENTIONAL SYSTEMS CO. | ) | |
| Defendants. | ) | |

## EXHIBITS TO BOSTON SCIENTIFIC'S REPLY BRIEF
## IN SUPPORT OF ITS CROSS-MOTION
## TO DEFER FURTHER PROCEEDINGS AND FOR A NEW TRIAL

Josy W. Ingersoll (#1088)
Karen L. Pascale (#2903) [kpascale@ycst.com]
Karen E. Keller (#4489)
YOUNG CONAWAY STARGATT & TAYLOR LLP
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  302-571-6600

July 8, 2008

*Attorneys for Defendants,*
*Boston Scientific Corporation and*
*Boston Scientific Scimed, Inc.*
*(formerly Scimed Life Systems, Inc.)*

OF COUNSEL:

George E. Badenoch
Mark A. Chapman
Huiya Wu
**KENYON & KENYON LLP**
One Broadway
New York, NY  10004
(212) 425-7200

# TABLE OF EXHIBITS

Ex. PP     Excerpts from trial transcript (Cordis v. Boston Scientific) (Vol. D), dated March 22, 2005 (D.I. 1372)

Ex. QQ     Excerpts from trial transcript (Cordis v. Boston Scientific) (Vol. A), dated March 17, 2005 (D.I. 1369)

Ex. RR     Project Olive Memorandum (DTX-3168)

Ex. SS     Excerpts from trial transcript (Cordis v. Boston Scientific) (Vol. B), dated March 18, 2005 (D.I. 1370)

Ex. TT     Excerpts from trial transcript (Cordis v. Boston Scientific) (Vol. E), dated March 23, 2005 (D.I. 1373)

Ex. UU     Excerpts from trial transcript (Cordis v. Boston Scientific) (Vol. I), dated December 6, 2000 (D.I. 202)

Ex. VV     Excerpts from trial transcript (Cordis v. Boston Scientific) (Vol. C), dated March 21, 2005 (D.I. 1371)

Ex. WW     Excerpts from trial transcript (Cordis v. Boston Scientific) (Vol. P), dated December 15, 2000 (D.I. 209)

Ex. XX     Excerpts from trial transcript (Cordis v. Boston Scientific) (Vol. N), dated December 13, 2000 (D.I. 207)

Ex. YY     Excerpts from trial transcript (Cordis v. Boston Scientific) (Vol. J), dated December 7, 2000 (D.I. 203)

# Exhibit
# PP

Page 830

```
 1              - VOLUME D -
        IN THE UNITED STATES DISTRICT COURT
 2      IN AND FOR THE DISTRICT OF DELAWARE
                   - - -
 3
    CORDIS CORPORATION,      :   CIVIL ACTION
 4           Plaintiff       :
                             :
 5      vs.                  :
                             :
 6   MEDTRONIC AVE., INC., BOSTON :
     SCIENTIFIC CORPORATION and   :
 7   SCIMED LIFE SYSTEMS, INC.,   :
             Defendants      :   NO. 97-550 (SLR)
 8                           - - -
     BOSTON SCIENTIFIC CORPORATION :  CIVIL ACTION
 9   and SCIMED LIFE SYSTEMS, INC., :
             Plaintiffs      :
10                           :
                             :
11      vs.                  :
                             :
12   ETHICON, INC., CORDIS CORP. :
     and JOHNSON & JOHNSON     :
13   INTERVENTIONAL SYSTEMS CO., :
             Defendants      :   NO. 98-19 (SLR)
14                           - - - -
                             :
15   CORDIS CORPORATION,      :   CIVIL ACTION
             Plaintiff       :
16                           :
        vs.                  :
17                           :
     MEDTRONIC AVE. INC., BOSTON :
18   SCIENTIFIC CORPORATION and   :
     SCIMED LIFE SYSTEMS, INC.,   :
19           Defendants      :   NO. 98-197 (SLR)
20
                    Wilmington, Delaware
21                  Tuesday, March 22, 2005
                    9:20 o'clock, a.m.
22                        - - -
23   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
24                       Valerie J. Gunning and
                         Leonard A. Dibbs,
25                       Official Court Reporters
```

Page 831

```
 1  APPEARANCES:
 2      ASHBY & GEDDES
        BY: STEVEN J. BALICK, ESQ.
 3
 4          -and-
 5
    PATTERSON, BELKNAP, WEBB & TYLER LLP
 6  BY: GREGORY L. DISKANT, ESQ.
        EUGENE M. GELERNTER, ESQ.
 7      WILLIAM F. CAVANAUGH, JR., ESQ.,
        MICHAEL TIMMONS, ESQ. and
 8      SCOTT HOWARD, ESQ.
        (New York, New York)
 9
10          -and-
11
    JOHNSON & JOHNSON
12  BY: ERIC I. HARRIS, ESQ.
13      Counsel for Cordis Corporation
14
    YOUNG, CONAWAY, STARGATT & TAYLOR
15  BY: JOSY W. INGERSOLL, ESQ.
16
17          -and-
18  KENYON & KENYON
    BY: GEORGE BADENOCH, ESQ.,
19      MARK CHAPMAN, ESQ. and
        WALTER HANLEY, ESQ.
20      (New York, New York)
21      Counsel for Boston Scientific
        Corporation
22                  - - -
23
24
25
```

Page 832

1 
2                    P R O C E E D I N G S
3 
4          (Proceedings commenced at 9:20 a.m., and the
5  following occurred without the presence of the jury.)
6 
7          MR. DISKANT:  Good morning, your Honor.
8          THE COURT:  Good morning.
9          MR. DISKANT:  I think we've reached a
10  substantial number of agreements.
11          First, the parties have agreed on an
12  instruction to request your Honor to give at the beginning
13  of the testimony.  I will read it to you.  I've written
14  it out as neatly as I can.  I hope you can read it.  The
15  proposed curative instruction is:
16          In light of yesterday's testimony, I want to
17  instruct you that there is only one infringement issue
18  for you to decide in this case.  That is the question
19  whether the NIR stent meets the substantially uniform
20  thickness limitation of Claim 23 of the '762 patent.
21          We've then agreed that Mr. Cavanaugh will
22  ask just one question on the subject of Dr. Richter, and
23  that question will be, in substance:
24          Dr. Richter, you understand that the only
25  infringement issue in this case is whether the NIR stent

Page 833

1  meets the substantially uniform thickness limitation of
2  Claim 23.
3          He will just say yes.  He will just say yes.
4  And we will then abandon the limitations analysis.  We
5  will just start asking him questions about the
6  substantially uniform thickness limitation.  If that's
7  acceptable to your Honor, the parties have agreed on
8  that.
9          MR. BADENOCH:  That is acceptable, your
10  Honor and, of course, we assume Mr. Cavanaugh will ask
11  it in a non-confrontational tone.
12          MR. CAVANAUGH:  All of Mr. Cavanaugh's
13  questions are non-confrontational, your Honor.
14          MR. DISKANT:  He does the best he can.
15          THE COURT:  He does the best he can?
16          MR. DISKANT:  That's where we are.
17          Secondly, I made a motion yesterday morning
18  with respect to a host of demonstratives which BSC
19  purported to say Claim 13 was cancelled and put in
20  other claims and argue about other claims.
21          I think we have agreed largely on that
22  subject.  There are -- and most of the slides that I
23  object to are gone.
24          There is a slide they wish to show, the one
25  that has methods.  Here it is.

Page 834

1      A purported comparison between a method claim
2  and a device claim, which I think is --
3          THE COURT: I think I already have that one.
4          MR. DISKANT: Okay. I think that's legally
5  incorrect and shouldn't be shown to the jury.
6      I also understand that while they've abandoned
7  any effort actually to show and review other claims with
8  the jury, they still want to say there are other claims
9  in the patent that call for balloon. I don't think
10 that's fair or correct. I think it's perfectly fair to
11 say Claim 23 doesn't say a balloon. I've got no quarrel
12 with that. When they start pointing to other claims,
13 Claim 44 requires a balloon in which another jury found
14 they infringe.
15     I don't think we should be going into other
16 claims in the patent.
17         THE COURT: Mr. Badenoch?
18         MR. BADENOCH: Good morning, your Honor.
19         THE COURT: Good morning.
20         MR. BADENOCH: The idea of the demonstrative
21 that counsel handed up is to try to explain it to the
22 jury. The difference in the abstract now between a
23 product claim and a process claim, without saying at
24 that time, referring to any other Palmaz claim. In
25 other words, the slides we had that compared 23 to 51.

Page 835

1  23 not same balloon, 51 same balloon. We agree to take
2  that out. And the ones that said we compare Claim 23
3  to Claim 1 as a method in order to teach the jury that.
4  Even though, of course, the jury does have the patent,
5  I mean, we can't get away from it, and they have the
6  '665 and so on.
7      But we won't say that, but for the jury to
8  understand our argument here, and this, of course, is
9  key, the claim that is in suit is a product claim with
10 structural limitations and we want to make that vivid
11 to the jury in the abstract, and that's what that slide
12 is to do, is to say, look, the process -- the process,
13 a process claim, not referring to anyone in particular,
14 would have the steps of putting it on a balloon, inserting
15 it and so on.
16     A product claim is this device, and I think
17 that's completely fair and teaches the jury correctly
18 what the issue is.
19         THE COURT: All right. Mr. Diskant?
20         MR. DISKANT: Well, first, I don't think this
21 is correct.
22     And, secondly, I don't think it's in the
23 abstract. It obviously demonstrates the Palmaz device
24 and we have a product claim for use in a particular
25 method. This is a legal instruction from an engineer.

Page 836

1  I don't think it's correct, and I don't think it's
2  appropriate, and I don't think it's in the abstract.
3      I object to it.
4          THE COURT: All right. Well, I do have some
5  concern about an engineer talking about the difference
6  between a method claim and a device claim. I mean, it's
7  one thing to go through the language of the claim and
8  say this is the device. It's another thing to illustrate
9  this.
10             - - -
11         MR. DISKANT: Your Honor, it's just not in his
12 expert report.
13         MR. BADENOCH: The demonstratives of none of
14 the witnesses had their demonstratives in the expert report.
15         THE COURT: I guess it's the analysis between
16 a method claim and device claim.
17             - - -

Page 8

1
2          MR. BADENOCH: Your Honor, the problem with
3  that, of course, is, particularly with the patent experts
4  not testifying, Dr. Buller, you see, is giving testimony
5  about the file history and the examiner is saying none,
6  and things like that, and so we have to allow, obviously
7  these experts at this point have studied these patents
8  and file wrappers intensely with the attorneys on both
9  sides, and so what we're basically doing is giving Dr.
10 Buller some leeway to discuss a few patent concepts.
11 And we have to do the same thing with Mr. Snyder.
12         THE COURT: Right. But there's one thing,
13 there's a difference between discussing and between
14 illustrating and simplifying the illustrations to the
15 point where it is not necessarily correct and it brings
16 up issues that we more or less agree shouldn't be
17 brought up.
18     So it's the demonstrative that I'm concerned
19 about, not what your -- not with your witness saying
20 this claim covers a device. So I am happy to have
21 your witness say that, but I am not comfortable with
22 this demonstrative.
23         MR. BADENOCH: All right, your Honor. We
24 will take it out.
25     Are you saying, though, that that would be

Page 838

1 something that we could use in the argument?
2      THE COURT: Perhaps. I'm not saying that,
3 but perhaps.
4      MR. BADENOCH: All right. Thank you.
5      Your Honor, just quickly, for the record, we
6 want to move for JMOL of noninfringement because they
7 have put in no evidence that the NIR stent meets the
8 substantially uniform thickness requirement where there's
9 a proper measurement of thickness.
10      Then quickly for the record, we did file a
11 motion yesterday. We believe what has happened here,
12 the Court, of course, ruled in limine that product-by-
13 product comparisons were relevant to validity, secondary
14 considerations.
15      And then, what counsel did, starting with the
16 AVE case, to say, Okay, we won't charge copying and we
17 won't charge that your stent is part of our commercial
18 success. And, therefore, all of that stuff has to go
19 out. That was their theory, and they did it in AVE and
20 then they did it again.
21      The problem is, is that under a different
22 terminology, they really are arguing the same thing.
23 What they are arguing is, Dr. Palmaz gave birth to the
24 whole industry, that all of the stents, including yours
25 and AVE's and ACS's use a Palmaz ring. They have all

Page 839

1 used the basic Palmaz invention. And that is accusing us
2 not just of infringement of Claim 23. That's accusing us
3 of taking and appropriating Palmaz's technology, and it's
4 saying that all of the commercial success of these stents
5 are attributable to that.
6      So our position is, your Honor, that opens
7 the door for us to discuss some of this product by-product
8 and superior properties and project --
9      THE COURT: Olive. Well, Project Olive
10 stays out. I, frankly, thought that what I was hearing
11 from Dr. Richter on the stand was about everything you
12 just talked about. And, frankly, when I looked at this
13 motion on my desk last night, I thought, Oh, well, it's
14 moot, because Dr. Richter has already talked about all
15 of these things, except for this one project, which is
16 still out.
17      So it seems to me as though --
18      MR. BADENOCH: The only thing, your Honor,
19 what we tried to do with that was -- he explained the
20 design process, but other than that, the details of
21 product features, he was addressing the U's and the
22 welds, and that's a separate issue, because that really
23 is core infringement here. They are arguing that these
24 things are trivial, no consequence. They are
25 manufacturing artifacts.

Page 840

1      THE COURT: So what is it what you want to say
2 in addition?
3      MR. BADENOCH: And we need to explain that
4 they're important to the way the stent works, that this
5 is a key point how these U's stick out, how the welds
6 are stronger. I mean, counsel said in the opening, he
7 basically said, Members of the jury, let me tell you
8 their defense. It's so unbelievable, I can scarcely
9 understand it, but here's what they are saying.
10      He went on. They're saying this little U
11 and this fly spec weld and so on.
12      And we have to, of course, respond to that
13 and say, no, this little fly spec weld is crucially
14 important to the stent, and the way the U works, which
15 does come from the manufacturing method, is crucial.
16      So all of that testimony is not intended to
17 be product by-product comparison at all. It's intended
18 to address the infringement issues.
19      THE COURT: All right. Well, again, I,
20 frankly, thought that that was being covered yesterday.
21 It seemed like an awful lot of that was covered. But if
22 you are telling me that you held back and that there was
23 more, maybe I need to review Dr. Richter's direct, but
24 I thought all of that has already been --
25      MR. BADENOCH: Not from this witness, your

Page 841

1 Honor.
2      THE COURT: All right. Before I forget, I've
3 got two questions about jury instructions, because we're
4 working on them to get them out.
5      Number one, should we be referring to
6 defendants collectively as BSC or Boston Scientific?
7      MR. BADENOCH: I think, your Honor, if we
8 say Boston Scientific or B.S. -- the problem is all three
9 are mentioned in the evidence.
10      THE COURT: Right, but I only want one. I
11 mean, it's hard enough to read these instructions, so you
12 pick one and I will use it.
13      You can confer and let me know.
14      MR. BADENOCH: Okay.
15      THE COURT: But I don't want to be saying one
16 or two on three; I want to use one thing consistently
17 throughout the instructions.
18      MR. BADENOCH: Fine, your Honor.
19      THE COURT: The other thing is, is, in fact,
20 are the defendants, in fact, pursuing an anticipation
21 defense?
22      MR. BADENOCH: No, your Honor.
23      THE COURT: All right.
24      MR. BADENOCH: And what we are saying is that
25 the Ersek device is so close that the differences on a

Page 842

1  few points are trivial and obvious.
2      THE COURT: All right. Well, I'm just -- in
3  terms of jury instructions, am I supposed to be
4  contemplating an anticipation instruction or are we still
5  with obviousness?
6      MR. BADENOCH: I think the answer is
7  obviousness, your Honor.
8      THE COURT: All right.
9      MR. BADENOCH: We'll certainly check that and
10  propose something if we think there's any reason for a
11  difference.
12      THE COURT: All right. So do I need to review
13  Dr. Richter's direct to see how much further it is I am
14  going to allow you all to go?
15      MR. BADENOCH: No, your Honor. I think Dr.
16  Richter's direct is finished, unless you were to change
17  the ruling on Project Olive. But even that, I think, we
18  could put in with deposition.
19      It's mostly a case of just, I think we tried
20  to, as succinctly as we could, put the list of quotes in
21  there where we think they opened the door. The only
22  thing is we filed it yesterday, before the even more
23  egregious quotes from yesterday afternoon. But --
24      THE COURT: Well, I guess I'm still -- it's
25  not -- because I thought this was coming in through Dr.

Page 843

1  Richter, it did not occur to me that I needed to look at
2  this that closely. I guess what I don't understand is
3  how much further you want to go than what -- I mean, so
4  that's where you could be helpful to me by explaining
5  to me, and maybe I need to refer to how far the line
6  testimony went, to see where exactly you want the line
7  drawn past that.
8      MR. BADENOCH: I don't think we need to do
9  more along that line, your Honor. The main thing would
10  be we believe we've opened the door to Project Olive
11  here and that could come in, a short deposition testimony
12  at the end of the day or tomorrow morning and, therefore,
13  I don't think you need to review more testimony than that.
14      THE COURT: All right. Thank you very much.
15      Anything else before we bring our jury in?
16  -- MR. DISKANT: Just one issue. I wasn't sure
17  I asked that Mr. Badenoch not be able to have his witness
18  say there are other claims that have balloons and to
19  focus his attention on the claims in suit. I don't think
20  I heard agreement. I would appreciate it if your Honor
21  would rule on that.
22      I don't think it's appropriate to tell the
23  jury there are other claims in this patent that have
24  balloons, that draws their attention away from the
25  only correct analysis, which is what the scope of this

Page 844

1  claim is. It's perfectly fine to say this claim is a
2  device claim that doctors can review. It's perfectly
3  fine to say this claim doesn't require a balloon. But
4  I don't think comparing it to other claims is
5  appropriate.
6      MR. BADENOCH: It's not a comparison, your
7  Honor. It's only to put the thing in context. One
8  sentence. I'm sort of reminded, because I vividly
9  remember it in the Israel case and the very last
10  argument, when I had no chance to respond, I remember
11  Mr. Diskant saying to the jury, they have lots of other
12  claims, we only want you to hold this one invalid or
13  something to this effect, or these five.
14      And, you know, that kind of thing clearly is
15  unfair. But that's not what we're doing.
16      This is only to show the jury the difference
17  between a product claim and a process claim, and we
18  simply say there are other claims in the patent that
19  require a balloon. He makes one sentence. No visuals on
20  it, no specific comparisons. That was the plan.
21      MR. DISKANT: This is just a reprise of
22  there's only one claim at issue theme, which your Honor
23  has ordered them to stop doing. I don't think it's fair.
24      THE COURT: I'm having trouble hearing you,
25  Mr. Diskant.

Page 845

1      MR. DISKANT: I'm sorry. I think this is just
2  a reprise of there's only one claim in issue theme, which
3  your Honor has directed them not to do and which we've
4  asked for an instruction and final instructions on. I
5  don't think it's appropriate.
6      MR. BADENOCH: I'm sorry, your Honor. The
7  fact that there's only one claim in issue, we're not
8  going to make comparisons and we're not going to suggest
9  anything speculative about the other claims, but the jury
10  has a patent. It's got 50 claims in it. They are going
11  to read it. We have to say the only claim for you to
12  decide, the only claim in issue is Claim 23, just like
13  we have to say the only issue for you to decide is
14  substantially uniform thickness on infringement. We
15  have to say that. Otherwise, the jury does not get what
16  the issue is.
17      THE COURT: Well, I mean, that is the case,
18  there's only one claim and there's only one infringement
19  issue in connection with that claim. It seems to me as
20  though that's a fair context to put this case in.
21      MR. BADENOCH: Thank you, your Honor.
22      THE COURT: All right. Let's bring our jury
23  in.
24      Now, should I be giving this instruction right
25  away?

Page 1026

1    Did you give that testimony?
2  A. I gave that testimony.
3  Q. Thank you.
4  A. I don't think that totally characterizes the reason.
5  Q. Okay. Nobody in 1985 knew that Palmaz was the
6  inventor of the balloon expandable stent, did they?
7  A. 1985?
8  Q. Before -- before he invented -- before --
9  A. Well, that depends on what they gathered from the
10 abstract.
11 Q. That's exactly right. You've made a bunch of
12 assumptions about what is in this little abstract; right?
13 A. I don't think so, no.
14 Q. Okay. We can agree, as Dr. Palmaz has written in
15 DX-17020 that Charles Dotter first described intravascular
16 stenting at a time when percutaneous angioplasty was not
17 even introduced. Unlike Dotter, most authors of original
18 stent concepts conceived these ideas -- let me pause on
19 the first sentence.
20     Dotter invented intravascular stenting at a
21 time when percutaneous angioplasty was not introduced.
22 As a consequence, Dotter couldn't be trying the, the
23 original Dotter anyway, could not have been trying to
24 improve on angioplasty. It didn't exist; right?
25 A. I see that, yes.

Page 1027

1  Q. Okay. And then Palmaz writes, unlike Dotter, most
2  authors of original stent concepts conceived these ideas
3  as a way to overcome the limitations of balloon
4  angioplasty.
5     And that's correct; right, sir?
6  A. Well, that's what Palmaz says. I'm not going to
7  quarrel with him.
8  Q. Okay. And what that means is that all the people
9  who were working on the self-expanding stents, the coil
10 stents, the spring stents, the Z stents, were all trying
11 to overcome the limitations of balloon angioplasty;
12 right?
13     Is that true or not true or you don't know?
14 A. Palmaz says that was most people's intent in his
15 opinion, yes.
16 Q. Okay. And you gave some testimony that the Z
17 stent -- you focused on the -- actually, let me ask
18 first, we can agree that, although you interpreted the
19 paragraph, it doesn't say anything in the paragraph in
20 words about controllable expansion; right? Those words
21 aren't in the paragraph, are they?
22 A. No. I think -- I mean, I think if you really look
23 at this carefully and try to replicate what he describes,
24 you're going to come upon it. But he doesn't say it
25 explicitly.

Page 1028

1  Q. He also doesn't say anything about a plastic
2  deformation in the paragraph, does he?
3  A. I think --
4  Q. Doctor, please answer my question.
5  A. He doesn't say explicitly.
6  Q. Does he say anything about a wall surface of
7  substantially uniform thickness? Yes or no?
8  A. No.
9  Q. Yes or no?
10 A. No. He describes a wall surface of not uniform
11 thickness.
12 Q. And he doesn't say anything about longitudinal
13 slots, does he?
14 A. Not directly. Again, if you --
15 Q. Doctor --
16 A. -- follow what he says, you'd see it.
17 Q. He doesn't say -- it doesn't say anything about
18 smooth surface; right? Does it?
19 A. No.
20 Q. Okay. Now, you've testified that -- you focused
21 on one sentence here and said the dilatation and
22 simultaneous placement and you said the Gianturco Z
23 stent wasn't strong enough to do that.
24     Did I hear you give that testimony? Yes or
25 no?

Page 1029

1  A. I said -- what I said was that it wasn't strong
2  enough to break plaque without being so strong that it
3  would injure the vessel. That's what I said.
4  Q. Yes, because the truth is, Doctor, that the
5  expansile force of assessment stent design can be
6  increased dramatically simply by shortening the length
7  of the zig-zag pattern. Is that true or not? Please.
8  Can you answer?
9  A. That's true, but --
10 Q. Thank you.
11 A. -- it would then be inappropriate for use.
12 Q. That's exactly right. The question is you've got
13 to find the right expansile force so it explodes with
14 enough pressure to expand the vessel, but not so much
15 that it injuries the body. Isn't that the problem with
16 the Z stents? Yes or no?
17 A. I don't think the Z stents are used that way or
18 intended to be used that way.
19 Q. Beyond the Z stents, I didn't notice you talking
20 about Dotter's later memory metal coil, not that there's
21 prior art, which was simultaneously placed and expanded
22 to expand a lesion; isn't that true, sir?
23 A. I didn't bother with that because Dr. Palmaz said
24 that his device was stainless steel and there is no such
25 thing as stainless steel memory metal.

Page 1030

1  Q.  Okay.  Let's just assume with me, just for purposes
2  of moving this along, that the description is a tad
3  obscure to the ordinary person.  Okay?
4  A.  What description is that?
5  Q.  The description in the one paragraph in the program
6  for the radiology meeting.  Okay?
7  A.  Okay.
8  Q.  Okay.  Let's talk about Ersek.
9        You have read the Ersek patent more than once.
10  Is that fair?
11  A.  I've read it through, sure.
12  Q.  Sure.
13        We can agree that the Ersek design was a
14  fixation device for use during surgery; is that right?
15  A.  Correct.  His intended use was during surgery.
16  Q.  Okay.  And surgery, of course, is the procedure in
17  which the body cavity is opened and a conventional
18  operation ensues; right?
19  A.  You've described conventional open surgery.
20  Q.  Okay.  And we can agree that that is exactly what
21  Dr. Palmaz was trying to avoid; correct?
22  A.  That's correct.
23  Q.  Okay.  And, in particular, what Ersek was interested
24  in was replacing stitches.  Is that fair?
25  A.  Again, you're -- you're confusing process with

Page 1031

1  product, I think.
2  Q.  Doctor, I'm asking you about the Ersek patent.  Can
3  I ask you about that?
4  A.  He's talking about making connection.  That is
5  conventionally done with stitches.
6  Q.  Okay.  In stitching, a needle and thread goes
7  through the body tissue and the surgeon, during an open
8  procedure, stitches together whatever he is stitching
9  together; right?
10  A.  Correct.
11  Q.  And Ersek thought that that took a long time and
12  his fixation sleeve would be faster and better; right?
13  A.  I think he only claims faster.
14  Q.  Okay.  You're right.
15        And, of course, the Ersek fixation sleeve was
16  never used or made commercially; is that correct?  Never
17  made commercially; is that true?
18  A.  That's true.  The --
19  Q.  Thank you.
20  A.  I don't know if the Palmaz version was ever
21  commercial.  I don't think so.
22        There are devices of this kind today.
23  Q.  Well, what there are are surgical clip appliers
24  have replaced stitches in many uses; is that true?
25  A.  That's different from this.

Page 1032

1  Q.  Doctor, is it true that surgical clip appliers have
2  replaced stitches in many uses?
3  A.  In some applications.
4  Q.  Okay.  Doctor, please let me ask my questions.
5  A.  No.
6        MR. DISKANT:  Your Honor --
7        THE WITNESS:  I need to change my answer
8  because a clip applier is different.  Clip appliers are
9  not replacements for stitches ordinarily.
10  BY MR. DISKANT:
11  Q.  A clip applier, a gun-like device has a row of
12  staples, and the surgeon, instead of stitching, uses the
13  clips that are between little jaws and the clip applier
14  goes squeeze and squeezes the staple shut during the
15  surgical procedure; isn't that how it works?
16  A.  No.  That's wrong.  You're mixing up what surgeons
17  call clips and clip appliers, which are used to occlude
18  vessels that you've cut and just want to seal off.
19  You're confusing them with staplers, which are used to
20  join two pieces together.
21  Q.  Okay.  Let's agree on terminology, then.  You want
22  to call these staples.
23        Surgical staplers are used instead of
24  stitching, a device in which little staples go between
25  the jaws and are clipped, staple things together or clip

Page 1033

1  them together as a replacement for sutures; correct?
2  A.  They kind of pinched them together instead of
3  passing thread through.
4  Q.  Okay.
5  A.  Correct.
6  Q.  And that's the art form in which Ersek is trying to
7  come up with an idea; right?  Replacing stitching; correct?
8  True or false?
9  A.  Right.  He's not making staples.  He's replacing
10  stitches.
11  Q.  Okay.  And you gave some testimony about expanded
12  metal.  And you put a brochure of some expanded metal
13  into evidence.  Do you remember that?
14  A.  Yes.
15  Q.  The truth is, there's all kinds of grades and kinds
16  of expanded metal; right?
17  A.  Yes.
18  Q.  Okay.  And so the important thing -- first of all,
19  let's just make sure we all understand what expanded
20  metal looks like and this is the kind of expanded metal
21  you might get at the hardware store, but it's big so
22  everyone can see it.
23        PX-7686.
24        Would you agree that this is a conventional;
25  piece of expanded metal (handing exhibit to the witness)?

Page 1062

1 A. Yes. A stent made by the teachings of Ersek, right.
2 Q. And so that we're clear, the experiment was the
3 idea of BSC lawyers, not you; right?
4 A. They thought it would be appropriate to test the
5 workability.
6 Q. Sure.
7 A. Yes.
8 Q. So one of counsel told you that this model has
9 been made and you went and observed it; right?
10 A. I observed the construction of the stents.
11 Q. Right. You didn't make it. The BSC engineers made
12 it; right?
13 A. I don't remember if I helped line those joints up.
14 Q. Okay. Maybe.
15     And the stents that you made based on
16 expanded metal, after they were made, they were crimped
17 on a balloon and flattened?
18 A. They were pushed down on a balloon and --
19 Q. Doctor, they were flattened; is that right? Yes
20 or no?
21 A. You're -- you're characterizing it as an intent.
22 What we found was that when we crimped it, they smashed
23 down.
24 Q. Doctor, Doctor, reduction on the mandrel resulted
25 in substantial flattening, particularly in the bond

Page 1063

1 areas; correct?
2 A. Right.
3 Q. Thank you.
4 A. It resulted in flattening. It's not that it was
5 set out to flatten them.
6 Q. Of course, flattening is the opposite of what
7 Ersek talks about as preferred; right?
8 A. It's --
9 Q. Is it or is it not?
10 A. It's different from the preference.
11 Q. Okay. And, indeed, the Patent Office, when it
12 considered this question, included that the bridge of
13 the expanded metal has a thickness twice as great as
14 the strand. The outside of the Ersek device is a
15 multitude of these obstacles, making it rough rather
16 than smooth. And, further, making the outside of the
17 Ersek device smooth rather than rough would be contrary
18 to the teachings of Ersek, since the rough surface
19 formed by narrow outwardly projecting edges is intended
20 to imbed itself into the tissue wall upon expansion.
21     That's what the Patent Office concluded; is
22 that correct, sir?
23 A. This is --
24 Q. Doctor, Doctor, is that what the Patent Office, the
25 United States -- of the United States concluded? Yes or

Page 1064

1 no? It's not a trick question.
2 A. Yes.
3 Q. Thank you.
4 A. As a result of Dr. Andros' declaration that the
5 examiner is not at liberty to ignore.
6 Q. Right. And Dr. Andros' declaration was
7 substantially identical to the testimony of Dr. Buller
8 in this courtroom, wasn't it?
9 A. All I heard was Dr. Buller saying he agreed.
10 Q. Okay. Let's talk about what Ersek said he was
11 doing. One of the things, and the impact of what he said
12 he was doing on one of ordinary skill.
13     Ersek had essentially two specific disclosures
14 in his patent. We just looked at them. One was to
15 implant a heart valve; correct?
16 A. Right. One was the valve.
17 Q. And there was a design from 1970 or thereabouts;
18 right?
19 A. Right.
20 Q. And you are familiar in your professional life
21 with heart valves; right?
22 A. Yes.
23 Q. You've published on the subject; right?
24 A. A long time ago, yes.
25 Q. Some from the eighties and nineties. You published

Page 1065

1 as recently as 1998, you've written on the dynamics of
2 prosthetic heart valves; right?
3 A. Yes. I helped somebody with instrumentation.
4 Q. It's on your C.V.
5     Now, after Ersek did his work, but before
6 the Palmaz invention, there was a very significant event
7 in the heart valve industry that had a profound effect
8 on all implantable medical devices. The Shiley failure;
9 right?
10 A. It had a big effect on how the FDA considers
11 medical devices.
12 Q. Right.
13     And Dr. Palmaz has even written about it.
14 This is DX-15020.
15     What he wrote was the mechanical performance
16 of an implanted device must also be evaluated carefully
17 under chronic exposure to a certain workload. Concern
18 about the long-term endurance of modern cardiac valves.
19 That's a heart valve; right? Cardiac valve means a
20 heart valve?
21 A. Yes.
22 Q. Concern over the long-term endurance of modern
23 cardiac valves underscores the importance of this
24 subject, he wrote. As the strut, as with the struts
25 of a cardiac valve, Dr. Palmaz wrote, a stent implanted

Page 1066

1  in an artery of a middle-aged patient must endure 1.5
2  to 2 billion pulsations and still perform without
3  failure.
4        You agree with that, don't you?
5  A. What --
6  Q. Doctor, do you agree with that or no? Yes or no?
7  A. I agree with it, but I understand that the valve
8  was made up of entirely different material than is
9  ever contemplated for a stent.
10  Q. Okay.
11  A. So I don't see the relevance.
12  Q. Okay.
13  A. I don't share Dr. Palmaz's reading --
14  Q. I understand, but you didn't invent the balloon
15  expandable stent either, did you? I withdraw that
16  question. I apologize.
17        Let's just talk about the Shiley story, so
18  the jury understands. You probably teach your students
19  about it, don't you?
20  A. I don't cover that.
21  Q. Someone else covers Shiley in your course
22  materials? Got to be taught; right?
23  A. We -- whether we do regulatory, we cover current
24  regulatory practices that people have to know about.
25  Q. The Shiley heart valve was first introduced in the

Page 1067

1  late 1970's and it was hailed as an advance in
2  mechanical heart prosthetics; is that right?
3  A. It may have been. It was one of many, became
4  relatively popular.
5  Q. It became notable when it killed more people than
6  any device in modern medical history. Is that fair?
7  A. Certain sizes of the valves, the largest two sizes,
8  occasionally broke. Unfortunately, by that time, there
9  were -- they were in a lot of people. When they failed,
10  a lot of people died.
11  Q. Basically, what you are talking about is inside
12  the beating heart there's a lot of stress on a
13  mechanical device; right?
14  A. Right. Shiley had chosen for the device for
15  particularly brittle material called Stellite, which
16  was subject to stress failure.
17  Q. Sure. And between 1979 and 1983, the struts that
18  held the valve in place fractured in 73 people, most of
19  whom died. Is that fair?
20  A. I don't remember the numbers, but that sounds --
21  Q. Okay. Of the 86,000 patients who received the
22  device during its total time on the market, 400 died.
23  Is that fair?
24  A. You said there were 76 strut fractures?
25  Q. No. Between '79 and '83. 400 comes from the FDA

Page 1068

1  website. Will you accept that?
2  A. Are you saying 400 died due to strut --
3  Q. Yes. Between '79 and '83. Now I'm talking about
4  the entire 86,000 patients who had it during its entire
5  time on the market through 1986.
6  A. If you are representing there were 400 strut
7  fractures, I believe that.
8  Q. Okay. Another 200 survived, but only after
9  emergency open-heart surgery, they survived fractures.
10  Is that fair?
11  A. That's what would happen.
12  Q. You don't disagree with me that the Shiley heart
13  valve has killed more people than any other medical
14  device in history?
15  A. That may be true.
16  Q. Between 1979 and 1985 --
17  A. I -- I -- I don't know if that's true.
18  Q. Okay.
19  A. I think you'd have to qualify that by saying --
20  Q. Do you know Dr. Henry Peeler?
21        THE COURT: Mr. Diskant, you do need to let
22  the witness complete his response.
23        MR. DISKANT: I'm sorry.
24        THE WITNESS: That's a pretty broad
25  statement and, unfortunately, there are failures of

Page 10

1  medical devices.
2  BY MR. DISKANT:
3  Q. Okay.
4  A. And if you are including ventilators that fail and
5  heart/lung machines and oxygenators and all of these
6  devices, I don't know. If you are saying implantable
7  medical devices, I think that would be true.
8  Q. Okay. That's fair.
9        Between 1979 and 1985, Shiley sent a series
10  of letters to the medical community about the fractures.
11  Is that fair?
12  A. I wasn't there, but I suppose that would have been
13  the case.
14  Q. And during those years, it was twice withdrawn for
15  fears about its safety and then put back on the market.
16  Is that true?
17  A. I don't recall that one way or the other.
18  Q. October 1985, Shiley finally ceased producing its
19  larger-sized valves. Is that fair?
20  A. That's 29 and 31.
21  Q. Yes. In 1986, the FDA finally demanded the removal
22  of the device from the market. Is that fair?
23  A. I will take your representation.
24  Q. Okay.
25  A. Sounds right.

Page 1070

1  Q. Is it fair to say, Doctor, that the Shiley failure
2  had a profound effect on scientists who were thinking
3  about putting metal in the coronary arteries in the
4  mid-1980s?
5        Yes or no?
6            - - -
7  A. No. It had a profound effect on people's design,
8  treatment of materials, selection of material, quality
9  assurance, depth of testing that goes into regulatory,
10 but it had no effect whatsoever on contemplation of
11 putting metal in vessels.
12           - - -
13
14
15  .
16
17
18
19
20
21
22
23
24
25

Page 1071

1
2  A. (Continuing) Every other heart valve on the market
3  that was a mechanical valve had a metal rings.
4  Q. You remember, Doctor, that one of the people that
5  Dr. Palmaz went to to try to interest them in his slotted
6  tube balloon expandable stent was Shiley?
7  A. Right. A little off base for them, but, yeah.
8  Q. I'm sorry. Shiley, February 1983, right in the
9  middle of the problem. True?
10 A. Right. So he's asking a company kind of on its
11 heels to invest a lot of money.
12 Q. Right. Here's what Shiley said in 1983: It is
13 apparent that your concept provides a unique method for
14 mechanically arresting the inherent elastic recoil of
15 vessels subjected to PTA. But the disadvantage would be
16 the necessity of leaving a prosthetic material in place
17 following the procedure. We feel this disadvantage
18 would outweigh the possible advantages of the advice and
19 have therefore decided not to pursue your concept,
20 Shiley wrote; right?
21 A. Well, yes. Their concern, as has been discussed,
22 was that the device would thrombus.
23 Q. Sure.
24 A. Nothing to do with fracture.
25 Q. Okay.

Page 1072

1  A. Doesn't say anything.
2  Q. You're sure in 1985 it would have been obvious to
3  take Ersek and make it little and make it smooth and make
4  it small and put it on a balloon and leave it in someone's
5  heart? Is that your testimony?
6  A. None of that is in Claim 23, so I didn't give an
7  opinion on that.
8  Q. Okay. Lastly, sir, you were required to consider
9  our so-called secondary factors; correct?
10 A. Yes.
11 Q. And you gave some testimony about that today; right?
12 A. Yes.
13 Q. At your deposition you testified you didn't recall
14 any secondary considerations that you had actually
15 reviewed. Is that fair?
16 A. That's not exactly true, no.
17 Q. And you didn't consider any commercial success or
18 any long-felt need or any recognition by the industry
19 or licenses at your deposition; is that fair?
20 A. I think those were aspects of secondary factors
21 that I said I had not considered, yes.
22 Q. Okay. Let me show you 7608, which I've marked
23 for identification (handing exhibit to the witness).
24       And we're talking about Claim 23, the claim
25 that requires a tubular member with longitudinal slots

Page 1073

1  and a first diameter for intraluminal delivery and a
2  second expandable and controllable diameter. Okay?
3  That's what my question is about.
4       We can agree that Claim 23 describes the
5  Palmaz stent that Dr. Palmaz designed; correct?
6  A. It describes this tube, yes.
7  Q. Describes the Palmaz stent that Dr. Palmaz
8  described that was sold commercially by Johnson & Johnson.
9  True?
10 A. Commercially, the tube was not sold by itself. It
11 was sold on a balloon in the hundreds, as far as I know.
12 Q. Talking about the Palmaz stent that Johnson &
13 Johnson packaged on a catheter in an angioplasty balloon
14 and sold in America as the Palmaz peripheral stent;
15 right?
16 A. Yes. Stent 1 balloon.
17 Q. Did you consider in your obviousness analysis the
18 report that the historic Palmaz stent was displayed at
19 the Smithsonian?
20 A. No. It's a wonderful testament to somebody who
21 worked so hard.
22 Q. It's just a testament to his enthusiasm. Is that
23 fair?
24 A. Enthusiasm, hard work, refusal to give up, yeah.
25 Q. Okay. Did you consider the world's most successful

# Exhibit QQ

Jury Trial – Volume A                CondenseIt™                Thursday, March 17, 2005

Page 1

```
1          - VOLUME A -
             IN THE UNITED STATES DISTRICT COURT
2          IN AND FOR THE DISTRICT OF DELAWARE
                      - - -
3
   CORDIS CORPORATION,            :    CIVIL ACTION
4          Plaintiff              :
                                  :
5          vs.                    :
                                  :
6  MEDTRONIC AVE, INC., BOSTON    :
   SCIENTIFIC CORPORATION and     :
7  SCIMED LIFE SYSTEMS, INC.,     :
          Defendants              :    NO. 97-550 (SLR)
8              - - - - - - -
   BOSTON SCIENTIFIC CORPORATION  :    CIVIL ACTION
9  and SCIMED LIFE SYSTEMS, INC., :
          Plaintiffs              :
10                                :
                                  :
11         vs.                    :
                                  :
12 ETHICON, INC., CORDIS CORP.    :
   and JOHNSON & JOHNSON          :
13 INTERVENTIONAL SYSTEMS CO.,    :
          Defendants              :    NO. 98-19 (SLR)
14             - - - - -
15 CORDIS CORPORATION,            :    CIVIL ACTION
          Plaintiff              :
16                                :
          vs.                    :
17                                :
   MEDTRONIC AVE, INC., BOSTON    :
18 SCIENTIFIC CORPORATION and     :
   SCIMED LIFE SYSTEMS, INC.,     :
19        Defendants              :    NO. 98-197 (SLR)
20                        Wilmington, Delaware
                          Thursday, March 17, 2005
21                        9:35 o'clock, a.m.
22
23 BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
24                        Valerie J. Gunning and
                          Leonard A. Dibbs,
25                        Official Court Reporters
```

Page 2

```
1  APPEARANCES:
2      ASHBY & GEDDES
       BY: STEVEN J. BALICK, ESQ.
3
4          -and-
5
   PATTERSON, BELKNAP, WEBB & TYLER LLP
6      BY: GREGORY L. DISKANT, ESQ.,
           EUGENE M. GELERNTER, ESQ.,
7          WILLIAM F. CAVANAUGH, JR., ESQ.,
           MICHAEL TIMMONS, ESQ. and
8          SCOTT HOWARD, ESQ.
           (New York, New York)
9
10         -and-
11
   JOHNSON & JOHNSON
12     BY: ERIC I. HARRIS, ESQ.
13         Counsel for Cordis Corporation
14
   YOUNG, CONAWAY, STARGATT & TAYLOR
15     BY: JOSY W. INGERSOLL, ESQ.
16
17         -and-
18 KENYON & KENYON
       BY: GEORGE BADENOCH, ESQ.,
19         MARK CHAPMAN, ESQ. and
           WALTER HANLEY, ESQ.
20         (New York, New York)
21         Counsel for Boston Scientific
           Corporation
22
23              - - -
24
25
```

Page 3

```
1                      -
2              P R O C E E D I N G S
3
4       (Proceedings commenced at 9:35 a.m.)
5
6       THE COURT: Good morning, counsel.
7       (Counsel respond "Good morning, your Honor.")
8       THE COURT: Deja vu all over again.
9       We see jurors in the back.  So, as soon as
10 they're kind of gathered, we'll bring them in.  I
11 understand that there are no issues, problems before
12 jury selection, so we'll just go forward.
13      MR. BADENOCH: Your Honor, one --
14      THE COURT: Yes?
15      MR. BADENOCH: -- noncontroversial on the
16 voir dire.  Albert Brenneisen is not here.  Walt Hanley
17 is.  So on Page 6, when you read counsel...
18      THE COURT: Well, I don't generally read.
19 They have the list.  So I can add that name.
20      Let me just make sure I have it right.
21 H-a-n-l-e-y?
22      MR. HANLEY: Correct, your Honor.
23      THE COURT: All right.
24      (At this point the prospective jurors were
25 brought into the courtroom.)
```

Page 4

```
1       THE COURT: Good morning, ladies and gentlemen.
2  I'm Judge Robinson and I will be presiding over a trial
3  for which a jury is about to be drawn in the case
4  captioned Cordis Corporation versus Boston Scientific
5  Corporation, et al.  Briefly stated, this is a patent
6  action, arising under the patent laws of the United
7  States, involving stents, which are medical devices
8  implanted in arteries.
9       The trial will last five days.  I time my
10 trials so the attorneys have to complete their trial
11 presentations within these limits.  However, jury
12 deliberations may require you to be present longer than
13 five days.
14      Our trial days will run approximately from
15 9:30 a.m. to 4:30 p.m.
16      In light of this brief summary, I'm going to
17 ask you certain questions, the purpose of which is to,
18 one, enable the Court to determine whether any prospective
19 juror should be excused for cause and, two, to enable
20 counsel for the parties to exercise their individual
21 judgment with respect to peremptory challenges, that is
22 challenges for which no reason need be given by counsel.
23      If any of you answer any question yes, please
24 stand up and, upon being recognized by the Court, state
25 your juror number.
```

Page 189

1 that I have no opinion about that because I am not
2 here to testify and not an expert on Claim 23.
3 Q. Okay. You also testified during your direct
4 testimony about the BX Velocity stent?
5 A. Yes.
6 Q. Which you and your family designed or helped
7 design?
8 A. Yes.
9 Q. Okay. And that was a very successful stent;
10 right?
11 A. Yes.
12 Q. And do you agree with me that the BX Velocity
13 stent is more flexible than the Palmaz/Schatz stent was?
14 A. I think that the BX Velocity is, you know, sort
15 of a third-generation stent. Stents got better. We all
16 used Dr. Palmaz's basic invention and, as smart people
17 hopefully will do, I'm not sure I'm one, but smart
18 people will improve upon what a pioneer does and make
19 them better. We're still not driving model T's. We're
20 driving better cars than that. But Henry Ford still
21 invented the internal combustion engine. I think we
22 should keep that in mind. People improve what Dr.
23 Palmaz invented, which is pioneering. That does not
24 mean that what he invented is not incredibly valuable
25 and actually, as I showed, that Palmaz slot is still

Page 190

1 in the BX Velocity, that critical building block. That
2 was the critical invention.
3 Q. I think you went a little beyond my question,
4 which is: Is the BX Velocity stent more --
5 A. Yes.
6 Q. Is it more flexible and easier to deliver than the
7 Palmaz/Schatz stent?
8 A. Yes.
9 Q. And therefore, do you agree with me that at least
10 part of the success of the BX Velocity stent in the
11 marketplace had to do with the fact that it was more
12 flexible and easier to deliver than the Palmaz/Schatz?
13 A. Yes.
14 A. We improved upon the Palmaz/Schatz design, made
15 it more flexible. That allowed it to be more deliverable
16 and improved on its success.
17 Q. I want to talk about the Cipher stent next, which
18 as I understand it is a BX Velocity stent that's got a
19 drug coating on it?
20 A. That's correct.
21 Q. So the structure is the same? The structure of the
22 stent?
23 A. As the BX Velocity?
24 Q. Yes.
25 A. Yes.

Page 191

1 Q. Okay. So I assume that it also is more flexible
2 and easier to deliver than the Palmaz/Schatz stent for
3 the same reasons you just gave?
4 A. Yes.
5 Q. Okay. And it has this additional feature, which is
6 the drug coating; correct?
7 A. Yes.
8 Q. And that, as I understand it, releases a drug after
9 the stent is implanted to prevent or retard the tissue
10 growth that causes restenosis?
11 A. Yes.
12 Q. Okay. And as a result, isn't it true that the
13 Cipher stent has much lower restenosis rates than the
14 bare metal BX Velocity stent?
15 A. Has much lower restenosis than any bare metal
16 stent in the history of the world. Really low and the
17 drug is very effective.
18 Q. So do you agree with me, then, that the success of
19 the Cipher stent is overwhelmingly due to the drug
20 coating which lowers restenosis?
21 A. There's no question that drug-eluting stents have
22 become very successful because, you know, it's probably
23 the next big stent. But in some ways continued
24 evolution, again, you know, now we have a V12 instead of
25 a V4 engine.

Page 192

1      It's still a better balloon expandable
2 stent. You know, we put a drug on it now. Some day
3 we'll do other things to make it even better. But it's
4 still all leveraging off of Dr. Palmaz's slotted design.
5 Q. But I think there was a yes in there, but don't
6 you -- do you agree with me that the success of the BX
7 Velocity -- I'm sorry. The success of the Cipher stent
8 as compared to the success of the BX Velocity stent has
9 to do with the reduced restenosis rates that you get
10 with the drug coating?
11 A. Yes, that has really helped with the success and
12 the widespread acceptance of that stent.
13 Q. Okay. And, again, Dr. Palmaz did not make that
14 contribution; correct?
15 A. That's correct.
16 Q. Okay. I think during your direct testimony that
17 you just testified that the standard of care today is a
18 balloon expandable stent. Is that what you testified to?
19 A. For the treatment of an obstructive or coronary
20 artery that's causing problems, the standard of care
21 today in my opinion is the treatment with not only a
22 stent, drug balloon expandable stent.
23 Q. Isn't the standard of care today really the use
24 of a drug-eluting balloon expandable stent?
25 A. My opinion, they're better than the bare metal

Page 193

1  stents and that has become the standard of care, using
2  a balloon expandable drug-eluting stents.
3  Q.  Okay.  You also testified during your direct
4  testimony about the Stress and Benestent clinical trials
5  that were published in 1994?
6  A.  Correct.
7  Q.  And I think you also testified about how before
8  those results were published, the medical community was
9  somewhat skeptical about the idea of stents?
10  A.  Yes.  I didn't say much about that during my
11  direct testimony, but I think that's true.  That is,
12  there was a lot of skepticism about putting a piece of
13  metal inside an artery, a thought that it would cause a
14  very high rate of clotting that would be unacceptable
15  and that it would be too dangerous.
16  Q.  So the skepticism was due to the fact that people
17  were concerned about leaving metal in an artery,
18  exposing it to the blood, and that would cause a blood
19  clot; right?
20  A.  And that really came out of the self-expanding
21  stent trials that preceded Stress and Benestent with the
22  Snyder stent, which had a very high rate of stent
23  clotting.  Once we put it on the balloon and expanded
24  it properly into the wall, the rate of clotting became
25  acceptable.  So once again, the concept of balloon

Page 194

1  expansion of the stent not only improved the deployment,
2  made bigger holes, prevented the reblockage, but also
3  improved the safety of the device, it appeared.
4  Q.  But weren't people skeptical about using balloon
5  expandable stents, not just self-expanding stents, but
6  balloon expandable stents in arteries?
7  A.  They were until the Stress and Benestent trial
8  proved that balloon expansion of a deformable piece of
9  steel into the wall was a good idea.  Until then, people
10  did not think it was a good idea.  And that in large part
11  was due to very bad experiences with self-expanding stents.
12  Q.  But Stress and Benestent did not overcome the
13  problem of thrombosis, did it?
14  A.  We still have not overcome the problem of
15  thrombosis.  The most recent drug-eluting trial stent
16  with thrombosis, 2 percent had clotted the Taxus stent.
17  Q.  The problem with thrombosis is as bad today as it
18  was in 1994?
19  A.  Almost as bad with the Taxus stent.  Not as bad
20  with Johnson & Johnson.
21  Q.  At the time because of this concern about
22  thrombosis, isn't it true that stent patients had to
23  receive very, very aggressive anticoagulation drugs?
24  A.  They had to receive Coumadin and aspirin and
25  Persantin, typically.  Those are three drugs.  Coumadin

Page 195

1  is given to about four million Americans every year.
2  It's one of the most widely prescribed drugs in the
3  United States.  And, yes, you could call it aggressive.
4  It was used for a month or two.
5        And that, with aspirin, which is continued
6  indefinitely for everyone has coronary artery disease
7  essentially.  So it was somewhat aggressive and some
8  people had bleeding, but that combination was reasonably
9  effective in reducing the stent clotting.
10  Q.  But as a result of the drugs, I think you alluded
11  to this in your answer, didn't that cause a lot of
12  bleeding and vascular complications in patients who
13  received stents and patients who received balloon
14  angioplasty didn't have to receive those drugs, so they
15  didn't suffer those complications?
16  A.  In the early days of stenting, back in 1994/95,
17  before we began to optimize some of those regimens, and
18  had better drugs and better regimens for deploying
19  stents, we had higher bleeding rates in the stent
20  patients than we had in balloon patients.  Most of
21  those were minor bleeding in the leg but, yes, that
22  was one of the original problems with pretty aggressive
23  blood thinning at the time the stent was put in in 1994.
24  Q.  And as a result of that, didn't people who
25  received stents at that time tend to have to stay in

Page 196

1  the hospital longer than people who just received
2  balloon angioplasty?
3  A.  In general, they would stay in two or three days
4  because they had to get on the Coumadin, and that takes
5  about three days to really kick in for the blood thing
6  of the Coumadin to work.  So we'd usually keep them in
7  the hospital for two or three days while the blood thing
8  was coming into effect to make sure they were safe and
9  that their stent stayed open.
10  Q.  And isn't it true that that problem was only
11  solved after Stress and Benestent by Dr. Columbo?
12  A.  I would say that Dr. Columbo, who, you know, he
13  made the observation that using higher pressure to
14  stretch the stent into the wall allowed you to have a
15  lower risk of stent clotting, and also then better
16  drugs came along.  The combination of those two things
17  allowed us to begin to back off on the blood thing and
18  discharge patients the next morning, which is what we
19  do today.
20  Q.  And so Dr. Columbo's contribution was to show that
21  if you used high-pressure balloons to expand the stent
22  more fully into the wall, the thrombosis problem
23  wouldn't happen in the first place, so you didn't need to
24  use the harsh drugs; right?
25  A.  He showed that it was important to stretch the

Page 197

1 Palmaz stent into the wall firmly. That was an
2 important observation that Dr. Columbo made and it
3 helped us. We learned that when the stent wasn't
4 totally touching the wall, that was one of the predictors
5 of stent clotting, and whether we were taught by Dr.
6 Columbo that pushing it into the wall a little harder
7 made the stent clotting rate lower, we then were able
8 to back off a little bit on the blood thinners and still
9 have very good results.
10 Q. And once you backed off the blood thinners, the
11 vascular and bleeding complications were reduced and the
12 hospital stays got shorter; right?
13 A. Everything got better. The evolution, like most
14 medical technologies, is we evolved it. Smart people
15 made contributions in how to further improve the
16 treatment and we did. We got better at it, better at
17 putting them in. We eventually got maybe a little bit
18 better stents, a little easier to deliver, as you
19 suggested.
20         And this was, don't forget, ten years ago we
21 had this, and medical progress is swift.
22 Q. And this advance and contribution that you just
23 described was Dr. Columbo's continue contribution, not
24 Dr. Palmaz's contribution; is that right?
25 A. He couldn't have done it without Dr. Palmaz's

Page 198

1 stent because that was the one he used to do his studies.
2 But, yes, he made an observation with Dr. Palmaz's stent
3 and figured out some ways to put them in better than we
4 did in Stress and Benestent. You know, he improved upon
5 our ability to put the stents in properly.
6 Q. I want to go back to the Palmaz/Schatz stent when
7 it was launched in 1994. In 1994 until 1997, didn't
8 Cordis essentially have the coronary market to itself
9 because the Palmaz/Schatz stent was the only stent
10 approved for general use?
11 A. I don't remember the exact dates, but something
12 like that time frame. The only -- there was one other
13 stent on the market at the time, which was a coil
14 stent, which didn't have the features that Dr. Palmaz
15 invented, and that, the Cook stent had very bad
16 long-term results. So it really took that strong, you
17 know, expandable slot to give the kind of results that
18 we saw in Stress and Benestent.
19         So the other stent on the market from Cook,
20 which was available, was pretty quickly recognized as
21 not having the beneficial effect that Dr. Palmaz's
22 stent had.
23         So because of that, even though there were
24 two stents in the market, everyone was pretty much using
25 the Palmaz, because it was the best stent.

Page 199

1 Q. Well, the other stent you're referring to, the one
2 by Gianturco, that wasn't approved for general use, was
3 it?
4 A. It was approved for coronary use. It was supposed
5 to be used if you got a bad balloon result. Of course,
6 as already suggested, on label. Off label use does not
7 stop doctors if they think they have better advice,
8 they'll use it.
9         So the doctors voted by using the Palmaz,
10 having both available on the shelves. If they really
11 thought that the Cook stent was better, they would have
12 used it even though it was only approved for fixing bad
13 balloon results, not for preventing restenosis. It
14 wasn't approved for preventing restenosis because it
15 didn't.
16 Q. But isn't it true that the Cook stent was only
17 approved for a very narrow group of cases where you had
18 a dissection or some other abrupt event whereas the
19 Palmaz/Schatz was approved for general coronary use?
20 A. I think I just said the Cook stent was approved
21 for fixing a -- that tear we showed in the video. The
22 Cook stent was approved for that. They did a study. I
23 was in the study, to try to prove that it was better
24 than a balloon to prevent reblockage and it wasn't. And
25 the doctors knew it. So they didn't use it, because the

Page 200

1 Palmaz was the only one that improved the long-term
2 results.
3         So it was, even though it was only
4 technically labeled for fixing torn vessels from balloons,
5 as I already alluded to, almost every vessel is torn by
6 balloons. You could have used it if you wanted, but it
7 wasn't as good a stent.
8 Q. Anyway, between '94 and '97, Cordis essentially
9 has the market to itself and then other companies, like
10 Boston Scientific, introduce more flexible stents; right?
11 A. They introduced -- they bought Medinol or did a
12 marketing arrangement with Medinol and introduced, I
13 guess in 1998, the Nir stent.
14 Q. And other companies also introduced more flexible
15 stents?
16 A. Guidant introduced a stent called the Multi-Link
17 stent, which was again sort of a second-generation stent
18 that used Palmaz structures and was more flexible and
19 was very widely and quickly adopted. It was a second-
20 generation. They said, Hey, we can do better, make it
21 a little more flexible, maybe. We see Dr. Palmaz's
22 piece in there. We can maybe tweak that, make it a
23 little better and sell a lot of stents. Very competitive
24 market.
25 Q. And I think you just mentioned that the Nir stent

# Exhibit
# RR

*Johnson & Johnson*
## INTERVENTIONAL SYSTEMS CO.

September 1, 1995

Mr. W.D. Dearstyne
to
Mr. J.T. Lenehan
to
Mr. C.H. Johnson
to
Executive Committee

EXHIBIT ___

*Croce-46*
11/23/99

------------------------------------------------------

### PROJECT OLIVE

This recommends an agreement with Cardimed in Tel Aviv, Israel
for the rights to the NIR Stent that consists of a $105MM license
for worldwide marketing rights and an option to buy the patents
and technology after a series of milestone payments of $230MM
have been paid within one year of the signing of this agreement
making the total acquisition $335MM.  JJIS needs to proceed with
this agreement immediately to prevent this very competitive and
valuable stent design from being acquired by Boston Scientific or
going public at a valuation between $450-500MM.  The following
strategic business reasons drive the need for this acquisition:

A.   The NIR Stent design is a <u>superior stent design</u> for both
     coronary and peripheral applications and has the potential
     to substantially replace the PALMAZ and PALMAZ-SCHATZ Stent
     due to these unique features:

     1.   <u>Flexible delivery, yet, very strong after deployment</u>.
          The flexibility aspect of the NIR Stent is a
          substantial competitive advantage over the current
          PALMAZ and PALMAZ-SCHATZ Stents and is a feature which
          can potentially replace up to 50% of our current stent
          volume based on indicated physician preference and
          limited clinical results.

     2.   <u>Accelerates JJIS expansion</u> into two major stent
          segments in which we are unable to participate due to
          the <u>inherent stiff design</u> of the PALMAZ and PALMAZ-
          SCHATZ Stents:

          a.   <u>Multi-vessel/extensive disease in patients.</u>
               The unique flexibility and strength of the NIR
               Stent will increase stent penetration into this
               important and large segment of the stent market -
               potential estimated to be over 100,000 procedures
               ($160MM) per year worldwide.  This will permit
               stenting of patients who would normally be sent to
               open heart surgery.  This is a major opportunity
               for JJIS.

Cordis v. BSC
CA No. 97-550 (SLR)
D.Del.
DXB 3168

a *Johnson & Johnson* company

------------------------------------------------------

40  TECHNOLOGY DRIVE  •  P.O. BOX 4917  •  WARREN, NJ 07059  •  TELEPHONE: 908-755-8300  •  FAX: 908-412-3060

CONFIDENTIAL ATTORNEYS EYES ONLY J          072947

- 2 -

b. <u><3mm Vessels</u> - The NIR Stent's unique design is ideal for stenting <3mm vessels and will permit more rapid penetration of this untapped large segment estimated to be 200,000 procedures ($320MM) per year worldwide.

3. <u>Longer Stent Design</u> - The NIR Stent design permits longer stents which will help reduce hospital/ procedure costs. JJIS needs longer, flexible stents to effectively compete against the multiple new stent products rapidly being introduced in Europe and other key markets. We cannot compete effectively, long term, with the current PALMAZ and PALMAZ-SCHATZ Stent design.

4. <u>Sheathless Delivery</u> - The NIR Stent design will permit a sheathless delivery, hence, minimizing the invasive nature of the stent procedures. This will reduce the incidence of bleeding at the puncture site, shorten hospital stays and permit safer delivery of the stent.

5. <u>Higher Peripheral Penetration Rates</u> - Due to the much easier/user friendly characteristics of the NIR Stent, we anticipate higher penetration rates into the current peripheral stent markets.

6. <u>Deflect Competitive Claims of Flexibility</u> - All competitive stents have a strong flexibility claim versus the PALMAZ and PALMAZ-SCHATZ Stents. The NIR Stent will match or exceed the flexibility performance of competitors and provide superior strength following deployment.

7. <u>Lower Manufacturing Costs</u> - The automated manufacturing and inspection method for the NIR Stent utilizes high-tech, integrated circuit technology and increases the precision of manufacturing. We anticipate it will lead to lower manufacturing costs.

In summary, this acquisition is necessary to perpetuate the stent franchise for Johnson & Johnson while protecting and building upon our worldwide leadership position.

M.L. Woodall

CONFIDENTIAL ATTORNEYS EYES ONLY J          072948

# Exhibit SS

Page 269

```
                    - VOLUME B -
            IN THE UNITED STATES DISTRICT COURT
            IN AND FOR THE DISTRICT OF DELAWARE
                       - - -
CORDIS CORPORATION,              :        CIVIL ACTION
           Plaintiff            :

    vs.                          :

MEDTRONIC AVE, INC., BOSTON      :
SCIENTIFIC CORPORATION and       :
SCIMED LIFE SYSTEMS, INC.,       :
           Defendants            :     NO. 97-550 (SLR)
                               - - - -
BOSTON SCIENTIFIC CORPORATION    :        CIVIL ACTION
and SCIMED LIFE SYSTEMS, INC.,   :
           Plaintiffs            :

    vs.                          :

ETHICON, INC., CORDIS CORP.      :
and JOHNSON & JOHNSON            :
INTERVENTIONAL SYSTEMS CO.,      :
           Defendants            :     NO. 98-19 (SLR)

                               - - - -

CORDIS CORPORATION,              :        CIVIL ACTION
           Plaintiff            :

    vs.                          :

MEDTRONIC AVE, INC., BOSTON      :
SCIENTIFIC CORPORATION and       :
SCIMED LIFE SYSTEMS, INC.,       :
           Defendants            :     NO. 98-197 (SLR)

                       - - -
                   Wilmington, Delaware
                   Friday, March 18, 2005
                   9:08 o'clock, a.m.

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
                       - - -
                   Valerie J. Gunning and
                   Leonard A. Dibbs,
                   Official Court Reporters
```

Page 270

```
APPEARANCES:

   ASHBY & GEDDES
   BY: STEVEN J. BALICK, ESQ.

        -and-

   PATTERSON, BELKNAP, WEBB & TYLER LLP
   BY: GREGORY L. DISKANT, ESQ.,
       EUGENE M. GELERNTER, ESQ.,
       WILLIAM F. CAVANAUGH, JR., ESQ.,
       MICHAEL TIMMONS, ESQ. and
       SCOTT HOWARD, ESQ.
       (New York, New York)

        -and-

   JOHNSON & JOHNSON
   BY: ERIC I. HARRIS, ESQ.

       Counsel for Cordis Corporation

   YOUNG, CONAWAY, STARGATT & TAYLOR
   BY: JOSY W. INGERSOLL, ESQ.

        -and-

   KENYON & KENYON
   BY: GEORGE BADENOCH, ESQ.,
       MARK CHAPMAN, ESQ. and
       WALTER HANLEY, ESQ.
       (New York, New York)

       Counsel for Boston Scientific
       Corporation
                   - - -
```

Page 271

## PROCEEDINGS

(Proceedings commenced at 9:08 a.m.)

THE COURT: I understand we have issues.

MR. BADENOCH: Good morning, your Honor.

THE COURT: Good morning.

MR. BADENOCH: To do this before the jury comes in, I just -- I understand of course the Court's ruling yesterday and we respect that, but I did for our record want to offer the exhibits that I referred to and I understand counsel is going to object.

And for the record, I will just recite what those were. They are Plaintiff's Exhibit -- I had them on a list here. It's Plaintiff's Exhibits 3642, 43, 44 and 45, Defendants' Exhibit 4507, Plaintiff's Exhibit 1137 and 1126.

And then I have a proffer of one more exhibit, Defendants' Exhibit 4585, which is one more letter that I would have concluded that line with yesterday, although I understand the Court has asked us to stop that line of examination. So we respect that, but I just want to make the proffer on the record.

Page 272

THE COURT: All right.

MR. BADENOCH: And just for the record, our position is that that does relate to credibility consistent with the Court's prior ruling because he gave a story of conception and we feel it's inconsistent with his prior --

THE COURT: Right. And I think the discussion we had in our -- when we pretried this case was that the defendants would be given some leeway, but there would be a line as always because conception is not at issue and I just -- in my belief, you crossed that line.

But, in any event, I don't know what any of these exhibits are, so I suppose we need to go through them to see what, if anything, should be admitted or not.

MR. DISKANT: I object to all of them, your Honor. They are basically a collection of documents. To the extent they had -- I would look at it this way. I think the examination made points that the documents make. I think it went way over the line. I think adding the exhibits to that would compound the damage. They are -- the documents themselves are utterly irrelevant to any issue in the case. They're receipts from balloon catheters and they're grant applications

**Jury Trial - Volume B**                    CondenseIt™                    **Friday, March 18, 2005**

Page 309

1  Eric Harris.
2          - - -
3          ... ROBERT W. CROCE, having been
4     duly sworn as a witness, was examined
5     and testified as follows ...
6          THE COURT: You may proceed, Mr. Harris.
7               DIRECT EXAMINATION
8  BY MR. HARRIS:
9  Q.  Good morning, Mr. Croce.
10 A.  Good morning.
11         MR. HARRIS:  Good morning, ladies and
12 gentlemen.
13 BY MR. HARRIS:
14 Q.  By whom have you been employed?
15 A.  I've been employed by Johnson & Johnson, and I
16 retired January 1st of 2005, just a couple months ago.
17 Q.  And how long had you worked there?
18 A.  Over 36 years.
19 Q.  Can you tell us a little bit about the business
20 of Johnson & Johnson?
21 A.  Yes.  We're the largest health care company in
22 the world and we kind of divide our businesses into
23 three different elements or segments.  The one that
24 most people are aware of is the consumer group, which
25 is baby powder, baby oil, Tylenol, Nutragena.  We have

Page 310

1  a large Pharmaceutical Group.  They make drugs in the
2  cancer area, arthritis, and literally many, many other
3  areas where serious illness is.
4          And then there's the Medical Device Group.
5  And the devices range from sutures, which close up
6  surgical incisions, surgical instruments, orthopedics
7  and, of course, stents and products that we use in the
8  stenting procedure.
9  Q.  And right -- prior to your retirement, what was
10 your job title and your job responsibilities?
11 A.  I was company Group Chairman for Johnson & Johnson
12 and I had worldwide responsibilities for Cordis.  Of
13 course, in 2004, I was transitioning slowly some of
14 those responsibilities over to my replacement.
15 Q.  And who is Cordis?
16 A.  Cordis is a Johnson & Johnson company and one of
17 the elements of Cordis is Cordis cardiology, and they
18 make and sell products like stents and the other
19 products that you saw in some of the illustrations
20 yesterday with Dr. Fischell:  The guide wires, catheters,
21 balloons, stuff like that.
22 Q.  And when did you first get responsibility for
23 Johnson & Johnson's stent business?
24 A.  That was in October of 1995.
25 Q.  How did Johnson & Johnson itself get involved in

Page 311

1  developing stents?
2  A.  Well, you heard a little bit about that yesterday.
3          MR. HANLEY:  Objection.  No foundation.
4          THE COURT:  Do you want to lay a foundation
5  for the question, Mr. Harris?
6          MR. HARRIS:  Yes.  I will do that, your
7  Honor.
8  BY MR. HARRIS:
9  Q.  Prior to your involvement, your responsibility for
10 the Cordis stent business, were you aware of Johnson &
11 Johnson's activities in the stent field?
12 A.  Yes.  I was on the Board of Directors of Ethicon,
13 which is another Johnson & Johnson company, that signed
14 the agreement with Dr. Palmaz, back in 1987.
15         MR. HARRIS:  May he proceed, your Honor?
16         THE COURT:  Yes, you may.
17 BY MR. HARRIS:
18 Q.  So I guess the question -- let me repeat the
19 question.  How did Johnson & Johnson first become involved
20 in developing stents?
21 A.  It started with the exclusive licensing agreement
22 between Ethicon, which I've explained is on the
23 Johnson & Johnson company, and Dr. Palmaz's partnership,
24 to develop his patented ideas into stent products,
25 basically.

Page 312

1  Q.  And did you enter into a licensing agreement with
2  them?
3  A.  Yes.  It was an exclusive licensing agreement with
4  Dr. Palmaz's partnership.
5  Q.  And when you say an exclusive licensing agreement,
6  what does that mean?
7  A.  Well, exclusive licensing would mean that if
8  someone was going to make or sell a product using Dr.
9  Palmaz's patented ideas, they would -- they need our
10 permission.  So it was basically or for use only.
11 Q.  And did Cordis and J&J compensate Dr. Palmaz's
12 company for the right to use his patent?
13 A.  Yes.  We paid the partnership royalties, $185
14 million, starting with the first commercial sale.  And
15 that lasted up until 1999.
16 Q.  1999?  What happened in 1999?
17 A.  Well, we heard this several times.  We bought the
18 patents outright, and the licenses to them, for 200
19 million.
20 Q.  So who owns -- who owns the patents today?
21 A.  Cordis owns the patents today.
22 Q.  Okay.  Now, after Johnson & Johnson entered into
23 this licensing agreement with Dr. Palmaz's company in
24 1986, did they invest money in order to develop Dr.
25 Palmaz's patented ideas?

Page 313

1  A. Yes. We invested a large amount of money. It was
2  a hundred million dollars. And to put that in
3  perspective, it's the largest amount of money that we
4  had ever spent at this point on a medical device. And
5  it was the largest amount of money ever spent on any
6  medical device in the industry at that particular point.
7  Q. Was it a risky investment?
8  A. Yes. It was a high risk, and I think you've heard
9  many different things about it. But basically, it was
10  an unproven concept as far as the durability and safety
11  and efficacy, and there was a tremendous amount of
12  skepticism, even in the cardiology community, at that
13  time, if this was really going to work.
14  Q. Now, in order to sell stents in the United States,
15  did Johnson & Johnson need to get the approval of a --
16  of the Government?
17  A. Yes. Every medical device needs FDA approval or
18  Food & Drug Administration before you could, you know,
19  make it available to physicians to use with patients.
20  Q. During this time when you were seeking FDA approval
21  and when Johnson & Johnson was investing all of this
22  money to develop the stent, was their publicity
23  suggesting that stenting may not work?
24  A. Yes. There was quite a bit of publicity, but one
25  particular article stands out. It was the New York

Page 314

1  Times article in 1991.
2  Q. Mr. Croce, could I ask you, I think you have it up
3  there, to take a look at what we've marked as Plaintiff's
4  Exhibit 186.
5  A. Yes. It's the article I just mentioned.
6      MR. HARRIS: Move Plaintiff's 186 into
7  evidence, your Honor.
8      MR. HANLEY: No objection.
9      THE COURT: Thank you.
10     DEPUTY CLERK: So marked.
11  ***      (Plaintiff's Exhibit No. 186 was received
12  into evidence.)
13     MR. HARRIS: Do you want to put it up,
14  please?
15  BY MR. HARRIS:
16  Q. This is the article you were referring to?
17  A. Yes, this is it.
18  Q. And what is the subject of this 1991 New York
19  Times article?
20  A. It basically is saying a new study came out on
21  stents which, by the way, was not the Palmaz/Schatz
22  stent, but failed in the clinical trial.
23  Q. And what does this headline, what does that
24  reflect?
25  A. It says failing grade. Usually, when you do a

Page 315

1  clinical trial, you usually have a success or not
2  success, and this meant this one failed, so it was not
3  successful.
4  Q. All right. Now, let me direct your attention to
5  the first sentence in the article.
6      What are the authors saying here?
7  A. Well --
8      MR. HANLEY: Objection, your Honor. The
9  document is in evidence and it speaks for it.
10     THE COURT: The objection is overruled.
11     MR. HANLEY: You don't need the witness to
12  relate what's in here.
13     THE COURT: Overruled.
14     THE WITNESS: Basically, this was a product
15  that had high hopes. The physicians were struggling
16  with restenosis, so they wanted some solution. They had
17  high expectations and, basically, what they found out,
18  that the product that was in this study actually made
19  things worse, so it was very disappointing.
20  BY MR. HARRIS:
21  Q. And let me just make -- let me ask you: This was
22  not the -- the test they were referring to in this
23  article was not a test of the Palmaz/Schatz, then, was
24  it?
25  A. No. As I already said, this was a coil stent. It

Page

1  was not the Palmaz/Schatz.
2  Q. Okay.
3      MR. HARRIS: Can we highlight that passage
4  a little further down, please?
5  BY MR. HARRIS:
6  Q. What are the authors saying here? Dr. Isner.
7  A. Yes. Dr. Isner and several other leading
8  cardiologists had comments throughout the article.
9  Q. All right.
10  A. His was, is sobering, that's another way of
11  saying disappointed. But it wasn't what they had
12  anticipated.
13  Q. Okay. Now, during this time period we're talking
14  about, what was the FDA telling Cordis and Johnson &
15  Johnson?
16  A. The FDA has a different charge. They -- they
17  embrace new technology. But they are responsible to
18  make sure that things that get out for widespread use
19  are safe and effective. And at that time, they were
20  probably even more skeptical than these -- and they
21  were insisting with our discussions with them that we
22  provide really hard clinical and scientific evidence
23  that these products were durable, that they could
24  stay in patients for a long time because they were
25  going to be there forever.

1   MR. DISKANT: We'd like to offer it as an
2   exhibit. We've calculated the standard deviation. Dr.
3   Buller has approved it.
4       MR. BADENOCH: I assume it's going to
5   demonstrate some point that they are going to make. I
6   don't think that makes it a fact exhibit. I think that
7   makes it a demonstrative exhibit.
8       THE COURT: If you don't mind it being shown
9   as a demonstrative, we'll talk about admission later.
10      MR. BADENOCH: I don't mind it being shown
11  and I don't object to the rest of it.
12      MR. DISKANT: That's fine.
13      THE COURT: All right. Thank you.
14      MR. DISKANT: In that case, I don't mind.
15      Can we show 7236 first?
16      No. Why don't you put up 7236-A?
17  BY MR. DISKANT:
18  Q. Okay. Dr. Buller, what has been added to 7236?
19  A. All of this is is tabulated form of measurements
20  of the wall thickness of the NIR stent. I think if we
21  could blow it up, this says wall thickness measured in
22  inches. And this is a series of measurements.
23  Q. Go ahead.
24  A. These are Boston Scientific's own measurements of
25  wall thickness, measured in inches. These are measuring

1   various different measurements here. They are tabulated.
2       Boston Scientific calculated the average.
3   This was .00366, which was the average. All that I have
4   had added to this is a measurement of the -- if you like,
5   the variation, which is scientifically measured as a
6   standard deviation. And the standard deviation which
7   is in red here that I have had added is .00006, so that
8   is six hundred thousandths of an inch variation.
9       So this is an incredibly uniform device.
10      MR. DISKANT: I offer 7236 and 7236-A.
11      Would you like me to address that, your
12  Honor?
13      THE COURT: I can barely hear you, Mr.
14  Diskant.
15      MR. DISKANT: Let me just offer 7236, which
16  is the one without the standard deviation. I will
17  address the other one later with the court.
18      MR. BADENOCH: No objection to that one.
19  And, your Honor, it's just a question of playing the
20  same rules here.
21      THE COURT: Exactly.
22      MR. BADENOCH: I don't actually object to
23  his calculation if we can have the same way with our
24  demonstratives.
25      MR. DISKANT: I'm fine with what we have.

1   I'm happy.
2       THE COURT: All right. Thank you.
3   BY MR. DISKANT:
4   Q. Based on the measurements done by Boston
5   Scientific's engineers, the wall thickness the NIR
6   stent, do you have an opinion as to whether its wall
7   thickness is substantially uniform?
8   A. Absolutely. It's substantially uniform. These
9   measurements clearly show that the wall has very little
10  variation.
11  Q. Have you had an opportunity in the course of this
12  case to review Boston Scientific's internal documents?
13  A. Yes.
14  Q. Have you seen any internal documents that disagree
15  with the analysis you've just presented about the
16  thickness of its wall surface?
17  A. No. I've looked carefully through a lot of
18  documents, including one submitted to the FDA by Boston
19  Scientific, to get a license to sell the NIR stent and
20  I have seen nothing that suggests that there is any
21  significant variation in wall thickness other than this
22  very limited point of the welds. There are very tiny
23  little welds along the length. They are only something
24  on the order of a couple of percent of the wall surface.
25      They take up a tiny fraction of the wall

1   surface.
2           - - -
3   Q. Now, these welds they talked about, what kind of
4   variations do they cause?
5   A. I'm sorry, Mr. Diskant, I missed your question.
6   Q. What kind of variations in thicknesses do the welds
7   cause?
8   A. They are absolutely tiny. The scale of the thing
9   is small. There is an increase. I think again Boston
10  Scientific's expert has measured them. I think at the
11  sort of the peak of the little hump. They can go up to
12  70 or so, 70-percent increase in thickness. 74 percent,
13  from memory, is the absolute maximum.
14          - - -
15
16
17
18
19
20
21
22
23
24
25

Page 445

1
2  A. (Continuing) But the important thing is these are
3  tiny little spots and, compared with the whole surface
4  of the stent, they are only a few percent of the surface
5  of the stent.
6  Q. Is 74 percent referring to both side?
7  A. 74-percent increase in thickness. So that's from
8  top to bottom and taking that -- the peak of the hill
9  and the bottom of the -- the -- the stent has this little
10 weld, which is like a little spherical weld.
11 Essentially, measuring from the very bottom to the very
12 top, it only reaches about 74 percent increase in
13 thickness at maximum.
14 Q. Is Palmaz -- can you make a Palmaz slotted tube
15 stent of Claim 23 by using welding?
16 A. Yes. Absolutely. I mean, Dr. Palmaz's invention
17 does not stop at being made as a flat sheet, cutting a
18 design in it and rolling it up and then joining it
19 together by whatever means you chose, like little welds,
20 for instance. And the little welds on a tiny little
21 area don't affect the uniformity of the much larger
22 part of the stent. So it is largely uniform.
23 Q. Now, you told us, we looked earlier at PX-1, which
24 was Dr. Palmaz's original filing. And you told us that
25 it had other methods of manufacture for the slotted tube

Page 446

1  embodiment; is that right?
2  A. Yes, that's correct.
3  Q. Let's take a look at that. PX-1.
4        Would you first look at 5743?
5        Okay. The '665 patent says, preferably,
6  tubular shaped member 71 is initially a thin-walled
7  stainless steel tube.
8        Is that Palmaz's preferred idea?
9  A. Yes. This is the way I was describing earlier.
10 You can make Dr. Palmaz's invention by starting with a
11 tube, a cylindrical tube of metal, and then you could
12 cut slots out. But that is not the only way you can
13 make even his preferred embodiment.
14 Q. The previous sentence says, bars 78, 79 may be
15 joined to one another in any conventional manner, such
16 as by welding.
17       Is welding a perfectly permissible way to
18 make a stent of Claim 23?
19 A. Yes. Yeah.
20 Q. And if you use welding, does it use weld spots?
21 A. Yes. Welding will leave little weld spots.
22 Q. Okay. Let's go back and look at some photos that
23 BSC has published.
24       Back to the PX-72 owe seven, which I think we
25 just looked at. Yes. That's in evidence.

Page 447

1        Can we just look at the picture on Page 132?
2  Can we just pull that up? This area right here
3  (indicating). From here to there. Super.
4        That's not a very good copy, but can you see
5  any welds in either published photograph?
6  A. I can't on that picture, no. I can't see. I'm
7  looking on my screen as well, which is rather better than
8  you are projecting in the courtroom. But, clearly, you
9  can see the design of the NIR stent. But on that picture,
10 I can't identify a clear weld spot.
11 Q. Okay. Let's get a clearer picture of where the
12 welds are.
13       Let me show you PX-339, and which I offer the
14 BSC engineering drawing.
15       MR. BADENOCH: No objection.
16       THE COURT: Thank you.
17       DEPUTY CLERK: So marked.
18 ***     (Plaintiff's Exhibit No. 339 was received
19 into evidence.)
20 BY MR. DISKANT:
21 Q. Let's just take a look at the pattern of the NIR
22 stent, if we could. I think we have an illustration.
23       MR. DISKANT: Can we blow up this picture?
24 BY MR. DISKANT:
25 Q. What are we looking at now, Dr. Buller?

Page 448

1  A. This is -- this is the pattern of the NIR stent.
2  This is representing a sheet of metal or part of a sheet
3  of metal on which the NIR stent pattern is cut and here
4  is represented the actual pattern of the NIR stent on
5  the flat sheet of metal as it would be cut.
6  Q. I think you told us there would be one weld for each
7  ring.
8        Can you just sort of point out where the
9  welding?
10 A. Yes. If you imagine this is cut flat and then it's
11 rolled together and joined and the weld would be one for
12 each ring. There will be a weld here. I represented it
13 as a red dot here. I put one for each of the -- there
14 would be another weld here, another weld here and
15 another weld here. I've made these with a sequence of
16 red dots just showing where the welds are, which will
17 join it into a cylindrical tube.
18       And now here for this version of the NIR
19 stent, here are the six little spots where the weld --
20 clearly, the weld will join this bit to this bit and
21 this will become a cylindrical structure.
22 Q. Okay. Like a seam?
23 A. Yes. It's joined along that line. It's rolled
24 into a cylinder and it's a bit like a seam, but you
25 might even see -- what you call it, a can in a

# Exhibit
# TT

Jury Trial - Volume E                 CondenseIt™                 Wednesday, March 23, 2005

Page 1152

```
                        - VOLUME E -
              IN THE UNITED STATES DISTRICT COURT
              IN AND FOR THE DISTRICT OF DELAWARE
                          - - -

CORDIS CORPORATION,          :       CIVIL ACTION
          Plaintiff         :

     vs.                     :

MEDTRONIC AVE, INC., BOSTON  :
SCIENTIFIC CORPORATION and   :
SCIMED LIFE SYSTEMS, INC.,   :
          Defendants         :       NO. 97-550 (SLR)
                          - - - - -
BOSTON SCIENTIFIC CORPORATION :      CIVIL ACTION
and SCIMED LIFE SYSTEMS, INC., :
          Plaintiffs          :

     vs.                      :

ETHICON, INC., CORDIS CORP.   :
and JOHNSON & JOHNSON         :
INTERVENTIONAL SYSTEMS CO.,   :
          Defendants          :      NO. 98-19 (SLR)
                          - - - - -
CORDIS CORPORATION,           :      CIVIL ACTION
          Plaintiff           :

     vs.                      :

MEDTRONIC AVE, INC., BOSTON   :
SCIENTIFIC CORPORATION and    :
SCIMED LIFE SYSTEMS, INC.,    :
          Defendants          :      NO. 98-197 (SLR)
                          - - -
                    Wilmington, Delaware
                    Wednesday, March 23, 2005
                    9:25 o'clock, a.m.
                          - - -
BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
                          - - -
                    Valerie J. Gunning and
                    Leonard A. Dibbs,
                    Official Court Reporters
```

Page 1153

```
APPEARANCES:

     ASHBY & GEDDES
     BY: STEVEN J. BALICK, ESQ.

          -and-

     PATTERSON, BELKNAP, WEBB & TYLER LLP
     BY: GREGORY L. DISKANT, ESQ.,
         EUGENE M. GELERNTER, ESQ.,
         WILLIAM F. CAVANAUGH, JR., ESQ.,
         MICHAEL TIMMONS, ESQ. and
         SCOTT HOWARD, ESQ.
         (New York, New York)

          -and-

     JOHNSON & JOHNSON
     BY: ERIC I. HARRIS, ESQ.

          Counsel for Cordis Corporation

     YOUNG, CONAWAY, STARGATT & TAYLOR
     BY: JOSY W. INGERSOLL, ESQ.


     KENYON & KENYON
     BY: GEORGE BADENOCH, ESQ.,
         MARK CHAPMAN, ESQ. and
         WALTER HANLEY, ESQ.
         (New York, New York)

          Counsel for Boston Scientific
          Corporation

                    - - -
```

Page 1154

PROCEEDINGS

(Proceedings commenced at 9:25 a.m., and the following occurred without the presence of the jury.)

MR. BADENOCH: Good morning, your Honor.

THE COURT: Good morning. You can keep talking. I just need to move some of these things out of my way.

All right.

MR. BADENOCH: We did prepare some language that we believe should be given to the jury as an instruction at the beginning on the business of referring to the absence of Brian Brown. And counsel and I have agreed on this, but we've scribbled up our form in which we prepared the agreement.

It might be better if I read it or I can hand it up. But what it says is, this is a timed trial in which the total time for each party to present its case is limited. Sometimes a party does not call a witness on the list of witnesses you read at the outset of the case. You are not to infer anything from that.

THE COURT: All right.

MR. BADENOCH: I will hand this up.

Page 1155

THE COURT: Hand it up, yes, then I will make sure I can read it as well as you did, Mr. Badenoch.

(Mr. Badenoch handed a document to the Court.)

THE COURT: Yes, I think I have it.

MR. BADENOCH: The other thing, your Honor, we had -- we're down to just a very few extremely minor things on the verdict form and the instruction, and I really think this is just clarity.

In the verdict form, where it says Claim 23 of the '762 patent requiring that the wall of, now it says a tubular member, and we want it to say the tubular member, which conforms, I think, to several other places throughout the instruction. And we feel, since there's clearly one tubular member in the accused stent that has been, as it has been presented to the jury, that that would be clearer.

I really think it's non-substantive. Counsel has said, Well, no, it departs from the claim construction, and I don't -- it did not seem to me that that was correct.

THE COURT: Well, I guess if it's non-substantive and if it isn't in dispute, and the claim construction reads an and we're going to the jury this morning, I wasn't confident that I wanted to go to the trouble of changing the to an every place it said

Cordis v. Boston & Scimed, CA#97-550(SLR), etc.               Page 1152 - Page 1155

Jury Trial – Volume E                CondenseIt™    ....    Wednesday, March 23, 2005

Page 1288

1  other thing.
2          He also repeatedly said Dr. Palmaz has been
3  adequately compensated, Johnson & Johnson has been
4  adequately compensated. That's not a proper argument.
5          THE COURT: No more of that, for sure.
6          MR. DISKANT: Thank you, your Honor.
7          (Luncheon recess taken:)
8                  - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1289

1
2                  AFTERNOON SESSION
3
4          (Proceedings resumed at 1:35 p.m.)
5
6          THE COURT: All right. Let's bring our jury
7  in.
8          (At this point the jury entered the courtroom
9  and took their seats in the box.)
10          THE COURT: All right. Mr. Diskant?
11          MR. DISKANT: Thank you, your Honor.
12          Ladies and gentlemen, this will be the last
13  time that I have an opportunity to speak with you before
14  you deliberate. I think issues in this case you will
15  find are very, very simple. The issues are simply right
16  and wrong. The right way of doing business and the
17  wrong way of doing business, honoring our patent system,
18  respecting someone else's property or not. That's
19  really what this case comes down to.
20          Boston Scientific and SciMed have come before
21  you with two defenses that, respectfully, I think, when
22  you deliberate, I would ask you to consider as absurd
23  and unsupported by any actual evidence. They've come
24  before you and suggested that their wall thickness is
25  insubstantially uniform, which all the documents say it

Page 1290

1  is and Mr. Badenoch spent all of his direct examination
2  explaining away BSC's documents and not showing you any
3  that supported his position.
4          They are coming before you, asking you to
5  invalidate pioneering Palmaz patent, Claim 23, based on
6  the ridiculous staple-like design of Ersek, and I mean
7  no disrespect to Ersek, but it did not work and it
8  wasn't ever commercialized. It has nothing whatever to
9  do with stenting.
10          Let's talk, first, about the right way to do
11  business with respect to the patent system. Not
12  trespassing.
13          Mr. Croce, company Group Chairman from Johnson
14  & Johnson, told you other competitors, not BSC, other
15  competitors have sought permission to use Abbott's -- to
16  use Palmaz's patent by taking a license.
17          One example is Abbott Pharmaceutical, a
18  large U.S. pharmaceutical company. They knew they needed
19  our permission to market stents in the United States.
20  That's the truth if it's going to be a balloon expandable
21  slotted tube stent like BSC sells. So they offered to
22  pay a substantial royalty and we came to terms and we
23  gave them a license to go on the market. The '762 patent.
24  26 percent on net sales. Guaranteed if you look at the
25  contract which is in evidence, $500 a stent for a drug-

Page 1291

1  eluting stent sold by Abbott. $500 a stent, each and
2  every one, for the right to use the power of Dr.
3  Palmaz's ideas to enter the stent marketplace. That's
4  the right way. That's why we have a patent system.
5          Now, you heard some arguments, Oh, Johnson &
6  Johnson has been adequately compensated, Dr. Palmaz has
7  been adequately compensated. It's okay for us now to
8  take their property and use it without permission. I
9  think you know that's not the right way to think about
10  things. You paid for your house. It doesn't mean
11  someone can come and sleep in your bedroom.
12          But the real fact is, the real fact is that
13  investments by companies like Johnson & Johnson of
14  innovative therapies are extremely expensive and for the
15  ones that pay off like this, and there are many that
16  don't, are just money poured down the drain, as Bob Croce
17  told you. $400 million on a direct myocardial
18  vascularization. I thought about that. That's on
19  cross-examination by Boston.
20          Yes, that's the truth. The truth is that
21  companies like Johnson & Johnson win some and lose some.
22  They lose more often than not, and you and I and our
23  family members and everyone in the community wants them
24  to make those investments. You want companies like
25  Johnson & Johnson to take risks on innovative, unproven

Page 1292

1  therapies, like Dr. Palmaz's was in 1986, because those
2  innovative, risk-taking ideas, with large capital
3  investments from large companies that are able to make
4  that investment and take the risk of complete and utter
5  loss, that's what makes us have a better, safer,
6  healthier society.
7      Johnson & Johnson is willing to pay for
8  innovative technologies. It invested a hundred million
9  dollars in the Palmaz, bringing it to market. It paid
10 Dr. Palmaz properly many millions of dollars in royalties
11 and then bought out his rights for $200 million.
12     Dr. Palmaz is very deservedly a wealthy man.
13 Johnson & Johnson, very correctly paid him for the right
14 to use his invention and it purchased the rights to the
15 '762 patent so it could protect its rights on the
16 marketplace of ideas. And Boston and SciMed just don't
17 seem to care.
18     Now, I like George Badenoch. He's a fine
19 person, a fine lawyer. He tries an able case, but his
20 clients, Boston Scientific and SciMed, are engaged in a,
21 say this respectfully, but intentionally, a dirty, mean-
22 spirited game. You saw it here in this trial.
23     They don't know what to say about Dr. Palmaz,
24 so in his opening, George said, Oh, Dr. Palmaz is
25 entitled to credit, we agree with that. He made an

Page 1293

1  important contribution. We all owe him great credit for
2  what he did.
3      And then Dr. Palmaz showed up and was cross-
4  examined. And was this disgusting? We went through some
5  of his awards.
6      Oh, shortly before that, you donated to that
7  institution a million dollars; correct?
8      That's the University of Texas, where Dr.
9  Palmaz is on the faculty and he has given them a whole
10 lot more than a million dollars. He has funded research
11 for years there.
12     Did he buy this award? Was that the point
13 of that questioning? No invention has revolutionized
14 the treatment of coronary artery disease like the
15 intravascular stent. Developed by Dr. Julio Palmaz,
16 the Palmaz stent was patented in 1988. The stent has
17 impacted the lives of millions of people around the globe.
18     Was Boston trying to suggest that he paid off
19 the University of Texas? That he bought entry into the
20 Smithsonian?
21     Or this one: Do you see the one of the
22 sponsors listed here is Cordis? Yes, Cordis and a whole
23 bunch of other companies, including other stent
24 manufacturers, are sponsors of Surfaces in Biomaterials
25 Foundation, a respected, not-for-profit in this industry.

Page 1294

1  Okay. But is it true that the stents made Dr. Palmaz's
2  device -- it just happens to be true. You know what?
3  Boston Scientific, the defendant in this case, agreed
4  with that in 1997, when it agreed to award the
5  Palmaz/Schatz stent the award for the most important new
6  medical device in the last 15 years. All of this comes
7  from Dr. Palmaz.
8      Oh, yes. Cordis is a sponsor. So are many
9  other fine companies and this is a very fine and fitting
10 tribute to Dr. Palmaz.
11     Look. Here's a picture with you and your
12 wife and underneath it, there's Marv Woodall. Who's
13 that? Oh, my. Here at the International Society of
14 Endovascular Specialists, medical doctors have gathered
15 to honor Dr. Palmaz for his development of the
16 endovascular stent, a landmark professional contribution,
17 and look at this just horribly embarrassing fact. I
18 just can't believe it. Marv Woodall, who used to work
19 at Johnson & Johnson, offered a toast. I will offer a
20 toast to Julio Palmaz any day of the week.
21     What was that cross-examination about? And
22 then it continued into the testimony of each and every
23 one of their witnesses.
24     Kobi Richter, Dr. Richter. The smaller
25 the invention, the more impressive. Oh, so small, so

Page 1295

1  impressive. But he pushed it forward and he succeeded.
2  I'm not trying to adjudge the invention, small though it
3  is. Thank you, Dr. Richter.
4      How about this? Without being derogatory,
5  Dr. Buller, he may be a very good stent driver. I want
6  to believe that he is. I want to believe that.
7      Thank you, Dr. Richter, for wanting to
8  believe that.
9      I would be proud to have Dr. Buller operate on
10 me or my children on any day.
11     Then Dr. Snyder. I don't consider parties,
12 these are nice recognitions for hard work. It embarrassed
13 George so much, he had to talk to you about it.
14     Here's another great one. The Palmaz stent,
15 part of a special presentation, the world's most
16 successful medical device. That's inaccurate. Must be
17 his home town paper. The most successful medical device
18 would be one of the more recent stents? They're all
19 Palmaz stents. That's the point. That's why we're here.
20 Palmaz invented the longitudinally slotted balloon
21 expandable stent, which everyone uses. Everyone has built
22 on his fine contribution to medicine.
23     Dr. Low. Palmaz invented the peripheral
24 stent with the balloon. Schatz developed the heart one.
25 Yeah. Schatz developed the heart one.

# Exhibit
# UU

Page 2222

```
 1              - VOLUME I -
           IN THE UNITED STATES DISTRICT COURT
 2         IN AND FOR THE DISTRICT OF DELAWARE

 3  CORDIS CORPORATION,              :  CIVIL ACTION

 4         Plaintiff                 :

 5         vs.                       :

 6  MEDTRONIC AVE, INC., et al.      :  NO. 97-550 (SLR)

 7  BOSTON SCIENTIFIC                :  CIVIL ACTION
    CORPORATION, et al.,
 8                                   :
           Plaintiffs
 9                                   :
           vs.
10                                   :
    ETHICON, INC., et al.,
11                                   :
           Defendants               :  NO. 98-19 (SLR)
12
    CORDIS CORPORATION,              :  CIVIL ACTION
13
           Plaintiff                :
14
           vs.                      :
15
    BOSTON SCIENTIFIC                :
16  CORPORATION, et al.,
                                     :
17         Defendants               :  NO. 98-197 (SLR)

18                                  Wilmington, Delaware
19                                  Wednesday, December 6, 2000
                                    9:00 o'clock, a.m.
20
                    - - - - -
21
22  BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

23                  - - - - -

24                              Official Court Reporters

25
```

Page 2223

```
 1  APPEARANCES:

 2

 3     ASHBY & GEDDES
       BY: STEPHEN J. BALICK, ESQ.
 4

 5        -and-

 6     PATTERSON, BELNAP, WEBB & TYLER, LLP
       BY: GREGORY L. DISKANT, ESQ.,
 7         EUGENE M. GELERNTER, ESQ.,
           WILLIAM F. CAVANAUGH, ESQ. and
 8         MICHAEL J. TIMMONS, ESQ.
           (New York, New York)
 9

10        -and-

11
       JOHNSON & JOHNSON
12     BY: ERIC I. HARRIS, ESQ.

13        Counsel for Plaintiffs

14
       YOUNG, CONAWAY, STARGATT & TAYLOR
15     BY: JOSY W. INGERSOLL, ESQ.

16
          -and-
17

18     KENYON & KENYON
       BY: GEORGE E. BADENOCH, ESQ.,
19         PAUL A. BONDOR, ESQ.,
           ALBERT J. BRENEISEN, ESQ.,
20         MICHAEL ZACHARY, ESQ. and
           ARTHUR GRAY, ESQ.
21         (Washington, D.C.)

22        Counsel for Defendants

23           - - - - -

24

25
```

Page 2224

PROCEEDINGS

(Proceedings commenced at 9:00 a.m., and the following occurred without the presence of the jury.)

THE COURT: I understand there is are an issue.

MR. DISKANT: Yes, your Honor. The defendants wish to play today the videotape deposition of Dr. Stanley Carson. We do not object to that. Also, however, they wish to introduce into evidence Dr. Stanley Carson's sworn declaration.

That is classic hearsay. Dr. Carson was examined. He was asked questions. He was cross-examined. They had the opportunity to bring him here to Court live if they wanted.

But a written witness statement does not come into evidence, it doesn't go back to the jury so they can read it. It is inadmissible. We object to it.

MR. BADENOCH: Your Honor, the problem is this: Dr. Carson is, of course, not under our control. He lives in California. Unlike a situation where we were taking a — if we had had an opportunity to examine him on direct and they had cross-examined, which is not the situation here — what happened here is he filed a

Page 2225

declaration in the Cook case. He was then fully cross-examined on the declaration by counsel for ETP and counsel for Cordis.

What we have done to create the video is to collect from that — from what is basically hostile examination the most coherent testimony that we can.

In that testimony, there is clear references to a paragraph of the declaration he is talking about. And in order to make sense of what he is talking about, the jury needs to see the text of what it is that he is being cross-examined about by counsel for EGP and/or Cordis.

The other thing is that, basically, — so for context, it is absolutely necessary. Because they cross-examined, basically, the policy on hearsay is that you don't allow hearsay because there is no chance to confront and cross-examine the witness. That is not true here.

What we have is kind of like the English system or the system in many courts in this country where you have direct testimony put in by a statement and then you have live cross-examination.

The other thing is the dates. They are in the part that they are going to play to attack Dr. Carson, who is going to point out that he was paid for an

Page 2290

1    "Answer: Yes. Inasmuch as I understand fraud
2  that -- I need to clarify that.
3    "I was upset when I read this, and I felt I
4  had been misled.
5    "Question: And why?
6    "Answer: There's more than one item, and I
7  may not take these in the order that they appear in this.
8    "Question: Okay. Go ahead. If you can
9  remember off the top of your head, go ahead and tell me.
10    "Answer: There are drawings here, and the
11  first drawing I recognize as being very similar to and
12  very much akin to the one that I made, that I gave to Dr.
13  Palmaz when I first proposed this idea.
14    "Question: Are you referring --
15    "Answer: That is referred to as 1-A and 1-B
16  in this document.
17    "Question: Okay. And --
18    "Mr. Kramer: The record should reflect you're
19  holding up the patent when you say this document, the '665
20  patent.
21    "Go ahead.
22    "The witness: Yes, I think it's also labeled
23  here at the top as patent.
24    "Now, I would assume perhaps -- I may be all
25  wrong -- but also for other reasons that the patent, if

Page 2291

1  it existed -- and, you know, I didn't have any reason to
2  question it being -- I don't think I thought about it.
3  But Johnson & Johnson's putting money into the market,
4  there's probably a patent.
5    "I had worked with them long enough to know
6  that they like to protect, as does everybody, their
7  investments.
8    "Now, I would have felt that the patent would
9  revolve around a particular design, configuration,
10  manufacturer and use of the Palmaz configuration, or
11  Palmaz stent it's been referred to, which is a specific
12  type of stent.
13    "That's one item.
14    "And so here is another drawing that I don't
15  think is original with Dr. Palmaz, but it now appears in
16  this patent and --
17    "Question: Could you, for the record, say --
18  when you said this -- another drawing --
19    "Answer: Another drawing, Figure 1-A and 1-B.
20  2-A and 2-B appears to be that of the Palmaz stent. The --
21  that's a bit annoying. It was to me at the time.
22    "The other thing is that -- another thing is --
23  not just the other thing, but another thing is that, quite
24  frankly, in reading this, it appears to me that what has
25  been covered by this patent is delivering a stent on a

Page 2292

1  balloon to a specific location.
2    "And I don't feel now, to this day, that that
3  was his original concept. I feel I presented that concept
4  to him. And at the time that I did it, I spent a lot of
5  time explaining the stent and the concept and didn't get
6  any feeling that this is anything but unfamiliar territory
7  to him at that time.
8    "The other thing that's going on here is
9  that -- I don't know whether these are page or paragraph
10  numbers here, the numbers at the top.
11    "Question: Are page numbers.
12    "Answer: All right. I'm going to refer,
13  then, to Page No. 4 on the document '665.
14    "Mr. Kramer: Let me explain this. That's
15  Page No. 4, Column 4.
16    "And then if you want to look under Column 4
17  where you see the numbers here, you can refer specifically
18  to those numbers.
19    "That would be Column 4, Line 10, for example,
20  would be that line. That's the way you read these?
21    "Answer: Four lines above Line 10 on Column 4
22  in '665, it states that a further feature of the present
23  invention is that a wire mesh tube may be utilized as the
24  intraluminal graft, which is I don't believe how I
25  visualized the Palmaz stent as being a wire mesh.

Page 2293

1    "I feel that the wire mesh was one of the
2  ideas that I had originally proposed to Palmaz and to
3  Vascor.
4    "And reading on Column 3, same line --
5    "Mr. Kramer: Yes, yes.
6    "Answer: Same lines. Okay. -- Line 25 and
7  in that same paragraph down from that --
8    "Mr. Kramer: You can read them into the
9  record, if you wish.
10    "The witness: Okay.
11    "Answer: 'The present invention includes, an
12  expandable, tubular shaped membrane -- member having first
13  and second ends and a wall surface disposed between the
14  first and second ends, the wall surface being formed by a
15  plurality of intersecting elongate members' -- which to me
16  appears to be a wire mesh.
17    "And again, I was a bit shocked.
18    "One other item comes to mind is the date.
19    "Question: And what about that upset you?
20    "Answer: Well, there was a reason that I
21  signed this November 15th, 1985 document to Dr. Palmaz.
22  And I have just been reminded of the date, because I had
23  sought this down and given a copy to Brian Bates.
24    "And at the time that I signed this was not
25  for purposes of payment, per se. At least that's not why

**Page 2294**

1   I was told I was signing this patent.
2      "So I feel that if he were going to patent my
3   ideas, that he should at least have told me.
4      "Question: The proposal to -- that you refer
5   to as the proposal to Hancock -- Vascor, tell me what that
6   was like.
7      "Answer: Well, it was a pretty basic proposal
8   in that we felt we needed to, in discussions with Dave
9   Lentz, outline why something was needed, what was being
10   done now and what we were proposing.
11      "Question: When you say 'we,' who's the
12   other -- who's the 'we?'
13      "Answer: In discussions with Dave Lentz, he
14   felt they needed this to fund it. They were fairly
15   unfamiliar with catheters and catheter work, that they
16   were not -- that wasn't part of their -- apparently,
17   their mission.
18      "Question: But I thought you said we drafted
19   something. Who drafted something?
20      "Answer: I don't -- we thought is what I recall
21   saying."
22         - - -
23
24
25

**Page 2295**

1
2      "Question: Was there a written proposal given
3   to Vascor?
4      "Answer: Yes.
5      "Question: Who drafted that proposal?
6      "Answer: I drafted it, along with Dr. Palmaz.
7   We both worked on it. We exchanged copies and came up with
8   a final.
9      "Question: What did it say?
10      "Answer: Best of my recollection, it stated
11   that arteries that are obstructed cause problems --
12      "The Reporter: I am sorry.
13      "The Witness: -- arteries that are obstructed
14   cause problems in the human body and that one of the ways
15   to open the arteries or to get necessary blood flow
16   through the arteries was to dilate the artery.
17      "One problem with the technique of dilating an
18   artery is that some arteries couldn't be dilated to
19   adequate size and that some arteries would rebound after
20   dilatation, and thrombosis in some arteries or clot
21   formations in some arteries would occur after dilatation.
22      "Basically stated, what we felt between us,
23   the current state of the art of balloon dilatation was
24   the arteries.
25      "And that in order to offset the dilatation

**Page 2296**

1   or the recurrence after dilatation or the unsuccessful
2   dilatation when an artery rebounds and perhaps keep the
3   artery open longer but certainly, initially, give more
4   successful result, was to put a stent at the time of the
5   dilatation, and the stent would keep the artery open by
6   its configuration, framework, support.
7      "We spent a lot of time in the proposal, in
8   our discussions between Dr. Palmaz, myself and Dr. Lentz
9   as to what would be acceptable with them as a proposal,
10   in deciding how much time in the proposal to give to the
11   current state of the art and catheters being used and so
12   on, because we felt we were presenting it to people that
13   weren't right in the midst of doing CAT digitization and
14   this sort of thing.
15      "Then we went to describe -- to make a
16   proposal in the last part of it after outlining the
17   problem and the possible solution for the problem in a
18   way that it could be done.
19      "There's some drawings. Both of those
20   drawings, I think, were in the proposal.
21      "The drawings that I looked at earlier,
22   they're on one sheet of paper. They were held up for
23   the camera.
24      "I don't think they're in that format, as I
25   recall. They may be. But to show what it might look

**Page 2297**

1   like.
2      "This is just a proposal. We have had not
3   made one. We wanted to show how it might be delivered.
4   We wanted to show how it might be made -- not how, but
5   what it might be made of because the people that I was
6   working with at Vascor and Hancock, a lot of the research
7   that has been done has been on materials that can be used
8   and retained in the vascular system.
9      "Question: I'm sorry. A lot of research who
10   has done? That you have done or that they have done?
11      "Answer: That I had done with them had been
12   done on the use of different materials in the vascular
13   system that would or would not be acceptable to be left
14   in the vascular system.
15      "Question: When was the proposal written?
16      "Answer: Most of the proposal, I believe, was
17   written in the early eighties. Early eighties.
18      "Question: 1980?
19      "Answer: Yes.
20      "Question: Well, let me ask you something.
21   Had you thought of this concept prior to Dr. Palmaz asking
22   you the question that you talk about in Paragraph 6?
23      "Answer: I thought of the idea of leaving
24   something in the blood vessel, yes.
25      "Question: Had you thought of the idea of --

# Exhibit VV

Jury Trial - Volume C                CondenseIt™                Monday, March 21, 2005

```
                                                   Page 546
1                      - VOLUME C -
2              IN THE UNITED STATES DISTRICT COURT
               IN AND FOR THE DISTRICT OF DELAWARE
3                       - - -
4   CORDIS CORPORATION,          :    CIVIL ACTION
          Plaintiff             :
5                               :
     vs.                        :
6   MEDTRONIC AVE, INC., BOSTON  :
    SCIENTIFIC CORPORATION and  :
7   SCIMED LIFE SYSTEMS, INC.,   :
          Defendants            :    NO. 97-550 (SLR)
8                               - - -
    BOSTON SCIENTIFIC CORPORATION :    CIVIL ACTION
9   and SCIMED LIFE SYSTEMS, INC., :
          Plaintiffs            :
10                              :
11                              :
     vs.                        :
12  ETHICON, INC., CORDIS CORP.  :
    and JOHNSON & JOHNSON       :
13  INTERVENTIONAL SYSTEMS CO.,  :
          Defendants            :    NO. 98-19 (SLR)
14                              - - -
15  CORDIS CORPORATION,          :    CIVIL ACTION
          Plaintiff             :
16                              :
     vs.                        :
17                              :
    MEDTRONIC AVE, INC., BOSTON  :
18  SCIENTIFIC CORPORATION and  :
    SCIMED LIFE SYSTEMS, INC.,   :
19        Defendants            :    NO. 98-197 (SLR)
20                              - - -
                       Wilmington, Delaware
21                     Monday, March 21, 2005
                       9:05 o'clock, a.m.
22
23  BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
                       - - -
24                            Valerie J. Gunning and
                             Leonard A. Dibbs,
25                           Official Court Reporters
```

```
                                                   Page 547
1   APPEARANCES:
2       ASHBY & GEDDES
        BY: STEVEN J. BALICK, ESQ.
3
4           -and-
5
    PATTERSON, BELKNAP, WEBB & TYLER LLP
6   BY: GREGORY L. DISKANT, ESQ.,
        EUGENE M. GELERNTER, ESQ.,
7       WILLIAM F. CAVANAUGH, JR., ESQ.,
        MICHAEL TIMMONS, ESQ. and
8       SCOTT HOWARD, ESQ.
        (New York, New York)
9
10          -and-
11
    JOHNSON & JOHNSON
12  BY: ERIC I. HARRIS, ESQ.
13      Counsel for Cordis Corporation
14
    YOUNG, CONAWAY, STARGATT & TAYLOR
15  BY: JOSY W. INGERSOLL, ESQ.
16
17          -and-
18
    KENYON & KENYON
19  BY: GEORGE BADENOCH, ESQ.,
        MARK CHAPMAN, ESQ. and
20      WALTER HANLEY, ESQ.
        (New York, New York)
21
        Counsel for Boston Scientific
22      Corporation
                       - - -
23
24
25
```

```
                                                   Page 548
1
2              P R O C E E D I N G S
3
4       (Proceedings commenced at 9:05 a.m., and the
5   following occurred without the presence of the jury.)
6
7       THE COURT: Mr. Diskant?
8       MR. DISKANT: Your Honor, we have a few
9   issues to raise before the examinations begin, I'm sorry
10  to say. In one way or another, they all relate to the
11  issue that we raised last week, which was BSC's attempt
12  to suggest that there was only one claim in issue, and
13  that they were entitled to some kind of mileage after
14  that. Your Honor last week admonished them that that
15  was misleading and asked them to stop.
16      We received demonstratives today, last night,
17  for the anticipated testimony of their first expert, Dr.
18  Snyder, which are riddled with this kind of comparison.
19  I raise it now because Dr. Buller is about to begin cross
20  and I fear they may attempt the same cross with him.
21      I will hand up a package of documents.
22      First, what is happening is the theory of
23  BSC's case has radically changed. The first document in
24  your pile is Dr. Snyder's expert report on which we
25  prepared the case. And if you just look at Paragraph 7,
```

```
                                                   Page 549
1   he summarizes the theory of their case, which is one of
2   ordinary skill who knew about balloon angioplasty, knew
3   that the Palmaz abstract discloses the concept of a
4   balloon expandable stent, and then the Ersek structures
5   of particular design that one would combine.
6       And so basically their theory of the case
7   was that Claim 23 as it is, in fact, is, a structure
8   claim for use in a particular method and then they were
9   combining the method with the structure in order to
10  make it that obvious in this case.
11      The Palmaz abstract has all but disappeared.
12  It was not mentioned in opening. There is maybe one
13  slide, Mr. Snyder's demonstratives on it, and they've
14  turned their case into simply a structure case. They
15  have now recast Claim 23 as just a structure and the
16  structure is Ersek.
17      Now, I think that's a fundamental change,
18  but I can live with that. I can litigate that
19  completely different case. That's not the point of my
20  comment except to put in context what they are doing as
21  a result of their fundamental change in their defense
22  strategy.
23      Now, to develop that strategy, the first, I
24  think the single worst thing they are doing is focusing
25  on the cancellation of Claim 13. In the opening, Mr.
```

Cordis v. Boston & Scimed, CA#97-550(SLR), etc.                Page 546 - Page 549

Page 550

1  Badenoch said, and the next package in your pile is a
2  collection of documents, including summaries, from the
3  opening.
4       Claim 13 is cancelled, still cancelled today,
5  and they said that Claim 23 is still okay. Why? Because
6  it has a smooth surface.
7       And this was an implicit argument. All that
8  makes Claim 23 valid is its smooth surface. There are
9  many, many things wrong with that argument.
10      First, on the facts, we cancelled Claim 23 as
11  the record reflects, not because we agreed with it,
12  because we're in re-examination and as we said, in the
13  record, we sought patent rights that could be forced
14  against infringers, so we're foregoing an appeal.
15      The law is very, very, very clear on this.
16  Section 282, each claim is independently presumed valid,
17  and even if, even if Claim 13 were invalid, which it
18  isn't, the law is that a dependent claim shall be
19  presumed valid, even though dependent upon an invalid
20  claim.
21      The case law is to exactly the same effect.
22  The case law is you can't do a domino-type approach
23  carving off elements and say the patent turns on any
24  one element. The case law says a patentee is not
25  required to fight tooth and claw over every possible

Page 551

1  thought an examiner had. These kind of battles may
2  bear on claim interpretation and we've had lots of
3  arguments about that. I don't begrudge anything arguing
4  the file wrapper for claim interpretation, but the
5  cancellation of a claim, even if it were an admission
6  of obviousness, which it was not, or even if it was
7  found obvious, is not relevant to the obviousness inquiry.
8       Each claim is presumed valid and you must look
9  at all of its limitations as a whole. And so the attempt
10  to whittle down Claim 13 to the smooth element, and they
11  now say -- after I've complained over the weekend, they
12  now say they're not going to focus on the smooth element,
13  they're just going to point it out.
14      And, of course, it's hard to imagine what
15  pointing it out does other than raise doubts in the
16  jury's mind about why there's only one element that
17  patentability supposedly depends upon. And the theory
18  that patentability depends only on the smooth element
19  isn't in any expert report and it is not relevant to
20  this remand trial because, of course, the definition of
21  smooth has not changed.
22      So there are a collection of slides. You
23  know, Cordis effectively gives up Claim 13 and pursues 23
24  to add smooth surface, cancels Claim 13. This is just
25  wrong-headed. It's off the reservation. It misleads

Page 552

1  the jury.
2       - - -
3       MR. DISKANT (Continuing): And it focuses on
4  only one claim in dispute, which is wrong.
5       They then continue that -- based on their
6  new-found argument that this is just a structure and
7  incorporates no use and method ideas.
8       - - -
9
10      MR. DISKANT (Continuing): And so they, in
11  this last set of slides I've attached, they now compare
12  Claim 23 to Claim 51, which requires a stent on a
13  balloon. Claim 23 does not do that.
14      They compare it to Claim 1, which describes
15  a method of implanting. They have a purported legal
16  instruction from their engineer about what method claims
17  and device claims are. They then compare the device of
18  Claim 23 with what a method claim would look like.
19      They compare the device with and without
20  the supposed method. All of this is legal instruction
21  from a mechanical engineer that will not be repeated in
22  the charge and is not right. It focuses on only one
23  claim in issue. It focuses on the finding, the validity
24  of Claim 23 in comparison to other claims rather than on
25  its own terms. And it's particularly egregiously wrong

Page ․

1  in this remand case where, as your Honor knows, we tried
2  in the first instance a method claim as well as a
3  product claim. We tried Claim 44, which includes a
4  balloon. We won that on infringement. Your Honor set it
5  aside because it was filed for the purpose of litigation.
6  I hope we never get the need to get to an appeal on the
7  issue. That is incorrect. It has not been resolved.
8       We're trying this one claim, 23, because
9  that's what's left at this point in time. And even if
10  we were not in an a remand situation, it would be simply
11  wrong to attempt to assess the validity of Claim 23 by
12  comparing it to other claims. There's only one
13  analysis. You take the claims and you compare them to
14  the prior art. And the other claims have nothing to do
15  with it and are confusing and misleading, and I think
16  highly prejudicial to my client.
17      I have, lastly, a proposed instruction for --
18  on a number of claims, which I will hand up. It's
19  really based on the number of witnesses charged. It
20  basically echoes the same thoughts, which is the number
21  of claims and the number of witnesses.
22      I would ask that these demonstratives be
23  stricken and this line of questioning barred from Dr.
24  Buller.
25      THE COURT: All right. What I'm concerned

CondenseIt™

Page 554

1  about right now is the cross-examination of Dr. Buller
2  so we don't hold our jury up.
3         So, Mr. Badenoch, if you would respond in
4  terms of your anticipated cross, I would appreciate it.
5  We will take this up at our next break.
6         MR. BADENOCH: Your Honor, yes. Thank you.
7         The point is, of course, that this is a
8  device claim. There's simply no question about that.
9  It's not a method claim. It is a claim for a structure.
10  That's very clear. We have not changed our theory on
11  that.
12         We are not going to say in these comparison
13  slides, we are using them because we think the jury needs
14  to be instructed on what the claim is and is not. We're
15  not going to argue that it's invalid compared to other
16  claims or invalid compared to Claim 13.
17         THE COURT: Doesn't my claim construction
18  take care of that, though?
19         MR. BADENOCH: Well, your Honor, here's what
20  has happened. The plaintiff, you see, has departed
21  totally from that. They are trying the case on Dr.
22  Palmaz's general idea, his method, his balloon
23  expandable tent, his awards. We've had a drum beat of
24  totally emotional prejudicial things talking about how
25  great Dr. Palmaz's balloon expandable stent is, and how

Page 555

1  great his method is. And it is critical to try this
2  case fairly that we point out that's not the claim in
3  suit. We have to be able to point out it's not the
4  claim in suit.
5         The other thing, your Honor, is that there
6  are some issues, including thickness, for example, how
7  you measure it, where the Court did decide that that
8  would be a fact question. The construction did not end
9  up putting in the Federal Circuit language on measuring
10  thickness, and we understand that. But now that makes
11  it very relevant to tell the jury what has been said
12  before about thickness and how you measure it, including
13  what they said in the file history.
14         When it comes to how you apply the Court's
15  construction to the facts, we have to be able to say
16  what Cordis said before in the public record. So we do
17  have to refer, at least to that extent, in the file
18  wrapper.
19         On Claim 13, my understanding of the --
20         THE COURT: Now, this has to do with what
21  you anticipate cross-examining Dr. Buller on. That's
22  what you are focusing on?
23         MR. BADENOCH: Yes, in part.
24         THE COURT: So tell me exactly what subjects
25  you intend to cross-examine him on.

Page 556

1         MR. BADENOCH: Well, I intend to go into his
2  understanding THAT it's a structure claim. I'm not going
3  to put up the Snyder slides that counsel is complaining
4  about with him, but I'm going to explain this is a
5  structure claim. And then I'm going to talk about -- in
6  fact, I can go into a little bit more detail. Your Honor,
7  if we're going to discuss my outline for Dr. Buller, maybe
8  he should step outside for just a minute.
9         THE COURT: All right. Dr. Buller, if you
10  would step out for just a minute.
11         Thank you.
12         MR. DISKANT: Perhaps to speed this along, let
13  me just be clear what I object to. Mr. Badenoch wants to
14  examine Dr. Buller about Claim 23 and isn't it a structure
15  claim. They can have at it as long as they want. I don't
16  object to that.
17         I object to comparing it to other claims in
18  the patent which implicitly suggest those comparisons
19  are relevant to any issue in this case when they are not.
20         So that is the focus of my objection. If you
21  are going to only examine about 23 and whether it's a --
22  that's fine. If there are other claims that could be
23  asserted or shouldn't be asserted or Claim 13 has been
24  cancelled, that's not fine. I don't object to
25  questioning about what the file wrapper said about the

Page 557

1  thickness.
2         MR. BADENOCH: It's my turn.
3         MR. DISKANT: I understand. I just wanted
4  perhaps to move it along.
5         MR. BADENOCH: The problem, your Honor, is
6  for the jury to understand this, to show them a method
7  claim and say, now, this is a method claim, it's not like
8  Claim 23, that --
9         THE COURT: If there's no dispute that Claim
10  23 -- well --
11         MR. BADENOCH: No, because what's happening,
12  your Honor, is they are trying the case based on the
13  unobviousness of the method, and we've got to bring that
14  back. We won't suggest that there's any -- you know,
15  that there's some suspicious reason why the other claims
16  are in the case or that the jury should speculate or
17  anything like that. That's what I understood the
18  complaint was about the opening. We won't say that.
19         If we talk about other claims with any of
20  the witnesses today, it is only to make the jury
21  understand that this is not a method claim, that a
22  method claim looks like this, that this is not a
23  balloon claim, the claim with a balloon in looks like
24  this. And that's all we're going to do with it. And
25  that, I think, is important for the jury to understand

Page 558

1 what the issue actually is.
2       And I would also just add that in Dr.
3 Snyder's expert report, we have not changed theory on
4 this. We did argue it both ways.
5       THE COURT: Where else is it?
6       MR. BADENOCH: I'm sorry?
7       THE COURT: I said where in his report --
8 ·      MR. BADENOCH: In Paragraph 7, your Honor,
9 the first sentence was, the Palmaz abstract and then
10 someone would look for Ersek to work in that. But the
11 next sentence is, on Page 2, moreover, I also expect to
12 testify that the Ersek patent describes and illustrates
13 a particular design for an expandable intraluminal graft
14 that one of ordinary skill in the art who knew about
15 balloon angioplasty and who read the abstract would have
16 understood could be used as a balloon expandable stent.
17       And that is our case. We are using the
18 abstract. We are using the idea that Ersek is almost
19 exactly like the structure and to the extent someone
20 wanted to use it as a stent like Palmaz, it would be
21 obvious from what you know of balloon angioplasty to make
22 slight modifications and do that.
23       THE COURT: All right.
24       MR. BADENOCH: And that's in the report.
25       THE COURT: I do have his report and we all

Page 559

1 know that if an expert goes beyond the bounds of his
2 report, two things happen: Either he will be asked to
3 step down or, if we go beyond that, you might be charged
4 for the amount of time in the trial.
5       So I've got his report. I understand that
6 there's no objection -- well, I'm not sure where the
7 objections are. I'm going to allow the cross-examination
8 to go forward but, as I've said on more than one occasion
9 now, we are not writing on a blank slate and I, quite
10 frankly, am not comfortable with using the file history
11 to try this case when the Federal Circuit has reviewed
12 the file history and -- well, and didn't enter judgment
13 on it, and I have not entered judgment on it, and I'm
14 not confident what relevance it has at this point.
15       MR. BADENOCH: Your Honor, can I just say one
16 thing on that?
17       THE COURT: One thing. Then we need to get
18 the jury.
19       MR. BADENOCH: Yes, I understand.
20       On the point of how you measure thickness,
21 the Federal Circuit made a comment. The Court decided
22 that was not intended to be part of the claim
23 construction mandate, so we respect that.
24       Cordis has argued that you can interpret how
25 you measure thickness by reading the specification. And

Page 560

1 they pointed to a passage about that. And that's about
2 the preferred embodiment, when you cut the stent from a
3 tube.
4       They also told, in the public record, that
5 you measure thickness a different way when you are
6 talking about a tube with twisted struts. And we have to
7 be able to point that out. That's the only thing we're
8 doing.
9       On that issue, what the public record says
10 about how you measure thickness, is highly relevant.
11       THE COURT: All right. We're still not having
12 a patent law expert to tell me that, though.
13       All right. Let's bring the jury in.
14       You need to get Dr. Buller in.
15       MR. BADENOCH: Yes, your Honor.
16       Will we address, then, later, the testimony
17 from Mr. Witherspoon?
18       THE COURT: What testimony for whom?
19       MR. BADENOCH: Mr. Witherspoon is to be the
20 patent expert, but he's not going to testify about the
21 law and he's not going to testify about anything other
22 than how the jury can find things in the file wrapper,
23 which is exactly what experts normally do.
24       THE COURT: I have not allowed an expert
25 witness here since I started showing the tape.

Page 5

1       MR. BADENOCH: It's certainly not going to
2 overlap the tape, your Honor. We'll make the proffer.
3       THE COURT: I don't believe so.
4       As far as I'm concerned, if your expert is
5 using the file history as his guide for how to do the
6 measurements, then your expert must have reviewed the
7 file history and can point it out. We don't need a
8 patent law expert to do that.
9       And if he did not use the file history, then
10 there's no relevance to it anyway.
11       MR. BADENOCH: The difference, of course, is
12 he's talking about the technical meaning of the subject
13 matter, which Mr. Witherspoon can't. Mr. Witherspoon
14 can explain where you find these things.
15       THE COURT: Well, but the expert must have
16 found it to use it.
17       MR. BADENOCH: Well, the expert can find it,
18 of course.
19       THE COURT: Yes.
20       MR. BADENOCH: The jury is not as -- as he is
21 in finding their way of big volumes.
22       THE COURT: Well, page numbers are a page
23 number. An expert who looked at it to do his
24 calculations can look at it and explain to the jury where
25 he looked for his analysis.

# Exhibit
# WW



Jury Trial - Volume P                    CondenseIt™                    Friday, December 15, 2000

```
                - VOLUME P -
         IN THE UNITED STATES DISTRICT COURT
        IN AND FOR THE DISTRICT OF DELAWARE
                - - - - -
CORDIS CORPORATION,              :    CIVIL ACTION
                                :
         Plaintiff              :
                                :
    vs.                         :
                                :
MEDTRONIC AVE, INC., et al.,    :    NO. 97-550 (SLR)
                                :
BOSTON SCIENTIFIC               :    CIVIL ACTION
CORPORATION, et al.,            :
                                :
         Plaintiffs             :
                                :
    vs.                         :
                                :
ETHICON, INC., et al.,          :
                                :
         Defendants             :    NO. 98-19 (SLR)
                                     - - - -
CORDIS CORPORATION,             :    CIVIL ACTION
                                :
         Plaintiff              :
                                :
    vs.                         :
                                :
BOSTON SCIENTIFIC               :
CORPORATION, et al.,            :
                                :
         Defendants             :    NO. 98-197 (SLR)

                         Wilmington, Delaware
                         Friday, December 15, 2000
                         7:35 o'clock, a.m.
                    - - - - -

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
                    - - - - -

                    Official Court Reporters
```

```
 1  APPEARANCES:
 2
 3      ASHBY & GEDDES
        BY: STEPHEN J. BALICK, ESQ.
 4
 5
 6      PATTERSON, BELNAP, WEBB & TYLER, LLP
        BY: GREGORY L. DISKANT, ESQ.
 7          EUGENE M. GELERNTER, ESQ.
            WILLIAM F. CAVANAUGH, ESQ. and
 8          MICHAEL J. TIMMONS, ESQ.
            (New York, New York)
 9
10          -and-
11
12      JOHNSON & JOHNSON
        BY: ERIC I. HARRIS, ESQ.
13
            Counsel for Plaintiffs
14
        YOUNG, CONAWAY, STARGATT & TAYLOR
15      BY: JOSY W. INGERSOLL, ESQ.
16
17          -and-
18      KENYON & KENYON
        BY: GEORGE E. BADENOCH, ESQ.
19          PAUL A. BONDOR, ESQ.,
            ALBERT J. BRENESSEN, ESQ.
20          MICHAEL ZACHARY, ESQ. and
            ARTHUR GRAY, ESQ.
21          (Washington, D.C.)
22          Counsel for Defendants
23          - - - - -
24
25
```

```
 1                P R O C E E D I N G S
 2
 3
 4      (Proceedings commenced at 7:35 o'clock a.m.,
 5  and the following occurred without the presence of the
 6  jury.)
 7
 8      THE COURT: Good morning.
 9      Let's get down to business. I guess we will
10  go through the jury instructions then the verdict, so that
11  we all have time to gather ourselves before we actually
12  present this to the jury. I guess we can go page by page,
13  or if you want to tell me the first -- wait a minute.
14      On Page 3, I have not stricken things from the
15  record at this point. So do I have everyone's permission
16  to cross out the instruction. Yes.
17      That is Page 4, Page 5 --
18      MR. GRAY: Your Honor, I think we are up through
19  Page 10, with the deposition.
20      THE COURT: Anything before Page 13 from
21  Cordis?
22      MR. DISKANT: No, your Honor.
23      MR. GRAY: Your Honor, 14, at least one valid
24  patent claim, we don't see a reason for the at least.
25      THE COURT: Because you found, okay.
```

```
 1      MR. GRAY: In the third line, where it says
 2  entitled to the full amount of damages, we don't see the
 3  need for the word full.
 4      THE COURT: That is true. They are entitled
 5  to a full amount of damages.
 6      MR. GRAY: Full implies more than --
 7      THE COURT: It implies a complete, not an
 8  overflowing amount of damages, or does not imply something
 9  more than they are entitled to.
10      MR. GRAY: Total amount.
11      MR. DISKANT: It is the right amount.
12      MR. GRAY: It seems to have a connotation,
13  your Honor. Maybe it's just me.
14      THE COURT: We will leave it at full.
15      MR. DISKANT: Your Honor, when we take out
16  the word at least, it gives a strange emphasis to the
17  one. It seems to me we should say because you found
18  Claim 23 of the '762 patent to be valid and infringed,
19  then keep going.
20      MR. GRAY: That would be fine, your Honor.
21      THE COURT: All right. 15.
22      MR. GRAY: In the second paragraph, your
23  Honor, it says it is not relevant to the question of
24  damages. I think more properly, it is not relevant to
25  the question of lost profits, to a reasonable royalty,
```

Page 3869

1 for world. But for infringement we would have kept right
2 on selling $500 million of stents a year and more in a
3 growing market. It's a phony issue.
4         They showed you charts from 1998 and said,
5 Oh, look, they only made 70,000 stents. Look at how
6 little capacity they had. We had closed the plants. We
7 had laid off the worse. People weren't buying our stents
8 because they had taken our market share with infringing
9 stents. Capacity is a phony issue.
10        I didn't see that 725,000 stent unit
11 documenting backup. I showed you. The small units,
12 386,000, shows J&J had enormous capacity to make stents.
13 I didn't hear any discussion currently. We ramped back
14 up with BX Velocity from 4 percent, we are now at 20
15 percent of the market. Norman Noble can make 150,000
16 stents a month. Come on? What are we talking about
17 here?
18        I think this was my favorite moment. Mr.
19 Colbert said, It's hard to imagine anyone ravaging
20 Johnson & Johnson. I don't know. They did a pretty good
21 job. And now they say, Well, all right, we killed you,
22 so you couldn't have made enough stents. As I say, it's
23 a phony issue.
24        Oh, but by the way, when you look at their
25 numbers on Radius, they say they immediately could have

Page 3870

1 ramped up and been half the market with Radius.
2         One more point on Radius. He showed you the
3 chart where suddenly it goes from 68 percent to 50/50,
4 what's wrong with that argument? It's very simple.
5 Cordis had a minimal market share, from '98 until BX
6 Velocity came out. Why? We were competing against other
7 balloon expandable stents. If a doctor is going to pick
8 a balloon expandable stent, he had a choice. He could
9 use the AVE infringing stent, the ACS infringing stent
10 or the NIR infringing stent or the Cordis stents. Of
11 course, we had a small market share. The question you
12 have to ask yourself is, take those three players out of
13 the market, and what do you have? You have what the
14 market looked like in 1996 and 1997. And no self-
15 expanding stent would have changed that reality.
16        Talk about ACS for a moment.
17        Can I have X-31162, please?
18        There is no reference to the second diameter
19 there. And I listened for an hour and ten minutes
20 waiting for Mr. Colbert to respond to the picture that I
21 put up, which explains why there is no reference to the
22 second diameter there.
23        Can I have X-31835, please?
24        It's because you can't have it in a common
25 cylindrical plane in the second diameter, because it is

Page 3871

1 expanded in a vessel. And it conforms to the vessel.
2 That's why we are only talking about it in the first
3 diameter. This definition of wall surface is talking
4 about it in the unexpanded form. Why? Because in the
5 expanded form, this is what it looks like. It's not in
6 a common cylindrical plane at that point. It can't be.
7         They put up Ersek X-31889. They put up the
8 language, but I kept waiting to see if Mr. Colbert would
9 respond to what I showed you, which is, when we are
10 talking about the fixation sleeve and outwardly projecting
11 edges, what are we talking about. We made it darned clear
12 to the Patent Office what we were talking about. We are
13 talking about it in the first diameter, unexpanded. How
14 do we know that? As is evident from the specification of
15 the patent with particular reference to Figure 1A. You
16 folks have the patent. Go look at Figure 1A. What is it?
17 Unexpanded, in the first diameter. That's all
18 we are talking about here. Why? That's all we can talk
19 about, because once it's expanded in a vessel, it reacts
20 to the vessel. If the vessel has plaque -- you saw the
21 pictures, they never addressed those pictures. Why?
22 They can't. Again, it's another phony issue.
23        They showed you measurements, references to
24 measurements, measurements taken in air. Again, Dr.
25 Snyder, why didn't he measure it in the pig vessel that

Page 3872

1 he tested? He didn't. He measured it in air. A stent
2 doesn't -- isn't designed to function in air. It
3 functions in a vessel, in a diseased vessel.
4         At the end of the day, the Multi-Link
5 infringes Claim 23. Literally and certainly under the
6 doctrine of equivalents. You folks have been through
7 this exercise before, this is a much, much easier exercise.
8 No issues about welds. No issues about use protruding.
9 Walk through the claim and you will see all the elements
10 are there. Both literally and under the doctrine of
11 equivalents. Function, way and result are all the same
12 with respect to the ACS Multi-Link when you look at the
13 claim elements of Claim 23.
14        Cost. There was a reference to, you know, we
15 had the data, you know, they didn't. Folks, we have
16 produced millions and millions of pages of documents. If
17 Dr. Bell could have figured out how to make his cost issue
18 make sense, he had the data to do it.
19        The problem is, as I have said at the
20 beginning, we have a factory. We make lots of things at
21 that factory. We make balloons. We make catheters. We
22 make guidewires. We make stents. Dr. Bell has
23 arbitrarily said, Well, I can divine how much of the
24 air-conditioning, how much of plant overhead, should be
25 ascribed to each of those products. We don't do it that

Page 3877

1
2      MR. CAVANAUGH (Continuing): People can't come
3  into the market and infringe, take sales away from the
4  companies, propose lowball royalty rates and get away with
5  it. That's why the law requires that infringers pay the
6  full amount of damages.
7      I want to thank you again for your time.
8      One of my colleagues just handed me a note
9  that said I made a mistake.
10     In calculating the reasonable royalty, you
11 look at Boston's average selling price of $1,710. That's
12 how we get to our $115 million, because the royalty is
13 based on their selling price, which was substantially
14 higher than ours.
15     I want to thank you again for your time.
16 It's been -- as I said at the outset, it's been a long
17 process and all of us are very thankful four your
18 attention and your diligence and your service. Have a
19 good weekend.
20     THE COURT: The question is, I have about 30
21 pages -- 39 pages of instructions, not as long as the
22 original batch, but still some. Would you like a break
23 before I read them?
24     All right. Why don't we hand them out, so you
25 can follow along.

Page 3878

1      Oh. We don't have the new ones yet? All right.
2  (Pause.)
3      THE COURT: If she is not back in a minute, we
4  will take a short break.
5      (Deputy Court Clerk returned and distributed
6  the instructions.)
7      MR. COLBERT: Thank you.
8      MR. CAVANAUGH: Thank you, Betty.
9      THE COURT: All right. Are we all set?
10     Members of the jury, I will now instruct you
11 about the law that you must follow in reaching your
12 verdict on the damages phase of the case.
13     As I did before your earlier deliberations, I
14 will start by explaining your duties and the general rules
15 that apply in every civil case, and then I will explain
16 some rules that you must use in evaluating particular
17 testimony and evidence. The reason I am repeating these
18 rules is that they are very important.
19     Then I will explain the positions of the
20 parties and the law you will apply in the damages phase
21 of the case.
22     And last, as I have before, I will explain
23 the rules that you must follow during your deliberations
24 in the jury room, and the possible verdicts that you may
25 return.

Page 3879

1      Please listen very carefully to everything I
2  say.
3      You have two main duties as jurors. The first
4  one is to decide what the facts are from the evidence that
5  you saw and heard here in court. Deciding what the facts
6  are you is your job, not mine, and nothing that I have
7  said or done during this trial was meant to influence your
8  decision about the facts in any way.
9      Your second duty is to take the law that I
10 give you, apply it to the facts, and decide the amount of
11 damages Cordis is entitled to by a preponderance of the
12 evidence. It is my job to instruct you about the law,
13 and you are bound by the oath that you took at the
14 beginning of the trial to follow the instructions that I
15 give you, even if you personally disagree with them.
16 This includes the instructions that I gave you before
17 and during the trial, and these instructions. All the
18 instructions are important, and you should consider them
19 together as a whole.
20     Perform these duties fairly. Do not let any
21 bias, sympathy or prejudice that you may feel toward one
22 side or the other influence your decision in any way.
23     You must make your decision based only on the
24 evidence that you saw and heard here in court. Do not
25 let rumors, suspicions or anything else that you may have

Page 3880

1  seen or heard outside of court influence your decision in
2  any way.
3      The evidence in this case includes only what
4  the witnesses said while they were testifying under oath
5  and the exhibits that I allowed into evidence. Nothing
6  else is evidence. The lawyers' statements and arguments
7  are not evidence. Their questions and objections are
8  not evidence. My legal rulings are not evidence. My
9  comments and questions are not evidence.
10     During the trial, I may have not let you hear
11 the answers to some of the questions that the lawyers
12 asked. I also may have ruled that you could not see some
13 of the exhibits that the lawyers wanted you to see. You
14 must completely ignore all of those things. Do not even
15 think about them. Do not speculate about what a witness
16 might have said or what an exhibit might have shown.
17 These things are not evidence, and you are bound by your
18 oath not to let them influence your decision in any way.
19     Make your decision based only on the evidence,
20 as I have defined it here, and nothing else.
21     You should use your common sense in weighing
22 the evidence. Consider it in light of your every-day
23 experience with people and events, and give it whatever
24 weight you believe it deserves. If your experience tells
25 you that certain evidence reasonably leads to a conclusion,

Page 3889

1 Wall stent do not infringe Claim 23 of the '762 patent.
2 The parties also agree that the Cook GR 1 and GR 2 stents
3 and the Medtronic Wiktor stents were licensed by Cordis
4 and that they were lawfully on the market as of the date
5 that they became licensed.
6      However, Cordis and Boston Scientific disagree
7 as to whether those stents would have been acceptable
8 substitutes for the patented products. Boston Scientific
9 contends that they would have been acceptable substitutes,
10 while Cordis contends that they would not have been. In
11 reaching your conclusion on this issue, you must apply the
12 standard for what constitutes an acceptable substitute
13 that I just told you about.
14      Both Cordis and Boston Scientific agree that
15 the stents made by ACS are substitutes for the patented
16 products. The parties agree that the ACS stents are
17 noninfringing substitutes to the patented products after
18 April 3, 2000, because Cordis and ACS on that date entered
19 into a settlement agreement, which included a grant of a
20 license to ACS under the '762 patent.
21      Cordis and Boston Scientific differ as to
22 whether the ACS stents should be considered as
23 noninfringing substitutes prior to April 3, 2000. Cordis
24 contends that the ACS stents are not noninfringing
25 substitutes prior to that date because Cordis contends

Page 3890

1 that they infringed Claim 23 of the '762 patent prior to
2 that date. Boston Scientific contends that the ACS
3 stents are noninfringing substitutes because Boston
4 Scientific contends that they have never infringed the
5 '762 patent — and that should be infringed Claim 23 of
6 the '762 patent.
7      Cordis has the burden of proving that the ACS
8 stents should not count as noninfringing substitutes prior
9 to April 3, 2000 by a preponderance of the evidence.
10      You must, therefore, determine whether ACS's
11 stents infringe Claim 23 of the '762 patent. In making
12 this determination, you should apply the instructions
13 regarding infringement and the meaning of patent claims
14 in dispute contained on Pages 21 through 40 of the set of
15 jury instructions applicable to the earlier phase of the
16 trial.
17      If you find that the ACS stents infringe
18 Claim 23 of the '762 patent, then the ACS stents were not
19 a noninfringing substitute until April 3, 2000. If you
20 find that the ACS stents do not infringe Claim 23 of the
21 '762 patent, then the ACS stents were noninfringing
22 substitutes from the date ACS entered the United States
23 market, October 3, 1997.
24      Further, AVE markets the MicroStent, GFX 1,
25 GFX 2, and S series stents. It is agreed between the

Page 3891

1 parties that these stents infringe Claim 23 of the '762
2 patent, and, therefore, are not noninfringing substitutes.
3      During the course of the trial, you may have
4 heard about various settlement agreements between Cordis
5 and other parties, which may have licensed one or more of
6 the patents at issue in the liability phase of the trial.
7      Settlement agreements are not evidence
8 regarding the value of a patent, the validity of a patent,
9 or infringement of a patent. Parties settle lawsuits for
10 various business reasons that may have nothing to do with
11 respective views of the worth of any patent claim.
12 Therefore, you should not consider the fact that a party
13 entered into a settlement agreement as evidence that it
14 infringed a patent, or that it agreed that it infringed
15 the patent, or even that it believed it infringed a patent.
16      You must decide the issue of infringement for
17 yourselves.
18      As I said before, to establish its entitlement
19 to lost profits based on lost sales, one of the things
20 that Cordis must prove is that there was demand for the
21 patented products attributable to the claimed features of
22 that product. Demand for the patented products can be
23 proven by significant sales of Cordis' products or by
24 significant sales of Boston Scientific's products.
25      As I indicated before, Cordis is only entitled

Page 3892

1 to lost profits for sales it would have made but for the
2 infringement. Accordingly, to be entitled to its lost
3 profits based on additional sales that it claims it would
4 have made, Cordis must prove that it would have had the
5 ability to manufacture or otherwise obtain its product
6 to make those additional sales, as well as the marketing
7 capability to make those additional sales.
8      It is not necessary for Cordis to prove that
9 Cordis and Boston Scientific were the only two suppliers
10 in the market in order for Cordis to demonstrate
11 entitlement to lost profits for some of Boston Scientific's
12 sales. If the realities of the marketplace are such that
13 noninfringing substitutes were available from suppliers
14 who would have made only some, but not all, of the sales
15 that were made by Boston Scientific, then Cordis may be
16 entitled to lost profits on a percentage of the infringing
17 sales.
18      The burden is on Cordis, however, to show to
19 a reasonable probability that it would have sold that
20 percentage if the NIR stents had never existed. By the
21 same token, even if you find that Cordis and Boston
22 Scientific would have been the only two suppliers of
23 products having the advantages of the patented product,
24 it does not necessarily mean that Cordis would have made
25 all of Boston Scientific's sales. The burden is on Cordis

# Exhibit
# XX

Jury Trial - Volume N                 CondenseIt™              Wednesday, December 13, 2000

Page 3258

```
                - VOLUME N -
        IN THE UNITED STATES DISTRICT COURT
        IN AND FOR THE DISTRICT OF DELAWARE

 3  CORDIS CORPORATION,         :   CIVIL ACTION
 4            Plaintiff         :
 5       vs.                    :
 6  MEDTRONIC AVE, INC., et al. :   NO. 97-550 (SLR)
 7  BOSTON SCIENTIFIC           :   CIVIL ACTION
    CORPORATION, et al.,        :
 8            Plaintiffs        :
 9       vs.                    :
10  ETHICON, INC., et al.,      :
11            Defendants        :   NO. 98-19 (SLR)
12  CORDIS CORPORATION,         :   CIVIL ACTION
13            Plaintiff         :
14       vs.                    :
15  BOSTON SCIENTIFIC           :
16  CORPORATION, et al.,        :
17            Defendants        :   NO. 98-197 (SLR)

                        Wilmington, Delaware
18                      Wednesday, December 13, 2000
19                      9:40 o'clock, a.m.

20  - - - - -

21  BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

22  - - - - -

23                      Official Court Reporters
24
25
```

Page 3259

```
 1  APPEARANCES:
 2
 3      ASHBY & GEDDES
        BY: STEPHEN J. BALICK, ESQ.
 4
        -and-
 5
 6      PATTERSON, BELKNAP, WEBB & TYLER, LLP
        BY: GREGORY L. DISKANT, ESQ.
 7          EUGENE M. GELERNTER, ESQ.
            WILLIAM F. CAVANAUGH, ESQ. and
 8          MICHAEL J. TIMMONS, ESQ.
            (New York, New York)
 9
10      -and-
11
        JOHNSON & JOHNSON
12      BY: ERIC I. HARRIS, ESQ.
13      Counsel for Plaintiffs
14
        YOUNG, CONAWAY, STARGATT & TAYLOR
15      BY: JOSY W. INGERSOLL, ESQ.
16
        -and-
17
18      KENYON & KENYON
19      BY: GEORGE E. BADENOCH, ESQ.
            PAUL A. BONDOR, ESQ.
20          ALBERT J. BRENEISEN, ESQ.
            MICHAEL ZACHARY, ESQ. and
21          ARTHUR GRAY, ESQ.
            (Washington, D.C.)
22      Counsel for Defendants
23
        - - - - -
24
25
```

Page 3260

## PROCEEDINGS

(Proceedings commenced at 9:40 o'clock a.m., and the following occurred without the presence of the jury.)

THE COURT: I understand we have an issue. I have had an emergency to take care of. So if it has to be addressed before the morning break, we will. Otherwise, I have held the jury up and would like to get proceeding.

Mr. Cavanaugh?

MR. CAVANAUGH: I don't know what it is, your Honor.

THE COURT: Mr. Walker.

MR. WALKER: We wanted to confirm how you would like us to handle — we anticipate we will want to make a few motions after they rest their case and we would like to know how you would like to handle that in front of the jury.

THE COURT: You do not handle it in front of the jury. We have motions and I will take them sometime when the jury is not here.

Let's bring the jury in. And I apologize for holding you all up.

Page 3261

(At this point the jury entered the courtroom and took their seats in the box.)

THE COURT: Members of the jury, I had to deal with some issues. I am the one who held you up. I apologize.

We will continue at this point.

Mr. Cavanaugh.

MR. CAVANAUGH: Thank you, your Honor. Good morning, ladies and gentlemen.

Our next and last witness will be Mr. Jesse Penn, who is the President of Cordis Cardiology. He is going to talk to you about manufacturing and capacity issues.

- - -

PLAINTIFF'S TESTIMONY

CONTINUED

... JESSE R. PENN, having been duly sworn as a witness, was examined and testified as follows ...

DIRECT EXAMINATION

BY MR. CAVANAUGH:

Q. Mr. Penn, what is your current position?

A. I am the President of Cordis Cardiology USA.

Q. When did you begin working for Johnson & Johnson?

Jury Trial - Volume N                    Condenselt™                    Wednesday, December 13, 2000

Page 3330

1  Q. Now, when the cardiologist selects the stent, how
2  does he select the length of the stent?
3  A. Well, you have to make sure you cover the whole
4  lesion or the whole narrowing. So if you have a length of
5  the vessel this long and you want to repair that and put a
6  stent in, you wouldn't pick a stent that is exactly as
7  long as the narrowing because, if you misplace the stent
8  by even a fraction of a millimeter, you will have a little
9  bit of that material hanging over the edge of the stent,
10  which is a result you wouldn't want.
11      So you always need to pick a stent that is a
12  little bit longer than the lesion, than the narrowing you
13  were repairing.
14  Q. So with a Multi-Link, would there always be
15  projecting edges that could imbed that are going beyond
16  the lesion area?
17  A. Right. Regardless of what you think the material
18  on the inside would do to the behavior of the stent, you
19  always have more healthy tissue at either end that you're
20  anchoring into.
21  Q. Okay. One last subject. I'd like to now talk for
22  a moment about the doctrine of equivalents in Claims 13
23  and 23. Do you have an understanding of the doctrine of
24  equivalents?
25  A. Generally, yes.

Page 3331

1  Q. Could you explain to the jury your understanding?
2  A. Well, the way I understand it is for something to
3  be, one product to be equivalent to a description in a
4  patent that the accused product has to basically do the
5  same thing, do it in basically the same way and get
6  essentially the same result in order to be considered
7  equivalent.
8  Q. So how does the ACS Multi-Link compare from a
9  doctrine of equivalents perspective to Claim 13?
10  A. Well, I think it works in a very different way. So
11  it shouldn't be considered equivalent.
12  Q. What is the different way? Could you explain that,
13  please?
14  A. The design intent of the Palmaz and the Palmaz
15  patent is for the device to keep this common cylindrical,
16  this very low profile in both states. In the unexpanded
17  state to help with insertion and then the expanded state
18  to keep the profile of the stent low in the vessel. The
19  design intent in the ACS stent is to intentionally flare
20  out and get superior anchoring in the vessel, reduce the
21  chances that the stent will move.
22  Q. And how does the ACS Multi-Link compare to the prior
23  art in connection with the Medinol?
24  A. It's using the same thing. It's using twisting of
25  the metal using outwardly projecting edges in both cases

Page 3332

1  to achieve this anchoring.
2      MR. BRENEISEN: Could we just highlight the
3  wall surface having a substantially uniform thickness?
4  And also a thin-walled tubular member?
5  BY MR. BRENEISEN:
6  Q. Do you, in your opinion, find there is an
7  equivalent -- let me start over. How, in your opinion,
8  did the ACS stents compare to the portion of Claim 13
9  which calls for a thin-walled tubular member having first
10  and second ends and a wall surface to the wall surface
11  having a substantially uniform thickness?
12  A. In both cases, in the expanded state they don't
13  exist in the ACS stent.
14  Q. And is there any equivalent in the ACS stent to what
15  is set forth in Claim 13?
16  A. No. Because the ACS stent is trying to get
17  something that is not thin-walled and not of uniform
18  thickness.
19      MR. BRENEISEN: I have nothing further, your
20  Honor.
21      THE COURT: All right. I think it's time for
22  our morning break, so before we start cross-examination,
23  let's take 15 minutes.
24      (Short recess taken.)
25          - - -

Page 3333

1
2      (Court resumed after the recess.)
3
4      THE COURT: Anything before we bring the jury
5  in?
6      MR. DISKANT: No, your Honor.
7      THE COURT: We'll stop at 1:00, come back at
8  1:30 and go to 3:30.
9      (At this point the jury entered the courtroom
10  and took their seats in the box.)
11      THE COURT: Mr. Diskant.
12      MR. DISKANT: Thank you, your Honor.
13          CROSS-EXAMINATION
14  BY MR. DISKANT:
15  Q. Good morning, Dr. Snyder.
16  A. Good morning.
17      MR. DISKANT: Can we have the picture on the
18  screen?
19  BY MR. DISKANT:
20  Q. Just see if we can have common ground. The ACS
21  stent, looking here at the unexpanded, I guess this is
22  the TriStar, is designed to provide a certain amount of
23  outward pressure when it is expanded and implanted in a
24  diseased tissue?
25  A. Right. The outwardly projecting edges they're called.

# Exhibit
# YY

Jury Trial   Volume J

Page 2480

```
 1              - VOLUME J -
 2      IN THE UNITED STATES DISTRICT COURT
        IN AND FOR THE DISTRICT OF DELAWARE
 3  CORDIS CORPORATION,            :   CIVIL ACTION
 4          Plaintiff             :
 5       vs.                      :
 6  MEDTRONIC AVE, INC., et al.   :   NO. 97-550 (SLR)
 7  BOSTON SCIENTIFIC             :   CIVIL ACTION
    CORPORATION, et al.,          :
 8          Plaintiffs           :
 9       vs.                      :
10  ETHICON, INC., et al.,        :
11          Defendants           :
12                               :   NO. 98-19 (SLR)
    CORDIS CORPORATION,           :   CIVIL ACTION
13          Plaintiff            :
14       vs.                      :
15  BOSTON SCIENTIFIC             :
    CORPORATION, et al.,          :
16                               :
17          Defendants           :   NO. 98-197 (SLR)
18                                   Wilmington, Delaware
19                                   Thursday, December 7, 2006
                                     7:35 o'clock, a.m.
20
21  BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
22
23
24              Official Court Reporters
25
```

Page 2481

```
 1  APPEARANCES:
 2
 3      ASHBY & GEDDES
        BY: STEPHEN J. BALICK, ESQ.
 4
 5
 6      PATTERSON, BELKNAP, WEBB & TYLER, LLP
        BY: GREGORY L. DISKANT, ESQ.
 7          EUGENE M. GELERNTER, ESQ.
            WILLIAM F. CAVANAUGH, ESQ. and
 8          MICHAEL J. TIMMONS, ESQ.
            (New York, New York)
 9
10              -and-
11
12      JOHNSON & JOHNSON
        BY: ERIC I. HARRIS, ESQ.
13
            Counsel for Plaintiffs
14
15      YOUNG, CONAWAY, STARGATT & TAYLOR
        BY: JOSY W. INGERSOLL, ESQ.
16
17              -and-
18
19      KENYON & KENYON
        BY: GEORGE E. BADENOCH, ESQ.
20          PAUL A. BONDOR, ESQ.
            ALBERT J. BRENEISEN, ESQ.,
21          MICHAEL ZACHARY, ESQ. and
            ARTHUR GRAY, ESQ.
22          (Washington, D.C.)
23          Counsel for Defendants
24              - - - - -
25
```

Page 2482

```
 1
 2              P R O C E E D I N G S
 3
 4          (Proceedings commenced at 7:35 o'clock a.m.,
 5  and the following occurred without the presence of the
 6  jury.)
 7
 8          THE COURT:  All right.  A couple preliminary
 9  explanations, so then we can go through this for purposes
10  of stating your objections for the record, correcting
11  typos, making minor revisions.
12          First of all, with -- and I don't know where
13  we stand with this, but in terms of whether there still
14  is a question of prosecution history estoppel before the
15  '762 patent, having reviewed the new Circuit case in
16  Festo, and I have no idea, this is on Page 24 of 80 or
17  whatever I have of Lexis.  I think clearly that's a
18  question for the Court.
19          And so, if it's an issue, it's not an issue for
20  the jury.
21          MR. GRAY:  Your Honor, I'm sorry, but may I
22  just interrupt for a second?
23          THE COURT:  Yes.
24          MR. GRAY:  We agree.  We have a JMOL on that
25  issue I would like to hand up (handing documents to the
```

Page 2483

```
 1  Court).
 2          THE COURT:  With respect to contributory
 3  infringement, we struggled -- we being me and my Law
 4  Clerks -- struggled with the question, and I didn't find
 5  the -- I didn't find the case law particularly persuasive
 6  but for one case, because this one case is the only one
 7  that actually addressed the issue.  Everything else, it
 8  was just trying to look at the facts and divine what the
 9  situation was.
10          And this is the case from the Northern District
11  of California, 1999.  I have no idea how to pronounce this.
12  Farugia (phonetic) Laboratories.  That Court said there's
13  got to be some connection.  It's not a substantial
14  relationship.  It's not no connection.  It's some
15  connection.
16          Now, I, frankly, don't know whether that has
17  been established.  I think its posit has been established.
18          So if we need, we can try to fit in argument
19  about that, but that's why I chose that language.  It's
20  based on that case.
21          MR. DISKANT:  Your Honor, we disagree with it
22  as a matter of law and, therefore, object to the charge,
23  but on my rebuttal with Dr. Buller, I will make sure it
24  gets connected up.  So I don't think there will be a
25  factual problem.
```

Jury Trial - Volume J                    Condenselt™              Thursday, December 7, 2000

---

Page 2744

1 in the wall surface of a tubular member as by the removal
2 of material.
3         Smooth surface. The outside of a wall surface
4 of the unexpanded tubular member has a continuously even
5 surface without roughness, points, bumps or ridges,
6 especially to the touch.
7         Terms found in the asserted claims of the '332
8 patent:
9         Segment. A piece or separate fragment of
10 something, one of the constituent parts into which a body
11 is or may be divided.
12         Generally tubular shape. The phrase segment
13 having a generally tubular shape is broader in scope than
14 the phrase tubular member and may encompass segments that
15 are not perfectly hollow, elongated or cylindrical in
16 shape.
17         Plurality of openings. More than one opening.
18 That is more than one breach or aperture.
19         Openings forming a series of alternating open
20 and closed portions. All openings have open and closed
21 portions. The closed portions comprising the materials --
22 the material that gives form to or encloses the openings.
23 It serves to block or shut off entry or passage in some
24 fashion.
25         The claim requires that the openings in the

---

Page 2745

1 segment alternate around the circumference so that each
2 end of a segment consists of alternating open and closed
3 portions.
4         The Court construes the phrase at issue to
5 mean a combination of openings, some of which are opened,
6 that is without a closing material at the end of the
7 segment, thus permitting ingress and egress and some of
8 which are closed, that is having a closing material at
9 the end of the segment, thus blocking the shutting off
10 entry of passage.
11         Connector. Discrete structure disposed or
12 particularly arranged between adjacent tubular members in
13 order to join them together. The language of the claim,
14 that is comprising a connector, does not require that the
15 claim be limited to a single connector.
16         Whereby each of the segments may be displaced
17 at an angle with respect to the longitudinal axis of an
18 adjacent segment, when the stent is delivered through a
19 curved portion of the access or coronary arteries.
20         Displaced means to remove from the usual
21 proper place, to put out of place.
22         And angle is a figure formed by two lines
23 diverging from the same point or by two services diverging
24 from the same point.
25         Axis is defined as a straight line with

---

Page 2746

1 respect to which a body or figure or system of points is
2 either radially or bilaterally symmetrical.
3         The phrase modifies the word segment. The
4 phrase is written in the case that the entire segment,
5 not a portion thereof, must be capable of angular
6 displacement with respect to the longitudinal axis of
7 the adjacent segment, not a portion thereof. In light of
8 the specification which speaks only in terms of the
9 connector being disposed to flexibly connect, rather than
10 in terms of flexible segments, the Court concludes that
11 the limitation requires relatively rigid segments and
12 relatively flexible connectors.
13         Terms found in the asserted claims of the
14 '312 and '370 patents.
15         Undulating. Rising and falling in waves,
16 thus having at least a crest and a trough.
17         Longitudinals and longitudinal structures.
18 Structures that extend or run lengthwise in the direction
19 of the stent's longitudinal axis. Although there is no
20 requirement that the longitudinals or longitudinal
21 structures extend the entire length of the stent, the
22 structures have to extend long enough to be considered
23 continuous across a number of points of support.
24         Closed perimeter sells. A relatively small
25 area on the perimeter of the stent that is bounded on all

---

Page 2747

1 sides by continuous metal.
2         The word closed means to block or shut off
3 entry or passage.
4         The word perimeter means the boundary of a
5 closed plane figure, outer limits.
6         Zig-zag segments. A portion of the stent that
7 has one or more short sharp turns or angles.
8         Stent or stent structure. A device used to
9 support, expand or hold open an artery or other body
10 passageway.
11         A patent owner may enforce his right to
12 exclude others from making, using or selling the patented
13 invention by filing a lawsuit for patent infringement. A
14 company accused or threatened with an accusation of patent
15 infringement may bring a lawsuit against the patent holder
16 for declaratory judgment that it does not infringe the
17 patents and that the patents are invalid.
18         Here, Boston Scientific brought such a suit
19 for declaratory judgment, asserting that the NIR stent
20 did not infringe the '762 patent, and that this patent
21 is invalid. Cordis has sued Boston Scientific and has
22 alleged that the NIR stent infringes Claims 23 and 24
23 of the '762 patent, Claim 22 of the '332 patent, Claim
24 21 of the '312 patent, and Claims 25 and 26 of the '370
25 patent.

---

Cordis v. Boston, et al., CA No. 97-550 (SLR), etc.                    Page 2744 - Page 2747

**Page 2748**

1  Patent law provides that any person or
2  business entity which makes, uses or sells without the
3  patent owner's permission, any product apparatus or
4  method, legally protected by at least one valid claim of
5  the patent within the United States before the patent
6  expires infringes the patent.
7  Cordis is asserting that Boston Scientific
8  directly infringed all of the asserted claims except
9  Claim 44 of the '762 patent.
10  There are two ways in which a patent claim
11  may be directly infringed. First, a claim may be
12  literally infringed. Second, a claim may be infringed
13  under what is called the doctrine of equivalents. With
14  respect to Claim 44, Cordis does not claim that Boston
15  Scientific itself directly infringes the claim but, rather,
16  alleges that Boston Scientific is liable for contributory
17  infringement.
18  Boston Scientific denies all of Cordis'
19  infringement allegations.
20  The preambles to all the asserted claims use
21  the transitional phrase comprising. Comprising is
22  interpreted the same as including or containing. In
23  patent claims, comprising means that the claims are open-
24  ended. As such, the claim is not limited to only what
25  is in the claim based on its explanation. If you find

**Page 2749**

1  that the NIR stent includes each element in an asserted
2  claim, the fact that it may also include an additional
3  element is irrelevant. The presence of additional
4  elements in the NIR stent does not mean that the NIR
5  stent does not infringe an asserted claim.
6  For the NIR stent to literally infringe any
7  of the asserted patent claims, the subject matter of the
8  patent claim must be found in the NIR stent. In other
9  words, any of the asserted patent claims is literally
10  infringed if the NIR stent includes each and every element
11  in the asserted patent claim. If the NIR stent omits any
12  single element decided in a given patent, Boston
13  Scientific does not literally infringe that claim. You
14  must determine literal infringement with respect to each
15  asserted claim individually. Please remember the question
16  is whether the NIR stent infringes any asserted claims of
17  the patents and not whether the NIR stent is similar to a
18  product made by Cordis. Accordingly, you must be certain
19  to compare the NIR stent with the claim it is alleged to
20  infringe and not with any product made by Cordis.
21  If you have found that any of the asserted
22  claims is literally infringed, you may nonetheless
23  consider whether the NIR stent is so far changed in
24  principle from the literal words of the claim that a
25  doctrine called the reverse doctrine of equivalents is

**Page 2750**

1  applicable.
2  Application of the reverse doctrine of
3  equivalents is the exception, not the rule, and is limited
4  to those situations where a defendant's product is so far
5  changed in principle that, although it performs the same
6  or a similar function to produce substantially the same
7  result as that defined by a patent claim, it does so in
8  a substantially different way.
9  If you find noninfringement under the reverse
10  doctrine of equivalents then you should not consider
11  infringement under the doctrine of equivalents.
12  If you do not find literal infringement, you
13  may consider infringement under the doctrine of
14  equivalents. Under the doctrine of equivalents, you may
15  find that the NIR stent infringes an asserted patent
16  claim if, for each element of the claim that is not
17  literally present, the NIR stent contains an equivalent
18  of that element. This instruction applies only to the
19  claims of the '762 and '332 patents.
20  Cordis is not contending that the NIR stent
21  infringes the '312 or '370 patents under the doctrine of
22  equivalents. Application of the doctrine of equivalents
23  is the exception, however, not the rule. Patent claims
24  must be clear enough so that the public has fair notice
25  of what was patented.

**Page 2751**

1  Notice permits other parties to avoid actions
2  which infringe the patent and to design around the patent.
3  On the other hand, the patent owner should not be deprived
4  of the benefits of his patent by competitors who
5  appropriate an invention while avoiding the literal
6  language of the patent claims. The test to determine
7  equivalents under the doctrine of equivalents is whether
8  the differences between the claim element, which you have
9  found not to be literally present, and the element present
10  in the NIR stent are insubstantial. If you find that the
11  claim element and the element of the NIR stent have only
12  insubstantial differences, then you will have determined
13  that the element in the NIR stent is equivalent to the
14  claimed element.
15  On the other hand, if you find that the claim
16  element and the element in the NIR stent have substantial
17  differences, then you will have determined that the
18  element in the NIR stent is not equal, then, to the
19  claimed element.
20  In determining whether the differences are
21  substantial or insubstantial, you may also consider
22  whether or not the claimed element and the element in
23  the NIR stent perform substantially the same function in
24  substantially the same way to produce substantially the
25  same result. Keep in mind that the doctrine of equivalents

**Page 2752**

1  cannot be applied so as to effectively eliminate a claim
2  requirement in its entirety.
3       The question of whether there is a substantial
4  or insubstantial difference between the element found in
5  the NIR stent and the claimed element is to be determined
6  as of the time of the alleged infringement rather than at
7  the time the patent application was filed or the patent
8  issued.
9       You have heard evidence that Boston Scientific
10  has obtained patents on stents. In connection with that
11  evidence, I instruct you that the grant of a patent only
12  gives the patent owner the right to exclude others from
13  making, using or selling the invention. It does not give
14  the patent owner the right to make, use or sell an
15  invention.
16      For that reason, the device that is covered
17  by a subsequent patent may still infringe an earlier
18  patent. Nonetheless, in considering the issue of
19  infringement under the doctrine of equivalents, you may
20  consider that Boston Scientific obtained the patent,
21  which may be some evidence that the differences between
22  the NIR stent and the asserted claim elements are
23  substantial. Such evidence should be considered along
24  with other evidence, other similarities and differences
25  between the asserted claim elements and the NIR stent.

**Page 2753**

1       . You may find that the NIR stent represents an
2  improvement over the invention defined in the asserted
3  patent claims and even that it may have obtained patents
4  on these improvements. However, you are not to presume
5  that these facts mean that Boston scientific could not
6  have infringed the asserted patent claims. As long as
7  the NIR stent includes all of the elements of an asserted
8  claim, either literally or by equivalence then that
9  asserted claim is infringed by the NIR stent despite
10  Boston Scientific's improvements.
11          - - -
12      THE COURT (Continuing): On the other hand,
13  the fact that Boston Scientific has obtained patents on
14  these improvements may be considered in determining
15  whether or not the NIR stent is substantially different
16  from the asserted claims.
17      Boston scientific would be liable for directly
18  infringing an asserted patent in this case if you find
19  that Cordis has proven by a preponderance of the evidence
20  that Boston Scientific has sold or offered for sale the
21  invention defined in at least one of the asserted claims
22  of that patent.
23          - - -
24
25

**Page 2754**

1
2       THE COURT (Continuing): A person may directly
3  infringe a patent without knowledge that what he is doing
4  is an infringement of the patent. He may also directly
5  infringe, even though in good faith he believed that what
6  he is doing is not an infringement of any patent.
7       Cordis alleges that Boston Scientific has
8  directly infringed all of the asserted patents, but for
9  Claim 44 of the '762 patent. Cordis alleges that Boston
10  Scientific has indirectly infringed Claim 44.
11      Cordis does not contend that Boston Scientific
12  directly infringes Claim 44 of the '762 patent. Instead,
13  Cordis contends that Boston Scientific indirectly
14  infringes that claim by contributory infringement.
15      Contributory infringement of a claim that
16  describes a process is established where one offers for
17  sale a device which may be and ordinarily issues and is
18  sold with the intention of being used in the manner
19  described in the claim. That is the patent holder must
20  establish that a device was sold and used in carrying
21  out a process described in the claim of the patent, and
22  that the seller knew the product was especially made for
23  that purpose and not a staple article suitable for a
24  substantial noninfringing use.
25      Thus, Cordis must prove by a preponderance of

**Page 2755**

1  the evidence each of the following to establish
2  contributory infringement of Claim 44, which covers a
3  method of medical treatment:
4       One, that Boston Scientific sold or supplied
5  the NIR stent.
6       Two, that the NIR stent is not a staple
7  article of commerce capable of substantial noninfringing
8  use.
9       Three, that Boston Scientific sold or supplied
10  the NIR stent with knowledge that the NIR stent was
11  especially made for use in the manner claimed in Claim 44
12  in the '762 patent or that the NIR stent is actually used
13  in a manner that directly infringes the claim.
14      And, four, that every step of the method of
15  medical treatment described in Claim 44 is performed
16  either by a single entity or by different persons or
17  entities who have some connection to each other.
18      In determining whether the NIR stent is a
19  staple article of commerce, you should focus on the NIR
20  stent actually supplied by Boston Scientific and you
21  should take into account the quality, quantity and
22  efficiency of the suggested uses. That a product is
23  known to have potential infringing uses is not sufficient
24  to establish contributory infringement. You should also
25  consider in this regard the uses for which the NIR stent